UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

BOMBARDIER INC.,

          Plaintiff,

    v.

MITSUBISHI AIRCRAFT CORPORATION,
MITSUBISHI AIRCRAFT CORPORATION
AMERICA INC., AEROSPACE TESTING
ENGINEERING & CERTIFICATION INC.,
MICHEL KORWIN-SZYMANOWSKI,
LAURUS BASSON, MARC-ANTOINE
DELARCHE, CINDY DORNÉVAL, KEITH
AYRE, AND JOHN AND/OR JANE DOES 1-
88,

          Defendants.

No.  2:18-cv-1543

VERIFIED COMPLAINT

JURY DEMAND

Plaintiff Bombardier Inc. ("Plaintiff" or "Bombardier") by and through its undersigned counsel, complains as follows:

**NATURE OF THE ACTION**

1.     This is an action for trade secret misappropriation under federal and state law pursuant to the Defend Trade Secrets Act of 2016 ("DTSA") codified at 18 U.S.C. § 1836 *et seq.* and the Washington Uniform Trade Secrets Act ("WUTSA") codified at RCW 19.108.010 *et seq.*  Claims for Tortious Interference with Business Expectancies and/or Contracts under Washington state common law are also raised herein, as are Breach of Contract claims.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**PARTIES**

2.     Plaintiff Bombardier Inc. ("Bombardier") is a corporation organized and existing under the laws of Québec, Canada, with its principal place of business at 800 Boulevard René-Lévesque West, Montréal, QC H3B 1Y8, Canada.   Bombardier has developed and owns all of the trade secret and confidential information misappropriated by Defendants.

3.     Upon information and belief, Defendant Mitsubishi Aircraft Corporation ("MITAC") is a corporation organized and existing under the laws of Japan, with its registered office and principal place of business at Nagoya Airport, Toyoyama-cho, Nishikasugai-Gun, Aichi 480-0287, Japan.

4.     Upon information and belief, Defendant Mitsubishi Aircraft Corporation America Inc. ("MITAC America") is a subsidiary corporation of Defendant MITAC organized and existing under the laws of the State of Delaware, with its registered principal place of business at 4951 Airport Parkway Suite 500, Addison, TX 75001 and with its Engineering Center located at 6100 4th Avenue South, Suite 300, Seattle, WA 98108.

5.     Upon information and belief, Defendant Aerospace Testing Engineering & Certification Inc. ("AeroTEC") is a corporation organized and existing under the laws of the State of Washington, with its registered office and principal place of business at 6100 4th Avenue South, Suite 300, Seattle, WA 98108.

6.     Upon information and belief, Defendant Michel Korwin-Szymanowski is an individual currently residing in this judicial district and working as Director, Test & Evaluation at AeroTEC after having worked at Bombardier for approximately fifteen (15) years, most recently as the Director, C-Series Flight Test Teams.  (*See* Declaration of John D. Denkenberger, attached hereto as Exhibit A ("Denkenberger Decl."), at Exhibit 1.)

7.     Upon information and belief, Defendant Laurus Basson is an individual currently residing in this judicial district and working as a Mechanical Systems Engineer (FCS) at AeroTEC after having worked at Bombardier for over three (3) years, most recently

COMPLAINT (_____) - 2

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  as a Senior Engineering Specialist (Flight Controls) and as a Candidate Design Approval

2  Designee. (*See* Denkenberger Decl., Ex. 2.)

3      8.    Upon information and belief, Defendant Marc-Antoine Delarche is an

4  individual currently residing in this judicial district and working as an Aircraft Performance

5  Engineer at AeroTEC after having worked at Bombardier for over ten (10) years, most

6  recently as an Engineering Specialist for Aircraft Performance. (*See* Denkenberger Decl., Ex.

7  3.)

8      9.    Upon information and belief, Defendant Cindy Dornéval is an individual

9  currently residing in this judicial district and working as an Aircraft Performance Engineer at

10  AeroTEC after having worked at Bombardier for approximately ten (10) years, most recently

11  as an Aircraft Performance Engineer. (*See* Denkenberger Decl., Ex. 4.)

12      10.   Upon information and belief, Defendant Keith Ayre is an individual who is

13  currently residing in or near Nagoya, Aishi, Japan and working as a Project Manager for

14  MITAC after having worked at Bombardier for over thirty-two (32) years, most recently as an

15  Aerospace Engineer.  (*See* Denkenberger Decl., Ex. 5.)

16      11.   Upon information and belief, Defendants John and/or Jane Does 1-88 are

17  individuals residing either in this judicial district or in Nagoya, Aishi, Japan working in

18  various roles for either MITAC, MITAC America, or AeroTEC, or working actively on the

19  Mitsubishi Regional Jet project (as described below) in another capacity, after having worked

20  at Bombardier for a number of years in similar capacities.  Collectively, the parties identified

21  in paragraphs 4-10 above are referred to hereafter collectively as "Defendants."

22                      **JURISDICTION AND VENUE**

23      12.   This action arises under the laws of the United States, namely the DTSA

24  codified at 18 U.S.C. § 1836 *et seq.*  This Court therefore has subject matter jurisdiction

25  pursuant to 28 U.S.C. § 1331.

26      13.   This action also arises under the laws of the State of Washington.  This Court

27  has subject matter jurisdiction pursuant to 28 U.S.C. § 1367 because the actions giving rise to

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1   claims under applicable state law are the same and/or related to the actions giving rise to the
2   asserted claims under federal law.  As such, the claims are so related that they form part of the
3   same case or controversy under Article III of the United States Constitution.

4       14.     The Court has personal jurisdiction over Defendants because each of them
5   either currently resides in the State of Washington, has a regular and established place of
6   business within the State of Washington, has had minimum contacts with the State of
7   Washington sufficient to confer the Court with general personal jurisdiction, or has committed
8   acts within the State of Washington giving rise to the claims asserted herein.

9       15.     MITAC is subject to personal jurisdiction in this Court because MITAC has
10  purposefully directed its activities at residents of the State of Washington and/or has
11  purposefully availed itself of the privilege of conducting activities within the State of
12  Washington, and thus has invoked the benefits and protections of Washington Law.  MITAC
13  maintains a flight-test center at the Grant County International Airport in Moses Lake,
14  Washington, where it conducts flight tests of its Mitsubishi Regional Jet ("MRJ") and, on
15  information and belief, employs around 100 pilots, engineers, and technicians. (Denkenberger
16  Decl., Ex. 6.)  MITAC originally estimated that, of the 100 people at Moses Lake working on
17  MRJ flight testing, 50-60 would be MITAC's engineers and technicians from Japan who
18  would stay for at least a year.  (*Id.*)  Additionally, MITAC noted that several of its Japanese
19  employees would remain in Moses Lake for several years as part of the MRJ flight testing.
20  (*Id.*)  Moreover, MITAC maintains at least four (4) MRJ flight-test aircraft in the State of
21  Washington at its Moses Lake flight-test center. (Denkenberger Decl., Ex. 7.)

22      16.     Further, MITAC celebrated the opening of its Seattle Engineering Center
23  ("SEC") on August 3, 2015, in Seattle, Washington. (Denkenberger Decl., Ex. 8.)  During the
24  ceremony, MITAC representatives, including then-MITAC President Hiromichi Morimoto
25  ("Mr. Morimoto"); Masahiro Omura, Consul General of the Japan in Seattle; and Washington
26  State Governor Jay Inslee participated in a traditional "kagami-biraki" (鏡開き) sake barrel
27  opening ceremony to celebrate MITAC's relations with Seattle and the State of Washington.

COMPLAINT (_____) - 4

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    (*Id.*; *see also* Denkenberger Decl., Ex. 9.)  Defendant MITAC directly employs about 50-60

2    Mitsubishi Aircraft engineers from Japan at the SEC and, on information and belief, other

3    employees, who work with Defendants AeroTEC and MITAC America to provide flight-test

4    and certification support for the MRJ.  (*Id.*)  Then-President "Morimoto said Mitsubishi chose

5    to set up here 'to make the best use of the resources and skill sets of the aircraft engineers and

6    professionals of Seattle, which is a global hub of the aviation industry.'" (*Id.*)   Further,

7    MITAC enlisted the assistance of Defendant AeroTEC, a Seattle-based company, to support

8    its efforts for certification of the MRJ. MITAC's Seattle employees are supported by MITAC

9    headquarters in Nagoya, Japan, such that "[a]ny data that needs crunching, engineering that

10   needs to be worked out, [Seattle employees] can hand over to Japan and they can take a stab

11   at it while we're asleep." (Denkenberger Decl., Ex. 10.)

12           17.     Additionally, high-ranking MITAC personnel, including Mr. Morimoto,

13   regularly visit Seattle and the State of Washington.  In addition to attending and speaking at

14   the SEC opening ceremony, Mr. Morimoto in his capacity at MITAC attended a ceremony

15   held at the Museum of Flight in Seattle, Washington on December 10, 2015. (Denkenberger

16   Decl., Ex. 11.)   At the ceremony, Mr. Morimoto celebrated MITAC's customer support

17   partnership with Boeing, including the partnership's unveiling of a web portal enabling

18   customers to access MRJ support on the internet.  (*Id.*)  Mr. Morimoto on behalf of MITAC

19   also attended a summit held by the Aerospace Futures Alliance, an aerospace industry

20   association in Washington, on October 6, 2016.   (Denkenberger Decl., Ex. 12.) On

21   January 12, 2017, Mr. Morimoto, on behalf of MITAC, again visited the State of Washington,

22   this time as part of a meeting between representatives of the aerospace industry and Governor

23   Inslee. (Denkenberger Decl., Ex. 13.)

24           18.     Moreover, the causes of actions complained of herein arise out of or relate to

25   MITAC's activities within the State of Washington and this judicial district. For example, and

26   on information and belief, in its aforementioned efforts to obtain certification of its MRJ

27   aircraft, MITAC has committed trade secret misappropriation in the State of Washington and

COMPLAINT (_____) - 5

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

this judicial district, individually, through its subsidiary MITAC America, and through its partnership with AeroTEC, such that personal jurisdiction over Defendant MITAC would comport with notions fair play and substantial justice.

19.     Defendant Keith Ayre is subject to personal jurisdiction in this Court because, as detailed herein upon information and belief, he has committed and/or is continuing to commit trade secret misappropriation in the State of Washington and this judicial district by way of illicitly using and/or disclosing Bombardier trade secret information to unauthorized third parties within this judicial district.  Additionally, personal subject matter of this Court over Defendant Ayre is proper at least because he purposefully directed his activities at this forum, because Bombardier's claims against him arise out of this forum-related activity, and because the exercise of jurisdiction over Defendant Ayre is reasonable under the circumstances alleged herein.  Specifically, and as alleged herein in greater detail, Defendant Ayre committed intentional acts constituting trade secret misappropriation at least when he (a) wrongfully obtained Bombardier trade secret information by sending such information without authorization to his personal email accounts from his Bombardier work email account within weeks and days of his planned and voluntary departure from Bombardier to work for MITAC on the MRJ project; (b) on information and belief used Bombardier trade secret information without authorization in furtherance of MITAC's MRJ certification efforts; and (c) impermissibly disclosed Bombardier trade secret information to unauthorized third parties. Each of these acts were expressly aimed at Washington and at this judicial district because Defendant Ayre knew at all relevant times that substantial MRJ certification efforts were occurring at least at the Seattle Engineering Center in this judicial district and that Bombardier's trade secret information therefore would be used without authorization in this judicial district.  Defendant Ayre also knew that Bombardier would likely incur harm in this judicial district as a result of his intentional acts, most notably in the form of devalued trade secret information and accelerated regional-jet-market competition.   At the very least, Defendant Ayre knew when he first wrongfully obtained Bombardier trade secret information,

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  and later when he illicitly used and/or disclosed Bombardier trade secret information, that his

2  acts would have foreseeable effects in this judicial district given the MRJ certification efforts

3  occurring here.  Because these acts and effects give rise to Bombardier's claims against

4  Defendant Ayre, and because these effects in this judicial district were at all relevant times

5  foreseeable (if not foreseen), the exercise of personal jurisdiction over Defendant Ayre by this

6  Court is reasonable.

7       20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1)

8  and/or (2) because at least one Defendant resides in this judicial district where all Defendants

9  are residents of the State of Washington, and/or because a substantial part of the events or

10  omissions giving rise to the claims alleged in this Complaint occurred in this judicial district.

11                             **FACTUAL ALLEGATIONS**

12           **Bombardier and Development of the C-Series Aircraft**

13       21.     Plaintiff Bombardier is one of the world's leading manufacturer of both planes

14  and trains.  It is headquartered in Montréal, Canada, and its shares are publicly traded on the

15  Toronto Stock Exchange (BBD).  It is comprised of over 69,000 employees and generated

16  revenues exceeding $16 billion in FY2017 alone.

17       22.     A significant portion of Bombardier's business involves the design,

18  manufacture, and support of innovative aviation products for the business, commercial,

19  specialized, and amphibious aircraft markets.  Bombardier employs more than 29,000

20  employees in its Aerospace division, and its high-performance aircraft and services set the

21  standard of excellence in several aircraft, aircraft services, and aircraft training markets.

22       23.     Among the many aircraft Bombardier has designed, built, sold, and supported

23  over the past thirty (30) is Bombardier's latest clean-sheet design: the C-Series.  The C-Series,

24  a "clean sheet" aircraft designed by Bombardier from the ground up, is a family of narrow-

25  body, geared turbofan twin-engine, medium-range jet airliners that marks a dramatic

26  improvement over older competing aircrafts in terms of efficiency and dependability.

27  Bombardier's clean-sheet C-Series design was adopted to cater to the aviation market seeking

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

aircraft that could accommodate between 110 and 135 passengers over 3,200 nautical miles and do so at measurably lower operating costs than existing aircraft of that class.

24.     The history and development of the C-Series is well documented in various publicly available sources.  According to these sources, Bombardier first began investigating the feasibility of what would become the C-Series in 2004.  Efforts to develop and launch the C-Series program continued into January 2006, at which time Bombardier announced that market conditions could not justify a full-scale pursuit of the launch.  Cost estimates for the C-Series program at that time—a program that would require a complete redesign of many components of an aircraft, as well as successful navigation of lengthy and expensive regulatory processes to obtain a series of necessary governmental approvals to build and mass produce the aircraft (described more fully below)—was estimated to cost approximately US$2.1 billion.

25.     In January 2007, Bombardier announced that work on the C-Series would continue in earnest.  Then-current economic forecasts projected that the market for 100- to 149-seat aircraft—the market segment targeted by the C-Series—would amount to approximately 6,300 units and roughly US$250 billion in revenues.

26.     After committing full-scale resources to the C-Series program over the next six-and-a-half years, Bombardier received government approval for the first C-Series aircraft test flight.  Nearly three (3) years and further government approvals later, in cooperation with SWISS International Air Lines, the first C-Series entered into service.

**The Expense of "Clean-Sheet" Design and Regulatory Approvals**

27.     That Bombardier dedicated nearly a decade and committed several billion dollars to bring the C-Series from concept and design to commercialization and flight is not atypical for a clean sheet aircraft. Indeed, it is extremely complex and costly to achieve successful clean-sheet design certification, even for an Original Equipment Manufacturer who has gone through said process before and can use existing processes, strategies, analysis, means and methods. Since 2000, only four (4) companies world-wide have been able to

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

develop a commercial clean-sheet aircraft program in compliance with the regulatory requirements of the Federal Aviation Administration ("FAA"), Transport Canada (Canada's FAA counterpart), and the European Aviation Safety Agency ("EASA," Europe's FAA counterpart).  This is because, understandably, these various regulatory agencies require aircraft manufacturers to meet innumerable exacting standards to ensure aircraft airworthiness and public safety.

28.   For example, federal law requires that before a clean sheet aircraft can be developed, sold, and entered into service on a commercial scale, FAA must issue a "type certificate," a "production certificate," and an "airworthiness certificate" applicable to each manufactured aircraft.  (*See* 49 U.S.C. § 44704.)  The aircraft manufacturer bears the burden to convincingly demonstrate to FAA that each certificate should be issued, and FAA must be confident that innumerable applicable federal regulations are satisfied before the certification process can conclude.  (*See, e.g.*, 14 CFR Parts 21, 25, 34, and 36.)  The process is incredibly costly, time-consuming, and complex—even for the most experienced of aircraft manufacturers who have gone through that process and developed trade secrets to face it more efficiently.

