# EXHIBIT C

Representing Management Exclusively in Workplace Law and Related Litigation



**Jackson Lewis P.C.**
520 Pike Street
Suite 2300
Seattle, WA  98101
Tel 206-405-0404
Fax 206-405-4450
www.jacksonlewis.com

| | | | |
|---|---|---|---|
| ALBANY NY | GREENVILLE SC | MONMOUTH COUNTY NJ | RALEIGH NC |
| ALBUQUERQUE NM | HARTFORD CT | MORRISTOWN NJ | RAPID CITY SD |
| ATLANTA GA | HONOLULU HI* | NEW ORLEANS LA | RICHMOND VA |
| AUSTIN TX | HOUSTON TX | NEW YORK NY | SACRAMENTO CA |
| BALTIMORE MD | INDIANAPOLIS IN | NORFOLK VA | SALT LAKE CITY UT |
| BIRMINGHAM AL | JACKSONVILLE FL | OMAHA NE | SAN DIEGO CA |
| BOSTON MA | KANSAS CITY REGION | ORANGE COUNTY CA | SAN FRANCISCO CA |
| CHICAGO IL | LAS VEGAS NV | ORLANDO FL | SAN JUAN PR |
| CINCINNATI OH | LONG ISLAND NY | PHILADELPHIA PA | SEATTLE WA |
| CLEVELAND OH | LOS ANGELES CA | PHOENIX AZ | ST. LOUIS MO |
| DALLAS TX | MADISON WI | PITTSBURGH PA | STAMFORD CT |
| DAYTON OH | MEMPHIS TN | PORTLAND OR | TAMPA FL |
| DENVER CO | MIAMI FL | PORTSMOUTH NH | WASHINGTON DC REGION |
| DETROIT MI | MILWAUKEE WI | PROVIDENCE RI | WHITE PLAINS NY |
| GRAND RAPIDS MI | MINNEAPOLIS MN | | |

My Direct Dial is:   (206) 626-6436
My Email Address is:  NOHLEP@JACKSONLEWIS.COM

April 26, 2016

**<u>VIA E-MAIL & FEDEX OVERNIGHT DELIVERY</u>**

Mr. Lee Human
President
Aerospace Testing, Engineering and Certification, LLC
6100 Fourth Avenue South, Suite 300
Seattle, WA  98108
LHuman@aerotec.com

Re:  *AeroTEC / Bombardier—Employee Raiding Matter*

Dear Mr. Human:

    We represent Bombardier, Inc., together with its parents, affiliates, subsidiaries, and predecessors (collectively "Bombardier" or the "company") in connection with its further efforts to secure compliance with its former employees' ongoing obligations to the company and prevent any interference on the part of Aerospace Testing, Engineering and Certification, LLC ("AeroTEC") with the same.

    The purpose of this letter is three-fold; namely:  (1) to remind you of the former employees' ongoing obligations to Bombardier and communicate the company's understanding about the types of activities that would violate or interfere with those ongoing obligations; (2) to advise you as to Bombardier's concerns regarding the recent activities of the former employees and AeroTEC, together with the substantial liabilities associated therewith and the company's intent should you continue flouting such ongoing obligations; and (3) to propose a reasonable means of securing compliance with the former employees' ongoing obligations going forward and to prevent AeroTEC's interference with the same.



Mr. Lee Human, President
Aerospace Testing, Engineering and Certification, LLC
April 26, 2016
Page 2

As detailed below, we are requesting that you and the former Bombardier employees take certain actions and timely provide additional information, so that Bombardier can make an informed decision as to whether litigation or some other form of additional enforcement action is necessary to protect its interests. In light of our understanding as to your current activities, it is imperative that you contact us as soon as possible and provide Bombardier with the assurances set forth in the Acknowledgements attached to this letter.

--------------------------------------------------------

## Background

As AeroTEC is well aware, Michel Korwin-Szymanowski is the former Director, Flight Test for Bombardier's Flight Test Center in Wichita, Kansas.  As a high-ranking employee, Mr. Korwin-Szymanowski occupied a position of trust and confidence with the company, and was required to acknowledge his understanding of and obligation to abide by Bombardier's Code of Ethics and Business Conduct (the "Code") on an annual basis.  *See, e.g.*, Code at page 4 ("Designated members of senior management are also required to annually sign an acknowledgement stipulating not only that they have read and understood the Code, but also that they have neither breached nor are aware of any breach of the Code's provisions.").[1]   Indeed, Mr. Korwin-Szymanowski electronically signed an acknowledgement confirming his obligations under the Code as recently as January 15, 2015.  *See* 2014-2015 Acknowledgment.[2]

As AeroTEC is also aware, Dale Goulding is a former Manager, Flight Test Engineering, for Bombardier, and was a direct report of Mr. Korwin-Szymanowski. Like his supervisor, Mr. Goulding also occupied a position of trust and confidence with the company, and was required to acknowledge and agree to the Code on an annual basis.

The Code sets forth obligations required of employees in a clear fashion, and expressly requires employees such as Mr. Korwin-Szymanowski and Mr. Goulding to "agree to do your part to achieve Bombardier's objectives to the best of your abilities, while making decisions consistent with the Code, and without compromise."  *See* Code at page 7. In fact, as management employees, Mr. Korwin-Szymanowski and Mr. Goulding had heightened duties under the Code; to wit:

The responsibilities of Bombardier managers include and go beyond those of other employees. As a manager, you are expected to:

- know the Code in detail and actively promote it in the workplace;

- lead by providing a model of high standards of ethical conduct, creating a work environment reflecting the content and the spirit of the Code;

- be vigilant in preventing, detecting and responding to any violations of the Code;

---

[1]   For your convenience, copies of the excerpted provisions of the Code referenced herein are attached as **Exhibit A**.
[2]   Attached as **Exhibit B**.



- protect those who report violations; and

- work with the Bombardier Ethics Advisory Council and the Compliance Officer to distribute the Code to employees and collect the above-mentioned acknowledgments when required.

*See* Code at page 8.

The Code expressly provides that employees and managers are required to safeguard and not misuse company property or information, **both during the period of employment and thereafter**. The Code is also clear that these obligations include the protection of both physical and electronic materials and systems, as well as the company's intellectual property and confidential information.[3] With regard to the latter, the Code includes a specific provision outlining each employee's and manager's duties and obligations with respect to confidential information:

> **Confidential information is information belonging to Bombardier that is not subject to public disclosure**. Confidential information encompasses information produced by Bombardier or obtained in confidence from a third party and covered by a non-disclosure agreement.

> **Examples of confidential information are** financial data, strategic plans, intellectual property, information on bids, **personal employee information**, legal documents and information on customers and suppliers.

