1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

9

BOMBARDIER INC.,

Plaintiff,

10

v.

11

12

MITSUBISHI AIRCRAFT CORPORATION,
MITSUBISHI AIRCRAFT CORPORATION
AMERICA INC., AEROSPACE TESTING
ENGINEERING & CERTIFICATION INC.,
MICHEL KORWIN-SZYMANOWSKI,
LAURUS BASSON, MARC-ANTOINE
DELARCHE, CINDY DORNÉVAL, KEITH
AYRE, AND JOHN AND/OR JANE DOES 1-
88,

13
14
15
16
17

Defendants.

No. 2:18-cv-1543

BOMBARDIER INC.'S MOTION
FOR PRELIMINARY
INJUNCTION

**NOTE ON MOTION
CALENDAR:
NOVEMBER 16, 2018**

18
19
20
21
22
23
24
25
26
27

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

# TABLE OF CONTENTS

I.      ISSUE PRESENTED ........................................................................... 1

II.     INTRODUCTION................................................................................ 1

III.    FACTUAL BACKGROUND .............................................................. 3

    A.     The Parties ............................................................................. 3

        1.    Bombardier ................................................................. 3

        2.    MITAC and the Corporate Defendants ...................... 4

        3.    The Individual Defendants ......................................... 4

           a.  Defendant Laurus Basson ............................... 5

           b.  Defendant Marc-Antoine Delarche................. 5

           c.  Defendant Cindy Dornéval ............................. 6

    B.     Aircraft Certification and Bombardier's Trade Secrets ....................... 6

    C.     MITAC's and the Corporate Defendants' Failure to Certify the MRJ and Subsequent Targeted Recruiting of Bombardier Personnel ............................. 8

    D.     Bombardier's Subsequent Efforts to Avoid Litigation ................................... 10

IV.    ARGUMENT .................................................................................... 10

    A.     Applicable Legal Standards ................................................. 10

        1.    Preliminary Injunction Standards ............................... 10

        2.    Breach of Contract Standards .................................... 11

        3.    Trade Secret Misappropriation Standards ................. 11

    B.     Bombardier Is Likely to Succeed on the Merits of its Breach of Contract Claims ................................................................................ 12

    C.     Bombardier Is Likely to Succeed on the Merits of its Trade Secret Misappropriation Claims .............................................................. 13

BOMBARDIER INC.'S MOTION FOR
PRELIMINARY INJUNCTION - i

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1.    Bombardier Has Developed and Owns Trade Secret Information ............. 13

    a.   The Substance of the Information at Issue Qualifies as Trade Secrets ...... 14

    b.   Bombardier Has Taken Sufficient Measures to Protect Its Trade Secret Information ............................................... 14

    c.   The Information at Issue Has Significant Value and Is Not Readily Ascertainable through Proper Means ....................................... 15

2.    The Individual Defendants Misappropriated Bombardier Trade Secrets ... 16

3.    Currently Available Evidence Strongly Suggests that the Individual Defendants Have Wrongfully Disclosed, and that the Corporate Defendants Have Wrongfully Acquired and Used, Bombardier's Trade Secrets ......... 17

4.    The Evidence Already Conclusively Establishes Threatened Trade Secret Misappropriation by the Corporate Defendants under Federal and State Law ....................................... 19

D.    A Preliminary Injunction Is Necessary to Prevent Further Irreparable Harm 20

E.    The Balance of Equities Favors a Preliminary Injunction ............................. 22

F.    A Preliminary Injunction Advances the Public Interest ................................. 23

G.    Any Bond Should Be Minimal ....................................... 24

V.    CONCLUSION ....................................... 24

CERTIFICATE OF SERVICE ....................................... 26

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**TABLE OF AUTHORITIES**

**Cases**

*Baldwin v. Silver*, 165 Wn. App. 463, 473 (2011) ................................................................. 11

*Earthbound Corp. v. MiTek USA, Inc.*, Case No. CV 16-7223 DMG (JPRx), at 5, 21 n.3 (C.D.
Cal. Feb. 10, 2017) ............................................................................................................... 15

*Earthbound Corp. v. MiTek USA, Inc.*, No. C16-1150 RSM, 2016 WL 4418013, at *10-11
(W.D. Wash. Aug. 19, 2016) ..................................................................................... 14, 20, 23

*Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d ............................................................... 17, 23

*Henry Schein, Inc. v. Cook*, No. 16-CV-03166-JST, 2016 WL 3418537, at *5 (N.D. Cal. June
22, 2016) ............................................................................................................................... 17

*IOTC Air, LLC v. Bombardier Inc.*, No 11-22861-CIV, 2012 WL 13013072, at *9-10 (S.D.
Fla. Mar. 23, 2012) ............................................................................................................... 12

*Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ...................................................... 24

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 973 (9th Cir. 1991) ................ 19, 21

*Munaf v. Geren*, 553 U.S. 674, 689-90 ...................................................................................... 10

*Otey v. Grp. Health Coop.*, 199 Wash. App. 1002, at *2 (May 15, 2017) .............................. 11

*Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1204 (E.D. Wash. 2003) .... 10,
13, 21

*U.S. Mission Corp. v. City of Mercer Island*, C14-1844RSM 2015 WL 540182, at *9 (W.D.
Wash. Feb. 10, 2015) ........................................................................................................... 24

*Waymo LLC v. Uber Techs., Inc.*, Case No. C 17-00939 WHA, at 20 (N.D. Cal. May 15,
2017) ............................................................................................................................... 22, 23

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) ............................. 10

**Statutes**

18 U.S.C. § 1836(b)(1) .............................................................................................................. 11

18 U.S.C. § 1836(b)(3) .............................................................................................................. 20

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

18 U.S.C. § 1836(b)(3)(A)(i) .......................................................................... 10

18 U.S.C. § 1839(3) ...................................................................................... 14

18 U.S.C. § 1839(3)(A) ................................................................................. 15

18 U.S.C. § 1839(3)(A)(B) ............................................................................ 11

18 U.S.C. § 1839(5)(A)(B) ............................................................................ 12

18 U.S.C. § 1839(6) ...................................................................................... 12

RCW 19.108.010(1) ...................................................................................... 12

RCW 19.108.010(2) ...................................................................................... 12

RCW 19.108.010(4) ...................................................................................... 11

RCW 19.108.010(4)(b) .................................................................................. 15

RCW 19.108.020 ..................................................................................... 10, 20

**Other Authorities**

Federal Aviation Administration; Special Conditions: Mitsubishi Aircraft Corporation Model
    MRJ–200 Airplane, Interaction of Systems and Structures, 83 Fed. Reg. 10,559 (Mar. 12,
    2018) ........................................................................................................ 22

S.Q. 1991, c. 64, art. 1458 ............................................................................ 12

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Bombardier Inc. ("Plaintiff" or "Bombardier") hereby respectfully moves for a preliminary injunction against Defendants Mitsubishi Aircraft Corporation America, Inc. ("MITAC America"), and Aerospace Testing Engineering & Certification Inc. ("AeroTEC") (collectively, the "Corporate Defendants"[1]), as well as against Defendants Laurus Basson, Marc-Antoine Delarche, and Cindy Dornéval (collectively, the "Individual Defendants"), to enjoin both sets of defendants (collectively, "All Defendants" or "Defendants") from the continued use and disclosure of Bombardier trade secret information, as well as information derived therefrom, that the Individual Defendants and/or any former Bombardier employee retained copies of in any form.

