UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| BOMBARDIER INC., <br><br> Plaintiff, <br><br> v. <br><br> MITSUBISHI AIRCRAFT CORPORATION, MITSUBISHI AIRCRAFT CORPORATION AMERICA INC., AEROSPACE TESTING ENGINEERING & CERTIFICATION INC., MICHEL KORWIN-SZYMANOWSKI, LAURUS BASSON, MARC-ANTOINE DELARCHE, CINDY DORNÉVAL, KEITH AYRE, AND JOHN AND/OR JANE DOES 1-88, <br><br> Defendants. | No. _____ <br><br> DECLARATION OF DANIEL BURNS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |

I, DANIEL BURNS declare as follows:

1. I am an employee of Bombardier, Inc. ("Plaintiff"). I have personal knowledge of the matters addressed herein. My position at Bombardier is Sr. Director, Product Integrity. I have extensive experience in aircraft certification procedures and have assisted Bombardier's efforts to certify numerous of its aircraft, including its C-series, and Global series aircraft.

2. In my role as Senior Director, Product Integrity for Bombardier, I have been asked to review specific documents, copies of which I understand were taken without authorization by certain former Bombardier personnel before their last days of employment

DECLARATION OF DAN BURNS IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 1

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

with Bombardier. I have also been asked to explain whether (and if so, how) each of the documents disclose information that Bombardier considers to be valuable, proprietary, confidential, and in general not readily ascertainable by way of reverse-engineering or other publicly available means. Copies of the documents that I have reviewed for purposes of this declaration are attached as Exhibits A-J. I will address each in turn.

3. The first document to be addressed is a PowerPoint slide deck that we at Bombardier used with Transport Canada ("TCCA") as part of our highly confidential negotiations during the regulatory approval process for Bombardier's Global 7000/8000 Aircraft. For purposes of this declaration, I will refer to this document as the "TCCA Presentation." A true and correct copy of this TCCA Presentation, having the electronic file name "2016-03-03 TCCA Skew Detection Presentation-JAN28 FINAL.pptx," is attached as Exhibit A. I am informed that this is one of the documents that former Bombardier employee Laurus Basson emailed to himself prior to his departure from Bombardier, along with another PowerPoint file entitled "TCCA Skew Detection Presentation- Updated with latest Systems and Structure Limits 16-02-01.pptx." A true and correct copy of this second PowerPoint file is attached hereto as Exhibit B. Because the exact information provided in Exhibit B can be found at slides 39-45 of the TCCA Presentation, I will address both documents at the same time.

4. First, the information contained in both the TCCA Presentation as well as in Exhibit B is undoubtedly valuable. It is certainly valuable to Bombardier, as it contains a wealth of information critical to establishing and satisfying, for regulatory certification purposes, Safety-of-Flight ("SOF") and Entry-in-Service ("EIS") criteria for Bombardier's Global 7000/8000 Flap Actuator Jam-Disconnect Skew Detection System ("SDS"). (A Skew Detection System is critical to the safety and performance of a commercial aircraft for a number of reasons beyond the scope of this declaration. As such, obtaining regulatory acceptance of an aircraft's SDS design is an essential step in obtaining the type certification necessary to enter a commercial airliner into service.) Bombardier invested thousands of

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 2

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

man-hours in designing, developing, testing, and certifying its SDS for the Global 7000/8000 Aircraft. The value of that information in the TCCA Presentation and Exhibit B to Bombardier is measured not only as a function of both time and money Bombardier invested in system design and certification on previous programs but also its prospective value—Bombardier can use the information in these documents as a roadmap to design, develop, and to obtain regulatory acceptance of a future aircraft's SDS design for years to come. In other words, Bombardier will not have to "start from scratch" SDS for its future aircraft models and instead it can base future SDS designs on the information contained in the TCCA Presentation and Exhibit B, thereby saving <u>significant</u> time and resources.

