The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BOMBARDIER, INC., | NO. 2:18-cv-1543 RAJ |
| Plaintiff, | |
| v. | DECLARATION OF MICHEL KORWIN-SZYMANOWSKI |
| MITSUBISHI AIRCRAFT CORPORATION, MITSUBISHI AIRCRAFT CORPORATION AMERICA, INC.; AEROSPACE TESTING ENGINEERING & CERTIFICATION, INC.; MICHEL KORWIN-SZYMANOWSKI; LAURUS BASSON; MARC-ANTOINE DELARCHE; CINDY DORNÉVAL; KEITH AYRE; and JOHN AND/OR JANE DOES 1-88, | |
| Defendants. | |

I, Michel Korwin-Szymanowski, declare as follows:

1. I am the Director of Test & Evaluation for Aerospace Testing Engineering & Certification, Inc. ("AeroTEC"). I am over the age of 18. I make this declaration based on my personal knowledge and I am otherwise competent to testify to the matters related below.

2. A true and correct copy of my curriculum vitae is attached to my declaration as Exhibit A. Before joining AeroTEC, I was employed with Bombardier, Inc., from 2000 to 2015. I started in May 2000 as a Bombardier Lead Flight Test Engineer at its flight test center in Wichita, Kansas. In 2010, I became the Director of the Wichita Flight Test Center, reporting to the Vice

KORWIN-SZYMANOWSKI DECLARATION - 1
#1213439 v2 / 45898-028

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

President of Flight Test.

3. I have been involved in hiring at both Bombardier and AeroTEC. At both companies we sought to hire employees with relevant skills and experience, in other words, aerospace employees. This kind of targeted recruiting is common in the aerospace industry, and Bombardier is no exception. For example, from 2009 to 2014, Bombardier needed to significantly increase their personnel to staff three concurrent aircraft programs: the CSeries, the Learjet 85, and the Global 7000 (now 7500). Recruiting became a priority at Bombardier for all kinds of personnel, including aerospace engineers and flight test personnel. At one point in 2011 or 2012, Bombardier Human Resources presented a PowerPoint at the Flight Test Staff Meeting to give an update on the hiring progress. In order to achieve the hiring goals, Bombardier asked me and other managers and directors to solicit employees we knew from our prior jobs for employment at Bombardier. As a result of our efforts, during this period the number of Flight Test employees at Bombardier more than doubled and we added experienced aerospace employees from Boeing, Airbus, Embraer and many other aerospace companies.

4. In late July 2013, I was asked to visit Bombardier's Flight Test Center in Mirabel, Quebec to audit the center's organization and make recommendations for improvements. At the time, the Mirabel Flight Test Center, as well as the entire company, was under intense pressure because Bombardier had announced that the "first flight" of the prototype aircraft for the CSeries would occur in June 2013, but the flight had been delayed to July 2013. A few days after I arrived at Mirabel, Bombardier announced another delay.

5. What was initially supposed to be a two-week task in Mirabel turned into a one-year assignment, and then a two-year assignment. I became the Director of Bombardier's CSeries Flight Test Team, still reporting to the Vice President of Flight Test. My role was to manage the flight test program. However, the program had such high visibility and pressure that this task was co-managed by me and the Vice-President.

6. This was an especially challenging time in my career, punctuated with both highs and lows. Ultimately, the Vice-President and I, my co-directors, our managers, our hard-working

KORWIN-SZYMANOWSKI DECLARATION - 2
#1213439 v2 / 45898-028

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1  employees and our suppliers were successful at improving performance to the point that
2  Bombardier was able to make commitments to our customers and to the media and then meet those
3  commitments.

4  7.  Having largely achieved our goals with the CSeries, the work performed at the
5  Mirabel Flight Center was gradually transferred to Bombardier's main Flight Center, located in
6  Wichita, Kansas. At some point in 2014, the Vice-President and I held an all-hands meeting and
7  confirmed what many of the employees at Mirabel had already come to suspect: the Montreal
8  Flight Test Center would eventually close. We told the employees that we would make every effort
9  to find employment for everyone after the program.

10  8.  I left Bombardier for personal reasons in May 2015. I found that the pressures of
11  the program were impacting both my health, and my family life. My wife and daughter had
12  remained in Wichita so that my daughter, who has severe autism and is unilingual, could finish
13  her school transition program and seek employment in an environment with more available
14  supports.

15  9.  At AeroTEC, I am functionally responsible for Flight Test and I have supported
16  multiple projects in my three years here, including the MRJ flight test program. My duties include
17  organizing AeroTEC's facilities and support equipment, and assisting with staffing the MITAC
18  America's new MRJ flight test center in Moses Lake. As part of this effort, I helped develop a
19  recruiting plan starting in the Fall of 2015. My strategy was to hire across the North American
20  aerospace labor market, focusing on regions with concentrations of aerospace manufacturers and
21  military flight test organizations, such as Wichita, Montreal, Fort Worth, Savannah, Mojave,
22  Jupiter, Pax River, and Seattle. Our efforts included employees from Bombardier, but there was
23  no difference in the way I was targeting Bombardier in comparison with other aerospace
24  employers.

25  10.  I do believe that many Bombardier employees were interested in new job
26  opportunities. At the time, Bombardier was on the verge of certifying the CSeries and there were
27  rumors of coming layoffs. In addition, Bombardier employees were reaching out to me about

KORWIN-SZYMANOWSKI DECLARATION - 3
#1213439 v2 / 45898-028

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

employment opportunities at AeroTEC. A few months later, the rumors proved justified. In November 2015, at the same time that the flight test of the CSeries was completed, Bombardier announced it would be laying off approximately 7,000 employees and shortly after the Canadian media began reporting that the Mirabel Flight Test Center would be shutting down. Upon hearing that announcement, AeroTEC contacted Bombardier to offer to help find jobs for the employees who were being laid off. But Bombardier rejected the offer.

