# EXHIBIT B

# ARTICLE: The Implications of the Social Model of Disablement for the Legal Regulation of the Modern Workplace in Canada and the United States

2009

**Reporter**

33 Man. L.J. 1 *

**Length:** 21354 words

**Author:** RAVI MALHOTRA *

* Assistant Professor, Faculty of Law, Common Law Section, LLM, Harvard Law School, SJD, University of Toronto. I wish to acknowledge the advice and tireless support of my doctoral supervisor, Kerry Rittich, at the University of Toronto Faculty of Law. I also acknowledge the partial funding of the SSHRC Doctoral Fellowship that enabled me to complete my degree. All errors are my own responsibility.

# Text

## [*1]  I. INTRODUCTION

In this comparative article, I consider the implications of the social model of disablement for different modes of regulation in the contemporary workplace in both Canada and the United States. The social model stands for the proposition that it is structural barriers in society that marginalize people with disabilities.  [1] I explore the role that legal rules and decisions play in workers' empowerment and in the specific circumstances that arise with respect to workers with disabilities. The barriers that people with disabilities face in the workplace are critical. Work holds out the very real possibility of escape from poverty and allows one to contribute to society in a substantive way. For many, their work constitutes an important part of their identity as a person.  [2]

I begin in Part II by challenging the myth of the self-regulating market. I show how the market and contemporary workplace are actually far from autonomous and, in fact, deeply regulated by the state and legal rules. I draw from examples in contract law doctrine to make my case for the arbitrary character of the distinction between a public and private sphere and the plasticity of the legal rules that are in place. I then briefly discuss historic rulings of the United States Supreme Court that are particularly salient for highlighting the arbitrary character and choice  [*2]  inherent in the formulation of legal regulation. While the illustrations in these sections are overwhelmingly American, I believe the same analysis applies in Canadian jurisprudence. I conclude Part II with a discussion of some illustrations, including two Supreme Court of Canada decisions, of how what some refer to as the new administrative state has adopted neo-liberal values with the focus on market mechanisms as the default option for decision-making. Nevertheless, courts still retain authority and autonomy to interpret legal rules within a range of parameters because market principles do not always have a particular political valence.

In Part III, I examine how specific legal doctrines in different areas of Canadian and American law, such as contract and property law, are used in ways that disadvantage workers and I illustrate the need to empower workers through the re-interpretation of legal doctrine. I then turn to an examination of the legal regulation of workers with disabilities through a

---

[1]  See generally Michael Oliver, *The Politics of Disablement* (London: Macmillan, 1990).

[2]  See generally Vicki Schultz, "Life's Work" (2000) 100 Colum. L. Rev. 1881.

detailed exploration of the implications of the Supreme Court of Canada's famous decision in *Meiorin*. [3] I stress throughout Part III that barriers are hardly natural but are a product of legal and social decisions that can be transformed. In Part IV, I examine the strengths and limitations of the model of reasonable accommodation, the foundation of disability rights law in both countries. In Part V, I outline the implications of the social model of disablement for the legal regulation of the workplace. Finally, in Part VI, I conclude by reviewing the findings of this article.

## II. THE MYTH OF THE SELF-REGULATING MARKET

### A. The Legal Regulation of Markets

What are the implications of the social model of disablement for the legal regulation of the modern workplace in Canada and the United States? I will demonstrate that the social model of disablement in the context of employment leads inexorably to the conclusion that the employment market is legally structured in a way that handicaps workers with disabilities who are marginalized as "inauthentic workers" [4] or excludes large numbers of people with disabilities from the workplace entirely. This reflects the fact that their experiences as disabled workers are not represented in the practices and rules that govern the workplace. Before one can fully evaluate the policy implications of this marginalization, however, one needs to systematically challenge the notion of an autonomous self-regulating aspect of social life known as the labour market. Challenging the notion of a self-regulating labour market is the basis for justifying accommodations in the workplace that require changes to work [*3] schedules, shifts and other work rules that are often resisted by employers and unions.

The self-regulating labour market has been predicated on the idea, prominent during what many legal historians refer to as the Classical or formalist period of legal thought, [5] that one could strictly demarcate the boundaries between the private sphere of individual contractual liberty and a public sphere of governmental regulation. [6] It also presupposed certain key legal principles: (a) that one cannot be forced to contract against one's will, (b) that one may contract if one wishes to do so and (c) that contracts that one agrees to will be enforced according to their terms and the state would not regulate the details of agreements between private parties. [7] Contracts was regarded as the core of the system while other branches of the law, such as family law, emerged to deal with the legal regulation of actors who were regarded as deviant from the norm including married women, children and of course people with disabilities. [8] Similarly, altruistic notions of a duty to assist were consigned to marginality by separating the law of torts from the law of contracts. [9] These divisions had the effect of reinforcing the individualist impulse and autonomy in contract law as the centre of the system that was the key to the functioning of the economy and to prosperity. The role of the state was consequently narrowly constrained, according to the theory, to merely protecting the property rights that were produced as a result of the exercise, or lack thereof, of contractual

---

[3]  *British Columbia (Public Service Employee Relations Commission) v. B.C.E.G.U*, [1999] 3 S.C.R. 3..

[4]  Michael A. Stein, "Same Struggle, Different Difference: ADA Accommodations as Antidiscrimination" (2004) 153 U. Pa. L. Rev. 579 at 604. Stein attributes the phrase to Schultz, *supra* note 2.

[5]  Duncan Kennedy, "The Role of Law in Economic Thought: Essays on the Fetishism of Commodities" (1985) 34 Am. U.L. Rev. 939 at 952-53 [Kennedy, "Role"].

[6]  Joseph W. Singer, "Legal Realism Now", Book Review of *Legal Realism at Yale: 1927-1960* by Laura Kalman, (1988) 76 Calif. L. Rev. 465 at 478. See also William A. Keener, *A Treatise on the Law of Quasi-Contracts* (New York: Baker, Voorhis & Co., 1893) at 3-4 (discussing identification of Quasi-Contracts as either simple contracts or contracts of record as "not only unscientific, and therefore theoretically wrong, but is also destructive of clear thinking, and therefore vicious in practice.").

[7]  Singer, *ibid.* at 479.

[8]  *Ibid.* at 480.

[9]  *Ibid.* at 481. Hence, in his classic 1866 text, Hilliard comments that "[i]t is the prevailing rule, that an action of tort cannot be maintained in connection with a mere contract, unless the misrepresentation or deceit be willful; that the scienter is an indispensable part of the allegation and proof." See Francis Hilliard, *The Law of Torts or Private Wrongs, Vol. 1* (Boston: Little, Brown & Co., 1866) at 11.

autonomy.   [10] These ideas retain considerable purchase in both legal doctrine, such as rights theory, and the popular imagination. Contemporary rights theory as exemplified by one of its most widely cited practitioners, John Rawls, is often pitched at such a high level of abstraction that different people with conflicting conceptions of justice interpret it to mean radically different ideas. Only a formalist analysis allows one to [*4] presuppose that one is generating a consensus from such abstract ideas.   [11] The continued influence of formalism serves to undermine the potential of disability accommodations such as modified work schedules and adaptations in the workplace to radically transform workplaces in a manner that truly empowers people with disabilities. Notwithstanding the passage of various statutes that limit contractual power in a number of ways, the inviolability of a contract between the bargaining parties remains an important foundational--and quite formalist-- concept whereby any interference with it, such as for accommodating workers with disabilities, is regarded with suspicion.

Yet the very idea of an employment market that has always operated autonomously from interventionist state regulation is mythical as the legal realists have demonstrated.   [12] Whereas many neo-classical theorists insist on viewing the employment market as functioning as a conflict between rational actors such as employees and employers, it is actually extraordinarily difficult to accurately distinguish between legal regulation and the marketplace itself. This is because legal rights accorded to some inherently affect the ability of others to exercise *their* legal rights in the marketplace. Property ownership accorded to X means that Y must work for X to earn their living, find alternative sources of income or starve. Even the failure to accord rights has a direct impact on the distribution of power and wealth in society by legitimating the unchecked exercise of influence by the more powerful over the weaker.   [13] In the fields of employment and labour law, first legal realists and later critical theorists have argued that the distinction between a public and private sphere as a matter of legal doctrine is illusory. For instance, while the employment at will doctrine that predominates in the United States gives employers the right to dismiss employees for essentially any cause, courts have, in practice, read in [*5] exceptions where employees have been fired for attempting to obey regulations.   [14] Yet from the formalist perspective, there is no analytically cogent reason to draw this distinction.

In fact, there is no sustainable distinction that can be articulated between intervention on the part of the state and non- intervention. Each course of action has real effects on actors and public policy. Despite the dogma of formalist legalist theorists whose conception entirely relies on a meeting of the minds between two autonomous and free contracting parties, contract law has a public dimension because the state is implicated in their selective enforcement, guided by conflicting policy considerations such as efficiency and wealth redistribution.   [15] As legal realist theorist Morris Cohen remarked in an article written during the Great Depression, "...the notion that in enforcing contracts the state is only giving effect to the will of the parties rests upon an entirely untenable theory as to what the enforcement of contracts involves."   [16] Similarly, the will theory

---

[10] Singer, *ibid*. at 481-82.

[11]  *Ibid*. at 519-20. A substantive discussion of John Rawls' theory of justice is beyond the scope of this article. However, I have critiqued his theory from the perspective of the social model of disablement. See Ravi A. Malhotra, "Justice as Fairness in Accommodating Workers with Disabilities and Critical Theory: The Limitations of a Rawlsian Framework for Empowering People with Disabilities in Canada" in Dianne Pothier and Richard Devlin, eds., *Critical Disability Theory: Essays in Philosophy, Politics, Policy and Law* (Vancouver: University of British Columbia Press, 2006) 70 at 70-86.

[12]  See Paddy Ireland, "From Amelioration to Transformation: Capitalism, the Market, and Corporate Reform" in Joanne Conaghan, Richard M. Fischl, & Karl Klare, eds., *Labour Law in an Era of Globalization: Transformative Practices and Possibilities* (Oxford: Oxford University Press, 2002) 197 at 205-07. For a compelling historical account of the highly contingent emergence of the modern market economy, see generally Karl Polanyi, *The Great Transformation* (Boston: Beacon Press, 1944).

[13]  Singer, *supra* note 6 at 482; Robert L. Hale, "Coercion and Distribution in a Supposedly Non-Coercive State", Book Review of *Principles of National Economy* by Thomas Nixon Carver, (1923) 38 Pol. Sci. Q. 470.

[14]  Karl Klare, "The Public/Private Distinction in Labour Law" (1982) 130 U. Pa. L. Rev. 1358 at 1362-64.

[15]  Singer, *supra* note 6 at 483. But see Jean Braucher, "The Afterlife of Contract" (1995) 90 Nw. U.L. Rev. 49 at 80 (noting irrelevance of American appellate decisions on contract law to actual business behaviour because of the importance of continuing cordial business relations in practice). The classic article on this theme is of course Stewart Macaulay, "Non-Contractual Relations in Business: A Preliminary Study" (1963) 28 Am. Soc. Rev. 1.

[16]  Morris Cohen, "The Basis of Contract" (1933) 46 Harv. L. Rev. 553 at 562 [Cohen, "Basis"].

of the contract has come under sharp criticism. The will theory stands for the proposition that all the myriad rules of contract law may be grounded in the idea that the law of contract endorses the will of the contracting parties. [17] But over the course of the first four decades of the twentieth century, the will theory was increasingly discredited and new doctrines, such as expectation, reliance and restitution, were appended to explain inconsistencies and contradictions within the doctrine. [18]

More recently, Clare Dalton, in analyzing the contradictions of contract law doctrine, has observed that "[T]he objectivist reliance on intent as the source of contractual obligation was a blatant abdication of responsibility, a failure to address and debate the substantive public policy issues involved in decisions about when and how courts should intervene in disputes between contracting parties. [19] In fact, the selective enforcement of contracts through the application of the constellation of rules that make up contract law reflects policy choices and profoundly political and social decisions about what kind of society one wishes to have and how [*6] resources in it ought to be allocated, implicating the state as a *de facto* party to a contract through its enforcement. [20] This leaves decision-makers with enormous power to reconstruct markets so as to craft the ends that they desire. Although these illustrations are American, the same principles are equally applicable to Canadian legal theory and jurisprudence as will become evident below.

## B. The Self-Regulating Market

The 1922 United States Supreme Court decision in *Coronado* [21] is an example of legal reasoning where conclusions about public policy were reached by circular reasoning without regard to the available evidence or relevant ethical arguments. [22] The Court held, *inter alia*, that a trade union was liable for damages resulting from torts committed by union members in the course of a strike and rejected the arguments of union counsel that a union could not be sued because a union was an unincorporated association and consequently could not be liable for damages in tort. [23]

Justice Taft held that the massive growth of unions, their use of the strike weapon and the labeling of products as union-made were all factors that indicated the growing significance of unions and warranted their liability for torts committed by members. [24] Yet the arguments of union counsel clearly reflect policy choices that have significant implications for the balance of power between unions and employers. By framing the discussion on abstract and formalist questions such as whether a union conforms to a set of criteria that would or would not exempt it from liability in tort, the court ignored the larger policy issues such as the implications of assigning financial liability to unions for the future of unions and labour relations. [25] Moreover, despite considering some empirical facts, Justice Taft articulated his ruling in formalist terms by holding that a labour union could be sued because it was essentially a person. [26] Instead of a self-regulating market that reaches a natural result, one finds

---

[17] Duncan Kennedy, "From the Will Theory to the Principle of Private Autonomy: Lon Fuller's 'Consideration and Form'" (2000) 100 Colum. L. Rev. 94 at 115 [Kennedy, "From"].

