HON. RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| BOMBARDIER INC., <br><br> Plaintiff, <br><br> v. <br><br> MITSUBISHI AIRCRAFT CORPORATION, MITSUBISHI AIRCRAFT CORPORATION AMERICA INC., AEROSPACE TESTING ENGINEERING & CERTIFICATION INC., MICHEL KORWIN-SZYMANOWSKI, LAURUS BASSON, MARC-ANTOINE DELARCHE, CINDY DORNÉVAL, KEITH AYRE, AND JOHN AND/OR JANE DOES 1-88, <br><br> Defendants. | No. 2:18-cv-1543-RAJ <br><br> DECLARATION OF NIGEL WATERHOUSE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |

I, Nigel A. Waterhouse, declare as follows:

1. I am an individual and over the age of twenty one.  I have personal knowledge of the matters addressed herein.

2. This declaration is being submitted in support of Bombardier Inc.'s Motion for Preliminary Injunction that was filed in this matter.

DECLARATION OF NIGEL WATERHOUSE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 1

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

## BACKGROUND AND QUALIFICATIONS

3. I am currently the owner and president of Can-Am Aerospace Inc. based in Montreal, QC. My work consists of aeronautical engineering, design, analysis and certification of aeronautical products, aircraft modifications and repairs. I also work as a consultant to the aviation industry supporting and advising OEM's, specialized aircraft operators, airlines and government agencies in all aspects of aircraft certification.

4. I have been working as an aeronautical engineer specializing in aircraft design and certification since 1998. Prior to that, I worked as an aircraft maintenance engineer (airframes and engines) for 12 years and obtained a United Kingdom Civil Aviation Authority Aircraft Maintenance Engineers License in 1991.

5. In my 20 years of experience, I have been involved in approximately 70 aircraft certification programs, most of those were cradle-to-grave and covered structures, interiors, mechanical systems, avionics and electrical. I also gained an FAA Production Approval (FAA PMA) and played a major role in establishing the first independent EASA Design Approval Organization in Mainland China, of which, I was also a design and certification delegate.

## TASK REQUESTED OF ME

6. I was asked to review certain documents in connection with the above-captioned litigation matter. Specifically, I have been asked to review the Declaration of Stephen Mr. Boyd ("Mr. Boyd Decl.") submitted by the defendants in this lawsuit. I was asked to provide my opinion regarding the accuracy of the facts and opinions provided by Mr. Boyd.

7. In addition to Mr. Boyd's declaration, I have also reviewed the complaint in this matter, the declarations of Dan Burns, David Tidd, and Robert Hansman, and the exhibits attached thereto. Specifically, I have reviewed the documents attached to the declarations of Dan Burns and David Tidd (the "Bombardier Documents") which Bombardier has informed me contain proprietary and confidential trade secrets of Bombardier.

8. What follows is my opinion of Mr. Boyd's declaration.

DECLARATION OF NIGEL WATERHOUSE IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - 2

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

## GENERAL DISAGREEMENT WITH
## THE CONCLUSIONS IN THE MR. BOYD DECLARATION

9. Mr. Boyd's declaration misses the forest for the trees. In short, Mr. Boyd generally suggests that because the Bombardier Documents cite to other documents that are publicly available, somehow the Bombardier Documents are themselves not valuable to MITAC. That opinion is fundamentally flawed.

10. Some of the details provided by Mr. Boyd are accurate. For example, as Mr. Boyd acknowledges, "[t]he certification process is complex." Mr. Boyd Decl. at ¶ 17. To "show" compliance, an aircraft manufacturer must present sufficient evidence that a new airplane design complies with every regulation of the myriad regulations that apply to that design. Mr. Boyd Decl. at ¶ 35. And as Mr. Boyd demonstrates, the number of potentially applicable regulations is enormous. See Mr. Boyd Decl. at ¶ 15, Exhibit M.

11. In addition, "the methods applicants might use to show compliance (e.g., what kinds of data is [*sic*] needed, what analyses are effective, what testing techniques should be used) can also be extensive, complex, and challenging." Mr. Boyd Decl. at ¶ 35. For example, showing compliance with any one particular regulation can require numerous flight tests and experiments, all performed at various different regions of a subject aircraft's performance envelope (e.g., airspeed, altitude, acceleration, G-forces). Every one of those tests imposes an additional cost both in terms of money and time.

