# EXHIBIT A



**WESTLAW**

🟨 **Most Negative Treatment** .
   📄 Original Image of 2007 QCCA 676, 2007 CarswellQue 3978 (PDF)

2007 QCCA 676
🟨 **Belisle Scientific Concentrates Inc. c. Lyrco Nutrition Inc.**
Court of Appeal of Quebec  |  May 14, 2007  |  2007 QCCA 676, 2007 CarswellQue 3978    *(Approx 33 pages)*

Belisle Scientific Concentrates Inc. c. Lyrco Nutrition Inc.

2007 CarswellQue 3978, 2007 QCCA 676, 164 ACWS (3d) 987, JE 2007-1062, DTE
2007T-440, EYB 2007-119488

Bélisle Scientific Concentrates Inc., Appellant-Plaintiff, and Bélisle
Solution Alimentar Inc., Appellant of Redetermination, c. Lyrco Nutrition
Inc., David Régis Bonneau, Yves Benoît, Luc Nadeau, The Kennels Benoît
and Nadeau enr., Management Benoît and Nadeau Inc., Marthe Bénard
and Gary Bélanger, Respondents-defendants

JCA Hilton, Bich JCA, Dufresne JCA

Hearing: 22 November 2005
Judgment: May 14, 2007
Record: CA Que. Montreal 500-09-014165-047

Counsel: *André Johnson* , for the appellant
*Michel Parent* , for the respondents

Subject: Labor ; Employment ; Public

**Bich JCA, Dufresne JCA, Hilton JCA** :

1 THE COURT, Deciding on an appeal from a judgment dated December 17, 2003, of the
Superior Court, District of St. François (the Honorable Léo Daigle), dismissing, with costs,
the action for damages brought the appellant against the respondents and partially
accepting the counterclaims of some of them;

2 Having studied the case, heard the parties and deliberated;

3 For the reasons of Bich JA, concurred in by Hilton and Dufresne JJ .:

4 With respect to the appellant's dismissal of the appellant's action against the
respondents, DISMISSES the appeal, with costs, except with respect to the finding at
paragraph 124 of the trial judgment, which is struck out and replaced by the following
conclusion:

> [124] REJECTS the action of SCIENTIFIC CONCENTRATES BÉLISLE INC. with costs
> in favor of the defendants grouped as follows: DAVID RÉGIS BONNEAU, YVES
> BENOÎT, LUC NADEAU and LYRCO NUTRITION INC. including his expert fees of $
> 32,059.77; THE BREEDS BENEDICT AND NADEAU ENR. and BENOIT
> MANAGEMENT AND NADEAU INC .; MARTHE BÉNARD and GARY BÉLANGER.

5 With respect to the appeal of the convictions resulting from the counterclaims of the
respondents, WELCOMES the appeal, with costs, for the sole purpose of subtracting $
10,000 from each of the amounts in paragraphs 126, 127 and 128 of the judgment of first
instance, so that these paragraphs now state that:

> [126] CONDEMNED SCIENTIFIC CONCENTRATES BÉLISLE INC. to pay DAVID
> RÉGIS BONNEAU the sum of $ 6,699.45 with the legal interest and the additional
> indemnity provided for in article 1619 CCQ as of December 22, 1994.

[127] CONDEMNED SCIENTIFIC CONCENTRATES BÉLISLE INC. pay YVES BENOÎ T the sum of $ 13,321.23 with the legal interest and the additional indemnity provided for in article 1619 CCQ as of December 22, 1994.

[128] CONDEMNED SCIENTIFIC CONCENTRATES BÉLISLE INC. pay LUC NADEAU the sum of $ 3,270 with the legal interest and the additional indemnity provided for in article 1619 CCQ from December 22, 1994.

*Bich JCA* :

6 The appeal raises mainly the question of the interpretation and the application of article 2088 CcQ

### I. PRELIMINARY REMARKS

7 The appeal was initially formed by Bélisle Scientifique Concentrates Inc. It became Bélisle Solution- Nutrition Inc., which took over the proceeding on April 18, 2006, following the appeal hearing.Nevertheless, in the pages that follow, I will refer to the appellant using a shortcut from her previous name, namely " Concentrates ".

8 For the sake of brevity and except for exceptions, I will refer to the natural persons referred to in the following pages using their only surname. Finally, when I talk about witness Bélisle , I will point out, unless otherwise indicated, Pierre Bélisle , former chief executive officer of Concentrés , and not his son Philippe Bélisle , who also testified.

### II. PROCEDURAL CONTEXT

9 In August 1994, Concentrés brought an action for damages, on the ground of unfair competition, against five ex-employees, the respondents Bonneau, Benoît, Nadeau, Bénard and Bélanger, as well as against three companies to which some of them are linked. Bonneau, Benoît and Nadeau are shareholders of Lyrco Nutrition inc. (" Lyrco "); Benoît and Nadeau operate Les Élevages Benoît and Nadeau enr. ("Elevages") and they are also the shareholders of Gestion Benoît and Nadeau inc. ("Management").

10 From amendment to amendment, Concentrés' claim at first instance ends with a total of $ 1,487,434, namely:

• $ 74,937 for the losses that Concentrés alleges to have suffered as a result of the unfair acts committed by Bonneau, Benoît, Nadeau, Bénard and Bélanger, directly or through Lyrco , Élevages et Gestion, prior to the termination of their contract of respective work in May 1994;

• $ 1,357,497 for losses that Concentrés alleges to have suffered as a result of the unfair competition to which Bonneau, Benoît, Nadeau, Bénard and Bélanger, directly or through Lyrco , Élevages et Gestion, would have committed after the termination of the employment contract of each, until December 31, 1994;

• $ 30,000 (at least) for extrajudicial costs incurred by Concentrates because of the unfair behavior of the respondents;

• $ 15,000 for damage to the reputation of Concentrates ;

• $ 10,000 for the use without right of data belonging to him.

11 At the appeal hearing, Concentrés' counsel states that his client no longer claims the extra-judicial fees of $ 30,000, nor the damages of $ 15,000 for damage to the reputation, nor the damages of $ 10,000 related to the use of certain data. He explains that he is no longer demanding damages for the decline in sales of Concentrates ( *ie* the losses incurred by it due to the unfair competition of the Respondents). In addition, it reduces the amount by $ 200,000 to reflect the fact that some of the clients served by the respondents were not regular clients of Concentrates .

12 In the case of Concentrés , the respondents filed a defense and counterclaim (also amended). Respondents deny any unfair act and unfair competition. Three of them also claim various claims against Concentrates. Believing that they were dismissed without a serious reason in May 1994, Bonneau, Benoît and Nadeau each claimed the payment of an indemnity in lieu of a notice period, according to article 2091 CCQ ($ 75,000 in the Bonneau case, 127,500 $ in Benoît's and $ 90,000 in Nadeau's). They also claim the payment of commissions and bonuses that would not have been paid at the time of their departure ($ 6,699.45 in the case of Bonneau, $ 13,321.23 in that of Benoît and $ 3,270 in

that of Nadeau). In addition, they claim substantial damages for damage to the reputation ($ 50,000 each) and for disturbances, inconveniences and abuse of rights ($ 100,000 each). The Respondent Management claims $ 3,456.11 in interest payments on a line of credit, interest that Concentrates would have been required to pay for the period from September 1993 to May 1994.

### III. JUDGMENT OF FIRST INSTANCE

13 The trial judge dismisses the action of Concentrés , finding, on the one hand, that it has not proved the unfair competition it blames the respondents and, on the other hand, that rather, it has brought an action against them for the purpose of unduly neutralizing their activities.

14 In summary, according to the judge, the respondents Bonneau, Benoît and Nadeau did not, during their employment, breach their obligation of loyalty, did not compete with Concentrés and did not put themselves in the latter in a situation of conflict of interest. Instead, the judge attributes to Laurier Paré, the appellant's general manager, the responsibility for the deterioration of the relationship between the parties: Paré, whose testimony the judge does not believe, would have poisoned what was only a misunderstanding , pinned a minor incident (about a certain Valère Lieutenant and the wife of the latter) and makes believe the CEO of Concentrates , Pierre Bélisle, "That its best sellers are unfairly competing with it from the FARMING facilities, while they are only carrying out operations previously promoted by CONCENTRATES " [1] . The judge is of the opinion that Bonneau, Benoît and Nadeau were dismissed "under the false pretext of the activities of LYRCO and because of the leadership they confirmed by setting up a union that would upset the objective of CONCENTRATES to modify their working conditions without negotiation " [2] .

15 Moreover, according to the judge, the appellant did not prove any unfair act on the part of the respondents Bénard and Bélanger who, without being accused of having participated in a conspiracy against the appellant , simply followed Bonneau, Benoît and Nadeau after their dismissal. At paragraphs 102 and 103 of his judgment, the judge wrote that:

> [102] CONCENTRÉS did not explain why she sued BÉNARD and BÉLANGER who decided to follow their immediate boss because of the climate at CONCENTRÉS after their dismissal: they had played no part in their decision to set up LYRCO and had no participation in MANAGEMENT and LIVESTOCK.

> [103] These defendants were associated with the alleged conspiracy of BONNEAU, BENOÎT and NADEAU by CONCENTRATE, which did not offer any reliable material evidence on this subject: it will have to suffer the consequences.

16 Finally, the judge apparently considers that the evidence does not reveal any unfair behavior of the respondents after the dismissal. The judge is rather convinced that Concentrés brought his action for the malicious purpose of harming a competitor. He writes that:

> [118] The prosecution of CONCENTRÉS as presented had all the appearance of a well-founded and bona fide remedy whose cause seemed reasonable and probable. It was only at the trial that his bad faith and his temerity became obvious by the proof of the pretext that made his claim inadmissible being itself guilty of having dismissed BONNEAU, BENOÎT and NADEAU for trade union activities.

> [119] One conclusion is necessary: CONCENTRÉS had only one objective when it began its prosecution on the basis of this false pretext of unfair competition: to neutralize the organization of LYRCO whose activities took importance to harm its shareholders, their employees BÉNARD and BÉLANGER as well as MANAGE and LIVESTOCK.

17 The judge therefore rejects the action of Concentrés .

18 It also only partly allows the respondents' counterclaim. First, he concludes that the real reason for the dismissal of Bonneau, Benoît and Nadeau lies in the fact that the latter wanted to form a union after Concentrés announced to all sellers of the company his intention to change their remuneration (which would have changed from a commission-based salary to a fixed salary) and to abolish or at least restrict the principle of exclusivity which they enjoyed until then in their respective sales territories. The judge is of the opinion that Bonneau, Benoît and Nadeau's appeal against this dismissal was therefore governed by sections 14 and 15 of *the Labor Code.* and was therefore within the exclusive jurisdiction

of what was then the labor commissioner. For this reason, he rejected Bonneau's application, Benoît and Nadeau, who claimed from Concentrés an indemnity equivalent to the time off which they would have been deprived of by dismissal. It will be noted immediately that since Bonneau, Benoît and Nadeau did not appeal this rejection, the question is not before the Court.

19 The judge also concludes that Bonneau, Benoît and Nadeau have failed to prove any damage to their reputation: their claim under this head is therefore dismissed. The interested parties did not appeal this rejection.

20 The judge, however, condemns Concentrés to pay to Bonneau, Benoît and Nadeau the amount of the commissions and bonuses that they claim to have been due to them at the time of their dismissal, that is to say, $ 6,699.45 for Bonneau, 15 $ 321.23 for Benoît (this amount is marred by a clerical error, Benoît claimed $ 13,321.23 [3] ) and $ 3,270 for Nadeau [4] . It further condemns Concentrés to pay each of them a sum of $ 10,000 in compensation for the inconvenience resulting from the action. Of the total, it grants interest at the statutory rate and the additional indemnity as of December 22, 1994.

