# EXHIBIT A

1

The Honorable Richard A. Jones

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

10

| | | |
|---|---|---|
| BOMBARDIER, INC., | ) | |
| | ) | NO. 2:18-cv-1543 RAJ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | DECLARATION OF |
| MITSUBISHI AIRCRAFT CORPORATION, | ) | LAURUS BASSON |
| MITSUBISHI AIRCRAFT CORPORATION | ) | |
| AMERICA, INC.; AEROSPACE TESTING | ) | |
| ENGINEERING & CERTIFICATION, INC.; | ) | |
| MICHEL KORWIN-SZYMANOWSKI; | ) | |
| LAURUS BASSON; MARC-ANTOINE | ) | |
| DELARCHE; CINDY DORNÉVAL; KEITH | ) | |
| AYRE; and JOHN AND/OR JANE DOES 1-88,) | | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I, Laurus Basson, declare as follows:

1.    I am an Aerospace Engineer – Mechanical Systems at Aerospace Testing Engineering & Certification, Inc. ("AeroTEC"), and a named defendant in this action.  I make this declaration based on personal knowledge and am otherwise competent to testify to the matters stated herein.

2.    I have a master's degree in mechanical engineering and more than 30 years' experience in the development, testing and certification of aircraft hydro-mechanical systems.  A true and correct copy of my resumé is attached as Exhibit A.

BASSON DECLARATION - 1
#1208326 v2 / 45898-028

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

3.      I was employed by plaintiff Bombardier, Inc., for about three years.  I started in 2013 as a Senior Engineering Specialist (SES), working primarily on flight controls, but I also worked on hydraulics and landing gear systems on Bombardier's Global 5000/6000 aircraft, solving advanced problems and supporting the production line on engineering issues.  The role also required that I be "on call" at times, and I was called after hours to resolve or assist in resolving engineering issues on the production line.

4.      I lived about 120 miles from my workplace in Toronto, and each day I commuted to and from work.  In addition to being "on call", I would often work after hours at home, which required that I have company documents on a laptop.

5.      In 2015 I became a Candidate Design Approval Designee (DCAD) for Bombardier, and started working 50% of my time on the Global 7000/8000 at Bombardier, which required occasional travel to St. Laurent in Montreal.

6.      Towards the latter part of 2015 I was asked to work full time in the DAD capacity and as Subject Matter Expert on the Global 7000 High Lift system.   This required me to travel to Montreal every week and spend the week there, which was a strain on my family life.  It was my responsibility to provide guidance to engineers in the design and certification approach to ensure the design would be certifiable by Transport Canada Civil Aviation ("TCCA"), Canada's aircraft regulatory agency.

7.      I was hired by Bombardier because of my skills, experience, and certification knowledge.  These attributes were due to my previous experience and skills, not to anything that I learned while working for Bombardier.  To this point, although a CDAD usually works under close supervision of a DAD, I was given the job with the authority of a DAD and only contacted DADs if I needed help, which is further confirmation that Bombardier considered my skills and expertise satisfactory.

8.      Most of the work I performed for Bombardier was on a company laptop.  I took my work laptop home on some occasions, but I also needed to do work on my personal computer, which was a common practice for Bombardier employees. It was common for Bombardier

BASSON DECLARATION - 2
#1208326 v2 / 45898-028

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1    employees to work at home from time to time.   Throughout my time at Bombardier, it was

2    common knowledge that employees would send documents to their personal email addresses and

3    work on them using personal computers.  Bombardier did have a system for remote access, but it

4    was often difficult and sometimes impossible to do so.  To avoid any such difficulties, many

5    employees would simply send documents to their personal email addresses.  I did this many times

6    throughout my career at Bombardier.  This was common knowledge.  I also sometimes used my

7    personal email to communicate with other Bombardier employees, and to send them documents

8    and other information on a task.  At no time did anyone ever raise any issues or concerns using

9    personal emails or computers for work.  I certainly was never disciplined for that, or for any other

10   reason, during my time at Bombardier.  My personal email is password protected and only I have

11   access to it.

