1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10

BOMBARDIER INC.,

CASE NO. C18-1543JLR

11

                    Plaintiff,

ORDER ON MOTIONS TO
DISMISS

         v.

12
13

MITSUBISHI AIRCRAFT
CORPORATION, et al.,

14

                    Defendants.

15

## I.   INTRODUCTION

16
17

    Before the court are:  (1) Defendant Mitsubishi Aircraft Corporation America,

Inc.'s ("MITAC America") motion to dismiss certain claims (MITACA MTD (Dkt.

18

# 54)); and (2) Defendants Aerospace Testing Engineering & Certification, Inc.

19

("AeroTEC"), Michel Korwin-Szymanowski, Laurus Basson, and Cindy Dornéval's

20

(collectively, "AeroTEC Defendants") motion to dismiss certain claims (AeroTEC MTD

21

(Dkt. # 56)).  Plaintiff Bombardier Inc. ("Bombardier") opposes both motions (Pl.

22

MITACA Resp. (Dkt. # 91); Pl. AeroTEC Resp. (Dkt. # 92)), and MITAC America and

AeroTEC Defendants filed replies (MITACA Reply (Dkt. # 96); AeroTEC Reply (Dkt.

# 95)).  The court has considered the motions, the parties' submissions concerning the

motions, the relevant portions of the record, and the applicable law.  Being fully advised,[1]

the court GRANTS MITAC America's motion, GRANTS in part and DENIES in part

AeroTEC Defendants' motion, and GRANTS Bombardier leave to file an amended

complaint within 15 days of the date of this order.

## II.    BACKGROUND

This action concerns alleged trade secret misappropriation and related claims for

breach of contract and tortious interference with business expectancies and/or contracts.

(*See generally* Compl. (Dkt. # 1).)

**A.    The Parties and Aircraft Certification**

Bombardier is a Canadian corporation and one of the world's leading plane

manufacturers.  (*Id.* ¶¶ 2, 21.)  Bombardier employs more than 29,000 people in its

Aerospace division.  (*Id.* ¶ 22.)  As part of its operations, Bombardier developed the

C-Series, which is a "clean-sheet" aircraft in a family of "medium-range jet airliners that

marks a dramatic improvement over older competing aircrafts in terms of efficiency and

dependability."  (*Id.* ¶ 23.)  The C-Series can accommodate between 110 and 135

//

//

---

[1] The parties have requested oral argument (*see* MITACA MTD at 1; Pl. MITACA Resp. at 1; AeroTEC MTD at 1; Pl. AeroTEC Resp. at 1), but the court finds oral argument unnecessary to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

1   passengers over 3,200 nautical miles and does so "at measurably lower operating costs

2   than existing aircraft of that class." (*Id.*)

3          Bombardier began investigating the feasibility of the C-Series in 2004, with efforts

4   picking up "in earnest" in January 2007. (*Id.* ¶¶ 24-25.) Bombardier then committed

5   "full-scale resources to the C-Series program over the next six-and-a-half years," at

6   which point it received government approval for the first C-Series aircraft test flight. (*Id.*

7   ¶ 26.) After another three years and further government approvals, the first C-Series

8   entered service. (*Id.*)

9          A clean-sheet aircraft is difficult and costly to certify. (*Id.* ¶¶ 27-32.) Since 2000,

10  only four companies worldwide have developed a commercial clean-sheet aircraft that

11  meets the requirements of the Federal Aviation Administration ("FAA") and the FAA's

12  counterparts in Canada and Europe. (*Id.*) In addition to the many steps involved in

13  certifying an aircraft, the certification processes have time limits. (*Id.* ¶ 30.) For

14  example, one certification process—the "type certification"—must be completed within

15  five years. (*Id.*) If an applicant fails to achieve certification within this time limit, it must

16  certify the aircraft to updated FAA standards, "thereby incurring significant and

17  redundant costs in the process." (*Id.*) Bombardier has certified 10 clean-sheet design and

18  derivative programs since 2006. (*Id.* ¶ 33.) According to Bombardier, "[t]his whole

19  process—design, certification, production—is the heart of each company's competitive

20  //

21  //

22  //

1   advantage, its own special secret sauce." (*Id.* (quoting Denkenberger Decl. (Dkt. # 1-10)

2   ¶ 15, Ex. 14 at 64[2]).)

3         Around the same time that Bombardier began investigating the C-Series, "the

4   Japanese government in conjunction with Mitsubishi Heavy Industries, Ltd. ('MHI')

5   initiated its own investigation into the feasibility of a similar aircraft project—the

6   Mitsubishi Regional Jet ('MRJ')." (Compl. ¶ 34.)  MHI then established Defendant

7   Mitsubishi Aircraft Corporation ("MITAC"), a Japanese corporation, to "conduct MRJ

8   business." (*Id.* ¶¶ 3, 35.)  The MRJ program was officially launched in 2008, with a 2013

9   target date for the MRJ to enter service. (*Id.* ¶ 35.)  The MRJ, however, experienced

10  numerous delays. (*Id.* ¶¶ 36-43.)  As a result, on June 4, 2014, MITAC formed MITAC

11  America to help with the MRJ's design, development, and certification. (*Id.* ¶ 41.)

12  MITAC America is a subsidiary of MITAC. (*Id.* ¶ 4.)  Further, by July 14, 2014, MITAC

13  enlisted AeroTEC, "a small engineering company that provides flight-testing and aircraft

14  certification services, [to] provide technical support for MITAC's MRJ project." (*Id.*

15  (internal quotation marks omitted).)  On August 3, 2015, MITAC, MITAC America, and

16  AeroTEC created and jointly staffed the Seattle Engineering Center to manage the MRJ's

17  flight testing, development, and certification in the United States. (*Id.* ¶ 42.)

18        Despite these efforts, the MRJ incurred further delays. (*Id.* ¶¶ 43-48.)  In January

19  2017, MITAC announced the fifth delay, changing the delivery date to sometime around

20  2020. (*Id.* ¶ 47.)  In explaining this fifth delay, MITAC stated that it made design

21

22      [2] In citing to Mr. Denkenberger's declaration and exhibits, the court cites to the page numbers on the top of the page provided by CM/ECF.

changes to the MRJ's avionics bay and electrical wire routing in December 2016, which required additional certification.  (*Id.* ¶ 48.)  MITAC further explained that, because of this delay, it "would be forced to return to the first stages of preliminary design review for the design change area."  (*Id.* ¶ 47 (internal quotations omitted).)  In sum, MITAC claimed that the fifth delay was needed to mitigate the "risk of not meeting certification criteria, or having to make changes even further down the aircraft's development."  (*Id.* ¶ 48.)

**B.    Bombardier Employee Recruitment**

Shortly before MITAC announced the MRJ's fourth delay in December 2015, MITAC, MITAC America, and AeroTEC began to recruit Bombardier personnel.  (*Id.* ¶ 49.)  As part of this effort, MITAC and MITAC America organized a job fair in Montréal, Canada for July 15-16, 2016, at a venue located less than one kilometer from Bombardier's principal place of business.  (*Id.*)  In promoting this job fair, MITAC and MITAC America advertised that they were "looking to hire over 200 Aircraft System Engineers who can work on Certification activities of MRJ aircraft."  (*Id.* (quoting Denkenberger Decl. ¶ 29, Ex. 28 at 135).)

Bombardier claims that these recruitment efforts quickly paid off for MITAC and MITAC America.  For example, on August 18, 2016, MITAC hired Keith Ayre to join the MRJ project.  (Compl. ¶ 49.)  Mr. Ayre had been a Design Approval Designee for Bombardier and "was critical to Bombardier's own certification efforts regarding the C-Series and Global 7000/8000 Aircraft."  (*Id.*)  Bombardier asserts that, although Mr. Ayre did not terminate his Bombardier employment until August 26, 2016, "MITAC was

1   actively soliciting, and Mr. Ayre was actively providing, MRJ certification guidance

2   during Bombardier business hours."  (*Id.*)

3          In addition to the Montréal job fair, AeroTEC organized a job fair for October

4   23-24, 2015, in Wichita, Kansas, which is the home of Bombardier's Flight Test Center

5   in the United States.  (*Id.* ¶ 50.)  AeroTEC held this job fair "to interview candidates to

6   work on MRJ flight testing in Seattle."  (*Id.*)  AeroTEC arranged for billboards

7   advertising the job fair to be displayed immediately outside Bombardier's Flight Test

8   Center.  (*Id.* (citing Denkenberger Decl. ¶ 30, Ex. 29 at 137-41).)

9          MITAC, MITAC America, and AeroTEC also retained a recruiting service,

10  contacted Bombardier personnel via email, and used successfully-recruited former

11  Bombardier personnel to entice former colleagues to join MITAC, MITAC America, and

12  AeroTEC.  (*Id.* ¶ 51.)  For example, Mr. Korwin-Szymanowski of AeroTEC—who had

13  worked at Bombardier for approximately 15 years—sent an email on October 20, 2015,

14  to 247 Bombardier email accounts stating that positions were open immediately to work

15  on "the development and certification" of the MRJ.  (*Id.* ¶¶ 6, 51.)

16         Bombardier took numerous steps to stop AeroTEC's targeted recruitment of its

17  employees, including:  informing AeroTEC and Mr. Korwin-Szymanowski of the

18  ongoing confidentiality duties Mr. Korwin-Szymanowski owed to Bombardier;

19  explaining that the recruitment efforts were occurring at a critical time in Bombardier's

20  development of the C-Series, as well as the Global 7000 and Global 8000 Aircraft, and

21  therefore may harm Bombardier's affairs; and providing a copy of Bombardier's Code of

22  Ethics that contained employees' confidentiality agreements.  (*Id.* ¶¶ 52-53, Ex. D

1   ("Code of Ethics") at 17-18.)  Bombardier also repeatedly reached out to MHI and

2   MITAC to address similar concerns with recruiting, specifically expressing that

3   Bombardier has "reasons to believe that the employees recruited by MHI will use

4   intellectual property owned by Bombardier to assist MHI in developing the MRJ aircraft

5   which will compete against Bombardier aircraft."  (Compl. ¶¶ 54-58, Ex. H at 2.)

6   According to Bombardier, its attempts to stop the recruitment of its employees was

7   unsuccessful:  MITAC, MITAC America, and AeroTEC now employ "at least 92 former

8   Bombardier personnel whose current job responsibilities relate directly to the

9   development, certification, and/or commercialization of the MRJ."  (Compl. ¶ 59.)

10          Bombardier further claims that many of the employees who left "absconded with

11  highly sensitive Bombardier trade secret information."  (*Id.*)  For example, on Mr.

12  Basson's last day at Bombardier before joining AeroTEC to work on the MRJ, Mr.

13  Basson sent two "proprietary PowerPoint slide decks" from his Bombardier email

14  account to his personal email account.  (*Id.* ¶ 60; *see also id.*, Ex. J.)  Bombardier claims

15  that these slide decks "contain highly sensitive proprietary Bombardier trade secret

16  information concerning Bombardier's Global 7000/8000 Skew Detection System and

17  related confidential communications Bombardier made . . . for certification purposes."