29.   For instance, FAA "type certification"—or the certification issued by FAA to deem an aircraft and its subcomponent designs suitable to assemble airworthy aircraft—has been described by FAA to consist of five (5) phases: Conceptual Design, Requirements Definition, Compliance Planning, Implementation, and Post Certification.  (*See* FAA Order 8110.4C; *see also* FAA Product Certification Guide, Third Edition, available at https://www.faa.gov/aircraft/air_cert/design_approvals/media/CPI_guide.pdf.)  Within each phase, multiple steps must be performed.  The Conceptual Design Phase requires "familiarization meetings" between the aircraft manufacturer ("applicant") and FAA; memorialized "correspondence to document decisions, agreements, schedules, milestones, and action item assignments" agreed upon between applicant and FAA; a "preliminary certification basis"; a "definition and plan for resolution of critical issues"; and identification

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

of a "core team to ensure continuity." (*Id.*)  The Requirements Definition Phase is comprised of submission of a formal application for type certification; acknowledgment of the application by FAA; formal Certification Project Notification and Establishment of Project; development of the Project Specific Certification Plan ("PSCP") including identification of project milestones and related events; agreement of proposed certification basis and definition of project issues such as means of compliance including special conditions, Equivalent Level of Safety findings ("ELOS"), and any exemptions.  (*Id.*)  The Compliance Planning Phase consists of, among other events, FAA formally accepting the PSCP; further "project schedul[ing] with FAA and applicant milestones for completion of analyses, test plan submission, . . . flight testing, . . .  critical issues resolution plan, and other items affecting the completion of the project"; identifying "stakeholders, including suppliers, subs-vendors, installers, inspection, etc."; establishing "Conformity Inspection Plans"; reaching agreement between applicant and FAA on what the type certification basis will be; formulating a "Compliance Checklist" and "Conformity Inspection Plans"; and establishing "Project evaluation measures." (*Id.*)  The Implementation Phase similarly is comprised of numerous events, including but not limited to "[t]rack[ing] and meet[ing] milestones for preparations for and accomplishment of work, procurement of materials, parts conformities, data, completion of analyses, manuals, test plan submission, equipment qual [*sic*] and test, ground test, installation conformities, TIA [Type Inspection Authorization], flight test, AEG [Aircraft Evaluation Group] evaluations, critical issues resolution plan, and other items affecting completion of the project"; "[c]omplet[ing] test plans/reports, conformity requests, inspections, and compliance documentation"; making "[c]ompliance and conformance findings"; and ultimately "Certificate . . . approval issuance." (*Id.*)

30.    Only after all these steps are completed to the satisfaction of FAA, meaning only if these steps result in establishing with FAA that the aircraft's design appears to satisfy all applicable federal regulations, can an aircraft manufacturer rely on the design to produce airworthy aircraft.  Coupled with this rigorous process, however, are time constraints.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Specifically, depending on the parameters of the aircraft to be type certified, the process must be completed (absent special dispensation) within five (5) years.  This is because when a company applies for a type certificate, the rules and regulations that are in force at the time of application are the rules with which the applicant must comply.  And given that FAA rules and regulations evolve and change over time, an applicant that takes longer than five (5) years to certify its aircraft will be obtaining a type certification under antiquated standards.  Therefore if an applicant fails to obtain type certification within the governing time limitation, it must certify to the later standards, thereby incurring significant and redundant costs in the process.

31.    Production certification is another regulatory approval process required before a manufacturer can begin producing a duplicate aircraft from a previously obtained type certification—in other words, before a manufacturer can enter into service an aircraft on a commercial scale.  *See* 49 U.S.C. § 44704(c).  Like the type certification process, this regulatory process is costly and time consuming, even more for an OEM who is going through it for the first time from scratch.  Unlike other certification processes, however, this certification focuses on the manufacturer's ability to duplicate an aircraft, aircraft engines, and/or its appliances that conform to the manufacturer's previously obtained and applicable type certification (or supplemental type certification, if applicable).  *Id.*

32.    Once the requisite certifications are obtained, all subsequently manufactured aircraft must be certified for "airworthiness" prior to delivery.  *See* 49 U.S.C. § 44704(d)(1).  This process is also complex and costly, as the OEM needs to developed testing parameters and configurations to prove that the aircraft meets the certified design criteria without having to arrive at those parameters and configurations independently or having to conduct needless, incredibly costly, additional flight testing.

33.    As a market leader with vast experience in aircraft manufacturing, Bombardier has been independently identified as proficient in aircraft certification procedures.  (*See* Denkenberger Decl., Ex. 14.)  As noted by this same source, Bombardier successfully

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

certified eighteen (18) aircraft from 1989 to 2006, some of which were derivative models of its previous aircraft, while others "were entirely new clean-sheet designs that have demonstrated Bombardier's robust certification process." (*Id*.)  Since then, Bombardier has developed and certified ten (10) additional clean-sheet design and derivative programs, and in doing so, has continued to cultivate and safeguard significant trade secrets.  "This whole process—design, certification, production—is the heart of each company's competitive advantage, its own special secret sauce, and they are not about to reveal the recipe." (*Id.*) "It's almost impossible to understand the full certification criteria for an aircraft, if one has not been through it once or twice." (Denkenberger Decl., Ex. 15 (attributing the quoted statement to Defendant Korwin-Szymanowski and his MRJ project colleague, Alex Bellamy, former Bombardier C-Series Flight Test Manager and current Vice President of MITAC).)

**The MRJ Project and Its Many Delays**

34.     At approximately the same time Bombardier began investigating the feasibility of what would become the C-Series project, the Japanese government in conjunction with Mitsubishi Heavy Industries, Ltd. ("MHI") initiated its own investigation into the feasibility of a similar aircraft project—the Mitsubishi Regional Jet ("MRJ").  Like the C-Series, the MRJ is a narrow-body, geared turbofan twin-engine, medium-range jet aircraft.  Unlike the C-Series, however, the MRJ has yet to receive the proper certifications to enter into service.

35.     According to MHI, the MRJ program was officially launched on March 28, 2008, with MHI initially targeting the MRJ's entry into service at some time in 2013.  Also on that day, MHI announced that effective April 1, 2008, Defendant MITAC—a "company established by MHI to conduct MRJ business"—would be responsible for "accelerat[ing] the MRJ's development and further strengthen sales activities to potential customers worldwide."  MITAC's responsibilities would also include "the jetliner's design, acquisition of type certification (T/C), procurement, sales and customer support." (Denkenberger Decl., Ex. 16.)

36.     Within the first two (2) years of the project, however, MITAC began implementing design changes in the MRJ that resulted in multiple significant delays.  For

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

example, a report of September 9, 2009 revealed that MITAC "unveiled extensive design changes" which would (1) move MITAC's deadline for a final design freeze from Q3 2009 to "mid-2010," (2) delay the MRJ's first flight test from Q4 2011 to Q2 2012, and (3) delay commercial delivery of the first MRJ from Q4 2013 to Q1 2014.  (Denkenberger Decl., Ex. 17.)

37.     Approximately a year later, on September 15, 2010, MITAC announced that it was entering the production drawing phase of the MRJ project and was proceeding with the manufacturing process.   At that time MITAC also announced that "the MRJ program continues to progress on schedule, with first flight scheduled for Q2 2012 and first delivery in Q1 2014."  (Denkenberger Decl., Ex. 18.)   MITAC would subsequently experience issues, however, that would further delay the MRJ's first test flight and first commercial delivery.

38.     On April 25, 2012, "[f]ollowing an in-depth review of the MRJ program," MITAC announced a "schedule update."  In relevant part, MITAC pushed the first scheduled flight of the MRJ from Q2 2012 to Q3 2013, and it delayed first commercial delivery of the MRJ from Q1 2014 to "the summer or later half of JFY [Japanese Fiscal Year] 2015." (Denkenberger Decl., Ex. 19.)   Thus just four (4) years into the MRJ program, MITAC announced at least two (2) delays that pushed the first scheduled test flight and first scheduled commercial delivery of the MRJ by nearly two (2) years.   More delays would follow.

39.     On August 22, 2013, MITAC disclosed that the updated schedule provided on April 25, 2012 would need further amendment.  Specifically, MITAC moved the MRJ's first scheduled flight to Q2 2015 and the aircraft's first commercial delivery to Q2 2017. (Denkenberger Decl., Ex. 20.)  On information and belief, MITAC's latest "delay was due to the company's underestimation of the time it needed to sort out how to validate the safety of the manufacturing process of the jet and its components, and not from any issues with specific suppliers."  (*Id.*)  This "latest delay to the MRJ extend[ed] development to nine years from the originally planned five and three quarter years.  Its cause, not previously detailed, stems from 2009 . . . [when MITAC] learned that it needed company-wide organization delegation

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  authorization (ODA), under which it would act on behalf of the certifying authority in the
2  more routine aspects of approving designs and ensuring airworthiness standards."
3  (Denkenberger Decl., Ex. 21.)  MITAC "underestimated the amount of effort in getting ODA
4  from the Japan Civil Aviation Bureau, which locally instituted the FAA system to keep
5  certification regulations internationally consistent." (*Id.*)

6      40.  As of August 22, 2013, however, "it remain[ed] unclear why [MITAC] took
7  until Aug. 22, more than five years after program launch and less than five months before its
8  previous first-flight target, to announce that the ODA tasks, by then complete, had caused
9  another delay of about 18 months." (*Id.*)  MITAC's first announced delay in 2009 was
10  attributable to design changes, and its second delay was reportedly caused by MITAC's
11  discovery that "it had not properly documented production processes.  The ODA work was
12  separate from that problem and ended in September 2012 when the authorization was
13  received." (*Id.*)  Nevertheless, by August 2013, MITAC had "no [remaining] hurdles except
14  the usual challenges of moving through manufacturing to flight testing and certification," for
15  which it had "hired many foreign experts, especially ex-Boeing people, to help." (*Id.*)

16      41.  Notwithstanding the clear road ahead, and despite already working with many
17  foreign experts on the MRJ project to date, MITAC began dedicating substantial additional
18  resources to the MRJ project by 2014.  For instance, MITAC formed its subsidiary, Defendant
19  MITAC America, on June 4, 2014, to, upon information and belief, focus on drawing from
20  North American resources to design, develop, and certify the MRJ.  Additionally, by no later
21  than July 14, 2014, MITAC enlisted the assistance of Defendant AeroTEC, "a small
22  engineering company that provides flight-testing and aircraft certification services, [to]
23  provide technical support" for MITAC's MRJ project.  (Denkenberger Decl., Ex. 6.)
24  According to MITAC's then-president, Teruaki Kawai, MITAC's explanation for these
25  additional resources was because until this time, "[MITAC] 'didn't have any experience in
26  how to get certification.' […] In Washington state, 'there are a lot of experienced people.'"
27  (*Id.*)

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

42.     Even with the assistance of Defendants MITAC America and AeroTEC, however, MITAC still could not avoid further unplanned delays on the MRJ project.  For instance, MITAC failed to conduct its MRJ flight test in accordance with its third amended schedule.  Instead of the MRJ's maiden voyage occurring in Q2 2015, it finally took place on November 11, 2015.  (Denkenberger Decl., Ex. 22.)  At that time, MITAC also confirmed the MRJ's "first delivery scheduled for the second quarter of 2017," and it announced that "flight tests in the US are scheduled to start in the second quarter of 2016, from the MRJ base at Grant County International Airport at Moses Lake in Washington State."  (*Id.*)  MRJ flight testing, development, and certification in the United States would be, and is, managed through the Seattle Engineering Center, formed on August 3, 2015 and jointly staffed by all Corporate Defendants.

43.     On December 24, 2015, approximately six (6) weeks after MITAC re-confirmed first commercial delivery of the MRJ for Q2 2017, MITAC again amended its schedule to delay delivery until 2018—"[a] surprise yearlong delay."  (Denkenberger Decl., Ex. 23.)  MITAC reportedly attributed the delay to the fact that the MRJ's "frame had passed strength tests for normal use, but there were concerns it wouldn't pass certification tests."  (*Id.*)  Defendant AeroTEC reportedly confirmed at that time that the latest MRJ delay would have "no impact to the preparations in Seattle and Moses Lake."  (*Id.*)

44.     This "fourth delay in bringing the [MRJ] to market" "likely [made] the U.S. side of the [MRJ] certification program more important."  (*Id.*)  According to at least one (1) report, the delay caused one aviation analyst to observe, "When you have a situation like this it's all hands on deck."  (*Id.*)

45.     Additionally, the MRJ program's fourth delay raised speculation that MITAC might start to lose purchase orders.  (*Id.*)  As of December 24, 2015, MITAC reportedly had "received 407 orders, including options and purchase rights" for the MRJ, 100 of which originated from U.S. regional airline SkyWest.  (*Id.*)

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

46.     On January 22, 2017, initial reports circulated that MITAC was "expected to announce yet another delay to the MRJ regional jet program at a press conference in Tokyo" that afternoon.  (Denkenberger Decl., Ex. 24.)  Speculation of the announcement had "been rife since last October [2016], when [MITAC] admitted that it had warned launch customer All Nippon Airways of a 'risk of delay' to the first MRJ."  (*Id.*)

47.     The following day, on January 23, 2017, MITAC confirmed the MRJ's fifth delay in the history of the program.  (Denkenberger Decl., Ex. 25.)  MITAC reportedly attributed this latest delay "due to revisions of certain systems and electrical configurations on the aircraft to meet the latest requirements for certification."  (*Id.*)  In light of the significant design change, and despite the fact that the MRJ Project was now well into its eighth year, MITAC would be forced to return to the first stages of "preliminary design review for the design change area," would "get into the critical design phase in a few months" thereafter, and would "require an additional two years" for projected commercial delivery of the MRJ. (Denkenberger Decl., Ex. 26.)  MITAC now "expected to obtain type certification in mid-2019" for its new design, and it projected first commercial delivery of the MRJ to occur "in mid-2020."  (Denkenberger Decl., Ex. 25.)

48.     Nearly four (4) months after announcing the MRJ project's fifth delay, MITAC was more forthcoming publicly about the need for it: reportedly the delay "was mainly to mitigating [*sic*] the risk of not meeting certification criteria, or having to make changes even further down the aircraft's development."  (Denkenberger Decl., Ex. 27.)  MITAC further reportedly explained that "in some small areas, it was very difficult to show the compliance of the avionics bay, so we decided to relocate components in the avionics bay and this also led to a change in the electrical wires routing."  (*Id.*)  When "[a]sked why the issue was only discovered more than eight years into the MRJ's development, [MITAC] stresse[d] that the manufacturer was already aware of the requirements, but explain[ed] that certification regulations do not 'precisely define' the risk analysis that must be done.  There was also the risk that it would 'take a lot of time' to explain how the system meets compliance to Japan's

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Civil Aviation Bureau, which could further delay its schedule." (*Id.*)  MITAC also reportedly disclosed that "[f]rom some efficiency view point, our original design of the avionics bay components was very efficient.  But at the same time we needed a complex process to certify it.  So from the viewpoint of how easy it is for certification, our original design was not so good." (*Id.*)  MITAC's decision for the MRJ's design change was reportedly made in December of 2016, after "[t]he [certification] issue was first identified sometime between summer and autumn [of 2016]." (*Id.*)  Importantly, the certification issue was identified only shortly after MITAC's direct recruiting efforts of Bombardier personnel began paying off.  Indeed, a detailed explanation for the MRJ program's January 2017 delay (its fifth) was provided to Leeham News six (6) months later by two (2) former Bombardier personnel— Alex Bellamy, former C-Series Flight Test Program Manager for Bombardier, subsequently the Senior Director of the MRJ Program Management office for Defendant MITAC, and a current MITAC Vice President; and Defendant Michel Korwin-Szymanowski, former Director of Bombardier's C-Series Flight Test Teams and the new Head of MRJ Flight Testing for Defendant AeroTEC.  (Denkenberger Decl., Ex. 15 (explaining latest delay attributable to "concerns the present aircraft configuration would be challenging to get through certification").)

**Targeted Recruitment of Bombardier Personnel and Theft of Bombardier's Trade Secrets**

49.     Shortly before MITAC's announcement in December 2015 of the MRJ's fourth delay, and despite the fact that MITAC had been working with ex-Boeing employees and other industry personnel in developing the MRJ, Defendants MITAC, MITAC America, and AeroTEC began a direct recruiting effort of Bombardier personnel.  As part of this effort, MITAC and MITAC America organized a "job fair" in Montréal to be held on July 15-16, 2016 at a venue located less than one (1) kilometer from Bombardier's global principal place of business.  (*See* Denkenberger Decl., Ex. 28.)  On information and belief, MITAC and MITAC America promoted their job fair both online and in the Montréal Gazette in the weeks

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

leading up to the event and they advertised that it was "looking to hire over 200 Aircraft System Engineers **who can work on Certification activities of MRJ aircraft**." (*Id.* (emphasis added).) On information and belief, MITAC's July 2016 targeted recruiting of Bombardier's employees in Montréal started paying dividends shortly thereafter. For example, by no later than August 18, 2016, MITAC successfully secured the commitment Mr. Keith Ayre to join the MRJ project. Mr. Ayre at that time was serving in the critical role of TCCA's Design Approval Designee ("DAD") for Bombardier. Mr. Ayre therefore was critical to Bombardier's own certification efforts regarding the C-Series and Global 7000/8000 Aircraft, as MITAC well knew. And despite the fact that Mr. Ayre did not terminate his employment with Bombardier until August 26, 2016, MITAC was actively soliciting, and Mr. Ayre was actively providing, MRJ certification guidance during Bombardier business hours through Mr. Ayre's personal email account more than one (1) week before Mr. Ayre left Bombardier.