> Do not divulge confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so. This includes confidential information provided by suppliers and customers. **Employees agree to maintain such confidentiality at all times, even after leaving the employ of Bombardier.**

> Employees should also exercise caution to avoid misusing or inadvertently disclosing confidential information. This includes:

> - keeping electronic and paper documents and files containing confidential information in a safe place;

> - not discussing confidential matters where they could be overheard, for example, in public places such as elevators, hallways, restaurants, airplanes and taxis;

> - exercising caution when discussing confidential matters on wireless telephones or other wireless devices;

---

[3] *See, e.g.*, Code at page 13 ("Company Property - Company property should only be used for legitimate business purposes. Bombardier employees are expected to take good care of company property and not expose it to loss, damage, misuse or theft. Intellectual Property - Intellectual property comprises trademarks, domain names, patents, industrial designs, copyrights and trade secrets. Employees have a duty to protect Bombardier's intellectual property, just as they have the obligation to respect that of others. Subject to applicable laws, any inventions or discoveries made by employees during the course of their work are Bombardier's property. Intellectual property is considered confidential information. Therefore, it is covered by the non-disclosure guidelines set out in the 'Confidential Information' section of this Code.").



- transmitting confidential documents by electronic devices, such as by fax or e-mail, only when it is reasonable to believe this can be done under secure conditions; and

- avoiding unnecessary copying of confidential documents.

*See* Code at pages 14-15 (emphasis added).

The Code also includes a specific provision addressing conflicts of interest in the workplace, which requires all employees and managers to "[a]void conflicts of interest, whether real or perceived, in the performance of [their] duties." The Code specifically advises that "[a] conflict of interest is considered to be any situation or arrangement where your personal activities or interests conflict with your responsibilities to Bombardier . . . [such as] when you take on outside work that could compromise the diligent performance of your duties for Bombardier." *See* Code at pages 17-18.

In short, Mr. Korwin-Szymanowski and Mr. Goulding (as well as their colleagues) were each subject to a number of well-publicized and binding obligations mandating the protection of Bombardier's confidential information and business interests. As detailed below, these contractual safeguards are supplemented by numerous common law and statutory constructs that apply to the former employees as a matter of law, including obligations arising under the duty of loyalty, fiduciary duty, and the law of trade secrets.

Despite the foregoing, AeroTEC began its raid on Bombardier's personnel when it hired Mr. Korwin-Szymanowski, at a time when it knew that Bombardier was is in a critical stage of the flight test activities for the C-Series and starting the flight test activities for the Global 7000 and 8000—two programs that are critical for Bombardier's future.

In his position as Director, Flight Operations, Mr. Korwin-Szymanowski had been entrusted with the knowledge and confidential and proprietary information of all Bombardier and Learjet flight test employees. This protectable information falls directly within the Code's definition of "Confidential Information," and constitutes a key asset of the company. Unfortunately, this protectable information was something that AeroTEC appears to have been more than happy to improperly leverage for its own benefit and to the detriment of Bombardier.

Indeed, the attached email from Mr. Korwin-Szymanowski to one of his former Bombardier co-workers leaves little room for doubt with respect to his use of and trading upon Bombardier's confidential information and business relations and attendant targeting of certain specific employees:

> **If you are getting this, it is because you have made such a strong positive impression on me in the past . . .** I am hoping to reconnect with you to share flight test opportunities we have at AeroTEC, the company I recently joined in Seattle . . . I have positions open immediately for Test Engineers, Flight Test Engineers, Instrumentation and Data Systems Engineers, Data Center Technicians, Project Managers, A&P Mechanics, Technicians, Supervisors . . . I would like to see you . . . for a confidential interview, and to answer any questions you may have about AeroTEC[.]



*See* email dated October 20, 2015 (emphasis added).[4]

Lest there be any doubt, Mr. Goulding's email to one of his former business associates expressly identifies Mr. Korwin-Szymanowski as the principal AeroTEC employee responsible for his recruitment and engagement: "I will be [the] Engineering Director for a company called AeroTEC . . . **I was headhunted as my former boss moved there 6 months ago and recommended me** . . . the package I am being offered is amazing and there are many other benefits of coming here[.]"  *See* email dated November 16, 2015 (redacted, emphasis added).[5]

In sum, even without the benefit of discovery, there is no doubt that Mr. Korwin-Szymanowski used the confidential information (including employee identities, abilities, preferences and compensation) and business relationships he had been exposed to at Bombardier in an effort to displace the company's employees for the benefit of AeroTEC.  If we are unable to reach resolution, we anticipate that substantial, additional information will be obtained in discovery, showing even more egregious activity.

With regard to Mr. Goulding, the known evidence regarding his acts of disloyalty is even more disconcerting than that relating to Mr. Korwin-Szymanowski. Like his former supervisor, Mr. Goulding was entrusted with substantial confidential and proprietary information relating to Bombardier's employees, which he appears to have leveraged for the benefit and on behalf of AeroTEC. Moreover, the documentary evidence in this case conclusively demonstrates that aside from any post-employment use he made of such information, **Mr. Goulding actually began his recruitment of Bombardier personnel prior to his November 19, 2015, resignation, while still employed by Bombardier and through the use of its electronic equipment and systems**.

For example, on November 10, 2015, Mr. Goulding had an email exchange[6] with one of his former colleagues, James Burrows, who at the time was serving as a Flight Test Powerplant System Engineer for Bombardier's C-Series project. During that communication, Mr. Goulding solicited Mr. Burrows for outside employment and acted as a recruiting conduit for AeroTEC. The following excerpt is illustrative:

| [Mr. Burrows]: | This is a copy of my CV as used to apply for a position here.  I'd like to update it today (after work) with my work here included, and then send it to you.  I'll be editing it to [emphasize] my Flight Science Masters and my work and skillset here. Plan is to do so as soon as my afternoon shift ends, so by 5pm you should have it. |
|---|---|
| [Mr. Goulding]: | Sounds good.  **I already gave a few managers a heads-**up . . . no bites yet.  When I have it, I will forward it on. |

---

[4]  Attached as **Exhibit C**.
[5]  Attached as **Exhibit D**.
[6]  Attached as **Exhibit E**.



Thus, separate and apart from any use of Bombardier's confidential information, it appears beyond dispute that Mr. Goulding blatantly disregarded his duty of loyalty and fiduciary duty to Bombardier. Further, the reference in the foregoing email to the "few managers" for whom he provided a "heads up," clearly indicates that Mr. Goulding engaged in the foregoing actions with the full knowledge and approval of his soon-to-be new employer, AeroTEC.

Against the foregoing backdrop, Bombardier took reasonable and timely efforts to protect its legitimate interests. For example, it sent you a letter on October 22, 2015, outlining its concerns regarding AeroTEC's tortious interference with its business and demanding cessation of the same. You answered Bombardier's letter that same day, confirming that you would take measures to stop AeroTEC's interference.

On December 2, 2015, following your hiring of Mr. Goulding, Bombardier sent you a follow-up letter, as well as correspondence directed to Mr. Korwin-Szymanowski, which reminded him of his obligations towards Bombardier and demanded compliance with the same.

On February 12, 2016, you sent an email to Dominique Denicourt advising that AeroTEC intended to restart its recruiting activities in the Montreal and Wichita areas, and offering to explore some form of collaboration in that regard. Mr. Denicourt timely responded and advised you that not only was Bombardier not interested in cooperating in any such activity, it was adamantly opposed to any activities aimed at improperly targeting Bombardier employees to try to entice them to leave the company and join AeroTEC.