## I.    ISSUE PRESENTED

Whether All Defendants should be preliminarily enjoined from disclosing and/or using, and from the continued disclosure and/or use of, clearly marked, highly confidential, proprietary Bombardier Confidential and trade secret information that was retained by the Individual Defendants and/or any other former Bombardier employees—in express violation of contractual obligations to Bombardier—subsequent to their planned and voluntary departure from Bombardier knowing they would imminently begin working for the Corporate Defendants in similar capacities.

## II.    INTRODUCTION

The relief sought by way of Bombardier's Motion for Preliminary Injunction ("Motion") arises out of Defendant MITAC's multi-billion dollar, nearly decade-long, still-continuing, as yet unsuccessful effort to certify and commercially deliver (or "enter into service") Japan's first commercial airliner in nearly fifty (50) years—the Mitsubishi Regional Jet ("MRJ").  Since shortly after the official launch of the MRJ project on March 28, 2008, MITAC has continually faltered in navigating the incredibly complex regulatory approval

---

[1] Because Defendants Mitsubishi Aircraft Corporation ("MITAC") and Keith Ayre are located in Japan, preparations for service of process through authorized means pursuant to the Hague Service Convention is underway but not yet complete.  As such, Bombardier does not yet seek against MITAC or Defendant Ayre the injunctive relief requested herein.  Once service is complete, Bombardier fully intends to seek on the same substantive grounds the same injunctive relief against MITAC and Defendant Ayre as that now requested.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

process to obtain the requisite certifications necessary to commercialize the MRJ.  To assist with MRJ certification, MITAC has enlisted the assistance of third party aviation experts; formed a U.S. subsidiary, Defendant MITAC America; and it has partnered with Defendant AeroTEC, a company claiming to specialize in flight testing and certification processes. Despite these efforts, totaling billions of dollars and countless person-hours, MRJ certification remained elusive.  Over a nine-year (9) period, MITAC announced no less than five (5) distinct and extraordinarily costly delays to the expected commercial availability of the MRJ.

Though the MRJ still awaits certification, its prospects look suddenly promising.  That is because on the eve of the MRJ's fifth announced delay, the Corporate Defendants began working the MRJ certification problem in a significantly different—and legally culpable— manner.  Specifically, the Corporate Defendants began targeted recruiting of then-current Bombardier personnel having experience with, and access to, Bombardier trade secret information pertaining to the successful certification of Bombardier aircraft, including its C-Series.  The Corporate Defendants hired these individuals to assist in their MRJ certification efforts, and together the Defendants knowingly used Bombardier's trade secrets in an attempt to fast-track the MRJ certification.

Bombardier's Complaint and supporting papers, filed concomitantly herewith, detail and document the MRJ's certification problems and associated delays to commercialization, the targeted recruitment of Bombardier personnel to assist in MRJ certification, and Defendants' sudden confidence that the MRJ, including its newly redesigned components, will be certified within the next year after eight (8) years of failure.  Further, the Complaint establishes in detail that at least Defendants Basson, Delarche, and Dornéval misappropriated Bombardier trade secrets and confidential documents pertaining to its proprietary aircraft certification processes and therefore violated their contractual obligations to Bombardier. With the benefit of minimal discovery, Bombardier fully expects to further prove what circumstantial evidence already establishes: that the Corporate Defendants knew or had

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

reason to know that the contributions of the Individual Defendants to MRJ certification efforts were based on misappropriated Bombardier trade secrets.

To prevent any continued irreparable harm it has already sustained, and to preserve the extraordinary investment in and value of its proprietary certification processes, Bombardier respectfully requests that the Court impose a narrowly tailored injunction prohibiting (1) All Defendants from the continued disclosure and use of Bombardier information misappropriated by former Bombardier personnel and any information derived therefrom; and (2) the Individual Defendants' continued involvement with the MRJ project for the duration of these proceedings. Bombardier will more than likely prevail on its breach of contract and trade secret misappropriation claims. Further, a balancing of the equities and public interest both favor enjoining All Defendants in the limited manner Bombardier requests.

## III.    FACTUAL BACKGROUND

### A. The Parties

#### 1. Bombardier

Bombardier, a Canadian corporation headquartered in Montréal, Canada that generates annual revenues in excess of $16 billion, currently employs over 69,000 people globally as the world's leading manufacturer of both aircraft and trains. (Complaint, Dkt. No. 1, ¶¶ 2, 21.) Bombardier's Aerospace division generates over half of its annual revenue, and employs more than 29,000 personnel dedicated to setting the standard of excellence in several aircraft, aircraft services, and aircraft training markets. (*Id.* at ¶ 22.) Since its purchase of Canadair in 1986, Bombardier has successfully designed, developed, certified, and entered into service nearly thirty (30) different models of aircraft, "some of which were derivative models of [previous] aircraft, while others 'were entirely new clean-sheet designs that have demonstrated Bombardier's robust certification process.'" (*Id.* at ¶ 33.) Bombardier's most recent success was its design, development, certification, and commercialization of its highly successful clean-sheet C-Series Aircraft—"a family of narrow-body, geared turbofan twin-

BOMBARDIER INC.'S MOTION FOR
PRELIMINARY INJUNCTION - 3

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

engine, medium range jet airliners that marks a dramatic improvement over older competing aircrafts in terms of efficiency and dependability." (*Id.* at ¶ 23.)

### 2. MITAC and the Corporate Defendants

Defendant MITAC is a Japanese corporation formed in April 2008. (*See* Declaration of John D. Denkenberger Dkt. No. 1-1 ("Denkenberger Decl."), Ex. 16.) The company was formed to pursue the design, development, and commercialization of Japan's "first commercial airliner it has developed in about half a century, the [MRJ]." (Denkenberger Decl., Ex. 34.) Approximately six (6) years into the MRJ project, after announcing multiple unplanned delays to the projected commercialization date of the MRJ, and despite working with "many foreign experts, especially ex-Boeing people, to help," (Denkenberger Decl., Ex. 21; *see also* Complaint, Dkt. No. 1, ¶ 40), MITAC began dedicating additional, U.S.-based resources to "work the MRJ problem." On June 4, 2014, for example, MITAC formed subsidiary MITAC America, having an office in Seattle, Washington, to assist on the MRJ project. Shortly thereafter, on July 14, 2014, MITAC announced that Defendant AeroTEC, a Seattle-based "engineering company that provides flight-testing and aircraft certification," would also join its MRJ commercialization efforts. (Denkenberger Decl., Ex. 6; *see also* Complaint, Dkt. No. 1, ¶ 41.) Approximately one (1) year later, on August 3, 2015, MITAC opened its Seattle Engineering Center where its personnel work with its partner AeroTEC to advance MRJ commercialization. (Complaint, Dkt. No. 1, ¶ 42.) Currently, the Corporate Defendants collectively continue their MRJ efforts and now expect MRJ certification by mid-2019 and MRJ commercialization by mid-2020. (*Id.* at ¶ 47.)