5. As valuable as the information contained in the TCCA Presentation and Exhibit B is to Bombardier, and given the information's nature as described above, it should be no surprise that the documents are considered proprietary to Bombardier and are clearly marked as such. Even if the TCCA Presentation and Exhibit B were not marked, relevant Bombardier employees would know the proprietary and confidential nature of the documents simply by looking at the information they contain. For instance, the TCCA Presentation contains at least the following: (a) the proposed agenda and topics Bombardier intended to cover with TCCA in presenting its SDS for consideration and acceptance during negotiations well known to be highly confidential; (b) explicit identification of Bombardier's Preliminary Design Review ("PDR") Requirements; (c) a design schematic of Bombardier's Slat/Flap Control System ("SFCS") complete with identification and placement of the various skew sensors; (d) explicit identification of Bombardier's Critical Design Review ("CDR") Requirements; (e) disclosure and explanations of Bombardier's previously approved CRJ SDS, complete with high-level schematics, upon which Bombardier's Global 7000/8000 aircraft SDS was predicated; (f) particularized and extensive details comparing and contrasting the SDS of the Global 7000/8000 and the CRJ SDS, complete with specific identification of design and component differences for both production and SOF configurations for the two models, and including defined and measured operating parameters

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 3

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

and system characteristics of each SDS; (g) particular details concerning installation of various components; (h) summaries and detailed analysis of compliance with various regulatory requirements related to criticality impact, Functional Development Assurance Level ("FDAL"), and Candidate Certification Maintenance Requirements ("CCMR"); (i) identification of particularized certification regulations "deemed applicable for demonstration of SDS compliance"; (j) summaries and data sufficient to show results from specifically identified testing configurations and compliance with applicable regulations (this is the same information provided in Exhibit B); (k) identification of the third party suppliers of various components of the SDS; (l) identification of and explanation of the Skew Detection Unit ("SDU") inputs/outputs and built-in tests; (m) explanation of conditions triggering SDS Crew-Alerting System ("CAS") messaging; (n) explanation and analysis of SDS Proof of Concept testing; and (o) explanation and analysis of SDS SOF requirements. Even a cursory review of this information would readily demonstrate that it is obviously the result of extraordinary investments in time and resources in design, development, and testing of a critical component of Bombardier's Global 7000/8000 Aircraft to demonstrate safety of the design. And because Bombardier's Code of Ethics—a document I, like all other Bombardier employees, agreed to review, understand, and abide by—clearly identifies this type of information as "Confidential," any Bombardier employee would know not to use this information for any non-Bombardier-related purpose even if the information were not marked as Private and Confidential.

6. As for whether the information contained in the TCCA Presentation or Exhibit B could be readily ascertained without having access to that information, in other words through reverse engineering or some other comparable approach, the answer is quite simple: no. As noted above, the TCCA presentation contains over 60 slides of particularized information concerning Bombardier's design, development, testing, and certification approach of the Global 7000/8000 Aircraft SDS, and it identifies with precision and specificity the entirety of regulations for which Bombardier specifically comported its testing to demonstrate

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 4

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

regulatory compliance of its SDS.  All of this information is highly proprietary to Bombardier, and none of it is publicly disseminated or available—including the testing data and information comprising Exhibit B and found at slides 39-45 of the TCCA Presentation. Even the applicable regulations for which Bombardier tested compliance are not readily ascertainable, because those particular regulations applicable to a specific system are a subset of countless regulations relating to commercial aircraft certification, and they are identified only after an aircraft manufacturer meets in confidence with certifying authority representatives (often through the course of several meetings) to reach agreement on which specific subset of regulations must be satisfied.

7.   It is for these reasons that the information contained in the TCCA Presentation, as well as that in Exhibit B, would have tremendous value to anyone seeking to obtain regulatory certification of a commercial aircraft.  The information contained in Exhibit B alone, for example, discloses testing configurations and measurements that certification authorities concurred are acceptable to demonstrate compliance of the SDS.  The information therefore provides a head-start to anyone involved in designing, developing, or certifying an aircraft SDS, because the reader now knows with greater certainty the quantity and quality of data needed for regulatory approval and the specific regulatory requirements for which compliance must be demonstrated.  In other words, it conveys institutional knowledge of SDS certification data that, without which, the reader would be forced to invest significant time and resources to develop independently.  This applies exponentially for the information contained in the TCCA Presentation, as that contains all the information provided in Exhibit B, as well as the additional information outlined above.  The TCCA Presentation is essentially a roadmap for how to design, develop, and/or certify a commercial aircraft SDS.