11. In October 2015, as part of the recruiting efforts described above, I decided to send an email to the many aerospace industry contacts I had created in LinkedIn. This included employees from Bombardier, but also employees from many other aerospace companies. I downloaded the information from LinkedIn and then sorted the contacts by location. On October 20, 2015, I sent an email to my LinkedIn contacts located in Wichita and Montreal because I planned to be in those cities for hiring events. The email is attached to Bombardier's Complaint at pages 33-34 of Exhibit C (ECF #1-12). I invited the recipients and their friends and co-workers to meet me at specific times and places to discuss opportunities at AeroTEC.

12. On my way to Wichita, during a layover between connecting flights, I received a cease and desist letter from Bombardier dated October 22, 2015. A copy of that letter is attached to Bombardier's Complaint as Exhibit B (ECF #1-11). The letter accused me of employee piracy using "confidential information" about Bombardier employees such as "their relative abilities and experience, evaluations, career aspirations, qualities and personal characteristics, salary and benefits, etc." This was very upsetting, both because the letter was very aggressive and because it was completely untrue. I generated my contact list entirely through my LinkedIn contacts. I did not use any Bombardier confidential information. Nonetheless, Bombardier's threatening approach had its intended effect. Bombardier had asked AeroTEC to bid on a project, and AeroTEC (and I) did not want to lose the opportunity to get Bombardier as a customer. In addition, my involvement was by no means critical to employee recruiting. I cancelled gatherings I had arranged at a local bar and we had other employees attend the career fair that I had invited my LinkedIn contacts to attend. Bombardier claims I was in Montreal for the career fair on Oct 28-30,

KORWIN-SZYMANOWSKI DECLARATION - 4
#1213439 v2 / 45898-028

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

but that is untrue. I was not there and I can corroborate this via my Google Timeline tool and dated family pictures.

13. AeroTEC has hired a small number of former Bombardier employees, but we never had any intent to specifically target Bombardier or harm its business. Just the opposite is true. On several occasions, Bombardier applicants and a Bombardier Manager asked that we delay their start dates, sometimes significantly, to allow them to complete Bombardier work or effectuate smooth transitions. Each time, we were happy to coordinate our hiring timeline to accommodate them. Either through lack of information or ill intent, Bombardier paints a misleading portrait of our hiring, trying to make it look like the MRJ certification process is being driven entirely by former Bombardier employees. This is just wrong. In my Test and Evaluation department, for example, the total number of ex-Bombardier employees hired as employees by AeroTEC at the height of AeroTEC's involvement in the MRJ flight test program was 9 out of 105, or 8.6%. The vast majority of my employees came from other companies.

14. In April 2016, Bombardier's attorney at Jackson Lewis sent a letter to AeroTEC, regarding the "Employee Raiding Matter." A copy of the letter is attached to Bombardier's Complaint as Exhibit C (ECF # 1-12). Bombardier again accused me and others of using "confidential information" to improperly target Bombardier personnel for AeroTEC employment. It asked me and AeroTEC to sign an "Agreement and Acknowledgement" to refrain from soliciting current or former Bombardier employees for a period of one year. *See* ECF #1-12 at pp. 15-16. The agreement Bombardier proposed in April 2016 had a number of issues, and it was never finalized or signed.

15. I did not sign any non-compete, non-solicit or confidentiality agreements with Bombardier, either during my employment there or afterwards. In fact, I am not aware of anyone having signed these kinds of agreements with Bombardier.

16. I did not target, solicit or recruit co-defendants Laurus Basson, Cindy Dornéval or Marc-Antoine Delarche for employment at AeroTEC. In fact, I did not meet Laurus or Cindy until after this lawsuit was filed. At its largest, AeroTEC employed nearly 500 people and neither Laurus

KORWIN-SZYMANOWSKI DECLARATION - 5
#1213439 v2 / 45898-028

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

nor Cindy worked in my department. I understand they have been accused of emailing confidential Bombardier documents to their personal email accounts. Bombardier tries to make this look bad, but anyone who worked at Bombardier would know this is a phony accusation. At Bombardier, it was common for employees, especially those in flight test, to work from home. The Bombardier culture for the groups working on CSeries certification was very aggressive, with a heavy emphasis on getting work done on time and at any cost as we were all well aware of the market challenges to Bombardier, and additionally felt considerable pride in our involvement in this important program. Sometime in 2011 or 2012, Bombardier stopped its practice of paying for overtime, yet employees were still expected to be "on call" and available to work from home whenever the need arose. The culture was on getting the work done, not on how. Emailing to a personal email account was not questioned or discouraged. It was common knowledge that employees would email themselves documents or take documents home on USB drives in order to complete their work assignments, particularly given that many of the support employees such as engineers had desktops, and not laptops at work

17.  I have never seen any of the documents described in the lawsuit, and I cannot imagine why any of them would be of any use or value to AeroTEC or any of AeroTEC's employees. Bombardier's suggestion that AeroTEC or I solicited any employee with the intent they would disclose or use their former employer's confidential or proprietary information is absurd.

18.  I have never seen or been given access to any of the documents Bombardier has identified as trade secrets or any information contained therein, and I am not aware that anyone at AeroTEC has done so.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and accurate.

Executed this 24th day of December, 2018, at Seattle, Washington.

_____
Michel Korwin-Szymanowski

KORWIN-SZYMANOWSKI DECLARATION - 6
#1213439 v2 / 45898-028

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100