[18] *Ibid*. at 154.

[19] Clare Dalton, "An Essay in the Deconstruction of Contract Doctrine" (1985) 94 Yale L.J. 997 at 1013.

[20] Singer, *supra* note 6 at 484-85.

[21] United Mineworkers of America v. Coronado Coal Co., 259 U.S. 344 (1922).

[22] Felix S. Cohen, "Transcendental Nonsense and the Functional Approach" (1935) 35 Colum. L. Rev. 809 at 814 [Cohen, "Transcendental"]. See also Duncan Kennedy, *A Critique of Adjudication (fin de siecle)* (Cambridge: Harvard University Press, 1997) at 105-06 [Kennedy, *Critique*].

[23] *Ibid*. at 383-92.

[24] *Ibid*. at 384-86.

[25] Cohen, "Transcendental", *supra* note 22 at 813.

[26] *Ibid*.

that legal reasoning reflects social choices that have deep implications for power relations yet are expressed in a way that presents these as the application of scientific principles.

 [**\*7**]  The United States Supreme Court's famous 1905 decision in *Lochner*     27 illustrates how courts have played a crucial role in shaping employment markets in ways that have real implications for workers with disabilities. The Supreme Court concluded that the New York state legislation establishing maximum working hours for bakers was unconstitutional in *Lochner* because it violated the bakers' right to contract, which the Court regarded as a part of the Due Process Clause of the 14th Amendment.   28 The Court held that bakers were not especially vulnerable to health risks from long hours of work and that this was consequently not neutral health legislation which could be justified as an interference with the rights of contractual parties. 29 *Lochner* was also an example of the political tensions between the legislature and the judiciary over the precise contours of the regulation of the market.   30 It marked the beginning of an era of decisions whereby an arbitrary principle of neutrality, symbolizing the self-regulating market and the status quo as defined in the common law, was utilized to overrule legislation that departed from this baseline.

Hence, in *Adkins v. Children Hospital*,   31 the Supreme Court held that minimum wage legislation for women and children was unconstitutional because it was an unreasonable tax on the employer who ought not be burdened with the responsibility of its employee's well-being.   32 Although the *Lochner* era is typically regarded to have ended in 1937,   33 *Lochner's* reasoning and legacy is evident in more modern decisions of the Supreme Court. The same arbitrary baselines have been used in structuring critical resource allocation decisions. For instance, in *Flemming v. Nestor*,   34 the Court held that a provision of the *Social Security Act*   35 that retroactively terminated social security benefits to aliens deported under certain circumstances related to their Communist beliefs was constitutional because the receipt of social security benefits was not a constitutionally protected property right.   36 As Cass Sunstein has shown, in such cases there is an assumption that the  [**\*8**]  United States Constitution is a collection of negative rights against interference from the state.   37 For instance, state abrogation of the law of trespass has been interpreted as violating the Takings Clause of the Fifth Amendment that protects property rights.   38 State enforcement of

---

27  Lochner v. New York, 198 U.S. 45 (1905) [*Lochner*].

28  Cass R. Sunstein, "Lochner's Legacy"  (1987) 87 Colum. L. Rev. 877. Sunstein's analysis is appealing because he gets away from the unhelpful "activist judiciary trope" by which the *Lochner* era is often characterized.

29  Lochner, supra note 27 at 57-59.

30  See, *e.g.*, Kerry Rittich, "Functionalism and Formalism: Their Latest Incarnations in Contemporary Development and Governance Debates" (2005) 55 U.T.L.J. 853.

31  261 U.S. 525 (1923)

32  *Ibid.* at 557-58.

33  Sunstein, *supra* note 28 at 876.

34  363 U.S. 603 (1960).

35  42 U.S.C.S.

36  *Ibid.* at 608-11. See the discussion in Morton J. Horwitz, *The Transformation of American Law 1870-1960: The Crisis of Legal Orthodoxy* (Oxford: Oxford University Press, 1992) at 245.

37  Sunstein, *supra* note 28 at 888-89.

contracts has also been typically been regarded as a right. Yet positive rights, such as socio-economic rights that would benefit workers with disabilities, are regarded as exceptional. [39]

Whether a particular right is characterized as positive or negative in fact depends on normative judgment and historical legacy. [40] The *Lochner* era demonstrates a state of jurisprudence very far from the self-regulating market imagined by formalist theorists. Instead of some mythical science that somehow mandated a lack of state intervention, one sees a systematic bias that branded redistributionist legislation to be illegitimate on the one hand, yet implicitly acquiesced in the economic coercion between parties of dramatically differing levels of power as embodying the normal functioning of the market. This hostility toward legislation that would benefit workers marginalized them and underscores the need for workers to have greater control over their lives. It also suggests that the plasticity of legal rules allows for multiple interpretations that can be used by advocates of workers with disabilities to challenge barriers that marginalize workers with disabilities.

Similarly, traditional formalist distinctions between adjudication and legislation have come under sharp attack. The traditional view was that law-making involved political choices and value judgments and should be left to the legislature. Adjudication was regarded as apolitical because it involved interpreting questions of law and fact that could be objectively analyzed by a trained legal professional. [41] Yet all but the most straightforward cases contain numerous ambiguities, gaps or conflicts that must be resolved by the judicial decision-maker, who will decide these according to his or her own political biases, rendering any fixed distinction between adjudication, legislation and administrative agencies incoherent. Indeed, numerous legal scholars have devoted much energy to demonstrating precisely how judges may interpret legislation that is subject to conflicting interpretations. [42] However, this **[*9]** expanded role for judicial interpretation of legislation is fraught with potential conflict at every turn in ways that systematically disadvantage those, such as people with disabilities, in economically weaker positions who often cannot afford to strategically lose a particular case in order to shape the long-term evolution of particular legal rules, and have less familiarity with the judicial machinery and practices. [43]

### C. The Emergence of Labour Market Regulation and Globalization

The passage of the *Wagner Act* in the United States in 1935 [44] as modified by the *Taft-Hartley Act* of 1947, [45] the foundational American labour law statutes, and P.C. 1003, [46] an order-in-council issued by the King government in Canada in

---

[38]  The Takings Clause was originally conceived as protection of property from government seizure compensation but its subsequent interpretation has been and hotly debated and is beyond the scope of this Article. See, *e.g.*, William Michael Treanor, "The Original Understanding of the Takings Clause and the Political Process" (1995) 95 Colum. L. Rev. 782 at 792.

[39]  Sunstein, *supra* note 28 at 888-89.

[40]  Sunstein, *supra* note 28 at 889-90.

[41]  Kennedy, *Critique, supra* note 21 at 26-27.

[42]  *Ibid.* at 30-38. Kennedy develops a typology of theories of adjudication, including, *inter alia*, the theories of H.L.A. Hart, Unger, Raz and Dworkin. See *ibid.* at 37. See also Duncan Kennedy, "Distributive and Paternalist Motives in Contract and Tort Law, with Special Reference to Compulsory Terms and Unequal Bargaining Power" (1982) 41 Md. L. Rev. 563 at 565 [Kennedy, "Distributive"] (suggesting that distinctions between adjudication, legislation and administrative agencies may have to do with false consciousness). For a perceptive critique of this argument, see Martha Minow, *Making All the Difference: Inclusion, Exclusion and American Law* (Ithaca: Cornell University Press, 1990) at 168-70.

[43]  See generally Marc Galanter, "Why the 'Haves' Come Out Ahead: Speculations on the Limits of Legal Change" (1974) 9 Law & Soc'y Rev. 95 (describing how litigants who are institutional repeat players, generally corporations, have acquired systemic advantages over one-shot parties, often the poor).

[44]  James G. Pope, "Republican Moments: The Role of Direct Popular Power in the American Constitutional Order" (1990) 139 U. Pa. L. Rev. 287 at 309. The amended version is known more commonly as the *National Labor Relations Act*. See 29 U.S.C. 151 (2004).

[45]  See Nelson Lichtenstein, "Taft-Hartley: A Slave-Labor Law?" (1998) 47 Cath. U.L. Rev. 763.

1944, signify the emergence of legal regulation of American and Canadian labour markets. [47] In both countries, the respective pieces of legislation were enacted following historic waves of strikes, marches and general labour unrest. [48] These frameworks allowed, to varying degrees, for the protection of union rights in exchange for a regulatory structure that ensured management control over the workplace, a keystone of the Keynesian consensus. Accordingly, the famous 1945 Ford strike in Windsor was settled by the adoption of the Rand formula, named after the Supreme Court of Canada Justice, that authorized the compulsory automatic dues-check off clause which facilitated union rights in exchange for responsible business unionism that would not threaten the property rights of management and would not engage in wildcat strikes that disrupted management prerogatives on the shop floor. [49] Despite a successful labour struggle at Stelco in **[*10]** 1946 for industry wide bargaining in the steel industry, the majority of industries resisted and plant-specific bargaining was institutionalized, fundamentally weakening the labour movement. [50]

Similarly, the *Wagner Act* regime, held by the Supreme Court to be constitutional in 1937, [51] promoted collective bargaining, free choice on the part of workers to select any union that they desired and the redressing, up to a point, of the power imbalance between management and labour to foster a measure of industrial democracy. [52] In the vision of industrial pluralists such as John R. Commons and Archibald Cox, whose ideas became hegemonic after World War II, the workplace would prosper as a self-governing democratic entity in which management and labour would bargain with minimal governmental regulation. [53] However, the language of democracy allowed what has been characterized as an "iron fist inside a velvet glove" [54] because the more counter-hegemonic and potentially transformative strategies of picketing and strikes were marginalized in place of the more collaborationist strategies of arbitration and collective bargaining even as a number of anti-union principles, such as allowing the permanent replacement of strikers and ruling that the sit-down strike was not a legally protected activity, were adopted by the NLRB. [55] Workers were narrowly conceived as mere sellers of their labour power rather than dynamic producers of society's goods and resources. [56] As in the Canadian case, the NLRB jurisprudence favoured smaller craft-oriented bargaining units over larger industrial ones. [57] It was this model that prevailed in both countries during the post-War Fordist era until eroded by globalization.

---

46      *Wartime Labour Relations Regulations*, P.C. 1003, February 17, 1944, online: The Labour Gazette: <https://socserv.socsci.mcmaster.ca/maclabour/article.php?id=503> [*Wartime*].

47  See generally Judy Fudge & Harry Glasbeek, "The Legacy of PC 1003", (1995) 3 C.L.E.L.J. 357.

48  *Ibid*. at 368 (noting "[Canadian] [t]rade union militancy, as measured by strike action, reached a level comparable only to that experienced during the labour crisis of 1919"); Pope, *supra* note 44 at 309.

49  Fudge & Glasbeek, *ibid*. at 373-75.

50  *Ibid*. at 375-76.

51  N.L.R.B. v. Jones and Laughlin Steel Corp. 301 U.S. 1 (1937).

52  Karl Klare, "The Judicial Deradicalization of the *Wagner Act* and the Origins of Modern Legal Consciousness, 1937-1941" (1978) 62 Minn. L. Rev. 265 at 281-85 [Klare, "Judicial"].

53  Reuel E. Schiller, "From Group Rights to Individual Liberties: Post-War Labor Law, Liberalism and the Waning of Union Strength" (1999) 20 Berkeley J. Emp. & Lab. L. 1 at 8, 20.

54  *Ibid*. at 18-19.

55  *Ibid*. at 19; Klare, "Judicial", *supra* note 52 at 318-25. For a discussion of sit-down strikes, see David Montgomery, *Workers' Control in America: Studies in the History of Work, Technology and Labor Struggles* (Cambridge: Cambridge University Press, 1979) at 163.

56  Klare, "Judicial", *ibid*. at 321.

57  Schiller, *supra* note 53 at 20. See also Douglas L. Leslie, "Labor Bargaining Units" (1984) 70 Va. L. Rev. 353 at 386 (noting that the NLRB rule in the retail chain store industry presumes that a single location bargaining unit is the appropriate bargaining unit). Ironically, the

[*11]  In an era of globalization, the state remains important as a site for conflicts and decisions over distribution among interest groups. The legal realist critique of autonomously functioning markets also remains valid. However, one must reconceptualize one's analysis to reflect contemporary changes. The rise of neo-liberalism has meant dramatic policy changes for advanced industrialized countries including a commitment to freer trade, lower taxation levels and a shift toward a different sort of administrative state.  [58] Labour markets have moved away in large measure from the standard long-term employer-employee relationship to a variety of more contingent governance mechanisms to regulate labour markets including freelancing, working at home and piece work.  [59] This does not imply, however, that there is no regulation at all. What has changed are the normative value system and modalities that undergird the entire administrative state, the concomitant resource allocation systems and the policy goals of this new regulatory state.