12. Presumably it is for these reasons that Alex Bellamy and Michel Korwin-Szymanowski, executives working on MITAC's MRJ project, "explained [that] it's almost impossible to understand the full certification criteria for an aircraft, if one has not been through it once or twice." Exhibit 15 to Denkenberger Declaration, Dkt. 1-10 at page 71.

13. Attempting to perform every one of the exorbitantly large number of potential tests that could be performed to prove compliance with every individual regulation that applies to a new airplane design would result in a certification process that is impossibly prohibitive both in cost and time. In short, the only way to navigate the enormously complex certification process in

DECLARATION OF NIGEL WATERHOUSE IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - 3

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

a timely manner and without exhausting an astronomical budget is to rely on experience and a proven track record of certifying aircraft. In other words, knowing what *not* to do is often more valuable than knowing what must be done. Likewise, knowing the particular flight parameters and performance metrics that are sufficient to show proper regulatory compliance enables the manufacturer to perform fewer flight tests while still engendering confidence in the regulatory authority that the aircraft is designed properly and airworthy. Fewer flight tests means less cost and less time to certification.

14. Mr. Boyd's declaration entirely ignores the realities of the certification process. By citing to countless regulations and publications that are generally available, Mr. Boyd describes a certification process which is completely unrealistic and which, in the real world, would never actually result in a clean-sheet aircraft achieving certification. As set out in Bombardier's complaint, MITAC knows very well the real-world difficulties of achieving certification without the benefit of a proven certification process. See Complaint at ¶¶ 34-48 (Dkt. 1).

15. The Bombardier Documents are extremely valuable to MITAC for those reasons. In just one example, the Bombardier Documents include "exhibits [that] identify the specific aircraft configurations that were used for testing (including the positioning of the inboard and outboard slats, flaps, ailerons, and landing gear), the particular airspeed calculation methodology employed during testing, schematics of the air data systems employed, and of course copies of the hard data that was gathered through testing." Burns Decl. at ¶ 17. Having that document would enable MITAC to drastically reduce the time and budget necessary to achieve compliance with applicable regulations by avoiding the time and expense of determining all those factors for itself. And as described in detail below, that information is still incredibly valuable to MITAC despite Mr. Boyd's position that the data pertains to a different aircraft.

16. For the foregoing reasons, it is my opinion that Mr. Boyd's declaration is flawed in its general position that the Bombardier Documents would not have been of significant value

DECLARATION OF NIGEL WATERHOUSE IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - 4

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

to MITAC as it attempts to navigate the highly complex certification process. Mr. Boyd's declaration simply mischaracterizes the true value of the Bombardier Documents.

## SPECIFIC INACCURACIES IN THE MR. BOYD DECLARATION

17. Mr. Boyd's declaration is not only incorrect in its generalities, it is also incorrect in its specifics as well. What follows are several material inaccuracies which, in sum, render Mr. Boyd's declaration at best misleading.

18. Mr. Boyd incorrectly states that "safety is not a competitive issue" and "manufacturers and other members of the aviation industry work closely with each other and with the regulatory authorities to develop and share safety-related information. This includes information about certification." Mr. Boyd Decl. at ¶ 12.

19. In fact, safety is a very competitive issue. Aircraft manufacturers that build safer aircraft have a competitive advantage and this is used as leverage in marketing, "Every Learjet is better than the last. We continually rethink and reinvent the design to integrate the most advanced technologies. For you, that means **a safer and more reliable aircraft**." Ref: Bombardier Learjet 70 marketing information https://businessaircraft.bombardier.com/en/aircraft/learjet-70#!#bba-pdp-section-1.

20. "Bombardier's proven fly-by-wire system has been engineered with intent to maximize safety through a balanced design that combines control input freedom with the security of the industry's most complete flight envelope protection." Ref: Bombardier Global 7500 marketing information https://businessaircraft.bombardier.com/en/aircraft/global-7500#!#bba-pdp-section-3.

21. Mr. Boyd is wrong when he suggests that certification data is freely available from the certifying organization. Neither the FAA nor Transport Canada share proprietary data with the general public or other aircraft designers/manufactures. These types of documents fall under an exception to the Access to Information Act.

DECLARATION OF NIGEL WATERHOUSE IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - 5

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

22. Mr. Boyd declares in ¶ 52 that the FAA policy would not include the applicant's positions or specific tools, analyses or computations. Mr. Boyd also states:

> It is important to note that each applicant must submit system description information, analyses, and tests results that show the design meets the regulatory requirements. This cannot be done by simply copying another approved design from another manufacturer and claiming compliance via similarity to that other design. Copying or "reverse engineering" another applicant's design is not sufficient, since such an approach does not produce the required certification/compliance data that was used in substantiating compliance for the other applicant's approved design.