21 Finally, the judge concludes that Concentrés owes Management the sum of $ 3,450.11.

### IV. CALL AND MEANS OF APPEAL

22      Concentrés appeals this judgment, which it alleges is vitiated by numerous errors of law and numerous manifest and dominant errors of fact, the latter resulting from a misunderstanding of the law by the judge. In fact, in a 47-page affidavit, she asks the Court to re-try the trial and urges her to treat all of the evidence in the trial record on its own merits and to analyze it. again in the light of the very arguments that have already been debated.

23 His main thesis can be summarized as follows. Beginning at least with the creation of Lyrco (in 1993), a company whose constitution was initially kept secret, Bonneau, Benoît and Nadeau, key employees of Concentrés , conspired against it, planning their departure, diverting directly or indirectly a part of the clientele of their employer towards Lyrco , unduly enlarging, for this purpose, the activities of Livestock and Management and exceeding the limits of the authorization which they had in this regard given Concentrés . They even competed with their employer by having Lyrco manufacture and sell products identical to those of Concentrates, using in addition one of the brands of the latter ("BB Courseur"). When Concentrés , aware of their activities, demanded their cessation, Bonneau, Benoît and Nadeau refused to comply, hence their dismissal, fully justified, of May 1994.

24      Bénard and Bélanger participated in this conspiracy, first by selling Lyrco products while they were still using Concentrates, and then by resigning from it at once to join Lyrco a few days later. the dismissal of Bonneau, Benoît and Nadeau.

25 Subsequently, the five respondents, realizing the diversion project initiated on the job, continued to compete Unfairly Concentrates , in particular by making use of data belonging to Concentrés and concerning its customers, by serving without reserve or reluctance, continuing to sell certain products identical to those of Concentrés and illegally borrowing its brand "BB Courseur".

26      Concentrés also challenges all the monetary convictions pronounced against it in favor of Bonneau, Benoît and Nadeau, including costs.

27 The respondents, for their part, rely primarily on the judgment at trial, emphasizing that the Court should not intervene in a case which is based primarily on the manner in which the judge assessed the documentary and testimonial evidence and, above all, , the credibility of the witnesses. The judge did not give weight to the testimony of Bélisle , former CEO of Concentrés , and Paré, his sales manager at the time. The Court can not review this assessment, which is not vitiated by any obvious and overriding error.

28 Moreover, according to the respondents, it is clear from the evidence that Bonneau, Benoît and Nadeau, during the course of their employment with Concentrés and until the very moment of their dismissal, were excellent salesmen, who reported a great deal to their employer, whose interests they have always served. All Breeding and Management activities have been endorsed and licensed by Concentrés , who can not now complain about what she herself has allowed. The same is true of Lyrco's activities , which did nothing more than Bonneau himself previously did in another way, with the permission of Concentrés and to his knowledge.

29 According to the respondents, it was Concentrés who, in January 1994, with the arrival of Paré, his new sales manager, attempted to change the rules of the game and to prohibit Bonneau, Benoît and Nadeau from had always been allowed and Paré himself had first approved, before changing his mind.

30 Bonneau, Benoît and Nadeau claim to have never concealed anything from Concentrés and to have acted in an open and transparent manner at all times.

31 According to the respondents, the accusations made to Bénard and Bélanger, who could freely leave Concentrés to join Lyrco after the dismissal of their former co-workers , are equally unfounded .

32 Finally, with respect to the post-dismissal period, the respondents allege that they did not commit any act of unfair competition. They say that they can not be blamed for having served Concentrates' customers or a part of them, since it is the customers themselves who, without being solicited or pushed in any way by the respondents, decided to follow after their dismissal. As for the data relating to Concentrés' customers , the evidence shows that it is the customers themselves who keep them in their hands: the Respondents can not be held responsible for the fact that Concentrés has, according to him, been unable to recover these data. .

## V. ANALYSIS

### 1. Reminder of the standard of intervention on appeal

33 Given the nature of the litigation and the grounds of appeal, it is first necessary to recall the standard that governs the intervention of this Court.

34 This standard is well known: a court of appeal may review the judgment of first instance where it is tainted by an error of law (unless it has no effect on the outcome of the dispute) or when the Trial judge erred in fact palpable and overriding, including by removing vital evidence or pulling the evidence clearly mistaken conclusions, unreasonable or unsupported [5] . The reservation is therefore necessary, particularly when the factual determinations of the judge depend on his assessment of the evidence and the credibility of the witnesses.

Considering this standard, I conclude that the appeal must be dismissed, except for one of the monetary convictions pronounced against it ( *ie* damages for the harm resulting from an abuse). For the rest, in fact, Concentrés failed to show any error of law of such a nature as to influence the outcome of the litigation or manifest and overriding error of fact.

36 I wish to make it clear that the following pages may give the impression that I am yielding to the appellant's invitation to resume the trial, which is not the nature of an appeal. Given that the appellant criticizes the Judge for the errors of law which would have decisively affected his understanding and appreciation of the evidence of the facts and in view, above all, of the manner in which the arguments in support of this allegation were presented, he it seemed necessary to review the whole file, to find the absence of the alleged error (except on one or two points without much consequence). Having done the exercise, I thought it good to express it and also to express the path that led me to this conclusion. C '

### 2. Duty of loyalty: general state of the law

37 Since the dispute concerns essentially the interpretation and application of article 2088 CCQ and the various aspects of the duty of loyalty incumbent on the employee and the former employee, it is necessary to briefly recall the state of the law. right in the matter.

38 Confirming the earlier right and specifying it, article 2088 CCQ states that:

> **2088.** The employee, in addition to being required to carry out his work with prudence and diligence, must act with loyalty and not make use of the confidential information he obtains in the performance or on occasion from his work.
>
> These obligations survive for a reasonable period of time after termination of the contract, and survive at all times when the information relates to the reputation and privacy of others.

39 During the course of a contract of employment, the first paragraph of this provision imposes on the employee a rather heavy obligation, particularly in the case of a key employee or in the case of an employee enjoying wide professional latitude, loyalty. being

commensurate with the employer's confidence. The outline of this duty of loyalty could be summarized as follows [6] : since he does not work on his own but for the employer, who alone has the fruits of labor, the employee must not harm or hinder the enterprise in which he participates; he must give precedence (in the context of work) to the interests of the employer over his own; he must not place himself in a situation of conflict of interest (which could lead him to favor the interest of third parties or his own rather than that of the employer); he must behave at all times with the utmost honesty towards the employer, can not appropriate the material or intellectual property of the latter or use them unduly to his advantage.He can not, of course, hijack the employer's clientele or usurp his or her business opportunities or those of third parties, and so on. In some contexts, even in the absence of a clause to that effect, the duty of loyalty may require the employee to have exclusive services, although this is not generally the case.

40 The employer can of course allow the employee gestures or behavior that would otherwise be prohibited him [7] .

41 The obligation of loyalty imposed by the first paragraph of section 2088 CCQ also includes a "discretion" ("confidentiality") aspect that is not in issue here and that I will not discuss.

42 Moreover, the second paragraph of article 2088 CCQ extends the duty of loyalty beyond the termination of the employment contract. The framework and the obligational content of this duty of post-contractual loyalty are the subject of abundant case law, the lessons of which can be summarized as follows:

• The second paragraph of article 2088 CCQ and the duty of loyalty it states must be interpreted restrictively, since the survival of a contractual obligation beyond the termination of the contract giving rise to it is exorbitant common. This restrictive interpretation is also justified by the fact that, in the organization of our society, competition in business is the rule.

• Post-contractual duty of loyalty is an attenuated duty that has neither the breadth nor the rigor of the obligation as it exists during the term of the contract. This duty of post-contractual loyalty can not, moreover, impose on the employee restrictions equivalent to those of a non-competition clause.

• In the absence of a non-competition clause, the ex-employee can in principle compete with his former employer (either by finding a new job with a competitor, by founding his own competing company, or by investing in a competing company, etc.). It may even engage in vigorous competition, provided that such competition remains fair and respects the principle of good faith.

• The specific obligational content of the post-contractual duty of loyalty will vary according to the circumstances (for example: nature of the contract and the company, nature, conditions and hierarchical level of the position held by the former employee, reasons for the termination of the contract of employment. labor market, state of competition in the employer's sector of activity, etc.).

• In itself, solicitation of customers is not prohibited, in principle, since it is an ordinary act of competition, the search for customers being the defining element of competition.

• Jurisprudence tends to prohibit behaviors such as: using, for solicitation of clientele, confidential documents or information of the former employer or using smear tactics or engaging in deception or misrepresentation; unduly benefit from certain privileged relationships with customers; Insistently and systematically soliciting ex-coworkers and trying to convince them to leave the employer; retain property or documents of the former employer [8] , etc.

• Finally, the post-contractual duty of loyalty lasts only one time, that of a "reasonable time", as stated in Article 2088 CCQ. Here again, the case law is rather reserved: the duration of the obligation to

Post-contractual loyalty depends on the circumstances of each species [9] , but rarely exceeds a few months. There may be exceptional cases, but they are exceptional and must remain so if we do not unduly limit the principle of competition that governs our society and benefit employers to the detriment of employees. After the expiry of this reasonable period of time, the former employee is no longer subject to the ordinary rules applicable to competition (under Article 1457 CCQ). [10]

43 It may be noted that there sometimes appears to be some duplication between the prohibition of unfair conduct resulting from section 1457 CCQ and the prohibition flowing from the second paragraph of article 2088 CCQ, whereas these two provisions should have their own scope, the second adding to the first.

44 That said, a serious or repeated breach of the duty of loyalty in the course of employment is a serious ground for dismissal within the meaning of Article 2094 CCQ, whether or not the breach caused injury to the employer. If there is prejudice, the employer may also demand compensation. Similarly, the former employee who violates his duty of post-contractual loyalty risks being sued by the former employer: request for an injunction, if it is to prevent the violation or to prevent it, request damages, if the violation has caused harm, combination of these remedies, if any.

### 3. First question: Did the judge err in law?

45 On the merits of the case, the appellant did not establish an error of law on the part of the trial judge, except on one point that does not affect the outcome of the litigation.

46 Although the judgment does not contain a formal statement of the applicable law, it appears that it is according to that right, which constitutes the implicit thread of its reasoning, that the judge proceeded to examine the evidence.

47 The appeal, in fact, does not concern a question of law. The only questions are: Did the respondents commit the acts alleged against them by the appellant? These acts, assuming they are established, can they be characterized as disloyal? The first question is factual; the second can be characterized as a mixed question of law and fact, the factual component being, once again, significant.

### 4. Second question: Did the judge err in fact or err in law and in fact?

48 As we have seen previously, Concentrés claims that Bonneau, Benoît and Nadeau, mainly, as well as Bénard and Bélanger, incidentally, have simmered their departure since (at least) the secret creation of Lyrco , in 1993, and that, taking advantage of Business opportunities offered by Concentrés , they laid the foundations for their future business and, most importantly, the foundation for their future clientele. This business took off soon after the dismissal, with Bonneau, Benoît and Nadeau pursuing, with the help of Bénard and Bélanger, an unfair activity that had begun earlier.

49     Concentrates has she proved the facts underlying this thesis? Did it prove that its former employees had, prior to the termination of the employment contract, breached the duty of loyalty imposed on them by the first paragraph of article 2088 CCQ? Did she prove that this failure caused her prejudice? Did it show that, subsequent to the termination of the employment contract, the respondents infringed the second paragraph of article 2088 CCQ? Did it establish the damage that would have resulted?

50 The trial judge answered all of these questions in the negative. In doing so, did he deceive himself in a serious and decisive way?

51 I also answer this question in the negative, except on one point.

### at. State of facts

52 Preliminarily, it must first be noted that the case is extremely peculiar and relies on a situation of unusual fact.

53 On the other hand, the evidence presented by the parties is contradictory and caution must be exercised in reviewing the findings of the trial judge, who had the benefit of hearing the parties and their witnesses. This proof is, in some respects, disturbing, as will be seen below, and this on one side as well as on the other. However, I consider that reading the entire appeal record does not invalidate the trial judgment, which generally retained the version of the former employees rather than that of their former employer. It will not be a question of revisiting all the evidence here by the menu, nor of repeating the analysis made by the trial judge, but it may be useful to mention certain elements.