12        9.      Bombardier was a frustrating place to work.  It was very bureaucratic, and not

13   efficient.  My salary was not good, and yearly bonuses were small and not dependent on how hard

14   you worked.  In 2015 there were a few rounds of layoffs at Bombardier.  This created an

15   atmosphere of uncertainty and I therefore decided to start looking for another job.  The uncertainty

16   continued when in early 2016 Bombardier announced it was laying off about 800 engineering

17   personnel.

18        10.     I left Bombardier on March 4, 2016, to work at AeroTEC.  I was not recruited by

19   anyone at AeroTEC.  I had been looking for another job because of impending layoffs Bombardier

20   was planning, and I found an open position at AeroTEC on the internet so I submitted an

21   application.  I also applied for other jobs at that time, but received first an offer from AeroTEC on

22   February 12, 2016, and accepted the offer.  My first day of work for AeroTEC was March 14,

23   2016.

24        11.     Towards the end of my employment with Bombardier, I was tasked to present

25   Bombardier's proposed certification of the Global 7000/8000 Skew Detection System (SDS) to

26   TCCA.  The Wing High Lift System (WHLS) of the Global 7000/8000 was supplied by United

27   Technologies Aerospace System (UTAS) and included a skew detection function to detect the

BASSON DECLARATION - 3
#1208326 v2 / 45898-028

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1  skew of a flap.  This WHLS is a generic system, which is supplied by UTAS to various aircraft in

2  the aerospace industry.  ██████████████████████████████████████

3  ██████████████████████████████████████████████████████

4  ██████████████████  The SDS is also used on the Bombardier CRJ aircraft.  The SDS is a relatively

5  simple system, which consists of two sensors per flap actuator and a controller.  Although the SDS

6  and UTAS skew systems were two different systems, they were in principle the same in that both

7  systems had sensors feeding a controller.  The SDS is not capable of detecting all the failure modes

8  of a skew since it relies on detecting relative motion between two actuators and not the flap

9  position.   There was nothing exceptional or advanced technologically about the SDS.   A

10  description of the SDS can be found on page 4 of the Aviation Investigation Report A06Q0188,

11  issued by the Transportation Safety Board of Canada.  A copy of this report, which is publicly

12  available       to       the       public       (http://www.bst-tsb.gc.ca/eng/rapports-

13  reports/aviation/2006/a06q0188/a06q0188.pdf at page 4), is attached hereto as Exhibit B.

14  Understanding the SDS does not require any exceptional expertise, other than typical engineering

15  knowledge expected of a system engineer.

16      12.    A colleague of mine collected information on the SDS and compiled a draft

17  presentation to TCCA for the proposed certification of the Global 7000/8000 SDS.  In my capacity

18  as CDAD I was responsible to determine what had to be presented to TCCA and update the

19  presentation accordingly, before I had to present it to TCCA.  When I left Bombardier on March

20  4, 2016, I had not completed updating and finalizing the SDS presentation.  Out of goodwill and a

21  personal sense of obligation, I told my manager and my colleague that I would try to finalize the

22  presentation if I had time.  In order to update the presentation after leaving Bombardier, I would

23  need to access it on my personal computer.  I emailed a copy of two PowerPoint presentations to

24  my personal email for this purpose.  That email is attached as Exhibit J to Bombardier's Complaint.

25  There were two PowerPoint presentations attached to that email:

26          (a) TCCA Skew Detection Presentation- Updated with latest Systems and Structure
              limits 16-02-01.pptx; and
27

BASSON DECLARATION - 4
#1208326 v2 / 45898-028

1                (b) 2016-03-03 TCCA Skew Detection Presentation- JAN 28 FINAL.pptx.

2 (the "PowerPoint Presentations").  I sent these documents to myself for the legitimate business

3 purpose of helping to finish making updates as requested, even though I planned to do so on my

4 own time and without any compensation.

5         13.     After I left Bombardier, it was a busy time moving to the USA and I never got

6 around to completing the updates to the PowerPoint Presentations, and Bombardier never followed

7 up with me.  I may have opened the PowerPoint Presentations once or twice to work on them for

8 Bombardier, but I never completed the work.  Since then, the only time I have ever opened the

9 PowerPoint Presentations was last year when I learned that Bombardier had accused me of stealing

10 the documents.  I did so only because the title of the document Bombardier had identified seemed

11 different than the one I remembered emailing to myself.  I did not modify the documents and I

12 certainly never used the documents or disclosed them to anyone outside Bombardier.