18  (Compl. ¶ 60.)  These slide decks also contain "particularized information concerning

19  Bombardier's design, development, testing, and certification approach of the Global

20  7000/8000 Aircraft."  (*Id.*)  Mr. Basson signed Bombardier's Code of Ethics, though it is

21  unclear on what date.  (*See id.*, Ex. K ("Basson Code") at 2 ("DATE:  4 MA").)

22  //

1          Ms. Dornéval is another former Bombardier employee who is currently working

2   on the MRJ at AeroTEC.  (Compl. ¶ 62.)  According to Bombardier, "in the weeks, days,

3   and even hours before her departure, [Ms. Dornéval] sent several documents containing

4   highly sensitive Bombardier trade secret information to her personal email account."  (*Id.*

5   ¶¶ 62-64; *see id.* ¶ 62, Ex. O.)  These documents "constitute Production Test Flight

6   Profiles for Bombardier's CSeries [sic] Aircraft," which include "specific details

7   concerning the flight test profiles developed throughout previous certification which

8   Bombardier employed in gathering necessary data to obtain certificates of airworthiness

9   for the C-Series aircraft prior to being able to commercially deliver them."  (Compl.

10   ¶ 62.)  Further, on her last day at Bombardier, Ms. Dornéval repeatedly tried to send

11   additional Bombardier trade secrets to her personal email.  (*Id.* ¶ 63, Ex. Q.)  These files

12   contained "standards and requirements regarding aircraft accident and incident

13   investigations meeting regulatory certification requirements."  (Compl. ¶ 63 (internal

14   quotations omitted).)  However, the files Ms. Dornéval tried to send were too large,

15   causing the emails to fail.  (*Id.*)  Bombardier claims that Ms. Dornéval did successfully

16   transmit one of these documents over email.  (*Id.*)  In addition, Bombardier believes that

17   Ms. Dornéval "absconded with this information in either hard copy form or through

18   portable storage device means."  (*Id.*)  Ms. Dornéval signed the Code of Ethics on July 3,

19   2007, around the time she was hired.  (*Id*. ¶ 62, Ex. P ("Dornéval Code") at 2-3.)

20          Bombardier also claims that Defendants Keith Ayre and Marc-Antoine Delarche

21   similarly took Bombardier trade secrets that relate to the C-Series' certification in the

22   days and weeks before leaving Bombardier to work for MITAC and AeroTEC,

1    respectively.  (Compl. ¶¶ 61, 65-67.)  Mr. Ayre and Mr. Delarche both signed the Code

2    of Ethics.  (*See id.* ¶¶ 61, 65, Ex. N ("Delarche Code"), Ex. R ("Ayre Code").)

3    Bombardier also names Defendants John and/or Jane Does 1-88 on the belief that the

4    other former Bombardier employees who joined MITAC, MITAC America, and

5    AeroTEC seized Bombardier trade secrets.  (Compl. ¶¶ 68-69.)

6    **C.    Present Lawsuit**

7            Based on the foregoing facts, Bombardier brings suit against MITAC, MITAC

8    America, AeroTEC, Mr. Korwin-Szymanowski, Mr. Basson, Mr. Delarche, Ms.

9    Dornéval, Mr. Ayre, and John and/or Jane Does 1-88.  (*See generally id.*)  MITAC

10   America and AeroTEC Defendants now move to dismiss the claims that pertain to them

11   pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See generally* MITACA MTD;

12   AeroTEC MTD); Fed. R. Civ. P. 12(b)(6).  Specifically, MITAC America moves to

13   dismiss counts III and IV of the complaint, which allege federal and state law trade secret

14   misappropriation; and count VIII, which alleges tortious interference with a contractual

15   relationship and/or business expectancy.  (*See generally* MITACA MTD; *see also*

16   Compl. ¶¶ 92-114, 146-54.)  AeroTEC Defendants move to dismiss counts V, VI, X, XI,

17   XVI, XVII, XIX, and XX, which allege federal and state law trade secret

18   misappropriation against all AeroTEC Defendants; counts XII and XVIII, which allege

19   breach of contract against Ms. Dornéval and Mr. Basson; and counts IX and XXI, which

20   allege tortious interference with a contractual relationship and/or business expectancy

21   against AeroTEC and Mr. Korwin-Szymanowski.  (*See generally* AeroTEC MTD; *see*

22   *also* Compl. ¶¶ 115-36; 155-86; 210-59.)  The court now addresses the motions.

1

III.     ANALYSIS

2

**A.     Motion to Dismiss Standard**

3       Rule 12(b)(6) provides for dismissal for "failure to state a claim upon which relief

4  can be granted." Fed. R. Civ. P. 12(b)(6).  When considering a motion to dismiss under

5  Rule 12(b)(6), the court construes the complaint in the light most favorable to the

6  nonmoving party.  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946

7  (9th Cir. 2005).  The court must accept all well-pleaded facts as true and draw all

8  reasonable inferences in favor of the plaintiff.  *Wyler Summit P'ship v. Turner Broad.*

9  *Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).  The court, however, is not required "to

10  accept as true allegations that are merely conclusory, unwarranted deductions of fact, or

11  unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th

12  Cir. 2001).

13       "To survive a motion to dismiss, a complaint must contain sufficient factual

14  matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

15  *v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

16  570 (2007)); *see also Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir.

17  2010).  "A claim has facial plausibility when the plaintiff pleads factual content that

18  allows the court to draw the reasonable inference that the defendant is liable for the

19  misconduct alleged."  *Iqbal*, 556 U.S. at 677-78.  "A pleading that offers 'labels and

20  conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'

21  . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further

22  factual enhancement.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555, 557).  Dismissal

1  under Rule 12(b)(6) can be based on the lack of a cognizable legal theory or the absence

2  of sufficient facts alleged under a cognizable legal theory.  *Balistreri v. Pacifica Police*

3  *Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

4  **B.    Trade Secret Misappropriation**

5  Bombardier alleges that MITAC America and AeroTEC Defendants

6  misappropriated Bombardier's trade secrets in violation of the Defend Trade Secrets Act

7  ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and the Washington Uniform Trade Secrets Act

8  ("UTSA"), RCW 19.108.010 *et seq.*  (*See* Compl. ¶¶ 92-136, 164-81, 210-27, 233-50.)

9  The relevant portions of the DTSA and the UTSA are almost identical.  *Compare* 18

10  U.S.C. § 1839(5), *with* RCW 19.108.010(2).   A plaintiff asserting a DTSA or UTSA

11  claim must establish that its trade secrets were misappropriated.  *See Inteum Co., LLC v.*

12  *Nat'l Univ. of Singapore*, No. C17-1252JCC, 2017 WL 6611961, at *4 (W.D. Wash. Dec.

13  27, 2017).  The two laws define misappropriation, in relevant part, as follows:

14      (A)    acquisition of a trade secret of another by a person who knows or has
            reason to know that the trade secret was acquired by improper means;
15            or

16      (B)    disclosure or use of a trade secret of another without express or
            implied consent by a person who--
17
        (i)    used improper means to acquire knowledge of the trade secret;
18
        (ii)   at the time of disclosure or use, knew or had reason to know that
19            the knowledge of the trade secret was--

20            (I)    derived from or through a person who had used improper
                means to acquire the trade secret;
21
22  //

ORDER - 11

1

       (II)    acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

2

3

       (III)   derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

4

5    18 U.S.C. § 1839(5); RCW 19.108.010(2).  Improper means includes "theft, bribery,

6    misrepresentation, [or] breach or inducement of a breach of a duty to maintain secrecy."

7    18 U.S.C. § 1839(6); RCW 19.108.010(1).  Although the complaint need not "spell out

8    the details of the trade secret," a plaintiff seeking relief for trade secret misappropriation

9    must identify the trade secret "with sufficient particularity . . . to permit the defendant to

10    ascertain at least the boundaries within which the secret lies."  *SMS Signature Cars v.*

11    *Connects Mktg. LLC*, No. SACV 12-1300 JVS (ANx), 2012 WL 12893935, at *2 (C.D.

12    Cal. Oct. 29, 2012) (internal quotations omitted); *see also MAI Sys. Corp. v. Peak Comp.,*

13    *Inc.*, 991 F.2d 551, 522 (9th Cir. 1993).

14         The parties do not dispute that the trade secrets at issue are the documents

15    allegedly taken by Mr. Basson, Ms. Dornéval, Mr. Ayre, and Mr. Delarche.[3]  (*See*

16    *generally* MITACA MTD; Pl. MITACA Resp.; AeroTEC MTD; Pl. AeroTEC Resp.)

17

18        [3] Bombardier claims that it "is not required to plead every instance where MITAC America acquired and used Bombardier's trade secrets."  (Pl. MITACA Resp. at 11.)  To the

19    extent Bombardier argues that the court should consider trade secrets other than the documents identified in the complaint, the court declines to do so.  At this point, the identified documents

20    are the only trade secrets that Bombardier alleges with sufficient particularity to support a trade secret misappropriation claim.  *See, e.g.*, *Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, No.

21    18-CV-00933-MMC, 2018 WL 2298500, at *3 (N.D. Cal. May 21, 2018) (holding that the plaintiff's trade secret allegations were "too broad[]" to state a claim under Rule 12(b)(6) when

22    the plaintiff identified the trade secrets as "design review templates," "fluidics design files," and "source code files").

1    Nor do the parties challenge that the documents are, in fact, trade secrets.  (*See generally*

2    *id.*)  Rather, MITAC America and AeroTEC Defendants argue that Bombardier fails to

3    allege sufficient facts that constitute misappropriation of those trade secrets.  (*See*

4    MITACA MTD at 16-22; AeroTEC MTD at 17-23.)

5         1.  <u>MITAC America's Motion</u>

6         MITAC America argues that Bombardier fails to plausibly allege two elements of

7    trade secret misappropriation:  (1) that MITAC America acquired or used the trade

8    secrets;[4] and (2) that MITAC America acquired or used the trade secrets with the

9    requisite knowledge.  The court addresses those arguments in turn.

10        *a.  Acquisition or Use of the Trade Secrets*

11        According to MITAC America, Bombardier fails to allege that MITAC America

12   acquired or used the trade secrets for two reasons.  (MITACA MTD at 16.)  First, none of

13   the people that Bombardier alleges to have taken its trade secrets are MITAC America

14   employees.  (*Id.*)  Rather, they are employed by MITAC or AeroTEC.  (*Id.*)  Thus,

15   according to MITAC America, Bombardier's trade secret misappropriation claims

16   necessarily infer that individuals stole Bombardier's trade secrets, then brought those

17   trade secrets to MITAC or AeroTEC, who then relayed the trade secrets to MITAC

18   //

19

---

20        [4] Although trade secret misappropriation includes the "acquisition," "use," or
     "disclosure" of trade secrets with the requisite knowledge, Bombardier does not allege that
21   MITAC America "disclosed" its trade secrets.  (*See* MITACA MTD at 16; *see generally* Pl.
     MITACA Resp.; Compl.); *see also* 18 U.S.C. § 1839(5); RCW 19.108.010(2).  The court,
22   therefore, confines its analysis to whether Bombardier sufficiently alleges that MITAC America
     improperly acquired or used its trade secrets.