50.     In addition to MITAC's direct recruitment efforts in Montreal, AeroTEC launched its own targeted recruiting campaign of Bombardier personnel working in the United States. Specifically, AeroTEC organized a job fair to be held on October 23-24 of 2015 in Wichita, Kansas—home of Bombardier's Flight Test Center in the United States—to interview candidates to work on MRJ flight testing in Seattle. (*See* Denkenberger Decl., Ex. 29.) On further information and belief, AeroTEC targeted Bombardier personnel specifically for this job fair by arranging for billboards mounted on flatbed trucks advertising the job fair to be displayed immediately outside Bombardier's Flight Test Center. (*See id.*)

51.     On information and belief, further efforts of MITAC, MITAC America, and AeroTEC to recruit Bombardier personnel to work on MRJ development and certification included retaining and using professional recruiting services such as Velocity Consulting Solutions (*see* Denkenberger Decl., Ex. 30), contacting Bombardier personnel directly via email (Denkenberger Decl., Ex. 31), and using successfully-recruited former Bombardier personnel to entice their former colleagues to likewise defect. For example, and by no means

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

limiting, former Bombardier employee and Defendant Korwin-Szymanowski of AeroTEC sent a targeted email on October 20, 2015 "to 247 Bombardier [email] accounts" entitled, "Flight Test Opportunities in Seattle" to inform then-current Bombardier personnel of "positions open immediately" to work on "the development and certification of the Mitsubishi Regional Jet (MRJ)."  (*Id*.) Four (4) days later, on October 24, 2015, Defendant Korwin-Szymanowski spoke directly with Mr. Stephen Stowe, then a Senior Engineering Test Pilot for Bombardier, about potential recruitment to AeroTEC.  (Denkenberger Decl., Ex. 32) Four (4) days after that, on October 28, 2015, Defendant Korwin-Szymanowski attended a "hiring event" in Montréal, Canada and solicited Bombardier personnel to meet him that evening for "drinks & food" at a venue located within a fifteen-minute drive from Bombardier.  (Denkenberger Decl., Ex. 33.)   On information and belief, these activities represent only a small fraction of the various Defendants' targeted recruiting efforts of Bombardier personnel.

52.    Bombardier learned of the Corporate Defendants' sustained targeted recruiting efforts shortly after they began with Defendant Korwin-Szymanowski's October 20, 2015 email, and it engaged in significant steps short of litigation to stop it.  For instance, on October 22, 2015, Bombardier wrote directly to Defendant Korwin-Szymanowski and AeroTEC to address the impropriety of their targeted recruitment of 247 Bombardier employees via email just two (2) days earlier, as well as the impropriety of AeroTEC's targeted recruiting of Bombardier personnel in Wichita, Kansas.   (*See* Exhibit B.) Specifically, Bombardier informed AeroTEC and Defendant Korwin-Szymanowski of his ongoing duties of confidentiality owed to Bombardier; it informed them  that their targeted recruiting was occurring at a critical time in the development of the C-Series, Global 7000, and Global 8000 Aircraft; and it specifically stated that their continued "activities in order to entice some key flight test employees to leave the employ of Bombardier and join AeroTEC LLC may lead to serious consequences on Bombardier's affairs."  (*Id.*)  Bombardier also requested that their targeted recruiting activities immediately cease.  (*Id.*)

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

53.     On April 26, 2016, Bombardier followed up with AeroTEC concerning the impropriety of its targeted recruiting efforts.  In addition to repeating its positions previously stated in its October 22, 2015 letter, Bombardier cited additional instances of improper recruiting efforts, including but not limited to using outgoing-but-still-current Bombardier personnel to actively recruit other Bombardier employees before their departure from Bombardier.  (*See* Ex. C.)  Bombardier also emphasized its former employees' ongoing obligation to maintain the confidentiality of Bombardier's proprietary information.  (*Id.*) Bombardier requested that in addition to discontinuing the practice of targeting Bombardier employees for recruitment, AeroTEC and all its former Bombardier employees execute an attached "Agreement and Acknowledgement of Obligations and Actions to Ensure Compliance with the Same" ("Agreement").  (*Id.*)  Terms of the Agreement included "refrain[ing] from, amongst other things, . . . Using or disclosing any confidential or proprietary information of Bombardier" as well as "Directly or indirectly soliciting or communicating with any current or recently departed employee of Bombardier regarding any employment or similar opportunities for work . . . for a period of one year." (*Id.*)  Bombardier also provided a copy of relevant portions of Bombardier's Code of Ethics.  (*Id.*)  Notably, Bombardier's Code of Ethics expressly provides, "Employees agree to maintain [the] confidentiality [of Bombardier's confidential information] at all times, even after leaving the employ of Bombardier." (*Id.*; *see also* Ex. D, at 15.)

54.     Having achieved no progress with its correspondence with AeroTEC directly, Bombardier on June 3, 2016 contacted Mr. Luke Walker of MHI, MITAC's corporate parent, to address concerns relating to AeroTEC's improper recruiting efforts.  Bombardier informed MHI of its concern that AeroTEC had "recently been soliciting and recruiting a number of key employees . . . , despite being asked by us on numerous occasions to cease and desist from that practice." (Ex. E.)  Bombardier continued:

> . . . we have reasons to believe that AeroTEC has been soliciting Mr. Ed Grabman, one of our test pilots who will be critical to the

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Global 7000 and 8000 flight test program.  His departure would seriously disrupt our flight test program.

We also have reasons to believe that some of these former Bombardier employees have been transferred to MHI or are working on the MRJ flight test program.

This raises serious concerns.  First this is draining our capabilities and depriving us of key resources that are critical to the success of our aircraft programs in development.  Second, the science and expertise of flight testing can only be acquired through experience and is extremely valuable to any OEM.  We are concerned that some of the Bombardier proprietary methods and know-how ("Proprietary IP") developed or acquired by the former Bombardier employees hired by AeroTEC while working for Bombardier will inevitably be transferred and used by AeroTEC or MHI for the purpose of their flight testing activities.

I am seeking your assistance in ensuring that this practice of soliciting and hiring Bombardier key flight testing employees ceases immediately and that those Bombardier employees who have been hired by AeroTEC or MHI and are working on MHI aircraft program development do not use any Bombardier Proprietary IP.

(*Id.*)  Mr. Walker in response stated, "The MITAC legal department and I are looking into this matter, and we will get back to you after we find out more information."  (*Id.*)

55.    On July 14, 2016, after being "recently informed" of MITAC's upcoming Montréal job fair, Bombardier again reached out to MHI.  On this occasion, Bombardier informed MHI of the potential harm to Bombardier resulting from that job fair.  (*See* Ex. F.)

56.    On August 5, 2016, Bombardier again reached out to MHI in an effort to protect its interests and intellectual property, this time from the desk of Bombardier's President and Chief Executive Office, Mr. Alain Bellemare, to MHI's Chairman of the Board Mr. Hideaki Omiya.  Mr. Bellemare, citing the fact that "Bombardier and MHI have been partners on various aircraft programs for several decades," and in an effort to preserve their "mutually beneficial relationship," asked for MHI's cooperation concerning execution of the Agreements Bombardier sent to AeroTEC in April 2016.  (Ex. G.)  Mr. Bellemare was forced to follow up with Mr. Omiya on January 27, 2017.  (*See* Ex. H.)  Mr. Bellemare again

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

requested that the targeted solicitation of Bombardier employees immediately cease, and he stated unequivocally as follows:

> Last August, I wrote to inform you that MHI has been engaging in massive solicitation of Bombardier engineers and asked that MHI cease[] such solicitation which is contrary to the relationship of trust that must prevail between close business partners such as ourselves.  Unfortunately, despite my letter to you and the various attempts that my team has made to address the situation with your team, MHI continues to actively solicit and hire key employees of Bombardier.  The employees targeted by MHI are highly skilled and specialized engineers and test pilots that have developed valuable know-how and trade-secrets through their experience and worth with Bombardier. . . .
>
> As you can understand, the hiring of these employees by MHI is detrimental to Bombardier's business.  Not only does it deprive Bombardier of key resources at a time when these resources are crucial to the development of its new aircraft programs, but we have reasons to believe that the employees recruited by MHI will use the intellectual property owned by Bombardier to assist MHI in developing the MRJ aircraft which will compete against Bombardier aircraft.

(*Id.*)

57.     On February 17, 2017, because its repeated attempts to resolve its concerns with the Corporate Defendants were unavailing, Bombardier commissioned outside counsel to contact Mr. Hiromichi Morimoto, President of MITAC, via couriered letter.  (*See* Ex. I.)  In so doing, Bombardier's counsel conveyed a formal "Letter of Demand – Solicitation of Key Bombardier Employees."  (*Id.*)  The letter reiterated in detail the concerns Bombardier previously conveyed to the various Corporate Defendants, and it contained a number of formal requests.  Among those requests were to "[r]equire all former employees of Bombardier to sign agreements undertaking not to solicit employees of Bombardier"; to "[r]equire all former employees of Bombardier to sign agreements undertaking not to divulge or use any confidential, proprietary or trade secret information of Bombardier for the purposes

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  of the MJR [*sic*] program"; and to "[t]ake any and all necessary measures to ensure that the

2  agreements are respected by former employees of Bombardier." (*Id.*)

3  58.    This February 17, 2017 Demand Letter prompted communications to begin

4  between outside counsel for Bombardier and outside counsel for MITAC.   For the next

5  several months, counsel exchanged correspondence to relay to each other their respective

6  positions.   Communications between the parties resumed in 2018 after a brief hiatus to

7  thoroughly evaluate opposing positions.   The most recent discussion between Bombardier and

8  MITAC was held on September 13, 2018.   No resolution was reached.

9  59.    Despite Bombardier's best efforts to prevent the continued targeted recruitment

10  of its employees, Defendants MITAC, MITAC America, and AeroTEC now employ, on

11  information and belief, at least 92 former Bombardier personnel whose current job

12  responsibilities relate directly to the development, certification, and/or commercialization of

13  the MRJ.   Among these are the individually named Defendants, who absconded with highly

14  sensitive Bombardier trade secret information before departing Bombardier.

15  60.    For example, Defendant Laurus Basson on information and belief is currently

16  working on the MRJ project as a "Mechanical Systems Engineer (FCS)" at AeroTEC in

17  Seattle, Washington. (Denkenberger Decl., Ex. 2.) On March 4, 2016, his last day as a

18  Bombardier employee, Defendant Basson, without permission, sent an email from his

19  Bombardier email account to his private "Yahoo" email account two (2) proprietary

20  PowerPoint slide decks entitled, "TCCA Skew Detection Presentation- Updated with latest

21  Systems and Structure Limits 16-02-01.pptx" and "2016-03-03 TCCA Skew Detection

22  Presentation-JAN 28 FINAL.pptx." (*See* Ex. J.) These documents contain highly sensitive,

23  proprietary Bombardier trade secret information concerning Bombardier's Global 7000/8000

24  Skew Detection System and related confidential communications Bombardier made with

25  Transport Canada for certification purposes, such as (a) the proposed agenda and topics

26  Bombardier intended to cover with TCCA in presenting its SDS for consideration and

27  acceptance during negotiations well known to be highly confidential; (b) explicit

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

identification of Bombardier's Preliminary Design Review ("PDR") Requirements; (c) a design schematic of Bombardier's Slat/Flap Control System ("SFCS") complete with identification and placement of the various skew sensors; (d) explicit identification of Bombardier's Critical Design Review ("CDR") Requirements; (e) disclosure and explanations of Bombardier's previously approved CRJ SDS, complete with high-level schematics, upon which Bombardier's Global 7000/8000 aircraft SDS was predicated; (f) particularized and extensive details comparing and contrasting the SDS of the Global 7000/8000 and the CRJ SDS, complete with specific identification of design and component differences for both production and SOF configurations for the two models, and including defined and measured operating parameters and system characteristics of each SDS; (g) particular details concerning installation of various components; (h) summaries and detailed analysis of compliance with various regulatory requirements related to criticality impact, Functional Development Assurance Level ("FDAL"), and Candidate Certification Maintenance Requirements ("CCMR"); (i) identification of particularized certification regulations "deemed applicable for demonstration of SDS compliance"; (j) summaries and data sufficient to show results from specifically identified testing configurations and compliance with applicable regulations; (k) identification of the third party suppliers of various components of the SDS; (l) identification of and explanation of the Skew Detection Unit ("SDU") inputs/outputs and built-in tests; (m) explanation of conditions triggering SDS Crew-Alerting System ("CAS") messaging; (n) explanation and analysis of SDS Proof of Concept testing; and (o) explanation and analysis of SDS SOF requirements.  These files also contain over 60 slides of particularized information concerning Bombardier's design, development, testing, and certification approach of the Global 7000/8000 Aircraft SDS, and it identifies with precision and specificity the entirety of regulations for which Bombardier specifically comported its testing to demonstrate regulatory compliance of its SDS.  All of this information is highly proprietary to Bombardier, and none of it is publicly disseminated or available—including the testing data and information found therein.  Even the applicable regulations for which Bombardier tested compliance are not

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

readily ascertainable, because those particular regulations applicable to a specific system are a subset of countless regulations relating to commercial aircraft certification, and they are identified only after an aircraft manufacturer meets in confidence with certifying authority representatives (often through the course of several meetings) to reach agreement on which specific subset of regulations must be satisfied. The information contained in these documents would be invaluable to anyone involved in an effort to certify an aircraft, specifically, and without limitation, to those attempting to certify the MRJ's skew detection system, for entry into service, and Defendant Basson knew or should have known as much.  The information contained in these documents is not readily ascertainable by proper means, as it was the result of countless hours of design effort, testing, verification, and other development efforts dedicated towards certification of Bombardier's aircraft throughout the past thirty (30) years and Defendant Basson knew this.  The documents also were the subject of efforts reasonable under the circumstances to keep secret, as access to the documents was restricted by Bombardier and the documents themselves were marked private and confidential, with Bombardier expressly reserving all rights in the documents.  Further, Defendant Basson knew or should have known he was violating Bombardier's Code of Ethics—a code taught to each Bombardier employee with the express expectation that each remains compliant therewith— when he emailed such highly sensitive information to his personal email account.  Defendant Basson expressly "agree[d] to conform to" Bombardier's Code of Ethics after expressly acknowledging "having received Bombardier's Code of Ethics" and "having read and understood all dispositions of that Code."  (*See* Ex. K.)  And because he emailed these documents to himself on his last day as a Bombardier employee knowing he would soon begin work on the MRJ project for AeroTEC, Defendant Basson on information and belief had every intention of misusing this information in his new role.

61.     Similarly, upon information and belief Defendant Marc-Antoine Delarche is a former Bombardier employee currently working on the MRJ project as an Aircraft Performance Engineer at AeroTEC. (Denkenberger Decl., Ex. 3.)  Defendant Delarche's last

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

day with Bombardier was May 18, 2016, but in the two (2) weeks leading up to his departure, after giving his notice of resignation, he sent several documents containing highly sensitive Bombardier trade secret information to his personal email account.  Specifically, on May 6, 2016, Defendant Delarche emailed six (6) such documents from his work email to his Hotmail email account entitled "RAA-BA503-412 Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf"; "RAA-BA503-414 Lag_Effects_in_the_Production_and_Experimental_Pitot-Static_Systems.pdf"; "RAA-BA503-418 Data Reduction of Ground Position Errors.pdf," "RAA-BA500-412 Rev A - Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf"; "RAA-BA500-414-RevA-Lag_Effects_in_the_Production_and_Experimental_Pitot-Static_Systems.pdf"; and "RAA-BA500-418_signed.pdf." (*See* Exs. L-M.)  Generally speaking, these documents are certification reports for Bombardier's CSeries Aircraft, specifically the CS100 Model BD-500-1A10 Commercial Aircraft and the CS300 Model BD-500-1A11, specifically recording the demonstration of compliance and constituting statements of compliance with pertinent certification type approval requirements as established by government regulations.  More specifically, the documents disclose highly confidential and proprietary Bombardier trade secret information concerning the CS100 and CS300 airspeed indicating systems under various conditions, static pressure systems, air temperature indicators, and lag effects during flight.  They disclose very specific and/or highly technical data and information pertaining to (a) Bombardier's production and experimental air data systems; (b) the flight tests conducted by Bombardier to determine the air data system errors, including but not limited to the flight test aircraft configurations used by Bombardier to demonstrate regulatory compliance (of which there are literally hundreds of possibilities, as a result of the various positions in which, for example, inboard and outboard slats, flaps, and ailerons could be configured and whether such tests were conducted with the landing gear deployed); (c) Bombardier's proprietary methodology used to determine Static Source Error Correction ("SSEC"); (d) how Bombardier's air data systems comport with applicable and governing regulations for

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

certification, including but not limited to measuring and testing performance thresholds when approaching flight stall speeds as well as at above maximum operating speeds; (e) Bombardier's total temperature probe; (f) identification of the regulations applicable to the air data system for which Bombardier is demonstrating compliance; (g) the proprietary methodology Bombardier used to determine the various lag values of its air data system; (h) the specific instrumentation installed by Bombardier for lag testing; (i) the parameters used to identify and quantify its air data system lag; (j) the proposed lag constants Bombardier used to calculate various lag through application of standardized formulae; (k) specific details concerning Bombardier's air data system for production; (l) detailed schematics of Bombardier's production and experimental air data systems; (m) specific data collected concerning the various lags of its air data systems; and (n) information in the form of extensive testing data under very specific and explicit testing conditions and configurations sufficient to establish conclusively and convincingly with the certifying authority that during accelerated takeoff for the CS100 and CS300 aircraft, ground speed errors between indicated and calibrated airspeeds were sufficiently negligible so as to require no correction to decision speed ($V_1$), rotation speed ($V_R$), or takeoff safety speed ($V_2$) as they are required to be presented in each aircraft's Aircraft Flight Manual ("AFM"). The information contained in these documents would be invaluable to anyone involved in an effort to certify aircraft for entry into service—they provide tremendous insight as to the quality, quantity, and type of information an aircraft manufacturer needs to provide to any particular regulatory agency to obtain certification—and Defendant Delarche knew or should have known as much. The information contained in these documents is not readily ascertainable by proper means, as it was the result of innumerable hours of exhaustive development efforts throughout the past thirty (30) years, and Defendant Delarche knew it. The documents also were the subject of efforts reasonable under the circumstances to keep secret, as access to the documents was restricted by Bombardier and the documents themselves were marked private and confidential, with Bombardier expressly reserving all rights in the documents. Further,

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1   Defendant Delarche knew or should have known he was violating Bombardier's Code of

2   Ethics when he emailed such highly sensitive information to his personal email account.

3   Defendant Delarche expressly agreed to conform to Bombardier's Code of Ethics after

4   expressly acknowledging having received Bombardier's Code of Ethics and having read and

5   understood all dispositions of that Code.  (*See* Ex. N.)  And because he emailed these

6   documents to himself in the two (2) weeks before his departure from Bombardier, after

7   resigning, knowing he would soon begin work on the MRJ project for AeroTEC, Defendant

8   Delarche on information and belief had every intention of misusing this information in his

9   new role.