Despite the above efforts, it has come to our attention that, in addition to Mr. Korwin-Szymanowski and Mr. Goulding, AeroTEC continues to target Bombardier employees through the use of its former employees. In fact, since December 2015, AeroTEC has hired upwards of twenty employees, including some key Bombardier Flight Test Center employees; to wit:

1. **David G Polk**, Senior Designer Specialist, December 4, 2015

2. **Adam T Brungardt**, Engineer Senior, Flight Sciences FTCE, January 23, 2016

3. **Juan Oropesa Perez**,  Senior Engineering Specialist, January 29, 2016

4. **Stephen D Stowe**, Pilot Flight Test, February 12, 2016

5. **Ernest W Spriggs**, Pilot Flight Test, February 12, 2016

6. **Alexander James Bellamy**, Section Chief, Flight Test Engineering, February 25, 2016

7. **Brice Feneux**, Engineering Specialist, Flight Test Engineering – Systems, February 27, 2016

8. **Uyen T Tran**, Engineer, Flight Sciences FTCE, February 27, 2016

9. **Nicholas Chapman**, Engineering Professional, Flight Test Engineering – Systems, February 27, 2016



10. **Geoffrey Crowe**, Designer Specialist, February 27, 2016

11. **Stephen P Watkins**, Principal Engineer Specialist, Technial FTCE, March 26, 2016

12. **Anthony R Mumford**, Section Chief, Flight Sciences, March 26, 2016

13. **Stephen C Long**, Pilot Flight Test, April 5, 2016

14. **David Barrow**, Manager, Fuel FTIS & Hydraulics, Integrated Production Development Team, Global, October 19, 2015

15. **Marco Aureli Espinosa Da Silva**, Engineering Specialist Principal, Electrical & EMC January 23, 2016 (FBW & Core Engineering)

16. **Daniel Kenji Nishimaru**, Engineering Specialist, Electrical February 10, 2016 (Integrated Production Development Team, Global)

17. **José Carlos Silva Menezes Senna**, Senior Engineering Specialist, Engine, APU, FIDEEX, February 20, 2016 (Integrated Production Development Team, Global)

18. **Laurus Basson**, Senior Engineering Specialist, Landing Gear, Wheels and Brakes March 5, 2016 (Integrated Production Development Team, Global)

19. **Alvino Da Silva**, Engineering Specialist, Landing Gear, Wheels and Brakes, March 25, 2016 (Integrated Production Development Team, Global)

In short, and despite several notices, the former employees' violations of their ongoing obligations continue, as do your attendant acts of interference. Bombardier not only firmly *believes* that its workforce has been raided by a group of former employees through the use of its confidential information and in violation of such employees' duties of loyalty and fiduciary duties – it has *documentary evidence* directly supporting its contentions. Given what we know to date, we are confident additional (and likely more egregious) acts of disloyalty will be uncovered through discovery if we cannot resolve the present dispute in an amicable manner.

In light of the foregoing, Bombardier is highly concerned that absent immediate corrective action and the implementation of additional controls and recognition on your part, it will have to take more formal action to protect the company's legitimate business interests, employment relationships, and the maintenance of its confidential, proprietary and trade secret information.

### The Former Employee's Ongoing Contractual Obligations to Bombardier

As an express condition of their employment, each of the former employees agreed to be bound by the terms of the Code, which contains a number of intra and post-employment restraints on their ability to compete with the company. As is relevant herein, those restraints include a requirement to act solely in the interest of the company during the period of employment and to refrain from using or disclosing confidential information "at all times, even after leaving the employ of Bombardier."

To avoid any misunderstanding as to the enforceability of the former employees' obligations, we note that reasonable restrictive covenants in employment agreements are lawful, and the courts of



Washington, Kansas, and Quebec routinely enforce them.[7] Well-established and controlling authorities recognize that employers like Bombardier may use such restraints so long as they are designed to protect their legitimate, reasonable business interests.[8]

The provisions in the Code are far less restrictive than similar agreements that have been held enforceable and undoubtedly relate to legitimate protectable interests of Bombardier.[9] The most well-recognized and chief amongst these interests relate to the former employees' intra –employment duty of absolute loyalty and the obligations to refrain from using or disclosing the company's confidential and proprietary information.[10]

In sum, there is no doubt that a Washington, Kansas, or Quebec court would enforce the above cited provisions of the Code in favor of Bombardier. We also note that in the unlikely event the foregoing restrictions were found to be overly broad as written, they would be partially enforced, reworded or otherwise modified so as to conform to the outer bounds of enforceability.[11]

### The Former Employees' Common Law Obligations to Bombardier

Separate and apart from the foregoing, as a matter of law, each of the former employees owes

---

[7]  *See, e.g., Perry v. Moran*, 109 Wn.2d 691, 696, 700 (1987), *opinion revised*, 111 Wn.2d 885 (1989); *Racine v. Bender*, 141 Wn. 606 (1927); *Machen, Inc. v. Aircraft Design*, 65 Wn. App. 319, 330-32 (1992), *overruled in part on other grounds, Water Tech., Inc. v. Flow Int'l Corp.*, 140 Wn.2d 313, 321 (2000); *Knight, Vale & Gregory*, 37 Wn. App. 366, 369 (1984); *see also, Chem-Trol, Inc. v. Christensen*, 2009 U.S. Dist. LEXIS 9894, at *30 (D. Kan. Feb. 10, 2009) (noting that 2-year restrictive covenants "are widely found to be reasonable in Kansas" based on the time it takes to forge new relationships); *Wichita Clinic P.A. v. Louis*, 39 Kan. App. 848 (2008); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1153 (D. Kan. 2007) (finding that a 5 year, world-wide restriction was not patently unreasonable in light of the small market of companies engaged in the field at issue and the fact that the plaintiff's products were distributed world-wide).

[8]  *See* fn. 7, *supra*; *see also Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 432 (1999); *Weber v. Tillman*, 259 Kan. 457 (Kan. 1996) (in determining whether a non-compete covenant is enforceable, a court must consider whether the covenant protects a legitimate business interest and whether there are reasonable time and territorial limitations contained in the covenant, with such reasonableness being determined based on the facts and circumstances of each case).