### 3. The Individual Defendants

The Individual Defendants are all former Bombardier employees who, within months, weeks, days, and even hours of their voluntary and planned departures from Bombardier to join the MRJ project, retained unauthorized personal copies of proprietary Bombardier certification information in violation of their contractual obligations to Bombardier. (*Id.* at ¶¶ 60-64.)

BOMBARDIER INC.'S MOTION FOR
PRELIMINARY INJUNCTION - 4

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

a.   Defendant Laurus Basson

Defendant Laurus Basson is a current Mechanical Systems Engineer (Flight Control Systems) at AeroTEC who until March 4, 2016, was a Senior Engineering Specialist (Flight Control Systems) at Bombardier. (Denkenberger Decl., Ex. 2.)  On March 4, 2016, his last day of work, Defendant Basson without authorization sent an email from his Bombardier work email account to his personal "Yahoo" email account attaching copies of two (2) proprietary Bombardier PowerPoint slide decks entitled, "TCCA Skew Detection Presentation- Updated with latest Systems and Structure Limits 16-02-01.pptx" and "2016-03-03 TCCA Skew Detection Presentation-JAN 28 FINAL.pptx."  (*See* Complaint, Ex. J, Dkt. No. 1-10.)  The information contained in these files is marked as proprietary Bombardier information and discloses details of Bombardier's proprietary aircraft certification processes. (Declaration of Daniel Burns ("Burns Decl.") filed concomitantly herewith, at ¶¶ 3-7 and supporting exhibits A and B thereto.)

b.   Defendant Marc-Antoine Delarche

Defendant Marc-Antoine Delarche is a current Aircraft Performance Engineer at AeroTEC who until May 18, 2016, was an Engineering Specialist for Aircraft Performance at Bombardier. (Denkenberger Decl., Ex. 3.)  On May 6, 2016, Defendant Delarche without authorization—and after giving his resignation from Bombardier on May 3—sent an email from his Bombardier work email account to his personal email account attaching copies of six (6) proprietary Bombardier documents entitled, "RAA-BA503-412 Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf"; "RAA-BA503-414 Lag_Effects_in_the_Production_and_Experimental_Pitot-Static_Systems.pdf";  "RAA-BA503-418 Data Reduction of Ground Position Errors.pdf," "RAA-BA500-412 Rev A - Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf"; "RAA-BA500-414-RevA-Lag_Effects_in_the_Production_and_Experimental_Pitot-Static_Systems.pdf"; and "RAA-BA500-418_signed.pdf." (*See* Complaint, Exs. L-M, Dkt. Nos. 1-12, 1-13.)  The information contained in these files is marked as proprietary Bombardier information and

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  discloses details of Bombardier's proprietary aircraft certification processes.  (Burns Decl., ¶¶

2  8-20 and Exs. C-H thereto.)

3           c.  <u>Defendant Cindy Dornéval</u>

4           Defendant Cindy Dornéval is a current Aircraft Performance Engineer at AeroTEC

5  who until February 10, 2017, had the same title at Bombardier.  (Denkenberger Decl., Ex. 4.)

6  On November 18, 2016, Defendant Dornéval without authorization sent an email from her

7  Bombardier work email account to her personal email account attaching copies of four (4)

8  proprietary Bombardier documents entitled, "FTP PROD CSeries Rev 5.0 – 17 November

9  2016.docx";  "FTP    PROD    CSERIES    Rev    5.0    –    17    November    2016.pdf";

10  "CS100_Flight_FTP_Perf_N1_target.pdf";   and   "CS300_Flight_FTP_Perf_N1_target.pdf."

11  (*See* Complaint, Ex. O, Dkt. No. 1-15.)  These documents were either marked as proprietary

12  Bombardier information or would have been understood to contain Bombardier proprietary

13  information by any Bombardier employee having access to these documents.  (Burns Decl., ¶¶

14  21-25 and Exs. I-J.)  Further, these documents disclose Bombardier's proprietary processes

15  related to obtaining a Certificate of Airworthiness required for commercial aircraft delivery

16  post-certification.  (Burns Decl., ¶ 22.)

17           In addition, on February 10, 2017, her last day at Bombardier, Defendant Dornéval

18  without authorization attempted to send Bombardier's proprietary Computerized Airplane

19  Flight Manual ("CAFM") Calculation Methodology, entitled "BM7002.02.15.02 – Flight

20  Performances.pdf," from her work email to her personal email.  (*See* Complaint, Ex. Q, Dkt.

21  No. 1-17.)  This document is expressly marked as proprietary Bombardier information and

22  discloses details of Bombardier's proprietary details regarding its CAFM, a computerized

23  version of an AFM which is required to obtain Certificate of Airworthiness required for

24  commercial aircraft delivery post-certification.  (Declaration of David Tidd ("Tidd Decl."), ¶¶

25  2-7, Ex. A.)

26  **B.  Aircraft Certification and Bombardier's Trade Secrets**

27           Before an aircraft manufacturer can legally produce and commercially deliver or

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

"enter into service" any aircraft, the manufacturer must first obtain mandatory governmental regulatory certifications deeming the aircraft and its design airworthy and safe for operation. (Complaint, Dkt. No. 1, ¶¶ 28-32.)  Navigating this regulatory approval process has been described as "one of the most frustrating, time-consuming, bureaucratically convoluted, mind-bogglingly expensive yet ultimate rewarding business ventures of all."  (Denkenberger Decl., Ex. 14.)  Even the Corporate Defendants have admitted publicly that "it's almost impossible to understand the full certification criteria for an aircraft, if one has not been through it once or twice."  (Denkenberger Decl., Ex. 15.)  Thus, it is no surprise that since 2000, only four (4) companies world-wide have been able to develop a clean-sheet commercial aircraft program in compliance with the regulatory requirements of the Federal Aviation Administration ("FAA"), Transport Canada (FAA's Canadian counterpart), and the European Aviation Safety Agency ("EASA," FAA's European counterpart.)  (Complaint, Dkt. No.1, ¶ 27.)  Bombardier is one of those companies; the Corporate Defendants are not.  (*See id.*)  As a result, Bombardier has developed a deep and up-to-date understanding of all three (3) regulatory agencies and each agency's interpretation of the requirements.

In addition to successfully certifying multiple clean-sheet aircraft, Bombardier is a market leader having vast experience in, and proficiency with, aircraft certification procedures.  (*Id.* at ¶ 33.)  Since 1989, Bombardier has obtained the requisite governmental certifications for nearly thirty (30) different aircraft, some of which were derivative models of its previous aircraft, while others "were entirely new clean-sheet designs that have demonstrated Bombardier's robust certification process."  (*See* Denkenberger Decl., Ex. 14.) Bombardier has dedicated countless person-hours and billions of dollars over three (3) decades to develop, refine, and implement its proprietary regulatory certification procedures, procedures that market participants readily understand to be "the heart of each company's competitive advantage, its own special secret sauce."  (*Id.*)  Bombardier has gone to significant lengths to protect these secrets, including but not limited to restricting physical and virtual access to such information to only properly credentialed personnel—including various

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

tiers of virtual access of which the Individual Defendants, because of their senior technical positions, had the highest authorization—and requiring all employees as a condition of employment to be bound by a Code of Ethics restricting dissemination of this information. (Declaration of Moshe Toledano ("Toledano Decl."), ¶¶ 2-7; Declaration of Nicole L'Écuyer ("L'Écuyer Decl."), ¶¶ 2-4; *see also* Complaint, Ex. D, Dkt. No. 1-4.)