8.   The next group of documents I have been asked to review and explain are copies of documents that I understand were emailed by former Bombardier employee Marc-Antoine Delarche to his personal email account without authorization within his last two weeks of employment with Bombardier.  My understanding is that there are at least six such

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 5

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

documents, and I have reviewed each for purposes this declaration.  They are as follows, a .pdf file entitled, "RAA-BA503-412 Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf," a true and correct copy of which is attached as Exhibit C; a .pdf file entitled, "RAA-BA503-414 Lag_Effects_in_the_Production_and_Experimental_Pitot-Static_Systems.pdf," a true and correct copy of which is attached as Exhibit D; a .pdf file entitled, "RAA-BA503-418 Data Reduction of Ground Position Errors.pdf," a true and correct copy of which is attached as Exhibit E; a .pdf file entitled, "RAA-BA500-412 Rev A - Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf," a true and correct copy of which is attached as Exhibit F; a .pdf file entitled, "RAA-BA500-414-RevA-Lag_Effects_in_the_Production_and_Experimental_Pitot-Static_Systems.pdf," a true and correct copy of which is attached as Exhibit G; and a .pdf file entitled, "RAA-BA500-418_signed.pdf," a true and correct copy of which is attached as Exhibit H.

9. Generally speaking, Exhibits C-H each are certification reports for Bombardier's CSeries Aircraft, specifically the CS100 Model BD-500-1A10 Commercial Aircraft and the CS300 Model BD-500-1A11, specifically recording the demonstration of compliance and constituting statements of compliance with pertinent certification type approval requirements as established by government regulations.  Exhibit C addresses with specificity Bombardier's CS300 airspeed indicating system, its static pressure systems, and its air temperature indicator, while Exhibit F addresses the same topics and systems relating Bombardier's CS100 Aircraft.  Exhibit D addresses with specificity Bombardier's CS300 air data system lag effects during flight, while Exhibit G addresses the same topic and related systems for Bombardier's CS 100 Aircraft.  Exhibit E addresses with specificity Bombardier's CS300 airspeed indication system during accelerated takeoff ground run, while Exhibit H addresses the same topic and corresponding system for Bombardier's CS 100 Aircraft.  Because of the similarity of subject matter between Exhibits C and F, D and G, and E and H, respectively, I will address each group of two documents in sequence.

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 6

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

10. With respect to Exhibits C and F, both documents have tremendous value to Bombardier, both in terms of the time and resources invested to compile, synthesize, and present the information contained in the exhibits, as well as in terms of prospective value. The information contained in these documents is a culmination of thousands of man-hours related to designing, testing under various conditions, optimizing, and certifying Bombardier's CSeries' airspeed indicating system, static pressure systems, and air temperature indicator. And for reasons that will be addressed below, the information contained in these documents constitutes institutional knowledge that can be used by Bombardier (or any other entity possessing these documents) to streamline certification efforts relating to these same systems of future aircraft.

11. Because of the prospective value to Bombardier of Exhibits C and F, and because of the competitive advantages an aircraft manufacturing competitor would gain in having this information readily available to it, this information is considered highly proprietary and confidential Bombardier property and is marked as such. Even if the information were not clearly marked, though, relevant Bombardier employees would know the proprietary and confidential nature of the documents simply by looking at the information they contain. For instance, both exhibits contain very specific and/or highly technical data and information pertaining to (a) Bombardier's production and experimental air data systems; (b) the flight tests conducted by Bombardier to determine the air data system errors, including but not limited to the flight test aircraft configurations used by Bombardier to demonstrate regulatory compliance (of which there are literally hundreds of possibilities, as a result of the various positions in which, for example, inboard and outboard slats, flaps, and ailerons could be configured and whether such tests were conducted with the landing gear deployed); (c) Bombardier's proprietary methodology use to determine Static Source Error Correction ("SSEC"); (d) how Bombardier's air data systems comport with applicable and governing regulations for certification, including but not limited to measuring and testing performance thresholds when approaching flight stall speeds as well as at above maximum operating