Fundamentally, this transformation has been marked by a shift towards the utilization of market principles as the default mode of regulation. The meaning of market principles, however, is hotly contested, ambiguous and reflects no automatic political valence. It may entail the reduction or elimination of key social programs. In some circumstances it may entail privatization of formerly public services or it may mean the inclusion of notions of competition, efficiency and productivity within the framework of a government bureaucracy. It may involve advisory codes of conduct that replace formal regulation by the state.  [60] However, there is certainly nothing preordained about the exact shape or form of the new administrative state. Legal rules remain pivotal as a way to allocate risk, and consequently resources and power, between parties in a world of uncertainty.  [61]

**D. Some Illustrations of the New Administrative State** [62]

What are some illustrations of both the new administrative state's market orientation and the flexibility that courts still maintain to craft rules from the  [*12]  plasticity of legal doctrine that can have a fundamentally significant impact on actors? Canadian courts have been very reluctant to expand the coverage of regulated fields to areas that the government does not wish to have regulated or to address delays by administrative agencies stemming from funding limitations. These funding limitations reflect a policy shift to neo-liberalism, which entails a number of interrelated initiatives including deregulation of industries, privatization of services and the transformation of the traditional purposes of administrative law from constraining private conduct to facilitating it.  [63] Consequently, equality rights under the *Charter of Rights* [64] have been given a cramped interpretation amounting to granting equality seekers the right to the same severely underfunded programs as others.  [65] This has been illustrated in two recent Supreme Court of Canada decisions: *Auton (Guardian ad litem of) v. British Columbia (A.G.)*

---

NLRB originally had developed the doctrine of determining bargaining unit size to justify larger bargaining units and thereby prevent one plant from maintaining production in the event of labour unrest at other plants. See Klare, "Judicial", *ibid.* at 315-18.

[58]  David Szablowski, "John Willis and the Challenges for Public Law Scholarship in a Neoliberal Globalizing World" (2005) 55 U.T.L.J. 869 at 873.

[59]  Harry Arthurs, "The Administrative State Goes to the Market (and Cries Wee Wee Wee All the Way Home)" (2005) 55 U.T.L.J. 797 at 806. Referencing Sarrazin v. Canada (Minister of National Revenue), [1997] T.C.J. No. 320 (QL) (Tax Ct.),

[60]  *Ibid.* at 808-10. See also Fudge & Cossman, "Introduction: Privatization, Law and the Challenge to Feminism" in Brenda Cossman & Judy Fudge, eds., *Privatization, Law and the Challenge to Feminism* (Toronto: University of Toronto Press, 2002); Lucy Brill, "Can Codes of Conduct Help Home-Based Workers?" in Rhys Jenkins, Ruth Pearson & Gill Seyfang, eds., *Corporate Responsibility and Labour Rights: Codes of Conduct in the Global Economy* (London: Earthscan, 2002) 113 at 113-23.

[61]  See Dalton, *supra* note 19 at 1039.

[62]  The title of this section is inspired by the seminal analysis contained in Arthurs, *supra* note 59 (analyzing the impact of neo-liberal policies on transforming administrative law)

[63]  See *ibid.* at 807-10.

[64]  *Canadian Charter of Rights and Freedoms*, Part I of the *Constitution Act, 1982*, being Schedule B to the *Canada Act 1982* (U.K.), 1982, c. 11 [*Charter*].

[65]  Arthurs, *supra* note 59 at 812-13. For an account of recent denials of discretionary benefits, see Bruce Porter, "Twenty Years of Equality Rights: Reclaiming Expectations" (2005) 23 Windsor Y.B. Access Just. 145 at 189.

[66] and *Newfoundland (Treasury Board) v. Newfoundland and Labrador Association of Public and Private Employees (N.A.P.E.).* [67]

In *Auton*, the Supreme Court allowed an appeal by the British Columbia government from a judgment of the British Columbia Court of Appeal that held that the provincial government's refusal to fund a new medical treatment for autistic children violated the equality rights of the patients with disabilities and their families under s. 15 of the *Charter*. [68] The Supreme Court held that there was no violation of s. 15 because the provincial health care plan distinguished between core and non-core services. The relevant legislation only mandated funding for core services, with the province entitled to fund non-core services at its discretion. Therefore, the Court found that the provision of the novel medical treatment was not a benefit under the law subject to *Charter* scrutiny. [69] The Court held that the legislation simply did not require funding of all medically necessary services. Rather, only services provided by medical practitioners were classified as core services with mandated funding. [70] The Court distinguished its landmark disability rights ruling in *Eldridge* [71] by holding that *Eldridge* concerned the application of a benefit conferred **[*13]** by law in a non-discriminatory manner, unlike the case at bar where there was no entitlement to the benefit. Such specious reasoning suggests that one may not successfully challenge a lack of funding for treatments that are specific to a particular disability.

The Court went on to say even if the treatment were a benefit under the law, there was no violation of s. 15 because one had to compare the respondents with able-bodied individuals or those with a disability other than a mental disability who required novel non-core therapies, not established ones. [72] This exceedingly cumbersome comparator group is not helpful in analyzing s. 15 claims. Furthermore, one had to demonstrate that children with autism were second-class citizens who were denied their fundamental human dignity. [73] This ruling raises questions about whether equality rights under the *Charter* will be interpreted narrowly where a group that has unique needs, often people with disabilities, cannot easily find a valid comparator group.

This ruling, however, does not necessarily indicate that courts will increasingly defer to legislative choices that are likely to reflect the neo-liberal consensus and limit possibilities for social justice. It would be far too crude to envision the Supreme Court and other judicial figures as the obedient foot-soldiers marching enthusiastically for neo-liberalism. Given the emphasis on the novelty of the treatment in the judgement, challenges to funding cuts with respect to more established treatments may fare better. [74] How future cases will interpret *Auton* remains to be seen and different analyses are entirely plausible. Still, the ruling is disappointing for human rights advocates who hoped for a more expansive analysis of equality rights and comparator groups when dealing with very small minorities such as people with autism who cannot be readily compared with others. To the extent that this indicates a willingness for courts to subordinate substantive *Charter* values to the priorities of legislatures, it is troubling and likely will have a significant impact on the ability of people with autism, having been denied treatment as children, to participate in public life and more specifically in the labour market.

An even more disturbing decision was the Supreme Court of Canada's ruling in *NAPE*. In *NAPE*, the Court dismissed a challenge by the union, the Newfoundland and Labrador Association of Public and Private Employees (NAPE), of the *Public*

---

[66] 2004 SCC 78, [2004] 3 S.C.R. 657. [*Auton* cited to S.C.R.].

[67] 2004 SCC 66, [2004] 3 S.C.R. 381. [*NAPE* cited to S.C.R.].

[68] *Auton, supra* note 66 at 663, 668.

[69] *Ibid*. at 676-78.

[70] *Ibid*. at 671-73.

[71] [1997] 3 S.C.R. 624, [1997] S.C.J. No. 86 (QL) [*Eldridge* cited to S.C.R.] (ruling failure to provide sign language interpretation to deaf hospital patients violated section 15 of the *Charter*).

[72] *Auton, supra* note 66 at 679.

[73] *Ibid*. at 682.

[74] *Ibid*. at 681. See also Porter, *supra* note 65 at 183 (noting the controversial nature of the medical treatment under litigation).

*Sector Restraint Act.* [75] This provincial legislation deferred for three years a pay **[*14]** equity agreement between the employer and the union that would have established equal pay for women in historically underpaid categories. [76]

The Supreme Court held that the provincial legislation in question indeed violated s. 15 of the *Charter* but was saved by s. 1 because of the supposedly dire state of the province's finances that, if left unchecked, might have resulted in grave harm to the province's credit rating. [77] In finding that the legislation was constitutional, the Court placed weight on the fact that the government had to mediate claims of a number of important stakeholders who all had pressing financial demands. [78] While this was not a disability rights case, a number of disability rights organizations acted as interveners on behalf of the appellants because of the implications of accepting fiscal constraints as grounds for limiting constitutional rights through s. 1. [79] The Supreme Court's respect for fiscal austerity may pose significant limitations for advocates of social justice. This raises the need for workers to have greater control over their workplace to ensure that issues that are important to them, whether it be pay equity or disability accommodations, are addressed in a timely manner. Nevertheless, the interpretation of s. 1 remains a malleable process with great uncertainty. It is by no means certain that future courts, dealing with different facts, will similarly grant the legislative branch an exemption from the enforcement of constitutional rights. Indeed, the fact that the Court in *NAPE* found a s. 15 violation in the first place is at least somewhat encouraging for advocates of equality rights.

### III. LEGAL DOCTRINE AND THE REGULATION OF LABOUR MARKETS [80]

 **[*15]** In this part, I will examine how the content of doctrine in particular domains of law, including contract law and property law, work to disempower workers. This systematic effect undermines the claims of formalist theorists that markets function automatically and neutrally in some sort of scientific way. Legal doctrine is deeply ideological and reflects a complex confluence of historical and political factors in a multicultural and pluralist society that is divided by class, race, gender, sexual orientation and disability. At the same time, it should not be assumed that simply because one rejects formalist claims of legal doctrine as neutral or scientific that one does not recognize the malleable and flexible dimensions to legal doctrine. Policy makers and actors at all levels have important choices among competing and indeterminate rules to make in how one structures a market framework. I hope to demonstrate that the indeterminacy inherent in much legal doctrine holds out the possibility for precisely such forms of immanent critique in order to render social justice, particularly for workers with disabilities, more feasible.

### A. Contract Law

Contract law demonstrates a systematic tendency to marginalize the interests of workers: an overarching preference for the views and perspectives of the employer in ways that are to the detriment of employees. This is why some legal scholars have insisted that classical principles derived from contract law ought to play no role in the interpretation of collective bargaining

---

[75] S.N. 1991, c. 3; S.N.L. 1992, c. P-41.1.

[76]  *NAPE, supra* note 67 at 388. The majority of a grievance arbitration board had found in favour of the union but this decision was quashed by the Newfoundland Supreme Court, Trial Division and the quashing was upheld by the Court of Appeal. See *ibid.* at 392-96 for the history of the case.

[77]  *Ibid.* at 413-14.

[78]  *Ibid.* at 420-22.

[79]  *Ibid.* at 386-87.

[80]  I am well aware that I largely ignore the substantive duty to accommodate unionized workers with disabilities that has been developed by labour arbitrators. Disability rights advocates can be justly proud that labour arbitrators have typically required significant changes in the workplace to accommodate disabilities of all kinds. However, I think that one gets a clearer sense of how doctrine works by analyzing the simpler management-worker relationships that are inherent in employment law, the system of governance that affects the large majority of workers. For a discussion of the duty to accommodate in the unionized sector, see Ravi A. Malhotra, "The Duty to Accommodate Unionized Workers with Disabilities: A Counter-Hegemonic Approach" (2003) 2 J.L. & Equality 92. For a more comprehensive treatment, see Michael Lynk, "Disability and the Duty to Accommodate: An Arbitrator's Perspective" [2001-02] Lab. Arb. Y.B. 51.

jurisprudence.  [81] Contract law is selectively invoked to remedy breaches of contract in ways that betray a remarkable and doctrinally indefensible difference between employment contracts and other types of contracts.  [82] In many areas of contract law, a variety of essentially paternalistic doctrines have arisen that operate as defenses to suits in contract to mitigate many of the negative effects that result from an inequality of bargaining power between, for instance, consumers and large corporations. [83] These include  [*16] duress and unconscionability. These doctrines need to be strengthened in the employment context to empower workers with disabilities.

Duress is a broad doctrine that historically referred to actual or threatened physical violence but now may include commercial pressure as the doctrines of duress, undue hardship and unconscionability have to some degree converged.  [84] In American law, one must demonstrate that the will of the party claiming duress was overwhelmed by force, threat of force or an improper threat.  [85] Under Ontario law, in order to evaluate a defendant's claim of duress, the trial judge must consider whether the defendant protested the threat of an illegal act; whether there was no alternative course open to the defendant; whether the defendant obtained independent advice; and whether after entering into the contract, the defendant took steps to avoid it.  [86] Demonstrating duress indicates that consent of the party in question, which must be voluntary, full and free, was insufficient to form a legally binding contract.  [87] Yet there is no reason to believe that in highly inegalitarian capitalist societies, duress may not play some role in people's choices in employment. Kelman has noted that duress may well have a role in people's formulation of preferences.  [88] In a classic legal realist critique, Hale comments on this when he observes that most individuals in a modern capitalist economy must seek employment in order to earn the wages necessary to purchase the goods necessary for survival.  [89] To the extent that workers with disabilities typically have even fewer options to change careers, given the difficulties in obtaining workplace accommodations or attendants, they are even more likely to be able to demonstrate duress.

It therefore seems anomalous that the duress doctrine would not also equally apply to employment contracts to vitiate situations reflecting massive imbalances of power between employers and employees, particularly employees with disabilities. The crafting of standards and burdens of proof to interpret the law of duress  [*17] narrowly in the employment law context betrays the malleability and plasticity of contract law doctrine that reflects the power differentials at play in society. I do not mean to

---

[81] Fudge & Glasbeek, *supra* note 47 at 383 (describing view of Chief Justice Laskin, as a judge as well as an arbitrator and an academic). For an interesting account of Chief Justice Laskin's jurisprudential philosophy on judicial deference to arbitrators, see Philip Girard, *Bora Laskin: Bringing Law to Life* (Toronto: University of Toronto Press, 2005) at 482.

[82] See generally Karl Llewellyn, "What Price Contract--An Essay in Perspective" (1930-31) 40 Yale L.J. 704 (commenting "Holmes long ago noted that in the pinch the measure of what a contract means is its meaning to the evil-minded person" at 724) for a classic legal realist critique of traditional contract doctrine, See also Kennedy, "Role", *supra* note 5 at 954 (noting evolution of American legal commentators in making analogies between contractual rights and property rights).