Mr. Boyd Decl. at ¶ 25.

23. Mr. Boyd incorrectly states that compliance cannot be shown by copying another approved design from another manufacturer and claiming compliance via similarity to that other design. There are several official FAA guidance documents that clearly state similarity is an acceptable means of compliance (MOC). Any data obtained by one manufacturer from another may be used to obtain certification credit regardless of how that data was obtained. Based on this alone, it can be shown that the Bombardier Documents are extremely useful and valuable to MITAC.

24. Mr. Boyd also states that: "The information in the sealed exhibits would be of little value to MITAC, because 1) many of the technical issues are well-understood by industry and are documented in various publicly available technical resources, or 2) the information is unique to each specific airplane model (such as analysis and test results)." Mr. Boyd Decl. at ¶ 63.

25. This statement is a gross generalization and is incorrect. The information contained in the sealed exhibits consists of formulae, compilations, methods, techniques and processes that represent decades of work, experience, and significant expense on the part of Bombardier. The business of aircraft design, development, certification and manufacturing is extremely complex and expensive and most successful aircraft manufacturers have a long pedigree upon which their current activities are based. Bombardier's foundation is built upon

DECLARATION OF NIGEL WATERHOUSE IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - 6

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

experience going back as far as 1928 with the foundation of de Havilland Aircraft of Canada Ltd with facilities based in what is now the Downsview area of Toronto, Ontario, Canada. This represents nine decades of experience.

26. Mr. Boyd also states in ¶ 63 of his declaration that: "the topics in the sealed exhibits generally represent niche issues that are either not representative of the major challenges in airplane design and certification or are unrelated to airplane certification." This is demonstrably incorrect as all the Burns exhibits are directly related to aircraft certification by both title and/or content. The Burns exhibits C, D, E, F, G, H contain a statement of compliance for the CS300 Commercial Aircraft with the pertinent certification type approval requirements. They address applicable regulatory requirements as they relate to the specific topic of each report. These reports contain a compilation of the specific relevant airworthiness requirements and the methods, techniques, formulae, devices and processes by which compliance has been shown. The use, collection, generation and assimilation of this data have come at the great expense, effort and time of Bombardier over a period up to 90 years. Therefore, this data would not be otherwise readily ascertainable by proper means.

27. Even if the topics in the Burns exhibits are directed to niche issues, the format, layout and general content of the reports are of value and can be applied to all type certification reports, regardless of the aircraft type or system. These aspects of the reports are also the result of considerable expense and experience in dealing with regulatory challenges, issues and agencies such as the FAA, EASA and Transport Canada. In the proper hands, these reports will afford MITAC considerable savings in time and expense because the certification approach would apply to other aircraft including the MRJ.

28. The Burns exhibits I and J describe a flight profile used to verify aircraft and systems build and function in a Production Flight Test environment. These tests are for the purpose of, and directly related to, aircraft type certification. The content and format of these test profiles is a compilation of techniques and methods skillfully assimilated from various sources over decades and at great expense. To an inexperienced aircraft manufacturer, they are

DECLARATION OF NIGEL WATERHOUSE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 7

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

of great value as at least a point of reference and guidance based on a recent and successful Part 25 aircraft type certification program.

### Burns Sealed Exhibits A & B Presentations on the Skew Detection System (SDS)

29. In ¶ 64, Mr. Boyd states that: "MITAC would gain little by access to the information in these exhibits, because most of it is either in the public domain, is dependent upon other Bombardier information that is not publicly available or is analysis or test result data that would not apply to a different airplane." I strongly disagree with this statement as Exhibits A & B form the basis of a confidential discussion with Transport Canada revealing details of analysis and simulation techniques and failure cases. Also revealed is Bombardier's approach for the revised skew detection methodology, for Safety Of Flight and Type Certification configuration.

30. Pages 30 and 31 reveal the certification basis in the High Lift Certification Plan. Certification plans are extremely valuable and time consuming to complete. An approved certification basis is the result of countless hours of research though numerous and complex airworthiness requirements and negotiations with the regulatory authorities. The concise certification basis compiled on page 31 is the result of Bombardier's decades of experience in designing certifiable systems amounting to hundreds of millions of dollars in expense. A cognizant systems engineer having access to an approved certification basis, such as this, along with the corresponding qualification and environmental test plan details would gain a significant advantage and would be provided with a high level of comfort in his own design and certification compliance efforts. In the proper hands, this would afford MITAC significant time and cost savings.