     * *

54     Concentrates manufactures and sells products for animal feed. His clientele is composed of farmers. It divided the territory in which it trades into the regions it has assigned to major sellers (the "land managers"), which are paid on a commission basis. This allocation is made according to the exclusive territory mode, each vendor having the

sole right to solicit and deal with customers in the region assigned to it. Some managers have assistants, that is, other salesmen who serve with them the territory and whose sales are taken into account in the calculation of commissions due to the former.

55 Bonneau, Benoît and Nadeau are land managers, first working in the Eastern Townships, the second in the St-Hyacinthe-Bagot, Shefford, the third in the Haut-Richelieu and the Haute-Yamaska [11] . Bénard is the assistant of Bonneau and Bélanger the deputy of Benoît. Bonneau specializes in feeding for dairy cows, Benoît and Nadeau for pigs. The judge describes the work of the sellers as follows:

> [8] Their work has two distinct but complementary components: promoting the products of CONCENTRATES and advising producers who will buy more of them. However, they do not charge any professional services, their remuneration being limited to commissions on sales. [. . . ]

56 We are dealing with Bonneau, Benoît and Nadeau with extremely successful salespeople whose sales (including those of Bénard and Bélanger) account for nearly 48% of Concentrés' sales (which account for more than 'a dozen other sellers). No one disputes their dynamism or the care with which they treat a customer who is particularly loyal to them and to whom they offer a high quality service in a sector of activity where the competition is fierce [12] .

In this sector, the relationships that each vendor has with its customers could be described as *intuitu personae* . Again, no one disputes the existence of this close link between the seller and his client, a link that is at the heart of their business relationship; no one denies the importance of this link and no one denies that the customer has a strong tendency to follow the seller, focusing on the latter personally rather than the one who employs it. As a result, the goodwill of the company is therefore mainly related to the person of its sellers.

58     Concentrates differs from its competitors in that it vigorously promotes the model of "producer-sucker." On the one hand, it encourages producers (cow or hog farmers, for example) to make the feed for their animals themselves, using ingredients sold to them in whole or in part. , Concentrates . On the other hand, it is important to encourage breeders with a higher feed production capacity than they need for their animals to produce feed for other breeders, always using ingredients sold by Concentrates. . These are the sellers of Concentrateswho, becoming in a way brokers, will be in charge of putting the producers-millers in contact with the ordinary breeders who would like to stock up at home. In an advertising brochure reproduced in the appeal file (Exhibit D-1), Concentrés recalls that she is the pioneer of this concept in Quebec and that:

> It was believed and still believed that making one's own feed is the key to success for an agricultural producer. In twenty years, ie since the early seventies, about 50% of Quebec producers have settled to make their own mold. It is appreciable but unfortunately still far from 100%. [13]

59 The evidence also reveals that Concentrates (although it is able to sell and sell itself feed or by-products such as corn curd, soybean meal, wheat gluten, etc.) activity on the sale of vitamins and minerals, products whose profit margin is much more substantial [14] . Belisle insists that at the material time, Concentrated, whose production facilities had been revised and expanded in the early 1990s, sold everything, as evidenced by its product and price lists, and wanted its sellers to offer customers all of the products available, including molded and by-products. However, Paré, testifying on the demand, says that:

> A. It was not Belisle's goal to sell the whole feed, they specialized in food for the producers who made their feed on the farm. It was the big specialty, but there are all kinds of needs that a company wants to fill. Of course the specialty, the big percentage of the profits came from there.
>
> Q. Minerals and vitamins?
>
> A. Minerals and vitamins and supplements, including, there was a product, the MSP, a mixture of by-products, which was a very important product in the profitability of the business too. [15]

This largely confirms the statements of Bonneau, Benoît and Nadeau, all of whom testify that Concentrés did not encourage its sellers to sell by-products and feed, but that it strongly insisted on the sale of vitamins and minerals . It is implicit in the judgment at first instance that the judge preferred this version, which is indeed sufficiently supported by the

evidence. This is not to deny that Concentrés also sold other products, but it was not its main activity.

60 In 1988, Benoît and Nadeau joined forces and created Élevages to purchase a first pig farm. They open it up to Belisle , who gives them his approval. By acquiring and operating this farm, Benoît and Nadeau increase and strengthen their professional credibility, which becomes an argument for the sale of Concentrates ' products to the clientele, as noted by the trial judge, at paragraph 14 of his judgment.

61 The farm acquired by Benoît and Nadeau, or, if one prefers, by Élevages, of which they are the associates, is equipped with a "moulange", that is to say a production unit of feed , which Belisle is aware of.

In 1992, Livestock will lease a second pig farm.

63 There is debate, both at trial and on appeal, as to the precise content of the authorization given by Bélisle with respect to the Livestock activities.

64     Bélisle holds that when allowed Benoît Nadeau and acquire their farm, he forbade them to produce molded to other farmers. Farms would have been authorized only to manufacture the feed for consumption of its own pigs and again only on the condition of obtaining the ingredients from Concentrates . He therefore forbade Benoît and Nadeau to become, in a way, producers-millers. At the very least, he asserts that there has never been any question that Benoît and Nadeau, through Élevages, become producers-millers, their situation thus to be distinguished from that of a certain Lebrun, another salesman of Concentrates [16] .

Benoît and Nadeau argue instead that Bélisle never forbids them to be producers-millers. On the contrary, Belisle would have given them permission to be producers-millers (and thus to sell their feed to others, molded from the products of Concentrates ), which perfectly illustrated the concept of producer-miller which is the strength of Concentrates and on which this focuses its development.

66 The trial judge found from the evidence that Concentrés had authorized all the activities of Benoît and Nadeau, by Élevages. It is unlikely, however, that the issue was specifically discussed in 1988. At that time, Benoît and Nadeau were no doubt already planning to become millers, thus offering a showcase for the concept promoted by their employer as well as for the products. of it, but it is possible that things have been implied and implied, each giving his interpretation to the other's words. Anyway, the sequence of events is quite revealing.

67 The evidence, on the other hand, does not establish that Benoît and Nadeau, through Élevages, acted as producers-millers before 1993, although it is clear that they did so to count of this date (on a very small scale), through Lyrco , which we must now talk about.

68     Lyrco , a company in which Bonneau, Benoît and Nadeau are equal shareholders, was founded in May 1993 and began operations in the summer of that year. In a form for the Inspector General of Financial Institutions (Exhibit P-4 [17] ), these activities are described as "Production and Distribution of Animal Feed". In an October 1993 document presenting the profile of Lyrco , a document intended for a banking institution (Exhibit P-23), we find the following statements:

> • All three are sellers of animal concentrate for 10 years at Bélisle and their product is complementary to what they sell *for their employer* [the latter indication is handwritten and it is not known who posted it.]

> • Yves and Luc have owned two businesses for 5 years (pig sector)

[. . .]

The company manufactures protein supplements (by-products) for the dairy cow and feed for pigs. She is also responsible for the distribution of her product. Moreover, by their competence they can offer a technical follow-up with their customers.

[. . .]

The production of the product is carried out at the facilities (mill and silos) of Les Elevages Benoît & Nadeau (owned by Yves and Luc) for a rental fee and exchange of services. An employee is employed by the company on a part-time basis (this employee is also employed by Les Élevages Benoît and Nadeau). [18]

[The text in square brackets is from the undersigned.]

69 This description is consistent with the overriding evidence. It also reveals that sales of by-products are intended for customers that Bonneau, Benoît and Nadeau also serve on behalf of Concentrés . It also reveals that, overall, sales of Lyrco feeds , from the date of its creation to that of the dismissal of Bonneau, Benoît and Nadeau, are not very important: indeed, as far as the feed is concerned ( manufactured by breedings as producer miller) Lyrco , which sells to customers of Benoît and Nadeau serves only five or six clients [19] . As shown in the list of invoices drawn up in the experts' report of Concentrés [20], the bulk (if not almost all) of Lyrco's sales is related to Bonneau's activities. During the same period, we also find in the books of this company some invoices attached to sales attributed to Bénard and Bélanger. Bonneau testifies that it is he, in fact, who made the sales put in the name of Bénard because they were customers whose last one dealt with Concentrés [21] . With respect to the invoice in the name of Bélanger, it appears that he actually used the services of Lyrco to produce a small quantity of feed and sell it to one of the customers he usually served at Concentrés, client who had a special need [22] .

70     Lyrco does not pay a commission on its sales [23] .

71 We must now say a few words about Bonneau's activities.

72 The situation of this one is quite complicated. It appears that in the 1980s, Bonneau, in its territory, faced the competition of a Richard Audy, attached to the Compton Grain Center, which itself sells by-products for dairy cows. Bonneau and Audy, who often meet at the same producers, come to the following agreement: each of them will promote the products of the other, with an exchange of commissions, the products of the one and the another found in the feeding of cows of their common customers. Thanks to this agreement, Bonneau is thus selling more minerals and vitamins from Concentrates .

73 It also appears that, in order to promote the concept of producer-miller for the customers it serves on behalf of Concentrés , Bonneau has also, from time to time, supplied by-products elsewhere than at Concentrés [24] .

Audy finally withdraws from the market, Bonneau explains the following:

> A. I tried to replace him by precisely two (2) other persons whom I had identified. There was one who was already doing it for me, who is Mr. Fernand Roy in the corner of St-Georges-de-Windsor there, but he had just a silo and there was a truck too, it took someone who had a truck of course, and he says I'm not interested in equipping other silos, was not equipped. It is still one of my suppliers. And I had been to see another one who was one of my sucker producer customers who had a truck and he told me he was not interested either. Pierre Bélisle also told me, I went to see Pierre Bélisle also at that time and Pierre Bélisletold me to try to tidy up in my corner and it was out of the question to start doing that, because it was not worth it. [25]

75 According to Bonneau, Bélisle agreed to these arrangements and, mainly, to the agreement with Audy. Belisle admits in the latter case, but denies allowing Bonneau to continue selling by-products himself after Audy pulled out of the market. He denies that he has ever Bonneau submitted his problem and denies the remarks attributed to him Bonneau above [26] .

76 Still, unable to solve the problem created by Audy's retirement, Bonneau is approaching Benoît and Nadeau. He knows that they are planning to buy a truck (in order to facilitate the transport of the feed between their two farms, in particular), a truck which he himself needs to deliver by-products; he knows that his colleagues (by Breedings) have a mussel, which can also be used to mix by-products. Benoît and Nadeau agreed to join forces with Bonneau and Lyrco was created in May 1993 to do so. Farms will install on its main farm silos that will be used to store Bonneau's by-products; she will make the mixture; it will produce the mold. By-products and feed will be sold and billed by Lyrco, in whose name the delivery will be made, thanks to the truck that she will buy, a truck which Élevages also uses. Bonneau finally reaffirms that it did not sell by-products to customers who were not primarily customers of Concentrates for Minerals and Vitamins. If he could not sell them like minerals and vitamins, it did not sell their byproducts [27] .

77 When they created Lyrco in May 1993, Bonneau, Benoît and Nadeau did not inform Bélisle . For the most part, they explain their silence by repeating that Lyrco simply allowed them to continue doing what they were doing previously, but within a different administrative structure. Each one of them insists on the fact that none of these activities were done secretly or in secret, but on the contrary, they were made in broad daylight. They claim that

it was for them complementary activities to their main activities at Concentrés, which allowed them to increase and retain customer base, increasing sales and, consequently, their own commissions. They spoke freely about how they deal with other Focus salespeople , at employer meetings and otherwise. Bonneau regularly bought Concentrates products . Nadeau will report that the drivers of the latter regularly came to deliver to Livestock [28] . This seems to be confirmed by the testimony of Gilbert (responsible for the warehouse of Concentrés in St-Valérien), which simply says that everyone knew that Livestock, from the minerals and vitamins of Concentrates, made mash for the customers of Benoît and Nadeau [29] , that is to say that it acted as producer-miller. He even adds that:

> Q. When we speak in nineteen ninety-four (1994), did they manufacture for other producers at that time?
>
> A. Yes.
>
> Q. When did you learn that what was being manufactured on Ferme Les Etoiles Benoît and Nadeau, in fact it was for a business they owned at three (3) rather than being Les Elevages Benoît and Nadeau?
>
> A. At the beginning of the year.
>
> Q. They never hid from that thing?
>
> A. No. [30]

78    Bélisle denies having been informed of the actual activities of its employees and their Lyrco et Élevages companies before January 1994, but this is highly unlikely given all the above. It seems rather that, even if Concentrés did not formally authorize these activities, she did so implicitly, tolerating them even though she was aware of them.