13         14.     Bombardier is now accusing me of misappropriating its trade secrets, disclosing

14 those trade secrets to unspecified other people, and using those trade secrets for my work at

15 AeroTEC.  Specifically, Bombardier has claimed that the two PowerPoint Presentations contain

16 confidential information and trade secrets.  I understand the PowerPoint Presentations themselves

17 have been filed under seal as Exhibits A and B to the Declaration of Daniel Burns, filed on October

18 18, 2018.

19         15.     In January 2018, after I learned Bombardier was accusing me of stealing the

20 PowerPoint Presentations, I was asked to give my personal laptop to AeroTEC to image the data.

21 The data was saved on a hard drive that was recently given to Fronteo USA, Inc.  I also gave

22 Fronteo all of my other personal and work devices.  I understand Fronteo has imaged the data from

23 all my electronic devices.

24         16.     At paragraph 165 of its Complaint, Bombardier alleges that it owns "*information*

25 *used for C-Series aircraft's design, development, testing, evaluation, certification, and*

26 *commercialization for use in the United States and abroad. Such information includes, but is not*

27 *limited to, information contained in two proprietary PowerPoint slide decks entitled, "TCCA Skew*

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1    *Detection Presentation- Updated with latest Systems and Structure Limits 16-02-01.pptx" and*

2    *"2016-03-03   TCCA   Skew   Detection   Presentation-JAN   28   FINAL.pptx"   (collectively,*

3    *"Bombardier Skew Detection TCCA Files").*"  I worked on the Global 7000/8000 and not the C-

4    Series.  The PowerPoint Presentations are not related to the C-Series.

5          17.     Bombardier further states that "[e]*ven the applicable regulations for which*

6    *Bombardier tested compliance are not readily ascertainable, because those particular regulations*

7    *applicable to a specific system are a subset of countless regulations relating to commercial aircraft*

8    *certification, ..."*  Complaint, ¶60.  The overall certification process is well described in documents

9    such as Advisory Circular (AC) No.521-002 (Type Certificate Requirements of Aircraft, Engines

10   and Propellers), FAA Order 8110.4C Change 6 Type Certification and The FAA and Industry

11   Guide  to  Product  Certifcate,  which  are  openly  available  to  the  public.   Bombardier  also

12   acknowledges FAA Order 8100C in their complaint, ¶29. Part V – Airworthiness Chapter 525 –

13   Transport Catergory Aeroplanes (Transport Canada) and Code of Federal Regulations Part 25

14   (Federal  Aviation  Administration)  clearly  define  the  regulations  that  are  applicable  to  the

15   certification of transport aircraft and systems.  Furthermore, documents such as AC 525-015

16   Aeroplane Flight Control System Failure Analysis, AC No. 525-016, Lift and Drag Devices,

17   Control  and  Indicators,  FAR/JAR  25.671  FCHWG - ARAC  Report,  AC/AMJ  26.671  Control

18   System General provide guidance for the interpretation of the regulations.  The certification

19   approach of the UTAS skew system had already been defined in the WHLS Certification Plan, so

20   the certification approach of the additional SDS was not novel and was readily ascertainable.

21         18.     Bombardier further claims that its trade secrets include SDS design information

22   which is predicated on the CRJ SDS.  As mentioned previously, the SDS design, functionality and

23   components  are  described  in  Aviation  Investigation  Report  A06Q0188  (Exhibit B),  which  is

24   available on the internet.

25         19.     When I left Bombardier, I was keenly aware of my duty not to use or disclose any

26   Bombardier trade secrets to anyone.  I have never shared or given any Bombardier documents or

27   information to any other person, at AeroTEC, MITAC, or otherwise.

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

20.     I did not sign a noncompete agreement or any confidentiality agreement with Bombardier, and I am not aware of anyone in my Bombardier group who did so.  Bombardier had a Code of Ethics and Business Conduct ("Code of Ethics"), a copy of which is attached to Bombardier's Complaint as Exhibit D.  I acknowledged receipt of the Code of Ethics, and I at all times to this day have taken my obligations seriously.  I understood that I was to use confidential information and trade secrets only for legitimate business purposes, and to disclose it only to Bombardier employees or others for whom the confidential information was intended.  Neither the Code of Ethics or other policy prohibited me from sending documents to myself at my personal email account or otherwise making copies for myself for Bombardier work, as long as it was done securely and without disclosing the documents to others.  Nobody else has access to my personal email or computer, so I reasonably believed it was safe to send myself documents.