1    America.  (*Id.* at 17.)  MITAC America argues that this chain of inferences is too

2    speculative to state a claim that it acquired or used the trade secrets.  (*Id.*)

3    　　　The court disagrees.  The DTSA and the UTSA do not rest liability on MITAC

4    America acquiring the trade secrets from an employee.  *See* 18 U.S.C. § 1839(5); RCW

5    19.108.010(2).  It is enough under the statutes that MITAC America acquired

6    Bombardier's trade secrets by improper means or used the trade secrets after they were

7    acquired by improper means.  18 U.S.C. § 1839(5)(A)-(B); RCW 19.108.010(2)(a)-(b).

8    Moreover, the inferential chain pleaded by Bombardier is not too speculative to support

9    the claim that MITAC America acquired or used the trade secrets.  MITAC was

10   established to "conduct MRJ business."  (Compl. ¶ 35.)  MITAC then formed MITAC

11   America to help design, develop, and certify the MRJ.  (*Id.* ¶ 41.)  MITAC also enlisted

12   AeroTEC to help on the MRJ.  (*Id.*)  Together, these three entities "formed" and "jointly

13   staffed" the Seattle Engineering Center to work on the MRJ's "flight testing,

14   development, and certification in the United States."  (*Id.* ¶ 42.)  In short, these entities

15   worked closely with each other on the MRJ project.  On these facts, it is plausible that, if

16   any of the alleged trade secrets were acquired or used by MITAC or AeroTEC, these

17   companies would have relayed the trade secrets to MITAC America.  In short, the court

18   does not find that Bombardier's failure to name a MITAC America employee defeats

19   Bombardier's allegation that MITAC America acquired or used the trade secrets.

20   　　　Second, MITAC America argues that the "timeline" Bombardier alleges does not

21   support MITAC America's acquisition or use.  (*Id.*)  In short, Bombardier relies on the

22   fact that "MITAC announced design changes to the MRJ to facilitate certification in

1   2017, after a 'critical mass' of former Bombardier employees joined MITAC, MITAC

2   America, and AeroTEC."  (*Id.* at 17-18 (quoting Compl. ¶ 99).)  According to MITAC

3   America, Bombardier cites this timeline as evidence that the MRJ's design changes were

4   influenced by MITAC America's acquisition or use of the trade secrets.  (MITACA MTD

5   at 18-20; MITACA Reply at 10.)  Yet, MITAC America claims that design changes and

6   delays routinely occur during the certification process, especially for new airplane

7   manufacturers like MITAC.  (MITACA MTD at 18-19.)  Moreover, the MRJ's design

8   changes to its avionics bay and electrical wire routing are not connected to the trade

9   secrets.  (*Id.* at 18.)  Rather, the trade secrets relate to skew detection, air speed

10  monitoring, and flight data for different aircraft.  (*Id.*)  Thus, MITAC America asserts,

11  there can be no inference that the MRJ's design changes were caused by the trade secrets

12  in dispute.  (*Id.*)  In sum, MITAC America argues that the timeline supports an innocent

13  alternative explanation:  "that the general skills and experience of the entire MRJ team

14  (not just the former Bombardier employees on that team) advanced the project toward

15  completion."  (*Id.* at 19.)  Lastly, MITAC America points out that Bombardier does not

16  allege that MITAC America or any of its employees were responsible for the redesign

17  decision, further negating the inference that MITAC America acquired or used the trade

18  secrets.  (*Id.* at 20.)

19      MITAC America seeks to undermine the timeline allegations by focusing on the

20  fact that the alleged trade secrets do not relate to the MRJ design changes.  (*Id.* at 18.)

21  But MITAC America misstates Bombardier's claim.  Bombardier alleges that MITAC,

22  MITAC America, and AeroTEC struggled to certify the MRJ, causing MITAC to push

1   back the MRJ's target date from 2013 to sometime around 2020.  (Compl. ¶¶ 35-48, 99,

2   110.)  Further, Bombardier details that numerous former employees took trade secrets in

3   the days before leaving Bombardier, and that these trade secrets relate to aircraft

4   certification, including certification of Bombardier's C-Series.  (*Id.* ¶¶ 60-63, 65-67, 99,

5   110.)  Bombardier also alleges that, in conducting their targeted recruitment of

6   Bombardier employees, MITAC and MITAC America advertised that they were "looking

7   to hire over 200 Aircraft System Engineers who can work on Certification activities of

8   MRJ aircraft."  (*Id.* ¶ 49 (emphasis omitted).)  In addition, Bombardier points out that,

9   after a "critical mass" of former Bombardier personnel began working for MITAC,

10   MITAC America, and AeroTEC, MITAC announced the design changes "even though

11   that would require MITAC to begin its certification process anew."  (*Id.* ¶¶ 99, 110

12   (emphasis omitted).)  Lastly, Bombardier claims that MITAC America acquired and/or

13   used Bombardier's trade secrets "to assist in the new design's certification."  (*Id.*)

14          In short, Bombardier asserts that MITAC America acquired and/or used

15   Bombardier's trade secrets to aid the MRJ's certification process—a process that had

16   already experienced numerous delays, a process that MITAC America specifically

17   recruited Bombardier employees to help with, and a process which began "anew"

18   because of the design changes.  (*See* Compl. ¶¶ 99, 110.)  Therefore, whether the alleged

19   trade secrets "influenced" the design changes or whether a MITAC America employee

20   was responsible for the design changes are beside the point.  (MITACA MTD at 18-20.)

21          The court finds that this case presents more significant allegations of trade secret

22   acquisition and/or use than *Inteum*, 2017 WL 6611961, a case upon which MITAC

America heavily relies.  (*See* MITACA MTD at 17 n.9; MITACA Reply at 11.)  In

*Inteum*, the defendant, NUS, had licensed Inteum's software.  2017 WL 6611961, at *1.

After using Inteum's software, NUS solicited bids to replace the Inteum system.  *Id.*

NUS eventually contracted with Wellspring for this job, one of Inteum's competitors.  *Id.*

Inteum alleged that NUS shared Inteum's confidential and trade secret information with

Wellspring to help Wellspring transfer "Inteum capabilities to their own system."  *Id.*

The *Inteum* court analyzed, among other things, NUS's bid solicitation that required

Wellspring to custom develop software for NUS so that Wellspring's system could port

over all existing functions of Inteum's system.  *Id.* at *3.  In other words, the bid

solicitation required Wellspring to create its own software rather than use Inteum's trade

secrets.  On these facts, the court determined that Inteum's complaint indicated "motive,

opportunity, and a possibility of improper disclosure or transfer of protected software,"

but did not amount to plausible allegations of misappropriation.  *Id.* at *3-4.

      The facts alleged here are more substantial, in part because Bombardier alleges the

specific trade secrets that were taken by former Bombardier employees in the days and

weeks before they joined MITAC, MITAC America, and AeroTEC.  (*See* Compl.

¶¶ 60-63, 65-67, 99, 110.)  These trade secrets also relate to the exact reason that

MITAC, MITAC America, and AeroTEC recruited these employees:  to help certify the

MRJ after a decade-long struggle to achieve certification.  (*See id.*)  In short, not only

does Bombardier indicate motive and opportunity, but Bombardier alleges that its former

employees improperly acquired specific trade secrets in the days and weeks before

joining the Defendant companies to aid the MRJ project.  (*See id.*)

1    The court understands that there are innocent alternative explanations for the facts

2    alleged, namely that design changes and delays are routine when certifying an aircraft

3    and that "that the general skills and experience of the entire MRJ team (not just the

4    former Bombardier employees on that team) advanced the project toward completion."

5    (MITACA MTD at 18-19.)  But "[i]f there are two alternative explanations, one

6    advanced by defendant and the other advanced by plaintiff, both of which are plausible,

7    plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."  *See Starr v.*

8    *Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  Here, the court concludes that Bombardier

9    plausibly alleges that MITAC America acquired and/or used Bombardier's trade secrets.

10        *b.  Requisite Knowledge*

11    MITAC America also argues that Bombardier's trade secret misappropriation

12    claims fail because Bombardier does not plausibly allege that MITAC America "knew or

13    had reason to know" that the trade secrets were improperly acquired.  (*See* MITACA

14    MTD at 20-22); 18 U.S.C. § 1839(5)(A)-(B); RCW 19.108.010(2)(a)-(b).  MITAC

15    America claims that Bombardier's only factual allegations pertaining to this element are

16    "that the disputed documents were marked as confidential and proprietary."  (MITACA

17    MTD at 20.)  Moreover, MITAC America argues, as it did above, that it cannot be

18    culpable because Bombardier fails to identify any MITAC America employee who saw

19    the trade secrets.  (*Id.* at 21.)  Lastly, MITAC America asserts that, even if Bombardier

20    plausibly alleges that somebody at MITAC, MITAC America, or AeroTEC saw that the

21    trade secrets were marked confidential and proprietary, it is improper to impute an

22    employee's knowledge to MITAC America.  (*Id.*)

1    Bombardier responds that it plausibly alleges MITAC America's knowledge in

2    numerous ways.  (Pl. MITACA Resp. at 13.)  First, Bombardier alleges that MITAC

3    America specifically targeted Bombardier employees with access to trade secrets and

4    then "announced significant changes to the MRJ certification efforts" after it acquired a

5    critical mass of Bombardier employees.  (*See* Compl. ¶¶ 98-99, 110.)  Bombardier also

6    points out that it contacted MHI and MITAC, as well as AeroTEC, a number of times to

7    express concerns about the targeted recruitment of Bombardier employees and the

8    potential for trade secret misappropriation.  (*See id.* ¶¶ 52-58.)  Yet, even after these

9    communications, MHI and MITAC "continue[d] to actively solicit and hire key

10   employees of Bombardier."  (*Id.*)

11       The court concludes that Bombardier fails to allege that MITAC America knew or

12   had reason to know that it improperly acquired or used Bombardier's trade secrets.  *See*

13   18 U.S.C. § 1839(5)(A)-(B); RCW 19.108.010(2)(a)-(b).  Here, Bombardier's failure to

14   identify any MITAC America employee or executive who took or viewed a trade secret is

15   crucial.  The most Bombardier alleges regarding MITAC America's knowledge of the

16   trade secrets is that MITAC America recruited Bombardier employees to work on the

17   MRJ's certification.  (*See* Compl. ¶¶ 49, 51, 99, 110.)  But merely recruiting another

18   company's employees does not meet the knowledge requirement for trade secret

19   misappropriation.  *Cf. Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 941-42 (Wash.