10      62.     Like Defendants Basson and Delarche before her, Defendant Cindy Dornéval

11  is a former Bombardier employee who upon information and belief is currently working on

12  the MRJ project for AeroTEC. (Denkenberger Decl., Ex. 4.)  Defendant Dornéval's last day

13  with Bombardier was February 10, 2017, and in the weeks, days, and even hours before her

14  departure, she sent several documents containing highly sensitive Bombardier trade secret

15  information to her personal email account.  For example, on November 18, 2016, Defendant

16  Dornéval emailed two (2) documents from her work email to her Hotmail email account

17  entitled "FTP PROD CSeries Rev 5.0 – 17 November 2016.docx"; and "FTP PROD

18  CSERIES Rev 5.0 – 17 November 2016.pdf." (*See* Ex. O.) Generally speaking, these

19  documents constitute Production Test Flight Profiles for Bombardier's CSeries Aircraft.

20  More specifically, these documents disclose highly confidential and proprietary Bombardier

21  trade secret information disclosing (a) preflight checklists detailing every system and

22  component the flight crew must check prior to every test flight; (b) the ground checks that the

23  flight crew must perform prior to every test flight; and (c) the critical in-flight checklist that

24  details hundreds of flight conditions the aircraft must perform to efficiently gather the data

25  necessary to show the aircraft and its systems perform properly during flight and therefore

26  that the aircraft warrants a Certificate of Airworthiness. In other words, these documents

27  constitute hundreds of pages of highly sensitive, proprietary Bombardier trade secret

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

information in the form of specific details concerning the flight test profiles developed throughout previous certification which Bombardier employed in gathering necessary data to obtain certificates of airworthiness for the C-Series aircraft prior to being able to commercially deliver them.  This information would be invaluable to anyone involved in an effort to obtain certificates of airworthiness for commercial delivery of an aircraft—not least because it would give the reader flight streamlined testing parameters and configurations to prove that the aircraft meets the certified design criteria without having to arrive at those parameters and configurations independently or having to conduct needless, incredibly costly additional flight testing.  The information contained in these documents is not readily ascertainable by proper means, as it was the result of innumerable hours of exhaustive development efforts throughout the past thirty (30) years, and Defendant Dornéval knew it.  The documents also were the subject of efforts reasonable under the circumstances to keep secret, as access to the documents was restricted by Bombardier and the documents themselves were either marked private and confidential with Bombardier expressly reserving all rights in the documents or the documents on their face contained known confidential information.  Further, Defendant Dornéval knew or should have known she was violating Bombardier's Code of Ethics when she emailed such highly sensitive information to her personal email account.  Defendant Dornéval expressly agreed to conform to Bombardier's Code of Ethics after expressly acknowledging having received Bombardier's Code of Ethics and having read and understood all dispositions of that Code.  (*See* Ex. P.)

63.     In addition to her illicit email of November 18, 2016, Cindy Dornéval improperly attempted to transmit to her personal email account highly sensitive, proprietary Bombardier trade secret and other Bombardier Confidential information on her last day at Bombardier on February 10, 2017.  Shortly after 8:00 P.M. upon completing her last day of work, Defendant Dornéval sent an email to her personal email account attaching a .zip file named "Carriere et training.zip" containing copies of three (3) Bombardier's Air Safety Investigation Office (ASIO) Manuals, entitled "010101," "020301," and "BM7002.06.01.01 -

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  TSG." (*See* Ex. Q.) These confidential manuals set forth "standards and requirements
2  regarding aircraft accident and incident investigations" meeting regulatory certification
3  requirements. Defendant Dornéval also attached Bombardier's Computerized Airplane Flight
4  Manual ("CAFM") calculation methodology, entitled "BM7002.02.15.02 – Flight
5  Performances" to that email. This document sets the standard for all current and future
6  Bombardier aircraft CAFM and would be highly valuable to another aircraft manufacturer's
7  attempts to obtain a certificate of airworthiness to enable it to deliver its commercial aircraft:
8  the document discloses with specificity the performance calculation methodology that
9  Bombardier uses in its CAFM to calculate performance outputs for various scenarios that can
10  occur during flight, including but not limited to identifying numerous coefficients determined
11  by equations and constants that were negotiated with applicable regulatory authorities;
12  identifying calculation methodologies for scenarios involving drag on the aircraft from
13  various precipitation conditions, for various airspeed and altitude calibrations, for maximum
14  altitude, weight, mach, load factor, and bank angle scenarios; and a large volume of other
15  significant, specific, and highly proprietary Bombardier trade secret information that was the
16  result of extraordinary investments in time and resources in design, development, and testing
17  of critical Bombardier aircraft components. Defendant Dornéval's email attempt failed,
18  however, because the file sizes of the email attachments were too large. Undaunted by her
19  first failure, Defendant Dornéval attempted to send the same attachments, with one exception,
20  to her personal email account again at 8:14PM (PST); at 8:18PM (PST); and at 8:20PM
21  (PST). (*Id.*) The lone exception, Bombardier's CAFM calculation methodology, contained
22  186 pages of Bombardier highly proprietary and trade secret certification information. Upon
23  information and belief, Defendant Dornéval absconded with this information in either hard
24  copy form or through portable storage device means after realizing the file was too large to
25  send by way of email.

26  64.  While each of Defendant Dornéval's attempts to send highly sensitive,
27  proprietary Bombardier trade secret information and other confidential information to her

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

personal email account late in the evening on her last day of work failed, on information and belief Defendant Dornéval nonetheless privately retained, in addition to the CAFM calculation methodology, copies of the documents entitled "010101," "020301," and "BM7002.06.01.01 – TSG" in violation of the Bombardier Code of Ethics.  These documents were expressly marked as Bombardier Confidential and Proprietary Information, and the information contained therein was "not to be used, reproduced or disclosed to others without the written consent of Bombardier Inc."  Because Defendant Dornéval emailed or otherwise retained personal copies of this information knowing she would soon begin work on the MRJ project for AeroTEC, on information and belief she had every intention of misusing this information in her new role.

65.     Defendant Ayre is another former Bombardier employee who upon information and belief is currently working on the MRJ project for MITAC.  (Denkenberger Decl, Ex. 5.)  Defendant Ayre's last day with Bombardier was August 26, 2016, and in the weeks and days before his departure, he sent several emails containing highly sensitive Bombardier trade secret information to his personal email accounts.  For example, on August 24, 2016, Defendant Ayre sent multiple emails from his Bombardier work email account to either his personal Apple or Gmail account containing detailed Bombardier trade secret information concerning Bombardier aircraft certification efforts and issues, schematics, and discussions with Transport Canada (TCCA).  (*See*, *e.g.*, Ex. R.)  This information would be invaluable to anyone involved in an effort to obtain certificates of airworthiness for commercial delivery of an aircraft.  Additionally, the information contained in these emails is not readily ascertainable by proper means, as it was the result of innumerable hours of exhaustive development efforts throughout the past thirty (30) years, and Defendant Ayre knew it.  The information contained in these emails were the subject of efforts reasonable under the circumstances to keep secret, as the information on its face is precisely the type of highly proprietary and confidential information routinely marked as such by Bombardier, is the type of information identified in Bombardier's Code of Ethics as highly confidential and

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

trade secret information, and is information that an individual with Defendant Ayre's extensive experience would know to be trade secret information of Bombardier. Defendant Ayre served as Bombardier's Principal Engineering Specialist (PES) and TCCA's Design Approval Designee (DAD), and in that role Defendant Ayre would have every reason to know that the information he was sending to his personal email accounts was restricted, was not for any use other than for Bombardier's benefit, and was not to be circulated through unsecure or private channels. Such distribution was expressly prohibited by Bombardier's Code of Ethics, a Code Defendant Ayre agreed to abide. (*See* Ex. R.)

66.     Upon information and belief, Defendant Ayre had every intention of misusing Bombardier trade secret information for MRJ certification efforts once he began work for MITAC. For instance, on July 11, 2016, Defendant Ayre emailed to himself what appears to be a summary of his job responsibilities that he would assume upon joining MITAC, and the next day, on July 12, 2016—more than one month before his final day at Bombardier—Defendant Ayre signed and dated a MITAC "Employee Proprietary Information, Inventions, Non-Competition and Non-Solicitation Agreement." (Ex. R.)   Among Defendant Ayre's responsibilities at MITAC would be to "[d]efine and support flight test for all smoke test detection, smoke penetration and smoke evacuation activities and systems effects." (*Id.*) Two days before his departure from Bombardier, on August 24, 2016, Defendant Ayre emailed to his personal account a highly confidential email he initially received from TCCA nearly three years earlier concerning smoke penetration testing for Bombardier aircraft. (*Id.*) Additionally, on August 18, 2016, Defendant Ayre emailed to himself a copy of correspondence previously exchanged with MITAC personnel concerning Bombardier trade secret certification activities, the details of which he was "happy to discuss" "when [he is] in the MRJ office." (*Id.*)

67.     Upon information and belief, Defendant Ayre has personally visited and participated in MRJ certification efforts in Washington State, and he illicitly relied on and made use of Bombardier trade secret information as part of those visits and efforts.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Additionally, Defendant Ayre knew at all relevant times that MRJ certification efforts were taking place within this judicial district, and that the trade secret certification information he deliberately misappropriated from Bombardier would be used within this judicial district to the detriment of Bombardier.

68.     In addition to the named Individual Defendants, and on information and belief, other former Bombardier personnel now currently residing in Japan also absconded with Bombardier trade secret information.  For example, and on information and belief, Andrius Knystautas is another former Bombardier employee who is now working on the MRJ project after having been involved with the C-Series project.  Specifically, Mr. Knystautas, after resigning, worked his last day at Bombardier on March 2, 2017, but less than one (1) month before his departure he sent an email to his Videotron.ca email account with a password-protected .zip file attached thereto.  Despite repeated efforts, Bombardier to date has been unable to determine the contents of that .zip file because of the strength of password protection Mr. Knystautas, on information and belief, imparted on that file.  On further information and belief, the .zip file Mr. Knystautas transmitted to his personal email account contains highly sensitive, proprietary Bombardier trade secret information.

69.     Defendants John and/or Jane Does 1-88 are individuals, including Mr. Knystautas, formerly employed by Bombardier and are currently working for either MITAC, MITAC America, or AeroTEC, and have some relationship to or connection with the MRJ project.  Individuals will be named with specificity to the extent discovery reveals that any individual appears to have misappropriated Bombardier trade secret information.

## CLAIMS FOR RELIEF

### Count I: Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* (MITAC)

70.     Bombardier incorporates by reference paragraphs 1-69, above, as though fully set forth herein.

71.     Prior to the commencement of the C-Series aircraft program, Bombardier had certified twenty-seven (27) clean-sheet design and derivative programs over a period of thirty

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

(30) years. To successfully achieve said design certifications, Bombardier developed and owns confidential, proprietary, and trade secret information. Said information was then used throughout the design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad, as described above, of Bombardier's latest clean-sheet design: the C-Series aircraft. Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier.  This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

72.    This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

73.    Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

74.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.  In addition to the foregoing, the information at issue would be of tremendous value to MITAC in its efforts to develop, certify, and commercialize its MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

75.     In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836, MITAC misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein.  In addition to the foregoing, and upon further information and belief, MITAC has misappropriated Plaintiff's trade secrets under federal law because it acquired Bombardier trade secret information knowing or having reason to know that it was acquired by improper means.  Additionally, MITAC misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, MITAC knew or had reason to know its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use.  Alternatively, MITAC misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before MITAC materially changed its position.

76.     For example, and by no means limiting, MITAC (as described above) had been working on the MRJ project for "more than five years" by August 22, 2013, and by that time it had already "hired many foreign experts, especially ex-Boeing people, to help." (Denkenberger Decl., Ex. 21.)  Notwithstanding years of its best efforts in conjunction with outside expert consulting help, MITAC was heading for its fourth announced delay by the end of 2015.  Upon realizing that it was no closer to successful certification of the MRJ program after seven (7) full years of effort than it was years before, MITAC began willful, targeted recruiting of Bombardier personnel—personnel who had experience in designing and/or certifying the clean-sheet, narrow-body, geared turbofan twin-engine, medium range C-Series

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    aircraft—to assist in the design and/or certification of MITAC's clean-sheet, narrow-body,

2    geared turbofan twin-engine medium range MRJ aircraft.  Upon further information and

3    belief, MITAC specifically targeted Bombardier personnel for recruitment with the intention

4    of using these new recruits to provide proprietary and trade secret Bombardier design and/or

5    certification information for use in the MRJ project.  This is evidenced as described above,

6    but it is also evidenced by the fact that experienced aviation experts such as ex-Boeing

7    personnel lacked sufficient information to prevent MITAC from experiencing four (4)

8    significant delays in the MRJ timetable; by the fact that upon information and belief at least

9    one (1) representative from MITAC was extracting proprietary and trade secret information

10   from then-current Bombardier personnel that had already accepted positions with MITAC and

11   were simply working their notice periods for Bombardier; by the fact that MITAC hosted a

12   job fair less than one (1) kilometer from Bombardier's global principal place of business

13   weeks before the fourth announced delay of the MRJ project, advertising that it was "looking

14   to hire over 200 Aircraft System Engineers who can work on Certification activities of MRJ

15   aircraft"; and by the fact that, upon information and belief, MITAC had knowledge of and

16   condoned AeroTEC's targeted recruiting of Bombardier personnel in Wichita, Kansas.

17   Further, MITAC's misappropriation of Bombardier trade secret information is also evidenced

18   by the fact that shortly after a critical mass of former Bombardier personnel began working

19   for MITAC, MITAC America, and AeroTEC in their respective capacities on the MRJ

20   project—a period that began over eight (8) years after the MRJ project was initially

21   launched—MITAC abandoned its design of certain MRJ systems and electrical configurations

22   in favor of a new design that would be easier to certify, even though that would require

23   MITAC to begin its certification process anew.  On information and belief, MITAC has been

24   using Bombardier trade secret information to assist in the new design's certification, and

25   MITAC has been benefiting from MITAC America's and AeroTEC's known illicit use of

26   Bombardier's trade secrets to further the MRJ project.  On further information and belief,

27   MITAC knows or should know that certification of its new design will rely on Bombardier

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    trade secret information, because of the aforementioned circumstances leading up to and

2    surrounding MITAC's January 2017 announcement.

3          77.     MITAC's conduct as described herein was intentional, knowing, willful,

4    malicious, fraudulent, and oppressive.

5          78.     As a direct and proximate result of MITAC's conduct, Plaintiff has suffered

6    and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss

7    of the confidentiality of their proprietary and trade secret information, for which there is no

8    adequate remedy at law.

9          79.     Plaintiff has also suffered substantial damages as a direct and proximate cause

10    of MITAC's conduct in an amount to be proven at trial.

11          80.     MITAC has also been unjustly enriched by its misappropriation of

12    Bombardier's trade secrets in an amount to be proven at trial.

13                **Count II: Violation of the Washington Uniform Trade Secrets Act (WUTSA),**

14                              **RCW 19.108.010 *et seq.* (MITAC)**

15          81.     Plaintiff incorporates by reference paragraphs 1-80, above, as though fully set

16    forth herein.