[9]  *See, e.g., Perry*, 109 Wn.2d at 700, 702 (enforcing five-year covenant prohibiting employee from servicing clients of his former employer); *Knight*, 37 Wn. App. at 369 (enforcing three-year covenant prohibiting employees from soliciting or performing work for their former employer's clients); *Racine*, 141 Wn. at 607-608 (same); *see also, Armstrong v. Taco Time International*, 20 Wn. App. 538 (1981) (court limited enforcement of agreement calling for five-year, nation-wide prohibition on competition to two-and-a-half-year, regional prohibition); *Alexander*, 19 Wn. App. at 688 (court limited enforcement of five-year non-competition obligation to a period of two years); *Hometask Handyman Servs. v. Cooper*, 2007 U.S. Dist. LEXIS 84708 (W.D. Wash. Oct. 29, 2007) (prohibiting defendant from operating competing business within her former territory plus a 25 mile buffer area). We note that the enforceability of the Code in full is particularly likely here given the specialized nature of the services at issue, and the fact that they are not "quick sell" items sold in bulk or large quantity. *See, e.g., Racine*, 141 Wn. at 614 (comparing the fungible nature of the goods at issue in *Ice Delivery Co. v. Davis*, 137 Wn. 649 (1926), with the specialized services at issue in *Davis & Co. v. Miller*, 104 Wn. 444 (1918), and finding that the nature of the latter supported enforcement of broader non-competition obligations).

[10]  *See, e.g., Perry*, 109 Wn.2d at 700 (recognizing that an employer "has a legitimate interest in protecting its existing client base from depletion by a former employee."); *see also Knight*, 37 Wn. App. at 369; *Racine*, 141 Wn. at 607; *Lewis Pacific Dairymen's Ass'n v. Turner*, 50 Wn.2d 762 (1957) (affirming permanent injunction against former employees who conspired to encourage other employees to leave their employment with the intention of commencing employment with a competitor and using confidential information acquired from the employer); *see also* fns. 7-9, *supra*.

[11]  *See Knight*, 37 Wn. App. at 371; *Armstrong*, 20 Wn. App. 538 (court limited enforcement of agreement calling for five-year, nation-wide prohibition on competition to a two-and-a-half-year, regional prohibition).



Mr. Lee Human, President
Aerospace Testing, Engineering and Certification, LLC
April 26, 2016
Page 9

Bombardier certain obligations under their duty of loyalty and/or as a matter of fiduciary duty.  More particularly, under the laws of Washington, Kansas, and Quebec, it is well established that an enforceable common law duty of loyalty exists between an employee and his employer, even where no covenant not to compete exists.  That duty includes both a strict duty of non-competition during the period of employment, as well as an ongoing duty not to misuse the employer's confidential information and property both during the period of employment and thereafter.  In particular, an employee has a duty:

> (1)  not to use property of the principal for the agent's own purposes or those of a third party; and

> (2)  not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party.[12]

The Restatement (Third) of Agency (2006), § 8.05, further advises:

> An agent's duties concerning confidential information do not end when the agency relationship terminates. An agent is not free to use or disclose a principal's trade secrets or other confidential information whether the agent retains a physical record of them or retains them in the agent's memory. If information is otherwise a trade secret or confidential, the means by which an agent appropriates it for later use or disclosure should be irrelevant. Feats of human memory, however commendable and intriguing in many respects, should not be privileged as instruments of disloyal conduct.[13]

In the present case, this post-employment aspect of the duty of loyalty is bolstered by the parties' agreement as set forth in the Code, which provides for the protection of "Confidential Information" and expressly prohibits misuse or disclosure of the same even after employment ends. Further, courts in this area have made clear that even "slight assistance" to a direct competitor would constitute a breach of the employee's duty of loyalty.[14]

---

[12] *See* The Restatement (Third) of Agency (2006), § 8.05; *see also Williams v. Queen Fisheries, Inc.*, 2 Wn. App. 691, 694 (1970) (same); *Steven Cole Salon, LLC v. Salon Lotus*, 2009 Wash. App. LEXIS 301, 12-13 (Wash. Ct. App. Feb. 9, 2009); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1155 (D. Kan. 2007) (quoting *Fryetech, Inc. v. Harris*, 46 F. Supp. 2d 1144, 1152 (D. Kan. 1999) ("Under Kansas law, agents are fiduciaries who must 'act solely for the benefit of the employer in all matters within the scope of the employee's employment . . . avoid conflicts between their duty to the employer and their own self-interest . . . act in good faith and with loyalty to further advance the interests of the principal . . . and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'").

[13] *See* Restatement (Third) of Agency (2006), § 8.05, at comment c; *see also id.* at Illustration No. 6 ("P, who owns a commercial cleaning service, maintains a list of customers and prospective customers, noting particulars about each. P's list would be of competitive use to others. P maintains the list on a computer in P's office and restricts access to high-level employees within P's organization. A, P's general manager, who wishes to establish a competing cleaning service, retains a hard copy of the list that P gave to A to use in A's work. A resigns, taking the list and planning to use it to solicit business for A's new competing firm. A has breached A's duty to P.").

[14] *See, e.g., Cameco, Inc. v. Gedicke*, 724 A.2d 783, 791 (N.J. 1999); *see also Kieburtz*, 68 Wn. App at 266; *Smith v. Olympic Bank*, 103 Wn.2d 418, 423 (1985); *Moon v. Phipps*, 67 Wn.2d 948, 954-55 (1966); *Organon, Inc. v. Hepler*, 23 Wn. App. 432, 436 (1979); *Appleway Leasing, Inc. v. Tomlinson Dairy Farms, Inc.*, 22 Wn. App. 781, 783 (1979).



Although we are confident in the enforceability of the Code, we raise the above concerns regarding the duty of loyalty to clarify any misconception on your part that all of Bombardier's concerns are tied to the enforceability of the Code or any statutory obligations relating to trade secrets.

### The Former Employees' Statutory Obligations to Bombardier

In addition to the foregoing, each of the former employees owes Bombardier an obligation not to make use of its protected information under the trade secrets laws of the jurisdictions at issue. Moreover, each of the former employees' actions can be imputed directly to AeroTEC, without an independent showing that AeroTEC knew of or acquiesced in the former employees' conduct.

Here, Bombardier will be able to satisfy all of the requirements for trade secret protection because: (a) the confidential personnel and other information learned, accessed and/or created by the former employees in connection with their Bombardier employment is not generally known outside of Bombardier's business; (b) Bombardier has taken reasonable efforts (including implementation of the Code) to maintain the secrecy of this confidential information; (c) Bombardier's confidential information includes information that derives independent economic value by not being known to the general public or to Bombardier's competitors; and (d) use of Bombardier's confidential information by others would injure the company's competitive position and subject it to unfair competition.[15]

Bombardier can also likely show that at least some of the former employees misappropriated its trade secrets and that it is entitled to monetary relief, either in the form of lost profits or unjust enrichment, in connection therewith.[16] As noted above, Bombardier already has evidence tending to show that one or more of the former employees used its confidential personnel information to solicit other employees, apparently with the full knowledge and consent of AeroTEC. In addition, we note that as indicated in recent orders issued from the King County Superior Court, the Washington courts are not averse to making use of the doctrine of inevitable disclosure in the context of trade secret protection (essentially the notion that a departed employee cannot help but make use of his or her former employer's confidential information under certain circumstances). Given the above, Bombardier can also likely recover exemplary damages of twice the amount of any actual damages, as well as attorney's fees, as the trade secret-related conduct at issue herein was undoubtedly "willful and malicious."[17]

In short, there is an abundance of information showing that the former employees had access to, and made use of, Bombardier's trade secret information in connection with their recruitment of the former colleagues.