### C. MITAC's and the Corporate Defendants' Failure to Certify the MRJ and Subsequent Targeted Recruiting of Bombardier Personnel

The MRJ program has been delayed numerous times. When the program was officially launched on March 28, 2008, the MRJ was projected to enter into service some time in 2013. (Denkenberger Decl., Ex. 16.)  Approximately two (2) years later, that date was moved from 2013 to 2014.  (Denkenberger Decl., Ex. 17.)  In April 2012, that date was again moved, this time from 2014 to 2015.  (Denkenberger Decl., Ex. 19.)  In August 2013, that date was moved a third time, to 2017.  (Denkenberger Decl., Ex. 20.)  In December 2015, the MRJ's planned entry into service was moved for a fourth time, to 2018.  (Denkenberger Decl., Ex. 23.)  Most recently, in January 2017, MITAC announced a fifth delay, this time pushing the expected first commercial delivery of the MRJ to "mid-2020."  (Denkenberger Decl., Ex. 25.)

MITAC has attributed the many delays to its lack of experience in navigating the regulatory certification process.  (Denkenberger Decl., Ex. 20 (delay attributable to MITAC's "underestimation of the time it needed to sort out how to validate the safety of the manufacturing process"), Ex. 21 (delay attributable to MITAC learning "that it needed company-wide organization authorization (ODA), under which it would act on behalf of the certifying authority" and because MITAC "had not properly documented production processes" for certification purposes); Ex. 6 (delays stemming from the fact that MITAC "didn't have any experience in how to get certification"), Ex. 23 (delay due to "concerns [the MRJ] wouldn't pass certification tests"); Ex. 25 (delay because of "revisions of certain systems and electrical configurations on the aircraft to meet the latest requirements for certification").)

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

MITAC announced all of these delays, despite the fact that it had been working with "many foreign experts, especially ex-Boeing people, to help" with certification since no later than August 2013 (Denkenberger Decl., Ex. 21), despite the fact that it formed MITAC America and partnered with AeroTEC by no later than July 2014 to assist with certification processes (Denkenberger Decl., Ex. 9), and despite the fact that MITAC had invested several billion dollars in the MRJ project to date. (Denkenberger Decl., Ex. 35.)

By late 2015, well into their multi-year certification quagmire, the Corporate Defendants turned to a known source of certification expertise—Bombardier personnel.  On October 20, 2015, for example, Defendant Korwin-Szymanowski on behalf of AeroTEC sent an email to 247 Bombardier email accounts advertising immediate employment opportunities to work on "the development and certification of the [MRJ]."  (Denkenberger Decl., Ex. 31.)

Within the next year, both MITAC and AeroTEC would hold its own job fairs to recruit Bombardier personnel.  MITAC organized its job fair to be held on July 15-16, 2016, at a venue located less than 1 kilometer from Bombardier's headquarters.  (*See* Complaint, Dkt. No. 1, ¶ 49.)  The job fair was promoted both online and in the Montréal Gazette in the weeks leading up to the event, and MITAC advertised that it was "looking to hire over 200 Aircraft Systems Engineers who can work on Certification activities of MRJ aircraft." (Denkenberger Decl., Ex. 28.)  AeroTEC's job fair, meanwhile, was held on October 23-24, 2015, in Wichita, Kansas—home of Bombardier's Flight Test Center in the United States— with the aim of interviewing candidates to work on the MRJ project in Seattle, Washington. (*See* Complaint, Dkt. No. 1, ¶ 50.)  AeroTEC targeted Bombardier employees directly in part by arranging for billboards mounted on flatbed trucks advertising the job fair to be displayed immediately outside Bombardier's Flight Test Center. (*See* Denkenberger Decl., Ex. 29.) As a result of these and other efforts, the Corporate Defendants hired at least 92 former Bombardier employees.  (*See* Complaint, Dkt. No. 1, ¶ 59.)

BOMBARDIER INC.'S MOTION FOR
PRELIMINARY INJUNCTION - 9

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**D. Bombardier's Subsequent Efforts to Avoid Litigation**

Bombardier has actively and frequently corresponded with the various Defendants in an effort to avoid the need for litigation since becoming aware of the Corporate Defendants' targeted recruitment of Bombardier personnel in late 2015.  (Complaint, Dkt. No. 1, ¶¶ 52-58.)  Specifically, Bombardier notified Defendant Korwin-Szymanowski in his individual capacity, Defendant AeroTEC, Defendant MITAC, and even MITAC's corporate parent, MHI, at various times of the impropriety of their targeted recruiting of Bombardier personnel and of the obligation to respect and preserve the confidentiality of Bombardier proprietary information.  (*Id.*)  Notwithstanding Bombardier's repeated attempts to resolve its concerns with the Corporate Defendants amicably, Bombardier was forced to file suit.

## IV.   ARGUMENT

**A. Applicable Legal Standards**

*1. Preliminary Injunction Standards*

"A party seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90.  In the context of a claim for trade secret misappropriation, "actual or threatened misappropriation may be enjoined," (RCW 19.108.020; *see also* 18 U.S.C. § 1836(b)(3)(A)(i)), and therefore mere "threats of disclosure . . . of [] trade secrets (future misconduct) [can] constitute[] irreparable injury justifying injunctive relief by the court." *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1204 (E.D. Wash. 2003) (explaining justification for ordering preliminary injunctive relief in trade secret misappropriation context).

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1

2.  *Breach of Contract Standards*

2

"To prevail on a breach of contract claim, the plaintiff must show the elements of

3

duty, breach, causation, and damages." *Otey v. Grp. Health Coop.*, 199 Wash. App. 1002, at

4

*2 (May 15, 2017) (citing *Baldwin v. Silver*, 165 Wn. App. 463, 473 (2011)).

5

3.  *Trade Secret Misappropriation Standards*

6

The DTSA and WUTSA both provide a cause of action for trade secret

7

misappropriation, and the DTSA further requires that the trade secrets relate to products used

8

or intended for use in interstate or foreign commerce. 18 U.S.C. § 1836(b)(1).  Each defines

9

trade secrets similarly: "financial, business, scientific, technical, economic, or engineering

10

information" that the owner has taken reasonable measure to keep secret, and that "derives

11

independent economic value . . . from not being known to, and not being readily ascertainable

12

through proper means by, another person who can obtain economic value from the disclosure

13

or use of the information." *See* 18 U.S.C. § 1839(3)(A)(B); RCW 19.108.010(4). Both also

14

define "misappropriation" similarly to include:

15

16

(A) acquisition of a trade secret of another by a person who knows
or has reason to know that the trade secret was acquired by
improper means; or

17

(B) disclosure or use of a trade secret of another without express or
implied consent by a person who—

18

(i) used improper means to acquire knowledge of the trade
secret;

19

(ii) at the time of disclosure or use, knew or had reason to
know that the knowledge of the trade secret was—

20

(I) derived from or through a person who had used
improper means to acquire the trade secret;

21

22

(II) acquired under circumstances giving rise to a duty to
maintain the secrecy of the trade secret or limit the use
of the trade secret; or

23

24

(III)   derived from or through a person who owed a duty
to the person seeking relief to maintain the secrecy of
the trade secret or limit the use of the trade secret; or

25

(iii) before a material change of the position of the person,
knew or had reason to know that—

26

(I) the trade secret was a trade secret; and

27

(II) knowledge of the trade secret had been acquired by
accident or mistake.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

18 U.S.C. § 1839(5)(A)(B); RCW 19.108.010(2). "Improper means" under the DTSA and WUTSA "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6); RCW 19.108.010(1).