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 7

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

speeds; (e) Bombardier's total temperature probe; and (f) identification of the regulations applicable to the air data system for which Bombardier is demonstrating compliance. Even a cursory review of this information would readily demonstrate that it is obviously the result of extraordinary investments in time and resources in design, development, and testing of critical components of Bombardier's CSeries Aircraft. And because Bombardier's Code of Ethics—as mentioned above, a document I, like all other Bombardier employees, agreed to review, understand, and abide by—clearly identifies this type of information as "Confidential," any relevant Bombardier employee would know not to use this information for any non-Bombardier-related purpose even if the information were not marked as Confidential.

12. As for whether the information contained in Exhibits C and F could be readily ascertained without having access to that information, in other words through reverse engineering or some other comparable approach, again the answer is no. To be clear, that is not to say that at least some of the information disclosed in these exhibits could not be gleaned through publicly available information. For example, reverse engineering of Bombardier's CSeries aircraft would readily reveal some details of Bombardier's aircraft components disclosed in the exhibits, such as the number, type, and location of the pitot/static systems employed in the CSeries Aircraft; the number, type, and positioning of Total Air Temperature ("TAT") sensors employed in the aircraft; and like information. But the exhibits also disclose incredibly sensitive, proprietary information concerning how Bombardier employed these systems under very specific flight configurations, parameters, and conditions to demonstrate compliance with applicable certification regulations; the technical references relied upon by Bombardier to demonstrate compliance; and even the subset of regulations negotiated by Bombardier in confidence with Transport Canada/FAA that were mutually agreed upon to be applicable to this system. None of this information is publicly available nor readily ascertainable without reference to Bombardier proprietary information. And precisely this information would be extraordinarily valuable to anyone seeking to obtain regulatory certification of a commercial aircraft. The information provides a head-start to anyone

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 8

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

involved in designing, developing, or certifying an aircraft airspeed indicating system, its static pressure systems, and its air temperature indicator. In other words, it conveys institutional knowledge of static system certification data that, without which, the reader would be forced to invest significant time and resources to develop independently. Together or independently, Exhibits C and F provide a roadmap for how to test and certify critical components of commercial aircraft. The significance of the competitive advantage this information would provide in the hands of a competitor would be difficult to overstate.

13. As with Exhibits C and F, Exhibits D and G likewise have tremendous value to Bombardier, both in terms of the time and resources invested to compile, synthesize, and present the information contained in the exhibits, as well as in terms of prospective value. The information contained in these documents is a culmination of significant man-hours relating the assessment and evaluation of Bombardier's CSeries air data system and lag effects during flight, development of a reliable methodology to determine various lag effects, and development and application of appropriate protocols to correct flight test data to account for various lag effects. And for the reasons that will be addressed below, the information contained in Exhibits D and G constitutes institutional knowledge that can be used by Bombardier (or any other entity possessing these documents) to streamline certification efforts for aircraft data systems requiring correction or modification protocols to account for lag effects.

14. Because of the prospective value to Bombardier of Exhibits D and G, and because of the competitive advantages an aircraft manufacturing competitor would gain in having this information readily available to it, this information is considered highly proprietary and confidential Bombardier property and is marked as such. Even if the information were not clearly marked, though, relevant Bombardier employees would know the proprietary and confidential nature of the documents simply by looking at the information they contain. For instance, both exhibits contain very specific and/or highly technical data and information pertaining to the proprietary methodology Bombardier used to determine the

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 9

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

various lag values of its air data system, the specific instrumentation installed by Bombardier for lag testing, the parameters used to identify and quantify its air data system lag, the proposed lag constants Bombardier used to calculate various lag through application of standardized formulae, specific details concerning Bombardier's air data system for production, detailed schematics of Bombardier's production and experimental air data systems, and specific data collected concerning the various lags of its air data systems. Even a cursory review of this information would readily demonstrate that it is obviously the result of Bombardier proprietary research and development efforts to demonstrate to the certifying authority that its flight test measurements used for certification purposes are verifiably accurate. This is the very type of information that Bombardier's Code of Ethics identifies as Confidential, so any relevant Bombardier employee would know not to use this information for any non-Bombardier-related purpose even if the information were not marked as Confidential.