[83] This is not to suggest that these doctrines have not been criticized as profoundly inadequate even if simultaneously strategically wise given the available choices. See Kennedy, "Distributive", *supra* note 42 at 620-24; Duncan Kennedy, "Form and Substance in Private Law Adjudication" (1976) 89 Harv. L. Rev. 1685 at 1777-78. The point is to contrast these doctrines with the comparatively strict regime that applies in Canadian and American employment law.

[84] Christine Boyle & David R. Percy, *Contracts: Cases and Commentaries*, 5th ed. (Toronto: Carswell, 1994) at 672; Geoffrey England, Roderick Wood & Innis Christie, *Employment Law in Canada*, 4th ed., looseleaf (Markham, Ontario: Butterworths, 2005) para. 7.107.

[85] Robyn L. Meadows, "Unconscionability as a Contract Policing Device for the Elder Client: How Useful Is It?" (2005) 38 Akron L. Rev. 741 at 757.

[86] England, Wood & Christie, *supra* note 84 at para. 7.107; Sifam Management & Sales Ltd. v. Raznick, [2005] O.J. No. 3688 at para. 29 (Sup. Ct.) (QL).

[87] Stacey Reginald Ball, *Canadian Employment Law*, looseleaf (Aurora, Ontario: Canada Law Book, 2006) at paras. 6:140-6:150 [*Canadian*].

[88] Mark Kelman, *A Guide to Critical Legal Studies* (Cambridge: Harvard University Press, 1987) at 131-32 [Kelman, *Guide*]. See also Robert L. Hale, "Bargaining, Duress and Economic Liberty" (1943) 43 Colum. L. Rev. 603 at 621; John P. Dawson, "Economic Duress -- An Essay in Perspective" (1947) 45 Mich. L. Rev. 253.

imply duress may never be used to address power imbalances in the employment context. For instance, the Prince Edward Island Court of Appeal has ruled that an agreement that required an employee to reduce the amount of notice or face immediate termination was unenforceable because no true consent was given by the employee.   [90]  The employee, a book bindery supervisor, filed an action for wrongful dismissal. After working for a number of years, he had been told to sign a document purporting to limit the number of weeks of notice in the event of termination.   [91]  Overturning the ruling of the Prince Edward Island Supreme Court,   [92]  the Court of Appeal found that the agreement in dispute was not binding because the employer did not tell the employee that these conditions were attached to the job prior to the acceptance of the offer, the conditions were only presented after the employee was working, the employee was given little time to consider the offer and the employee was threatened with dismissal if he did not agree to the conditions.   [93]  Yet it is clear that not all economic pressure will constitute duress. Duress is found only in those exceptional situations where pressure which the law does not accept as legitimate is applied and to such an extent that the party under pressure has no choice but to submit.   [94]  The asymmetrical power relationship between employers and employees is taken as the standard and is simply not questioned in most cases. This suggests that more radical change in the workplace is needed to empower workers with disabilities that would allow them to have day-to-day control of the workplace.

Like duress, unconscionability is a doctrine that at common law may serve as grounds for rescission where there has been an improvident bargain and there is an inequality in the position of the bargaining power of the parties to the contract.   [95]  Under Canadian law, a defendant must show that there was an inequality in bargaining power reflecting the ignorance, need or distress of the weaker party; the stronger party unconscionably employed a position of power to achieve an  **[*18]**  advantage; and the agreement reached was substantially unfair to the weaker party or sufficiently anomalous with respect to community standards that it ought to be set aside.   [96]  In the United States, the unconscionability doctrine is contained in the Uniform Commercial Code. It encompasses both a procedural dimension, addressing the legitimacy of the making of the agreement, and a substantive dimension, concerning the legitimacy of its terms.   [97]  However, the scope of the doctrine is somewhat unclear because neither the Code nor the accompanying commentary clearly defines precisely what constitutes unconscionability and legal scholars are divided on whether one must demonstrate both procedural and substantive dimensions with a contract to

---

[89]  Hale, *ibid*. at 604-06. See also the discussion at 621-24.

[90]  Puiia v. Occupational Training Centre (1983), 43 Nfld. & P.E.I.R. 283, 127 A.P.R. 283 (P.E.I.C.A.), rev'g (1983) 43 Nfld. & P.E.I.R. 291, 127 A.P.R. 291 (P.E.I.S.C.) (QL) [*Puiia*].

[91]  *Ibid*. at paras. 9-12 (P.E.I.C.A.).

[92]  While the Court of Appeal does not discuss this, the Supreme Court decision notes that this workplace was once a sheltered workshop, employing workers with disabilities who were perceived as unable to compete on the regular job market. See *ibid*. at para. 19 (P.E.I.S.C.).

[93]  *Ibid*. at para. 18 (P.E.I.C.A.).

[94]  Techform Products Ltd v. Wolda [2000] O.J. No. 5676 at P59, 5 C.P.R. (4th) 25 at 45-46 (S.C.J.), supplementary reasons [2000] O.J. No. 5677 (S.C.J.), rev'd on other grounds [2001] O.J. No. 3822, 56 O.R. (3d) 1 (C.A.), leave to appeal to S.C.C. refused, [2001] S.C.C.A. No. 603. Interestingly, the Ontario Court of Appeal overturned the Superior Court's finding of duress in the context of an Employee Technology Agreement assigning rights to any inventions conceived by the employee to the employer.

[95]  Boyle & Percy, *supra* note 84 at 688; Ball, *supra* note 87 at 6-28-6-29.

[96]  England, Wood & Christie, *supra* note 84 at para. 7.714. See also Waxman v. Waxman, [2002] O.J. No. 2528 P1350-65, (2002) 25 B.L.R. (3d) 1 (Sup. Ct.), rev'd on other grounds [2004] O.J. No. 1765, (2004) 2 B.L.R. (4th) 1 (C.A.) (QL). The classic British case is, of course, Lord Denning's reasons in Lloyd's Bank v. Bundy, [1975] 1 Q.B. 326.

[97]  Susan Randall, "Judicial Attitudes Toward Arbitration and the Resurgence of Unconscionability" (2004) 52 Buffalo L. Rev. 185. See also Russell Korobkin, "Bounded Rationality, Standard Form Contracts and Unconscionability" (2003) 70 U. Chi. L. Rev. 1203 at 1255-78 (applying a Law and Economics analysis to the doctrine of unconscionability).

ground a claim of unconscionability. [98] An examination of case law reveals that some of the relevant factors that are taken into consideration include the bargaining power of the parties, the conspicuousness of the supposedly unfair term, and the oppressiveness and unreasonableness of the term. [99]

Canadian judicial developments have oscillated between formalist acceptance of enormous power differentials between employers and employees and greater recognition of the possibility of using unconscionability where it is genuinely warranted to insert some modicum of reasonableness into the bargains struck between employers and employees. [100] In *Wallace v. Toronto-Dominion Bank*, [101] the majority of the Ontario Court of Appeal struck a formalist note when it ruled that the employment contract between a bank employee and his employer that limited his notice period upon termination to four weeks, notwithstanding his long years of service, was valid. The majority found no reason to set aside what it characterized as a straightforward and simple contract. [102] This brand of formalist thinking is emblematic of the problems I have identified in contract law.

**[*19]** In contrast, two important Supreme Court of Canada decisions that have articulated a broader interpretation of unconscionability are *Machtinger v. H.O.J. Industries Ltd.* and *Wallace v. United Grain Growers Ltd.* [103] In *Machtinger*, the majority of the Supreme Court of Canada, in a decision written by Justice Iacobucci, held that where an employment contract between a car dealership and certain employees provided a notice period that failed to comply with the minimum notice required by employment standards legislation, because the employer attempted to contract out of employment standards legislation, the parties will be deemed to have failed to rebut the common law principles of reasonable notice. By imposing the longer period required by common law rules, where an employer drafted a contract that violated employment standards legislation, the majority held that employers would be encouraged to refrain from undermining employment standards legislation by drafting contracts that violated these laws. [104] In a concurring judgment, Justice McLachlin, as she then was, reached the same conclusion but would have found that the intention of the parties is irrelevant with respect to implied contractual terms which are questions of law, rather than fact. [105] Consequently, where it is necessary for a term to be implied, she held that it ought to be done and she found that a reasonable notice period for termination, given modern socio-economic conditions, was clearly a necessary incident for this class of contract. [106]

In *Wallace*, the majority of the Supreme Court, again in a judgment written by Justice Iacobucci, held that inducements made to a middle aged employee regarding permanent job security should he agree to work as an expert salesperson for the employer with respect a specialized piece of equipment could be taken into consideration in determining the relevant notice period when

---

[98]  Meadows, *supra* note 85 at 742-3; Samuel A. Marcosson, "Who is 'Us' and Who is 'Them' -- Common Threads and the Discriminatory Cut-off of Health Care Benefits for AIDS under ERISA and the *Americans with Disabilities Act*" (1994) 44 Am. U.L. Rev. 361 at 389-90.

[99]  Carter v. Exxon Co. USA, 177 F.3d 197 at 207 (3d Cir. 1999). See also Daniel D. Barnhizer, "Inequality of Bargaining Power" (2005) 76 U. Colo. L. Rev. 139 at 201.

[100]  Ball, *supra* note 87 at 6-30.

[101]  [1983] O.J. No. 2969, 41 O.R. (2d) 161 (C.A.).

[102]  *Ibid.* at para. 56.

[103]  *Machtinger v. H.O.J. Industries Ltd.*, [1992] 1 S.C.R. 986, (1992), 91 D.L.R. (4th) 491 (QL) [*Machtinger* cited to S.C.R.]; *Wallace v. United Grain Growers Ltd.*, [1997] 3 S.C.R. 701, (1997) 152 D.L.R. (4th) 1 (Lexis) [*Wallace* cited to D.L.R.]. For an older critique of case law in this area, see Etherington, "Enforcement", *infra* note 117.

[104]  *Machtinger, ibid.* at 996-1005.

[105]  *Ibid.* at 1007-10.

[106]  *Ibid.* at 1011-12.

he was subsequently dismissed without cause after fourteen years of service. [107] The majority acknowledged the power imbalance inherent in the contract of employment. [108] It therefore held that the trial judge acted appropriately in awarding a generous twenty-four months' salary in lieu of notice, in light of the inducements that were [*20] made. [109] In a dissenting judgement, Justice McLachlin, as she then was, joined by Justices L'Heureux-Dube and La Forest, would have found that the law has evolved to establish an implied duty of good faith in the termination of employment. [110] These welcome rulings suggest that Canadian jurisprudence has moved toward a more expansive reading of unconscionability. I would argue that workers with disabilities will benefit where courts accord a broader interpretation to unconscionability. Yet the hierarchical nature of the workplace means that such a doctrine inevitably can only have a limited impact on addressing the power imbalances that are constitutive of the workplace.

In the United States, employment at will emerged as the standard doctrine and it has allowed an employer to fire an employee for almost any reason. While there are some prohibited exceptions such as discrimination on the basis of various grounds including race, gender and disability (as protected in civil rights legislation), the firing of whistleblowers or those who refuse to engage in criminal acts ordered by the employers, or the firing of those who pursue their statutory rights such as filing a workers' compensation claim, [111] an employer in the United States essentially has complete freedom with respect to hiring and firing. [112] Indeed, the concept of freedom of contract was even used to exempt employers from liability for injuries to servants caused by fellow servants. [113]

In the Canadian context, the employment relationship has historically imposed a duty of good faith, fidelity, and obedience on the employee toward his or her employer. The employer was granted unilateral control over the servant's labour and thereby institutionalized an asymmetrical power dynamic between the parties. [*21] Employment contracts were typically brief, allowing courts to interpret the sizable gaps with the status-oriented class stratified feudal origins of employment contracts in mind. An employee who was dismissed was limited to the loss of remuneration and benefits associated with the notice period and few Canadian jurisdictions have adopted legislation prohibiting unfair dismissal. [114] It is true that under common law principles, an employee who is terminated without cause is typically entitled either to reasonable notice or damages consisting of a severance payment for failure to give reasonable notice. [115] In practice, the situation is even graver as only a tiny fraction

---

107  *Wallace, supra* note 103 at paras. 80-109. See also David Doorey, "Employer 'Bullying': Implied Duties of Fair Dealing in Canadian Employment Contracts" (2005), 30 Queen's L.J. 500 (discussing how employer bullying may be seen as repudiation by breach of employment contract in Canadian law).

108  *Wallace, ibid.* at para. 90-92.

109  *Ibid.* at para. 87.

110  *Ibid.* at para. 135-36.

111  James E. Macdonald & Caryn Beck-Dudley, "A Natural Law Defence to the Employment-at-Will Question: A Response to Richard Epstein" (2001) 38 Am. Bus. L.J. 363 at 371 at notes 43-45.