31. The certification basis described in this report applies to all Part 25 aircraft being developed in this era, regardless of whether MITAC decides to use a similar system. Also, whether access to this information obviates the need to start from scratch does not diminish the value of such a document.

DECLARATION OF NIGEL WATERHOUSE IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - 8

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

32. Mr. Boyd states in his conclusions on page 35, "Of course, MITAC may benefit from awareness of the general design principles, installation, and performance of the CRJ-series SDS." What Mr. Boyd fails to recognize is that the real benefit to MITAC is in the correlation between the certification information and the general design principles, installation, and performance of the CRJ-series SDS. In the proper hands, this correlation is both valuable and transferable to other aircraft manufacturers.

**Burns Sealed Exhibits C and F - Certification Report Reduction Of Temperature, Airspeed, Altitude And Mach Number Errors**

33. In ¶ 65, Mr. Boyd states: "MITAC would gain little by access to the information in these exhibits, because much of it is in the public domain. The technical concepts have been well-understood by the aviation community for many decades and are documented in publicly available sources, as are the test methods used to do the actual measurements. Furthermore, the error correction methods claimed to be 'Bombardier's proprietary methodology' were identified in these exhibits as having been provided by their air data probe supplier, UTAS."

34. I strongly disagree with this statement as Exhibits C and F are more than a mere collection of public domain material, they are Certification Reports that make statements of compliance for the CS100 Commercial Aircraft with the pertinent certification type approval requirements. They represent a subset of applicable regulations regarding the airspeed indicating system, the static pressure systems, and the air temperature indicator. That subset was chosen by Bombardier based on its decades of experience and testing.

35. The challenge with an aircraft certification program is not limited to developing test methods. The challenge includes establishing an appropriate certification basis and developing effective means and methods of showing compliance with the accepted certification basis. Bombardier has developed this expertise through decades of experience and at considerable expense. The certification process is extremely complex and time consuming. The concise certification basis compiled by Bombardier and the demonstration of compliance is the

DECLARATION OF NIGEL WATERHOUSE IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - 9

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

result of Bombardier's decades of experience in designing certifiable systems and aircraft amounting to hundreds of millions of dollars in expense. This is the inherent value of Exhibits C and F. They are a compilation of all that is required to establish a certification basis and plan and effectively show compliance. This is the result of the skillful assimilation and compilation of the so-called "public domain" information.

36. As previously stated, developing and negotiating a certification plan that is acceptable to the regulatory authorities along with acceptable means and methods of showing compliance is often more complicated and challenging than developing the system to be certified. Exhibits C and F provide information on the applicable airworthiness regulations, the methods and techniques of showing compliance and the presentation of the test results that show compliance in an acceptable format. This information combined with the available FAA guidance material provides invaluable data that can be used to considerable advantage by MITAC; affording them considerable savings in both cost and time.

**Burns Sealed Exhibits E and H - Type Certification Report Data Reduction of Ground Position Errors**

37. In ¶ 66, Mr. Boyd states: "MITAC would gain little by access to the information in these exhibits, because much of it is either in the public domain, is dependent upon other Bombardier information that is not publicly available or is analysis or test result data that would not apply to a different airplane. For some of the key information, Bombardier is not the source; it was derived from a document produced by a different airplane manufacturer."

38. I strongly disagree with this statement as Exhibits E and H of the Burns declaration are more than a mere collection of public domain material; they are Certification Reports that make statements of compliance for the CS100 Commercial Aircraft with the pertinent certification type approval requirements. They address the requirements of applicable regulations regarding the airspeed indication system during accelerated takeoff ground run. The performance model described was used for the CS100 CAFM data expansion.

DECLARATION OF NIGEL WATERHOUSE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 10

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

39. The challenge with an aircraft certification program is not limited to developing test methods. The challenge is in establishing an appropriate certification basis and developing effective means and methods of showing compliance with the accepted certification basis. Bombardier has developed this expertise through decades of experience and at considerable expense. The certification exercise is extremely complex and time consuming. The concise certification basis compiled on page VII and the demonstration of compliance in section 5 is the result of Bombardier's decades of experience in designing certifiable systems and aircraft amounting to hundreds of millions of dollars in expense. This is the value of Exhibits E and H. They are a compilation of all that is required to establish a certification basis and plan and effectively show compliance. This is the result of the skillful assimilation and compilation of the so-called "public domain" information.