79 In addition, in 1989, Benoît and Nadeau set up Gestion Benoît and Nadeau Inc., which purchases surplus piglets from cow-calf producers for sale to growers-fatteners, acting as brokers. It is a service that Concentrates , unlike its competitors, did not dispense. Benoît and Nadeau decided to offer it and offer it to their co-workers as well, starting in 1991. Concentrés approved the initiative and even agreed to pay the interest owed by Gestion on its line of credit, to count of 1991 [31] . This is what the trial judge found in paragraph 15 of his judgment:

> [15] On October 19, 1989, BENOÎT and NADEAU found GESTION BENOÎT ET NADEAU INC. to accommodate producers who have surplus piglets. CONCENTRÉS , which had tried unsuccessfully to set up such a service, agrees to pay interest on the line of credit MANAGEMENT because all its sellers will benefit from this service which involves risks that few agree to take: CONCENTRATE refused to share but recognized that it was a tool for promoting its products.

80 In another order of ideas, it appears that there has been some dispute between Concentrés and all of its sellers since at least 1993. In January 1993, Concentrés , worried about its financial health, tackles various subjects. with its sellers, mentioning among other things the possibility of abandoning or modifying the principle of territorial integrity to which sellers are affected [32] . The sellers did not accept these changes, as a result of which Concentrés was content, unilaterally, with minor modifications.

81 The evidence also shows that Concentrés was having some difficulty in controlling its salespeople, including the issue of sales relationships: Bélisle explained at length that the salespeople followed the example of the leaders of Bonneau, Benoît and Nadeau. , refused to make written reports of their activities or were reluctant to do so. In 1993, the sales director at the time, Jacques Francoeur, had unsuccessfully attempted to impose the submission of such reports. Finally, he apparently gave up consenting to Bonneau, Benoît and Nadeau's permission to make telephone or verbal reports.

Bonneau, Benoît and Nadeau, while admitting, like their colleagues, that they did not want to make this kind of report, pointed out that Concentrés was still getting it, thanks to the meetings that the salespeople thanks to specialized committees to which they belonged, all information it claims to have wanted to get by means of the written reports [33] . This version of things is quite plausible and, to tell the truth, more plausible than the version given by Bélisle .

83 At any event, Francoeur, in the fall of 1993, resigned from his position as sales manager of Concentrés . He was replaced by Paré, who took office on January 10, 1994. Bélisle entrusted Paré with the task of instilling a new team spirit and new discipline into the

salespeople, admitting almost as well that Paré also had the mission to put Bonneau, Benoît and Nadeau at a walk. He explains that:

> Q. What was his mandate when you hired Mr. Paré?
>
> A. When I hired Mr. Paré, his mandate was to try to improve the spirit we had in our sales team and then to have a sales team that would collaborate with the company. And necessarily to increase the sales of the company.
>
> Q. What do you mean you wanted a sales team that would collaborate with the company?
>
> A. Well, it is that Benoît, Bonneau and Nadeau were recognized as good sellers, so necessarily in a company the best sellers are not just good sellers to sell products, they are also good sellers to sell their person, so were people with strong personality, they were people who exercised strong leadership. And then it is certain that at a given moment if Benoît, Bonneau and Nadeau did not make sales reports and it was tolerated there was no one who made sales reports there. [34]

84 In reply , Bélisle will have very interesting remarks, which clearly show what he was trying to remedy by hiring Paré after losing several sales managers in succession. One can almost see then a cry of the heart and, certainly, the affirmation of a desire to take things in hand, which undoubtedly reinforced the misunderstanding between the parts:

> A. How do I explain that? I explain that, it was very difficult to have the collaboration of the representatives. At one point I realized that the representatives, from the moment they were paid by commission, they no longer considered themselves employees of the company. In their head it was more employees of the company. It was as if there was a company in my company worse than me in their territory, in the management of the territory, the company Concentrés Scientifiques Bélislehad nothing to do there. Trying to find ways the Judge to better develop these territories, to have greater penetration of the market, to have the collaboration of the territorial managers to do that it was difficult. Territory managers were generally the best sellers of the company, so those who exercised the greatest leadership. Worse when those who exert the greatest leadership have difficulty and do not consider themselves employees of the company and do not collaborate, ben the entire sales team follows the leaders, those who exercise leadership. [35]

85 Paré took office on January 10, 1994 and, in order to familiarize himself with the business, met with members of his sales team, including Bonneau, Benoît and Nadeau, on January 25, 1994. The stories told by The protagonists make this meeting diverge, except on the following point: Bonneau, Benoît and Nadeau informed Paré, in detail, of all their activities and their methods of work and recruitment of the customers; they explained the services offered by Lyrco , Livestock and Management, etc.

86 According to Paré however (that the trial judge did not believe [36] ), Bonneau, Benoît and Nadeau would have been very aggressive: they would have asked to become shareholders of Concentrés , threatening to leave the company if we did not complain at their request and unveiling their activities only to better show that they already had the means to compete with their employer and to harm him.

As we can imagine, Bonneau, Benoît and Nadeau deny threatening anyone. Only Benoît, moreover, would have mentioned the possibility of acquiring shares of Concentrates ; Nadeau has no particular interest in it, and Bonneau does not desire it. It is simply to inform Paré, newly arrived in the company, that they explained to him all their activities, activities that everyone else knew.

88 The trial judge chose the respondents' version and can not be faulted. It should also be noted that the employees voluntarily and without reluctance unveiled their activities in Paré, which is not compatible with the idea of a secretly planned departure.

89 After the meeting, and according to his testimony, Paré informed Bélisle of what he had just learned and that he claims to have not known before that moment. Rather than act immediately, we agree to let Paré have the time to meet other sellers and see what is happening.

90 On March 2, 1994, unexpectedly, Paré asked Nadeau to visit the farm of Élevages with Bélisle . Nadeau agrees. On the spot, Bélisle would have succumbed to anger, considering

that Livestock competition clearly Concentrated . According to Nadeau, he finally calms down and everyone ends up at the restaurant. Bélise says he went to the restaurant before the visit, not after, and also said he was not happy about his "discovery" of the activities of Elevages and Lyrco .

Things then degenerate.

First, there is the "Valère Lieutenant" incident. Lieutenant is a dairy farmer; he is the most important customer that Bonneau serves at Concentrés . Lieutenant no longer wants to do business with the latter because of previous disappointments. Bonneau, through Lyrco , sells to Lieutenant (or his wife, who cares for milk-fed calves) minerals and vitamins that he gets from Concentrés. Pare having discovered the affair, he summons Bonneau. He explains that he used this ploy to retain the clientele of Lieutenant, who is his biggest buyer. Paré orders Bonneau to drop the client. He also criticizes Bonneau for not having supported his employer in one of the disputes with Lieutenant and being rather "on the edge" [37] of the latter. But Bonneau is proud of his client, who is a leader in the industry and who has sent him several other clients. According to Bonneau, if he loses the Lieutenant customers, further it may lose much of its credibility [38] . Bonneau remains convinced that by doing so, he was selling a large quantity of minerals and vitamins to concentrate and thus preserved both the interest of the latter and its own commissions.

93 Bonneau states that he was flabbergasted by Paré's request: in his opinion, "someone with a salesman mentality can not say something like that" [39] . For its part, Paré declares:

> A. Yes, we would rather lose the client than continue to feed it like that in secret and business that we do not know by a company we did not know, no. [40]

94 Paré then summons Bonneau to a meeting at which Benoît and Nadeau, informed of the troubles of their colleague, and apparently feeling the hot soup, will also attend (without warning Paré). Again, the minutes of this meeting, held on March 25, 1994, diverge: Paré claims to have banned Bonneau continue to sell by-products, whether by Lyrcoor otherwise; he also gives him a letter to that effect. He further asserts that he has prohibited Benoît and Nadeau from continuing their activities as producers-millers. Bonneau, Benoît and Nadeau acknowledge that Paré has indeed ordered the former to stop the sale of by-products, but they state that they have received express permission to continue to sell the feed. The judge accepted this version, which the evidence supports sufficiently.

95 On April 8, 1994, Bonneau met Élisabeth Bélisle and Paré at the Delta Hotel in Sherbrooke. Bonneau says that:

> A. It lasted for about three quarters of an hour, and I repeated everything that I had already said, that I found it inconceivable that I could be accused of being disloyal to the company, to the competition. I said, stop it, it's not true and I know it, I did not believe that, I said it's not a good reason, it can not be. That I did not accept that they tell me that I made, that I did something wrong. [41]

96 On April 11, 1994, Paré wrote to Benoît and Nadeau a letter containing, in each case, the following passages:

> I would therefore like to confirm what was said on this occasion: the company CONCENTRÉS SCIENTIFIQUES BÉLISLE INC. will not tolerate in any way that its employees compete directly or indirectly; any action demonstrating this intention will be punished by immediate dismissal.

> If you want to clarify the situation regarding your activities, you can be assured of the support of the company to regularize the situation and find a clear and advantageous common ground for each of us. [42]

Benoît, after consulting a lawyer, responds to this letter as follows, on 17 April 1994:

> As a follow-up to your letter of April 11, 1994, I want to reassure you about your concern. I do not compete in any way, direct or indirect Scientific Concentrates Bélisle inc.

> I do not understand the sending of such a letter on the other hand if you find discussion on this subject, I will be happy to listen to you. [43]

98 Nadeau, having also consulted a lawyer, responds to Paré on April 17:

> Following your letter of April 15, 1994, I wish to clarify certain points.

I do not consider myself in any way in competition with the company Concentrés Scientifiques Bélisle inc. I do not have direct links in the sale of by-products with David Régis Bonneau.In addition, David Régis Bonneau is not competing with Concentrés Scientifiques Bélisle inc. It only serves its customers in complementary product to the mineral as it has been doing for almost 11 years with the agreement of the company Concentrés Scientifiques Bélisle inc.

I also want to remind you that you confirmed to me on at least two occasions during the meeting of March 25, 1994 that I could distribute and sell feed directly from my farm without being in competition with Concentrés Scientifiques Bélisle inc.

I remain available to discuss it further with you if you see the need. [44]

99 It appears from these letters that Benoît and Nadeau do not seem to understand or pretend not to understand that their association with Bonneau in Lyrco associates them equally well with the sales of by-products, by-products which are, moreover, manufactured by farms.

As for him, Bonneau addresses to Paré the following letter, dated April 18, 1994:

I have read your letter of March 24, 1994 and wish to answer some of your concerns.

I would like to remind you that I have never had a conflict of interest with Belisle Scientific Concentrates Inc. Indeed, not to lose my customers I have to sell other products that you do not offer and thus ensure that my customers continue to buy your products all this with your consent. In addition, it would be difficult to talk about a conflict of interest because since I started selling by-products, not only have I retained my clientele but I have even managed to increase the sales volume of manufactured products. by Belisle Scientific Concentrates Inc. and this years after years.

As you know and told me, I never had to choose between Belisle's interests and my own interests. I have always played "Fair Play" since the beginning and still today my attitude has not changed.

As you say so when you talk about customers, calling them "my clients", I remind you that it took me more than 10 years to build my clientele and meet their needs with my genius, my righteousness and my skill. I am very attached to my clients and conversely, it would be a pity that one day, they have to choose between me and Belisle .

Recently, I lost a very important client who had been dealing with me and you for a long time. I fought to try to keep it but alas it was impossible and as he told me: "It's not your skill that is at stake but another factor that you know. . . ". I do not insist, you know who it is and you know the reasons.