21.     Before I went to work for AeroTEC, I expressly agreed that I would not use or reveal any Bombardier trade secrets or confidential or proprietary information to AeroTEC.  AeroTEC's appointment letter, which I signed, expressly provided that I would not "use or reveal to AeroTEC, any trade secrets, confidential or proprietary information, or any other information belonging to Bombardier."  A true and correct copy of my appointment letter dated February 12, 2016 (with personal, confidential information redacted), which I signed before commencing work at AeroTEC, is attached hereto as <u>Exhibit C</u>.  I have never used or revealed any such information to AeroTEC, any of its employees, or anyone else.  I fully understood that I could not use any Bombardier confidential information for AeroTEC work, and I would not have done so even if the PowerPoint presentations would have been useful or relevant.  I have never shown, disclosed or sent the PowerPoint Presentations to anybody outside Bombardier.  I have never used the PowerPoint Presentation or any of the information contained in them for any purpose since leaving Bombardier.    Nobody at AeroTEC has ever asked me to provide them with any confidential Bombardier information.

22.     The skew systems described in these documents are not complex and available to the public.  *See* Exhibit B.  The PowerPoint Presentations would in any case have no value to

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1   AeroTEC or me or anyone else working on the MRJ, since it cannot detect all the flap skew failure

2   modes.  Furthermore, the SDS system is not implemented on the MRJ.  The MRJ's skew system,

3   which is supplied by UTAS, was incorporated into the MRJ before I left Bombardier.  The SDS

4   and MRJ skew systems are different.  Since the SDS is not installed on the MRJ, the information

5   in the PowerPoint Presentations is irrelevant to the MRJ design and certification.

6        23.    At AeroTEC, I am not responsible for dealing with certification of the MRJ as a

7   DAD or DER (Designated Engineering Representative), and have no authority to implement

8   design changes to the MRJ or interfacing with any certification authorities.  That is all done by

9   MITAC. AeroTEC has done nothing to change the MRJ skew system since I began working at

10   AeroTEC.  It was also not part of the design changes because of non certifiable issues, referred to

11   by Bombardier.  Testing is still a way off, so changes to the skew system may be required in the

12   future.  Whatever changes may be required, the PowerPoint Presentations would be of no use or

13   value to MITAC, me or anyone else at AeroTEC. It cannot detect all the skew failure mode.

14   Bombardier is seeking to enjoin me from "[u]sing, accessing, imitating, copying, disclosing or

15   making available to any person or entity" the PowerPoint Presentations or any information

16   contained therein.  I have never done so, and I have no intention, need or desire to do so.

17        24.    Bombardier makes a categoric accusation that I have "… *misappropriated the*

18   *confidential, proprietary, and trade secret information described above, including but not limited*

19   *to the Bombardier Skew Detection TCCA Files, in an improper and unlawful manner as alleged*

20   *herein. Additionally, and upon information and belief, on or after May 11, 2016, Defendant Basson*

21   *disclosed this and potentially other Bombardier trade secret information to others without*

22   *Bombardier permission…*".  Complaint, ¶169.  I respectfully request that Bombardier be instructed

23   to define what other information it believes I have used or disclosed, to provide detailed

24   substantiation of how this and "*potentially other*" information was misappropriated, and to identify

25   to whom it was disclosed.  This is essential in order for me to properly defend myself against these

26   allegations.

27        25.    The information in the TCCA PowerPoint presentations at issue is either basic

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1  engineering knowledge common to all aircraft, or specific to Bombardier's Global 7000 aircraft

2  and of no use or relevance to the MRJ.  It does list certain regulations, but does not disclose the

3  means of compliance with those regulations, which would possibly be the useful or proprietary

4  part.  There is nothing in these documents about Bombardier's certification approach.

5       I declare under penalty of perjury of the laws of the United States that the foregoing is true

6  and accurate.

7       Executed this 20th day of December, 2018, at Seattle, Washington.

8

9                                    *Basan*

10       _____

11       Laurus Basson

BASSON DECLARATION - 9
#1208326 v2 / 45898-028

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100