20   1999) ("As a general rule, an employee who has not signed an agreement not to compete

21   is free, upon leaving employment, to engage in competitive employment.  In so doing, the

22   former employee may freely use general knowledge, skills, and experience acquired

1  under his or her former employer."); *Hollingsworth Solderless Terminal Co. v. Turley*,

2  622 F.2d 1324, 1337 (9th Cir. 1980) ("Mere solicitation of an employee, under no

3  contract of employment, to leave and associate with a competing firm is not illegal.").

4  Further, Bombardier's communications with corporate executives to halt the recruitment

5  were sent to people at MHI, MITAC, and AeroTEC—not MITAC America.  (Compl.

6  ¶¶ 52-58.)  Bombardier also alleges that it was solely MITAC's decision to make the

7  design changes that restarted the certification process.  (*See, e.g.*, *id.* ¶ 99 ("MITAC

8  abandoned its design of certain MRJ systems and electrical configurations . . . .").)  In

9  short, the facts pleaded do not satisfy the DTSA's or the UTSA's knowledge requirement

10  against MITAC America.

11          For example, in *Joshua David Mellberg LLC v. Will*, 96 F. Supp. 3d 953, 981-82

12  (D. Ariz. 2015), the plaintiff alleged trade secret misappropriation against defendant

13  Impact Partnership.  There, the complaint alleged that other defendants had knowledge of

14  the improper acquisition or use of trade secrets, that these other defendants were

15  associated with Impact Partnership, and that they transferred the trade secrets to Impact

16  Partnership.  *Id.* at 970, 977, 981-82.  The court determined that, although the allegations

17  that the other defendants used trade secrets in the course of their work with Impact

18  Partnership were sufficient, "there [we]re no facts showing that Defendant Impact

19  Partnership had any knowledge whatsoever regarding the information purportedly used."

20  *Id.* at 982.  The court therefore concluded that the plaintiff "fail[ed] to nudge" the claims

21  regarding Impact Partnership's culpability "'across the line from conceivable to

22  plausible.'"  *Id.* at 982 (citing *Somers v. Apple*, 729 F.3d 953, 966 (9th Cir. 2013).

1  The same is true here.  Although Bombardier alleges sufficient facts to show that

2  MITAC America acquired or used its trade secrets, Bombardier fails to plausibly allege

3  that MITAC America had any knowledge of the acquisition or use of these trade secrets.[5]

4  Nevertheless, Bombardier argues that MITAC America is simply the alter ego of

5  MITAC and therefore MITAC's knowledge should be imputed to MITAC America.  (*See*

6  Pl. MITACA Resp. at 10 n.2 (citing *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070-71 (9th Cir.

7  2015)).)  However, Bombardier does not raise this theory in its complaint.  (*See generally*

8  Compl.)  "In ruling on a motion to dismiss, a district court generally 'may not consider

9  any material beyond the pleadings.'"  *Cooper v. Pickett*, 137 F.3d 616, 622 (9th Cir.

10  1997) (quoting *Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir. 1994)).  Therefore, the court

11  cannot consider Bombardier's argument that MITAC America is the alter ego of MITAC.

12  *See E & E Inv., Inc. v. Simmons Co.*, 169 F.R.D. 467, 468 (D.P.R. 1996) (deciding to not

13  consider the plaintiff's alter ego argument because "[t]he complaint does not allege that

14  Simmons is liable for breach of an agreement between SCBI and E & E under an alter

15  ego theory of liability").

16  Bombardier also attempts to show MITAC America's knowledge by stating that

17  MITAC America directly employs "at least some of Does 1-88."  (Pl. MITACA Resp. at

18

19

20  _____

[5] Likewise, Bombardier's arguments regarding *respondeat superior* and vicarious liability against MITAC America fail because Bombardier does not identify any MITAC America employee or agent who misappropriated the trade secrets in connection with his or her employment.  (*See* Pl. MITACA Resp. at 12-13); *Thola v. Henschell*, 164 P.3d 524, 528 (Wash. Ct. App. 2007) (explaining that vicarious liability is a "valid theory under the UTSA," but that it depends on, in relevant part, "an employee acting in the course and scope of employment" or "an agent whose tort is imputed to her principal").

11.)  But, as MITAC America points out, the trade secret statutes require that a defendant know that improper means were used with respect to "the trade secret[s]" at issue.  (MITACA Reply at 13 (citing 18 U.S.C. § 1839(5); RCW 19.108.010(2)).)  Thus, even if Bombardier is correct that some of the Does 1-88 work for MITAC America, Bombardier fails to plausibly allege that these Does 1-88 are linked in any way to "the trade secret[s]" identified in the complaint, which are the only trade secrets the court can consider.  *See supra* § III.B.  In other words, Bombardier cannot establish culpability by alleging that unidentified persons have knowledge of unidentified trade secrets.

Thus, the court concludes that Bombardier plausibly alleges that MITAC America acquired and/or used Bombardier's trade secrets, but that Bombardier fails to plausibly allege that MITAC America did so with the requisite knowledge.  The court therefore GRANTS MITAC America's motion to dismiss counts III and IV.

2.  AeroTEC Defendants' Motion

The court will separately address the trade secret misappropriation claims against each of the AeroTEC Defendants.

*a.  Laurus Basson*

Citing *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1129 (9th Cir. 2010), Mr. Basson first asserts that Bombardier cannot state a claim that he "acquired" the trade secrets by "improper means" because he possessed the documents as a Bombardier employee.  (AeroTEC MTD at 19.)  The court disagrees.  The facts of *JustMed* are readily distinguishable.  In *JustMed*, the trade secret at issue was the source code for a digital device.  *See* 600 F.3d at 1120-23.  The defendant in that case helped create the source

1    code "from his home . . . using his own computer." *Id.* at 1122.  The Ninth Circuit

2    defined "acquired" as "to come into possession, control, or power of disposal of." *Id.* at

3    1129 (citing Webster's Third New Int'l Dictionary 18 (3d ed. 1993)).  Applying that

4    definition to the facts, the Ninth Circuit explained that the defendant "did not 'acquire'

5    the source code through improper means because he already had possession of it as an

6    employee. . . .  Indeed, he created much of it." *JustMed*, 600 F.3d at 1129.  Here, in

7    contrast, Bombardier alleges that Mr. Basson sent two "proprietary PowerPoint slide

8    decks" to his personal email account the day before he left Bombardier and began

9    working for AeroTEC.  (*See* Compl. ¶¶ 60, 165-66.)  Unlike the defendant in *JustMed*,

10   Mr. Basson did not already possess these documents *as an* employee.  On the contrary, he

11   came into possession of the documents on his personal email precisely because he was no

12   longer going to be a Bombardier employee.

13         More compelling, Mr. Basson argues that he cannot be liable under the DTSA for

14   acquiring the trade secrets because Bombardier alleges that he sent the documents to his

15   personal email on March 4, 2016.  (AeroTEC MTD at 20; Compl. ¶ 60.)  The DTSA

16   "applies to the 'misappropriation of a trade secret . . . for which any act occurs on or after

17   the date of [its] enactment,' specifically, May 11, 2016." *See Becton*, 2018 WL 2298500,

18   at *4 (citing Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, 130 Stat. 376,

19   381-82 (May 11, 2016)).  Therefore, Mr. Basson argues, his pre-May 11, 2016,

20   acquisition cannot form the basis of a DTSA claim.  (AeroTEC MTD at 20.)  Here, the

21   court agrees with Mr. Basson.  Of note, however, this argument does not apply to the

22   //

ORDER - 23

1   UTSA because the Washington law applies to misappropriations that occur after January

2   1, 1982.  *See* RCW 19.108.930.

3       That said, even if a plaintiff acquired the trade secret before May 11, 2016, he or

4   she may be liable under the DTSA for any use or disclosure that occurs after that date.

5   *See Digital Mentor, Inc. v. Ovivo USA, LLC*, No. C17-1935RAJ, 2018 WL 6724765, at

6   *6 (W.D. Wash. Dec. 21, 2018) (finding the plaintiff's claim "sufficient" where the

7   plaintiff alleged the defendant acquired the trade secrets prior to May 11, 2016, but used

8   and disclosed the trade secrets after that date); *Yeiser Research & Dev. LLC v. Teknor*

9   *Apex Co.*, 281 F. Supp. 3d 1021, 1057 (S.D. Cal. 2017) ("[T]he DTSA has been

10  interpreted to apply to misappropriation of trade secrets that occurred before the DTSA

11  was enacted as long as the misappropriation continues to occur after the enactment

12  date.").  Thus, Mr. Basson can still be liable for misappropriation under the DTSA if he

13  "used" or "disclosed" the trade secrets after May 11, 2016.

14      The court finds that Bombardier plausibly alleges that, under the DTSA, Mr.

15  Basson used and/or disclosed the trade secrets and additionally, under the UTSA, that Mr.

16  Basson acquired the trade secrets.  As discussed, Bombardier details that Mr. Basson sent

17  himself trade secrets shortly before starting work at AeroTEC on the MRJ.  (Compl.

18  ¶ 60.)  Bombardier also explains the "tremendous value" of these trade secrets in

19  certifying the MRJ.  (*Id.* at 168.)  A plausible reading of the facts alleged is that Mr.

20  Basson sent himself the certification-related trade secrets in order to disclose them to his

21  future employer—who was looking for people to help with the MRJ's certification—as

22  well as to use the trade secrets while working on the MRJ.

1          Further, the court concludes that Bombardier plausibly alleges that Mr. Basson

2    achieved this conduct by "improper means."  *See* 18 U.S.C. § 1839(6); RCW

3    19.108.010(1).  Bombardier alleges that Mr. Basson sent himself the trade secrets in the

4    hours before leaving Bombardier in order to divulge the information to AeroTEC and use

5    the information in his AeroTEC employment.  (*See* Compl. ¶¶ 60, 165-66.)  All of this

6    was done, according to Bombardier, to aid in the certification of the MRJ, an aircraft in

7    competition with Bombardier's C-Series.  (*See id.*)  These allegations sufficiently allege

8    improper means.  Thus, the court concludes that Bombardier adequately alleges that Mr.

9    Basson used improper means to acquire, disclose, and use the trade secrets.

10         Lastly, Bombardier plausibly alleges that Mr. Basson acted with the requisite

11   knowledge.  The documents that Mr. Basson sent to himself "were marked private and

12   confidential" and access to them "was restricted by Bombardier."  (*Id.* ¶ 60.)  In addition,

13   Bombardier alleges that Mr. Basson emailed these documents to himself on his last day at

14   Bombardier (*id.*)—at which point he could not reasonably be taking the documents home

15   in order to perform work for Bombardier.  Thus, the court concludes that Bombardier

16   plausibly alleges that Mr. Basson knowingly and improperly acquired, used, and

17   disclosed the trade secrets.

18         In sum, the court finds that Bombardier plausibly alleges trade secret

19   misappropriation under the DTSA and the UTSA against Mr. Basson.  The court

20   therefore DENIES Mr. Basson's motion to dismiss counts X and XI.