17          82.     As explained above, Plaintiff has developed, owns, and possesses certain

18    confidential, proprietary, and trade secret information, including but not limited to

19    information used for the C-Series aircraft's design, development, testing, evaluation,

20    certification, and commercialization for use in the United States and abroad. Such

21    information includes, but is not limited to, the specific documents described and/or identified

22    above as being illicitly transmitted to personal email accounts by former Bombardier

23    personnel before their departure from Bombardier. This information constitutes financial,

24    business, scientific, technical, economic, and/or engineering information.

25          83.     This confidential, proprietary, and trade secret information relates to products

26    and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or

27    ordered in, interstate and foreign commerce, as it was used, among others, for the medium

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other

2  regulatory agencies abroad for service between states and foreign countries.

3  84.   Plaintiff has taken reasonable measures to keep such information secret as

4  described above and including, without limitation, subjecting all employees to a Code of

5  Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier

6  proprietary information; clearly marking trade secret information as proprietary and

7  confidential subject to restrictions on further use and dissemination; physically restricting

8  access in its facilities to properly credentialed individuals; and virtually restricting electronic

9  access to proprietary trade secret information to properly credentialed personnel.

10  85.   This confidential, proprietary, and trade secret information derives independent

11  economic value from not being generally known to, and not being readily ascertainable

12  through proper means by another person who could obtain economic value from the

13  disclosure or use of the information.  In addition to the foregoing, the information at issue

14  would be of tremendous value to MITAC in its efforts to develop, certify, and commercialize

15  its MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately

16  obtaining regulatory certification for entry into service of a narrow-body, geared turbofan

17  twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its

18  MRJ despite nearly a decade of effort.

19  86.   In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*,

20  MITAC misappropriated the confidential, proprietary, and trade secret information described

21  above in an improper and unlawful manner as alleged herein.  In addition to the foregoing,

22  and upon further information and belief, MITAC has misappropriated Plaintiff's trade secrets

23  under Washington law because it acquired Bombardier trade secret information knowing or

24  having reason to know that it was acquired by improper means.  Additionally, MITAC

25  misappropriated Bombardier's trade secrets because at the time it obtained and/or used

26  Bombardier trade secret information without Bombardier permission, MITAC knew or had

27  reason to know its knowledge of the trade secrets was derived from or through a person who

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use.  Alternatively, MITAC misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before MITAC materially changed its position.

87.    For example, and by no means limiting, MITAC (as described above) had been working on the MRJ project for "more than five years" by August 22, 2013, and by that time it had already "hired many foreign experts, especially ex-Boeing people, to help." (Denkenberger Decl., Ex. 21.)  Notwithstanding years of its best efforts in conjunction with outside expert consulting help, MITAC was heading for its fourth announced delay by the end of 2015.  Upon realizing that it was no closer to successful certification of the MRJ program after seven (7) full years of effort than it was years before, MITAC began willful, targeted recruiting of Bombardier personnel—personnel who had experience in designing and/or certifying the clean-sheet, narrow-body, geared turbofan twin-engine, medium range C-Series aircraft—to assist in the design and/or certification of MITAC's clean-sheet, narrow-body, geared turbofan twin-engine medium range MRJ aircraft.  Upon further information and belief, MITAC specifically targeted Bombardier personnel for recruitment with the intention of using these new recruits to provide proprietary and trade secret Bombardier design and/or certification information for use in the MRJ project.  This is evidenced as described above, but it is also evidenced by the fact that experienced aviation experts such as ex-Boeing personnel lacked sufficient information to prevent MITAC from experiencing four (4) significant delays in the MRJ timetable; by the fact that upon information and belief at least one representative from MITAC was extracting proprietary and trade secret information from then-current Bombardier personnel that had already accepted positions with MITAC and were simply working their notice periods for Bombardier; by the fact that MITAC hosted a job fair less than one (1) kilometer from Bombardier's global principal place of business weeks before

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

the fourth announced delay of the MRJ project, advertising that it was "looking to hire over 200 Aircraft System Engineers who can work on Certification activities of MRJ aircraft"; and by the fact that, upon information and belief, MITAC had knowledge of and condoned AeroTEC's targeted recruiting of Bombardier personnel in Wichita, Kansas.   Further, MITAC's misappropriation of Bombardier trade secret information is also evidenced by the fact that shortly after a critical mass of former Bombardier personnel began working for MITAC, MITAC America, and AeroTEC in their respective capacities on the MRJ project—a period that began over eight (8) years after the MRJ project was initially launched—MITAC abandoned its design of certain MRJ systems and electrical configurations in favor of a new design that would be easier to certify, even though that would require MITAC to begin its certification process anew.   On information and belief, MITAC has been using Bombardier trade secret information to assist in the new design's certification, and MITAC has been benefiting from MITAC America's and AeroTEC's known illicit use of Bombardier's trade secrets to further the MRJ project.   On further information and belief, MITAC knows or should know that certification of its new design will rely on Bombardier trade secret information, because of the aforementioned circumstances leading up to and surrounding MITAC's January 2017 announcement.

88.   MITAC's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

89.   As a direct and proximate result of MITAC's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

90.   Plaintiff has also suffered substantial damages as a direct and proximate cause of MITAC's conduct in an amount to be proven at trial.

91.   MITAC has also been unjustly enriched by its misappropriation of Bombardier's trade secrets in an amount to be proven at trial.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**<u>Count III: Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*</u>**

**<u>(MITAC America)</u>**

92.     Plaintiff incorporates by reference paragraphs 1-91, above, as though fully set forth herein.

93.     As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.

94.     Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier.  This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

95.     This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

96.     Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

97.     This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC America in its efforts assisting MITAC to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of collective effort.

98.     In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836, MITAC America misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein. In addition to the foregoing, and upon further information and belief, MITAC America has misappropriated Plaintiff's trade secrets under federal law because it acquired Bombardier trade secret information knowing or having reason to know that it was acquired by improper means. Additionally, MITAC America misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, MITAC America knew or had reason to know its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use. Alternatively, MITAC America misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before MITAC America materially changed its position.

99.     For instance, MITAC (MITAC America's corporate parent as described above) had been working on the MRJ project for "more than five years" by August 22, 2013, and by that time it had already "hired many foreign experts, especially ex-Boeing people, to help." (Denkenberger Decl., Ex. 21.) Notwithstanding years of its best efforts in conjunction with

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    outside expert consulting help, MITAC was heading for further delays.  On information and

2    belief, MITAC and/or MITAC officers and/or directors formed MITAC America on June 4,

3    2014, at least in part to expand efforts into the United States to work the MRJ project.  On

4    further information belief, MITAC America then opened the Seattle Engineering Center

5    jointly with AeroTEC on August 3, 2015, at least in part to further expand U.S. efforts to

6    work the MRJ Project.  Shortly thereafter, on information and belief, MITAC America

7    participated with MITAC in the willful, targeted recruiting of Bombardier personnel—

8    personnel who had experience in designing and/or certifying the clean-sheet, narrow-body,

9    geared turbofan twin-engine, medium range C-Series aircraft—to assist in the design and/or

10   certification of MITAC's clean-sheet, narrow-body, geared turbofan twin-engine medium

11   range MRJ aircraft.  Upon further information and belief, MITAC America specifically

12   targeted Bombardier personnel for recruitment with the intention of using these new recruits

13   to provide proprietary and trade secret Bombardier design and/or certification information for

14   use in the MRJ project.  This is evidenced as described above, but it is also evidenced by the

15   fact that experienced aviation experts such as ex-Boeing personnel lacked sufficient

16   information to prevent MITAC from experiencing four (4) significant delays in the MRJ

17   timetable; by the fact that MITAC America, on information and belief, operates as a corporate

18   subsidiary to MITAC and was formed at least in part to expand efforts in North America to

19   design, develop, and certify the MRJ; by the fact that shortly after forming MITAC America,

20   MITAC hosted a job fair less than one (1) kilometer from Bombardier's global principal place

21   of business weeks before the fourth announced delay of the MRJ project advertising that it

22   was "looking to hire over 200 Aircraft System Engineers who can work on Certification

23   activities of MRJ aircraft"; and by the fact that, upon information and belief, MITAC America

24   had knowledge of and condoned AeroTEC's targeted recruiting of Bombardier personnel in

25   Wichita, Kansas.  Further, MITAC America's misappropriation of Bombardier trade secret

26   information is also evidenced by the fact that shortly after a critical mass of former

27   Bombardier personnel began working for MITAC, MITAC America, and AeroTEC in their

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

respective capacities on the MRJ project—a period that began <u>over eight (8) years after the</u> <u>MRJ project was launched</u>—MITAC abandoned its design of certain MRJ systems and electrical configurations in favor of a new design that would be easier to certify, <u>even though</u> <u>that would require MITAC to begin its certification process anew</u>.  On information and belief, MITAC America has been using Bombardier trade secret information to assist in the new design's certification, and MITAC America has been benefiting from the Corporate Defendants' collective known illicit use of Bombardier's trade secrets to further the MRJ project. On further information and belief, MITAC America knows or should know that certification of its new design will rely on Bombardier trade secret information, because of the aforementioned circumstances leading up to and surrounding MITAC's January 2017 announcement.

100.    MITAC America's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

101.    As a direct and proximate result of MITAC America's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

102.    Plaintiff has also suffered substantial damages as a direct and proximate cause of MITAC America's conduct in an amount to be proven at trial.

103.     MITAC America has also been unjustly enriched by its misappropriation of Bombardier's trade secrets in an amount to be proven at trial.

**<u>Count IV: Violation of the Washington Uniform Trade Secrets Act (WUTSA),</u>**

**<u>RCW 19.108.010 <i>et seq.</i> (MITAC AMERICA)</u>**

104.    Plaintiff incorporates by reference paragraphs 1-103, above, as though fully set forth herein.

105.    As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.   Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier.   This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

106.   This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

107.   Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

108.   This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.   In addition to the foregoing, the information at issue would be of tremendous value to MITAC America in its efforts assisting MITAC to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of collective effort.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

109.     In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*, MITAC America misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein.  In addition to the foregoing, and upon further information and belief, MITAC America has misappropriated Plaintiff's trade secrets under federal law because it acquired Bombardier trade secret information knowing or having reason to know that it was acquired by improper means. Additionally, MITAC America misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, MITAC America knew or had reason to know its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use.  Alternatively, MITAC America misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before MITAC America materially changed its position.

110.     For instance, MITAC (MITAC America's corporate parent as described above) had been working on the MRJ project for "more than five years" by August 22, 2013, and by that time it had already "hired many foreign experts, especially ex-Boeing people, to help." (Denkenberger Decl., Ex. 21.)  Notwithstanding years of its best efforts in conjunction with outside expert consulting help, MITAC was heading for further delays.  On information and belief, MITAC and/or MITAC officers and/or directors formed MITAC America on June 4, 2014, at least in part to expand efforts into the United States to work the MRJ project.  On further information belief, MITAC America then opened the Seattle Engineering Center jointly with AeroTEC on August 3, 2015, at least in part to further expand U.S. efforts to work the MRJ Project.  Shortly thereafter, on information and belief, MITAC America participated with MITAC in the willful, targeted recruiting of Bombardier personnel—

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    personnel who had experience in designing and/or certifying the clean-sheet, narrow-body,

2    geared turbofan twin-engine, medium range C-Series aircraft—to assist in the design and/or

3    certification of MITAC's clean-sheet, narrow-body, geared turbofan twin-engine medium

4    range MRJ aircraft.   Upon further information and belief, MITAC America specifically

5    targeted Bombardier personnel for recruitment with the intention of using these new recruits

6    to provide proprietary and trade secret Bombardier design and/or certification information for

7    use in the MRJ project.   This is evidenced as described above, but it is also evidenced by the

8    fact that experienced aviation experts such as ex-Boeing personnel lacked sufficient

9    information to prevent MITAC from experiencing four (4) significant delays in the MRJ

10   timetable; by the fact that MITAC America, on information and belief, operates as a corporate

11   subsidiary to MITAC and was formed at least in part to expand efforts in North America to

12   design, develop, and certify the MRJ; by the fact that shortly after forming MITAC America,

13   MITAC hosted a job fair less than one (1) kilometer from Bombardier's global principal place

14   of business weeks before the fourth announced delay of the MRJ project advertising that it

15   was "looking to hire over 200 Aircraft System Engineers who can work on Certification

16   activities of MRJ aircraft"; and by the fact that, upon information and belief, MITAC America

17   had knowledge of and condoned AeroTEC's targeted recruiting of Bombardier personnel in

18   Wichita, Kansas.   Further, MITAC America's misappropriation of Bombardier trade secret

19   information is also evidenced by the fact that shortly after a critical mass of former

20   Bombardier personnel began working for MITAC, MITAC America, and AeroTEC in their

21   respective capacities on the MRJ project—a period that began <u>over eight (8) years after the</u>

22   <u>MRJ project was launched</u>—MITAC abandoned its design of certain MRJ systems and

23   electrical configurations in favor of a new design that would be easier to certify, <u>even though</u>

24   <u>that would require MITAC to begin its certification process anew</u>.   On information and belief,

25   MITAC America has been using Bombardier trade secret information to assist in the new

26   design's certification, and MITAC America has been benefiting from the Corporate

27   Defendants' collective known illicit use of Bombardier's trade secrets to further the MRJ

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  project. On further information and belief, MITAC America knows or should know that

2  certification of its new design will rely on Bombardier trade secret information, because of the

3  aforementioned circumstances leading up to and surrounding MITAC's January 2017

4  announcement.

5        111.  MITAC America's conduct as described herein was intentional, knowing,

6  willful, malicious, fraudulent, and oppressive.

7        112.  As a direct and proximate result of MITAC America's conduct, Plaintiff has

8  suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an

9  irreparable loss of the confidentiality of their proprietary and trade secret information, for

10  which there is no adequately remedy at law.

11        113.  Plaintiff has also suffered substantial damages as a direct and proximate cause

12  of MITAC America's conduct in an amount to be proven at trial.

13        114.   MITAC America has also been unjustly enriched by its misappropriation of

14  Bombardier's trade secrets in an amount to be proven at trial.

15  **Count V: Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* (AeroTEC)**

16        115.  Plaintiff incorporates by reference paragraphs 1-114, above, as though fully set

17  forth herein.

18        116.  As explained above, Plaintiff has developed, owns, and possesses certain

19  confidential, proprietary, and trade secret information, including but not limited to

20  information used for the C-Series aircraft's design, development, testing, evaluation,

21  certification, and commercialization for use in the United States and abroad.  Such

22  information includes, but is not limited to, the specific documents described and/or identified

23  above as being illicitly transmitted to personal email accounts by former Bombardier

24  personnel before their departure from Bombardier.  This information constitutes financial,

25  business, scientific, technical, economic, and/or engineering information.

26        117.  This confidential, proprietary, and trade secret information relates to products

27  and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  ordered in, interstate and foreign commerce, as it was used, among others, for the medium

2  range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other

3  regulatory agencies abroad for service between states and foreign countries.

4      118.   Plaintiff has taken reasonable measures to keep such information secret as

5  described above and including, without limitation, subjecting all employees to a Code of

6  Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier

7  proprietary information; clearly marking trade secret information as proprietary and

8  confidential subject to restrictions on further use and dissemination; physically restricting

9  access in its facilities to properly credentialed individuals; and virtually restricting electronic

10  access to proprietary trade secret information to properly credentialed personnel.

11      119.   This confidential, proprietary, and trade secret information derives independent

12  economic value from not being generally known to, and not being readily ascertainable

13  through proper means by another person who could obtain economic value from the

14  disclosure or use of the information.  In addition to the foregoing, the information at issue

15  would be of tremendous value to AeroTEC in its efforts to assist MITAC and MITAC

16  America develop, certify, and commercialize its MRJ aircraft, as it would at a minimum

17  provide invaluable guidance in ultimately obtaining regulatory certification for entry into

18  service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something

19  MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

20      120.   In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C.

21  § 1836, AeroTEC misappropriated the confidential, proprietary, and trade secret information

22  described above in an improper and unlawful manner as alleged herein.  In addition to the

23  foregoing, and upon further information and belief, AeroTEC has misappropriated Plaintiff's

24  trade secrets under federal law because it acquired Bombardier trade secret information

25  knowing or having reason to know that it was acquired by improper means.  Additionally,

26  AeroTEC misappropriated Bombardier's trade secrets because at the time it obtained and/or

27  used Bombardier trade secret information without Bombardier permission, AeroTEC knew or

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

had reason to know its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use.   Alternatively, AeroTEC misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before AeroTEC materially changed its position.