---

[15]  *See* RCW 19.108.010, *et seq.*; *see also* K.S.A. § 60-3320, *et seq.*

[16]  *See* RCW 19.108.030 ("a complainant may recover damages for the actual loss caused by misappropriation . . . [a]complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss."); K.S.A. § 60-3322 ("[A] complainant is entitled to recover damages . . . [d]amages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation[.]")

[17]  *See, e.g.,* RCW 19.108.030; K.S.A. § 60-3322(b).



## AeroTEC's Liability for Interference

We further note that the former employees' actions affect not only their own interests, but those of AeroTEC and its employees and officers as well.  Indeed, the relevant authorities are clear that the knowing interference with the rights of another – in this case AeroTEC's interference with Bombardier's rights in the Code – expose the interferer to liability for both common law tortious interference and statutory unfair business practices.[18] With regard to the latter, Bombardier would be entitled to seek both its costs and attorneys' fees and actual damages, as well as a potential enhancement award of up to three times its actual damages.[19]

The relevant authorities have similarly found that interference with an employee's duty of loyalty is likewise sufficient to satisfy the improper means element of an interference claim.[20] Moreover, the courts have specifically held that an interference cause of action is not negated by a defendant's good faith belief that the underlying contract was potentially unenforceable.[21]

Furthermore, under well-established law, the successful prosecution of an interference action allows the plaintiff to recover not only lost profits or unjust enrichment damages, but also the value of any diminution in good will, even if it cannot be measured with any great degree of exactness.  For example, the Washington Supreme Court has stated:

> While the value of the good will cannot be measured thereby with any great degree of exactness, we are to remember that it was caused by a malicious willful act of appellants, and that in such case damages need not be measured with any degree of nicety . . . where there is . . . intentional wrong, there is not the same strictness to exclude remote or uncertain damages, even though punitive damages are not involved . . . the nature of the case is such as the wrongdoer has chosen to make it; and, upon every consideration of justice, he is the party who should be made to sustain all the risk of loss which may arise from the uncertainty pertaining to the nature of the case and the difficulty of accurately estimating the results of his own wrongful act.[22]

In short, it appears that the former employees and AeroTEC face the prospect of significant liability given the above-recited facts and law.

---

[18]   *See, e.g., Newton Ins. Agency & Brokerage v. Caledonian Ins. Group*, 114 Wn. App. 151, 159 (2002) (noting that "[i]nterference with a business expectancy in violation of a contract not to compete" is a case where "the determination of whether the interference was improper should be made as a matter of law, similar to negligence per se."); *Pleas v. City of Seattle*, 112 Wash.2d 794, 800 (1989) (finding that the required element of "wrongful conduct" in a tortious interference claim can be satisfied by proof that the defendant's action caused injury to the plaintiff's contractual relationships).

[19]   *See* RCW 19.86.090.

[20]   *See Kieburtz*, 68 Wn. App. at 267.

[21]   *See Newton*, 114 Wn. App. at 159-160 (rejecting argument that interference would not lie because defendant was advised that employee's covenant was potentially unenforceable, stating "[defendant employer] cites no authority for the proposition that the advice of counsel, whether reasonable or not, provides a shield against liability.")

[22]   *See Seidell v. Taylor*, 86 Wn. 645, 649 (1915) (emphasis supplied); *Caruso v. Local 690*, 33 Wn. App. 201, 208, (1982), rev'd on other grounds, 100 Wn.2d 343 (1983) (citing *Seidell*, 86 Wn. 645  with approval). *See also W. Prosser, Torts* § 130, at 950 (4th ed. 1971).



### Action Requested to Address Bombardier's Concerns

Based on the foregoing, we strongly advise you that the former employees and AeroTEC are in violation of Bombardier's rights, both under the Code, pursuant to the common law, and otherwise. As indicated above, it is our understanding that the former employees have already engaged in substantial conduct in direct violation of their obligations, and that such action was done with the full knowledge and for the benefit of AeroTEC. Please be advised that Bombardier intends to vigorously protect its legitimate and enforceable business interests through whatever means it deems necessary.

Because of the substantial concern raised by the former employees' and AeroTEC's recent activities, Bombardier requests that AeroTEC execute the second form of Acknowledgment appearing below under penalty of perjury and abide by the same. Because true compliance on AeroTEC's part would necessarily require coordination and understanding between and amongst it and the former employees, we also plan on sharing our concerns with those parties, and request that you arrange for each of them to sign the first form of Acknowledgment appearing below, and facilitate their compliance with the same.

In addition, given the potential for litigation, we demand that AeroTEC and each of the former employees refrain from deleting, altering or destroying any potentially relevant information relating to the present dispute, including, but not limited to, any information, data or documents regarding AeroTEC's recruitment and engagement of Mr. Korwin-Szymanowski, Mr. Goulding, and the other former employees, and any communications and records of interaction between and amongst such former employees.

---

### CONCLUSION

In conclusion, we expect that the former employees will abide by their ongoing obligations to Bombardier and that AeroTEC will not facilitate or permit any interference with the same – a proposition which necessarily means that the former employees and AeroTEC will **not** be continuing the targeting of Bombardier employees.  If AeroTEC and the former employees intend to honor these obligations to Bombardier going forward, please send fully executed Acknowledgments in the forms set forth below to the undersigned in hard copy, via facsimile or email on or before close of business on Friday, May 6, 2016.

If you would like to discuss this matter directly, please do not hesitate to contact the undersigned at nohlep@jacksonlewis.com or 206-626-6436. Please also contact the undersigned if there is any reason or circumstance of which you are aware that renders you unable to truthfully certify the below requested warranties, or if the foregoing representations regarding your activities are inaccurate in any regard. Otherwise, we look forward to receiving your response on or before close of business on Friday, May 6, 2016.



Mr. Lee Human, President
Aerospace Testing, Engineering and Certification, LLC
April 26, 2016
Page 13

Sincerely,

JACKSON LEWIS P.C.

Peter H. Nohle

PHN/awp
Enclosures (Exhibit A–Exhibit E)

## AGREEMENT AND ACKNOWLEDGEMENT OF OBLIGATIONS
## AND ACTIONS TO ENSURE COMPLIANCE WITH THE SAME

I, _____ [**insert name of former employee**], hereby acknowledge my past, current, and ongoing obligations to my former employer Bombardier, Inc., together with its parents, affiliates, subsidiaries, and predecessors (collectively "Bombardier" or the "company") as set forth in the Code of Ethics and Business Conduct (the "Code"), which I acknowledged and agreed to as a condition of my employment with Bombardier.