**B. Bombardier Is Likely to Succeed on the Merits of its Breach of Contract Claims[2]**

Each of Defendants Basson, Delarche, and Dornéval has an ongoing valid contractual duty with Bombardier to not disclose or retain any Bombardier confidential information. Bombardier's Code of Ethics defines Confidential information as "information belonging to Bombardier that is not subject to public disclosure" and "encompasses information produced by Bombardier" including various types of data and intellectual property. (Complaint, Ex. D, Dkt. No. 1-4, at 14-15.) The Code of Ethics further prohibits "divulg[ing] confidential information to anyone other than the person or persons for whom it is intended" and warns against the misuse of confidential information by "transmitting documents by electronic devices, such as fax or email . . . ." (*Id.* at 15.) "Employees [further] agree to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (*Id.*) Each of Defendants Basson, Delarche, and Dornéval acknowledged that they had received, read, and understood the Code of Ethics, and each "agree[d] to conform to it." (*See* Complaint, Exs. K, N, P, Dkt. Nos. 1-11, 1-14, 1-16.)

Defendants Basson, Delarche, and Dornéval each breached their contractual duty by failing to conform to the Code of Ethics when they sent or attempted to send to their personal email accounts, and/or retained without authorization by other means Bombardier Confidential information in the months, weeks, days, or hours prior to their departure from Bombardier. *See* Factual Background, Section A.3 *supra*.

---

[2] The outcome of Bombardier's breach of contract claims will be unchanged should the Court decide Quebec civil code governs rather than Washington State law because the elements are essentially the same. *See IOTC Air, LLC v. Bombardier Inc.*, No 11-22861-CIV, 2012 WL 13013072, at *9-10 (S.D. Fla. Mar. 23, 2012) ("Every person has a duty to honour his contractual undertakings. Where he fails in this duty, he is liable for any bodily, moral, or material injury he causes to other party and is liable to reparation for the injury") (quoting S.Q. 1991, c. 64, art. 1458).

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

By breaching their contractual duty, Defendants Basson, Delarche, and Dornéval each caused significant harm to Bombardier. First and foremost, Bombardier faces significant immeasurable and irreparable harm from its competitor's access or threatened access to its trade secret and Confidential information.  Moreover, each Defendant has compromised the security of Bombardier Confidential information by emailing that information to their personal email accounts and/or retaining that information without authorization by other means, has lessened the value of the information, and has reduced the competitive advantages Bombardier previously enjoyed by virtue of maintaining that information as confidential.

Thus Bombardier has shown a likelihood of success on its breach of contract claims. *See Pac. Aerospace*, 295 F. Supp. 2d at 1202 (finding that identifying a probable trade secret and a probable misappropriation in violation of a contractual agreement to maintain confidentiality sufficient to conclude that "plaintiff has at least a 'fair,' if not a 'probable,' chance of succeeding on more than one of its" claims, including trade secret misappropriation and breach of contract).

## C. Bombardier Is Likely to Succeed on the Merits of its Trade Secret Misappropriation Claims

Bombardier is more than likely to succeed on the merits of its trade secret misappropriation claims.  Bombardier has developed and owns trade secrets—particularly with respect to aviation certification processes—that were acquired through improper means by the Individual Defendants in breach of their contractual duties.  Further, Bombardier will more than likely prove, as circumstantial evidence already strongly suggests, that the Individual Defendants have disclosed these trade secrets to the Corporate Defendants for their use, and that the Corporate Defendants have acquired and already used this information knowing (or at least having reason to know) that the information was Bombardier's acquired through improper means.

### 1.  Bombardier Has Developed and Owns Trade Secret Information

The information Bombardier's Aerospace division has compiled, developed, and

BOMBARDIER INC.'S MOTION FOR
PRELIMINARY INJUNCTION - 13

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

protected over the last three (3) decades pertaining to the regulatory approval process—the information misappropriated by the Defendants—qualifies for trade secret protection under federal and state law.  Bombardier's Complaint identifies specific files that the Individual Defendants misappropriated in their final weeks, days, and even hours at Bombardier before departing to work on the MRJ project.  (Complaint, Dkt. No. 1, ¶¶ 58-62.)  Additionally, Bombardier "has taken reasonable measures to keep such information secret," and the information "derives economic value . . . from not being known to, and not being readily ascertainable through proper means," by the Corporate Defendants.  18 U.S.C. § 1839(3).

a.  <u>The Substance of the Information at Issue Qualifies as Trade Secrets</u>

The information contained in the files identified in the Complaint as misappropriated (*see* Complaint, Dkt. No. 1, ¶¶ 60-64, 165-169, 174-178, 188-192, 197-201, 211-215, 220-224) qualifies for trade secret protection under both federal and Washington law. The highly-technical information at issue was compiled by Bombardier over decades as a result of its successful certification of nearly thirty (30) clean sheet design and derivative programs over thirty (30) years, and forms part of Bombardier's playbook for obtaining mandatory regulatory aircraft certifications.  (Burns Decl., ¶¶ 3-26; Tidd Decl., ¶¶ 2-7.)  This is precisely the type of information that the DTSA and WUTSA is intended to safeguard from misappropriation. *See Earthbound Corp. v. MiTek USA, Inc.*, No. C16-1150 RSM, 2016 WL 4418013, at *10-11 (W.D. Wash. Aug. 19, 2016) (finding plaintiff's compilations of business data protectable trade secrets under both the DTSA and WUTSA and granting TRO, using preliminary injunction standard, enjoining defendants from use of plaintiff's data).

b.  <u>Bombardier Has Taken Sufficient Measures to Protect Its Trade Secret Information</u>

Bombardier's proprietary information has been the subject of reasonable efforts to maintain its secrecy.  As an initial matter, all of the material contained in the documents and files identified with specificity in the Complaint is clearly and legibly marked as Bombardier proprietary information that was not to be shared with unauthorized personnel.  (Burns Decl.,