15. As for whether the information contained in Exhibits D and G could be readily ascertained without having access to that information, in other words through reverse engineering or some other approach, the answer is a qualified "no." The answer is qualified because there is admittedly some information contained in these documents that would be known or readily ascertainable by those with experience in the field, such as the various types of lag that must be accounted for in typical air data systems and the appropriate mathematical formulae used to calculate various lag. However, information concerning Bombardier's proprietary methodology used to determine the various lag values of its air data system, the specific instrumentation installed by Bombardier for lag testing, the parameters used to identify and quantify its air data system lag, the proposed lag constants Bombardier used to calculate various lag through application of standardized formulae, specific details concerning Bombardier's air data system for production, detailed schematics of Bombardier's production and experimental air data systems, and specific data collected concerning the various lags of its air data systems would not be publicly known or readily ascertainable. Consequently, this

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 10

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

specific information would be extraordinarily valuable to anyone seeking to obtain regulatory certification of a commercial aircraft. It could be used to ensure that—at least to the satisfaction of a certifying authority—the various lag effects inherent in air data systems under flight conditions would be accounted for when reporting flight testing data for purposes of obtaining regulatory certification. It would also identify the instrumentation and methodology to be used, and an aircraft manufacturer could rely on this same instrumentation and methodology to verify the accuracy of its own reporting data with confidence knowing that these protocols were previously deemed acceptable for certification purposes. In other words, it provides immediate "know-how" to adjust flight test data to account for lag, and it can be used as a roadmap for certification efforts for years to come. And instead of investing the time and resources in developing its own protocol to account for lag, these documents provide the reader with essentially pre-approved protocols. This is a significant competitive advantage for any aircraft manufacturer seeking regulatory certification of its aircraft.

16. Exhibits E and H also have tremendous value to Bombardier. As noted above, the exhibits are statements of compliance relating to the CSeries airspeed indication system during accelerated takeoff run, and each addresses all related regulatory requirements for certification with TCCA, FAA, and the European Aviation Safety Agency ("EASA") for the particular aircraft model to which each exhibit pertains. The information contained in these exhibits is the result of significant investments of Bombardier time and resources, all simply to establish conclusively and convincingly with the certifying authority that during accelerated takeoff for the CS100 and CS300 aircraft, ground speed errors between indicated and calibrated airspeeds were sufficiently negligible so as to require no correction to decision speed ($V_1$), rotation speed ($V_R$), or takeoff safety speed ($V_2$) as they are required to be presented in each aircraft's Aircraft Flight Manual ("AFM"). This may seem like a small detail, but it serves as an excellent example of how expensive and time-intensive aircraft certification is and how even the smallest details in aircraft certification matter greatly.

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 11

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

17. For example, as Exhibits E and H reveal, certifying authorities require exacting proof of the representations made during regulatory approval processes.  To support the simple proposition that an aircraft's airspeed indication system is sufficiently accurate and precise so as to require no data correction for that aircraft's AFM, extensive testing under very specific conditions and configurations is required.  These exhibits identify the specific aircraft configurations that were used for testing (including the positioning of the inboard and outboard slats, flaps, ailerons, and landing gear), the particular airspeed calculation methodology employed during testing, schematics of the air data systems employed, and of course copies of the hard data that was gathered through testing.