112  Richard A. Mann, *et al.*, "Starting from Scratch: A Lawyer's Guide to Representing a Start-Up Company" (2004) 56 Ark. L. Rev. 773 at 810-11. See the classic case, Payne v. Western & A. R.R. Co., 81 Tenn. 507 (1884), overruled on other grounds by Hutton v. Watters, 132 Tenn. 527 (1915) (commenting that "[a]ll may dismiss their employes [sic] at will, be they many or few, for good cause, for no cause or even for cause morally wrong, without being guilty thereby of legal wrong" at 519-20). See also Richard M. Fischl. "'A Domain into which the King's Writ Does Not Seek to Run': Workplace Justice in the Shadow of Employment-at-Will" in Conaghan, Fischl & Klare, *Labour, supra* note 12, 253 at 259-61; William R. Corbett, "The Need for a Revitalized Common Law of the Workplace" (2003) 69 Brooklyn L. Rev. 91 at 124-35. The single exception is Montana. See J. Wilson Parker, "At-Will Employment and the Common Law: A Modest Proposal to De-Marginalize Employment Law" (1995) 81 Iowa L. Rev. 347 at 371-73. However, Parker makes clear that the Montana legislation was enacted at the behest of employers to curb excessive pro-worker jury awards.

113  Joseph Slater, "The Rise of Master-Servant and the Fall of Master Narrative: A Review of *Labor Lawin America*", Book Review of *Labor Lawin America* edited by Christopher L. Tomlins & Andrew J. King (1994) 15 Berkely J. Emp. & Lab. L. 141 at 152.

114  Judy Fudge, "New Wine into Old Bottles? Updating Legal Forms to Reflect Changing Employment Norms" (1999) 33 U.B.C. L. Rev. 129 at 134-35; Judy Fudge, "The Limits of Good Faith in the Contract of Employment: From *Addis* to *Vorvis* to *Wallace* and Back Again"

of employees, primarily well paid professionals, are able to exercise their legal rights because of the high costs of litigation. Most employees are, therefore, limited to the period set out in provincial employment standards legislation. [116] Indeed, Etherington observes that most non-unionized employees are unaware that they are entitled to a common law principle of reasonable notice and many would assume that they may, as in the United States, be dismissed at will by their employer. [117] Employees in Canada are also typically required to mitigate the damages they claim by seeking other employment. [118] All of these conditions leave employees with disabilities, who in some cases may require accommodations in the workplace and in general have difficulty entering the labour market in the first place, particularly vulnerable where there is no union in the workplace, which is the situation for most workers in Canada.

**B. Property Law**

Property law also remains a source of marginalization for workers. As the legal realist Felix Cohen acidly remarked, "property is a function of inequality." [119] Property rights in revenue-generating property such as a business amount in effect **[*22]** to a legal right to tax the future social product of the revenue generating property. [120] Workers without ownership of essential goods such as food and lodging that they require for survival must exchange their wage-labour to those who effectively exercise sovereign power over them in order to acquire these essential goods. [121] In contrast, wealthy property owners are in a stronger position to set the terms of bargaining with workers. [122] Consequently, rules in property law directly impact on the determination of contracts between parties inevitably shaped by different endowments of property. The enormous inequalities in wealth that is a feature of both Canadian and American society thereby suggest that property law doctrine cannot be coherently derived from a set of abstract principles. [123] It inherently implicates the resolution of moral and philosophical questions and policy making as an essential part of determining competing and conflicting property law claims. [124] This also offers hope that property law doctrine may be reworked to achieve social justice for workers with disabilities.

An illustration may enhance an understanding of the contradictions contained in property law. Legal regulations governing employment law typically require constant loyalty and performance, at the pain of dismissal, from workers yet, according to the United States Supreme Court decision in *First National Maintenance Corp. v. N.L.R.B.*, they fail to prevent a unionized employer from closing a part of its workplace, property that it controls, or even refusing to bargain with its unionized workers

---

(2007), 32 Queen's L.J. 529 at paras. 1, 9 (QL); Ball "Canadian", *supra* note 87 at para. 5:30. See also Simon Deakin, "The Many Futures of the Contract of Employment" in Conaghan, Fischl & Klare, *supra* note 12, 177 at 187.

[115] Robert C. Bird & Darren Charters, "Good Faith and Wrongful Termination in Canada and the United States: A Comparative and Relational Inquiry" (2004) 41 Am. Bus. L.J. 205 at 205.

[116] On the issue of the costs of litigation, see A. Edward Aust, *et al., Executive Employment Law*, looseleaf (Markham, Ontario, LexisNexis Canada, 1993) at para. 13.8.

[117] Brian Etherington, "The Enforcement of Harsh Termination Provisions in Personal Employment Contracts: The Rebirth of Freedom of Contract in Ontario" (1990) 35 McGill L.J. 459 at 468 [Etherington, "Enforcement"].

[118] *Bardal v. The Globe and Mail (1960)*, 24 D.L.R (2d) 140 at 145, [1960] O.W.N. 253 (H.C.J.) [*Bardal*].

[119] Cohen, "Transcendental", *supra* note 22 at 816.

[120] Singer, "Legal", *supra* note 6 at 488.

[121] Morris Cohen, "Property and Sovereignty" (1927) 13 Cornell L.Q. 8 at 12.

[122] Singer, "Legal", *supra* note 6 at 489.

[123] For instance, restrictions on picketing during a strike implicate an owner's property rights but also significantly affect contractual rights. See *ibid*. at 492 (discussing picketing injunctions).

[124] *Ibid*. at 490-91.

over the closure.   125 In *First National*, the majority of the Court, in an opinion by Justice Blackmun, held that an employer's decision to dismiss nursing home employees for economic reasons did not count as part of the definition of "terms and conditions" under section 8(d) of the NLRA with respect to which Congress mandates bargaining by an appropriately certified bargaining unit. The majority concluded that the potential harm of such a broad definition to the employer's requirements to operate freely in making decisions to shut down a component of its operations for purely economic, as opposed to anti-union, reasons outweighed any incremental benefit that might accrue to the union by participation in such a decision.   126 In dissent, Justice Brennan, joined by Justice Marshall, held that negotiations over plant closings could well result in a greater flow of **[*23]** information and an agreement that might benefit both labour and management. Therefore, the dissent held that there ought to be a rebuttable presumption that employers have a duty to bargain over the partial closure of an operation.   127

Plant closings have only intensified in recent years as manufacturing jobs leave the high wage markets of the United States and Canada for cheaper locations abroad, rendering the majority decision in *First National* that much more troubling.   128 Yet what is clear is that this was by no means a decision that explicitly followed from the terms of the statute. The notoriously convoluted and ambiguous NLRA can be interpreted either narrowly or broadly depending on the priorities of the court that is shaping the decision. Indeed, the Supreme Court of Canada took a very different approach when a majority of the Court, speaking through Justice Gonthier, upheld a decision of the Ontario Labour Relations Board which concluded that the employer had failed to bargain in good faith when it failed to disclose during negotiations an impending decision to close the plant.   129 Again, this suggests that boards and courts can reach different decisions in interpreting and regulating property rights. It also suggests that workers are marginalized by their lack of control over the workplace, including the very real risk that the workplace may simply be shut down and moved outside the jurisdiction.

Moreover, worker input and creativity into the management of the firm have been co-opted and appropriated primarily when it facilitates greater profitability but is largely discredited and ignored when it threatens the bottom line of maximizing profits. 130 The notion of a property right in social assistance payments has received, **[*24]** at best, only tenuous acceptance in legal

---

125 See, *e.g.,* First National Maintenance Corp. v. NLRB 452 U.S. 666 (1981) [*First National*]; Robert A. Gorman, "The Negligible Impact of the *National Labor Relations Act* on Managerial Decisions to Close or Relocate" (1984) 58 Tul. L. Rev. 1354.

126   *First National, ibid.* at 686.

127   *Ibid.* at 690-91.

128   Terry Collingsworth, "Resurrecting the *National Labor Relations Act*--Plant Closings and Runaway Shops in a Global Economy" (1993) 14 Berkeley J. Emp. & Lab. L. 72 at 99-104.

129   *International Woodworkers of America, Local 2-69 v. Consolidated-Bathurst Packaging Ltd.*, [1990] 1 S.C.R. 282, [1990] S.C.J. No. 20 (QL). Note that the long appeals of the OLRB decision were not on the substantive issue but on the question of whether the rules of natural justice were breached by the conduct of the OLRB in holding a second meeting with a large number of Board members present. Furthermore, it should be understood that employers in Canadian jurisdictions, such as Ontario, have the right to shut down their operations where there is no anti-union animus-a rather slippery distinction. For the latest example of the Court's jurisprudence on this issue see Plourde v. Wal-Mart Canada Corp., 2009 SCC 54 (upholding Wal-Mart's right to close store). This decision was released just as this article was going to press.

130   See generally James Rinehart, "Appropriating Workers' Knowledge: Quality Control Circles at a General Motors Plant" (1984) 14 Stud. Pol. Econ. 75 for a classic account. For more recent accounts of workers' consciousness on the workplace floor, see John E. Baugher, "Caught in the Middle? Worker Identity under New Participatory Roles" (2003) 18 Soc. F. 417 at 431 (discussing worker resistance strategies in context of employer attempts to appropriate workers' knowledge at Louisiana GM plant); James W. Rinehart, *The Tyranny of Work: Alienation and the Labour Process*, 4th ed., Toronto: Harcourt Canada, 2001) at 160-63 (discussing exploitative aspects of participatory teams at Ingersoll, Ontario auto assembly plant); Bob Russell, "Rival Paradigms at Work: Work Reorganization and Labor Force Impacts in a Staple Industry" (1997) 34 Can. Rev. Soc. & Anthrop. 25 at 49 (concluding that new processes led to increased labour for workforce rather than increased skills); Irene Padavic, "Laboring under Uncertainty: Identity Renegotiation among Contingent Workers" (2005) 28 Symbolic

scholarship. [131] Given the importance of the inclusion of accessibility features, such as strong and enforceable building codes, in property law for people with disabilities, this is all the more true for people with disabilities. Legal rules that empowered greater worker control over the workplace are one effective strategy to encourage larger developments in property law that would empower workers with disabilities.

## C. Analyzing *Meiorin*

How does the disability discrimination jurisprudence regulate workers with disabilities? A critical reading of the Supreme Court of Canada decision in *Meiorin*, a gender discrimination case, has direct relevance to disability discrimination. [132] The Supreme Court of Canada judgment should be read in light of United States jurisprudence. The ADA (Americans With Disabilities Act) defines a person with a disability as one has a physical or mental impairment that substantially limits one or more major life activities, has a record of such a physical or mental impairment or regarded as having such a physical or mental impairment. [133] The United States Supreme Court has generally interpreted the ADA definition narrowly and plaintiffs frequently falter on very basic preliminary questions such as whether the plaintiff truly qualifies as having a disability. [134] Conversely, Canadian law has accorded a very broad definition to disability. [135]

 **[*25]** Moreover, the general civil rights legislation in the United States that prohibits race and gender discrimination, Title VII, applies a disparate treatment test that requires an employee alleging discrimination to demonstrate intent on the part of the employer. [136] In contrast, intent to discriminate does not form a requirement under *Charter* equality claims. [137] Finally, the recent evolution of United States Supreme Court federalism doctrine has, in decisions such as *Board of Trustees of the University of Alabama v. Garrett*, [138] rendered portions of the ADA unconstitutional in the context of state government defendants. [139]

In *Meiorin*, the Court considered whether the adoption of an aerobic fitness standard for forest firefighters violated the equality rights of women under s. 13 of the British Columbia *Human Rights Code*. [140] An arbitrator had found that the grievor's rights pursuant to s. 13 had in fact been violated because women were far less likely to be able to meet the standard and there was no evidence that the aerobic standard was necessary in order to perform safely as a firefighter. [141] The British Columbia Court of

---

Interaction 111 (discussing psychological responses of a sample of American contingent workers to marginalization and exploitation). For an interesting Australian account, see Richard Dunford & Peter McGraw, "Quality Circles in the Manufacturing Industry" in Evan Willis, ed., *Technology and the Labour Process. Australasian Case Studies* (Sydney: Allen & Unwin, 1988) 81 at 81-95.

131  But see William H. Simon, "The Invention and Reinvention of Welfare Rights" (1985) 44 Md. L. Rev. 1 for an account of earlier American debates on welfare rights before the current welfare reform movement gained hegemony.

132  *British Columbia (Public Service Employee Relations Commission) v. BCGSEU (Meiorin Grievance)* [1999] 3 S.C.R. 3, (1999) 176 D.L.R. (4th) 1 (QL) [*Meiorin* cited to S.C.R.]

133  Ruth Colker, *The Law of Disability Discrimination*, 6th ed. (Newark: LexisNexis, 2007) at 39.

134  See, *e.g.*, Sutton v. United Air Lines, 119 S. Ct. 2139 (1999) [*Sutton*] (petitioners with severe myopia correctable through use of glasses did not have substantial limitations as to qualify under the ADA); Murphy v. United Parcel Service, 119 S. Ct. 2133 (1999) [*Murphy*] (petitioner commercial driver with hypertension did not constitute a substantial limitation as to qualify under the ADA); Albertsons, Inc. v. Kirkingburg, 119 S. Ct. 2162 (1999) [*Albertsons*] (truck driver's visual impairment did not constitute a substantial limitation as to qualify under the ADA). For a more recent ruling, see, *e.g.*, **Toyota Motor Mfg., Kentucky Inc. v. Williams, 534 U.S. 184 (2002)** [*Toyota*] (worker with carpal tunnel syndrome and tendonitis did not have such a substantial limitation as to qualify under the ADA). An excellent overview may be found in Wayne T. Oakes, *Perspectives on Disability, Discrimination, Accommodations and Law* (New York: LFB Scholarly Publishing, 2005) at 94-124.