40. As previously stated, developing and negotiating a certification plan that is acceptable to the regulatory authorities along with acceptable means and methods of showing compliance is often more complicated and challenging than developing the system to be certified. Exhibits E and H provide information on the applicable airworthiness regulations, the methods and techniques of showing compliance and the presentation of the test results that show compliance in an acceptable format. This information combined with the available FAA guidance material provides invaluable data that can be used to considerable advantage by MITAC; affording them considerable savings in both cost and time.

41. In ¶ 66(a), Mr. Boyd states one of the reasons Exhibits E and H are of no value to MITAC is because it is analysis or test result data that would not apply to a different airplane. In the same section he also states: "For some of the key information, Bombardier is not the source; it was derived from a document produced by a different airplane manufacturer." In ¶ 66(e), Mr. Boyd states: "The specific test conditions would need to be individually determined for each type of airplane, so knowledge of one airplane manufacturer's test conditions would be of limited value to another manufacturer." He further states: "the methods used by Bombardier were directly taken from a [competitor's] document, so they do not appear to be exclusively owned by

DECLARATION OF NIGEL WATERHOUSE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 11

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Bombardier." This is an apparent contradiction of his own statements. Mr. Boyd claims that knowledge of one airplane manufacturer's test conditions would be of limited value to another manufacturer, yet he points out that Bombardier successfully used another aircraft manufacturer's data. It is reasonable to conclude that the other manufacturer's data is transferable and adaptable. The same applies to the potential use of Bombardier data by MITAC. This method of "copying" is known and accepted by the FAA as discussed above.

**Burns Sealed Exhibits D and G - Type Certification Report Lag Effects in the Production and Experimental Pitot-Static Systems**

42. In ¶ 67, Mr. Boyd states: "MITAC would gain little by access to the information in these exhibits, because most of it is based on technical data that has been well understood by the aviation community and in the public domain for many decades, or it is detailed test results that would only apply to the specific airplane being tested."

43. I strongly disagree with this statement as Exhibits D and G are more than a mere collection of public domain material, they are Certification Reports that make statements of compliance for the CS300 Commercial Aircraft with the pertinent certification type approval requirements. It addresses the requirements of applicable regulations regarding air data system lag.

44. The challenge with an aircraft certification program is not limited to merely developing test methods. The challenge is in establishing an appropriate certification basis and developing effective means and methods of showing compliance with the accepted certification basis. Bombardier has developed this expertise through decades of experience and at considerable expense. The certification exercise is extremely complex and time consuming, requiring many expensive hours of flight testing. The concise certification basis compiled on page VI and the demonstration of compliance in the report is the result of Bombardier's decades of experience in designing certifiable systems and aircraft amounting to hundreds of millions of dollars in expense. This is the value of Exhibits D and G. They are a compilation of all that is

DECLARATION OF NIGEL WATERHOUSE IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - 12

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

required to establish a certification basis/plan and effectively show compliance. This is the result of the skillful assimilation and compilation of the so called "public domain" information.

45. As previously stated, developing and negotiating a certification plan that is acceptable to the regulatory authorities along with acceptable means and methods of showing compliance is often more complicated and challenging than developing the system to be certified. Exhibits G and D provide information on the applicable airworthiness regulations, the methods and techniques of showing compliance and the presentation of the test results that show compliance in an acceptable format. This information combined with the available FAA guidance material provides invaluable data that can be used to considerable advantage by MITAC; affording them considerable savings in both cost and time.

46. In ¶ 67(e), Mr. Boyd concludes that: "Lag effects in air data systems is a well-understood phenomenon and there is a large amount of publicly available information on what it is, how it is measured, and how the errors can be managed. Any test results would only apply to the tested airplane and could not be 'reused' by MITAC, which would need to conduct their own testing." I disagree with that conclusion because whether MITAC could use this data to obviate its own need for testing is not the point. The point is that Exhibits D and G provide at least an approved point of reference for the certification of aircraft pitot static systems. They provide a certification basis, a method, approved results, a report structure and format that is known and accepted by the regulatory authorities. Use of these reports save MITAC the effort of compiling this information themselves. This is an advantage and value.

**Burns Sealed Exhibits I and J - C Series CS100/300 Production Flight Test Profile**

47. In ¶ 68, Mr. Boyd states: "MITAC would gain little by access to the information in these exhibits, because the overall strategy depicted is publicly available and the details are dependent on the details of the specific airplane (i.e. not directly transferable to a different model)."