In my opinion, the clientele is precious and neither you nor I can afford to lose a client. It is to be feared that there is reaction to the chain.

You qualify the situation as serious. This surprises me a lot because in the past my behavior has been impeccable and I have always taken Belisle's interests and the interests of my clients to heart . I have never been a problem for you. All of a sudden, there is a turnaround and I become a source of conflict! There are no words to describe my disappointment and astonishment at your letter of March 24, 1994. I do not understand the why of such a letter, except for accessory and misappropriated purposes.

I also take this opportunity to urge you to immediately stop conveying any misleading statements about me that I am in a conflict of interest. In doing so, you are damaging my reputation and you know very well that what you are spreading is absolutely wrong.

Failing to comply with this request, I will be obliged to see that my rights are respected.

Please act accordingly. [45]

101 Neither Bonneau nor Benoît nor Nadeau (any more than Élevages or Lyrco ) continue their sales of by-products or feed.

102 On April 22, 1994, Concentrés' management called the salespeople to re-announce its intention to change the nature of their compensation and to call into question the principle of the integrity of the sales territories. One of the salesmen talking about the need to

regroup to fight against these changes, Benoît evokes the idea of union. A few days later, along with Bonneau and Nadeau, he will make some representations to the Centrale des Syndicats Démocratiques.

103    Concentrés fired Bonneau on May 2, 1994 and, the next day, Benoît and Nadeau, [46] alleging in all three cases an unacceptable conflict of interest.

104 At the time of the dismissal, Concentrés did not pay Management the sums she owes him in repayment of interest on the line of credit since October 1993. Nadeau claims to have sent a statement of account to Concentrés à date of March 15, 1994, covering interest from October 1993 to February 1994 inclusive. This statement of account would have been produced at trial as Exhibit P-63. This request totaled $ 2,603.06. Subsequently, to arrive at the claim of $ 3,455.11, Nadeau added interest in March and April. The total bill was made following the preliminary examinations in 1995 [47] . Neither this statement of account nor this invoice is in the appeal file.

105    Bélisle explains why Concentrés did not repay to Gestion any interest that it might have owed him:

> Q. Do you agree that if you did not pay that interest on the margin, that you owe it to Mr. Bélisle ?
>
> A. I admit that we paid on account statements, production of statements of account. If the sums that are listed there have not been paid, it is because there was no production of statements and when I dismissed them, well I considered that after the dismissal I owed nothing to anyone, they were fired. If they wanted to be paid before, it was up to them to produce their statements before. [48]

106 Following their dismissal and after the dismay of the early days, Bonneau, Benoît and Nadeau, whose proof reveals that they have a certain sense of entrepreneurship, decide to make Lyrco their livelihood.Based on their knowledge and experience at Concentrés , they redirect Lyrco's activities : it will also sell vitamins and minerals, competing directly with Concentrates .

107 Bénard (by letter dated May 11, 1994) and Bélanger (whose last day of work was May 27, 1994) resigned from Concentrés and joined Lyrco a few days later as salesmen. They are then given the territories they previously served at Concentrés and they immediately start work.

108 It is important to note that the evidence does not reveal that Bonneau, Benoît and Nadeau incited their former colleagues to resign from Concentrés . Bonneau admits talking to Bénard in the days following his dismissal, which was normal between people who have worked closely together over the last few years, but he categorically denies pushing Bénard to resign or have convinced [49] .

109 The evidence also does not show that Bonneau, Benoît and Nadeau (and not Bénard or Bélanger) retained any revenue from Concentrés' products or other documents or information of that kind. They developed their own revenues, with the help of external experts, and Lyrco began production in June 1994. From mid-May to the end of May 1994, sales of by-products and of mold (presumably manufactured by breedings) and some sales of vitamins and minerals [50] . Bonneau, Benoît and Nadeau rented a warehouse (which is opposite that of Concentrés in St-Valérien). They began their production from leased facilities [51] . Lyrcowould become fully functional some three or four months later [52] , as confirmed by the increase in sales during this period and subsequently [53] .

110 Having heard the news of the dismissal, the customers that Bonneau, Benoît and Nadeau served at Concentrés almost all followed them at Lyrco . The overriding evidence reveals that Bonneau, Benoît and Nadeau did not solicit their former clientele, any more than Bénard or Bélanger. It is rather the customers who have decided to continue doing business with them, because of the bond of trust previously developed.

Paré was well aware of the risk he was causing to Concentrés by dismissing his three best sellers. Bélisle was also: he even tried to contact various clients of Bonneau, Benoît and Nadeau, offering them advantageous conditions to retain them, but in vain The testimony of Philippe Bélisle is also eloquent.

112 The fact is that Concentrés has lost most of Bonneau's clients, Benoît, Nadeau, Bénard and Bélanger.

Finally, it should be noted that Bénard left Lyrco shortly after the action of Concentrés . The fate of Bélanger is not clear.

* *

114 This account is not exhaustive and other elements could have been mentioned, which can be found partly in the judgment at first instance. Some of these facts, considered in themselves, seem to be in line with the appellant's claims about the disloyalty of former employees on the job (for example: the "Hoffmann Laroche" incident [54] ; "Gilbert" incident - if it is true [55] , the fact that in October 1993, Lyrco subscribed a $ 50,000 line of credit in addition to the $ 30,000 invested in the business at the start - which may be a great deal for a company whose activities, which are claimed not to be profitable, are presented as a complement to those of Bonneau,Concentrates ; the fact that a list of Lyrco employees , a list dated December 1993, already contains the names of Bénard and Bélanger - which Bonneau explains in a way that one might find more or less convincing; Lyrco's indiscriminate (and presumably illegal) use of the "BB Courseur" trademark; the fact that by producing and selling the feed themselves through Élevages and Lyrco , Benoît and Nadeau were also competing with their own producers-millers). Conversely, in addition to those which it is made above, other factors tend to favor the respondents' position (eg, the fact that the turnover of Concentratesduring the 1993-1994 period , [56] Concentrés complains that its former employees refuse to give him the records of the clients they served prior to their dismissal, whereas these files are in the hands of the clients themselves. the same [57] ; the slowness with which Concentrés acted after supposedly learning the actions of Bonneau, Benoît and Nadeau in January 1994, etc.). Some items also affect the overall credibility of Bélisle , including the way it presents attempts Concentratesto change the working conditions of employees or the explanations they provide to justify the use of apralan and selenium - ingredients not approved in Canada - in some of its products. As for Paré's credibility, she may have been negatively affected by the excessive importance he attaches to the "Valère Lieutenant" incident, by the omission of certain significant facts or by the fact that he asked for another salesman (a certain Lemire) to start taking care of Bonneau's territory even before his dismissal, and so on.

115 That being said, while not restating all aspects of the evidence, the narrative of the preceding pages highlights elements that, together with those held by the trial judge, amply justify the factual determinations of the trial judge, the following, mainly:

    • Concentrated allowed Bonneau to sell its by-products and Benoît and Nadeau to act as producers-millers.

    • The activities of Bonneau, Benoît and Nadeau were never hidden and were known to Concentrés , both before and after the creation of Lyrco .

    • With the arrival of Paré, Concentrés wanted to unilaterally modify the *status quo* .

    • Whether directly or through Lyrco and Élevages, Bonneau, Benoît and Nadeau did nothing but what they had always done, with the permission of Concentrés , by others means.

    • There is nothing wrong with Bénard and Bélanger.

*b. Application of the law to the facts*

116 On the basis of these factual determinations, I will first examine the question of whether Bonneau, Benoît, Nadeau, Bénard and Bélanger breached the duty of contractual and post-contractual loyalty imposed on them by section 2088 CCQ. The case being essentially focused on the behavior of the first three, it is to them that I will be interested above all.

### i. Bénard and Bélanger

117 We can indeed exclude Bénard and Bélanger from debate. The evidence about them is simply not sufficient to show that during the term of their employment with Concentrés they failed in their duty of loyalty or collaborated with the allegedly unfair activities of their colleagues Bonneau, Benoît and Nadeau prior to dismissal of these. There are undoubtedly some curious elements in this evidence (for example, the bills bearing their name in the Lyrco books , prior to mid-May 1994 or the mention of their names on a list of Lyrco employees in December 1993), but in addition to being plausibly explained by Bonneau, these elements are so few as to suggest disloyalty.

118 Moreover, the fact that Bénard and Bélanger thought of resigning and then resigned from their position at Concentrés , to join Lyrco , can not be considered an unfair gesture.

An employee linked to his employer by an employment contract of indefinite duration may resign at will, thus terminating the contract, all in accordance with article 2091 CCQ The fact that Bénard spoke to Bonneau after the dismissal of the latter, while she was still working with Concentrates, can not be considered, in itself, as an unfair gesture: when an employee is dismissed, it is not unfair for those who stay with the employer to keep in touch with their former colleague or to maintain personal links.

119 That Bénard and Bélanger subsequently joined Lyrco , Concentrés' new competitor , can not be criticized either, in the absence of a non-competition clause, and Article 2088 CCQ did not prevent them from doing so. 'no way.

120 Finally, the evidence does not show that Bénard and Bélanger, after their arrival at Lyrco , engaged in acts of unfair competition.

### ii. Bonneau, Benoît and Nadeau

• *Before the dismissal (article 2088, first paragraph, CCQ)*

121 Like the trial judge, an attentive review of the evidence proves to me that, despite some troubling elements and because of the extremely special circumstances of the case, Bonneau, Benoît and Nadeau, while were still in the employ of Concentrés , did not breach the obligations set out in the first paragraph of article 2088 CCQ, at least until March 1994.

122 It is true that had it not been for the authorization of Concentrés , the "complementary" activities of Bonneau, Benoît and Nadeau would have been unfair (except for the purchase and operation of a pig farm by Benoît and Nadeau, the evidence not showing, despite Bélisle's assertions , that the contract of employment of these with Concentrés stipulated exclusive service [58] ). By selling their own products to Concentrate customers, rather than the similar products offered by it, Bonneau, Benoît and Nadeau committed acts of appropriation or misappropriation or, at the very least, would have placed themselves in a situation of conflict of interest incompatible with the duty of loyalty enshrined in the first paragraph of article 2088 CcQ

123 Similarly, by selling to others the feed that they produced through Livestock and thus acting themselves as producers-millers (and not just as breeders or hog producers), Benoît and Nadeau, even though their sales on the one hand, they have thus deprived Concentrés of certain opportunities to sell the feed, a product which it offers, and, on the other hand, they are not satisfied with their duty of loyalty. would also be found to compete with millers who are part of their own customer base and to deprive them of business opportunities. At first glance, this could have been considered a way of indirectly undermining the concept that Concentrated Foam, which seeks precisely to convince its customers that it is profitable to become producers-millers by supplying other producers.

124 However, Concentrés having authorized these activities, we can no longer speak of a breach of the first paragraph of article 2088 CcQ

125 As noted above, the Trial Judge found that Concentrés had allowed Bonneau's parallel trade (by-product sales) because it was able to benefit from it by taking advantage of this means. an increase in its sales of minerals and vitamins, which are its star products (and also the most profitable). Moreover, even supposing that Bonneau had somewhat extended the terms of the authorization that Concentrés had given him at the time of the "Audy agreement", he did not hide his activities, the evidence rather showing that he acted openly (notably by his purchases at Concentrés), without hesitating to talk about his "sales method" to his co-workers. It is difficult, indeed impossible, to believe that the direction of Concentrés has not been informed. And if she has tolerated the situation, her tolerance, in the circumstances, can not be interpreted otherwise than as an implicit acceptance.

126 As for Benoit, Nadeau and Élevages, again, like the trial judge, we must conclude that not only Concentrés , in the person of Bélisle , allowed them to operate a pig farm and produce their own feed. for the purpose of feeding their animals, but also allowing them to become producers-millers (and thus to sell to others), which enhanced, illustrated and exemplified the concept it promotes, all of which promoting the sale of its products and particularly that of vitamins and minerals.