21   //

22   //

ORDER - 25

1          *b.  Cindy Dornéval*

2          For the reasons articulated above with respect to Mr. Basson's motion, the court

3   also DENIES Ms. Dornéval's motion to dismiss the trade secret misappropriation claims

4   against her.  *See supra* § III.B.2.a.  There are, however, two differences between Mr.

5   Basson's motion and Ms. Dornéval's motion that require clarification.

6          First, Ms. Dornéval's last day at Bombardier was February 10, 2017.  (*See* Compl.

7   ¶ 62.)  Bombardier alleges that she sent trade secrets to her personal email account "in the

8   weeks, days, and even hours before her departure" to work on the MRJ project with

9   AeroTEC.  (*See id.* ¶¶ 62-64.)  Thus, the DTSA's May 11, 2016, effective date is not

10  implicated by Bombardier's claims against Ms. Dornéval.  *See supra* § III.B.2.a.  The

11  court therefore finds that Bombardier plausibly alleges that, under both the DTSA and the

12  UTSA, Ms. Dornéval acquired, used, and disclosed trade secrets with the requisite

13  knowledge.

14         Second, Bombardier alleges that, in addition to the trade secrets she previously

15  sent to herself, Ms. Dornéval transmitted only one document over email on her last day at

16  Bombardier because the other files were too large.  (*Id.* ¶ 63.)  Instead, "[u]pon

17  information and belief," Bombardier claims that Ms. Dornéval took the un-transmitted

18  information "in either hard copy form or through portable storage device means."  (*Id.*)

19  Ms. Dornéval argues that these claims do not raise a plausible inference that she in fact

20  acquired the un-transmitted information.  (AeroTEC MTD at 19.)  The court, however,

21  does not need to reach this question.  It is undisputed that Ms. Dornéval successfully

22  transmitted some trade secrets to herself.  (Compl. ¶¶ 62-64.)  Bombardier identifies

1    those trade secrets in sufficient detail so as to state a claim.  (*See id.*); *see also SMS*

2    *Signature Cars*, 2012 WL 12893935, at *2.  Thus, regardless of whether Ms. Dornéval

3    took the un-transmitted documents in hard copy, on a portable storage device, or through

4    other means, Bombardier alleges a plausible trade secret misappropriation claim against

5    her.  The court DENIES Ms. Dornéval's motion to dismiss counts XVI and XVII.

6           *c.  Michel Korwin-Szymanowski*

7           Mr. Korwin-Szymanowski moves to dismiss the trade secret misappropriation

8    claims against him.  (AeroTEC MTD at 20-21.)  Mr. Korwin-Szymanowski argues that

9    Bombardier fails to assert specific facts that he acquired, used, or disclosed any trade

10   secrets.  (*Id.*)  In response, Bombardier points to its allegations that Mr.

11   Korwin-Szymanowski sent emails to 247 Bombardier email accounts stating that

12   AeroTEC had open positions to work on "the development and certification" of the MRJ.

13   (Pl. AeroTEC Resp. at 11 (citing Compl. ¶ 51).)  Bombardier claims that "[t]hese

14   allegations alone indicate that the recruitment was directed at employees who would have

15   access to—and therefore would abscond with—Bombardier trade secrets."  (Pl. AeroTEC

16   Resp. at 11.)

17          Mr. Korwin-Szymanowski's recruitment emails were allegedly sent to Mr.

18   Basson, Mr. Delarche, and Ms. Dornéval, among other people, in the days before the

19   October 23-24, 2015, recruitment event in Wichita.  (Compl. ¶¶ 238, 247.)  Further, Mr.

20   Korwin-Szymanowski attended a "hiring event" in Montréal on October 28, 2015, where

21   he solicited Bombardier personnel.  (*Id.* ¶ 51.)  Bombardier claims that Mr.

22   Korwin-Szymanowski continued recruiting its employees even after Bombardier directly

1    asked him to stop in part because of "his ongoing duties of confidentiality owed to

2    Bombardier." (*Id.* ¶¶ 51-52.)  On these facts, Bombardier claims that Mr.

3    Korwin-Szymanowski "misappropriated Bombardier trade secrets by inducing or

4    knowingly permitting Defendants Basson, Delarche, and Dornéval to misappropriate,

5    divulge, and/or use trade secrets." (*Id.* ¶¶ 238, 247.)  Alternatively, Bombardier alleges

6    that Mr. Korwin-Szymanowski "disclosed and/or used Bombardier trade secrets without

7    permission knowing or having reason to know that the information constituted trade

8    secrets." (*Id.*)

9         The court concludes that Bombardier does not plausibly allege that Mr.

10   Korwin-Szymanowski misappropriated the trade secrets.  Regardless of whether

11   Bombardier sufficiently pleads that Mr. Korwin-Szymanowski acquired, disclosed, or

12   used the trade secrets, Bombardier fails to plead that Mr. Korwin-Szymanowski acted

13   with the requisite knowledge.  For similar reasons as discussed with MITAC America,

14   recruiting Bombardier employees to work on the MRJ does not satisfy the knowledge

15   requirement for trade secret misappropriation. *See supra* § III.B.1.  Although

16   Bombardier directly asked Mr. Korwin-Szymanowski to stop recruiting Bombardier

17   employees—a request he disregarded—the complaint nevertheless fails to link Mr.

18   Korwin-Szymanowski with any of the trade secrets at issue such that it is plausible that

19   he knew or had reason to know that the trade secrets at issue were improperly acquired,

20   disclosed, or used.  (*See generally id.*); 18 U.S.C. § 1839(5); RCW 19.108.010(2).

21        This case stands in contrast to *SolarCity Corp. v. Pure Solar Co.*, No.

22   CV1601814BRODTBX, 2016 WL 11019989 (C.D. Cal. Dec. 27, 2016).  In *SolarCity*,

1    the plaintiff sent a company's officer, Ahmed Jamal Karmouta, two cease and desist

2    letters to stop using the plaintiff's customer database, which is a trade secret.  *Id.* at *3-4.

3    Mr. Karmouta allegedly denied possession of the customer information and took no steps

4    to prevent the company from continuing to use this information.  *Id.* at *4.  On these

5    facts, the court determined that the plaintiff had stated a trade secret misappropriation

6    claim against Mr. Karmouta.  *Id.*  The court explained that the "Plaintiff's allegations

7    sufficiently establish that after Plaintiff approached [Mr.] Karmouta about the alleged

8    trade secret misappropriation, [Mr.] Karmouta 'had reason to know' that [the company]

9    was possibly using misappropriated trade secrets that had been obtained unlawfully and

10   that he failed to take any actions to prevent continued misappropriation."  *Id.*  In other

11   words, after the plaintiff informed Mr. Karmouta about the trade secrets at issue, Mr.

12   Karmouta continued to use the trade secrets.

13          Here, however, Bombardier did not inform Mr. Korwin-Szymanowski about the

14   specific trade secrets in this case.  Nor could it have.  Bombardier asked Mr.

15   Korwin-Szymanowski to stop recruiting employees in October 2015 and only alleges that

16   he engaged in recruitment activities around this time.  (*See* Compl. ¶¶ 51-52.)  But the

17   earliest date that Bombardier alleges that one of the trade secrets at issue was acquired

18   was on March 4, 2016, by Mr. Basson.  (*See id.* ¶ 60.)  In other words, Mr.

19   Korwin-Szymanowski could not have known about the trade secrets while he was

20   recruiting employees because these trade secrets were not acquired until, at the earliest,

21   six months later.  Bombardier also does not plausibly allege that an individual Defendant

22   provided a trade secret to Mr. Korwin-Szymanowski such that he would have knowledge

1    of its improper origin or acquisition.  (*See generally id.*)  Therefore, Bombardier fails to

2    allege that Mr. Korwin-Szymanowski had the requisite knowledge regarding any

3    purported acquisition, use, or disclosure of the trade secrets at issue.

4         Accordingly the court GRANTS Mr. Korwin-Szymanowski's motion to dismiss

5    counts XIX and XX.

6         d.  *AeroTEC*

7         For the reasons articulated above with respect to MITAC America's motion, the

8    court also finds that AeroTEC acquired and/or used Bombardier's trade secrets.  *See*

9    *supra* § III.B.1.a.  In short, the court finds that Bombardier's "timeline" allegations

10   sufficiently allege that AeroTEC acquired or used the trade secrets.  *See id.*  Moreover,

11   AeroTEC cannot avail itself of MITAC America's other unsuccessful argument because

12   Bombardier sufficiently alleges that AeroTEC employees—Mr. Basson and Ms.

13   Dornéval—acquired, used, and disclosed the trade secrets.  *See supra* §§ III.B.2.b-.c.

14        The court therefore turns to whether Bombardier properly alleges that AeroTEC

15   had the requisite knowledge regarding acquisition or use.  AeroTEC argues that it does

16   not for two main reasons.  (*See* AeroTEC MTD at 21-22.)  First, AeroTEC says that

17   Bombardier does not make any factual allegation that AeroTEC knew or had reason to

18   know that anyone improperly used, disclosed, or acquired a Bombardier trade secret.

19   (*See id.* at 21.)  Second, AeroTEC argues that, even if one of its employee was liable for

20   trade secret misappropriation, "this would not be sufficient to impute any wrongdoing" to

21   AeroTEC.  (*Id.* (citing *Mellberg*, 96 F. Supp. 3d at 982).)

22   //

1    Similar to Mr. Korwin-Szymanowski, the court finds that Bombardier does not

2    plausibly allege that AeroTEC had knowledge regarding the trade secret misappropriation

3    because none of Bombardier's alleged requests to stop recruitment identified a specific

4    trade secret.  *See supra* § III.B.2.c; (Compl. ¶¶ 52-53.)  At most, the requests explained

5    that the Bombardier Code of Ethics prohibited former Bombardier employees from

6    disclosing trade secrets.  (*Id.*)  But this is not enough to show that AeroTEC knew or had

7    reason to know that former Bombardier employees were, in fact, misappropriating trade

8    secrets and then using or disclosing them to AeroTEC.  Moreover, "[i]n light of the

9    emphasis in trade-secret law on unfair use, it is generally not appropriate to . . . impute an

10   agent's knowledge of a secret to the principal."  *Droeger v. Welsh Sporting Goods Corp.*,

11   541 F.2d 790, 792-93 (9th Cir. 1976); *see also Carr v. AutoNation Inc.*, No.

12   2:17-CV-01539-JAM-AC, 2018 WL 288018, at *3 (E.D. Cal. Jan. 4, 2018).  Therefore,

13   the court will not impute Mr. Basson's and Ms. Dornéval's knowledge to AeroTEC.