121.    For example, and by no means limiting, AeroTEC on information and belief began its involvement with the MRJ project by no later than August 3, 2015, at which time in conjunction with MITAC America it opened the Seattle Engineering Center.  On information and belief, MITAC America partnered with AeroTEC for at least the purpose of enlisting AeroTEC's assistance in the design, development, and/or certification of the MRJ—a project that by August 3, 2015 had experienced three significant delays and would soon experience a fourth.   Upon information and belief, shortly after partnering with MITAC America in forming the Seattle Engineering Center, and after realizing it did not then have the necessary personnel or resources to effectively assist MITAC and MITAC America with the MRJ project,  AeroTEC began willful, targeted recruiting of Bombardier personnel—personnel who had experience in designing and/or certifying the clean-sheet, narrow-body, geared turbofan twin-engine, medium range C-Series aircraft—to assist in the design and/or certification of MITAC's clean-sheet, narrow-body, geared turbofan twin-engine medium range MRJ aircraft.   Upon further information and belief, AeroTEC specifically targeted Bombardier personnel for recruitment with the intention of using these new recruits to provide proprietary and trade secret Bombardier design and certification information for use in the MRJ project.  This is evidenced as described above, but it is also evidenced by the fact that upon information and belief AeroTEC initially lacked the requisite expertise—just as experienced aviation experts such as ex-Boeing personnel did—to prevent MITAC from experiencing any additional delays in the MRJ timetable; by the fact that at least one (1)

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    officer or director of AeroTEC, former Bombardier employee Defendant Michel Korwin-
2    Szymanowski, sent targeted electronic communications to then-current Bombardier personnel
3    relaying his and AeroTEC's intention to hire Bombardier personnel for work on the MRJ
4    project; by the fact AeroTEC retained the services of professional recruiting services such as
5    Velocity Consulting Solutions who attempted to recruit Bombardier personnel; and by the fact
6    that AeroTEC organized a job fair in Wichita, Kansas in proximity to Bombardier's U.S.
7    Flight Test Center and upon information and belief further targeted Bombardier personnel
8    specifically for this job fair by arranging for billboards mounted on flatbed trucks advertising
9    the job fair to be displayed immediately outside Bombardier's Flight Test Center.  Further,
10   AeroTEC's misappropriation of Bombardier trade secret information is also evidenced by the
11   fact that shortly after a critical mass of former Bombardier personnel began working for
12   AeroTEC in their respective capacities on the MRJ project—<u>over eight (8) years after the</u>
13   <u>MRJ project was launched</u>—MITAC abandoned its design of certain MRJ systems and
14   electrical configurations in favor of a new design that would be easier to certify, <u>even though</u>
15   <u>that would require MITAC to begin its certification process anew</u>.  On information and belief,
16   AeroTEC has been using Bombardier trade secret information to assist in the new design's
17   certification, and AeroTEC has been benefiting from the Corporate Defendants' collective
18   known illicit use of Bombardier's trade secrets to further the MRJ project.  On further
19   information and belief, AeroTEC knows or should know that certification of the MRJ's new
20   design will rely on Bombardier's trade secret information, because of the aforementioned
21   circumstances leading up to and surrounding MITAC's January 2017 announcement.

22       122.    AeroTEC's conduct as described herein was intentional, knowing, willful,
23   malicious, fraudulent, and oppressive.

24       123.    As a direct and proximate result of AeroTEC's conduct, Plaintiff has suffered
25   and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss
26   of the confidentiality of their proprietary and trade secret information, for which there is no
27   adequately remedy at law.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

124.    Plaintiff has also suffered substantial damages as a direct and proximate cause of AeroTEC's conduct in an amount to be proven at trial.

125.    AeroTEC has also been unjustly enriched by its misappropriation of Bombardier's trade secrets in an amount to be proven at trial.

**Count VI: Violation of the Washington Uniform Trade Secrets Act (WUTSA), RCW 19.108.010 *et seq.* (AeroTEC)**

126.    Bombardier incorporates by reference paragraphs 1-125, above, as though fully set forth herein.

127.    As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.  Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier.  This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

128.    This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

129.    Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

130. This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to AeroTEC in its efforts to assist MITAC and MITAC America develop, certify, and commercialize its MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

131. In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*, AeroTEC misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein. In addition to the foregoing, and upon further information and belief, AeroTEC has misappropriated Plaintiff's trade secrets under federal law because it acquired Bombardier trade secret information knowing or having reason to know that it was acquired by improper means. Additionally, AeroTEC misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, AeroTEC knew or had reason to know its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use. Alternatively, AeroTEC misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission, knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before AeroTEC materially changed its position.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1       132.    For example, and by no means limiting, AeroTEC on information and belief

2 began its involvement with the MRJ project by no later than August 3, 2015, at which time in

3 conjunction with MITAC America it opened the Seattle Engineering Center.  On information

4 and belief, MITAC America partnered with AeroTEC for at least the purpose of enlisting

5 AeroTEC's assistance in the design, development, and/or certification of the MRJ—a project

6 that by August 3, 2015 had experienced three significant delays and would soon experience a

7 fourth.  Upon information and belief, shortly after partnering with MITAC America in

8 forming the Seattle Engineering Center, and after realizing it did not then have the necessary

9 personnel or resources to effectively assist MITAC and MITAC America with the MRJ

10 project,  AeroTEC began willful, targeted recruiting of Bombardier personnel—personnel

11 who had experience in designing and/or certifying the clean-sheet, narrow-body, geared

12 turbofan twin-engine, medium range C-Series aircraft—to assist in the design and/or

13 certification of MITAC's clean-sheet, narrow-body, geared turbofan twin-engine medium

14 range MRJ aircraft.  Upon further information and belief, AeroTEC specifically targeted

15 Bombardier personnel for recruitment with the intention of using these new recruits to provide

16 proprietary and trade secret Bombardier design and certification information for use in the

17 MRJ project.  This is evidenced as described above, but it is also evidenced by the fact that

18 upon information and belief AeroTEC initially lacked the requisite expertise—just as

19 experienced aviation experts such as ex-Boeing personnel did—to prevent MITAC from

20 experiencing any additional delays in the MRJ timetable; by the fact that at least one (1)

21 officer or director of AeroTEC, former Bombardier employee Defendant Michel Korwin-

22 Szymanowski, sent targeted electronic communications to then-current Bombardier personnel

23 relaying his and AeroTEC's intention to hire Bombardier personnel for work on the MRJ

24 project; by the fact AeroTEC retained the services of professional recruiting services such as

25 Velocity Consulting Solutions who attempted to recruit Bombardier personnel; and by the fact

26 that AeroTEC organized a job fair in Wichita, Kansas in proximity to Bombardier's U.S.

27 Flight Test Center and upon information and belief further targeted Bombardier personnel

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

specifically for this job fair by arranging for billboards mounted on flatbed trucks advertising the job fair to be displayed immediately outside Bombardier's Flight Test Center.  Further, AeroTEC's misappropriation of Bombardier trade secret information is also evidenced by the fact that shortly after a critical mass of former Bombardier personnel began working for AeroTEC in their respective capacities on the MRJ project—over eight (8) years after the MRJ project was launched—MITAC abandoned its design of certain MRJ systems and electrical configurations in favor of a new design that would be easier to certify, even though that would require MITAC to begin its certification process anew.  On information and belief, AeroTEC has been using Bombardier trade secret information to assist in the new design's certification, and AeroTEC has been benefiting from the Corporate Defendants' collective known illicit use of Bombardier's trade secrets to further the MRJ project.  On further information and belief, AeroTEC knows or should know that certification of the MRJ's new design will rely on Bombardier's trade secret information, because of the aforementioned circumstances leading up to and surrounding MITAC's January 2017 announcement.

133.    AeroTEC's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

134.    As a direct and proximate result of AeroTEC's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

135.    Plaintiff has also suffered substantial damages as a direct and proximate cause of AeroTEC's conduct in an amount to be proven at trial.

136.    AeroTEC has also been unjustly enriched by its misappropriation of Bombardier's trade secrets in an amount to be proven at trial.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Count VII: Tortious Interference with Contractual Relationship and/or Business Expectancy (MITAC)**

137.    Plaintiff incorporates by reference paragraphs 1-136, above, as though fully set forth herein.

138.    Bombardier had a reasonable and valid contractual relationship and/or business expectancy with each of its former employees arising from each former employee's agreement to be bound by Bombardier's Code of Ethics provision to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so.  This includes confidential information provided by suppliers and customers.  Employees agree to maintain such confidentiality at all times, even after leaving the employ of Bombardier."  (Ex. D.)

139.    Bombardier also had a reasonable and valid business expectancy that it would continue to employ its personnel, specifically Defendants Basson, Delarche, Dornéval, and Does 1-88, to continue their design, development, engineering, and/or certification efforts in Bombardier's aerospace division.  These employer-employee relationships were more than simple "at-will" employment arrangements at least because each employee had a continuing obligation following termination of employment to maintain the confidentiality of all Bombardier proprietary and confidential information.

140.    Bombardier also had a reasonable and valid business expectancy that it would not lose a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft within a span of months to work for a competing venture in need of Bombardier's proprietary and confidential information.

141.    Bombardier had yet another reasonable and valid business expectancy that it would generally adhere to its certification schedules set forth for the C-Series and Global 7000/8000 Aircraft, particularly because Bombardier had successfully obtained certification for approximately thirty (30) different aircraft in the preceding three (3) decades, it had significant experience and understanding of certification processes as a result of these

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

previous certifications, and it could reasonably expect based on this experience and understanding that its projected schedule to obtain certification for the C-Series and Global 7000/8000 Aircraft would be accurate.

142.    MITAC knew of each of these contractual relationships and business expectancies, at least because Bombardier informed MITAC of these relationships and expectancies through various letters described above, because MITAC had previously hired former Bombardier personnel who were aware of these relationships and expectancies, and/or because MITAC as a similarly situated corporate entity maintains the same relationships and/or expectations of its own.

143.    By engaging in the aforementioned conduct, specifically but without limitation targeting Bombardier personnel for recruitment for its MRJ project, MITAC intentionally interfered with Bombardier's contractual relationships and business expectancies, which proximately induced or caused breach of the aforementioned contractual relationships with, and business expectancies from, at least Defendants Basson, Delarche, Dornéval, and Does 1-88 as individuals, with these defendants collectively as comprising a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft, and with these defendants collectively as instrumental to adhering to Bombardier's certification schedule for the C-Series and Global 7000/8000 Aircraft.

144.    MITAC's intentional interference with Bombardier's contractual relationships and business expectancies was conducted for improper purposes; namely—to illicitly obtain Bombardier confidential, proprietary, and/or trade secret information knowingly and willfully to assist in the development and/or certification of its MRJ; and to harm Bombardier in the form of costly delays to its certification efforts for the C-Series and Global 7000/8000 Aircraft.

145.    MITAC's intentional interference with Bombardier's contractual relationships and business expectancies for an improper purpose has caused resulting damage to Plaintiff and is continuing to cause resulting damage to Plaintiff.

COMPLAINT (_____) - 57

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  **Count VIII: Tortious Interference with Contractual Relationship and/or Business**
2  **Expectancy (MITAC AMERICA)**

3      146.    Plaintiff incorporates by reference paragraphs 1-145, above, as though fully set
4  forth herein.

5      147.    Bombardier had a reasonable and valid contractual relationship and/or business
6  expectancy with each of its former employees arising from each former employee's
7  agreement to be bound by Bombardier's Code of Ethics provision to "not divulge
8  [Bombardier] confidential information to anyone other than the person or persons for whom it
9  is intended, unless authorized or legally required to do so.  This includes confidential
10 information provided by suppliers and customers.  Employees agree to maintain such
11 confidentiality at all times, even after leaving the employ of Bombardier."  (Ex. D, at 15.)

12     148.    Bombardier also had a reasonable and valid business expectancy that it would
13 continue to employ its personnel, specifically Defendants Basson, Delarche, Dornéval, and
14 Does 1-88, to continue their design, development, engineering, and/or certification efforts in
15 Bombardier's aerospace division.  These employer-employee relationships were more than
16 simple "at-will" employment arrangements at least because each employee had a continuing
17 obligation following termination of employment to maintain the confidentiality of all
18 Bombardier proprietary and confidential information.

19     149.    Bombardier also had a reasonable and valid business expectancy that it would
20 not lose a significant number of its key personnel involved in the testing and certification of
21 the C-Series and Global 7000/8000 Aircraft within a span of months to work for a competing
22 venture in need of Bombardier's proprietary and confidential information.

23     150.    Bombardier had yet another reasonable and valid business expectancy that it
24 would generally adhere to its certification schedules set forth for the C-Series and Global
25 7000/8000 Aircraft, particularly because Bombardier had successfully obtained certification
26 for approximately thirty (30) different aircraft in the preceding three (3) decades, it had
27 significant experience and understanding of certification processes as a result of these

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

previous certifications, and it could reasonably expect based on this experience and understanding that its projected schedule to obtain certification for the C-Series and Global 7000/8000 Aircraft would be accurate.

151.    MITAC America knew of each of these contractual relationships and business expectancies, at least because Bombardier informed MITAC America of these relationships and expectancies through various letters described above, because MITAC America had previously hired former Bombardier personnel who were aware of these relationships and expectancies, and/or because MITAC America as a similarly situated corporate entity maintains the same relationships and/or expectations of its own.

152.    By engaging in the aforementioned conduct, specifically but without limitation targeting Bombardier personnel for recruitment for its MRJ project, MITAC America intentionally interfered with Bombardier's contractual relationships and business expectancies, which proximately induced or caused breach of the aforementioned contractual relationships with, and business expectancies from, at least Defendants Basson, Delarche, Dornéval, and Does 1-88 as individuals, with these defendants collectively as comprising a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft, and with these defendants collectively as instrumental to adhering to Bombardier's certification schedule for the C-Series and Global 7000/8000 Aircraft.

153.    MITAC America's intentional interference with Bombardier's contractual relationships and business expectancies was conducted for improper purposes; namely—to illicitly obtain Bombardier confidential, proprietary, and/or trade secret information knowingly and willfully to assist in the development and/or certification of its MRJ; and to harm Bombardier in the form of costly delays to its certification efforts for the C-Series and Global 7000/8000 Aircraft.

154.    MITAC America's intentional interference with Bombardier's contractual relationships and business expectancies for an improper purpose has caused resulting damage to Plaintiff and is continuing to cause resulting damage to Plaintiff.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Count IX: Tortious Interference with Contractual Relationship and/or Business Expectancy (AeroTEC)**

155.    Plaintiff incorporates by reference paragraphs 1-154, above, as though fully set forth herein.

156.    Bombardier had a reasonable and valid contractual relationship and/or business expectancy with each of its former employees arising from each former employee's agreement to be bound by Bombardier's Code of Ethics provision to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so.  This includes confidential information provided by suppliers and customers.  Employees agree to maintain such confidentiality at all times, even after leaving the employ of Bombardier."  (Ex. D, at 15.)

157.    Bombardier also had a reasonable and valid business expectancy that it would continue to employ its personnel, specifically Defendants Basson, Delarche, Dornéval, and Does 1-88, to continue their design, development, engineering, and/or certification efforts in Bombardier's aerospace division.  These employer-employee relationships were more than simple "at-will" employment arrangements at least because each employee had a continuing obligation following termination of employment to maintain the confidentiality of all Bombardier proprietary and confidential information.

158.    Bombardier also had a reasonable and valid business expectancy that it would not lose a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft within a span of months to work for a competing venture in need of Bombardier's proprietary and confidential information.

159.    Bombardier had yet another reasonable and valid business expectancy that it would generally adhere to its certification schedules set forth for the C-Series and Global 7000/8000 Aircraft, particularly because Bombardier had successfully obtained certification for approximately thirty (30) different aircraft in the preceding three (3) decades, it had significant experience and understanding of certification processes as a result of these

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

previous certifications, and it could reasonably expect based on this experience and understanding that its projected schedule to obtain certification for the C-Series and Global 7000/8000 Aircraft would be accurate.

160.   AeroTEC knew of each of these contractual relationships and business expectancies, at least because Bombardier informed AeroTEC of this expectation through various letters described above, because AeroTEC had previously hired former Bombardier personnel who were aware of these relationships and expectancies, and/or because AeroTEC as a similarly situated corporate entity maintains the same relationships and/or expectations of its own.

161.   By engaging in the aforementioned conduct, specifically but without limitation targeting Bombardier personnel for recruitment for its MRJ project, AeroTEC intentionally interfered with Bombardier's contractual relationships and business expectancies, which proximately induced or caused breach of the aforementioned contractual relationships with, and business expectancies from, at least Defendants Basson, Delarche, Dornéval, and Does 1-88 as individuals, with these defendants collectively as comprising a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft, and with these defendants collectively as instrumental to adhering to Bombardier's certification schedule for the C-Series and Global 7000/8000 Aircraft.

162.   AeroTEC's intentional interference with Bombardier's contractual relationships and business expectancies was conducted for improper purposes; namely—to illicitly obtain Bombardier confidential, proprietary, and/or trade secret information knowingly and willfully to assist in the development and/or certification of the MRJ; and to harm Bombardier in the form of costly delays to its certification efforts for the C-Series and Global 7000/8000 Aircraft.