In exchange for Bombardier's agreement to refrain from immediately enforcing its rights through other means, contingent on my compliance with the terms set forth in this agreement, I hereby acknowledge and confirm that I will adhere to my obligations to Bombardier.  I understand and acknowledge that these obligations require me to refrain from, amongst other things, the following activities:

(a)    Directly or indirectly soliciting or communicating with any current or recently departed employee of Bombardier regarding any employment or similar opportunities for work outside of Bombardier, whether on my own behalf or for the benefit of any competitor, including, but not limited to Aerospace Testing, Engineering and Certification, LLC ("AeroTEC"), for a period of one year from the date of this Agreement;

(b)    Using or disclosing any confidential or proprietary information of Bombardier, including, but not limited to, any information regarding its employees' identities, abilities, preferences and compensation, whether on my own behalf or for the benefit of any competitor, including, but not limited to, AeroTEC.

To ensure my ongoing compliance with the foregoing, I agree to provide Bombardier with a monthly certification under penalty of perjury attesting to my ongoing compliance with the non-solicitation and non-disclosure obligations set forth above during the one-year term set forth in sub-section (a), above.

I acknowledge and understand that Bombardier may use any available lawful means to insure my adherence to the post-employment obligations I owe to the company, including but not limited to, the institution of a civil action, if it believes that I am violating the Code or its rights, despite the foregoing acknowledgements and affirmations.

I understand, acknowledge, and agree that Bombardier's promise to forego or delay enforcing its rights through other means, contingent on my compliance with this Agreement, is a substantial form of consideration, and that this Agreement is fully enforceable in law and equity.

I declare under penalty of perjury of the laws of the United States of America and the State of Washington that the foregoing is a true statement of my present intention and future plans.

Executed this _____ day of April/May, 2016, in_____ [city], Washington.

_____
Signature

_____
Name of Former Employee

**AEROSPACE TESTING, ENGINEERING AND CERTIFICATION, LLC
AGREEMENT AND ACKNOWLEDGEMENT**

I, _____, acknowledge and agree that I am an authorized representative of Aerospace Testing, Engineering and Certification, LLC ("AeroTEC") and that AeroTEC is aware of and intends to abide by and facilitate the ongoing obligations that the former employees of Bombardier, Inc., and/or its parents, affiliates, subsidiaries, and predecessors (collectively "Bombardier" or the "company") owe to the company as set forth the individual agreements and acknowledgments executed by such former employees.

I understand and acknowledge that these obligations require the former employees and AeroTEC to refrain from, amongst other things, the following activities:

    (a)    Directly or indirectly soliciting any current or recently departed employee of Bombardier regarding any employment or similar opportunities for work outside of Bombardier for a period of one year from the date of this Agreement;

    (b)    Using or leveraging any confidential or proprietary information of Bombardier, whether obtained from or through the former employees or otherwise, including, but not limited to, any information regarding Bombardier's employees' identities, abilities, preferences and compensation.

To ensure AeroTEC's ongoing compliance with the foregoing, AeroTEC agrees to provide Bombardier with a monthly certification under penalty of perjury attesting to its and the former employees' ongoing compliance with the non-solicitation and non-disclosure obligations set forth above and in the individual employee agreements and acknowledgments during the one-year term set forth in sub-section (a), above.

I acknowledge and understand that Bombardier may use any available lawful means to insure AeroTEC's adherence to the foregoing obligations, including but not limited to, the institution of a civil action, if it believes that AeroTEC or the former employees are violating its rights, despite the foregoing acknowledgements and affirmations.

AeroTEC understands, acknowledges, and agrees that Bombardier's promise to forego or delay enforcing its rights through other means, contingent on AeroTEC's compliance with this Agreement, is a substantial form of consideration, and that this Agreement is fully enforceable in law and equity.

I declare under penalty of perjury of the laws of the United States of America and the State of Washington that the foregoing is a true statement of my and AeroTEC's present intention and future plans.

Executed this _____ day of April/May, 2016, in_____ [city], _____[state].

    Aerospace Testing, Engineering and
    Certification, LLC


    _____
    By: _____
    Its: _____

# EXHIBIT  A



## Code of Ethics and Business Conduct

# We

are committed

**BOMBARDIER**

## WHO MUST FOLLOW THE CODE

This Code applies at all times, without exception, to all members of the Board of Directors and all Bombardier employees[3]. Bombardier suppliers and partners, as well as third parties (such as agents), are also expected to adhere to the Code when dealing with or acting on behalf of Bombardier.

## WHICH LAWS APPLY

As an international corporation, Bombardier does business in many countries around the world. As a result, we are subject to the laws of many jurisdictions, including nations, provinces, states, municipalities and international bodies, such as the European Union. Bombardier and its employees must obey the law in each jurisdiction where the Corporation operates. If a conflict should arise between the applicable laws of different countries where Bombardier does business, or between the Bombardier Code and any law or regulation, the matter should be brought to the attention of a Bombardier Legal Services representative.

## COMMITTING TO THE CODE

Where applicable, newly hired employees must sign an acknowledgement that they have read and understood the Code. Designated members of senior management are also required to annually sign an acknowledgement stipulating not only that they have read and understood the Code, but also that they have neither breached nor are aware of any breach of the Code's provisions.

## POLICIES AND PROCEDURES
## OF THE CORPORATION

Each business group or division issues its own set of policies and procedures, in line with Bombardier's corporate policies. Employees have an obligation to follow those policies and procedures in addition to those described in this Code.

[3] Bombardier's Code applies to all employees, including management. In the Code, the word "employee" includes all managers. For specific provisions concerning supervisory and executive employees, see the section on Management's Responsibilities.

## EMPLOYEES

As an emp oyee, you are expected to:

- assume persona  respons b  ty for perform ng your dut es
  w th fa rness and  ntegr ty;

- agree to do your part to ach eve Bombard er's object ves
  to the best of your ab  t es, wh  e mak ng dec s ons
  cons stent w th the Code, and w thout comprom se;

- have a bas c understand ng of the Code and rev ew  t from
  t me to t me. You shou d a so have a deta ed know edge
  of  ts prov s ons that app y spec fica y to your job; and

- consu t your superv sor or one of the Bombard er contacts
   sted on page 23  f you have any quest ons about the Code.

If you become aware of a poss b e v o at on of the Code, you
are expected to:

- act prompt y and  n good fa th by ra s ng  t w th your
  superv sor or one of the other contacts  sted on page 23;

- take your concern beyond your superv sor to one of the
  other contacts  sted on page 23  f the suspected breach
  you have reported was not reso ved; and

- be prepared to cooperate  n Bombard er  nvest gat ons
  regard ng v o at ons of the Code.

## MANAGEMENT

The responsb t es of Bombard er managers nc ude and go beyond those of other emp oyees. As a manager, you are expected to:

- know the Code n deta and act ve y promote t n the workp ace;

- ead by prov d ng a mode of h gh standards of eth ca conduct, creat ng a work env ronment reflect ng the content and the sp r t of the Code;

- be v g ant n prevent ng, detect ng and respond ng to any v o at ons of the Code;

- protect those who report v o at ons; and

- work w th the Bombard er Eth cs Adv sory Counc and the Comp ance Officer to d str bute the Code to emp oyees and co ect the above ment oned acknow edgments when requ red.

11

# Code of Ethics & Business Conduct

4

The Bombardier Code addresses ethical conduct in relation to the work environment, business practices and relationships with external stakeholders.