BOMBARDIER INC.'S MOTION FOR
PRELIMINARY INJUNCTION - 14

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Exs. A-J; Tidd Decl., Ex. A.)  Additionally, Bombardier requires all employees to abide by its published Code of Ethics, which expressly defines "Confidential Information" to include the very type of information at issue here, which expressly forbids employees from distributing such information to unauthorized personnel, which expressly cautions against "transmitting confidential documents by electronic devices [except] when it is reasonable to believe this can be done under secure conditions," and which expressly states that "Employees agree to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (L'ÉcuyerDecl., ¶¶ 3-4; *see also* Complaint, Ex. D, Dkt. No. 1-4, at 14-15). Each of the Individual Defendants declared that they had read the Code of Ethics and agreed to bound by its terms. (*See* Complaint, Exs. K, N, P, Dkt. Nos. 1-11, 1-14, 1-16.)  Further, Bombardier restricts physical access to confidential information to only properly credentialed individuals. (Toledano Decl., ¶¶ 2-3.)  Bombardier likewise restricts virtual access to sensitive information, including the information specifically identified in the Complaint, and has multiple tiers of access, with the most access being reserved solely for the most senior technical employees—like the Individual Defendants. (*Id.* at ¶¶ 4-7.)  Thus, Bombardier has taken "reasonable measures under the circumstances to maintain [the] secrecy" of its trade secret information."  RCW 19.108.010(4)(b); *see also* 18 U.S.C. § 1839(3)(A); *Earthbound Corp. v. MiTek USA, Inc.*, Case No. CV 16-7223 DMG (JPRx), at 5, 21 n.3 (C.D. Cal. Feb. 10, 2017) (granting preliminary injunction under the DTSA and WUTSA based on reasonable measures to maintain secrecy including restricting access to information despite employer failing to require employees to sign confidentiality agreements).

        c.   <u>The Information at Issue Has Significant Value and Is Not Readily Ascertainable through Proper Means</u>

As noted above, the information at issue, exemplified by that identified with specificity in the Complaint, has significant value because it relates to the data, processes, strategies, analysis, and methods Bombardier employs to obtain regulatory certification for its aircraft or which Bombardier uses after certification to streamline commercial delivery of its

BOMBARDIER INC.'S MOTION FOR
PRELIMINARY INJUNCTION - 15

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

aircraft.   These types of information are "the meat and potatoes of new airplane development," they comprise "the heart of each company's competitive advantage," and companies possessing this type of information "are not about to reveal the recipe." (Denkenberger Decl., Ex. 14.)   And because Bombardier has invested billions of dollars spanning over three (3) decades to develop, improve, and refine its certification processes, its information unquestionably holds value. (Burns Decl., ¶ 26.)

Further, the Bombardier information at issue is not readily ascertainable through proper means by another who can obtain economic value from its disclosure or use.  As noted by the Corporate Defendants themselves, "it's almost impossible to understand the certification criteria for an aircraft, if one has not been through it once or twice." (Denkenberger Decl., Ex. 15.)  This much is also evidenced by the fact that since 2000 only four (4) companies world-wide have successfully certified a clean-sheet aircraft with FAA, EASA, and Transport Canada (Complaint, Dkt. No. 1, ¶ 27); by the fact that MITAC for nearly a decade has attempted and failed to obtain requisite certifications for the MRJ (*id.* at ¶¶ 35-48); and by the fact that MITAC's explanation for those failures is because it "didn't have any experience in how to get certification" (Denkenberger Decl., Ex. 6). With the assistance of the information misappropriated by the Individual Defendants, the Corporate Defendants will likely save hundreds of millions of dollars in flight-testing and avoid several years' delay in the certification processes because the information is, again, part of Bombardier's certification playbook and identifies, among other things, the specific types of flight tests that regulators have previously approved for certification. (Burns Decl., ¶ 26.)  As such, the Bombardier information wrongfully obtained by the Individual Defendants constitutes trade secret information.

2. *The Individual Defendants Misappropriated Bombardier Trade Secrets*

Specifically, and as noted above, each of the Individual Defendants knowingly and without authorization retained personal copies of highly sensitive Bombardier trade secret information pertaining to Bombardier's certification of various Bombardier aircraft, including

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

its C-Series. (Complaint, Dkt. No. 1, ¶¶ 60-64, 165-169, 174-178, 188-192, 197-201, 211-215, 220-224, Exs. J, L, M, O, Q, Dkt. Nos. 1-10, 1-12, 1-13, 1-15, 1-17.) Each did so in express contravention of the Code of Ethics, and each did so within weeks, days, and even hours of their planned and voluntary departure from Bombardier to begin work on the MRJ project. (*Id.*; *see also* Complaint, Exs. K, N, P, Dkt. Nos. 1-11, 1-14, 1-16.)  Moreover, because Bombardier's Code of Ethics expressly instructed the Individual Defendants to maintain Bombardier's information in confidence subsequent to their departure, the Individual Defendants acquired such information under circumstances giving rise to a duty to maintain its secrecy. (Complaint, Ex. D, Dkt. No. 1-4, at 15.)  Thus, the Individual Defendants' acquisition, and any subsequent disclosure or use, of the documents they retained is quintessential trade secret misappropriation. *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, (N.D. Cal. 2016) (granting TRO and finding plaintiff likely to succeed on the merits of its DTSA and California trade secret claims because "Defendant[s] e-mailed and downloaded, to [their] personal devices, confidential information from [Plaintiff] before leaving . . . to work at a competitor*"* despite having signed confidentiality agreements); *Henry Schein, Inc. v. Cook*, No. 16-CV-03166-JST, 2016 WL 3418537, at *5 (N.D. Cal. June 22, 2016) (preliminarily enjoining defendant's use of misappropriated trade secrets based on same actions).

3. *Currently Available Evidence Strongly Suggests that the Individual Defendants Have Wrongfully Disclosed, and that the Corporate Defendants Have Wrongfully Acquired and Used, Bombardier's Trade Secrets*

Currently available evidence shows that the Individual Defendants disclosed and/or used Bombardier trade secret information following their departure from Bombardier for purposes of advancing the MRJ project—in further contravention of their ongoing duty to maintain the secrecy of that information.  Such evidence also shows that the Corporate Defendants have at least wrongfully acquired, if not illicitly used, Bombardier trade secret information.

BOMBARDIER INC.'S MOTION FOR
PRELIMINARY INJUNCTION - 17

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1   As noted above, the Corporate Defendants have delayed the certification and delivery
2   schedule of the MRJ aircraft no less than five (5) times since the project began a decade ago.
3   (Complaint, Dkt. No. 1, ¶¶ 35-48.)  The first four (4) delays were incurred prior to the arrival
4   of any Individual Defendant at AeroTEC, and none of the first four (4) delays were coupled
5   with any announcement of a redesign to the MRJ.  (*See id.* at ¶¶ 35-45.)  Defendant Basson
6   then left Bombardier for AeroTEC in March 2016, taking with him unauthorized personal
7   copies of Bombardier Confidential and trade secret information pertaining to aircraft
8   certification.  (*Id.* at ¶ 60.)  Defendant Delarche did likewise two (2) months later.  (*Id.* at ¶
9   61.)  Just seven (7) months thereafter, MITAC announced its fifth and most recent delay, but
10  this time it coupled its announcement with the unexpected news that it was changing direction
11  in the MRJ design.  (*Id.* at ¶ 47.)  The MRJ redesign, MITAC explained, was for purposes of
12  facilitating MRJ certification.  (*Id.* at ¶ 48.)  Despite failing to certify the MRJ's original
13  design after nearly eight (8) years of continuous effort, MITAC in January 2017 suddenly and
14  unequivocally informed the public of a confidence that the MRJ, with its newly redesigned
15  components, will be certified within two-and-a-half years.  One month later, Defendant
16  Dornéval left Bombardier to take a comparable role in the Corporate Defendants' MRJ
17  certification effort. Before leaving, however, Defendant Dornéval maintained contact with the
18  Corporate Defendants during her final months at Bombardier and misappropriated
19  Bombardier Confidential and trade secret information in her final weeks—*and evidence*
20  *strongly suggests even in her last few hours*—of Bombardier employment.  (*Id.* at ¶¶ 62-64.)