18. The value of this information to Bombardier, in addition to it being the result of significant investments of time and resources, also has tremendous prospective value. Specifically, the disclosures contained in Exhibits E and H, having been reviewed and accepted by appropriate certifying authorities, represent a veritable "how-to" guide for confirming the accuracy and precision of an aircraft's airspeed indication system under certain takeoff conditions.  These documents save Bombardier (or any other aircraft manufacturer in possession of these documents) from having to formulate and execute such an expensive flight test plan in a vacuum, without the benefit of knowing whether the plan and resulting data would be acceptable to certifying authorities.  Further, Exhibits E and H also reveal levels of permissible variance between indicated and calibrated airspeeds during accelerated takeoff that will not require correction in an aircraft's AFM.  These documents therefore provide Bombardier (or any aircraft manufacturer) the opportunity to increase efficiencies in future aircraft certification efforts.

19. For at least these reasons, the information contained in Exhibits E and H is considered highly proprietary and confidential Bombardier property and is labeled accordingly.  But even if the information were not labeled as Confidential, any relevant Bombardier employee would know the proprietary and confidential nature of the documents simply by looking at the information they contain.  As with the previous exhibits, Exhibits E

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 12

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

and H contain very specific and/or highly technical data and information pertaining to flight testing required for aircraft certification. This is the very type of information that Bombardier's Code of Ethics identifies as Confidential, so any relevant Bombardier employee would know not to use this information for any non-Bombardier-related purpose, whether or not it was clearly labeled Confidential or proprietary.

20. Additionally, and for reasons already outlined above, the information contained in Exhibits E and H could not be readily ascertained through public or other generally available means. For example, the testing data disclosed in these exhibits could not be ascertained without conducting the actual tests again; the tested configurations and conditions disclosed in these exhibits and deemed acceptable by certifying authorities for demonstrating compliance with the pertinent regulations could not be readily deduced without extensive personal interaction with certifying authorities themselves; and the level of variance between indicated and calibrated airspeeds during accelerated takeoff deemed acceptable by certifying authorities would not be readily known absent being involved in similar negotiations and discussions with those same certifying authorities. Additionally, while the particular airspeed calculation methodology Bombardier used during testing might be generally known to those with experience in the field, it would not be known, absent specific experience in presenting the methodology for consideration by the certifying authority, that the methodology would result in regulatory approval. Exhibits E and H therefore contain substantial information that would give those in possession of the documents a considerable competitive advantage in advancing certification efforts for other aircraft.

21. The next document to be addressed is a document that describes a flight profile used during the manufacturing process to verify that an aircraft and its systems are built and function appropriately in a Production Flight Test environment and thus are in conformance with the certified design. For purposes of this declaration, I will refer to this document as the "Production Flight Test Profile." Attached as Exhibit I is a true and correct copy of the Production Flight Test Profile having the electronic file name "FTP PROD CSeries Rev 5.0 –

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 13

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100


17 November 2016.docx." I am informed that this is one document former Bombardier employee Cindy Dornéval emailed to her personal email account without authorization prior to her departure from Bombardier, along with a .pdf version of the same file with the electronic file name "FTP PROD CSeries Rev 5.0 – 17 November 2016.pdf." A true and correct copy of the .pdf file is attached hereto as Exhibit J. Because Exhibits I and J contain the exact same information, I will address Exhibit I below with the understanding that my comments also apply to Exhibit J.

22. The Production Test Flight Profile contains information that is undoubtedly valuable. Bombardier considers it of high value because it details the types of flight tests Bombardier needed to perform to obtain regulatory Certificate of Airworthiness ("COA") for its C-series aircrafts. The COA is a regulatory certificate that deems the aircraft to be airworthy and allows delivery of the aircraft to the customer. This Production Test Flight Profile checklist was developed over decades by Bombardier, as similar checklists have been used by Bombardier to conduct its flight test conformity process of its other aircraft and was updated specifically for Bombardier's C-series aircraft to meet the design defined by the type certificate. Because Bombardier successfully completes its manufacturing process for its C-series Aircraft based in part on the information contained in the Production Test Flight Profile, the value of that information to Bombardier is measured not only as a function of the time and money Bombardier invested to derive that information, but also as a function of its prospective value—Bombardier can use its Production Test Flight Profile as a roadmap for future production flight testing for years to come. Like so many of the other documents discussed in this declaration, the Production Test Flight Profile allows Bombardier a head start in its further efforts to streamline the flight test conformity process because Bombardier will not have to "start from scratch" to develop a flight testing profile, thereby enabling it to save significant time and resources.