135  Lynk, "Disability", *supra* note 80.

136  Linda H. Krieger, "The Content of Our Categories: A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity" (1995) 47 Stan. L. Rev, 1161 at 1168 (noting that "[u]nder existing law, the disparate treatment plaintiff, whether proceeding under Title VII or under **42 U.S.C. sections 1981** or 1983, must prove not only that she was treated differently, but that such treatment was caused by purposeful or intentional discrimination."). For a recent discussion, see Kelly C. Timmons, "Accommodating Misconduct under the *Americans with Disabilities Act*" (2005) 57 Fla. L. Rev. 187 at 194.

33 Man. L.J. 1, *25

Appeal allowed the province's appeal from this decision and ruled that since there was an issue of safety and the grievor had been individually tested, the arbitrator's decision ought to be quashed. [142] The Supreme Court, in a judgment by Justice McLachlin, as she then was, concluded that the standard, in fact, violated the *Human Rights Code*. The Court allowed the grievor's **[*26]** appeal and ordered that she be reinstated. [143] In this decision, like the Supreme Court of Canada ruling in *Eldridge* [144] before it, the Supreme Court implicitly acknowledged elements of the social model of disablement by accepting that analysis must be shifted from accommodating individuals with disabilities as exceptions to the rule to challenging the way in which standards arbitrarily discriminate against people with disabilities. [145]

McLachlin J. set out a new three part test to replace the confusing distinction in Canadian human rights law between direct and adverse effect discrimination when evaluating whether an employer's standard constitutes a *bona fide* occupational requirement. [146] In essence, adverse effect discrimination doctrine had traditionally not permitted a defense that the standard in question was a *bona fide* occupational requirement. It rather directly considered whether the duty to accommodate the individual was an accommodation that did not constitute undue hardship on the employer. Conversely, direct discrimination doctrine only permitted an examination of the *bona fide* occupational requirement and imposed no duty to accommodate on the employer at all. [147] Therefore, many remedies turned on arbitrary distinctions that depended on whether a particular act was classified as direct or indirect discrimination. For example, a workplace rule imposing a mandatory pregnancy test could be characterized as a regulation directly discriminating against women or a neutral rule, which adversely affected women. [148] Under the previous regime, one therefore could have the absurd situation whereby an employer had a perverse incentive to argue that an ostensibly discriminatory rule, such as a height requirement for certain professions, constituted direct discrimination, was a *bona fide* occupational requirement and therefore it did not have to accommodate the employee at all. [149]

The first branch of the new test requires an employer to demonstrate that it adopted the standard for a purpose rationally connected to job performance. The second branch requires the employer to show that the employer adopted the standard in an honest and good faith belief that it was necessary for the fulfillment of that purpose. Finally, the third branch requires that the employer demonstrate that the standard is reasonably necessary to accomplish that work related purpose. In order to meet the

---

[137] Colleen Sheppard, "Of Forest Fires and Systemic Discrimination: A Review of *British Columbia (Public Service Employee Relations Commission) v. B.C.G.S.E.U.*", Case Comment (2001) 46 McGill L.J. 533 at 544 [Sheppard, "Of"].

[138] [531 U.S. 356 (2001)](#) [*Garrett*].

[139] *Ibid.*

[140] [R.S.B.C. 1996] c. 210. Section 13(1) states that:

A person must not

(a) refuse to employ or refuse to continue to employ a person, or

(b) discriminate against a person regarding employment or any term or condition of employment because of the race, colour, ancestry, place of origin, political belief, religion, marital status, family status, physical or mental disability, sex, sexual orientation or age of that person or because that person has been convicted of a criminal or summary conviction offence that is unrelated to the employment or to the intended employment of that person.

[141] *Meiorin, supra* note 132 at 13.

[142] *Ibid.* at 13-14.

[143] *Ibid.* at 44-45.

[144] *Eldridge, supra* note 71 (holding failure to provide sign language interpretation to Deaf hospital patients violated the s. 15 of the *Charter*).

[145] *Meiorin, supra* note 132 at 24-25.

[146] *Ibid.* at 32-33.

final branch of the test, an employer must show that it is **[*27]** impossible to accommodate employees with the characteristic of the claimant challenging the standard without experiencing undue hardship. [150]

The Court also identified six key questions that ought to be explored as one moves through the process of determining whether an employer has fulfilled its duty in any particular case, be it a gender or disability discrimination case. First, one must consider whether the employer has investigated alternative approaches that do not have a discriminatory effect, such as individual testing against a more sensitive standard. Second, if alternative standards were investigated and found to be capable of fulfilling the employer's goals, one must determine why they were not implemented. Third, one must ask if it is necessary that all employees meet the standard or if standards that reflect group or individual differences could still allow the employer to accomplish its legitimate goals. Fourth, one must explore whether there is a way to do the job that is less discriminatory while still achieving the employer's purpose. Fifth, one must consider whether the standard is appropriately designed so that the desired qualification is attained without placing an undue burden on the person or group to whom the standard applies. Finally, one analyzes whether other parties, such as the employees and any union, who are obliged to assist in the search for possible accommodations have fulfilled their roles. [151]

There is no question that the development of this new test was a positive step forward that merits praise and has potentially positive implications for workers with disabilities. It is a partial acknowledgement of the social model of disablement by the highest judicial authorities. It legitimates the idea of challenging barriers rather than changing atypical individuals to better fit into existing structures. Such a transformation of legal discourse and the regulatory structure to more seriously address an outlook of substantive equality is most welcome. [152] The concept of the "normal" worker is no longer always valorized as the standard that workers with disabilities must endeavour to approximate, with or without accommodation.

For all its supposedly transformative language and the advances that *Meiorin* made in abolishing the distinction between adverse and direct discrimination, however, the Supreme Court has remained "remedially timid". [153] Workers must still pursue individual complaints of discrimination through a complicated, bureaucratic **[*28]** and backlogged human rights system. [154] Despite gestures towards acknowledging the structural dimensions of the problem, one still detects the implication that such human rights complaints are regarded as anomalous in an otherwise fair and rational system. Instead, they reflect individual prejudices rather than systemic problems and can be solved on a case-by-case basis. This reveals an emphasis on individualist and reactive remedies as opposed to institutional change. [155] Its limitation also underscores the direction for

---

[147] Sheppard, "Of", *supra* note 137 at 537-40.

[148] *Meiorin, supra* note 132 at 18-19.

[149] Sheppard "Of", *supra* note 137 at 539.

[150] *Meiorin, supra* note 132 at 32-33.

[151] *Ibid.* at 36-37.

[152] See generally Denise Reaume, "Discrimination and Dignity" (2003) 63 La. L. Rev. 645 (discussing substantive equality).

[153] Dianne Pothier, "Legal Developments in the Supreme Court of Canada Regarding Disability" in Dianne Pothier & Richard Devlin, eds., *Critical Disability Theory. Essays in Philosophy, Politics, Policy and Law* (Vancouver: University of British Columbia Press, 2006) 305 at 316 [Pothier, "Legal"].

[154] Brian Etherington, "Promises, Promises: Notes on Diversity and Access to Justice" (2000) 26 Queen's L.J. 43 at para. 15-16 [Etherington, "Promises"]. See also Ian B. McKenna, "Legal Rights for Persons with Disabilities in Canada: Can the Impasse Be Resolved?" (1997-1998) 29 Ottawa L. Rev. 153 at paras. 49-51.

[155] See Isabel Grant & Judith Mosoff. "Hearing Claims of Inequality: *Eldridge v. British Columbia (A.G.)*" (1998) 10 C.J.W.L. 229 at 274. For a perceptive critique, see generally Colleen Sheppard, "Equality Rights and Institutional Change: Insights from Canada and the United States" (1998) 15 Ariz. J. Int'l & Comp. L. 143 [Sheppard, "Equality"]. It is true that these critiques predate the Supreme Court of Canada decision in *Meiorin*. However, I believe it is clear that the Supreme Court has been reluctant to pursue systemic remedies that would address widespread discrimination.

future change that is so badly needed: greater worker control of the day to day workplace. Such a strategy can result in real gains for workers with disabilities. I should stress that this does not necessarily mean that accommodation costs would be paid entirely by the employer. A range of options would be available that would allow the different stakeholders, such as government, the employer, and, where applicable, even unions to equitably share the costs. In many cases, it would not necessarily be the case that the employer would be funding the majority of the costs.

Another important dimension is that while *Meiorin* certainly has implications for workers with disabilities, the actual application was in the context of gender discrimination. [156] Very large numbers of people with disabilities remain outside the labour market in both Canada and the United States and pernicious attitudes and stereotyping about the capabilities of people with disabilities remain widespread. Consequently, it does not automatically follow that the *Meiorin* test will be applied in the less well-established and more complex area of disability rights. While there are grounds for optimism, the application of doctrine to challenge standards and work practices involving a completely different set of individuals with their own history, experiences and claims will necessarily involve complex articulations on the part of decision makers in any jurisdiction.

One specific difficulty is finding appropriate comparator groups. People with specific disabilities, unlike women, are often an extremely small segment of the population and formulating an appropriate comparator group can be challenging. It is also essential that the comparison does not encourage the decision maker to interpret the standard from the perspective of how well the disabled person fits **[*29]** within an able bodied standard. [157] This is no hypothetical quibble. In Supreme Court of Canada decisions such as *Granovsky v. Canada (Minister of Employment and Immigration)*, [158] and *Auton*, [159] the use of inappropriate comparator groups has been a sticking point and led to problematic decisions with negative impacts for people with disabilities in both cases. Claimants have not been able to choose their comparator group in framing constitutional arguments, much to their prejudice.

Moreover, the framework established by *Meiorin* is inherently limited because it only addresses standards that are created by employers. [160] Many barriers, from transportation to attendant services, may be outside the purview of the employer yet be just as serious in precluding or limiting a disabled worker in employment. Only addressing one component of a multifaceted and interlocking series of problems that may arise in many different sectors cannot sustain substantive disability rights. This dilemma suggests the need for comprehensive disability supports across a person's lifetime, decoupled from an individual's labour market status. The costs would have to be borne by a variety of organizations including government, employers and, to some limited extent, perhaps disabled users as well. Complex and appropriate legal regulation will have to be crafted to intelligently design such supports in an effective manner.

## IV. UNDERSTANDING REASONABLE ACCOMMODATION

The very term, "reasonable accommodation", widely used as the standard in determining whether equality has been achieved in disability law, [161] suggests that equality for people with disabilities must be measured against the existing workplace. The normal worker, a white male able-bodied individual, is taken as the implicit standard that people with disabilities and others with less social power must always meet in order to demonstrate merit and their worthiness for inclusion into mainstream

---

[156] *Meiorin, supra* note 132.

[157] Pothier, "Legal", *supra* note 153 at 313-14.

[158] [2000] 1 S.C.R. 703, 2000 SCC 28 (QL) [*Granovsky*].

[159] See *supra* notes 63-71, and accompanying text.

[160] See *Meiorin, supra* note 132 at 32-33.

[161] See Samuel R. Bagenstos, "The Supreme Court, *the Americans with Disabilities Act*, and Rational Discrimination" (2004) 55 Ala. L. Rev. 923 at 948 (observing that "[t]he centrality of 'reasonable accommodation' to the ADA's nondiscrimination scheme sends the message that disability is different from other forbidden classifications precisely because it is often relevant to one's ability to do the job") [Bagenstos, "Supreme"]; M. David Lepofsky, "The *Charter's* Guarantee of Equality to People with Disabilities - How Well Is It Working?" (1998) 16 Windsor Y.B. Access Just. 155 at 165-66.

society.   [162] As discussed above, after the landmark Supreme Court of Canada decision in *Meiorin*, there is a modicum of transformation of existing **[*30]** standards that are challenged as discriminatory.   [163] The American policy debates, however, are dramatically different and merit exploration. Many American commentators and jurists are accustomed to consider equality in terms of racial distinctions, i.e., equality between otherwise identical individuals. They have not been able to grasp the meaning of reasonable accommodation of workers with disabilities. Instead, they have regarded requests for reasonable accommodation under the ADA as equivalent to improper requests for affirmative action or even a redistributionist benefits scheme for people with disabilities merely because they go beyond requesting identical treatment.   [164]

A brief account of Title I of the ADA is warranted. Title I of the ADA covers employment. It requires employers to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business. Possible accommodations specifically identified by the ADA could include making existing employee facilities accessible; job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modification of equipment or devices; appropriate adjustment or modifications of examinations, training materials or policies; and the provision of qualified readers or interpreters.   [165] It thus goes beyond conventional forms of equality in demanding that particular individuals have their disability-related needs met by the employer.

Whereas conventional civil rights legislation is based on the principle that similarly situated people ought to be treated similarly, Samuel Isaacaroff and Justin Nelson maintain that the concept of reasonable accommodation as set out in the ADA "starts this unique statutory inquiry with the claim that differently situated persons should be treated differently."   [166] Perhaps this misunderstanding of the purposes of the ADA is not all that surprising given that claims of disability discrimination are not entitled to a higher standard of review under American constitutional law.   [167] Even Canadian scholars, who have little reason to confuse the **[*31]** issue given the constitutional protection granted to affirmative action or employment equity policies for disadvantaged groups in s. 15(2) of the *Charter*,   [168] have occasionally conflated the duty to accommodate and affirmative action.   [169]

However, a closer examination reveals that these analogies simply fail. In the important Supreme Court employment law decision, *US Airways, Inc. v. Barnett*,   [170] for instance, the Court considered the plaintiff's argument that he ought to be exempted from the employer-imposed seniority system in operation at the employer as a disability accommodation pursuant to the ADA because, as a direct consequence of a back injury that precluded the plaintiff from doing strenuous physical labour,

---

[162] For an early perceptive critique, see Shelagh Day & Gwen Brodsky, "The Duty to Accommodate: Who Will Benefit?" (1996) 75 Can. Bar Rev. 433.