DECLARATION OF NIGEL WATERHOUSE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 13

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

48. I disagree with this statement because those exhibits are Transport Canada-approved flight test profiles that contain detailed, step-by-step instructions that can be applied to any transport category (Part 25) aircraft. Whether or not the information is directly transferable to a different model is not the point. The point is, the document is Transport Canada-approved. This approval covers the entire document, it details data, methods, configurations and format. It can be easily adapted to any Part 25 aircraft and used as a reference in MITAC's plan. This alone gives the document value to MITAC in terms of what is presented to the FAA and the reduced effort on the part of MITAC to produce such documents.

49. The details, layout and contents of such documents are important to regulators and manufacturers, as a good layout and format contributes to an effective, efficient and, more importantly, a safe execution. In ¶ 68(d), Mr. Boyd states the information contained in the plan can be considered valuable to another manufacturer to the extent that the specific, detailed procedures would be applicable to the other manufacturer's airplane and this is the whole point. In the same paragraph, Mr. Boyd equates the Bombardier 109-page approved production test plan to a single slide of a 12-slide power point deck intended as a free information lecture (*i.e.*, part of the Hamburg Aerospace Lecture Series). That is simply not a proper comparison.

**The Tidd exhibit A - Aerodynamics / Flight Performance (Aero) CAFM Calculation Methodology**

50. Exhibit A to the Tidd declaration contains compilations, formulae, programs and algorithm information, methods and techniques that are required to produce a Computerized Airplane Flight Manual. Airplane flight manuals are complex and exhaustive documents in which format and content are critical. The information and data contained within this exhibit have been produced by Bombardier, based on decades of experience in the design and development of large complex aircraft. Producing such documents is time extremely consuming and expensive. The information contained within this document can be adapted and used to

DECLARATION OF NIGEL WATERHOUSE IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - 14

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

produce or aid in the production of a computerized or conventional Airplane Flight Manual or aid in the verification of a flight manual currently in the production, draft or review stage.

51. There is FAA guidance material available that relates to airplane flight manuals. As with most FAA guidance material, only basic information is provided. The Tidd Exhibit A provides incredibly useful details not found elsewhere. The two documents combined provide a significant reference and starting point to any group tasked with producing a flight manual for a complex transport category aircraft such as the MRJ. For this reason, the Tidd Exhibit A is a high value document to MITAC.

## CONCLUSION

52. I earn my living by working as an aircraft certification expert. The documentation I produce consists of certification plans, test plans, test reports, substantiation reports, flight manual documents, aircraft maintenance documents, engineering drawings, and various analytical documents. These are all required in order to gain a type certificate. Some of those documents are required by the aircraft operator, and these documents are listed on the type certificate. For instance, documents such as the airplane flight manual and maintenance manual may be listed on the type certificate. However, the documents that are used to show and make findings of compliance are proprietary to me and I consider them my trade secrets, as they reveal how I do my work.

53. I do not disclose certification plans, test plans, test reports, substantiation reports, analytical or test methods to clients except under exceptional circumstances and I have never knowingly disclosed such documents to a competitor.

54. It is common practice in this business for employees to steal data, documents, test plans, etc. to gain an advantage for themselves either directly or for a future employer. This practice is extremely damaging to a business as it gives competitors insight into how the work is done and enables those competitors to gain an advantage.
DECLARATION OF NIGEL WATERHOUSE IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - 15

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

55. In my opinion and based on my experience, all of the Bombardier Documents have value to any organization involved in the design, certification and/or manufacture of aircraft, including MITAC.

56. For all the foregoing reasons, it is my opinion that Mr. Boyd's declaration is fatally flawed both in its general conclusions as well as the underlying factual bases for many of his statements.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED at Montreal, QC, Canada, this 4th day of January, 2019.

Nigel A. Waterhouse, President
Can-Am Aerospace Inc.

DECLARATION OF NIGEL WATERHOUSE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 16

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Certificate of service

I hereby certify that on January 4th, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

s/ John D. Denkenberger
John D. Denkenberger, WSBA No.: 25,907
Brian F. McMahon, WSBA No. 45,739

Christensen O'Connor Johnson Kindness PLLC
1201 Third Avenue, Suite 3600
Seattle, WA 98101-3029
Telephone: 206.682.8100
Fax: 206.224.0779
E-mail: john.denkenberger@cojk.com, brian.mcmahon@cojk.com, litdoc@cojk.com

*Attorney for Plaintiff Bombardier Inc.*

DECLARATION OF NIGEL WATERHOUSE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 17

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100