127 It can not be denied that Bonneau, Benoît and Nadeau had been wise to warn about Concentrés de la création, in 1993, of Lyrco . This might have avoided the misunderstanding, so to speak, that followed. But Lyrco pursuing in an administratively different way the complementary activities of Bonneau, Benoît and Nadeau, his creation really did not change anything at the bottom of things.

128 In short, at least until March 1994, Concentrés can not blame Bonneau, Benoît and Nadeau for the requirement of loyalty.

129 Alongside all of this, the evidence shows that there was some laxity in the Concentrates business or, at least, some management difficulties. I quoted a passage from Bélisle's testimony a little earlier, a passage that I allow myself to take up again and which attests to the unease in the company:

> A. How do I explain that? I explain that, it was very difficult to have the collaboration of the representatives. At one point I realized that the representatives, from the moment they were paid by commission, they no longer considered themselves employees of the company. In their head it was more employees of the company. It was as if there was a company in my company worse than me in their territory, in the management of the territory, the company Concentrés Scientifiques Bélislehad nothing to do there. Try to find ways for the Judge to better develop these territories, to have greater penetration of the market, to have the collaboration of the territorial managers to do that it was difficult. Territory managers were generally the best sellers of the company, so those who exercised the greatest leadership. Worse when those who exert the greatest leadership have difficulty and do not consider themselves employees of the company and do not collaborate, ben the entire sales team follows the leaders, those who exercise leadership. [59]

130 At a time when relations between Concentrés and its sales staff are growing , Bélisle is worried about the profitability of his business. He hires a new sales director, Paré, who is specifically in charge of putting the vendors in order and seems particularly in charge of mater, so to speak, Bonneau, Benoît and Nadeau, they having, according to Belisle , a bad influence on their colleagues, particularly because of their reluctance to provide written activity reports.

It is from this moment, which coincides with the arrival of Paré and his meeting with Bonneau, Benoît and Nadeau, that the situation is changing. It is likely that Paré was surprised and perhaps even shocked to learn what the three vendors explained to him on January 25, 1994. Paré was just coming to Concentrés and was not familiar with the company's practices. We do not really know if he was the one who convinced Belisle to no longer tolerate the situation or if Bélisle saw an opportunity to get into the ranks of salespeople who, despite their excellence, took too many liberties with employers' demands. , but the fact remains: from mid-March 1994, Paré, certainly with the agreement ofBélisle , decides that it will now be banned in Bonneau to sell by-products. Paré informs Bonneau, he repeats it on March 25, 1994, in the presence of Benoît and Nadeau, who confirm it; he gave him a letter to that effect, letter whose terms are a bit vague, however, content to talk about conflict of interest [60] . All the same, because of the explicit nature of the verbal prohibition addressed to him on March 25, 1994, Bonneau can not ignore what is in question.

132 Unlike the trial judge, I am of the opinion that Bonneau should have obeyed the order given to him by his employer, just as he should have obeyed the order Paré had previously given him to give up. customer Valère Lieutenant.

133 These orders may have been ill-advised, and they may have violated the parties' previous agreements, but Bonneau's legal subordination, as an employee of Concentrés , compelled him to obey. He could not, arguing as he did in the best interest of the employer, refuse to comply with Concentrates' request . To the extent that he went about his business of by-products with the authorization of Concentrés , he had to terminate it as soon as the employer withdrew the authorization.

134 An employer can make bad decisions [61] . If the employee disagrees with them or if he feels that he is suffering unduly, he may try to convince the employer to act otherwise and, if he does not succeed, he may resign, sit down or institute appropriate remedies.

135 Similarly, as of March 25, 1994, while witnessing the prohibition on the sale of by-products to Bonneau, Benoît and Nadeau should have ceased to work with him, as they did in the past. intermediate of Elevages and Lyrco . Assuming that it was not clear on that day, the letter sent to them on April 11, 1994 should have allowed them to understand what was being said, even though these letters do not go too far .

136 In short, as to the by-product trade, Bonneau, Benoît and Nadeau should have obeyed the order of their employer and their recalcitrance, tantamount to insubordination, is at fault.

137 Has Concentrate been harmed by the fact that Bonneau, Benoît and Nadeau did not stop their by-product trade as of March 25 (or April 11, as the case may be)? The evidence does not support that assertion.

138 It is true that during this period Lyrco made sales of by-products listed in the Concentrés experts' report . According to the testimony of Bonneau, who was in charge at the time of the management of Lyrco , the invoices followed by approximately 15 days the delivery of the by-products. It is therefore likely that invoices from April 7 to May 15, 1994, approximately, reflect sales made during the blackout period. These sales total approximately $ 60,000. Must we, according to the principle applied by the Supreme Court in *Bank of Montreal c. Ng* [62] , convict Bonneau, Benoît and Nadeau (with Lyrco ) to pay the equivalent of this sum toConcentrates ?

139 A negative answer is necessary here: if Concentrés were entitled to something in this respect, it would have been entitled, at best, only to the profits made by Lyrco on this sum. However, neither the experts' report of Concentrés nor that of the experts of the respondents makes it possible to know what these profits were for the two months in question or to calculate them easily (which would require a precise knowledge of the costs of supply, production, operation, labor as well as transportation costs, at least). Nadeau and Bonneau also claim that Lyrco never made a profit, which appears to confirm the financial statements of March 1994, which show a deficit of [63] . It is not possible, finally, to adapt the theoretical approach adopted by Concentrés ' expertso evaluate what Concentrés' profit would have beenif it were, rather than Lyrco , who had made these sales (notably because it considers the contribution margin rather than the rate of profit).

140 In these circumstances, the only conclusion that can be drawn from the evidence is that Lyrco's revenues during the blackout period did not generate a profit. More precisely, the overwhelming evidence, the burden of which was on Concentrés , does not establish the existence or the amount of that profit. No conviction can ensue.

141 As for the activities of Benoît and Nadeau, through Élevages and Lyrco , as producers-millers of the feed, the proof is not clear: did Concentrates want to ban them in March or April 1994? Paré affirms that yes; Benoît and Nadeau say the opposite. Nadeau, in his answer to Paré, April 17, 1994 [64] expressly recalls that the latter has confirmed the permission; Paré does not answer this letter. We can conclude from all this, at best, that there was an ambiguity here that neither of the parties thought it best to dispel, each one encapsulating its positions. The trial judge found in favor of Benoît and Nadeau and the state of the evidence does not negate this conclusion. In any event, in the circumstances, Concentrés having dismissed the employees a few days later, I consider that it has thus prevented any prejudice that may result from the ambiguous situation it has contributed to creating and maintaining in relation to the production and sale of feed.

 • *After the dismissal (article 2088, second paragraph, CCQ)*

142 What about the violation of the second paragraph of article 2088 CCQ? Have Bonneau, Benoît and Nadeau, directly or by Lyrco , Élevages et Gestion, in any way failed in their duty of post-contractual loyalty?

143 In agreement with the trial judge, I conclude in the negative, in accordance with the principles developed in this matter by case law and doctrine, principles recalled above.

144 After their dismissal, Bonneau, Benoît and Nadeau redirected Lyrco , of which they made a competitor of Concentrates, working in the same sector. In the absence of a non-competition clause, they had the right to do so and to compete with their former employer, subject to the second paragraph of article 2088 CCQ In this case, the proof does not demonstrate that they have contravened this provision. They even refrained from soliciting clients with whom they had a privileged relationship: it was rather this clientele who, informed of their dismissal, followed them en masse. Article 2088 CCQ does not require that the former employee refuses customers who come to his door, even if he served them at his former employer and even if it had with them a close relationship [65] . Bonneau, Benoît and Nadeau n 'Concentrated or used confidential information or specific tools of the latter. They did not, contrary to Concentrés' support , prevent it from having access to the files of its customers, who are in the hands of the latter.

145 The business opportunities that arose at Lyrco following the dismissal of Bonneau, Benoît and Nadeau can not be considered here as the culmination of a plot hatched before the dismissal or that of an unfair undertaking begun before the dismissal and of which the respondents today would withdraw the illegitimate fruits. Even if we can blame them for

their recalcitrance of the months of March and April 1994, it is irrelevant to the development of Lyrco after the dismissal. The conspiracy theory advanced by Concentrates is not supported by the evidence [66] .

146 Clearly, having worked for a long time at Concentrés allowed Bonneau, Benoît and Nadeau to acquire the knowledge, the contacts, the expertise and the experience that explains the success of Lyrco , in combination with the fact that their recognized excellence as salespeople has fostered close relationships with customers who have followed them without special solicitation. In a way, it is therefore their passage in Concentrés that served as a springboard. But this is the law of competition and, in the circumstances, we can not see anything that contravenes the second paragraph of Article 2088 CcQ

147 The losses suffered by Concentrés after the dismissal of Bonneau, Benoît and Nadeau [67] are simply the foreseeable consequence of the departure of these employees: in other words, even if, on the hypothetical grounds for doing so, an employer does not dismiss his employment with impunity. best sellers, especially when they directly or indirectly produce 48% of the company's sales.

148 Moreover, in the period immediately following the departure of Bonneau, Benoît, Nadeau and, a little later, that of Bénard and Bélanger, the difficulties of Concentrés could be increased as well (although to a does not quantify) the marketing of the failure of cubes food for cows [68] and another product for pig feed [69] .

149 Finally, the fact that the sales and thus the revenues of Concentrés have decreased after the departure of Bonneau, Benoît and Nadeau does not confer in itself any disloyalty to the competition that it now delivers Lyrco .

150 In *Excelsior (L '), life insurance company c. Canada Mutual (La) , life insurance company* [70] , LeBel J. writes:

> Whether the obligation of loyalty comes from a mandate, as it seems to be the case here, or the employment contract, we can not once again give it an interpretation and content more irreconcilable with the foundations of public order. than the non-competition clauses themselves. It does not make it possible to consolidate a property right of the clientele, which remains the object of the fight for the market, a struggle to which the former employee or agent has the right to participate, provided that he does it correctly. It can not exclude from the insurance market an insurance agent, a mere executor, holder, at most, of general information on the trade and the insurance market, as well as a more specific knowledge of the environment. human, groups of customers, to the within which he works, that he necessarily acquired during his work or that he previously held. We must not fool ourselves: to conclude thus would sometimes mean its exclusion from economic life or the obligation to move towards completely different activities. In the real world, taking into account the terms and conditions of building an insurance clientele, the proposal defended by Mutuelle would, for all intents and purposes, prevent the former insurance agent from rebuilding a clientele, because the passivity it would require of him with regard to the people and groups he knows, and from which he can create and develop sales opportunities and therefore survival in this environment. he necessarily acquired during his work or previously held. We must not fool ourselves: to conclude thus would sometimes mean its exclusion from economic life or the obligation to move towards completely different activities. In the real world, taking into account the terms and conditions of building an insurance clientele, the proposal defended by Mutuelle would, for all intents and purposes, prevent the former insurance agent from rebuilding a clientele, because the passivity it would require of him with regard to the people and groups he knows, and from which he can create and develop sales opportunities and therefore survival in this environment. he necessarily acquired during his work or previously held. We must not fool ourselves: to conclude thus would sometimes mean its exclusion from economic life or the obligation to move towards completely different activities. In the real world, taking into account the terms and conditions of building an insurance clientele, the proposal defended by Mutuelle would, for all intents and purposes, prevent the former insurance agent from rebuilding a clientele, because the passivity it would require of him with regard to the people and groups he knows, and from which he can create and develop sales opportunities and therefore survival in this environment. to conclude this way would sometimes mean its exclusion from economic life or the obligation to move towards completely different activities. In the real world, taking into account the terms and conditions of building an insurance clientele, the proposal defended by Mutuelle would, for all intents and purposes, prevent the former insurance agent from rebuilding

a clientele, because the passivity it would require of him with regard to the people and groups he knows, and from which he can create and develop sales opportunities and therefore survival in this environment. to conclude this way would sometimes mean its exclusion from economic life or the obligation to move towards completely different activities. In the real world, taking into account the terms and conditions of building an insurance clientele, the proposal defended by Mutuelle would, for all intents and purposes, prevent the former insurance agent from rebuilding a clientele, because the passivity it would require of him with regard to the people and groups he knows, and from which he can create and develop sales opportunities and therefore survival in this environment.