14   However, as Bombardier argues, "[t]here is no need to 'impute' any knowledge to

15   AeroTEC because, as the employer, AeroTEC is already vicariously liable for its

16   employees' misappropriation."  (Pl. AeroTEC Resp. at 29.)  The court agrees.  Under the

17   *respondeat superior* doctrine, an employer can be held liable for the intentional torts that

18   its employees committed within the scope of employment even if the employer did not

19   authorize the employee to commit the tort.  *See SolarCity Corp.*, 2016 WL 11019989, at

20   *5.  Courts can find vicarious liability "so long as there is a 'causal nexus' between the

21   activity and the employee's work."  *Id.*; *Thola*, 164 P.3d at 528 ("[W]e agree with the

22   majority of jurisdictions addressing the issue and conclude that one may violate the

1   UTSA vicariously and be held responsible for such violation.")  "[C]onduct will be

2   considered within the scope of employment when it is performed, at least in part, to

3   benefit the employer, though the employer may forbid it."  *SolarCity Corp.*, 2016 WL

4   11019989, at *5 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998)).

5        Here, Bombardier plausibly alleges that Mr. Basson and Ms. Dornéval were acting

6   within the scope of their employment with AeroTEC when they committed the alleged

7   misappropriation to help AeroTEC on the MRJ project.  *See supra* §§ III.B.2.a, .b.

8   Further, the court may properly infer based on Bombardier's allegations that Mr.

9   Basson's and Ms. Dornéval's alleged conduct was likely intended, at least in part, to

10   benefit AeroTEC by advancing the MRJ's certification.  *See SolarCity Corp.*, 2016 WL

11   11019989, at *5 (finding the company vicariously liable for its employee's trade secret

12   misappropriation where the employee's "unlawful conduct was intended, at least in part,

13   to benefit [the company] through additional customers and sales").  The court therefore

14   DENIES AeroTEC's motion to dismiss counts V and VI.

15   **C.**    **Tortious Interference with a Contractual Relationship and/or Business
Expectancy**

16

17        Bombardier alleges that MITAC America, AeroTEC, and Mr.

   Korwin-Szymanowski committed tortious interference with a contractual relationship

18   and/or business expectancy under Washington law.  (*See* Compl. ¶¶ 146-63, 251-59.)  A

19   plaintiff asserting a tortious interference claim must establish that "(1) there exists a valid

20   contractual relationship or business expectancy, (2) the defendant had knowledge of the

21   same, (3) the defendant's intentional interference induced or caused a breach or

22

termination of the relationship or expectancy, (4) the defendant's interference was for an improper purpose or by improper means, and (5) the plaintiff suffered damage as a result." *Evergreen Moneysource Mortg. Co. v. Shannon*, 274 P.3d 375, 383 (Wash. Ct. App. 2012) (citing *Pleas v. City of Seattle*, 774 P.2d 1158, 1161 (Wash. 1989)).

"A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value." *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 52 P.3d 30, 33 (Wash. Ct. App. 2002).  An enforceable contract is not required to support a tortious interference action.  *CaptiveAire Sys., Inc. v. ITW Food Equip. Grp., LLC*, C09-0244JLR, 2009 WL 10676075, at *6 (W.D. Wash. Sept. 28, 2009).  Instead, all that is required is a relationship between parties contemplating a contract, with at least a reasonable expectancy of fruition.  *Broten v. May*, 744 P.2d 1085, 1088 (Wash. Ct. App. 1987).  The interference is intentional if the defendant desires to bring it about or if the defendant knows that the interference is certain or substantially certain to occur as a result of its action.  *Newton*, 52 P.3d at 34. "Interference is for an improper purpose if it is wrongful by some measure beyond the interference itself, such as a statute, regulation, recognized rule of common law, or an established standard of trade or profession."  *Id.*

Bombardier identifies four contractual relationships and business expectancies, each of which, it asserts, "forms an independent basis for Bombardier's tortious interference claims against" MITAC America, AeroTEC, and Mr. Korwin-Szymanowski. (Pl. MITACA Resp. at 15-16; Pl. AeroTEC Resp. at 17-18.)  The four alleged contractual relationships and/or business expectancies are as follows:

1.  Bombardier reasonably expected each of its former employees to adhere to Bombardier's Code of Ethics, including the obligation to not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so.

2.  Bombardier reasonably expected that it would continue to employ Defendants Basson, Delarche, Dornéval, and Does 1-88, to continue working in Bombardier's aerospace division.

3.  Bombardier reasonably expected that key personnel for the C-Series and Global 7000/8000 Aircraft would not join (within a span of a few months) a competing venture in need of Bombardier's trade secret information.

4.  Bombardier reasonably expected to adhere to its certification schedules for the C-Series and Global 7000/8000 Aircraft.

(Pl. MITACA Resp. at 15-16 (citing Compl. ¶¶ 147-50); Pl. AeroTEC Resp. at 17-18; *see also* Compl. ¶¶ 156-59, 252-55.)  Before addressing the parties' motions, the court notes that, for purposes of the fourth element of a tortious interference claim, the parties agree that Bombardier does not allege that MITAC America, AeroTEC, or Mr. Korwin-Szymanowski interfered by "improper means," but rather only for "improper purposes."  (MITACA MTD at 22-23; AeroTEC MTD at 15; *see generally* Pl. MITACA Resp.; Pl. AeroTEC Resp.)

1.  MITAC America's Motion

MITAC America argues that Bombardier's tortious interference claim fails because Bombardier's alleged contractual relationship and business expectancies are not valid.  (MITACA MTD at 24-30.)  With respect to Bombardier's second and third business expectancies—the continued employment of the individual Defendants and the retention of "a significant number of key personnel involved in the testing and

1    certification of the C-Series and Global 7000/8000"—the court agrees.  These are not

2    valid business expectancies because it appears that Bombardier's employee relationships

3    are "at-will."  (*See* Compl. ¶¶ 148-49.)

4         Under Washington law, "[g]enerally, at-will employees do not have a business

5    expectancy in continued employment."  *Woody v. Stapp*, 189 P.3d 807, 811 (Wash. Ct.

6    App. 2008).  Employers likewise "d[o] not have a business expectancy in their future

7    relationship with their at-will employees."  *Nat'l City Bank, N.A. v. Prime Lending, Inc.*,

8    No. CV-10-034-EFS, 2010 WL 2854247, at *4 (E.D. Wash. July 19, 2010); *see also*

9    *Ford v. Trendwest Resorts, Inc.*, 43 P.3d 1223, 1226 (Wash. 2002) ("[I]n the absence of a

10   contract stating otherwise, an employee has the absolute right to abandon his or her

11   employment at-will.").

12        Bombardier claims it alleges that its employees were "more than simple 'at-will'"

13   employees "at least because each employee had a continuing obligation following

14   termination of employment to maintain the confidentiality of all Bombardier proprietary

15   and confidential information."  (Pl. MITACA Resp. at 21 (citing Compl. ¶ 148).)  But

16   Bombardier does not explain how an employee's potential obligations under the Code of

17   Ethics' confidentiality agreement transforms the employment into something other than

18   at-will.  (*See* Pl. MITACA Resp. at 21.)  And the court finds that it does not.  The

19   confidentiality agreement regulates how employees should act during and after their

20   Bombardier employment.  (*See* Code of Ethics at 17-18.)  Nothing in the confidentiality

21   agreement, however, inhibits Bombardier or its employees from terminating the

22   employment relationship.  (*Id.*)

1    Bombardier also argues that at least some of its employees were more than at-will

2  because they worked for Bombardier in Canada and, under Canadian law, employees owe

3  a duty of good faith and fidelity to their employers.  (*See* Pl. MITAC Resp. at 21.)

4  Bombardier does not make this allegation in its complaint and the court will not consider

5  it here.  *See Cooper*, 137 F.3d at 622 ("In ruling on a motion to dismiss, a district court

6  generally may not consider any material beyond the pleadings." (internal quotation

7  omitted)); (*see generally* Compl.).

8    The court does find, however, that Bombardier's other alleged contractual

9  relationship and business expectancy are valid.  (*See* Compl. ¶¶ 147, 150.)  At this point,

10  the court assumes without deciding that the Code of Ethics that the individual Defendants

11  signed are valid contracts for purposes of a tortious interference claim; there is

12  undoubtedly a "pecuniary value" in safeguarding trade secrets.  *See Newton*, 52 P.3d at

13  33.  Further, the court concludes that Bombardier has a valid business expectancy in

14  adhering to its certification schedules for the C-Series and Global 7000/8000 Aircraft

15  because this business expectancy, similarly, is of pecuniary value.  *See id.*

16    Bombardier's tortious interference claim against MITAC America fails, however,

17  because Bombardier fails to sufficiently plead that MITAC America "induced or caused a

18  breach" of this contractual relationship or business expectancy.  *See Evergreen*, 274 P.3d

19  at 383.  Bombardier asserts that it sufficiently alleges this element by claiming that

20  "MITAC America targeted specific Bombardier employees with expertise in and access

21  to Bombardier's certification-related trade secrets."  (Pl. MITACA Resp. at 19.)

22  Bombardier further claims that it alleges this element by showing that "the employees

1  targeted by MITAC and MITAC America began providing information in support of the

2  MRJ certification efforts while they were still employed by Bombardier." (*Id.* (citing

3  Compl. ¶ 49) (emphasis omitted).)  The court concludes that these allegations do not

4  plausibly show that MITAC America induced or caused a breach of the Code of Ethics or

5  Bombardier's certification schedules.

6       At most, Bombardier plausibly alleges that MITAC America recruited Bombardier

7  employees to work on the MRJ project.  As explained above, recruiting a competitor's

8  employees is not unlawful on its own.  *See supra* § III.B.1.  Moreover, an employee does

9  not breach his or her Bombardier Code of Ethics simply by joining a competitor.  Rather,

10  an employee would need to breach a specific aspect of the Code of Ethics, such as

11  "divulg[ing] confidential information to anyone other than the person or persons for

12  whom it is intended." (*See* Code of Ethics at 18.)  But Bombardier does not plausibly

13  allege that MITAC America caused any breach of the Code of Ethics.  Although

14  Bombardier claims that Mr. Basson, Ms. Dornéval, Mr. Delarche, and Mr. Ayre breached

15  their Code of Ethics agreements by misappropriating trade secrets, none of these

16  individual Defendants work for MITAC America.  The court finds that, on the facts

17  pleaded, it is not plausible that MITAC America induced another company's employees

18  to breach their Bombardier Code of Ethics.  That leaves Does 1-88, but there are even

19  fewer allegations that relate to their purported breach of the Code of Ethics. (*See*

20  *generally* Compl.)  For instance, there is no information regarding what trade secrets, if

21  any, Does 1-88 "divulge[d]" to MITAC America such that they would be in breach of

22  their Code of Ethics. (*See generally id.*; *see also* Code of Ethics at 18.)

1    Similarly, the court concludes that Bombardier fails to plausibly allege that

2 MITAC America induced or caused a breach of Bombardier's certification schedules for

3 the C-Series and Global 7000/8000 Aircraft.  Outside of a formulaic recitation of the

4 tortious interference elements, Bombardier provides no factual allegations to show that

5 any breach of this business expectancy actually occurred.  (*See* Compl. ¶¶ 153-54); *see*

6 *also Iqbal*, 556 U.S. at 678 ("A pleading that offers . . . a formulaic recitation of the

7 elements of a cause of action will not do." (quoting *Twombly*, 550 U.S. at 555)).  Simply,

8 the court does not find that Bombardier plausibly alleges that MITAC America induced

9 an un-pleaded delay.[6]

10    In sum, the court concludes that Bombardier fails to plausibly allege that MITAC

11 America induced or caused a breach of Bombardier's alleged contractual relationship or

12 business expectancies.  The court therefore GRANTS MITAC America's motion to

13 dismiss count VIII.