163.   AeroTEC's intentional interference with Bombardier's contractual relationships and business expectancies for an improper purpose has caused resulting damage to Plaintiff and is continuing to cause resulting damage to Plaintiff.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Count X: Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.***

**(Laurus Basson)**

164.    Bombardier incorporates by reference paragraphs 1-163, above, as though fully set forth herein.

165.    As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.    Such information includes, but is not limited to, information contained in two proprietary PowerPoint slide decks entitled, "TCCA Skew Detection Presentation- Updated with latest Systems and Structure Limits 16-02-01.pptx" and "2016-03-03 TCCA Skew Detection Presentation-JAN 28 FINAL.pptx" (collectively, "Bombardier Skew Detection TCCA Files"). These documents contain highly sensitive, proprietary Bombardier trade secret information concerning Bombardier's Skew Detection System and related confidential communications Bombardier made with Transport Canada for certification purposes.

166.    This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Skew Detection TCCA Files—relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of certain Bombardier aircraft.

167.    Plaintiff has taken reasonable measures to keep such information—including the information contained in the Bombardier Skew Detection TCCA Files—secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    access in its facilities to properly credentialed individuals; and virtually restricting electronic

2    access to proprietary trade secret information to properly credentialed personnel.

3    168.    This confidential, proprietary, and trade secret information—including the

4    information contained in the Bombardier Skew Detection TCCA Files—derives independent

5    economic value from not being generally known to, and not being readily ascertainable

6    through proper means by another person who could obtain economic value from the

7    disclosure or use of the information.  In addition to the foregoing, the information at issue

8    would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to

9    develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide

10   invaluable guidance in ultimately obtaining regulatory certification for entry into service of a

11   narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has

12   been unable to obtain for its MRJ despite nearly a decade of effort.

13   169.    In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C.

14   § 1836, Defendant Basson misappropriated the confidential, proprietary, and trade secret

15   information described above, including but not limited to the Bombardier Skew Detection

16   TCCA Files, in an improper and unlawful manner as alleged herein.  Specifically, and without

17   limitation, Defendant Basson misappropriated at least the Bombardier Skew Detection TCCA

18   Files because at the time he emailed the files to his private email account, he lacked

19   authorization to do so, and he knew or should have known that this was an impermissible

20   transfer of Bombardier files containing highly sensitive Bombardier trade secret information

21   for his personal possession.  Additionally, and upon information and belief, on or after May

22   11, 2016, Defendant Basson disclosed this and potentially other Bombardier trade secret

23   information to others without Bombardier permission after using improper means to acquire

24   the information, knowing or having reason to know at the time of disclosure that his

25   knowledge of the trade secret information was derived under circumstances giving rise to a

26   duty to maintain its secrecy and limit its use.

27

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

170.    Defendant Basson's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

171.    As a direct and proximate result of Defendant Basson's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

172.    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Basson's conduct in an amount to be proven at trial.

**Count XI: Violation of the Washington Uniform Trade Secrets Act (WUTSA), RCW 19.108.010 *et seq.* (Laurus Basson)**

173.    Bombardier incorporates by reference paragraphs 1-172, above, as though fully set forth herein.

174.    As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including, but is not limited to, information contained in two proprietary PowerPoint slide decks entitled, "TCCA Skew Detection Presentation- Updated with latest Systems and Structure Limits 16-02-01.pptx" and "2016-03-03 TCCA Skew Detection Presentation-JAN 28 FINAL.pptx" (collectively, "Bombardier Skew Detection TCCA Files").   These documents contain highly sensitive, proprietary Bombardier trade secret information concerning Bombardier's Skew Detection System and related confidential communications Bombardier made with Transport Canada for certification purposes.

175.    This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Skew Detection TCCA Files—relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of certain Bombardier aircraft.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

176.    Plaintiff has taken reasonable measures to keep such information—including the information contained in the Bombardier Skew Detection TCCA Files—secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

177.    This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Skew Detection TCCA Files—derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.  In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

178.    In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*, Defendant Basson misappropriated the confidential, proprietary, and trade secret information described above, including but not limited to the Bombardier Skew Detection TCCA Files, in an improper and unlawful manner as alleged herein.  Specifically, and without limitation, Defendant Basson misappropriated at least the Bombardier Skew Detection TCCA Files because at the time he emailed the files to his private email account, he lacked authorization to do so, and he knew or should have known that this was an impermissible transfer of Bombardier files containing highly sensitive Bombardier trade secret information for his personal possession.  Additionally, and upon information and belief, Defendant Basson

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

179.    Defendant Basson's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

180.    As a direct and proximate result of Defendant Basson's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

181.    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Basson's conduct in an amount to be proven at trial.

**Count XII: Breach of Contract (Laurus Basson)**

182.    Bombardier incorporates by reference paragraphs 1-181, above, as though fully set forth herein.

183.    At all relevant times, Bombardier had a valid and enforceable contract with Defendant Basson at least arising out of Defendant Basson's express agreement to abide by Bombardier's Code of Ethics.

184.    Pursuant to at least Bombardier's Code of Ethics, Defendant Basson owed Bombardier a duty to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so." (Exs. D, K.)  Defendant Basson's duty was "to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (*Id.*)  Defendant Basson also owed Bombardier duties to Bombardier to "keep[] electronic and paper documents and files containing confidential information in a safe place"; to "transmit[] confidential documents by electronic devices, such as by fax or e-mail, only when it is reasonable to believe this can be

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

done under secure conditions"; and to "avoid[] unnecessary copying of confidential documents." (*Id.*)

185.    Defendant Basson breached these duties owed to Bombardier at least by making and sending electronic copies of confidential and/or trade secret information from his work email account to his unsecure personal email account without authorization as described above.   Upon information and belief, Defendant Basson also breached these duties by disclosing Bombardier's confidential and/or trade secret information to unauthorized third parties—including but not limited to his employer AeroTEC—and/or by using Bombardier's confidential and/or trade secret information in his role at AeroTEC.

186.    Defendant Basson's breach of his duties has proximately caused Bombardier harm, both in the form of irreparable harm and monetary damages to be determined at trial, at least because his breach has compromised the security of Bombardier confidential and/or trade secret information, has lessened the value of Bombardier's investment to develop and maintain the misappropriated confidential and/or trade secret information at issue, and has reduced Bombardier's benefits and competitive advantages it previously enjoyed by virtue of maintaining such information as confidential.

## Count XIII: Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*
## (Marc-Antoine Delarche)

187.    Bombardier incorporates by reference paragraphs 1-186, above, as though fully set forth herein.

188.    As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the   C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.     Such information includes, but is not limited to, information contained in six proprietary .pdf files entitled, "RAA-BA503-412 Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf";   "RAA-BA503-414   Lag_Effects_in_the_Production_and_Experimental_Pitot-

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Static_Systems.pdf"; "RAA-BA503-418 Data Reduction of Ground Position Errors.pdf," "RAA-BA500-412 Rev A - Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf"; "RAA-BA500-414-RevA-Lag_Effects_in_the_Production_and_Experimental_Pitot-Static_Systems.pdf"; and "RAA-BA500-418_signed.pdf." (collectively, "Bombardier Certification Reports"). These documents contain highly sensitive, proprietary Bombardier trade secret information developed throughout previous certification and used for the certification of the C-Series aircraft and critical subcomponents, and they include hundreds of pages of highly detailed certification reports.

189.   This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Certification Reports—relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of the C-Series, a medium range aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

190.   Plaintiff has taken reasonable measures to keep such information—including the information contained in the Bombardier Certification Reports—secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

191.   This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Certification Reports—derives independent economic value from not being generally known to, and not being readily ascertainable

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

192.    In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836, Defendant Delarche misappropriated the confidential, proprietary, and trade secret information described above, including but not limited to the Bombardier Certification Reports, in an improper and unlawful manner as alleged herein. Specifically, and without limitation, Defendant Delarche misappropriated at least the Bombardier Certification Reports because at the time he emailed the files to his private email account, he lacked authorization to do so, and he knew or should have known that this was an impermissible transfer of Bombardier files containing highly sensitive Bombardier trade secret information for his personal possession. Additionally, and upon information and belief, Defendant Delarche disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

193.    Defendant Delarche's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

194.    As a direct and proximate result of Defendant Delarche's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    195.    Plaintiff has also suffered substantial damages as a direct and proximate cause

2    of Defendant Delarche's conduct in an amount to be proven at trial.

3    **Count XIV: Violation of the Washington Uniform Trade Secrets Act (WUTSA),**

4    **RCW 19.108.010 *et seq.* (Marc-Antoine Delarche)**

5    196.    Bombardier incorporates by reference paragraphs 1-195, above, as though fully

6    set forth herein.

7    197.    As explained above, Plaintiff has developed, owns, and possesses certain

8    confidential, proprietary, and trade secret information, including but not limited to

9    information used, among others, for the C-Series aircraft's design, development, testing,

10   evaluation, certification, and commercialization for use in the United States and abroad.  Such

11   information includes, but is not limited to, information contained in six proprietary .pdf files

12   entitled, "RAA-BA503-412 Reduction of Temperature, Airspeed, Altitude and Mach Number

13   Errors.pdf";   "RAA-BA503-414   Lag_Effects_in_the_Production_and_Experimental_Pitot-

14   Static_Systems.pdf"; "RAA-BA503-418 Data Reduction of Ground Position Errors.pdf,"

15   "RAA-BA500-412 Rev A - Reduction of Temperature, Airspeed, Altitude and Mach Number

16   Errors.pdf";                                                        "RAA-BA500-414-RevA-

17   Lag_Effects_in_the_Production_and_Experimental_Pitot-Static_Systems.pdf";   and   "RAA-

18   BA500-418_signed.pdf."   (collectively,   "Bombardier   Certification   Reports").     These

19   documents contain highly sensitive, proprietary Bombardier trade secret information

20   developed throughout previous certification and used for the C-Series aircraft and critical

21   subcomponents, and they include hundreds of pages of highly detailed certification reports.

22   198.    This confidential, proprietary, and trade secret information—including the

23   information contained in the Bombardier Certification Reports—relates to products and

24   services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or

25   ordered in, interstate and foreign commerce, as it was used, among others, for the design,

26   development, and/or certification of the C-Series, a medium range aircraft with a range of

27

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service

2  between states and foreign countries.

3  199. Plaintiff has taken reasonable measures to keep such information—including

4  the information contained in the Bombardier Certification Reports—secret as described above

5  and including, without limitation, subjecting all employees to a Code of Ethics that instructs

6  personnel in the specifics of identifying and safeguarding Bombardier proprietary

7  information; clearly marking trade secret information as proprietary and confidential subject

8  to restrictions on further use and dissemination; physically restricting access in its facilities to

9  properly credentialed individuals; and virtually restricting electronic access to proprietary

10  trade secret information to properly credentialed personnel.

11  200. This confidential, proprietary, and trade secret information—including the

12  information contained in the Bombardier Certification Reports—derives independent

13  economic value from not being generally known to, and not being readily ascertainable

14  through proper means by another person who could obtain economic value from the

15  disclosure or use of the information.  In addition to the foregoing, the information at issue

16  would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to

17  develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide

18  invaluable guidance in ultimately obtaining regulatory certification for entry into service of a

19  narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has

20  been unable to obtain for its MRJ despite nearly a decade of effort.

21  201. In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*,

22  Defendant Delarche misappropriated the confidential, proprietary, and trade secret

23  information described above, including but not limited to the Bombardier Certification

24  Reports, in an improper and unlawful manner as alleged herein.  Specifically, and without

25  limitation, Defendant Delarche misappropriated at least the Bombardier Certification Reports

26  because at the time he emailed the files to his private email account, he lacked authorization

27  to do so, and he knew or should have known that this was an impermissible transfer of

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Bombardier files containing highly sensitive Bombardier trade secret information for his personal possession.   Additionally, and upon information and belief, Defendant Delarche disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

202.    Defendant Delarche's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

203.    As a direct and proximate result of Defendant Delarche's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

204.    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Delarche's conduct in an amount to be proven at trial.

### Count XV: Breach of Contract (Marc-Antoine Delarche)

205.    Bombardier incorporates by reference paragraphs 1-204, above, as though fully set forth herein.

206.    At all relevant times, Bombardier had a valid and enforceable contract with Defendant Delarche at least arising out of Defendant Delarche's express agreement to abide by Bombardier's Code of Ethics.

207.    Pursuant to at least Bombardier's Code of Ethics, Defendant Delarche owed Bombardier a duty to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so."  (Exs. D, N.)  Defendant Delarche's duty was "to maintain such confidentiality at all times, even after leaving the employ of Bombardier."  (*Id.*)  Defendant Delarche also owed Bombardier duties to Bombardier to "keep[] electronic and paper documents and files

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

containing confidential information in a safe place"; to "transmit[] confidential documents by electronic devices, such as by fax or e-mail, only when it is reasonable to believe this can be done under secure conditions"; and to "avoid[] unnecessary copying of confidential documents." (*Id.*)

208.   Defendant Delarche breached these duties owed to Bombardier at least by making and sending electronic copies of confidential and/or trade secret information from his work email account to his unsecure personal email account without authorization as described above.   Upon information and belief, Defendant Delarche also breached these duties by disclosing Bombardier's confidential and/or trade secret information to unauthorized third parties—including but not limited to his employer AeroTEC—and/or by using Bombardier's confidential and/or trade secret information in his role at AeroTEC.

209.   Defendant Delarche's breach of his duties has proximately caused Bombardier harm, both in the form of irreparable harm and monetary damages to be determined at trial, at least because his breach has compromised the security of Bombardier confidential and/or trade secret information, has lessened the value of Bombardier's investment to develop and maintain the misappropriated confidential and/or trade secret information at issue, and has reduced Bombardier's benefits and competitive advantages it previously enjoyed by virtue of maintaining such information as confidential.

## <u>Count XVI: Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*</u>

## <u>(Cindy Dornéval)</u>

210.   Bombardier incorporates by reference paragraphs 1-209, above, as though fully set forth herein.

211.   As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.   Such information includes, but is not limited to, information contained in various Bombardier

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

electronic documents with the following file names: "FTP PROD CSeries Rev 5.0 – 17 November 2016.docx"; "FTP PROD CSERIES Rev 5.0 – 17 November 2016.pdf"; "CS100_Flight_FTP_Perf_N1_target.pdf"; and "CS300_Flight_FTP_Perf_N1_target.pdf," and "BM7002.02.15.02 – Flight Performances" (collectively, "Flight Test Files and CAFM Methodology"). These documents contain highly sensitive, proprietary Bombardier trade secret information developed throughout previous certification and used for the C-Series aircraft, including but not limited to hundreds of pages of specific details concerning the flight test profiles Bombardier employed in gathering necessary data to obtain certificates of airworthiness for the C-Series aircraft for entry into service and parameters used in Bombardier's proprietary Airplane Flight Manual.

212. This confidential, proprietary, and trade secret information—including the information contained in the Flight Test Files and CAFM Methodology —relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of the C-Series, a medium range aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

213. Plaintiff has taken reasonable measures to keep such information—including the information contained in the Flight Test Files and CAFM Methodology—secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

214. This confidential, proprietary, and trade secret information—including the information contained in the Flight Test Files and CAFM Methodology—derives independent

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.  In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in how to streamline flight testing to ultimately obtain a certificate of airworthiness for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft.

215.    In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836, Defendant Dornéval misappropriated the confidential, proprietary, and trade secret information described above, including but not limited to the Flight Test Files and CAFM Methodology, in an improper and unlawful manner as alleged herein.  Specifically, and without limitation, Defendant Dornéval misappropriated at least the Flight Test Files and CAFM Methodology because at the time she emailed the files to her private email account, she lacked authorization to do so, and she knew or should have known that this was an impermissible transfer of Bombardier files containing highly sensitive Bombardier trade secret information for her personal possession.  Additionally, and upon information and belief, Defendant Dornéval disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

216.    Defendant Dornéval's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

217.    As a direct and proximate result of Defendant Dornéval's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  irreparable loss of the confidentiality of their proprietary and trade secret information, for

2  which there is no adequately remedy at law.

3     218.   Plaintiff has also suffered substantial damages as a direct and proximate cause

4  of Defendant Dornéval's conduct in an amount to be proven at trial.

5     **Count XVII: Violation of the Washington Uniform Trade Secrets Act (WUTSA),**

6     **RCW 19.108.010 _et seq._ (Cindy Dornéval)**

7     219.   Bombardier incorporates by reference paragraphs 1-218, above, as though fully

8  set forth herein.