## BUSINESS PRACTICES

### Company Property

Company property shou d on y be used for eg t mate bus ness purposes. Bombard er emp oyees are expected to take good care of company property and not expose t to oss, damage, m suse or theft.

### Intellectual Property

Inte ectua property compr ses trademarks, doma n names, patents, ndustr a des gns, copyr ghts and trade secrets. Emp oyees have a duty to protect Bombard er's nte ectua property, just as they have the ob gat on to respect that of others. Subject to app cab e aws, any nvent ons or d scover es made by emp oyees dur ng the course of the r work are Bombard er's property.

Inte ectua property s cons dered confident a nformat on. Therefore, t s covered by the non d sc osure gu de nes set out n the "Confident a Informat on" sect on of th s Code.

### Books and Records

Bombard er's books and records are comp ete, fa r and accurate and comp y w th a ega report ng requ rements. Supported by Bombard er's systems of nterna contro s, they reflect a assets, ab t es, transact ons and events and conform to requ red account ng pr nc p es.

Bombard er emp oyees manage, store, arch ve and d spose of books and records both pr nt and e ectron c accord ng to estab shed po c es and ega requ rements.

### Communications

As a Bombard er emp oyee, you shou d be truthfu and stra ghtforward n your dea ngs and not ntent ona y m s ead co eagues, customers or supp ers. Use appropr ate, profess ona anguage, both n wr tten documents and pub c conversat ons.

Commun cat ons w th the med a, the nvestment commun ty and regu ators are the respons b ty of des gnated Corporate spokespersons. Inqu r es rece ved by an emp oyee must be referred to an author zed spokesperson.

**Electronic Mail and Internet Usage**

Bombard er's e ectron c ma and Internet systems are prov ded for bus ness use. When us ng e ectron c ma , you shou d remember that t s suscept b e to ntercept on, creates a permanent record, can be pr nted or forwarded to others by the rec p ent and w ke y be reta ned on the rec p ent's computer for a ong t me. Therefore, exerc se the same care n send ng e ectron c ma as n other wr tten bus ness commun cat ons. Never use Bombard er's Internet connect on or computer equ pment to access, transm t or down oad content that s nappropr ate and does not meet bus ness requ rements.

**Gifts and Entertainment**

Emp oyees, supp ers, partners and other th rd part es represent ng Bombard er must avo d g v ng or rece v ng g fts or enterta nment f these m ght mproper y nfluence the rec p ent's judgment or m ght be perce ved to do so. G fts can nc ude goods, serv ces, favours, oans, tr ps, accommodat on or use of property, etc.

Somet mes n bus ness, for examp e, n certa n cu tures, an exchange of g fts s appropr ate. In such nstances, the g fts shou d be reasonab e, n good taste, and have token or nom na va ue. Emp oyees must never g ve or accept g fts when proh b ted from do ng so by aw or by the rec p ent's or donor organ zat on's po c es.

**Confidential Information**

Confident a nformat on s nformat on be ong ng to Bombard er that s not subject to pub c d sc osure. Confident a nformat on encompasses nformat on produced by Bombard er or obta ned n confidence from a th rd party and covered by a non d sc osure agreement.

Examp es of confident a nformat on are financ a data, strateg c p ans, nte ectua property, nformat on on b ds, persona emp oyee nformat on, ega documents and nformat on on customers and supp ers.

Do not d vu ge confident a nformat on to anyone other than the person or persons for whom t s ntended, un ess author zed or ega y requ red to do so. Th s nc udes con fident a nformat on prov ded by supp ers and customers. Emp oyees agree to ma nta n such confident a ty at a t mes, even after eav ng the emp oy of Bombard er.

Emp oyees shou d a so exerc se caut on to avo d m sus ng or nadvertent y d sc os ng confident a nformat on. **This includes:**

keep ng e ectron c and paper documents and fi es conta n ng confident a nformat on n a safe p ace;

not d scuss ng confident a matters where they cou d be overheard, for examp e, n pub c p aces such as e evators, ha ways, restaurants, a rp anes and tax s;

exerc s ng caut on when d scuss ng confident a matters on w re ess te ephones or other w re ess dev ces;

transm tt ng confident a documents by e ectron c dev ces, such as by fax or e ma , on y when t s reasonab e to be eve th s can be done under secure cond t ons; and

avo d ng unnecessary copy ng of confident a documents.

### Securities Laws and Insider Trading

It s ega for anyone who has mater a nformat on about a pub c corporat on that has not been made pub c to buy, se or trade n secur t es of sa d corporat on, or to pass on und sc osed mater a nformat on to anyone e se. Mater a nformat on s defined as any nformat on re at ng to a

A  emp oyees  are  abso ute y  proh b ted  from  convey ng und sc osed mater a  nformat on (known as "t pp ng") about Bombard er  to  anyone,  nc ud ng  outs de  profess ona adv sors,  other  emp oyees  of  Bombard er  or  members  of the r fam es, un ess do ng so n the necessary course of Bombard er bus ness.

S nce  t  may  be  extreme y  d fficu t  to  d st ngu sh  between nformat on that s "mater a  nformat on," as defined above, and  nformat on  that  s  not,  and  n  order  to  avo d  the appearance  of  poss b e  mpropr ety,  as  an  emp oyee,  you are requ red to comp y w th the fo ow ng ru es:

> at a  t mes, avo d recommend ng the purchase or the sa e of the secur t es of Bombard er Inc. to th rd part es;

> f, as an emp oyee, you w sh to buy, se  or trade n secur t es of Bombard er Inc. for yourse f or other w se, the Corporat on strong y suggests that you do so on y dur ng a trad ng per od of 25 ca endar days, start ng the fifth work ng day fo ow ng the pub cat on of Bombard er Inc.'s quarter y or annua  financ a  reports; and

> t s understood however that at a  t mes, even dur ng th s 25 day per od, you cannot trade n secur t es of Bombard er Inc. f you are aware of, or have access to, any und sc osed mater a  nfor mat on as defined above, or f Bombard er Inc. has prov ded not ce to  ts emp oyees under  ts corporate D sc osure Po cy that trad ng n Bombard er secur t es s proh b ted.

■ **Conflicts of Interest**

Avo d confl cts of  nterest, whether rea  or perce ved, n the performance  of  your  dut es.  A  confl ct  of  nterest  s cons dered to be any s tuat on or arrangement where your persona   act v t es  or   nterests  confl ct  w th  your respons b t es to Bombard er.





**BOMBARDIER**

© January 2012  Bombardier  nc  or  i s subsidiaries
All righ s reserved  Prin ed in Canada

EXHIBIT  B

## Bombardier Code of Ethics and Business Conduct Compliance Certificate

**Coverage Period: Fiscal Year 2014**

We request that you complete your declaration by Friday, January 23, 2015.