21  The nature, sequence, and timing of these events strongly suggest that the Individual
22  Defendants disclosed, and the Corporate Defendants acquired, Bombardier's trade secret
23  information to advance MRJ certification efforts.  For years leading up to MITAC's fifth
24  announced delay, MITAC, MITAC America, and AeroTEC were all jointly working on the
25  MRJ project with an "all hands on deck" effort, enlisting the assistance of third-party aviation
26  experts, and still could not successfully certify the initial design of the MRJ.  (Denkenberger
27  Decl., Ex. 23.)  With each announced delay, MITAC explained the challenges associated with

BOMBARDIER INC.'S MOTION FOR
PRELIMINARY INJUNCTION - 18

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

certifying its clean-sheet aircraft.   (Complaint, Dkt. No. 1, ¶¶ 36-48.)   The Corporate Defendants then set their sights on recruiting Bombardier personnel, personnel with recent experience in clean-sheet aircraft certification, to join the MRJ certification effort.   (*Id.* at ¶¶ 49-51.)   Shortly after their recruitment efforts began paying off—particularly with Defendants Basson and Delarche, and later Dornéval, arriving with Bombardier trade secret information in hand—the Corporate Defendants publicly and confidently forecasted MRJ certification by mid-2019, even though that would require certifying the brand-new MRJ redesigns within a fraction of the time it would otherwise take.

Under these circumstances, Bombardier will more than likely prevail in establishing that the Individual Defendants disclosed Bombardier Confidential and trade secret information.  *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 973 (9th Cir. 1991) (affirming grant of preliminary injunction under the Oregon UTSA because, "[a]s a practical matter, it would be difficult for a person developing the same technology for two clients not to use knowledge gained from the first project in producing the second").  Bombardier will also more than likely prove that the Corporate Defendants not just wrongfully acquired, but also illicitly used, Bombardier trade secret information.  *See id.* (finding circumstantial evidence sufficient to support that defendant knew that its newly hired consultant would utilize misappropriated trade secrets from that consultant's former employer, the plaintiff, when defendant hired consultant to design a similar device).   The evidence already strongly suggests that but for the wrongful individual disclosure and corporate acquisition of Bombardier's Confidential and trade secret information, MRJ certification would remain elusive for far longer than MITAC now projects.   Discovery in these proceedings will conclusively establish as much.

     *4.   The Evidence Already Conclusively Establishes Threatened Trade Secret Misappropriation by the Corporate Defendants under Federal and State Law*

Even if the evidence outlined above is insufficient to establish a likelihood that the Individual Defendants have disclosed, and the Corporate Defendants have acquired and/or

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    used, Bombardier trade secret information, the narrow preliminary injunction Bombardier

2    now seeks is nevertheless still appropriate, warranted, and needed.  It is appropriate because

3    under both federal and Washington state law, "the Court may grant an injunction to prevent

4    actual *or threatened* misappropriation of trade secrets."  *Earthbound Corp. v. MiTek USA,*

5    *Inc.*, 2016 WL 4418013, at *10-11 (W.D. Wash. Aug. 19, 2016) (citing 18 U.S.C. §

6    1836(b)(3); RCW 19.108.020) (emphasis added).  It is warranted because the evidence noted

7    above establishes at least a threat of imminent disclosure, acquisition, and/or use by the

8    Corporate Defendants.     Specifically, the Individual Defendants wrongfully possess

9    Bombardier trade secret information, they now occupy positions with the Corporate

10   Defendants that are the same or similar to their previous positions at Bombardier, and the

11   information they misappropriated would on its face be invaluable to both the Individual and

12   Corporate Defendants in their sustained and as-of-yet unsuccessful efforts to obtain regulatory

13   certification of the MRJ.  If the Defendants have not already disseminated to each other

14   Bombardier's trade secret information (and currently available evidence already strongly

15   suggests that they have), the narrow preliminary injunction Bombardier now seeks is

16   appropriate, warranted, and needed to prevent that, and the irreparable harm that would result,

17   from happening.

18          **D.  A Preliminary Injunction Is Necessary to Prevent Further Irreparable Harm**

19          Bombardier will sustain irreparable injury if All Defendants are permitted to continue

20   benefiting from Bombardier's trade secret information and related data, as well as information

21   derived therefrom.     Specifically, unless the Defendants are enjoined, Bombardier's

22   misappropriated trade secret information stands to serve as the very foundation for a revival

23   of the Japanese aircraft manufacturing industry as a whole.  Recently published business news

24   reports confirm as much:

25                  The Mitsubishi Regional Jet (MRJ) has been delayed five times
                    and faces rising costs, yet its future as the vanguard of Japanese-
26                  built passenger jets seems assured by the corporate muscle behind

27

BOMBARDIER INC.'S MOTION FOR
PRELIMINARY INJUNCTION - 20

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

it and a government set on reviving an aerospace industry dismantled after World War Two.

. . . [T]he Japanese government's primary goal isn't to make money for [MITAC], the MRJ's manufacturer, rather it's to have the plane cement an industry revival that failed to take off half a century ago.

. . . Presentation documents prepared by the ministry of Economy, Trade and Industry, seen by Reuters, see the MRJ as the first in a three-generation program stretching beyond 2060.

(Denkenberger Decl., Ex. 35.)

In other words, MITAC intends to leverage Bombardier's proprietary trade secret information to certify the MRJ, which will then serve as "the foundation of a strong aerospace industry" spanning for decades. *Id.* MITAC views the MRJ "as the creation of a new industry, establishing supply chains *and a regulatory certification process*" for years to come. *Id.* (emphasis added).

If All Defendants are not enjoined from continued use of Bombardier's trade secret certification information, the irreparable harm awaiting Bombardier is immeasurable. Not only will Bombardier be deprived of its substantial investment made in developing and refining its proprietary certification processes, but it will also be forced to compete with literally a new nation of competing aircraft manufacturers that would otherwise not exist for at least several years to come. The Corporate Defendants have spent nearly a decade in futility, time and again failing to obtain the requisite certifications to commercialize Japan's first commercial airliner in nearly fifty (50) years. Permitting the Defendants to utilize Bombardier information to accelerate the launch of not just one competing aircraft, but the innumerable Japanese aircraft that will follow, is the very type of irreparable harm a preliminary injunction is designed to prevent. *See Lamb-Weston, Inc.*, 941 F.3d at 974 ("An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained."). *E.g., Pac. Aerospace*, 295 F. Supp. 2d at 1198 ("an intention to make imminent or continued use of a

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

trade secret or to disclose it to a competitor will almost always certainly show irreparable harm").