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 14

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

23. As valuable as the information contained in the Production Test Flight Profile is to Bombardier, and given the information's nature as described above, it should be no surprise that the documents are considered proprietary to Bombardier and are clearly marked as such. Even if the Production Test Flight Profile were not marked, though, any relevant Bombardier employee would know the proprietary and confidential nature of the documents simply by looking at the information they contain. For instance, the Production Test Flight Profile contains at least the following: (a) preflight checklist detailing every system and component the flight crew must check prior to every flight; (b) the ground checks that the flight crew must perform prior to every flight; (c) and, most importantly, the critical in-flight checklist that details hundreds of flight condition the aircraft must perform to efficiently gather the data necessary to show the aircraft and its systems perform properly during flight and therefore that the aircraft is worthy of a COA. The systems described as needing testing during flight include, for example, the C-series' take off, autopilot and autothrust operations; cabin pressure; landing gear operation; flap operation; environmental controls and pressurization; various tests of the engine and its components; and both approach and landing systems. Even a cursory review of this information would readily demonstrate that it is obviously the result of extraordinary investments in time and resources in design, development, testing, and manufacturing of a critical component of Bombardier's C-series aircraft. And because Bombardier's Code of Ethics—a document I, like all other Bombardier employees, agreed to review, understand, and abide by—clearly identifies this type of information as "Confidential," any relevant Bombardier employee would know not to use this information for any non-Bombardier-related purpose even if the information were not marked as Private and Confidential.

24. I do not believe the information contained in the Production Test Flight Profile could be readily ascertained without having access to that information through reverse engineering or some other comparable approach. As noted above, the Production Test Flight Profile contains hundreds of flight test parameters, defined in a very specific sequence in

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 15

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

order to maximize the efficiency of the flight, which are required to show the proper function of the aircraft and its systems during flight, all of which were developed through confidential negotiations with regulatory authorities and that were also the result of Bombardier's efforts to obtain COAs on its numerous other aircrafts through production flight testing. All of this information is highly proprietary to Bombardier, and none of it is publicly disseminated or available—including the flight tests that need to be performed to gather the necessary data as described in the Production Test Flight Profile.

25. It is for these reasons that the information contained in the Production Test Flight Profile, i.e., Exhibits I and J, would have tremendous value to anyone seeking to obtain a COA for a commercial aircraft. The information therefore provides a head-start to anyone involved in designing, developing, or obtaining a COA of an aircraft because the reader now knows with greater certainty the quantity and quality of data needed to be obtained during flight testing necessary for this approval. In other words, it conveys institutional knowledge, without which, the reader would be forced to invest significant time and resources to develop independently. The Production Test Flight Profile is essentially a roadmap of the sequencing of tests to be conducted to obtain the requisite flight data needed to obtain a COA for a commercial aircraft. Given the tremendous expense associated with flight testing—often the most costly and time consuming part of obtaining a COA for an aircraft—the value of knowing what data one is required to gather and the sequence to efficiently gather this data cannot be understated.

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 16

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

26. In sum, Exhibits A-J of this declaration, and the information contained therein, form part of Bombardier's playbook to achieve regulatory certification for its aircraft. These documents and information are the result of decades of Bombardier efforts to certify numerous aircraft. Bombardier has invested billions of dollars in its certification processes and procedures over those decades, and an aircraft manufacturer could use Exhibits A-J to save hundreds of millions of dollars in flight testing because Exhibits A-J disclose specific configurations of flight tests already approved by regulators.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED at Montreal, QC, Canada, this 16th day of October, 2018.

Daniel Burns
Senior Director, Product Integrity
Bombardier, Inc.

DECLARATION OF DANIEL BURNS IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION - 17