[163] See *supra* notes 94-121 and accompanying text.

[164] Samuel R. Bagenstos, "'Rational Discrimination', Accommodation, and the Politics of (Disability) Civil Rights" (2003) 89 Va. L. Rev. 825 at 862 [Bagenstos, "Rational"]; Carlos A. Ball, "Preferential Treatment and Reasonable Accommodation under the *Americans with Disabilities Act*" (2004) 55 Ala. L. Rev. 951 at 966-67; Matthew Diller, "Judicial Backlash, the ADA and the Civil Rights Model" (2000) 21 Berkeley J. Emp. & Lab. L. 19 at 43-47.

[165] 42 U.S.C. §§ 12101-213, § 12111(9) (1990).

[166] Samuel Issacharoff & Justin Nelson, "Discrimination with a Difference: Can Employment Discrimination Law Accommodate the *Americans with Disabilities Act*?" (2001) 79 N.C.L. Rev. 307 at 315.

[167] See City of Cleburne v. Cleburne Living Centre, Inc., 473 U.S. 432 (1985) [*Cleburne*] (finding that discrimination against people with intellectual disabilities need only be considered on the low standard of a rational basis of review)

[168] *Charter, supra* note 64, at s. 15(2).

[169] See Marcia H. Rioux, "Towards a Concept of Equality of Well-Being: Overcoming the Social and Legal Construction of Inequality" (1994) Can. J.L. & Jur. 127 at P41 (QL) [Rioux, "Towards"].

[170] **535 U.S. 391 (2002)** [*Barnett*].

bumping by a more senior employee would result in his unemployment. [171] The majority of the Court disappointingly ruled that requests for a departure from the established seniority system would normally be deemed to be unreasonable accommodations. However, the Court concluded that a plaintiff was entitled to demonstrate the existence of special circumstances, such as the fact that the employer allowed other exceptions in its seniority system, which warranted granting departing from the seniority system in particular cases. [172] In dissent, Justice Souter, joined by Justice Ginsburg, held that a unilaterally created seniority system, such as the one in place at US Airways and subject to change without notice upon the employer's whim, was not entitled to any special protection under the ADA. [173]

What is particularly relevant for the analysis here is that a majority of the Court, one that has been very ambivalent about affirmative action, [174] rejected arguments proffered by the defendant that would have created a categorical rule prohibiting any type of accommodation that was inconsistent with the established seniority system. [175] Instead, the Court evinced a more subtle and comprehensive understanding of equality, although still one ultimately limited by the undue hardship standard.

[*32]  *Barnett* underscores two key points that distinguish reasonable accommodation from affirmative action. Whereas affirmative action is a class based remedy for past historical wrongs, reasonable accommodation in employment is based on an individualized evaluation of the disabled employee's circumstances. It cannot be said that Mr. Barnett argued that he ought to receive a preference in interpreting seniority rights because of a history of systemic discrimination against people with disabilities. Rather, the request for exemption from the seniority system was based on an individualized assessment of how his particular impairment affected his ability to perform the essential functions of his job in a specific workplace. [176] Second, a failure to provide reasonable accommodation under the ADA in itself constitutes discrimination against people with disabilities provided that it does not impose an undue hardship on the employer. In contrast, under Title VII, affirmative action is merely a remedy when discrimination has already been demonstrated to have occurred in the past. A failure to provide affirmative action is not, in itself, a civil rights violation under Title VII. [177] In the case of alleged ADA violations, an employer's current actions, not remedies for past wrongs, are subjected to scrutiny. This illustrates that, notwithstanding the rocky experience of the ADA before the Supreme Court, a broader form of equality was envisioned by Congress in enacting the ADA. [178]

Similarly, other scholarship has erected a hierarchy of rights by distinguishing reasonable accommodation of workers with disabilities from the earlier civil rights that prohibited race and gender discrimination in employment. The main argument is that traditional civil rights legislation [179] may be interpreted as expanding the economic pie by efficiently perfecting the market through stigmatizing irrational racial discrimination that unjustly robs employers and society of potential talent and

---

[171] Ball "Preferential", *supra* note 164 at 957.

[172]  *Barnett, supra* note 170 at 405-06.

[173]  *Ibid*. at 420-23. In another dissent reflecting the polar opposite view, Justice Scalia, joined by Justice Thomas, held that departures from neutral rules under seniority systems could not be reasonable accommodations. See *ibid*. at 411-20.

[174] See Grutter v. Bollinger, 539 U.S. 306 (2003) (narrowly upholding 5-4 University of Michigan Law School affirmative action program); Gratz v. Bollinger, 539 U.S. 244 (2003) (narrowly striking down 5-4 University of Michigan's College of Literature, Science and the Arts affirmative action program).

[175] Ball "Preferential", *supra* note 164 at 973.

[176] See *ibid*. at 974-76.

[177]  *Ibid*. at 977-79.

[178]  *Ibid*. at 977-81.

[179] However, note that some scholars would also be critical of certain aspects of traditional civil rights jurisprudence such as rational or statistical discrimination against racial minorities or women and also see rational discrimination as illegitimate as a duty to accommodate. See Bagenstos, "'Rational'", *supra* note 164 at 871 (discussing Kelman's opposition to prohibiting rational discrimination).

33 Man. L.J. 1, *32

therefore should not be subject to any sort of qualification.   180 Reasonable accommodations, on the other hand, ought to be seen as merely a claim to redistribute public resources and therefore subject to evaluation, by factoring in cost considerations and assessing valid alternative uses of scarce public resources, in  [*33] order to ensure that inefficient accommodations do not waste resources that could be better spent on other critical social needs.   181

This view also lacks merit and betrays a narrow notion of equality. It presumes that disability accommodations may never be efficient, even though it is entirely conceivable that certain types of disability accommodations are highly efficient in enabling unemployed people with disabilities to leave social assistance programs and make a valuable contribution to the economy.   182 In many cases, it is a matter of what one uses as the baseline for one's analysis and comparisons. While redistribution is enormously important as a policy goal, I would reject the idea that disability accommodation is somehow a form of redistribution in a qualitatively different way than the duty to accommodate.

This is not to suggest there is not a significant degree of complexity in making these evaluations. In *NAPE*,   183 for instance, the Supreme Court of Canada had to balance difficult and conflicting claims between women's rights under a pay equity agreement and fiscal austerity. In my view, the Court certainly erred in finding that legislation abrogating the pay equity agreement was saved by s. 1 of the *Charter*. However, by rendering the decision through s. 1,   184 the Court at least acknowledged the *Charter* violation before balancing the economic impact of the decision against the equality rights at stake. Consequently, a methodology based on a hierarchy of rights is without foundation and the skepticism towards reasonable accommodation that pervades much American legal scholarship is entirely unwarranted.

Canadian law has generally had, at least at first glance, the merit of promoting a substantive vision of equality in interpreting *Charter* rights.   185 Unlike the refusal of the United States Supreme Court to apply more than a rational basis standard of review for interpreting statutory classifications on the basis of disability,   186 s. 15 of  [*34] the *Charter* of course enshrines equality for people with disabilities.   187 Accordingly, the Supreme Court of Canada, as far back as Justice McIntyre's opinion in the first interpretation of s. 15 of the *Charter, Andrews v. The Law Society of British Columbia*,   188 has repeatedly

---

180 For an earlier argument about market perfecters, see Mark Kelman, "Emerging Centrist Liberalism" (1991) 43 Fla. L. Rev. 417 at 443 [Kelman, "Emerging"].

181 Mark Kelman, "Market Discrimination and Groups" (2001) 53 Stan. L. Rev. 833 at 834, 880 [Kelman, "Market"] (arguing at 880 that "[i]t is most fruitful to see the demand for accommodation as a straightforward demand for resource distribution"). See also Bagenstos, "'Rational'", *supra* note 164 at 872-73.

182 Bagenstos, "Rational", *ibid*. at 892-93. See also Sharon Rabin-Margalioth, "Anti-Discrimination, Accommodation and Universal Mandates--Aren't They All the Same?" (2003) 24 Berkeley J. Emp. & Lab. L. 111. A fuller discussion of this appears in Ravi Malhotra, "The Law and Economics Tradition and Workers with Disabilities" (2007-8) 39 Ottawa L. Rev. 249.

183 *NAPE, supra* note 67.

184 *Ibid*. para 52-116.

185 See, *e.g.* Po-Jen Yap, "Four Models of Equality" (2005) 27 Loy. L.A. Int'l & Comp. L. Rev. 63 (arguing Canadian courts espouse a substantive model of equality)

186 Under the rational basis standard of review that applies in American constitutional jurisprudence to disability discrimination, the government need only demonstrate that the impugned law or rule allegedly causing disparate treatment has some legitimate governmental purpose to avoid a liability of the Equal Protection Clause. See *Garrett, supra* note 138 at 366-67.

187 *Charter, supra* note 64 at s. 15.

188 [1989] 1 S.C.R. 143, [1989] S.C.J. No. 6 (QL) [Andrews cited to S.C.R.] (ruling that citizenship requirement in the British Columbia *Barristers and Solicitors Act* to be a lawyer violates section 15 of the *Charter*). A majority of the Court adopted Justice McIntyre's reasons with respect to the analysis of section 15 and its relationship to s. 1, but disagreed solely on whether the legislation at issue in *Andrews* was

enunciated its view that equality rights were not restricted to similarly situated groups. [189] Furthermore, mere oversight has been found to be sufficient to base a claim of discrimination under s. 15, such as a failure to provide sign language interpretation in hospitals as was litigated in the Supreme Court decision in *Eldridge v. British Columbia (Attorney General)*. [190] This was an important development for disability rights law and this signifies the value of the principle of adverse effect discrimination. [191] This jurisprudence can be traced back to the application of the adverse effect discrimination analysis in a trilogy of employment law cases concerning religious discrimination claims arising from otherwise neutral workplace rules or practices that had an adverse effect on particular religious minorities. [192]

Even those decisions that ultimately ruled against disabled plaintiffs have contained language that indicates a significant understanding of the need for a substantive vision of equality. For instance, the Supreme Court's decision in *Eaton v. Brant County Board of Education* [193] evinced a clear understanding of the relationship between discrimination and the failure to provide accommodation for people with disabilities. [194] Moreover, while ultimately upholding the placement of a public school student with a disability (Eaton) in a segregated setting, the Court **[*35]** specifically rejected arguments by the defendant school board that the placement of Eaton in a segregated setting did not amount to differential treatment for the purposes of analysis under s. 15. [195]

Consequently, reasonable accommodation in the workplace has been accorded a broad interpretation in Canadian law and has, to a large extent, escaped being submerged in formalistic and unhelpful debates about the nature of equality. An employer is required to engage in a four part process; (i) determining if the employee can perform his or her current job as it is; (ii) if not, evaluating whether he or she can perform the existing job with modifications or re-bundled duties; (iii) if not, determining if he or she can perform another job as it exists; (iv) if not, determining whether he or she can perform another job in a modified form. Adverse effect discrimination that unintentionally harms a member of a protected group is clearly unacceptable. Accommodation is therefore seen in law as a significant obligation on the part of the employer. This jurisprudential philosophy is most clearly manifested in the pro-active approach of Supreme Court of Canada's decision in *Meiorin*. [196]

Nevertheless, reasonable accommodation is subject to a defense of undue hardship. Reasonable accommodations are only acceptable if they do not impose undue hardship and the definitions under both the ADA and Canadian human rights statutes clearly regard cost as a major factor in evaluating whether an accommodation is undue hardship. [197] Having said that, it must

---

saved by s. 1. See also Marie-Adrienne Irvine, "A New Trend in Equality Jurisprudence?" (1999) 5 Appeal 54 at 56-57; Craig D. Bavis, "*Vriend v. Alberta, Law v. Canada, Ontario v. M. and H.*: The Latest Steps on the Winding Path to Substantive Equality" (1999) 37 Alta. L. Rev. 683 at 690-91.

[189]  *Andrews, ibid.* at 167, McIntyre J., dissenting, but not on this issue (commenting "a bad law will not be saved merely because it operates equally upon those to whom it has application. Nor will a law necessarily be bad because it makes distinctions").

[190]  Eldridge, *supra* note 71.

[191]  Reaume, *supra* note 152 at 687.

[192]  *Ont. Human Rights Commission v. Simpsons-Sears*, [1985] 2 S.C.R. 536, [1985] S.C.J. No. 74 (QL); *Bhinder v. Canadian National Railway Co*., [1985] 2 S.C.R. 561, [1985] S.C.J. No. 75 (QL); *Alta (HRC) v. Central Alberta Dairy Pool*, [1990] 2 S.C.R. 489, [1990] S.C.J. No. 80 (QL).

[193]  [1997] 1 S.C.R. 241, [1996] S.C.J. No. 98 (QL) [*Eaton* cited to S.C.R].