In our economic system, customers are free to choose. She decides where she will be. Every company assumes the risks of its movements. These comments by Chief Justice Lafontaine remain relevant in *La Moderne Insurance Company v. Vanchestein* [reference omitted], according to which the clientele belongs, ultimately, to itself:

> The customer belongs only to himself. He is subject to competition from anyone.
> 71

151 And further:

> The freedom of competition represents the fundamental principle of organization of economic activities, in the insurance sector as elsewhere, subject to its legislative or regulatory framework. Although harmful, competition, in itself, can not be faulty and a source of civil liability. Even if it is seriously detrimental for an insurance company, the sole conquest of a market share by a new competitor does not entitle him to compensation. Competition is one of those activities recognized as lawful, though damaging. You have the right to drive the restaurateur or the neighboring grocer to bankruptcy, provided that, in doing so, lawful and correct means are used. [. . .]

> Unless we adopt such an absolutist conception of the obligation of loyalty as the Mutual defended, and which has been discussed and dismissed previously, civil liability can not be based on the very fact of competition. Rather, it would depend on the terms and conditions of the activity in question, ie the systematic substitution of existing insurance policies.

> [. . .] 72

152 These remarks, which are still current, apply to this case. However, the appellant has not established conclusively that Bonneau, Benoît and Nadeau, directly or through their companies, acted dishonestly or improperly after their dismissal.

*c. Monetary convictions*

### i. Commission and bonuses

153      Concentrés contests the monetary convictions that were pronounced against her in favor of Bonneau, Benoît and Nadeau.

154 On the issue of commissions and bonuses, she criticizes the trial judge for having imposed on him the burden of proof; it further alleges that it was "entirely justified not to pay a commission for the transactions that were finalized after the dismissal and not to pay a bonus to the respondents who had delivered it and still subject it to unfair competition". These arguments do not convince and there is no need to reform the judgment of first instance on this point.

155 It is true that the evidence given by Bonneau, Benoît and Nadeau concerning unpaid commissions and bonuses is strictly testimonial. Concentrates , however, has not really disputed or contradicted, except to deny it, saying that all monies due to interested were paid their 73 . The trial judge found that the evidence presented by Bonneau, Benoît and Nadeau in this context was sufficient to establish their claim. This conclusion need not be reversed.

### ii. Trouble arising from the action of Concentrates

156 The judge also ordered Concentrés to pay Bonneau, Benoît and Nadeau $ 10,000 each, an amount intended to compensate for the damage they would have suffered as a result of the action. The judge considers that this action was brought maliciously, for the sole purpose of neutralizing a competitor, and he concludes as follows in paragraphs 119 to 122 of his judgment:

[119] One conclusion is necessary: CONCENTRÉS had only one objective when it began its prosecution on the basis of this false pretext of unfair competition: to neutralize the organization of LYRCO whose activities took importance to harm its shareholders, their employees BÉNARD and BÉLANGER as well as MANAGE and LIVESTOCK.

[120] BONNEAU, BENOÎT and NADEAU testified that the development of LYRCO had been slowed down by the pursuit of CONCENTRATES because it did not obtain the necessary credit for its development.

[121] Their banker learned beforehand that CONCENTRÉS was preparing to claim $ 755,000 for unfair competition, an amount that almost doubled three years later on October 9, 1997. They had to explain themselves several times with their banker. and their suppliers who were hesitant to credit them because of the risk of a continuation of this magnitude.

[122] LYRCO has not proved any damage and moreover does not claim it. On the other hand, there is no doubt that BONNEAU, BENOÎT and NADEAU have suffered personal inconveniences because of the troubles that this unfounded pursuit has caused them and that must not be confused with those resulting from their unlawful dismissal. for which the Tribunal can not compensate them. The evidence justifies the award of $ 10,000 to each.

157 With all due respect, I do not share this opinion. It is not because Concentrés' action is unfounded that it is abusive or malicious, which the evidence does not establish in a preponderant manner. On the other hand, the evidence that Bonneau, Benoît and Nadeau presented about the troubles that this action may have caused them is vague and imprecise: that they have undergone some stress is likely, that this stress could constitute in this case a compensable loss is not. For this reason, I would set aside the judgment of the first instance on this point.

### iii. Interest due to Management

158 Finally, with respect to the claim of Gestion, Concentrés , at p. 45 of his factum, contends that:

At paragraph 109 of the judgment *a quo* , the trial judge stated that GESTION is entitled to the sum of $ 3,450.11 representing the interest that Belisle would not have paid on its line of credit. This conviction is manifestly ill-founded. Indeed, as previously mentioned, BÉLISLE allowed BENOÎT and NADEAU to operate a piglet business in order to promote the BÉLISLE products and to retain the customers involved in this business. BÉLISLE was justified in terminating this agreement from the moment the Respondents BENOÎT and NADEAU showed insubordination and characterized him unfairly.

159 This argument can not be accepted. The evidence reveals 1 ° that the activities of Gestion were entirely guaranteed and endorsed by Concentrés , which did not offer them itself, and 2 ° that these activities have nothing to do with the reproaches addressed to Benoît and Nadeau. The fact that Gestion continued its activities after the dismissal, presumably from the same customers, can not be considered as unfair competition against Concentrés , which still did not offer the service. In addition, this agreement has never been formally terminated by Concentrés . Finally, although we can consider that the agreement between Management and Concentrateshas been broken by the dismissal of the shareholders of the first, it remains that the sums he owed the second until that date are due. There is therefore no need to reform the judgment of first instance on this point.

### iv. costs

160    Concentrés also challenges the manner in which the trial judge awarded the costs. The following are the relevant paragraphs of the judgment:

[101] CONCENTRATES did not explain why it directed its action against GESTION, which had been set up with its approval to trade in piglets and even less against Élevages who operated two pork farms, made its own feeds and prepared them for others in the context of the concept of mill producer, which has been encouraged until now by CONCENTRATES .

[102] CONCENTRÉS did not explain why she sued BÉNARD and BÉLANGER who decided to follow their immediate boss because of the climate at

1/6/2019     Belisle Scientific Concentrates Inc. v. Lyrco Nutrition... 1993 CarswellQuebec...

Case 2:18-cv-01549-RAJ Document 92-1 Filed 01/07/19 Page 24 of 29

CONCENTRÉS after their dismissal: they had played no part in their decision to set up LYRCO and had no participation in MANAGEMENT and LIVESTOCK.

[103] These defendants were associated with the alleged conspiracy of BONNEAU, BENOÎT and NADEAU by CONCENTRATE, which did not offer any reliable material evidence on this subject: it will have to suffer the consequences.

[104] His case is therefore dismissed with costs, which are mitigated as follows because of the distinct grounds for dispute, in favor of the DEFENDANTS grouped as follows, each group being entitled to costs.

> • BONNEAU, BENOIT and NADEAU;
>
> • LYRCO who may include the cost of his expert in the amount of $ 32,059.77 which includes $ 15,956.27 for his presence at the trial [referral omitted].
>
> • BREEDING and MANAGEMENT;
>
> • BÉNARD and BÉLANGER;

[ . . . ]

[124] DENIES the action of BELISLE SCIENTIFIC CONCENTRATES INC. in favor of the defendants grouped as follows: DAVID REGIS BONNEAU, YVES BENOÎT and LUC NADEAU; LYRCO NUTRITION INC. including his expert's fees of $ 32,059.77: THE BENEDICT AND NADEAU ENR. STUDENTS, BENOIT MANAGEMENT AND NADEAU INC .; MARTHE BÉNARD and GARY BÉLANGER.

[125] MAINTAIN, without charge, counterclaims:

[ . . . ]

161 According to Concentrés , this way of awarding costs to four separate groups of defendants is unjustified, since these defendants filed a common defense, that six of them are related persons (Bonneau, Benoît, Nadeau, Lyrco , Gestion et Breedings) and that the two others (Bénard and Bélanger) did not testify. In the alternative, Concentrés contends that the expert fees awarded to Lyrco should be reduced to $ 16,103.50, "the presence of the expert throughout the trial not being necessary, his testimony being more of an argument than an argument. expertise " [74] .

162 The award of trial costs within the discretion of the trial judge requires the Court to show a great deal of restraint and, even more so, when the judge explains them for serious reasons, as he does. right here.

163 Therefore, I do not think there is any reason for intervention except on one point.

164 With respect, the Judge should not have distinguished, for the purpose of awarding costs, Bonneau, Benoît, Nadeau, on the one hand, and Lyrco , on the other. In fact, these four people are closely related to each other, as are the various elements of their defense, Lyrco having been the corporate vehicle by which Bonneau, Benoît and Nadeau, both before and after the dismissal, chose to engage in the activities that are the subject of the dispute. To separate them into two groups does not seem appropriate in the circumstances and unduly duplicates the effect of the award of costs in their favor.

165     One might be tempted to include Élevages in this group, since this company, prior to the dismissal, also participated in the litigious activities. That being said, the involvement of Elevages in the contentious activities of the other respondents after the dismissal has not been established, while the bulk of the action, in monetary terms, is aimed at these post-dismissal activities. Likewise, Management has nothing to do with pre- and post-dismissal litigation and, in a way, it is not unreasonable to put these two companies in the same group. Whatever the case may be, the final result would be almost the same: if we place Élevages with the Bonneau group, Benoît, Nadeau and Lyrco , Gestion would remain alone on its side,Concentrated , in practice.

## VI. CONCLUSION

166 For all these reasons, I therefore propose to dismiss the appeal, with costs, with respect to the part relating to Concentrés' main action against the respondents, except as to the award of costs at first instance. The conclusion in paragraph 124 of the judgment at trial must therefore be modified in this regard, so that this conclusion states rather than:

[124] REJECTS the action of SCIENTIFIC CONCENTRATES BÉLISLE INC. with costs in favor of the defendants grouped as follows: DAVID RÉGIS BONNEAU, YVES BENOÎT, LUC NADEAU and LYRCO NUTRITION INC. including his expert fees of $ 32,059.77; THE BREEDS BENEDICT AND NADEAU ENR. and BENOIT MANAGEMENT AND NADEAU INC .; MARTHE BÉNARD and GARY BÉLANGER.

167 With respect to the appeal of the convictions arising from the counterclaim, I propose that it be allowed in part, with costs, for the sole purpose of subtracting $ 10,000 from each of the amounts in paragraphs 126, 127 and 128 of the judgment of first instance. instance (and correcting a clerical error), so that these paragraphs now state that:

> [126] CONDEMNED SCIENTIFIC CONCENTRATES BÉLISLE INC. to pay DAVID RÉGIS BONNEAU the sum of $ 6,699.45 with the legal interest and the additional indemnity provided for in article 1619 CCQ as of December 22, 1994.

> [127] CONDEMNED SCIENTIFIC CONCENTRATES BÉLISLE INC. to pay to YVES BENOÎT the sum of $ 13,321.23 with the legal interest and the additional indemnity provided for in article 1619 CCQ as of December 22, 1994.

> [128] CONDEMNED SCIENTIFIC CONCENTRATES BÉLISLE INC. pay LUC NADEAU the sum of $ 3,270 with the legal interest and the additional indemnity provided for in article 1619 CCQ from December 22, 1994.

Solicitors of record:

*Desjardins Ducharme Stein Monast* , for the appellant

*Legault Joly Thiffault* , for the respondents

| Footnotes |
|---|

1     Par. 86 of the judgment of first instance.

2     Par. 99 of the judgment of first instance.

3     See the statement of defense and counterclaim of January 14, 2001.

4     See Defense Findings and Amended Counterclaim of January 14, 2001, which detail the claim for commissions and bonuses.