14    2.  Mr. Korwin-Szymanowski's Motion

15    Bombardier alleges a similar tortious interference claim against Mr.

16 Korwin-Szymanowski.  (*See* Compl. ¶¶ 251-59.)  For the same reasons as discussed

17 above, the court concludes that Bombardier's second and third alleged business

18 expectancies are not valid.  *See supra* § III.C.1; (*see also* Compl. ¶¶ 253-54.)  Likewise,

19

20

21

22

---

[6] The court notes that Bombardier's failure to plead a delay to its certification schedules could also be analyzed as a failure to satisfy the fifth element of a tortious interference claim: that "the plaintiff suffered damage as a result" of the improper interference.  *Evergreen*, 274 P.3d at 383.  Regardless, Bombardier's fails to plausibly allege all the elements of a tortious interference claim.

1   the court concludes that Bombardier does not allege that Mr. Korwin-Szymanowski

2   induced a breach of Bombardier's aircraft certification schedules because Bombardier

3   does not sufficiently allege that any delay occurred. *See supra* § III.C.1; (*see also*

4   Compl. ¶ 255.)

5          Bombardier's allegation that Mr. Korwin-Szymanowski induced former

6   Bombardier employees to breach their Code of Ethics, however, requires further analysis.

7   (Compl. ¶ 252.)  In contrast to Bombardier's claims regarding MITAC America,

8   Bombardier alleges that Mr. Korwin-Szymanowski directly contacted Mr. Basson, Mr.

9   Delarche, and Ms. Dornéval when he was recruiting employees to AeroTEC.  (*See id.*

10  ¶¶ 238, 247.)  Bombardier also alleges that Mr. Korwin-Szymanowski is the Head of

11  MRJ Flight Testing for AeroTEC and that Mr. Basson, Mr. Delarche, and Ms. Dornéval

12  all now work on the MRJ project for AeroTEC.  (*Id.* ¶ 48, 60-62.)  Bombardier also

13  points out the specific Bombardier trade secrets that Mr. Basson, Mr. Delarche, and Ms.

14  Dornéval purportedly brought to AeroTEC.  (*Id.* ¶¶ 60-64.)  On these facts, the court

15  concludes that Bombardier plausibly alleges that Mr. Korwin-Szymanowski induced Mr.

16  Basson, Mr. Delarche, and Ms. Dornéval to violate the Bombardier Code of Ethics that

17  each of them signed.[7]

18

19          [7] The court notes the seeming tension between its finding on Bombardier's trade secret
    misappropriate claims against Mr. Korwin-Szymanowski and its finding here.  *See supra*
20  § III.B.2.c.  The court therefore clarifies its determinations:  although Bombardier plausibly
    alleges that Mr. Korwin-Szymanowski intentionally induced certain individual Defendants to
21  seize trade secrets, Bombardier fails to plausibly allege that Mr. Korwin-Szymanowski had any
    knowledge that the trade secrets at issue—purportedly taken from Bombardier and brought to
22  AeroTEC at the earliest six months after Mr. Korwin-Szymanowski engaged in any alleged
    recruiting activities—were acquired, used, or disclosed.  *See id.*

1    Mr. Korwin-Szymanowski raises an additional issue, however, which is whether

2    Mr. Basson's, Mr. Delarche's, and Ms. Dornéval's Code of Ethics are enforceable

3    contracts such that they can form the basis of a tortious interference claim.  (AeroTEC

4    MTD at 10-11, 13.)  Like any contract, a confidentiality agreement must be supported by

5    consideration.  *See DePhillips v. Zolt Const. Co., Inc.*, 959 P.2d 1104, 1107 (Wash.

6    1998); *Labriola v. Pollard Group, Inc.*, 100 P.3d 791, 794 (Wash. 2004).  "The general

7    rule in Washington is that contracts signed when an employee is first hired, such as

8    non-competition agreements, arbitration clauses, and confidentiality provisions, are

9    supported by consideration."  *E.E.O.C. v. Fry's Elecs., Inc.*, No. C10-1562RSL, 2011

10   WL 666328, at *1 (W.D. Wash. Feb. 14, 2011) (citing *Labriola*, 100 P.3d at 794).

11   However, "a promise to continue an at-will employment relationship, with no increase in

12   wages, change in responsibilities, promise of training, or other material alteration in the

13   relationship, is not consideration for a post-employment modification or additional

14   agreement."  *Fry's Elecs.*, 2011 WL 666328, at *1.  In order to determine whether

15   consideration was exchanged for a contract signed after employment began, the court

16   analyzes whether the employment relationship "materially changed at the time of

17   contracting, with both parties taking on new obligations."  *Id.*  "Neither continued atwill

18   [sic] employment nor promising to pay an employee his or her current salary constitute

19   independent consideration."  *Int'l Paper Co. v. Stuit*, No. C11-2139JLR, 2012 WL

20   1857143, at *4 (W.D. Wash. May 21, 2012) (citing *Labriola*, 100 P.3d at 794).[8]

21

22        [8] The court notes that there is some confusion in the case law regarding whether
continued employment is independent consideration for a post-employment contract

1    Here, Mr. Korwin-Szymanowski argues that the relevant Code of Ethics is an

2  invalid contract for lack of consideration.  (*See* AeroTEC MTD at 10-11, 13.)

3  Specifically, Mr. Korwin-Szymanowski notes that the Code of Ethics cited by

4  Bombardier has a copyright date of January 2012 for the English version and June 2011

5  for the French version.  (*See id.* at 11 (citing Code of Ethics at 29, 57).)  In addition,

6  Bombardier fails to allege that Mr. Basson, Ms. Dornéval, and Mr. Delarche signed this

7  version of the Code of Ethics.[9]  Thus, Mr. Korwin-Szymanowski argues, the Code of

8  Ethics that Bombardier relies upon as the contractual relationship for its tortious

9

10  ───────────────

modification or additional contract.  For example, in *Gaglidari v. Denny's Restaurants, Inc.*, 815 P.2d 1362, 1367-68 (Wash. 1991), the Washington Supreme Court explained that a plaintiff's receipt of an employment handbook after her employment began satisfied the requisites of contract formation in part because "[t]he consideration was plaintiff's continuation of her employment."  Citing *Gaglidari*, the Washington Court of Appeals has detailed how post-employment contracts can be formed with at-will employees:  "In such cases, a new contract is formed when the employer communicates the new terms (offer), the employee works after receiving notice (acceptance), and the employee continues in employment although free to terminate (consideration).  *Cascade Auto Glass, Inc. v. Progressive Cas. Ins. Co.*, 145 P.3d 1253, 1257 (Wash. Ct. App. 2006).  However, cases from the courts in this district, relying on more recent Washington Supreme Court cases, have uniformly held that "a promise to continue an at-will employment relationship, with no increase in wages, change in responsibilities, promise of training, or other material alteration in the relationship, is not consideration for a post-employment modification or additional agreement."  *Fry's Elecs.*, 2011 WL 666328, at *1 (citing *Labriola*, 100 P.3d at 794); *Int'l Paper*, 2012 WL 1857143, at *4; *Omega Morgan, Inc. v. Heely*, No. C14-556RSL, 2015 WL 1954653, at *3 (W.D. Wash. Apr. 29, 2015) (explaining that a contract entered into after employment must be supported by "independent, additional consideration," which may include "increased wages, a promotion, a bonus, a fixed term of employment, or perhaps access to protected information.")

[9] Mr. Korwin-Szymanowski's motion focuses on the Code of Ethics for Mr. Basson and Ms. Dornéval, but not the one for Mr. Delarche, perhaps because Mr. Basson and Ms. Dornéval are included in the AeroTEC Defendants while Mr. Delarche is not.  (*See* AeroTEC MTD at 10-11, 13; *see generally id.*)  Regardless, Mr. Delarche's Code of Ethics is relevant to the court's analysis because, among other things, Bombardier alleges that Mr. Korwin-Szymanowski directly recruited him to join AeroTEC.  (*See* Compl. ¶ 257.)

1  interference claim is, in fact, a modification of the Code of Ethics that the individual

2  Defendants signed and is therefore invalid for lack of consideration.  The court agrees.

3      Mr. Delarche began working at Bombardier in January 2005.  (*See* Compl. ¶ 8;

4  Denkenberger Decl. ¶ 4, Ex. 3 at 18-19.)  Ms. Dornéval began working at Bombardier in

5  July 2007.  (*See* Compl. ¶ 8-9; Denkenberger Decl. ¶ 5, Ex. 4 at 22).)  Mr. Delarche and

6  Ms. Dornéval both signed the Code of Ethics at the beginning of their respective

7  employments.  (*See* Delarche Code at 2-3; Dornéval Code at 2-3.)  These employees were

8  bound by the Code of Ethics that they signed.  However, the Code of Ethics before the

9  court is copyrighted to 2011 and 2012.  (*See* Code of Ethics at 29, 57.)  Therefore, in

10  order for Mr. Delarche and Ms. Dornéval to be bound by this Code of Ethics, Bombardier

11  needs to allege either that this Code of Ethics is an unmodified version of the one that Mr.

12  Delarche and Ms. Dornéval signed, or that any modifications were supported by

13  independent consideration.  Bombardier does not attempt to make the first allegation.