9     220.   As explained above, Plaintiff has developed, owns, and possesses certain

10  confidential, proprietary, and trade secret information, including but not limited to

11  information used for the C-Series aircraft's design, development, testing, evaluation,

12  certification, and commercialization for use in the United States and abroad.   Such

13  information includes, but is not limited to, information contained in various Bombardier

14  electronic documents with the following file names: "FTP PROD CSeries Rev 5.0 – 17

15  November 2016.docx"; "FTP PROD CSERIES Rev 5.0 – 17 November 2016.pdf";

16  "CS100_Flight_FTP_Perf_N1_target.pdf";   and   "CS300_Flight_FTP_Perf_N1_target.pdf,"

17  and "BM7002.02.15.02 – Flight Performances" (collectively, "Flight Test Files and CAFM

18  Methodology").   These documents contain highly sensitive, proprietary Bombardier trade

19  secret information developed throughout previous certification and used for the C-Series

20  aircraft, including but not limited to hundreds of pages of specific details concerning the flight

21  test profiles Bombardier employed in gathering necessary data to obtain certificates of

22  airworthiness for the C-Series aircraft for entry into service and parameters used in

23  Bombardier's proprietary Airplane Flight Manual.

24     221.   This confidential, proprietary, and trade secret information—including the

25  information contained in the Flight Test Files and CAFM Methodology—relates to products

26  and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or

27  ordered in, interstate and foreign commerce, as it was used, among others, for the design,

COMPLAINT (_____) - 76

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

development, and/or certification of the C-Series, a medium range aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

222.    Plaintiff has taken reasonable measures to keep such information—including the information contained in the Flight Test Files and CAFM Methodology—secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

223.    This confidential, proprietary, and trade secret information—including the information contained in the Flight Test Files and CAFM Methodology—derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.  In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in how to streamline flight testing to ultimately obtain a certificate of airworthiness for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft.

224.    In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*, Defendant Dornéval misappropriated the confidential, proprietary, and trade secret information described above, including but not limited to the Flight Test Files and CAFM Methodology, in an improper and unlawful manner as alleged herein.  Specifically, and without limitation, Defendant Dornéval misappropriated at least the Flight Test Files and CAFM Methodology because at the time she emailed the files to her private email account,

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  she lacked authorization to do so, and she knew or should have known that this was an

2  impermissible transfer of Bombardier files containing highly sensitive Bombardier trade

3  secret information for her personal possession.  Additionally, and upon information and

4  belief, Defendant Dornéval disclosed this and potentially other Bombardier trade secret

5  information to others without Bombardier permission after using improper means to acquire

6  the information, knowing or having reason to know at the time of disclosure that his

7  knowledge of the trade secret information was derived under circumstances giving rise to a

8  duty to maintain its secrecy and limit its use.

9      225.   Defendant Dornéval's conduct as described herein was intentional, knowing,

10  willful, malicious, fraudulent, and oppressive.

11     226.   As a direct and proximate result of Defendant Dornéval's conduct, Plaintiff has

12  suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an

13  irreparable loss of the confidentiality of their proprietary and trade secret information, for

14  which there is no adequately remedy at law.

15     227.   Plaintiff has also suffered substantial damages as a direct and proximate cause

16  of Defendant Dornéval's conduct in an amount to be proven at trial.

17             **Count XVIII: Breach of Contract (Cindy Dornéval)**

18     228.   Bombardier incorporates by reference paragraphs 1-227, above, as though fully

19  set forth herein.

20     229.   At all relevant times, Bombardier had a valid and enforceable contract with

21  Defendant Dornéval at least arising out of Defendant Dornéval's express agreement to abide

22  by Bombardier's Code of Ethics.

23     230.   Pursuant to at least Bombardier's Code of Ethics, Defendant Dornéval owed

24  Bombardier a duty to "not divulge [Bombardier] confidential information to anyone other

25  than the person or persons for whom it is intended, unless authorized or legally required to do

26  so."  (Exs. D, P.)  Defendant Dornéval's duty was "to maintain such confidentiality at all

27  times, even after leaving the employ of Bombardier."  (*Id.*)  Defendant Dornéval also owed

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Bombardier duties to Bombardier to "keep[] electronic and paper documents and files containing confidential information in a safe place"; to "transmit[] confidential documents by electronic devices, such as by fax or e-mail, only when it is reasonable to believe this can be done under secure conditions"; and to "avoid[] unnecessary copying of confidential documents." (*Id.*)

231.   Defendant Dornéval breached these duties owed to Bombardier at least by making and sending electronic copies of confidential and/or trade secret information from her work email account to her unsecure personal email account without authorization as described above.   Upon information and belief, Defendant Dornéval also breached these duties by disclosing Bombardier's confidential and/or trade secret information to unauthorized third parties—including but not limited to his employer AeroTEC—and/or by using Bombardier's confidential and/or trade secret information in her role at AeroTEC.

232.   Defendant Dornéval's breach of his duties has proximately caused Bombardier harm, both in the form of irreparable harm and monetary damages to be determined at trial, at least because her breach has compromised the security of Bombardier confidential and/or trade secret information, has lessened the value of Bombardier's investment to develop and maintain the misappropriated confidential and/or trade secret information at issue, and has reduced Bombardier's benefits and competitive advantages it previously enjoyed by virtue of maintaining such information as confidential.

**Count XIX: Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.***

**(Michel Korwin-Szymanowski)**

233.   Bombardier incorporates by reference paragraphs 1-232, above, as though fully set forth herein.

234.   As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.   Such

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1   information includes, but is not limited to, the specific documents described and/or identified

2   above as being illicitly transmitted to personal email accounts by former Bombardier

3   personnel before their departure from Bombardier. This information constitutes financial,

4   business, scientific, technical, economic, and/or engineering information.

5       235.   This confidential, proprietary, and trade secret information relates to products

6   and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or

7   ordered in, interstate and foreign commerce, as it was used, among others, for the medium

8   range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other

9   regulatory agencies abroad for service between states and foreign countries.

10      236.   Plaintiff has taken reasonable measures to keep such information secret as

11  described above and including, without limitation, subjecting all employees to a Code of

12  Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier

13  proprietary information; clearly marking trade secret information as proprietary and

14  confidential subject to restrictions on further use and dissemination; physically restricting

15  access in its facilities to properly credentialed individuals; and virtually restricting electronic

16  access to proprietary trade secret information to properly credentialed personnel.

17      237.   This confidential, proprietary, and trade secret information derives independent

18  economic value from not being generally known to, and not being readily ascertainable

19  through proper means by another person who could obtain economic value from the

20  disclosure or use of the information.  In addition to the foregoing, the information at issue

21  would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to

22  develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide

23  invaluable guidance in ultimately obtaining regulatory certification for entry into service of a

24  narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has

25  been unable to obtain for its MRJ despite nearly a decade of effort.

26      238.   In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C.

27  § 1836, Defendant Szymanowski misappropriated the confidential, proprietary, and trade

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

secret information described above in an improper and unlawful manner as alleged herein. Additionally, Szymanowski misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, Szymanowski knew or had reason to know that his knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use. Specifically, and without limitation, Defendant Szymanowski misappropriated Bombardier trade secrets by inducing or knowingly permitting Defendants Basson, Delarche, and Dornéval to misappropriate, divulge, and/or use the Bombardier trade secrets described above through his targeted recruitment efforts on behalf of AeroTEC, including through his emails to Defendants Basson, Delarche, and Dornéval. Alternatively, upon information and belief, on or after May 11, 2016, Szymanowski misappropriated Bombardier's trade secrets because he disclosed and/or used Bombardier trade secrets without permission knowing or having reason to know that the information constituted trade secrets.

239.    Defendant Szymanowski's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

240.    As a direct and proximate result of Defendant Szymanowski's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

241.    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Szymanowski's conduct in an amount to be proven at trial.

**Count XX: Violation of the Washington Uniform Trade Secrets Act (WUTSA), RCW 19.108.010 *et seq.* (Michel Korwin-Szymanowski)**

242.    Bombardier incorporates by reference paragraphs 1-241, above, as though fully set forth herein.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

243.    As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.    Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier. This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

244.    This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

245.    Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

246.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.  In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has

2    been unable to obtain for its MRJ despite nearly a decade of effort.

3        247.    In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C.

4    § 1836, Defendant Szymanowski misappropriated the confidential, proprietary, and trade

5    secret information described above in an improper and unlawful manner as alleged herein.

6    Additionally, Szymanowski misappropriated Bombardier's trade secrets because at the time it

7    obtained and/or used Bombardier trade secret information without Bombardier permission,

8    Szymanowski knew or had reason to know that his knowledge of the trade secrets was derived

9    from or through a person who had utilized improper means to acquire it, acquired under

10   circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or

11   through a person who owed a duty to Bombardier to maintain its secrecy or limit its use.

12   Specifically, and without limitation, Defendant Szymanowski misappropriated Bombardier

13   trade secrets by inducing or knowingly permitting Defendants Basson, Delarche, and

14   Dornéval to misappropriate, divulge, and/or use the Bombardier trade secrets described above

15   through his targeted recruitment efforts on behalf of AeroTEC, including through his emails

16   to Defendants Basson, Delarche, and Dornéval. Alternatively, upon information and belief,

17   Szymanowski misappropriated Bombardier's trade secrets because he disclosed and/or used

18   Bombardier trade secrets without permission knowing or having reason to know that the

19   information constituted trade secrets.

20       248.    Defendant Szymanowski's conduct as described herein was intentional,

21   knowing, willful, malicious, fraudulent, and oppressive.

22       249.    As a direct and proximate result of Defendant Szymanowski's conduct,

23   Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill,

24   and an irreparable loss of the confidentiality of their proprietary and trade secret information,

25   for which there is no adequately remedy at law.

26       250.    Plaintiff has also suffered substantial damages as a direct and proximate cause

27   of Defendant Szymanowski's conduct in an amount to be proven at trial.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Count XXI: Tortious Interference with Contractual Relationship and/or Business Expectancy (Michel Korwin-Szymanowski)**

251.    Plaintiff incorporates by reference paragraphs 1-250, above, as though fully set forth herein.

252.    Bombardier had a reasonable and valid contractual relationship and/or business expectancy with each of its former employees arising from each former employee's agreement to be bound by Bombardier's Code of Ethics provision to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so.  This includes confidential information provided by suppliers and customers.  Employees agree to maintain such confidentiality at all times, even after leaving the employ of Bombardier."  (Ex. D, at 15.)

253.    Bombardier also had a reasonable and valid business expectancy that it would continue to employ its personnel, specifically Defendants Basson, Delarche, Dornéval, and Does 1-88, to continue their design, development, engineering, and/or certification efforts in Bombardier's aerospace division.  These employer-employee relationships were more than simple "at-will" employment arrangements at least because each employee had a continuing obligation following termination of employment to maintain the confidentiality of all Bombardier proprietary and confidential information.

254.    Bombardier also had a reasonable and valid business expectancy that it would not lose a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 aircraft within a span of months to work for a competing venture in need of Bombardier's proprietary and confidential information.

255.    Bombardier had yet another reasonable and valid business expectancy that it would generally adhere to its certification schedules set forth for the C-Series and Global 7000/8000 Aircraft, particularly because Bombardier had successfully obtained certification for approximately thirty (30) different aircraft in the preceding three (3) decades, it had significant experience and understanding of certification processes as a result of these

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

previous certifications, and it could reasonably expect, based on this experience and understanding, that its projected schedule to obtain certification for the C-Series and Global 7000/8000 Aircraft would be accurate.

256.    As a former employee of Bombardier, Defendant Korwin-Szymanowski knew of each of these contractual relationships and business expectancies.   Further, Defendant Korwin-Szymanowski was made aware of these relationships and expectancies through various letters he received from Bombardier as detailed above.

257.    By engaging in the aforementioned conduct, specifically but without limitation using and/or authorizing various means to target Bombardier personnel for recruitment for AeroTEC's involvement in the MRJ project, Defendant Korwin-Szymanowski intentionally interfered with Bombardier's contractual relationships and business expectancies, which proximately induced or caused breach of the aforementioned contractual relationships with, and business expectancies from, at least Defendants Basson, Delarche, Dornéval, and Does 1-88 as individuals, with these defendants collectively as comprising a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft, and with these defendants collectively as instrumental to adhering to Bombardier's certification schedule for the C-Series and Global 7000/8000 Aircraft.

258.    Defendant Korwin-Szymanowski's intentional interference with Bombardier's contractual relationships and business expectancies was conducted for improper purposes; namely—to illicitly obtain Bombardier confidential, proprietary, and/or trade secret information knowingly and willfully to assist in the development and/or certification of the MRJ; and to harm Bombardier in the form of costly delays to its certification efforts for the C-Series and Global 7000/8000 Aircraft.

259.    Defendant Korwin-Szymanowski's intentional interference with Bombardier's contractual relationships and business expectancies for an improper purpose has caused resulting damage to Plaintiff and is continuing to cause resulting damage to Plaintiff.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Count XXII: Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.***

**(Keith Ayre)**

260.     Bombardier incorporates by reference paragraphs 1-259, above, as though fully set forth herein.

261.     As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.   Such information includes, but is not limited to, information contained in several emails Defendant Ayre sent from his Bombardier work email account to his personal Apple and Gmail email accounts in the weeks and days before his departure from Bombardier.  These emails contain highly sensitive, proprietary Bombardier trade secret information concerning Bombardier's aircraft certification efforts and related confidential communications Bombardier made with Transport Canada for certification purposes.

262.     This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of certain Bombardier aircraft.

263.     Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

264.     This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

through proper means by another person who could obtain economic value from the disclosure or use of the information.  In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

265.    In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836, Defendant Ayre misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein. Specifically, and without limitation, Defendant Ayre misappropriated the identified Bombardier aircraft certification information because at the time he emailed the information to his private email accounts, he lacked authorization to do so, and he knew or should have known that this was an impermissible transfer of Bombardier information containing highly sensitive Bombardier trade secret information for his personal possession.  Additionally, and upon information and belief, on or after August 18, 2016, Defendant Ayre used and/or disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

266.    Defendant Ayre's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

267.    As a direct and proximate result of Defendant Ayre's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

268. Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Ayre's conduct in an amount to be proven at trial.

**Count XXIII: Violation of the Washington Uniform Trade Secrets Act (WUTSA), RCW 19.108.010 *et seq.***

**(Keith Ayre)**

269. Bombardier incorporates by reference paragraphs 1-268, above, as though fully set forth herein.

270. As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad. Such information includes, but is not limited to, information contained in several emails Defendant Ayre sent from his Bombardier work email account to his personal Apple and Gmail email accounts in the weeks and days before his departure from Bombardier. These emails contain highly sensitive, proprietary Bombardier trade secret information concerning Bombardier's aircraft certification efforts and related confidential communications Bombardier made with Transport Canada for certification purposes.

271. This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of certain Bombardier aircraft.

272. Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

273.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.  In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

274.    In violation of Plaintiff's rights under RCW 19.108.010 *et seq.*, Defendant Ayre misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein.  Specifically, and without limitation, Defendant Ayre misappropriated the identified Bombardier aircraft certification information because at the time he emailed the information to his private email accounts, he lacked authorization to do so, and he knew or should have known that this was an impermissible transfer of Bombardier information containing highly sensitive Bombardier trade secret information for his personal possession.  Additionally, and upon information and belief, on or after August 18, 2016, Defendant Ayre used and/or disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

275.    Defendant Ayre's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

276.    As a direct and proximate result of Defendant Ayre's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

277.    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Ayre's conduct in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

A.    A preliminary and permanent injunction prohibiting MITAC, MITAC America, AeroTEC, and all those employed by, or acting in concert with, any of them from using, disclosing, further disclosing, or in any way relying on any proprietary Bombardier information misappropriated by any former Bombardier personnel;

B.    A preliminary and permanent injunction prohibiting MITAC, MITAC America, AeroTEC, and all those employed by, or acting in concert with, any of them from continuing to recruit personnel from Bombardier for the improper purpose of obtaining Bombardier confidential, proprietary, and/or trade secret information;

C.    An award of Plaintiff's damages;

D.    Disgorgement of, or constructive trust on, the wrongful profits attributable to and resulting from Defendants' conduct;

E.    An award to Plaintiff of punitive damages; and

F.    Any other relief deemed appropriate by this Court.

## JURY DEMAND

Bombardier demands a jury trial on all issues triable by jury.

Dated this 19th day of October, 2018.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CHRISTENSEN O'CONNOR
JOHNSON KINDNESS<sup>PLLC</sup>




s/John D. Denkenberger
John D. Denkenberger, WSBA No.:  25,907
Brian F. McMahon, WSBA No. 45,739
Christensen O'Connor Johnson Kindness<sup>PLLC</sup>
1201 Third Avenue, Suite 3600
Seattle, WA  98101-3029
Telephone:  206.682.8100
Fax:  206.224.0779
E-mail:  john.denkenberger@cojk.com,
brian.mcmahon@cojk.com, litdoc@cojk.com

*Attorneys for Plaintiff Bombardier Inc.*

COMPLAINT (_____) - 91

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**VERIFICATION**

I, Fassi Kafyeke, am a Senior Director for Strategic Technology and Innovation,
Aerospace, for Bombardier, Inc.

1.      I have personal knowledge of the facts concerning and relating to Bombardier,
Inc. as set forth in the foregoing Verified Complaint and as supported by the relevant
accompanying exhibits and if called to testify as to these matters would do so competently.

2.      I verify under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.

Executed on _October 19_, 2018.

Fassi Kafyeke
Senior Director, Strategic Technology and
Innovation, Aerospace, Bombardier, Inc.

COMPLAINT (_____) - 92

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100