Bombardier is proud to provide the Code in 15 languages. Please select your language of choice from the box below to download a PDF version of the Code.



| | | |
|---|---|---|
| 🇺🇸 English | 🇨🇳 Chinese | Czech | 🇩🇰 Danish | 🇳🇱 Dutch |
| 🇨🇦 French | 🇩🇪 German | 🇭🇺 Hungarian | 🇮🇹 Italian | 🇳🇴 Norwegian |
| 🇵🇱 Polish | 🇵🇹 Portuguese | 🇷🇴 Romanian | 🇪🇸 Spanish | 🇸🇪 Swedish |

---

### ☐ Statements                                    **(Complete)**

I, Michel Korwin-Szymanowski, the undersigned, declare that I have read Bombardier's Code of Ethics and Business Conduct (the "Code"). I hereby confirm that during the coverage period:

| Statements | Response | If your response was "Disagree", please explain. |
|---|---|---|
| 1. I have abided by all provision of the Code; and | Agree | |
| 2. I have no personal knowledge that the Code has been breached. | Agree | |

Save

---

### ☐ E-Signature                                    **(Complete)**

**Signature**                                    **Date:  Thursday, January 15, 2015**

**I, Michel Korwin-Szymanowski, hereby certify that the above statements are true to the extent of my knowledge.**

*Disclaimer: This form cannot be completed by anyone other than the undersigned. You cannot forward this certificate to anyone nor ask anyone else to sign on your behalf.*

| Name: | **Michel Korwin-Szymanowski** |
|---|---|
| Title: | Dir, Engr FTC |
| Group: | Bombardier Aerospace |
| Division: | Product Development Eng., Aerospace |

Save

---

## Final Steps

Please click **Submit** to submit your certification to Bombardier.

If you have any questions please contact compliance.office@bombardier.com or Nora Baronian at 1-514-861-9481 ext.13395

*Thank you!*

EXHIBIT  C

**From:** Michel Korwin-Szymanowski
**Sent:** Tuesday, October 20, 2015 12:54 PM
**Subject:** Flight Test Opportunities in Seattle

Hi,

I hope you are doing well.

**First off, I want to apologize for using a form letter – I have met just too many awesome professionals such as yourself to be able to craft an individual e-mail for everyone. If you are getting this, it is because you have made such a strong positive impression on me in the past**.

I wanted to let you know that I will be visiting Wichita and Montréal, and I am hoping to reconnect with you to share flight test opportunities we have at AeroTEC, the company I recently joined in Seattle. The bigger project we have going on is, of course, the development and certification of the **Mitsubishi Regional Jet (MRJ)** which we plan to fly here in Moses Lake, just outside of Seattle. In addition, we always have a handful of STC projects on the go.

As a result, I have positions open immediately for Test Engineers, Flight Test Engineers, Instrumentation and Data System Engineers, Data Center Technicians, Project Managers, A&P Mechanics, Technicians, Supervisors. In addition, I expect to start hiring for experimental test pilots next month.

I would love to see you, either socially or **for a confidential interview**, and to answer any questions you may have about AeroTEC, the type of work we do, the MRJ program, our benefits, etc.

If you are interested, you can:

1. Read more details here: http://www.aerotec.com/content/mrj/index.html
   a. Our Q&A is located here: http://www.aerotec.com/content/mrj/MRJ_Q&A.pdf
   b. E-mail me with any questions you may have.

2.  Call to setup a **<u>confidential</u>** interview
    a.  Call us at our hiring hot line here: ~~**1-800-791-3555**~~ **1-888-791-3555**
    b.  Call me directly at: **206-724-8414**
    c.  Or send your resume to **<u>careers@aerotec.com</u>**
    d.  Or send me an email to my address: **<u>mkorwin@aerotec.com</u>**

3.  Meet me at our informal social event after work (drinks & food on me)
    a.  Wichita: Thursday, 22 Oct at **Hangar One**, 4PM-9PM
    b.  Montreal: Wednesday, 28 Oct at **Boston Pizza** in Mirabel, 4PM-9PM
        i.  Located at Exit 31, Highway 15
    c.  *Please note that this is strictly for socializing and is not a "hiring event". As such, I have invited Managers and Directors to this event as well. Do, however, come on over for a good time so that we can chat!*

4.  Meet me at the Hyatt Regency in Wichita:
    a.  Friday 10/23,  7AM – 7PM
    b.  Saturday 10/24, 7AM – 4PM

5.  Meet me at the Sheraton Hotel in Laval:
    a.  Thursday 10/29, 7AM - 7PM
    b.  Friday, 10/30, 7AM – 2:30 PM

And please, send a copy of this email to your friends and co-workers. ☺

I look forward to seeing you, and catch up with what is going on with you.

Cheers!

**Michel Korwin-Szymanowski**

Director, Test & Evaluation

Cell: 206-724-8414

**<image001.png>**

**AeroTEC LLC**

6100 4th Ave S, Suite 300

Seattle, WA 98108

EXHIBIT  D

**De :** Dale Goulding
**Envoyé :** Monday, November 16, 2015 11:05 AM
**À :** REDACTED
**Objet :** Re: How are things?

Hey up, <sup>REDACTED</sup>. Good to hear from you!

Things are going great....i was going to email you buy haven't had the time, and I think you already know?   We are moving on from Montreal and heading to Seattle! I will be he Engineering Director for a company called AeroTEC - they have the contract to flight test the MRJ and have other projects ongoing also.
There will likely be lots of travel to Japan. I was headhunted as my former boss moved there 6 months ago and recommended me.

It has been a huge, emotional decision as we absolutely love Montreal, but the package I am being offered is amazing and there are many other benefits of coming here. It will be a huge wrench to leave Montreal though.

So things are not looking good there? You've had an amazing run, really?!
So what's next? Have you got anything lined up?

How's the family? Playing lots of football I see from Facebook?

# REDACTED

REDACTED

Cheers,

Dale Goulding
Manager, Engineering (Systems)
Bombardier Flight Test Center
**From:** REDACTED
**Sent:** Monday, November 16, 2015 7:42 AM
**To:** Dale Goulding
**Subject:** How are things?

Dave G,

How are thing with you Mr Goulding?

# REDACTED

Just thought I would drop you a quick mail to see how you are.

REDACTED

EXHIBIT  E

**De :** Dale Goulding
**Envoyé :** Tuesday, November 10, 2015 10:21 AM
**À :** James Burrows
**Objet :** RE:

Sounds good.  I already gave a few managers a heads-up....no bites yet.

When I have it, I will forward it on.

**Dale Goulding**

Bombardier Flight Test Center (BFTC)
Manager, Engineering (Systems)
Avions commerciaux / Commercial Aircraft
dale.goulding@aero.bombardier.com





T   514-855-5001 ext. 28734
C   438-998-3990

**From:** James Burrows
**Sent:** Tuesday, November 10, 2015 10:16 AM
**To:** Dale Goulding
**Subject:** FW:

This is a copy of my CV as used to apply for the position here.

I'd like to update it today (after work) with my work here included, and then send it to you.

I'll be editing it to emphasise my Flight Science Masters and my work and skillset here.

Plan is to do so as soon as my afternoon shift ends, so by 5pm you should have it.