Now that MITAC expects to certify the MRJ in mid-2019, and has been conducting certification test flights guided by Bombardier trade secret information, time is of the essence. (*See* Complaint, Dkt. No. 1, ¶ 47-48; *see also* Federal Aviation Administration; Special Conditions: Mitsubishi Aircraft Corporation Model MRJ–200 Airplane, Interaction of Systems and Structures, 83 Fed. Reg. 10,559 (Mar. 12, 2018) (Special Condition for the MRJ requiring certification to include analyses of "any significant nonlinearity" (including flap skew, the very subject matter Defendant Basson misappropriated from Bombardier)).) Bombardier "reasonably refrained from bringing suit until it discovered evidence indicating use"—in this case, public statements from the Corporate Defendants, as well as in the Federal Register, indicating imminent and continued use of Bombardier trade secrets. *See Waymo LLC v. Uber Techs., Inc.*, Case No. C 17-00939 WHA, at 20 (N.D. Cal. May 15, 2017) (holding that it was appropriate for Waymo to file its preliminary injunction motion until it received what it believed was proof of Uber's use of its trade secrets, and that any delay did not "suggest[] a lack of urgency belying likelihood of irreparable harm").

**E.  The Balance of Equities Favors a Preliminary Injunction**

The balance of equities likewise overwhelmingly favors the issuance of a preliminary injunction against All Defendants because Bombardier is seeking a very narrow form of relief.  In particular, Bombardier is seeking to enjoin All Defendants merely from disclosing and/or using any proprietary Bombardier information that any former Bombardier employee wrongfully retained after his or her departure from Bombardier, from using any information subsequently derived from that information, and from temporarily prohibiting Defendants Basson, Delarche, and Dornéval from any continued work on the MRJ project until these proceedings conclude.  Regarding the last, the Corporate Defendants have publicly disclosed that hundreds of personnel are currently working on the MRJ project, so temporarily restraining three (3) individuals from continuing their work on the MRJ project is hardly

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1   prohibitive.   That is particularly the case here, where substantial irreparable harm to
2   Bombardier hangs in the balance.

3         As to the remainder of Bombardier's request, enjoining All Defendants from further
4   disclosure and/or use of Bombardier Confidential and/or trade secret information or
5   information derived therefrom merely maintains the status quo of affairs prior to the
6   Individual Defendants' misappropriation of that information.  The Corporate Defendants are
7   not enjoined from continuing their work on the MRJ project, and if the Corporate Defendants
8   in fact did not disclose or use any Bombardier information, the injunction will have no impact
9   at all.  Bombardier's requested relief is sufficiently narrow in scope to be eminently fair to all
10  involved. *See Henry Schein, Inc.*, 191 F. Supp. 3d at 1077 (The "balance of hardships tips in
11  favor of plaintiff seeking injunction when it would do no more than require Defendant to
12  comply with federal and state laws.") (citations and quotations omitted).

13        **F.  A Preliminary Injunction Advances the Public Interest**

14        The issuance of a preliminary injunction against All Defendants in this instance also
15  favors the public interest. "Theft of trade secrets, and allowing the thieves to retain and use
16  the confidential information they purloined, undermines business development and stability;
17  preventing such conduct is in the public's interest." *Earthbound Corp.*, 2016 WL 4418013 at
18  *10. *See also Henry Schein, Inc.*, 191 F. Supp. 3d at 1078 ("[T]he public interest is served
19  when defendant is asked to do no more than abide by trade laws and the obligations of
20  contractual agreements signed with her employer. Public interest is also served by enabling
21  the protection of trade secrets.").

22        Moreover, any competition related concerns are minimal as Bombardier's requested
23  relief allows the Corporate Defendants to continue development and certification of the MRJ,
24  albeit in a proper manner. *See Waymo*, Case No. C 17-00939 WHA, at 21 ("[S]afeguards
25  imposed on [the Corporate Defendants] in response to brazen misappropriation of trade
26  secrets by its executive[s] and engineer[s] would hardly discourage *legitimate* competition in
27  a field where intellectual property rights are important to innovation.") (emphasis in original).

BOMBARDIER INC.'S MOTION FOR
PRELIMINARY INJUNCTION - 23

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1  **G. Any Bond Should Be Minimal**

2  Any bond required by Bombardier to obtain a preliminary injunction in this matter

3  should be minimal.  As a preliminary matter, Bombardier has eminently clean hands, and it

4  should not be forced to pay a prohibitive ransom to maintain the secrecy of its invaluable

5  proprietary information.  Second, Bombardier is seeking injunctive relief that effectively

6  passes strict scrutiny: it is narrowly tailored to protect Bombardier proprietary information

7  that was misappropriated in very specific instances, and it is ostensibly the least restrictive

8  means to maintain the secrecy and value in that information.  Bombardier is not seeking to

9  prevent the continued employment of its former personnel with any of the Corporate

10  Defendants, nor is it seeking to prevent the continued participation of all other former

11  Bombardier personnel on the MRJ project.  Rather, Bombardier is requesting only that the

12  Defendants stop any continued use and/or disclosure of Bombardier information that was

13  misappropriated by former employees, and it asks only that the three (3) Individual

14  Defendants—for whom proof currently exists to establish that they misappropriated

15  Bombardier trade secrets—discontinue work on the MRJ project for the duration of these

16  proceedings.  Finally, and perhaps definitively, the injunction will not restrict the Corporate

17  Defendants in the slightest if they are in fact not misappropriating Bombardier trade secret

18  information. "[T]he district court may dispense with the filing of a bond when it concludes

19  there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."

20  *U.S. Mission Corp. v. City of Mercer Island*, C14-1844RSM 2015 WL 540182, at *9 (W.D.

21  Wash. Feb. 10, 2015) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)).

22  **V.  CONCLUSION**

23  In light of the foregoing, Bombardier respectfully requests that the Court grant

24  Bombardier's Motion and issue the narrowly tailored preliminary injunction requested herein.

25

26

27

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    Dated this 19th day of October, 2018.

2

3                                            CHRISTENSEN O'CONNOR
                                             JOHNSON KINDNESS<sup>PLLC</sup>
4

5

6                                            s/John D. Denkenberger
                                             John D. Denkenberger, WSBA No.:  25,907
7                                            Brian F. McMahon, WSBA No. 45,739
                                             Christensen O'Connor Johnson Kindness<sup>PLLC</sup>
8                                            1201 Third Avenue, Suite 3600
                                             Seattle, WA  98101-3029
9                                            Telephone:  206.682.8100
                                             Fax:  206.224.0779
10                                           E-mail:  john.denkenberger@cojk.com,
                                             brian.mcmahon@cojk.com, litdoc@cojk.com
11

12                                           *Attorney for Plaintiff Bombardier Inc.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on October 19, 2018, I electronically filed the foregoing with the

3   Clerk of the Court using the CM/ECF system.

4

5                                              s/John D. Denkenberger
                                               John D. Denkenberger, WSBA No.:  25,907
6                                              Brian F. McMahon, WSBA No. 45,739
                                               Christensen O'Connor Johnson Kindness[PLLC]
7                                              1201 Third Avenue, Suite 3600
                                               Seattle, WA  98101-3029
8                                              Telephone:  206.682.8100
                                               Fax:  206.224.0779
9                                              E-mail:  john.denkenberger@cojk.com,
                                               brian.mcmahon@cojk.com, litdoc@cojk.com
10

11                                             *Attorney for Plaintiff Bombardier Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100