[194]  *Ibid.* at para. 67 (noting "it is the failure to make reasonable accommodation, to fine-tune society so that its structures and assumptions do not result in the relegation and banishment of disabled persons from participation, which results in discrimination against them."). See generally Lepofsky, "*Charter's", supra* note 161.

[195]  Lepofsky, "*Charter's", ibid.* at 200-01.

[196]  Lynk, "Disability", *supra* note 80 at 58-61.

[197]  See *e.g., Americans with Disabilities Act*, 42 U.S.C. § 12111(10) (2000) (Lexis). It states that:

be kept in mind that the reasonable accommodation principle in effect under Canadian law after the **[*36]** Supreme Court of Canada decision in *Meiorin*, prior to the application of any defense of undue hardship, is a broad one.

The American context may be understood by analyzing the contrasting judgments of Judge Posner's decision in *Vande Zande* [198] and Judge Calabresi's ruling in *Borkowski*. [199] In *Vande Zande*, the Court of Appeals for the Seventh Circuit, in a ruling by Judge Posner, upheld a ruling dismissing the plaintiff's claims that her employer, a state agency, failed to accommodate her disability. The plaintiff was a paraplegic who requested either the provision of a computer to enable her to work at home or reinstatement of her sick leave because of pressure ulcers that were caused by her disability. [200] She also requested that the sink in the office cafeteria be lowered so that it was accessible to her. [201] Judge Posner ruled that in evaluating reasonable accommodations, the cost of the requested accommodation must be proportionate to the benefit to employee or the health of the employer. This finding, which inserts a cost-benefit analysis directly within the reasonable accommodation standard itself, was made using rather alarmist and iconoclastic language. Judge Posner remarked that "[I]f the nation's employers have potentially unlimited financial obligations to 43 million disabled persons, the Americans with Disabilities Act will have imposed an indirect tax potentially greater than the national debt." [202]

A second implication of this decision is the interpretation of the undue hardship defense. Judge Posner concludes that undue hardship must consider both the financial capabilities of the employer and the benefits of the accommodation for the disabled worker. [203] It therefore requires a plaintiff under the ADA to justify the substantive merits of the accommodation at two separate stages: first in determining whether the request is indeed a reasonable accommodation and then again when evaluating whether the accommodation request constitutes undue hardship. [204] Strict readings of the undue hardship defense inevitably mean that reasonable accommodations under the ADA will be interpreted narrowly and generate fewer **[*37]** accommodations than might otherwise be the case, even for those lucky plaintiffs who surmount all the other procedural and substantive hurdles to reach the undue hardship stage.

In contrast, in *Borkowski*, [205] the Court of Appeals for the Second Circuit, in reasons by Judge Calabresi, held that the District Court's judgment in favour of the defendant School District ought to be vacated. [206] The plaintiff, a school teacher, had experienced a head injury which resulted in problems relating to memory, concentration, balance, coordination and mobility.

---

In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodations; the number of persons employed at such facility; the effect of expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographical separateness, administrative, or fiscal relationship of the facility in question to the covered entity.

See also *Human Rights Code*, R.S.O., c. H.19, s. 17(2) (QL). It states that:

(2) No tribunal or court shall find a person incapable unless it is satisfied that the needs of the person cannot be accommodated without undue hardship on the person responsible for accommodating those needs, considering the cost, outside sources of funding, if any, and health and safety requirements, if any.

[198]  Vande Zande v. State of Wisconsin Department of Administration, 44 F.3d 538 (7th Cir. 1995) [*Vande Zande*] (affirming dismissal of ADA complaint where employee requested option to work at home as accommodation and lowering of sink in workplace kitchen).

[199]  Borkowski v. Valley Central School District, 63 F.3d. 131 (2d. Cir. 1995) [*Borkowski*] (vacating judgment in favour of school district and remanding for further consideration)

[200]  Vande Zande, supra note 198 at 544-45.

[201]  *Ibid*. at 545-46.

33 Man. L.J. 1, *37

[207] After being denied tenure because of allegations that there were deficiencies in her performance due to her inability to control the classroom, she brought a claim alleging discrimination on the basis of disability.   [208] She argued that with the provision of a teacher's aide, she was fully capable of performing the essential functions of her job as a library teacher and was otherwise qualified for the position.   [209] The Court held that it was possible that a reasonable jury would conclude that the plaintiff's request was a reasonable accommodation under the law.   [210] Therefore, once the plaintiff has demonstrated that there is *prima facie* evidence of an effective accommodation that allows the plaintiff to perform the essential functions of the job and that on its face would not clearly cost more than any potential benefits, the burden shifts to the employer to demonstrate that the requested accommodation constitutes undue hardship.   [211] The plaintiff's burden is not a heavy one.   [212] It would appear that a plurality of the United States Supreme Court favoured the more generous analysis enunciated in *Borkowski* in its decision in *Barnett*, probably because the employee is unlikely to have the relevant information with respect to the financial costs associated with the provision of accommodations.   [213]

At first glance, the Canadian duty to accommodate jurisprudence appears broader than its American counterpart. Lynk states that "cost will amount to an undue hardship only if it is established to be (1) related to the accommodation; (2) provable, and not based on surmise or speculation; and (3) so substantial that it  **[*38]**  would either change the essential nature of the operation or substantially impact upon its financial viability."   [214] Six factors are weighed in making this assessment: financial cost, impact on any collective agreement, problems of employee morale, interchangeability of workforce and facilities, size of the employer's operations and safety.   [215] Nevertheless, the point stands that reasonable accommodation in Canadian law remains making after-the-fact modifications to structural environments and institutions that systemically handicap people with disabilities in their everyday lives.   [216] As Lynk observes, an employee must be able to "perform the *essential* duties of the existing, restructured or newly-assigned position."   [217] And what of the remedy where problems of discrimination do arise? The human rights systems across Canada, designed for compromise and education rather than an adversarial model and based on individual complaints that necessarily fragment the analysis of structural questions of power and privilege into depoliticized

---

[202]   *Ibid.* at 543. For a critique, see generally Marta Russell & Ravi Malhotra, "Capitalism and Disability" in Leo Panitch and Colin Leys, eds., *A World of Contradictions: Socialist Register 2002* (Halifax: Fernwood Press) at 211-28.

[203]   *Vande Zande, ibid.* I should clarify that I do not mean to imply that this interpretation by Judge Posner is the universal interpretation of undue hardship under the ADA.

[204]   *Ibid.* at 543.

[205]   Borkowski, supra note 199 (vacating judgment in favour of school district and remanding for further consideration).

[206]   *Ibid.* at 133.

[207]   *Ibid.* at 134.

[208]   *Ibid.* at 134-35. This case was technically litigated under Section 504 of the *Rehabilitation Act* but its jurisprudence is now interpreted through the framework of the ADA.

[209]   *Ibid.* at 140.

[210]   *Ibid.* at 142.

[211]   *Ibid.* at 139-40.

[212]   *Ibid.* at 138.

[213]   Seth D. Harris, "Re-Thinking the Economics of Discrimination: US Airways v. Barnett, the ADA and the Application of Internal Labor Market Theory" (2003) 89 Iowa L. Rev. 123 at 125.

individual assessments, have been painfully slow in dealing with such matters. [218] The question of addressing power in the workplace would go a long way to resolving the limitations of the reasonable accommodation model.

## VI. DEVELOPING THE IMPLICATIONS OF THE SOCIAL MODEL OF DISABLEMENT

As alluded to in the previous sections, a true engagement with the social model of disablement requires real and substantive conceptual and physical control over day to day production decisions for workers with disabilities to be truly empowered. The separation of decision making between labour and management that is enshrined through labour arbitration law principles such as "work now, grieve later" [219] poses fundamental legal hurdles to the practical realization of the social model of disablement.

While the separation of decision making between labour and management is regarded as an established workplace norm in contemporary Canadian and American society that has naturally existed for all time, this is an entirely misleading view. In fact, the current institutional arrangements originate in the **[*39]** passage of the *Wagner Act* in the United States in 1935 [220] as modified by the *Taft-Hartley Act* of 1947, [221] the foundational American labour law statutes, and P.C. 1003, [222] an order-in-council issued by the King government in Canada in 1944. [223] These regimes established regulatory frameworks whereby the labour movement agreed to allow management to exercise day to day decisions over production m exchange for a degree of protection of union rights and relatively stable bargaining conditions. Prior to this era, there in fact was a long tradition of workers' struggles that directly challenged the authority of management to make production decisions. In industries as diverse and significant as railway and coal, workers demanded public ownership of the industries and a large role for the workers in their organization. The speed of the production line was frequently determined by workers' capacity to intervene from below and halt the production of goods in response to disputes with management. [224]

How is this salient for workers with disabilities? Greater control for workers means less risk of management's capacity to divide workers over issues of substantive equality for workers with disabilities. Problems related to deskilling could be eliminated as workers distributed assignments in a democratic manner. Consequently, conceptual and physical control by workers should be a key criterion in evaluating the merit of proposals that purport to improve conditions for workers with disabilities.

---

[214] Lynk, "Disability", *supra* note 80 at 66.

[215] *Ibid.* at 64.

[216] See, *e.g., Holmes v. Canada (Attorney General)*[1997] F.C.J. No. 577, aff'd [1999] F.C.J. No. 598 (affirming Canadian Human Rights Commission decision to dismiss allegations by pay clerk that failure to accommodate her shoulder pain violated human rights statute).

[217] Lynk, "Disability", *supra* note 80 at 76 (emphasis in original).

[218] Etherington, "Promises", *supra* note 154 at para. 15-16. See also McKenna, *supra* note 154 at para. 49-51.

[219] Ford Motor Co., 3 LA 779, (1944) (Schulman).

[220] James G. Pope, "Republican Moments: The Role of Direct Popular Power in the American Constitutional Order" (1990) 139 U. Pa. L. Rev. 287 at 309. The amended version is known more commonly as the *National Labor Relations Act*. See 29 U.S.C. 151 (2004).

[221] Nelson Lichtenstein, "Taft-Hartley: A Slave-Labor Law?" (1998) 47 Cath. U.L. Rev. 763.

[222] *Wartime Labour Relations Regulations*, P.C. 1003, February 17, 1944, online: The Labour Gazette <http://socserv.mcmaster.ca/labourstudies/LearningCentre/article.php?id=506>

[223] Fudge & Glasbeek, *supra* note 47.

[224] David Montgomery, *Workers' Control in America: Studies in the History of Work, Technology and Labor Struggles* (Cambridge: Cambridge University Press, 1979) at 154-55.

33 Man. L.J. 1, *39

I certainly do not mean to suggest that this will solve all problems. Conflicts and discrimination will certainly remain. A balance must of course also be struck to ensure that the interests of management, within the paradigm of greater worker control, are addressed in a fair and equitable fashion. A workplace that is not profitable will soon be bankrupt. However, given the numerically small number of workers with disabilities with such diverse experiences of disability that may range from blindness to an intellectual disability and beyond in any given workplace, this approach has far greater chance of success than an *exclusive* focus on disability identity and consciousness raising by disability rights activists in the workplace.

A second implication of the social model of disablement for workers with disabilities is the provision of systemic disability supports for workers with disabilities **[*40]** across the lifespan that would be entirely decoupled from employment and income status. This would involve accessibility and integration from nursery school through public schools to workplace training and co-ops to a system of workplace accommodations rather than the very limited, fragmented and dysfunctional disability supports provided today in Canada and the United States. It would necessitate a system to allow those injured on or off the job to obtain the required rehabilitation and secure effective re-entry into the labour market. It would make every effort to ensure quality well-remunerated employment for those who wanted it and guarantee that people with disabilities were not economically penalized for leaving social assistance programs. Most fundamentally, it would provide disability supports independently of income means testing and labour market status to ensure that the needs of the most vulnerable workers were addressed. [225] But it would also value those with disabilities involved in productive activity and contributions to society that did not translate into skills that were valued on the labour market. [226] Any new proposal or development must be critically assessed in light of these criteria.

## VII. CONCLUSIONS

In this article, I began by deconstructing the myth that the labour market was a self-regulating and autonomous phenomenon before examining the implications of the social model of disablement for the regulation of the workplace. The major implications of the social-political model of disablement for the legal regulation of workers with disabilities are two-fold. First, the social-political model mandates democratic control of the workplace with respect to both the conceptual and physical dimensions. Second, workers with disabilities are marginalized as subordinate and non-standard workers. Consequently, advocates of the social-political model must advocate a system of disability supports that is decoupled from labour market status in order to empower workers with disabilities to flourish.

The Manitoba Law Journal
Copyright (c) 2009 The Manitoba Law Journal
The Manitoba Law Journal

[225] Some policy analysts have started to make this argument. See Cameron Crawford, *Improving The Odds: Employment, Disability and Public Programs in Canada* (Toronto: Roeher Institute, 2004) at 105-08. See generally Alain Supiot *et al.*, *Beyond Employment: Changes in Work and the Future of Labour Law in Europe* (Oxford; Oxford University Press, 2001); Peter Auer & Bernard Gazier, eds., *The Future of Work, Employment and Social Protection: The Dynamics of Change and the Protection of Workers* (Geneva, Switzerland: International Labour Organization, 2002); Kerry Rittich, "Vulnerability at Work: Legal and Policy Issues in the New Economy,"(Ottawa, Law Commission of Canada, 2004).

[226] For preliminary thoughts on this idea, see generally Sunny Taylor, "The Right Not to Work: Power and Disability" (2004) 55:10 Monthly Rev. 30.