5     See: *Lapointe* v *Le Gardeur Hospital* , [1998] 1 SCR 351 ; *HL c. Attorney General of Canada* , [2005] 1 SCR 401 ; *Prud'homme c. Prud'homme* , [2002] 4 SCR 663 ; *Housen c. Nikolaisen* , [2002] 2 SCR 235 ; *Simard c. Tremblay* , 2005 QCCA 887, JE 2005-1838 ; *Allaire c. Girard & Associés (Girard et Cie Chartered Accountants)* , 2005 QCCA 713, JE 2005-1539 ; *Vachon c. Routhier* , 2005 QCCA 631, JE 2005-1315 .

6     See for example: *Bank of Montreal c. Ng* , [1989] 2 SCR 429 ; *Armanious c. Datex Bar Code Systems Inc./ Datex Bar Code Systems inc.* , [2001] RJQ 2820 , [2001] RJDT 1743 (CA) ; *Abbas-Turqui c. LNS Systems Inc.* , JE 2004-898 (CA) ; *Pro-quai inc. c. Tanguay* , 2005 QCCA 1217, JE 2006-138 .

7     It is obviously difficult to imagine an employer allowing the employee to behave dishonestly, but the situation is different in terms of conflict of interest, since the employer can authorize what would normally be considered a breach in this respect.

8     The refusal to hand over these goods, moreover, constitutes in some cases an outright theft, without regard to the notion of loyalty.

9     The factors mentioned above will be considered again (for example: nature of the contract and the company, nature, conditions and hierarchical level of the position held by the former employee, length of service of the former employee within the the business of the employer, reasons for the termination of the employment contract, state of competition in the sector of the employer's activities, etc.). In addition, the reasons and circumstances of the termination of the employment contract and the length of service of the former employee will be considered. Thus, the unjustified nature of a dismissal may have a downward effect over the reasonable period of time. The good or bad faith of the former employee may be an element to be considered in assessing the duration of this reasonable period of time.

1/6/2019     Bélisle c. Scientific Concentrates 2001-... c. Lyric Nutrition (07/11/3 ses... Mead...

Case 2:18-cv-01543-RAJ   Document 92-1   Filed 01/07/19   Page 26 of 29

10     On the whole, see for example: *Excelsior (L '), life insurance company c. Mutual Life Insurance Company of Canada* , [1992] RJQ 2666 (CA) ; *Dufresne c. Christie Group Ltd.* , [1992] RDJ 546 (CA) ; *Positron c. Desroches* , [1988] RJQ 1636 (out of court settlement, CA, 1991-09-16, 500-09-000620-880); *Improthèque inc. c. St-Gelais* , [1995] RJQ 2469 (CS); *Financial Group Assbec c. Dion* , [1995] RDJ 172 (CA); *Frank White Enterprises Inc. c. 130541 Canada inc.* , JE 95-1233 (CA); *Armanius c. Datex Bar Code Systems Inc./ Datex Bar Code Systems inc.*, supra note 6; *National label inc. c. Sarrazin* , JE 2002-508 ; *Flexart Industries Ltd. c. Baril* , [2003] RJQ 665 , [2003] RJDT 39 (CA) ; *Management Marie-Lou (St-Marc) inc. c. Lapierre* , JE 2003-1698 (CA) ; *Claisse Scientific Corporation inc. c. Katanax Instruments Inc.* , 2006 QCCA 1425, JE 2006-2266 .

11     See judgment of first instance, para. 7.

12     On this subject, see Paré's testimony, appellant's factum, p. 1295, which describes the business sector in which Concentrates works as being "very, very competitive as a medium". To the P. 1507, Paré will speak of "very fierce" competition. This is also explained by Nadeau, appellant's factum, p. 2880 *in fine* -2881.

13     Appellant's Brief, p. 903-904.

14     Bélisle , in her testimony, estimates, approximately, the gross margins on each of the types of products (appellant's factum, page 1856 *in fine* -1857): 55% for vitamin and mineral blends, 25% for mineralized supplements, 15% for by-products and feeds, 10% for the rest. These figures are repeated by the expert Després (for Concentrates ), appellant's factum, at p. 3275.

15     Testimony of Paré, appellant's factum, p. 1404.

16     On the whole, see Belisle's testimony , especially at p. 1707-1708, 1808-1809, 1837, 3095-3096 of the appellant's factum and, in the case of Lebrun, p. 1838 and s.

17     Appellant's Brief, p. 283.

18     Exhibit P-23, Appellant's Brief, p. 513.

19     See, in particular, Nadeau's testimony, at p. 2886 and 2945 of the appellant's factum, and that of Bonneau, particularly at p. 2219 *in fine* , 2220 and 2458-2459.

20     Exhibit P-19, Volume 2 of the record (as delivered at the hearing).

21     Testimony of Bonneau, Appellant's Brief, p. 2687-2689 and 2691.

22     Testimony of Benoît, Appellant's Brief, p. 2485-2492.

23     Testimony of Benoît, Appellant's Brief, p. 2484.

24     Testimony of Bonneau, Appellant's Brief, p. 2528.

25     Testimony of Bonneau, Appellant's Brief, p. 2546-2547.

26     Testimony of Bélisle , Appellant's Brief, p. 3086.

27     Testimony of Bonneau, Appellant's Brief, p. 2651-2652.

28     Testimony of Nadeau, appellant's factum, p. 2980.

29     Testimony of Gilbert, Appellant's Brief, p. 2077 *in fine* , 2078 and 2079.

30     Testimony of Gilbert, Appellant's Brief, p. 2081.

31     On creation and management activities, see in particular the testimony of Bélisle , appellant's factum, p. 1709-1713 and 1716, and that of Nadeau, p. 2834-2835. See also Exhibit P-35, a note sent by Bélisle to Benoît and Nadeau on September 17, 1991.

32     See in particular Exhibit D-5 (letter summoning the sellers of Concentrates to a meeting where certain topics are to be discussed), Appellant's Brief, p. 926-

Case 2:18-cv-01549-RAJ   Document 92-1   Filed 01/07/19   Page 27 of 29

927; Benedict's testimony, p. 2208 et se .; Bonneau's testimony, at p. 2503 and s. (particularly from 2510); testimony of Nadeau, p. 2843.

33     On this subject, see in particular the testimony of Benoît, appellant's factum, p. 2239 and s .; Bonneau's testimony, p. 2669-2670 and testimony of Nadeau, p. 2877.

34     Testimony of Bélisle , Appellant's Brief, p. 1802.

35     Testimony of Bélisle , Appellant's Brief, p. 3157 *in fine* , and 3158.

36     See in particular para. 94 of the judgment of first instance.

37     Testimony of Paré, appellant's factum, p. 1475, line 18.

38     On the entire Lieutenant incident, see: testimony of Paré, appellant's memorial, notably p. 1473-1481 and 1667-1668; testimony of Bonneau, appellant's factum, p. 2557-2601. On the reaction of Bonneau, see the testimony of the latter, including p. 2596-2600 of the appellant's factum.

39     Testimony of Bonneau, Appellant's Brief, p. 2601.

40     Testimony of Paré, appellant's factum, p. 1480.

41     On the account of the meeting, see Bonneau's testimony, appellant's factum, p. 2610-2613 and 2661.

42     Exhibit P-10 (Letter to Benoît and Letter to Nadeau), Appellant's Brief, p. 295-296.

43     Exhibit P-11, Appellant's Brief, p. 297.

44     Exhibit P-12, Appellant's Brief, p. 298.

45     Exhibit P-13, Appellant's Brief, p. 299-300.

46     Letters of dismissal, Exhibit P-14 (Bonneau), P-15 (Benoît) and P-16 (Nadeau), appellant's factum, p. 301 to 303.

47     On this point, see Nadeau's testimony, appellant's factum, p. 2899-2902.

48     Testimony of Bélisle , Appellant's Brief, p. 1988.

49     Testimony of Bonneau, Appellant's Brief, p. 2780-2781.

50     See Lyrco 's Bills in the Experts' Report of Concentrates , Appellant's Brief , Vol. 2, tab 2, p. 356-358.

51     See Nadeau's testimony, appellant's factum, p. 2869.

52     See the testimony of Benoît, appellant's factum, p. 2233-2234. See also Nadeau's versions, p. 2869, and s., And Bonneau, p. 2642.

53     See the Experts' Report of Concentrates , Exhibit P-19, Appellant's Brief, Vol. 2, tab 2, p. 358 and s. See also para. 113 of the judgment of first instance, which summarizes the amount of Lyrco's sales in the months following the dismissal.

54     Livestock would have ordered minerals and vitamins at Hoffmann Laroche (competitor of Concentrates ), to do experiments, says one. Concentrated sees another sign of disloyalty.

55     Gilbert, director of the warehouse of Concentrés in St-Valérien is the one who reports the incident Hoffmann Laroche; he also tells that, twice, Benoît would have, before May 1994, offered a job at Lyrco , which Benoît formally denies. The judge did not believe Gilbert, which he describes the version of "suspicious" for reasons that he explained in para. 62 and 63 of his judgment.

56     See the testimony of expert Després (for Concentrates ), Appellant's Brief, p. 3255, 3273, and his report, Exhibit P-19, p. 17 (Appellant's Brief, 334).

57     See, in particular, the testimony of Paré, appellant's factum, p. 1649-1650. See also the testimony of Belisle , who admits that the information was at the

client's premises (although it might be difficult to reconstruct it), appellant's factum, p. 1819-1820.

58      While Bonneau, in 1990, had signed a written contract stipulating the exclusivity of services, exclusivity that must be assessed according to the facts of the case. See Exhibit P-28, Appellant's Brief, p. 679 *in fine* .

59      Testimony of Bélisle , Appellant's Brief, p. 3157 *in fine* and 3158.

60      Exhibit P-9, Appellant's Brief, p. 294.

61      We are not talking here about illegal decisions, but about business or management decisions and the like.

62      Above, note 6.

63      Exhibit D-6, Experts' Report of the Respondents, Appellant's Brief, p. 956.

64      Exhibit P-12, Appellant's Brief, p. 298.

65      The recent case law of the Court also tends to allow a solicitation of clients formerly served by the former employer, under certain conditions. See for example: *Gestion Marie-Lou (St-Marc) inc. c. Lapierre* , supra note 10, in particular paras. 44 to 49; *National label inc. c. Sarrazin* , supra note 10, in particular paras. 33 and s. Of course, the assessment of the undue nature of the solicitation of customers must take into account the context of the case. See for example: *Financial Group Assbec c. Dion* , supra note 10; *Armanious c. Datex Bar Code Systems Inc./ Datex Bar Code Systems inc.* , supra, note 6.

66      Unlike what is observed in the case *Armanious c. Datex Bar Code Systems Inc./ Datex Bar Code Systems inc.* , supra, note 6.

67      See the testimony of expert Després (for Concentrates ), Appellant's Brief, p. 3255 *in fine* , 3256 and 3274: the sales of concentrates declined by about 2.5 million between 1 st April 1994 and 31 March 1995. See also the report of this expert, Exhibit P-19 (Appellant's Brief, pp. 334-335)

68      See Paré's testimony on this subject, Appellant's Brief, p. 1658-1660, 1661; See the testimony of expert Després, Appellant's Brief, p. 3313-3317 and that of the expert Fontaine, appellant's factum, p. 3367-3372 (which also speaks of the product for pigs).

69      On the product for hogs, see Nadeau's testimony, appellant's factum, p. 2872-2875, Bélisle's testimony , p. 3049 to 3051. See also Paré's testimony, appellant's factum, p. 1663-1664.

70      Above, note 10.

71      *Id.* , P. 2684.

72      *Id.* , P. 2686.

73      Testimony of Bélisle , Appellant's Brief, p. 1989-2002.

74      Appellant's Brief, p. 46 *in fine* and 47.

**End of the document**      © Thomson Reuters Canada Limited or its licensors (except individual legal documents).

All rights reserved.

Westlaw. © 2019 Thomson Reuters  |  Privacy Statement  |  Accessibility  |  Supplier Terms  |  Contact Us  |  1-800-REF-ATTY (1-800-733-2889)  |  **Improve Westlaw**     THOMSON REUTERS