14  Regarding the second, Bombardier appears to concede that it did not give anything in

15  exchange for modifying the Code of Ethics beyond continued employment or a promise

16  to pay the employee's salary.  (*See* Pl. AeroTEC Resp. at 13 ("Each continued to work

17  for Bombardier after receiving the Code of Ethics, and accordingly continued to receive a

18  salary.").)  Likewise, Bombardier's complaint does not include facts alleging that the

19  relationship between Bombardier, on the one hand, and Mr. Delarche and Ms. Dornéval,

20  on the other, changed as a result of any modification.  *See Fry's Elecs.*, 2011 WL

21  666328, at *1.  In short, Bombardier fails to allege that the Code of Ethics before the

22  court was not materially modified from the 2005 and 2007 version(s) that Mr. Delarche

1   and Ms. Dornéval signed or, alternatively, that any modifications were supported by valid

2   consideration.  *See id.* (citing *Labriola*, 100 P.3d at 794).  Thus, the court concludes that

3   Bombardier fails to allege a valid contractual relationship with Mr. Delarche and Ms.

4   Dornéval that supports its tortious interference claim.[10]

5        The court also holds that Bombardier fails to adequately plead that Mr. Basson's

6   Code of Ethics is valid, but for slightly different reasons.  Mr. Basson began working at

7   Bombardier in approximately March 2013.  (*See* Compl. ¶ 7; *see also* Denkenberger

8   Decl. ¶ 3, Ex. 2 at 14.)  Thus, it is possible that Mr. Basson signed the version of the

9   Code of Ethics that is before the court when he first started his employment.  If that were

10  the case, then Mr. Basson's Code of Ethics would be a valid contract because

11  confidentiality agreements signed when an employee is first hired are supported by

12  consideration.  *See Fry's Elecs.*, 2011 WL 666328, at *1 (citing *Labriola*, 100 P.3d at

13  794).  However, Bombardier fails to allege that Mr. Basson signed the version of the

14  Code of Ethics that is before the court as opposed to a different version that was available

15  when he was hired.  (*See generally* Compl.)  Moreover, even if Bombardier alleged that

16

17      [10] It is true that "an enforceable contract is not required to support a tortious interference
    action," *see CaptiveAire Sys.*, 2009 WL 10676075, at *6, and that "all that is required is a

18  relationship between parties contemplating a contract, with at least a reasonable expectancy of
    fruition," *Broten*, 744 P.2d at 1088.  However, Bombardier bases this part of its claim on the
    existence of a valid contract.  (*See* Pl. AeroTEC Resp. at 18 ("[T]he individual defendants have

19  enforceable contractual obligations that were in fact breached.").)  To the extent Bombardier
    argues that it has a valid business expectancy that former employees will abide by the

20  confidentiality agreement even if the Code of Ethics is not a valid contract, Bombardier bases
    this argument on alleged duties under Canadian law.  (*See id.* at 15-16.)  As explained,

21  Bombardier does not make these allegations in its complaint and the court will not address them
    here.  *See supra* § III.C.1.  The court therefore does not reach whether, in the absence of an
    enforceable Code of Ethics, Bombardier had a "reasonable expectancy" that its former

22  employees would adhere to a modified Code of Ethics.  *See Broten*, 744 P.2d at 1088.

1 | Mr. Basson signed the Code of Ethics that is before the court, it is impossible to

2 | determine if Mr. Basson signed his Code of Ethics at the beginning of his employment

3 | because the date beneath his signature is incomplete.  (*See* Basson Code at 2 ("DATE:  4

4 | MA").)  In other words, the court cannot determine whether Mr. Basson signed at the

5 | beginning of his employment—which alone provides sufficient consideration—or

6 | whether he signed after he started working, which would require additional consideration

7 | for the Code of Ethics to be a valid contract.

8 |        In sum, the court concludes that Bombardier fails to plausibly allege a valid

9 | contractual relationship or business expectancy of which Mr. Korwin-Szymanowski

10 | induced its breach.  (Compl. ¶¶ 252-55.)  Bombardier thus fails to state a claim for

11 | tortious interference with a contractual relationship or business expectancy against Mr.

12 | Korwin-Szymanowski.  *See Evergreen*, 274 P.3d at 383.  The court therefore GRANTS

13 | Mr. Korwin-Szymanowski's motion to dismiss count XXI.

14 |        3.  AeroTEC's Motion

15 |        For the reasons articulated above with respect to Mr. Korwin-Szymanowski's

16 | motion, the court also finds that Bombardier fails to state a claim for tortious interference

17 | with a contractual relationship or business expectancy against AeroTEC.  *See supra*

18 | § III.C.2.  The court therefore GRANTS AeroTEC's motion to dismiss count IX.

19 | **D.     Breach of Contract**

20 |        Bombardier alleges that Ms. Dornéval and Mr. Basson breached their contracts

21 | with Bombardier by absconding with alleged trade secrets and disclosing them to

22 | AeroTEC.  (*See* Compl. ¶¶ 182-86, 228-32.)  To allege a breach of contract claim, a

1  plaintiff must "prove a valid contract between the parties, breach, and resulting damage."

2  *Lehrer v. State, Dep't of Soc. & Health Servs.*, 5 P.3d 722, 727 (Wash. Ct. App. 2000).

3      Bombardier's breach of contract claims rely on Ms. Dornéval's and Mr. Basson's

4  Code of Ethics being valid contracts.  (*See, e.g.*, Compl. ¶ 229 ("At all relevant times,

5  Bombardier had a valid and enforceable contract with Defendant Dornéval at least arising

6  out of Defendant Dornéval's express agreement to abide by Bombardier's Code of

7  Ethics.").)  However, for the reasons discussed above, the court concludes that

8  Bombardier fails to plausibly allege that Ms. Dornéval's and Mr. Basson's respective

9  Code of Ethics are valid contracts.  *See supra* § III.C.2.  In particular, Bombardier fails to

10  allege that the version of the Code of Ethics that is before the court either is an

11  unmodified version of the Code of Ethics that Ms. Dornéval and Mr. Basson signed when

12  they first began employment or that sufficient consideration supports any modifications.

13  *See id.*  Thus, the court GRANTS Ms. Dornéval's motion to dismiss count XVIII and Mr.

14  Basson's motion to dismiss count XII.

15  **E.    Leave to Amend**

16      When a claim is dismissed pursuant to a Rule 12(b)(6) motion, "a district court

17  should grant leave to amend even if no request to amend the pleading was made, unless it

18  determines that the pleading could not possibly be cured by the allegation of other facts."

19  *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).

20  Here, the court GRANTS Bombardier leave to file an amended complaint to cure the

21  deficiencies with the claims that the court dismissed.  *See Int'l Paper*, 2012 WL 1857143,

22  at *4, 8-9 (dismissing claims for breach of contract and tortious interference with a

1    business expectancy with leave to amend in a case involving the UTSA).  For purposes of

2    future proceedings, the court briefly discusses MITAC America's and AeroTEC's

3    argument that Bombardier's breach of contract and tortious interference claims are

4    preempted by the UTSA.  (*See* MITACA MTD at 27-28; AeroTEC MTD at 16-17.)

5          The UTSA "displaces conflicting tort, restitutionary, and other law of this state

6    pertaining to civil liability for misappropriation of a trade secret."  RCW 19.108.900(1).

7    Conversely, the UTSA does not displace "[c]ontractual or other civil liability or relief

8    that is not based upon misappropriation of a trade secret."  RCW 19.108.900(2)(a).  Thus,

9    when a plaintiff raises a civil claim alongside a UTSA claim, the court must determine if

10   the UTSA preempts the civil claim.  MITAC America and AeroTEC both ask the court to

11   analyze preemption under the approach articulated in *Thola v. Henschell,* 164 P.3d at

12   530.  (*See* MITACA MTD at 27-28; AeroTEC MTD at 16-17.)

13         In determining UTSA preemption under *Thola*'s approach, courts "(1) assess the

14   facts that support the plaintiff's civil claim; (2) ask whether those facts are the same as

15   those that support the plaintiff's UTSA claim; and (3) hold that the UTSA preempts

16   liability on the civil claim unless the common law claim is factually independent from the

17   UTSA claim."  *Thola*, 164 P.3d at 530.  Courts refer to this approach as "factual

18   preemption" or the "strong" view of the UTSA's preemptive scope.  *See SEIU*

19   *Healthcare Nw. Training P'ship v. Evergreen Freedom Found.*, 427 P.3d 688, 693-94

20   (Wash. Ct. App. 2018), *review denied sub nom. SEIU Healthcare N.W. Training P'ship*

21   *v. Evergreen Freedom Found.*, 435 P.3d 275 (Wash. 2019)  Courts in this district have

22   endorsed this approach, while noting that "[t]he preemptive scope of the UTSA is an

1    unsettled issue in Washington." *Inteum Co., LLC v. Nat'l Univ. of Singapore*, No.

2    C17-1252JCC, 2018 WL 2317606, at *2 (W.D. Wash. May 22, 2018) (citing *T-Mobile*

3    *USA, Inc. v. Huawei Device USA, Inc.*, 115 F. Supp. 3d 1184, 1197 (W.D. Wash. 2015));

4    *see also Int'l Paper*, 2012 WL 1857143, at *8 ("[T]he Washington Supreme Court has

5    not spoken on the scope of preemption under the UTSA.")

6           A recent Washington State case, however, clarifies that factual preemption is not

7    the correct approach. *See SEIU Healthcare*, 427 P.3d at 694-95. *SEIU Healthcare* states

8    that "[t]he leading case in Washington on the preemptive scope of the [UTSA] is not

9    *Thola*; it is our Supreme Court's decision in *Boeing Co. v. Sierracin Corp.* [738 P.2d 665,

10   674 (Wash. 1987)]." *SEIU Healthcare*, 427 P.3d at 694. The *SEIU Healthcare* court

11   explains that *Boeing* utilized an elements analysis for preemption rather than *Thola*'s

12   factual preemption. *Id.* at 695. Rather than asking whether the facts of the plaintiff's

13   civil claim are the same as those that support the plaintiff's UTSA claim, the elements

14   analysis holds that "a common law claim is not preempted if the elements require some

15   allegation or factual showing beyond those required under the UTSA." *Id.* at 694

16   (citations omitted). In other words, "*Boeing* indicates the [UTSA] is preemptive only if

17   an examination of the allegedly preempted cause of action shows that it is founded on a

18   law 'regarding civil liability for misappropriation.'" *Id.* at 695 (quoting *Boeing*, 738 P.3d

19   at 674). *Thola*—a Washington Court of Appeals case—"does not cite *Boeing* on the

20   issue of preemption, even though the issue arose in both cases in a similar posture," let

21   alone purport to overrule it. *SEIU Healthcare*, 427 P.3d at 694. Thus, as the court in

22   *SEIU Healthcare* explained, "[u]ntil or unless the Washington Supreme Court overrules

1    *Boeing* and adopts the *Thola* analysis, *Boeing* controls."  *Id.* at 695 (quoting *Modumental,*

2    *Inc. v. Xtalic Corp.*, 425 P.3d 871, 882 (Wash. Ct. App. 2018)).

3         The court is persuaded by *SEIU Healthcare* that Washington courts should apply

4    the elements analysis for UTSA preemption, rather than factual preemption.  Although

5    courts in this district have applied factual preemption, that is only because "the court's

6    best prediction [wa]s that the Washington Supreme Court would embrace [*Thola*'s] view

7    . . . if it were called upon to make a choice between those views."  *T-Mobile USA*, 115 F.

8    Supp. 3d at 1199.  *SEUI Healthcare* clarifies that the Washington Supreme Court has

9    made a choice between those views, and it is not up to this court to overrule that choice.

10   Thus, the court will analyze any preemption arguments in this case under the elements

11   approach.

12                         **IV.    CONCLUSION**

13        For the foregoing reasons, the court GRANTS MITAC America's motion (Dkt.

14   # 54), GRANTS in part and DENIES in part AeroTEC Defendants' motion (Dkt. # 56),

15   and GRANTS Bombardier leave to file an amended complaint within 15 days of the date

16   of this order.

17        Dated this 15th day of April, 2019.

18

19

20        JAMES L. ROBART
          United States District Judge

21

22

ORDER - 48