Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| BOMBARDIER INC.,<br><br>                    Plaintiff,<br><br>        v.<br><br>MITSUBISHI AIRCRAFT CORPORATION,<br>MITSUBISHI AIRCRAFT CORPORATION<br>AMERICA INC., AEROSPACE TESTING<br>ENGINEERING & CERTIFICATION INC.,<br>MICHEL KORWIN-SZYMANOWSKI,<br>LAURUS BASSON, MARC-ANTOINE<br>DELARCHE, CINDY DORNÉVAL, KEITH<br>AYRE, AND JOHN AND/OR JANE DOES 1-<br>88,<br><br>                    Defendants. | No. 2:18-cv-01543-JLR<br><br>BOMBARDIER INC.'S ANSWER<br>TO MITSUBISHI AIRCRAFT<br>CORPORATION AMERICA<br>INC.'S COUNTERCLAIMS |

Plaintiff Bombardier Inc. ("Plaintiff" or "Bombardier"), by and through its undersigned counsel, answers the Counterclaims filed on January 28, 2019 (Dkt. # 105) by Mitsubishi Aircraft Corporation America Inc. ("MITAC America" or "Defendant") as follows:

## ANSWER TO COUNTERCLAIMS

### GENERAL DENIAL

Unless expressly admitted below, Bombardier denies each and every allegation MITAC America has set forth in its Counterclaims, per Fed. R. Civ. P. 8(b)(3).

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**RESPONSE TO MITAC AMERICA'S SPECIFIC ALLEGATIONS**

The numbered paragraphs below correspond to the numbered paragraphs in the Counterclaims.

## I.    INTRODUCTION[1]

1.    Since 2015, Bombardier has engaged in a multifaceted scheme to expand its power within the regional jet market by impeding the entrance of a new competing aircraft: the Mitsubishi Regional Jet ("MRJ"). Through a series of interrelated actions directed at MITAC America and other companies and individuals involved in the MRJ's development and certification, Bombardier has attempted to prevent or delay competition from the MRJ by denying access to a critical development input—the skill and know-how of experienced aerospace professionals—and by tainting the image of the MRJ among purchasers of regional jets. Bombardier's anticompetitive aims are clear: to increase its market share and revenues by causing prospective MRJ customers to instead purchase Bombardier's competing Canadair Regional Jets ("CRJs") or extend the lives of in-service CRJs through the purchase of parts, maintenance, and other aftermarket services from Bombardier.

**Response to Paragraph 1:**    Bombardier denies all allegations in Paragraph 1.

2.    Bombardier's scheme has included a series of actions intended to delay and disrupt the development, certification, and sale of the MRJ. Over the course of the past three years, Bombardier has: (1) levied baseless threats and accusations against MITAC America and others involved in developing the MRJ—including Mitsubishi Aircraft Corporation ("MITAC"), Mitsubishi Heavy Industries, Ltd. ("MHI"), Aerospace Testing Engineering & Certification, Inc. ("AeroTEC"), and those companies' current and prospective employees—in order to restrict the free flow of skilled labor; (2) made threats against its own employees to deter them from accepting employment on the MRJ program; (3) attempted to coerce MITAC America, MITAC,

---

[1] For ease of reference, Bombardier has reproduced the headings MITAC America used in its Counterclaims. To the extent these headings contain any allegations or characterizations, Bombardier denies the truth, if any, of those allegations or characterizations.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

and AeroTEC to enter into per se unlawful no-poaching agreements in order to undermine recruitment and hiring activities in support of the MRJ program; (4) threatened the long-standing supply relationship between MHI and Bombardier in an attempt to achieve its illicit ends; and (5) initiated this litigation in a further effort to delay the MRJ program, undermine prospective customers' and suppliers' confidence in the MRJ, and impair the efforts of MITAC America and MITAC to sell the MRJ during a critical period for regional jet services.

**Response to Paragraph 2:**   Bombardier denies all allegations in Paragraph 2.

3.      The purported justifications for Bombardier's demands have changed over time, but the purpose and intended effect of its conduct have been consistent, as demonstrated by Bombardier's own statements confirming its intent to block competition from the MRJ. This litigation is the latest in a series of efforts taken by Bombardier to blunt an emerging competitive threat in an attempt to monopolize the regional jet market. Bombardier's anticompetitive conduct violates the Sherman Act and the Washington Consumer Protection Act.

**Response to Paragraph 3:**   Bombardier denies all allegations in Paragraph 3.

## II.     THE PARTIES

4.      Counterclaim Plaintiff MITAC America is a Delaware corporation with its principal place of business in Seattle, Washington. MITAC America is a wholly-owned subsidiary of MITAC, a Japanese corporation. MITAC is a subsidiary of MHI, also a Japanese corporation. Together, these companies are referred to herein as "Mitsubishi."

**Response to Paragraph 4:**   Admitted to the extent that MITAC America is a Delaware corporation. Bombardier lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 4 and therefore denies them.

5.      Counterclaim Defendant Bombardier, on information and belief, is a corporation organized and existing under the laws of the province of Quebec, Canada, with its principal place of business in Montreal, Quebec, Canada.

**Response to Paragraph 5:**   Admitted.

BOMBARDIER INC.'S ANSWER TO MITAC
AMERICA INC.'S COUNTERCLAIMS (2:18-cv-
01543-JLR) - 3

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

### III.   JURISDICTION AND VENUE

6.      MITAC America brings its claims against Bombardier under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and the Washington Consumer Protection Act, RCW ch. 19.86.

**Response to Paragraph 6:**   Bombardier admits that MITAC America purports to bring an action under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and the Washington Consumer Protection Act, RCW ch. 19.86, but denies it has violated either the Sherman Act or the Washington Consumer Protection Act.

7.      The Court has subject-matter jurisdiction over MITAC America's counterclaims under 15 U.S.C. § 2 pursuant to 28 U.S.C. §§ 1331 and 1337. The Court has subject-matter jurisdiction over MITAC America's counterclaims under Washington state law pursuant to 28 U.S.C. § 1367 because the state-law claims arise out of the same case or controversy as gives rise to MITAC America's counterclaims under the Sherman Act.

**Response to Paragraph 7:**   Paragraph 7 asserts legal conclusions to which no responses are required. To the extent responses are required, Bombardier denies all allegations in Paragraph 7.

8.      The Court has personal jurisdiction over Bombardier because Bombardier consented to the Court's jurisdiction over it by filing this action in this Court and because Bombardier has committed unlawful acts within Washington that give rise to the causes of action alleged herein.

**Response to Paragraph 8:**   Paragraph 8 asserts legal conclusions to which no responses are required. To the extent any response is required, Bombardier consents to the personal jurisdiction of this Court for the limited purposes of contesting MITAC America's Counterclaims. Bombardier denies the remaining allegations in Paragraph 8.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this judicial district and pursuant to 28 U.S.C. § 1391(c) because Bombardier is not a

BOMBARDIER INC.'S ANSWER TO MITAC AMERICA INC.'S COUNTERCLAIMS (2:18-cv-01543-JLR) - 4

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

resident of any judicial district and Bombardier is subject to the court's personal jurisdiction, including by virtue of Bombardier's filing of this action in this Court.

**Response to Paragraph 9:**   Paragraph 9 asserts legal conclusions to which no responses are required. To the extent any response is required, Bombardier admits that it brought suit against Defendants in this action. Bombardier denies the remaining allegations in Paragraph 9.

## IV. FACTUAL BACKGROUND

### A.   Mitsubishi's Efforts to Enter the Regional Jet Market

10.     Regional jets are single-aisle, turbofan-powered commercial aircraft with seating capacity for 50 to 100 passengers and flight ranges up to approximately 2,500 nautical miles.

**Response to Paragraph 10:** Bombardier admits that regional jets may have a single aisle, may be turbofan-powered, may have seating capacity for 50 to 100 passengers, and/or may have flight ranges of up to approximately 2,500 nautical miles. The allegations of Paragraph 10 purport to be MITAC America's definition of "regional jets." Bombardier denies that such definition is the only manner in which to define regional jets and further denies that it is the proper definition for purposes of identifying any particular market for MITAC America's counterclaims. To the extent there are remaining allegations in Paragraph 10, Bombardier denies them.

11.     The first regional jets entered service in 1992 when Bombardier began delivery of its Canadair Regional Jet ("CRJ"). Prior to introduction of the CRJ100, demand for short to medium-range aircraft had increased due in part to U.S. airlines' increasing use of a hub-and-spoke system (which increased the number of flights between larger "hub" airports and smaller "spoke" airports) after passage of the 1978 Airline Deregulation Act. Neither turboprop airplanes nor existing jets were capable of meeting the market demand for fast, efficient, quiet, and smooth midsized aircraft needed to service an increasing number of routes worldwide. As the first jet capable of filling the gap between the operating capabilities of short-haul turboprop airplanes and larger capacity, longer range jets, the CRJ100 quickly surpassed analysts' sales expectations and established Bombardier's position as the leader in the regional jet market.

BOMBARDIER INC.'S ANSWER TO MITAC AMERICA INC.'S COUNTERCLAIMS (2:18-cv-01543-JLR) - 5

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Response to Paragraph 11:** Admitted only that the CRJ100 entered service in 1992. The remaining allegations of Paragraph 11 constitute opinion to which no response is required. To the extent any response is required; Bombardier lacks knowledge or information sufficient to form a belief as to the truth, if any, of the allegations and therefore denies them.

12. Bombardier was the sole manufacturer of regional jets until late 1996, when Brazilian jet maker Embraer SA ("Embraer") delivered its first Embraer Regional Jet ("ERJ"). Since then, Bombardier and Embraer have dominated the market for regional jets, accounting for 89% of in-service regional jets worldwide over the past decade, and as of 2018. British Aerospace and Fokker briefly attempted to compete with Bombardier and Embraer in the regional jet market, but neither succeeded in gaining a foothold and both ultimately ceased manufacturing regional jets. Russian-based United Aircraft Corporation and Chinese state-owned Commercial Aircraft Corporation of China have made some inroads in their home markets but together only account for approximately 4% of in-service regional jets as of 2018.

**Response to Paragraph 12:** Bombardier lacks knowledge or information sufficient to form a belief as to the truth, if any, of the allegations in Paragraph 12 and therefore denies them**.**

13. The barriers faced by new entrants into the regional jet market are significant. As explained further below, these barriers include the cost of developing a regional jet, the complexity of the development and certification process, manufacturing requirements and costs, the challenges of earning customer trust for a new aircraft, and the costs associated with an airline's decision to switch to a new manufacturer's aircraft. Among the many barriers to entry is the finite supply of engineers with the skills and know-how necessary to the development and certification of commercial jets. Restrictions on the mobility of employees with these specialized skills and know-how can serve as an additional barrier to entry.

**Response to Paragraph 13:** The allegations of Paragraph 13 constitute opinion to which no response is required; to the extent any response is required, Bombardier lacks knowledge or information sufficient to form a belief as to the truth, if any, of the allegations and therefore denies them**.**

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

14.     Due to the limited supply and vital importance of engineers with specialized skills and know-how, aircraft manufacturers (including companies seeking to enter the market) frequently seek to recruit and hire such employees from other aerospace companies. For example, when Bombardier was developing its own expertise in support of certification of the CRJ100, it recruited heavily from British Aerospace, which at the time was a leading jet manufacturer. Similarly, in 1997—the year after Embraer began competing against Bombardier in the regional jet market—Bombardier recruited and hired at least a dozen engineers from Embraer. More recently, Bombardier hired at least 50 experienced aeronautical engineers from Embraer to work on the development of its CSeries family of narrowbody jets. On information and belief, Bombardier recruited and hired these Embraer employees so that Bombardier could benefit from the specialized skills and know-how that the employees had developed through their work on Embraer jets. On information and belief, Embraer likewise has hired skilled employees from Bombardier.

**Response to Paragraph 14:** Bombardier admits that aircraft manufacturers recruit and hire employees from other aerospace companies. Bombardier further admits that it and other aerospace companies have properly sought to recruit engineers with specialized skills and know-how in various aspects of aircraft development and design. Bombardier denies the allegation of Paragraph 14 to the extent they imply that Bombardier has engaged in recruiting and hiring practices that are improper or that have harmed a competitor. In addition, Bombardier denies the remaining allegations in Paragraph 14 because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations, if any.

15.     In March 2008, MHI announced the launch of a program to develop the MRJ, a next-generation regional jet that seeks to be the most efficient, comfortable, and reliable commercial aircraft of its type to ever take flight. MITAC and MITAC America were formed in 2008 to lead the MRJ program, including the development, marketing, and sale of the MRJ. The MRJ is being designed to burn 20% less fuel and make 40% less noise compared to existing

BOMBARDIER INC.'S ANSWER TO MITAC
AMERICA INC.'S COUNTERCLAIMS (2:18-cv-
01543-JLR) - 7

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

regional jets. As such, the MRJ is expected to pose formidable competition to Bombardier in the regional jet market.

**Response to Paragraph 15:**  Bombardier admits only that a program to develop the MRJ was announced in or about 2008. Bombardier lacks knowledge or information sufficient to form a belief as to the truth, if any, of the remaining allegations of Paragraph 15 and therefore denies them.

16.    The MRJ is a "clean sheet" aircraft, which means the design is new, not based on a prior previously certified plane. Development and certification of a clean sheet aircraft is a complex, costly, and lengthy process. As Bombardier acknowledges in its complaint, even experienced manufacturers typically spend several billion dollars and upwards of ten years bringing a clean sheet aircraft from concept and design to commercialization and flight. (*See* Dkt. 1 at ¶¶ 24-27.) Unexpected setbacks and delays during the development process are also not atypical. Certification flight testing of the MRJ is currently expected to begin in early 2019 with the MRJ entering into service in 2020.

**Response to Paragraph 16:**  Bombardier admits that the MRJ is a clean sheet aircraft and that bringing a clean sheet aircraft from concept and design to commercialization and flight can be a complex and costly process. Paragraph 16 also contains characterizations of a document that speaks for itself. Bombardier lacks sufficient information to form a belief as to the truth, if any, of all other allegations of Paragraph 16 and therefore denies them.

17.    The MRJ will be the first all-new commercial jet developed in large part by a Japanese company since the 1960s. Consequently, at the time the MRJ program was launched, few individuals in Japan possessed expertise related to the development and certification of aircraft.

**Response to Paragraph 17:**  Paragraph 17 contains allegations that assume facts and future events, and on at least that basis, Bombardier denies the allegations in the first sentence of Paragraph 17. Bombardier lacks sufficient information as to the truth of the second sentence in Paragraph 17 and therefore denies it.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

18.     To support their efforts to bring the MRJ to market, including by obtaining required certification from regulatory authorities in the United States, Japan, Canada, and Europe, MITAC and MITAC America have sought to obtain expert assistance from outside Japan. Since mid-2014, MITAC has partnered with AeroTEC, a company based in Seattle, Washington that specializes in the testing, engineering, and certification of aircraft for its clients. In July 2015, MITAC America opened its Seattle Engineering Center to assist in testing and certification efforts for the MRJ. The following summer, in August 2016, MITAC America opened a Flight Test Center in Moses Lake, Washington.

**Response to Paragraph 18:** Bombardier admits the allegations in Paragraph 18 to the extent that Bombardier is aware that MITAC and MITAC America have sought and obtained expert assistance from outside Japan to support their efforts to bring the MRJ to market. Bombardier further admits that MITAC purports to have partnered with AeroTEC. Bombardier lacks knowledge or information sufficient to form a belief as to the truth, if any, of all other allegations of Paragraph 18 and therefore denies them.

19.     In order to meet their human resources needs, MITAC, MITAC America, and AeroTEC have undertaken efforts to recruit and hire individuals with specialized skill and know-how related to the development and certification of regional jets.

**Response to Paragraph 19:** Bombardier admits that the named entities have undertaken efforts to recruit and hire individuals with specialized skill and know-how related to the development and certification of regional jets. Bombardier lacks knowledge or information sufficient to form a belief as to the truth, if any, of the remaining allegations of Paragraph 19 and therefore denies it.

20.     As detailed further below, beginning in 2015, AeroTEC advertised that it was hiring for positions related to flight testing of the MRJ, held job fairs to identify potential candidates, and engaged in other recruitment activities both through recruiters and via direct communications with potential hires.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Response to Paragraph 20:** Admitted that AeroTEC has engaged in substantial recruiting activity related to the MRJ. Bombardier lacks sufficient information to form a belief regarding any further allegations in this paragraph, such as when recruiting activities began.

21.     In 2016, MITAC and MITAC America sought to recruit and hire over 200 aircraft system engineers to work on certification activities of the MRJ aircraft. As part of their efforts, the companies held eight job fairs in cities throughout North America in 2016: Wichita, Kansas (May 6-7), Anaheim, California (June 18-19), Dallas, Texas (June 24-25), Montreal, Quebec (July 15-16), and Seattle, Washington (July 30-31, August 19-20, October 28, and December 3). Those cities were chosen because each was well-known to be the home of sizeable aerospace companies and thus job fairs in those cities were expected to result in sizeable pools of qualified job applicants. Through the eight job fairs held in 2016, MITAC hired a total of 28 employees, 9 of whom had previously been employed by Bombardier.

**Response to Paragraph 21:** Admitted to the extent a) that in 2016 MITAC and MITAC America sought to recruit and hire engineers to work on certification activities of the MRJ aircraft, b) that MITAC and MITAC America organized a "job fair" in Montreal, Quebec for July 15-16, 2016, c) that the North American cities listed have aerospace companies, and d) that MITAC has hired individuals who worked at Bombardier. Bombardier lacks knowledge or information sufficient to form a belief as to the truth, if any, of all other allegations in Paragraph 21 and therefore denies them.

22.     In addition to holding job fairs, MITAC and MITAC America have publicized job openings via the website LinkedIn.com and have engaged recruiting firms to identify job candidates. All told, MITAC and MITAC America have together recruited and hired candidates from the leading jet manufacturers (including Boeing, Airbus, and Embraer) as well as systems suppliers and government agencies.

**Response to Paragraph 22:** Admitted to the extent MITAC and MITAC America have engaged professional recruiting services to support their efforts to hire Bombardier employees and to the extent that ex-Boeing personnel were known to be in the employ of MITAC.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1   Bombardier lacks knowledge or information sufficient to form a belief as to the truth, if any, of

2   all other allegations in Paragraph 22 and therefore denies them.

3       23.     The singular purpose of MITAC and MITAC America's recruiting efforts was to

4   meet the human resources needs of the MRJ program. Neither MITAC nor MITAC America

5   sought to disrupt or interfere with the business operations of Bombardier or any other company

6   nor to acquire any company's proprietary intellectual property. Nor did MITAC or MITAC

7   America believe that any such disruption or interference with Bombardier's operations was

8   possible given Bombardier's immense size and its long history of experience with jet

9   development and certification. On information and belief, AeroTEC's own recruiting efforts

10  were similarly motivated only by its desire to meet its own human resources needs, not to disrupt

11  the operations of Bombardier or any other company or to acquire any company's proprietary

12  intellectual property.

13      **Response to Paragraph 23:** Bombardier    denies    all    allegations    contained    in

14  Paragraph 23.

15  **B.    Bombardier's Predatory Scheme to Thwart Competition in the Regional Jet Market**

16      24.     Since late 2015, Bombardier has engaged in a multifaceted scheme to restrain

17  competition in the regional jet market by impeding and delaying the development, certification,

18  and sale of the MRJ. Bombardier's anticompetitive conduct has included a series of spurious and

19  improper threats and allegations against Mitsubishi, AeroTEC, and former and current

20  Bombardier employees that were intended to prevent and impede competition from the MRJ.

21  Bombardier's attempts to prevent Mitsubishi and AeroTEC from hiring, retaining, and utilizing

22  highly-skilled individuals critical to the development and certification of the MRJ have included

23  its efforts to: coerce Mitsubishi and AeroTEC to enter per se illegal no-poach agreements or

24  otherwise refrain from the legitimate recruitment and hiring of Bombardier employees (including

25  via threats that the Bombardier-MHI supply relationship would be threatened if Bombardier's

26  illegal demands were not heeded); deter potential job candidates from applying for or accepting

27  employment related to the MRJ program; and limit the ability of former Bombardier employees

BOMBARDIER INC.'S ANSWER TO MITAC
AMERICA INC.'S COUNTERCLAIMS (2:18-cv-
01543-JLR) - 11

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

to perform legitimate job functions in support of the MRJ effort. At the same time, Bombardier has attempted to impair Mitsubishi's reputation and goodwill, including among current and potential MRJ customers and suppliers, by falsely insinuating that the success of the MRJ program is dependent on misappropriated trade secrets, thus sullying the image of the MRJ and creating doubt and uncertainty about whether the MRJ will be able to meet development and production deadlines and enter the market notwithstanding Bombardier's lawsuit. All of these actions were taken as part of an overarching plot to monopolize and reduce competition in the regional jet market.

**Response to Paragraph 24:** Bombardier denies all allegations in Paragraph 24.

25.    Bombardier's efforts to undermine the development of the MRJ began no later than October 22, 2015 when Bombardier's Director of Legal Services wrote to AeroTEC and its Head of MRJ Flight Testing, Michel Korwin-Szymanowski, threatening to "institute legal proceedings" unless AeroTEC and Mr. Korwin-Szymanowski ceased efforts to recruit Bombardier and Learjet employees. (*See* Ex. A (October 22, 2015 correspondence between Bombardier and AeroTEC); Dkt. 1-11 (October 22, 2015 letter from Bombardier to Korwin-Szymanowski).)

**Response to Paragraph 25:** Bombardier admits that on October 22, 2015, Bombardier's Director of Legal Services wrote to AeroTEC's Head of MRJ Flight Testing, Michel Korwin-Szymanowski. Paragraph 25 contains characterizations of documents and written correspondence that speak for themselves. Bombardier denies any and all remaining allegations in Paragraph 25.

26.    Two days prior, on October 20, 2015, Mr. Korwin-Szymanowski had emailed a "form letter" to hundreds of individuals with flight test experience, including but not limited to former colleagues at Bombardier, regarding employment opportunities at AeroTEC and referencing recruiting and non-recruiting social events being held the following week in Wichita, Kansas and Montreal, Canada. (*See* Dkt. 1-12 at 33-35.) These recruiting activities were aimed at hiring qualified personnel to work on the MRJ program.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Response to Paragraph 26:**  Admitted that Bombardier filed as Dkt. # 1-12 a copy of an email that Defendant Korwin-Szymanowski purportedly sent to 247 Bombardier employees. Bombardier refers MITAC America to Dkt. # 1-12 for the content contained therein. Bombardier is without sufficient knowledge or information to form a belief as to the truth, if any, of the other allegations in Paragraph 26 and therefore denies them.

27.     Referencing Mr. Korwin-Szymanowski's October 20, 2015 email, Bombardier demanded that Mr. Korwin-Szymanowski and AeroTEC cancel events planned for October 22, 2015 and October 28, 2018 in Wichita and Montreal, respectively, and end the use of "mobile truck signage with the mention 'Now hiring in Seattle' with interview dates and times" in any area "around Bombardier and Learjet facilities." Notwithstanding that Mr. Korwin-Szymanowski was no longer employed by Bombardier and had never entered a post-employment non-compete agreement, Bombardier asserted that Mr. Korwin-Szymanowski's recruitment activities "unquestionably constitute[] a breach of [his] confidentiality duty and also a breach of contract." Citing no authority, Bombardier asserted that "[c]ourts have routinely reached the conclusion that former employees are not allowed to facilitate the piracy of employees from their former employer" and that "[i]n these situations, employees and their new employer are liable for the conspiracy to achieve such piracy." (Dkt. 1-11.)

**Response to Paragraph 27:**  Paragraph 27 contains characterizations of a document and written correspondence that speak for themselves. Bombardier admits that as of the time of the written correspondence, Bombardier did not employ Defendant Korwin-Szymanowski. Bombardier lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 27 and on that basis denies those allegations.

28.     Although neither AeroTEC nor Mr. Korwin-Szymanowski had done anything improper, AeroTEC reluctantly conformed to Bombardier's demands, with AeroTEC's President Lee Human advising in an October 22, 2015 email that "1) Mr. Korwin-Szymanowski has been removed from this recruiting activity either directly or indirectly; 2) We have cancelled the social hour scheduled for tonight at Hangar 1; 3) We have moved recruitment trucks away from your

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

facilities." (*See* Ex. A.) As Mr. Human later explained, AeroTEC "did not agree with Bombardier's claims of impropriety," but AeroTEC nevertheless "decided to cancel the impending social events and job fairs in Wichita and Montreal, and agreed Michel [Korwin-Szymanowski] would not contact any Bombardier employees going forward," in part because AeroTEC "had recently been invited by Bombardier to bid on a project . . . and we wanted to stay in their good graces." (Dkt. 66 at ¶ 5; *see also* Dkt. 60 at 3 ("AeroTEC did not, and does not, agree that Korwin-Szymanowski used or possessed any such confidential information, but in an attempt to work with Bombardier, AeroTEC agreed that he would no longer be involved with the recruiting activity.").)

**Response to Paragraph 28**: Denied that neither "AeroTEC nor Mr. Korwin-Szymanowski had done anything improper." Admitted that MITAC America attached as Exhibit A to its Counterclaims a purported copy of correspondence that Mr. Human sent to Bombardier. Admitted that paragraph 28 appears to include quotations from a declaration purportedly by Mr. Human filed at Dkt. # 66 and from AeroTEC's Redacted Opposition to Bombardier's Motion for a Preliminary Injunction filed at Dkt. #60. To the extent that Paragraph 28 contains characterizations of documents, those documents speak for themselves. Bombardier lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 28 and on that basis denies such allegations.

29.    On or about February 12, 2016, AeroTEC informed Bombardier that it intended to restart its recruiting activities in the Montreal and Wichita areas. In response, Bombardier's Senior Director of Human Resources, Product Development Engineering stated that Bombardier was adamantly opposed to any such recruitment activities by AeroTEC. (*See* Dkt. 1-12 at 7.)

**Response to Paragraph 29:** The allegations in Paragraph 29 contain characterizations of a document that speaks for itself. Bombardier admits only that the referenced docket item purports to refer to an alleged communication from AeroTEC to Bombardier. Bombardier denies any remaining allegations in Paragraph 29 because it lacks knowledge or information sufficient to form a belief about the truth, if any, of the allegations.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

30.     On April 26, 2016, Bombardier escalated its threats towards AeroTEC and its employees when Bombardier's outside counsel, Peter Nohle of Jackson Lewis, sent a letter to AeroTEC's president threatening litigation against AeroTEC and the former Bombardier employees hired by AeroTEC unless, among other things, AeroTEC and the former Bombardier employees entered into no-poaching agreements pursuant to which they would not directly or indirectly communicate with or otherwise solicit "any current or recently departed employee of Bombardier regarding any employment or similar opportunities for work outside of Bombardier for a period of one year from the date of this Agreement." (*See* Dkt. 1-12.) The threats issued by Bombardier's outside counsel purported to be based on legal obligations and/or restrictions that Bombardier inaccurately claimed were applicable to its current and former employees Bombardier's Code of Ethics and Business Conduct, and on Bombardier's claim that the recruitment-related activities of two former Bombardier employees, Mr. Korwin-Szymanowski and Dale Goulding, created the risk of "substantial liability" for AeroTEC. Even if those propositions were correct (and they are not), they would provide no lawful basis for the wide-ranging and anticompetitive no-poaching agreement Bombardier demanded.

**Response to Paragraph 30:** The allegations in Paragraph 30 contain characterizations of a document that speaks for itself. Bombardier admits Paragraph 30 only to the extent that legal counsel acting on behalf of Bombardier wrote AeroTEC's president on April 26, 2016, to discuss Bombardier's Code of Ethics and Business Conduct and related obligations of former Bombardier employees hired by AeroTEC such as Mr. Korwin-Szymanowski and Mr. Goulding. Bombardier specifically denies the allegations of Paragraph 30 that state or imply that the letter constituted "threats" against AeroTEC or its employees; that Bombardier was demanding that AeroTEC enter into an anticompetitive no-poaching agreement; or that Bombardier engaged in any wrongdoing. To the extent there are any additional factual allegations in this paragraph, Bombardier denies any such allegations.

31.     In early May 2016, outside counsel for AeroTEC responded to Bombardier's April 26 demand letter, and over the following months counsel for the companies discussed the

BOMBARDIER INC.'S ANSWER TO MITAC
AMERICA INC.'S COUNTERCLAIMS (2:18-cv-
01543-JLR) - 15

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

terms of the additional no-poach agreement Bombardier requested. Ultimately, the companies did not execute any agreement.

**Response to Paragraph 31:** Admitted to the extent Bombardier and its counsel communicated with counsel for AeroTEC and that no agreement was reached. Bombardier denies any remaining allegations in Paragraph 31.

32.     However, Bombardier's threats towards AeroTEC succeeded in their objective of continuing to deter AeroTEC's hiring of employees in support of the MRJ project. As stated in a June 3, 2016 letter from AeroTEC's president to Bombardier test pilot Ed Grabman, "AeroTEC does not agree with Bombardier's assertion that we cannot freely recruit employees of any background and the two companies are in the process of trying to work out their differences. Until this is accomplished, however, we are refraining from offering positions to any current employees of Bombardier." (Ex. B.) Thus, AeroTEC's ability to hire skilled labor for the MRJ program was impaired not only by the concessions Bombardier had coerced AeroTEC to make, but also by Bombardier's subsequent threats of legal action against AeroTEC.

**Response to Paragraph 32:** The allegations in Paragraph 32 contain characterizations of a document that speaks for itself. Bombardier denies that the referenced letter or its content was the result of improper threats or any improper action asserted against AeroTEC, or that any such improper action occurred. Bombardier denies any other allegations in Paragraph 32.

33.     Around this time, Bombardier began issuing similar threats to Mitsubishi. On June 3, 2016, Bombardier's Vice President of Contracts and Legal Services, Christian Poupart, sent an email to the Managing Counsel of MHI, Luke Walker, regarding Bombardier's "concern[]" that "AeroTEC . . . has recently been soliciting and recruiting a number of key employees from our Flight [T]est Center, despite being asked by us on numerous occasions to cease and desist from that practice" and that "some of these former Bombardier employees have been transferred to MHI or are working on the MRJ flight test program." (Dkt. 1-14.) Alluding vaguely to the "concern[]" that undefined "Bombardier proprietary methods and know-how" would "inevitably be transferred and used by AeroTEC or MHI for the purpose of their flight

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

testing activities," Mr. Poupart requested Mr. Walker's "assistance in ensuring that this practice of soliciting and hiring Bombardier key flight testing employees ceases immediately . . . ." In response, Mr. Walker requested that Mr. Poupart provide "the non-solicitation agreement that Bombardier believes prohibits AeroTEC from recruiting Bombardier employees" in addition to "any of the correspondence that you have had with AeroTEC." Mr. Poupart did not respond to Mr. Walker's request.

**Response to Paragraph 33:** The allegations in Paragraph 33 contain characterizations of documents which speak for themselves. Bombardier admits Paragraph 33 to the extent that Mr. Poupart emailed Mr. Walker of MHI on June 3, 2016, relative to concerns involving the recruiting activities of AeroTEC and that Mr. Walker replied two days later. *See* Dkt. # 1-14 at 2. Bombardier denies that Mr. Poupart's email constituted "threats" to Mitsubishi or that the email did not clearly express concerns relating to "Bombardier proprietary methods and know-how." Bombardier denies any remaining allegations in Paragraph 33.

34.     On July 14, 2016, Mr. Poupart sent a letter to Mr. Walker expressing objections to a job fair scheduled to take place over the following two days in Montreal. (Dkt. 1-15.) As indicated in the newspaper advertisement for the job fair referenced in Mr. Poupart's letter, MITAC was at that point "looking to hire over 200 Aircraft Systems Engineers who can work on Certification activities for MRJ aircraft in Japan." (Dkt. 1-10 at 134-35.) After acknowledging the lawful intent of the job fair and that the promotional materials were not "directly aimed at Bombardier employees," Mr. Poupart nevertheless insinuated that Mitsubishi's holding of the job fair was illegal. Without citation to authority or explanation of how Mitsubishi's conduct was wrongful, Mr. Poupart claimed that "[c]ourts have routinely reached the conclusion that massive solicitation that cause (sic) irreversible damages to a business is prohibited. In these situations, employees and their new employer can be held jointly liable for the prejudice caused by such practice." Then, without contending or suggesting that any previously-departed Bombardier employee had in fact misappropriated any Bombardier intellectual property, Mr. Poupart "remind[ed]" Mr. Walker that any such hypothetical misappropriation would be wrongful. Mr.

BOMBARDIER INC.'S ANSWER TO MITAC
AMERICA INC.'S COUNTERCLAIMS (2:18-cv-
01543-JLR) - 17

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Poupart concluded by stating that "[w]e trust you understand the seriousness of the situation and ask that MHI refrains from engaging in any illegal activity that could cause Bombardier to suffer damages, failing which we reserve all of our rights against MHI, including our right to institute legal proceeding (sic) against MHI without any further notice."

**Response to Paragraph 34:** The allegations in Paragraph 34 contain characterizations of a document that speaks for itself. Admitted to the extent that on July 14, 2016, Mr. Poupart sent a letter to Mr. Walker discussing a job fair scheduled to take place over the following two days in Montreal. *See* Dkt. # 1-15 at 2. Bombardier denies that Mr. Poupart expressed objections to the holding of the job fair or that he "insinuated that Mitsubishi's holding of the job fair was illegal." Bombardier denies any remaining allegations of Paragraph 34.

35.    Three weeks later, Bombardier escalated its threats against MHI. On August 5, 2016, Alain Bellemare, the President and Chief Executive Officer of Bombardier, sent a letter to Hideaki Omiya, the Chairman of the Board of MHI, in which he described the two companies' partnership "on various aircraft programs for several decades" and how they have "had to face and resolve several issues in order to continue enjoying a mutually beneficial relationship." (Dkt. 1-16.) After making a request for MHI's cooperation on certain payment terms related to the companies' supply contract, Mr. Bellemare referred Mr. Omiya to an attached letter— Mr. Poupart's July 14, 2016, letter to Mr. Walker—and implicitly threatened the continuation of the supply relationship between Bombardier and MHI unless MHI ceased the solicitation of Bombardier employees. Mr. Bellemare wrote: "You will appreciate the fact that the relationship between our two companies must be based on trust. As key suppliers, we expect Mitsubishi not to cause harm to Bombardier by engaging in massive solicitation of our engineers." The letter concluded with the not-so-subtle threat that "[t]he long standing partnership between Bombardier and MHI has been a successful one and I trust that MHI will continue to be [a] key supplier and will support Bombardier in light of the current market conditions."

**Response to Paragraph 35:** The allegations in Paragraph 35 contain characterizations of a document that speaks for itself. Bombardier admits that on August 5, 2016, Mr. Bellemare

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

sent a letter to Mr. Omiya. Bombardier specifically denies that the letter constituted a "threat" to MHI or that Bombardier otherwise engaged in improper conduct. Bombardier further denies any remaining allegations in this paragraph.

36.     In response to Mr. Bellemare's letter, on August 22, 2016, Hiromichi Morimoto, the President of MITAC, wrote to Mr. Bellemare to acknowledge that MITAC was "currently engaged in an aircraft development program in Japan and North America and due to our need for qualified engineers, we have recently carried out various recruiting activities, including job fairs, in several North American cities with an aviation industry presence." (Ex. C.) He went on to assure Mr. Bellemare that MITAC was acting within the law and not attempting to harm Bombardier's business:

> We are confident that all our recruiting activities held, or to be held, fully comply with all applicable laws and regulations, and moreover, should be considered routine and customary for any company in our industry seeking qualified employees. With respect to your concerns, please be assured that these recruiting activities were not and are not intended to harm or target Bombardier's business. Further, Mitsubishi Aircraft Corporation, like MHI and all other MHI group companies, has a strong commitment to respect the intellectual property rights of all third parties, and we take appropriate measures in this respect with all new employees.

**Response to Paragraph 36:** The allegations in Paragraph 36 contain characterizations of a document that speaks for itself. Bombardier admits receipt of the letter referenced in Paragraph 36. Bombardier denies any remaining allegations in this paragraph.

37.     Mr. Bellemare did not reply to Mr. Morimoto's letter or otherwise respond to MITAC. Instead, Mr. Bellemare opted to send a second letter to the Chairman of the Board of MHI, again implicitly threatening the MHI-Bombardier supply relationship on the basis of MITAC's lawful efforts to compete with Bombardier. (Dkt. 1-17.) In a January 27, 2017 letter to Mr. Omiya, Mr. Bellemare complained that "despite my [August 5, 2016] letter . . . MHI continues to actively solicit and hire key employees of Bombardier." Without evidence or explanation—but with an acknowledgement that Bombardier's fear of competition in the

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

regional jet market underpinned its threats—Mr. Bellemare asserted that "we have reasons to believe that the employees recruited by MHI will use the intellectual property owned by Bombardier to assist MHI in developing the MRJ aircraft which will compete against Bombardier aircraft" and requested that Mr. Omiya "[t]ake note that my team is instructed to take all necessary actions to ensure the protection of the intellectual property of Bombardier and its know-how." Mr. Bellemare concluded by again implicitly threatening the MHI-Bombardier supply relationship should MITAC's lawful hiring activities continue, stating that "[i]n light of the long standing partnership between our corporations, I trust that I can count on your cooperation in putting an end to the solicitation of our employees by MHI."

**Response to Paragraph 37:** The allegations in Paragraph 37 contain characterizations of a document that speaks for itself. Bombardier admits Mr. Bellemare sent a letter to MHI. Dkt. # 1-17. Bombardier denies it was sent instead of responding to Mr. Morimoto's August 22, 2016 letter. Paragraph 37 is also denied to the extent the allegations maintain that Bombardier made threats, acted out of fear, lacked evidence or explanation, or otherwise acted improperly. Bombardier denies any remaining allegations in this paragraph.

38. Bombardier's threats to the MHI-Bombardier supply relationship—and its acknowledgment that potential competition from the MRJ animated those threats—did not emanate only from its President and CEO. On August 30, 2016, Bombardier's Chief Procurement Officer, Nico Buchholz, issued similar threats to the President of MHI Canada Aerospace, Inc., Mike McCarthy. (Ex. D.) After noting that MHI was a "valued supplier of Bombardier," Mr. Buchholz complained that MHI "has been recruiting several Bombardier employees to work on the MRJ program" and that this recruitment was "contrary to what we expect from a long term business partner such as MHI." The letter made clear that Bombardier feared the competition posed by the MRJ, and that the competition was the primary basis for the company's threats and demands. According to Mr. Buchholz, Mitsubishi's hiring activity "raises serious concerns that valuable knowledge and know-how will be transferred to MHI and put to use to accelerate the development and entry of the MRJ aircraft which will compete with our

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

commercial aircraft programs." Mr. Buchholz stated that Bombardier had "notified MHI's head office of this issue and have asked that MHI refrain from hiring Bombardier employees. Unfortunately, our request seems to have been ignored. I'm asking your assistance in getting this issue permanently resolved: MHI, as a valued supplier to Bombardier, must stop recruiting Bombardier employees. I trust that you understand the seriousness of the situation and that I can count on your cooperation."

**Response to Paragraph 38:** The allegations in Paragraph 38 contain characterizations of a document that speaks for itself. Bombardier admits Mr. Buchholz sent an email to Mr. McCarthy, but denies that it was a threat animated by potential competition from the MRJ or was otherwise improper. Bombardier denies any remaining allegations in this paragraph.

39.     In early 2017, Bombardier again escalated its pressure and threats against Mitsubishi, this time through outside counsel. In a "Letter of Demand" dated February 17, 2017 and addressed to Mr. Morimoto of MITAC, Marianne Plamondon of the Norton Rose Fulbright law firm formally demanded that the solicitation of Bombardier employees cease. (Dkt. 1-18.) Ms. Plamondon asserted that "by targeting and soliciting key employees at Bombardier[,] Mitsubishi is (i) knowingly destabilising Bombardier's aircraft activities which constitutes unfair competition and (ii) acquiring proprietary information belonging to Bombardier to accelerate the development and entry into service of the MRJ aircraft." The letter identified 26 former Bombardier Product Development and Engineering employees who had allegedly been hired directly or indirectly by Mitsubishi since the summer of 2015, claiming that "Mitsubishi continues to target and solicit key employees who possess confidential information essential to the development of the MRJ program and to meeting certification requirements." While acknowledging that the recruited employees in question possessed skills and abilities important to Mitsubishi's effort to compete in the regional jet market, Ms. Plamondon attempted to portray that recruitment as an attack on Bombardier, asserting that Mitsubishi's "solicitation of Bombardier's employees [was] an attempt to destabilise and disrupt the internal affairs of a competitor, and obstruct their activities and aircraft development and launch," claiming that this

BOMBARDIER INC.'S ANSWER TO MITAC
AMERICA INC.'S COUNTERCLAIMS (2:18-cv-
01543-JLR) - 21

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

"constitutes illegal and unfair competition towards Bombardier and engages Mitsubishi's liability and the liability of Bombardier's former employees towards Bombardier." Ms. Plamondon explicitly acknowledged that the employees' own "know-how" was valuable to Mitsubishi, but nonetheless she appeared to believe that merely by hiring highly-skilled and specialized engineers and test pilots from Bombardier, Mitsubishi was acquiring "trade secrets" and "proprietary information" belonging to Bombardier. According to Ms. Plamondon:

> The employees targeted by Mitsubishi are highly skilled and specialized engineers and test pilots, many of whom held key positions during their employment at Bombardier. More importantly, the know-how and trade secrets acquired by these employees can hardly be acquired outside the context of the development of new aircraft programs. This information is both rare and extremely valuable. We have every reason to believe these employees are now assigned to the MRJ program, which raises important questions regarding the disclosure of proprietary information, especially in the wake of recent press highlighting Mitsubishi's difficulties and lack of expertise.

The letter warned Mitsubishi that unless it took "immediate corrective action," Bombardier "will have no other option than to take more formal legal action" against it. Bombardier demanded that Mitsubishi "immediately cease any behavior which constitutes unfair competition"— behavior that, although not explicitly defined, was evident from the remainder of the letter to mean the hiring of Bombardier employees. Bombardier also demanded that Mitsubishi "[r]equire all former employees of Bombardier to sign agreements undertaking not to solicit employees of Bombardier" and to "[t]ake any and all necessary measures to ensure that the agreements are respected by former employees of Bombardier and inform Bombardier of such measures." The letter concluded by demanding that Mitsubishi confirm in writing by February 28, 2017 that it would accede to Bombardier's no-poach agreement.

**Response to Paragraph 39:** The allegations in Paragraph 39 contain characterizations of a document that speaks for itself. Bombardier admits that counsel for Bombardier sent a letter to Mr. Morimoto of MITAC. Bombardier denies the allegations of Paragraph 39 relative to the

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

letter being a "threat" or being otherwise improper. Bombardier denies the remaining allegations in this paragraph.

40.    Bombardier's over-the-top accusations about the "destabilization" of its business through the loss of a few dozen employees were not only unsupported by any facts set forth in Ms. Plamondon's letter, they were also demonstrably false. Indeed, Ms. Plamondon made no mention that Bombardier was laying off substantial numbers of its own employees at the same time, including many of its most important employees in its aircraft business. For example, as reported in news media:

In 2014, well before the first recruiting activity by AeroTEC, Bombardier eliminated 2,900 positions worldwide.

In May 2015, Bombardier announced that it was cutting 1,750 jobs, including 1,000 positions at the company's facility in Montreal and 480 at its facility in Toronto. Positions eliminated in 2015 would eventually total 2,750.

In February 2016, Bombardier announced that it would cut 10 percent of its workforce over two years.

In October 2016, Bombardier cut 7,500 positions worldwide, including 1,500 in Quebec. This itself constituted more than 10 percent of Bombardier's worldwide workforce.

In February 2017—the very month of Ms. Plamondon's letter— Bombardier announced that it would be eliminating another 7,000 positions worldwide, including 2,800 in Canada (more than 10 percent of its remaining Canadian workforce) and 220 in Wichita. Of these 7,000 positions, all but 150 would be in product development and engineering.

In light of these substantial and ongoing job cuts, it is implausible that MITAC's recruitment and hiring of 26 employees could "destabilize" Bombardier, particularly given Bombardier's vast size. According to Bombardier's complaint in this litigation, Bombardier employs over 69,000 persons worldwide—even after the significant job cuts over the past several years—including more than 29,000 persons who work in Bombardier's Aerospace division.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Response to Paragraph 40:** Bombardier admits that during the relevant time there was a reduction in its workforce but denies all remaining allegations in this paragraph.

41.     MITAC refused to accede to Bombardier's anticompetitive demands. By letter dated March 9, 2017, MITAC's outside counsel, W. Jay DeVecchio of Morrison Foerster, rejected the accusations in Ms. Plamondon's letter and explained that MITAC would not enter an agreement with Bombardier in violation of the antitrust laws. (Ex. E.) As Mr. DeVecchio explained:

> MITAC has not acted improperly in any way in connection with its hiring activities. MITAC has no legal or other obligation to Bombardier to refrain from exploring free-market hiring opportunities with potential employees. Furthermore, to engage in any such no-poaching agreement with Bombardier could create potential antitrust liability for both MITAC and Bombardier. MITAC accordingly strongly urges Bombardier to cease its repeated attempts to induce MITAC into such an agreement.

> To be clear, MITAC's only intent in its hiring activities is to meet its human resources needs. MITAC does not have any intent to destabilize Bombardier's aircraft activities, to acquire Bombardier's proprietary information, or otherwise to harm Bombardier in any way.

Mr. DeVecchio continued, emphasizing the lack of factual support for Bombardier's assertions:

> Bombardier unjustifiably accuses MITAC of soliciting key employees at Bombardier to "knowingly destabili[ze] Bombardier's aircraft activities" and "acquir[e] proprietary information belonging to Bombardier." Bombardier ascribes these motives to MITAC without providing any support, pointing only to the fact that MITAC, at times, has hired employees who previously worked for Bombardier. However, the fact that some of MITAC's employees have previously worked for Bombardier is hardly surprising, as both companies rely on a relatively limited pool of highly-skilled and specialized engineers to support their product lines. Bombardier also speculates that MITAC held a job fair in Montreal for the sole purpose of soliciting Bombardier employees, despite Montreal's being one of the top five largest hubs for aerospace jobs in North America. MITAC estimates that three-fourths of the nearly 150 attendees were not employed by Bombardier. We also note that MITAC held job fairs in various other North American cities for the same recruiting reasons as mentioned above.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

> In any event, MITAC is free to explore hiring possibilities with whomever it pleases, regardless of any past or present employment by Bombardier, absent a Bombardier employee's raising an express, written employment agreement restriction by Bombardier against future employment by MITAC. We are unaware of any such enforceable "noncompete" agreements, and you have conspicuously failed to mention any.

Mr. DeVecchio then responded to Bombardier's speculative allegations that the hiring of Bombardier employees was part of a plot to improperly acquire Bombardier's trade secrets and proprietary information:

> Bombardier expresses its concern that former Bombardier employees might disclose Bombardier's proprietary information or trade secrets, although Bombardier does not identify a single instance where such information was divulged or used, nor indeed does Bombardier identify with any specificity any trade secrets the former employees might usurp. Lacking these facts, Bombardier attempts to support its speculation by referring to a MITAC press release and two news articles that indicate MITAC currently is working to meet certification requirements for its MRJ aircraft. Certification requirements, however, are published in regulations and publicly available. Therefore, this assertion rests on two equally implausible premises: First, that only Bombardier engineers have the know-how and information necessary to meet these governmental and industry-wide certification standards; and second that knowledge of these certification standards is a trade secret of Bombardier. Neither of these premises is accurate.

> Without any allegation, much less fact, that particular and specifically-identified Bombardier trade secrets exist that are being or are threatened to be disclosed, Bombardier is left only with the implication that employees are not allowed to carry general know-how with them in their new employment endeavors. This is contrary to common sense and experience, and certainly is not the law.

After observing that Bombardier had failed to respond to MITAC's requests to specifically identify former employees improperly disclosing Bombardier's trade secrets or breaching

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

confidential or nondisclosure agreements, Mr. DeVecchio explained the procedures that MITAC

employs to prevent such disclosures:

> New employees are instructed not to bring any proprietary
> information or materials from their former employers, and they are
> further instructed not to use, release, or disclose any such
> information in the course of their employment at MITAC. These
> requirements also are embedded in MITAC's Code of Ethics.
> Indeed, many if not all of Bombardier's former employees were
> specifically admonished not to bring over, disclose, or otherwise
> misappropriate Bombardier trade secrets or confidential
> information.

Finally, Mr. DeVecchio noted the lack of a legal basis for Bombardier's demands and further

explained that the agreement Bombardier was seeking from MITAC likely was illegal:

> MITAC has no legal obligation to cease soliciting or hiring
> Bombardier's employees. Yet, as your letter notes, Bombardier
> repeatedly has attempted to induce MITAC to agree not to solicit
> or not to hire Bombardier's employees. In doing so, Bombardier
> has not identified any lawful basis for restricting competition
> between Bombardier and MITAC in hiring employees.
> Conversely, the U.S. Department of Justice and Federal Trade
> Commission recently issued formal guidance instructing that such
> agreements may be unlawful. This guidance instructs businesses
> that "[a]n individual is likely breaking the antitrust law if he or she
> ... agrees with individual(s) at another company to refuse to solicit
> or hire that other company's employees (so-called "no poaching"
> agreements)." *See*
> https://www.justice.gov/atr/file/903511/download at 3, 6. This is
> not a hypothetical concern. The Justice Department has brought
> several actions, including two cases in which at least one company
> "agreed to limit its hiring of employees who currently work at a
> competitor." *Id*. at 4 (note that both cases involved the hiring of
> "highly skilled and specialized engineers"). The agency further
> warns that it "will criminally investigate allegations that employers
> have agreed among themselves ... not to solicit or hire each others'
> employees," and that naked "no-poaching" agreements could
> expose the companies involved to "substantial criminal and civil
> liability." *Id*. at 4, 6.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Response to Paragraph 41:**  The allegations in Paragraph 41 contain characterizations of a document that speaks for itself. Bombardier admits receipt of the March 9, 2017 letter sent by MITAC's outside counsel, but denies that it had been, or was, attempting to enter into an agreement in violation of the antitrust laws. Bombardier further denies that it had unjustifiably accused MITAC of improper solicitation of key Bombardier employees, or otherwise engaged in improper conduct. Bombardier denies any remaining allegations in this paragraph.

42.     By letter dated April 12, 2017, Ms. Plamondon responded to Mr. DeVecchio's letter, accusing Mr. DeVecchio of acting inappropriately and in bad faith by requesting factual support for Bombardier's assertion that MITAC's hiring practices were destabilizing Bombardier's business or were otherwise unlawful. (Ex. F.) Rather than provide any such evidence of "destabilization" of Bombardier, Ms. Plamondon suggested that because the employees in question were important to MITAC's certification efforts, the hiring of these individuals necessarily constituted "unfair competition." Tellingly, Ms. Plamondon again made no mention that Bombardier had been laying off its own employees or that its CSeries aircraft, the CS100 and CS300, had already been awarded certification. Misstating the law—and making clear that Bombardier's primary concern was not the "destabilization" of its business but rather competition from the MRJ—Ms. Plamondon wrote that "We reiterate that the targeting by MITAC of Bombardier's employees for a project which is in direct competition with Bombardier's activities is clearly unfair competition under Quebec law" and falsely accused MITAC of engaging in the "unlawful misappropriation of Bombardier's competitive advantage." Ms. Plamondon did not dispute that the no-poaching agreement demanded by Bombardier would violate the U.S. antitrust laws. Instead, she stated Bombardier's view that the Sherman Act is "not directly applicable in Canada" and claimed that the demanded agreement was not a per se violation of Canada's Competition Act. The letter concluded by reiterating Bombardier's threat that "any further solicitation of Bombardier's employees by MITAC at this stage with the aim of further destabilising Bombardier's activities will be firmly contested."

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Response to Paragraph 42:**  The allegations in Paragraph 42 contain characterizations of a document that speaks for itself. Bombardier admits Ms. Plamondon responded to Mr. DeVecchio's letter on April 12, 2017 and that Exhibit F of Defendant's Counterclaim is a copy of that letter. Bombardier: (1) denies that the letter accuses Mr. DeVecchio of "acting inappropriately and in bad faith by requesting factual support for Bombardier's assertion that MITAC's hiring practices were destabilizing;" (2) denies that the letter misstates the law of Quebec, (3) denies that the letter "falsely accused MITAC of engaging in the 'unlawful misappropriation of Bombardier's competitive advantage," and (4) denies that Bombardier otherwise acted improperly. Bombardier denies any remaining allegations in this paragraph.

43.     Mr. DeVecchio responded on behalf of MITAC on May 1, 2017, writing to Ms. Plamondon: "We have received your response of April 12, 2017, and disagree with and reject every assertion you have made about MITAC's actions and motivations. Although we are always available for constructive discussions, MITAC has done nothing wrong, and we consider this matter to be closed." (Ex. G.)

**Response to Paragraph 43:**  The allegations in Paragraph 43 contain characterizations of a document that speaks for itself. Bombardier admits receipt of a letter from Mr. DeVecchio and admits that Paragraph 43 accurately recites language from that letter. Bombardier disagrees with the conclusions of the letter and denies the remainder of Paragraph 43.

44.     Bombardier's attempts to prevent Mitsubishi and AeroTEC from exercising their right to recruit and hire Bombardier employees were not limited to its baseless threats against the companies. Rather, in parallel with those threats, Bombardier sent dozens of threatening letters to former Bombardier employees and individuals considering employment opportunities in connection with the MRJ program. On March 2-3, 2017, Bombardier, through its outside counsel at Norton Rose Fulbright, sent a "letter of demand" to no fewer than 37 former Bombardier employees. (*See, e.g.*, Ex. H.) Similar letters were sent to no fewer than four other former Bombardier employees on April 13, 2017. (*See, e.g.*, Ex. I.) The letters contended that the former employees were in possession of undefined "confidential information" that the individuals were

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

purportedly "obligated contractually and legally to protect." Noting that "MITAC carries on activities that compete directly with the activities of Bombardier," the letters stated that the former employees were obligated, among other things, "not to solicit, directly or indirectly, our client's employees in order to induce them to leave." The letters concluded by stating that "Should you fail to comply fully with all of your contractual and legal obligations, our client has instructed us to institute against you, without further notice or delay, any and all legal proceedings as are appropriate and necessary, including injunction proceedings . . . DO GOVERN YOURSELF ACCORDINGLY."

**Response to Paragraph 44:** The allegations in Paragraph 44 contain characterizations of documents that speak for themselves. Bombardier admits Exhibits H and I are copies of letters sent by its outside counsel to former employees, but denies that the referenced exhibits evidence the number of employees to whom letters were sent. Bombardier specifically denies it made, or was making "baseless threats against the companies," and further specifically denies the referenced exhibits (or any other letters to former Bombardier employees and individuals considering employment opportunities in connection with the MRJ program) constituted "threats," an improper "letter of demand," or were otherwise improper. Bombardier denies the remaining allegations in this paragraph to the extent they suggest or imply that Bombardier was not acting within the purview of the law of competition. To the extent there are any further allegations in this paragraph, they are denied.

45.     Bombardier also issued ultimatums to its own employees that led those employees to delay the start of their employment on the MRJ project. For example, on February 17, 2017, Andrius Knystautas, then a Principal Engineering Specialist and Section Chief of Flight Simulation at Bombardier, announced to Bombardier that he was resigning effective March 2, 2017. On March 2, 2017—Mr. Knystautas' planned last day of employment—Bombardier (through its outside counsel at Norton Rose Fulbright) demanded that Mr. Knystautas continue working at Bombardier for an additional ten weeks. (Ex. J.) Mr. Knystautas responded by stating his disagreement with Bombardier's demand but offering to extend his end date so as to provide

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

a six-week notice period which, on account of overtime worked, would make his last day of work at Bombardier March 24, 2017. (Ex. K; Ex L.) In response, Bombardier refused to shorten the notice period it had demanded. (Ex. M.) Ultimately, Mr. Knystautas agreed to continue working at Bombardier until April 7, 2017, weeks after Mr. Knystautas' original scheduled start date with MITAC. (Ex. N.) Similarly, on August 1, 2017, Bombardier demanded that Jeff Kirdeikis, then a Principal Engineering Specialist, provide eight weeks' advance notice of his departure, and in doing so extend his announced end date at Bombardier and scheduled start date at MITAC. Ultimately, Mr. Kirdeikis agreed to extend his end date until late August, delaying his anticipated start date at MITAC.

**Response to Paragraph 45:** The allegations in Paragraph 45 contain characterizations of documents that speak for themselves. Bombardier admits Paragraph 45 only to the extent the referenced exhibits are communications between Bombardier management and employees who were leaving Bombardier to work on the "MRJ project." Bombardier specifically denies that the communications were "ultimatums" (or ultimatum "examples") that exceed Bombardier's management rights or improperly impinge on the rights of its employees, and denies any remaining allegations in Paragraph 45.

46. On information and belief, Bombardier has taken additional actions designed to limit the mobility of its employees, including by notifying employees that if they accept work on the MRJ project, they will be blacklisted from any future work at Bombardier.

**Response to Paragraph 46:** Bombardier denies the allegations in Paragraph 46.

47. As part of its predatory scheme to impede competition from the MRJ, Bombardier filed its complaint in this action on October 19, 2018, alleging claims of trade secret misappropriation against MITAC, MITAC America, AeroTEC, and former Bombardier employees Laurus Basson, Marc-Antoine Delarche, Cindy Dorneval, Michel Korwin-Szymanowski, and Keith Ayre; tortious interference with contractual relationship and/or business expectancy against MITAC, MITAC America, AeroTEC, and Mr. Korwin-Szymanowski; and breach of contract against Mr. Basson, Mr. Delarche, and Mrs. Dorneval.

BOMBARDIER INC.'S ANSWER TO MITAC
AMERICA INC.'S COUNTERCLAIMS (2:18-cv-
01543-JLR) - 30

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Bombardier also named as defendants 88 "John and/or Jane Does," identified only as former Bombardier employees now employed by MITAC, MITAC America, or AeroTEC or otherwise "working actively on the Mitsubishi Regional Jet project." (*See* Dkt. 1.) In its prayer for relief, Bombardier seeks, among other things, "a preliminary and permanent injunction prohibiting MITAC, MITAC America, AeroTEC, and all those employed by, or acting in concert with, any of them from continuing to recruit personnel from Bombardier for the improper purpose of obtaining Bombardier confidential, proprietary, and/or trade secret information[.]" (*Id.* at 90).

**Response to Paragraph 47:** The allegations in Paragraph 47 contain characterizations of a document that speaks for itself. Bombardier admits it filed the complaint in this action on October 19, 2018, but denies that act was part of an alleged-but non-existent-"predatory scheme to impede competition from the MRJ." Bombardier denies the remaining allegations in Paragraph 47 to the extent they suggest or imply the filing of the complaint was an improper act or seeks improper relief.

48.    Also on October 19, 2018, Bombardier filed a motion for preliminary injunction against MITAC America, AeroTEC, Mr. Basson, Mr. Delarche, and Ms. Dorneval. (Dkt. 4.) Despite cloaking them in the language of trade secrets and propriety information, Bombardier's motion and proposed order reveal that Bombardier's primary objective in this litigation is to prevent and impede competition in the regional jet market. For example, in identifying the "irreparable harm" that it will incur if a preliminary injunction is not granted, Bombardier states that "unless the Defendants are enjoined, Bombardier's misappropriated trade secret information stands to serve as the very foundation for a revival of the Japanese aircraft manufacturing industry as a whole." (*Id.* at 20.) It adds that absent an injunction, Bombardier will "be forced to compete with literally a new nation of competing aircraft manufacturers that would otherwise not exist for at least several years to come." (*Id.* at 21.)

**Response to Paragraph 48:** The allegations in Paragraph 48 contain characterizations of a document that speaks for itself. Bombardier admits it filed a motion for preliminary injunction on October 19, 2018. Bombardier denies any remaining allegations in Paragraph 48.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

49. Since filing its complaint and preliminary injunction motion, Bombardier has confirmed that its objective in this litigation is to delay the certification of the MRJ. In a brief submitted to the Court on December 7, 2018, Bombardier contended that any delay in the schedule for its motion for a preliminary injunction could render its request for equitable relief "moot" given MITAC's "public statements that it expects to obtain regulatory certification for its commercial aircraft 'in mid-2019.'" (Dkt. 47 at 5; *see also id.* at 9 ("This may prove too late, as MITAC Japan expects certification of its aircraft by mid-2019.").)

**Response to Paragraph 49:** The allegations in Paragraph 49 contain characterizations of a document that speaks for itself. To the extent an answer is required, Bombardier admits it submitted a brief to the Court on December 7, 2018, but denies that the brief "confirmed" any improper "objective in this litigation [] to delay the certification of the MRJ." Bombardier's brief was filed as part of its efforts to obtain relief it believes it is entitled to receive.

50. Like its pre-litigation demands, Bombardier's statements in this litigation confirm that its primary objective here is to impede and delay entry of a nascent competitor in the regional jet market. The form of relief requested by Bombardier's complaint and preliminary injunction evidence that Bombardier's primary motivation is not to protect any valid intellectual property rights, but rather to accomplish the illicit goal of its anticompetitive scheme. Moreover, despite knowing about the hiring activities in support of the MRJ program at issue in its complaint since at least 2015 and knowing (or having reason to know) about the circumstances of the individual defendants' departures for years, Bombardier waited until late 2018 to file this lawsuit. On information and belief, Bombardier delayed filing suit until the MRJ was close to entering the market and increasingly competing with the CRJ for sales so as to maximize the damage to Mitsubishi's reputation and undermine sales of the MRJ.

**Response to Paragraph 50:** Bombardier admits filing this suit in 2018, but denies all other allegations of Paragraph 50.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1

**C.      Bombardier's Pretextual and Meritless Excuses for its Efforts to Impede Competition**

2

51.      Bombardier's supposed justifications for demanding the cessation of hiring

3      related to the MRJ project have shifted through the years, but the primary motivation for its

4      actions, as established by its own statements, has remained the same: to impede or delay the

5      formidable competition on the merits posed by the MRJ's entry into the regional jet market.

6      **Response to Paragraph 51:** Bombardier denies the allegations in Paragraph 51.

7      52.      As detailed above, Bombardier's initial threats against AeroTEC lacked factual

8      and legal merit. Among other things, Bombardier did not have a basis to enforce its Code of

9      Ethics and Business Conduct against departed employees in the way it contended, including

10      against Mr. Korwin-Szymanowski, nor did it have a basis for its claims that AeroTEC could face

11      "substantial liability" as a result of its lawful hiring efforts. Moreover, the form of "relief" sought

12      by Bombardier—that AeroTEC enter an unenforceable, anticompetitive no-poach agreement—

13      demonstrates the bad faith nature of Bombardier's demands.

14      **Response to Paragraph 52:** Bombardier denies the allegations in Paragraph 52.

15      53.      Bombardier's initial threats against Mitsubishi were similarly meritless. As

16      explained, the June 3, 2016 demand to "cease[] immediately" the soliciting and hiring of

17      Bombardier personnel provided no legal or factual basis beyond a vague and speculative

18      reference to the possibility that some undefined "Bombardier proprietary methods and know-

19      how" would "inevitably be transferred and used by AeroTEC or MHI." The next letter, sent July

20      14, 2016, falsely insinuated that MITAC's planned job fair was illegal. The subsequent letters

21      from Bombardier's President and Chief Executive Officer to MHI's Chairman of the Board

22      levied similarly vague and unsupported claims that Mitsubishi's hiring practices were unlawful,

23      threatening that the MHI-Bombardier supply relationship would be jeopardized if the hiring

24      activities continued.

25      **Response to Paragraph 53:** The allegations in Paragraph 53 contain characterizations

26      of documents that speak for themselves. Bombardier denies the allegations in Paragraph 53 in

27

BOMBARDIER INC.'S ANSWER TO MITAC
AMERICA INC.'S COUNTERCLAIMS (2:18-cv-
01543-JLR) - 33

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

that they mischaracterize Bombardier as making threats, false insinuations, and levying vague and unsupported claims. *See* Bombardier's responses to Paragraphs 33 and 34 above. Bombardier denies the remaining allegations in this paragraph.

54. The demands issued to Mitsubishi by Bombardier's outside counsel likewise sought to coerce MITAC to enter an anticompetitive no-poach agreement through baseless allegations of illegal conduct by Mitsubishi. As explained, the February 17, 2017 letter claimed that by "targeting and soliciting key employees at Bombardier[,] Mitsubishi is (i) knowingly destabilising Bombardier's aircraft activities which constitutes unfair competition." But the letter was devoid of facts suggesting that Bombardier had been "destabilized" by the loss of the 26 employees identified in the letter (or otherwise), let alone that Mitsubishi had any reason to know that its efforts to hire employees for the MRJ program had any such effect. In fact, Bombardier had engaged in several rounds of highly-publicized layoffs, including in its aviation business, and Bombardier had already completed certification activities for its CSeries aircraft. Tellingly, Bombardier's complaint in this litigation contains no allegations of "destabilization" or related harm purportedly resulting from the Defendants' hiring activities.

**Response to Paragraph 54:** The allegations in Paragraph 54 contain characterizations of a document that speaks for itself. Bombardier specifically denies the allegations in Paragraph 54 to the extent they characterize Bombardier as seeking "to coerce MITAC to enter an anticompetitive no-poach agreement through baseless allegations of illegal conduct by Mitsubishi" and sending any communication "devoid of facts." *See* Bombardier's response to Paragraph 39 above. Bombardier denies the remaining allegations in this paragraph.

55. The February 17, 2017 letter also claimed that Mitsubishi was "(ii) acquiring proprietary information belonging to Bombardier to accelerate the development and entry into service of the MRJ aircraft." But the letter identified no such "proprietary information belonging to Bombardier" or "trade secrets" that had been taken by any of the departed employees, let alone acquired by Mitsubishi. Instead, the letter left little doubt that it was the employees' own "know-how . . . acquired [in] the context of the development of new aircraft programs" that

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Bombardier sought to prevent being used on the MRJ program. Bombardier had no legal basis to stop its employees from taking that know-how to Mitsubishi. Nor did Bombardier have any legal basis for its demands that MITAC enter a per se illegal no-poach agreement. Nevertheless, even after MITAC's counsel pointed out the factual and legal infirmities in Bombardier's demands, Bombardier reiterated its baseless claims in its counsel's April 12, 2017 letter.

**Response to Paragraph 55:** The allegations in Paragraph 55 contain characterizations of documents that speak for themselves. Bombardier admits to sending letters on February 17, 2017, and April 12, 2017, but Bombardier specifically denies the allegations in Paragraph 55 in that they mischaracterize Bombardier's communications as having "factual and legal infirmities" and falsely portray Bombardier's counsel as reiterating "baseless claims." For additional bases for denying the allegations of Paragraph 55, see Bombardier's response to Paragraph 39 above. Bombardier denies any remaining allegations in Paragraph 55.

56.     The form of "relief" requested by Bombardier further demonstrates the anticompetitive nature its pre-litigations threats and demands. Each of Bombardier's demands to Mitsubishi and AeroTEC sought the cessation of recruitment and hiring activities in support of the MRJ project. Bombardier did not (and could not) contend that any specific trade secrets had been misappropriated by Mitsubishi or AeroTEC for use in the MRJ program, nor did Bombardier request that the companies refrain from or cease using any misappropriated trade secrets. Rather, Bombardier improperly demanded that Mitsubishi and AeroTEC cease their lawful hiring activities. Indeed, Bombardier demanded that AeroTEC cease the hiring of not only Bombardier's current employees but also former employees who had already departed the company.

**Response to Paragraph 56:** Bombardier specifically denies the allegations in Paragraph 56 in that they mischaracterize Bombardier's pre-litigation communication as "anticompetitive," "threatening," and "improper." Bombardier denies the remaining allegations in this paragraph.

57.     Bombardier's counsel in the instant litigation has essentially confirmed that there was no factual basis for Bombardier's initial threats and demands. In a January 11, 2018 email to

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

counsel for MITAC America and the AeroTEC defendants, Bombardier's counsel stated that "[w]hile Bombardier certainly took issue with your clients' recruiting tactics those years ago, litigation was not necessary until (1) Bombardier discovered actual evidence of trade secret misappropriation . . ." Although MITAC America denies Bombardier's counsel's assertion regarding trade secret misappropriation, counsel's statement amounts to an unqualified admission that Bombardier did not have any evidence of misappropriation at the time Bombardier demanded that Mitsubishi and AeroTEC enter illegal no-poach agreements to delay or disrupt certification and sale of the MRJ.

**Response to Paragraph 57:** The allegations in Paragraph 57 contain characterizations of a document that speaks for itself. To the extent a response is required, all allegations of Paragraph 57 are denied.

58.     Bombardier's threats towards its former and then-current employees also represent an improper attempt to chill the free flow of skilled labor. As explained in MITAC America's motion to dismiss (Dkt. 54, incorporated herein by reference), Bombardier had no legal basis to contend that its Code of Ethics and Business Conduct imposed binding contractual obligations on its former employees that prevented them from seeking or accepting new employment, nor did Bombardier have a factual basis to insinuate that the dozens of recipients of its letters had acted contrary to the Bombardier Code of Ethics and Business Conduct or any provision of law. On information and belief, Bombardier's objective in issuing these demands was to impede or delay the MRJ program.

**Response to Paragraph 58:** The allegations in Paragraph 58 contain characterizations of a document that speaks for itself. To the extent a response is required, Bombardier denies the allegations in Paragraph 58.

59.     Bombardier's claims against MITAC and MITAC America in this litigation are meritless. As detailed in MITAC America's motion to dismiss (incorporated herein by reference), there is no factual or legal basis for the claims in Bombardier's complaint that MITAC America misappropriated Bombardier's trade secrets, tortiously interfered with a valid

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

contractual relationship or business expectancy of Bombardier, or otherwise acted unlawfully by recruiting, hiring, and continuing to employ former Bombardier employees. For similar reasons, Bombardier's claims against MITAC lack merit.

**Response to Paragraph 59:** The allegations in Paragraph 59 contain characterizations of a document that speaks for itself.  To the extent a response is required, Bombardier denies the allegations in Paragraph 59.

60.     Neither MITAC nor MITAC America has acquired, possessed, used, disclosed, or even had knowledge of the alleged trade secret information identified by Bombardier. Bombardier's complaint asserts no factual allegations to the contrary.

**Response to Paragraph 60:**  Bombardier denies the allegations in Paragraph 60.

61.     MITAC and MITAC America take precautions to ensure that newly hired employees do not transfer to MITAC and MITAC America, or use in their work for MITAC and MITAC America, trade secrets or other confidential or proprietary information that they acquired from former employers. New employees are instructed not to bring any proprietary information or materials from their former employers, and they are further instructed not to use, release, or disclose any such information during their employment at MITAC or MITAC America. These requirements are embedded in MITAC's Code of Ethics. On information and belief, the same precautions are taken with respect to persons hired by MITAC's partners, such as AeroTEC, who perform work on projects for MITAC or MITAC America. Consistent with these policies, on information and belief, many if not all of the former Bombardier employees hired by AeroTEC were specifically admonished not to bring with them, disclose, or otherwise misappropriate Bombardier trade secrets or confidential information.

**Response to Paragraph 61:** Bombardier lacks knowledge or information sufficient to form a belief about the truth, if any, of the allegations in Paragraph 61, and therefore denies them.

62.     MITAC and MITAC America have not misappropriated the alleged trade secret information identified by Bombardier, and Bombardier lacks any basis to allege otherwise.

BOMBARDIER INC.'S ANSWER TO MITAC AMERICA INC.'S COUNTERCLAIMS (2:18-cv-01543-JLR) - 37

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    Bombardier's complaint is devoid of factual allegations connecting MITAC or MITAC America
2    to any alleged misappropriation. Moreover, the alleged trade secrets identified by Bombardier
3    would have been of no use to the development, certification, and sale of the MRJ by MITAC and
4    MITAC America.

5    **Response to Paragraph 62:** Bombardier denies all allegations in Paragraph 62.

6    63.    Even if Bombardier had a basis to allege that MITAC or MITAC America had
7    obtained Bombardier information, Bombardier's claims would lack merit insofar as the
8    documents and information that Bombardier contends constitutes legally-protectable trade
9    secrets are not legally-protectable trade secrets because, among other things, such information is
10   publicly available and/or was provided to Bombardier by government agencies.

11   **Response to Paragraph 63:** Bombardier denies the allegations in Paragraph 63.

12   64.    On information and belief, Bombardier's claims against AeroTEC in this
13   litigation are meritless because, among other things, AeroTEC: has not acquired, possessed,
14   used, or disclosed the alleged trade secret information identified by Bombardier; has not
15   tortiously interfered with a valid contractual relationship or business expectancy of Bombardier;
16   and has not otherwise acted unlawfully by recruiting, hiring, and continuing to employ former
17   Bombardier employees.

18   **Response to Paragraph 64:** Bombardier denies the allegations in Paragraph 64.

19   65.    On information and belief, Bombardier's claims against the individual defendants
20   in this litigation are meritless because, among other things, none of the individual defendants:
21   used any Bombardier trade secrets in performing work on the MRJ project; transferred any
22   documents containing Bombardier trade secrets to any AeroTEC, MITAC or MITAC America
23   computer; disclosed any Bombardier trade secrets to any persons employed by AeroTEC,
24   MITAC or MITAC America; or discussed any Bombardier trade secrets with other persons
25   employed by AeroTEC, MITAC or MITAC America.

26   **Response to Paragraph 65:** Bombardier denies the allegations in Paragraph 65.

27

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

66.     On information and belief, none of the individual defendants who allegedly sent Bombardier documents to their personal email accounts did so for the purpose of misappropriating those documents or Bombardier's trade secrets or other proprietary information. Rather, each did so for the purpose of conducting work that they had been assigned to do for Bombardier or for other reasons unrelated to the individuals' subsequent work on the MRJ project. Moreover, it was a common practice for Bombardier employees to send Bombardier documents to their home email systems so that they could work on and complete work assignments at home.

**Response to Paragraph 66:**  Bombardier specifically denies the allegations in Paragraph 66 to the extent they contend that individual defendants who sent Bombardier documents to their personal email accounts did "so for the purpose of conducting work that they had been assigned to do for Bombardier or for other reasons unrelated to the individuals' subsequent work on the MRJ." Bombardier denies the remaining allegations in this paragraph because it lacks knowledge or information sufficient to form a belief about the truth, if any, of the allegations.

67.     On information and belief, none of the Bombardier documents that the individual defendants allegedly sent to their personal email accounts contained trade secret information that would have been of use in the development, manufacture, or certification of the MRJ because of, among other things, the significant differences between the MRJ and Bombardier's jet aircraft, including but not limited to different systems (e.g., different flap skew detection systems and different pitot-static systems) and different engines. Bombardier knew or should have known that the Bombardier documents that the individual defendants allegedly sent to their home email systems contained no trade secret information that would have been of use in the development, manufacture, or certification of the MRJ.

**Response to Paragraph 67:**  Bombardier denies the allegations in Paragraph 67.

**D.     The Relevant Market and Bombardier's Market Power**

68.     The relevant market of commerce in which to analyze the effects of Bombardier's anticompetitive scheme is the market for single-aisle, turbofan-powered commercial aircraft with

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

seating capacity for 50 to 100 passengers and flight ranges up to approximately 2,500 nautical miles (the "Regional Jet Market").

**Response to Paragraph 68:** Paragraph 68 sets forth a legal conclusion requiring no response. To the extent a response is required, Bombardier denies that Paragraph 68 contains a proper definition of a "Regional Jet Market," and it denies all remaining allegations contained in Paragraph 68.

69.     The Regional Jet Market is an accepted, defined market within the aerospace industry. Commercial aircraft with capacity for over 100 passengers are classified within the industry as "narrowbody" jets (such as the Boeing 737 and the Airbus 220) or even larger "widebody" jets (such as the Boeing 747 and the Airbus 330). Bombardier's own annual market forecasts acknowledge that the jet industry is segmented between "regional aircraft" with capacity for up to 100 seats and jets with greater seating capacity. Similarly, Bombardier's Commercial Aircraft President Fred Cromer has stated as recently as June 2018 that the market for regional jets with a maximum capacity of 100 passengers is distinct from the market for narrowbody jets with capacity for over 100 passengers, acknowledging that Bombardier's CSeries family of jets (small narrowbody jets with seating capacity of 108 passengers and above, now known as the Airbus A220) do not compete within the market for regional jets.

**Response to Paragraph 69:** Bombardier denies that Paragraph 69 accurately defines the "Regional Jet Market" and on that basis denies the remaining allegations.

70.     Regional jets are not interchangeable with other commercial aircraft given their differentiated passenger seating capacity, flight ranges, fuel efficiencies, operating costs, and sales prices. Other commercial aircraft are not close enough substitutes to prevent Bombardier and other regional jet suppliers from raising prices above competitive levels, degrading quality, or reducing output for regional jets. Put simply, other commercial aircraft are not a material competitive constraint on Bombardier regional jets.

**Response to Paragraph 70:** Bombardier denies the allegations of Paragraph 70.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

71.     Specifically, airlines and other aerospace customers do not consider larger narrowbody jets to be a reasonable substitute for regional jets, nor do they consider regional jets to be a reasonable substitute for narrowbody jets. Regional jets and narrowbody jets are differentiated by their passenger seating capacities, flight ranges, and costs, among other factors. For example, the shorter flight range of regional jets prevents regional jets from servicing many routes that can be served only by narrowbody jets, including routes between the East and West coasts of the United States. Moreover, government regulations, airport operating restrictions, and contractual arrangements, including clauses in airline pilot contracts limiting the size of aircraft that can be flown by certain pilots, serve to reduce the interchangeability of regional jets and narrowbody jets. Regional jets and narrowbody jets are also differentiated by their initial sales price and subsequent operating costs. Larger and heavier narrowbody jets typically cost more to operate, on a trip cost basis, than smaller regional jets, and these operating costs represent most of the lifetime cost of a plane. As a result, airlines and other aerospace customers are disinclined to purchase a jet with more seats or a longer flight range than needed for a specific route. Narrowbody jets are not a material competitive constraint on regional jets.

**Response to Paragraph 71:** Bombardier denies the allegations of Paragraph 71.

72.     Airlines and other aerospace customers do not consider turboprop airplanes to be a reasonable substitute for regional jets, nor do they consider regional jets to be a reasonable substitute for turboprop airplanes. As compared to turboprop airplanes, regional jets are capable of longer flight ranges, are faster, are safer, and provide superior passenger comfort, including less noise and vibration. Regional jets and turboprop airplanes are also differentiated by their initial sales price and subsequent operating costs. As such, turboprop airplanes are not a material competitive constraint on regional jets.

**Response to Paragraph 72:** Bombardier denies the allegations of Paragraph 72.

73.     For these reasons, the Regional Jet Market is a distinct product market. The relevant geographic market for regional jets is worldwide. Regional jets are manufactured by a small number of companies (predominantly Bombardier and Embraer) and are capable of being

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

sold by those companies on a worldwide basis. However, the United States is the largest and most important market area for regional jet manufacturers, as discussed further below.

**Response to Paragraph 73:** Bombardier denies the allegations of Paragraph 73 in that MITAC America's definition of "the Regional Jet Market" is a legal conclusion, not a statement of fact. Bombardier lacks information sufficient to form a belief concerning any remaining allegations of Paragraph 73 and on that basis denies them.

74.    Bombardier has significant market power in the Regional Jet Market. Bombardier's market power in the Regional Jet Market is directly evidenced by its ability to exclude or delay the entry of competition in the Regional Jet Market. Bombardier's market power is further demonstrated by its significant share of the Regional Jet Market, a market which is highly concentrated with the vast majority of jets manufactured by Bombardier and Embraer and is subject to substantial barriers to entry and other conditions that serve to protect Bombardier's market power, including Bombardier's exclusionary conduct. On information and belief, these conditions allow Bombardier to charge supracompetitive prices for regional jets.

**Response to Paragraph 74:** The allegations of Paragraph 74 contain legal conclusions to which no response is required. To the extent a response is required, Bombardier denies all allegations of Paragraph 74.

75.    Since the launch of the original CRJ, Bombardier has held a significant share of the Regional Jet Market. From at least 2010 to present, Bombardier's worldwide share of the Regional Jet Market has consistently been over 40%, with Bombardier's CRJs comprising over 40% of in-service regional jets worldwide as of 2018. Bombardier's position has been even more significant in the largest and most important market for regional jets, the United States. In the U.S., where Bombardier's only other active competitor in recent years has been Embraer, Bombardier's market share was 49% as of 2018.(footnote omitted)

**Response to Paragraph 75:** The allegations in Paragraph 75 contain legal conclusions to which no response is necessary. To the extent a response is required, Bombardier denies the

BOMBARDIER INC.'S ANSWER TO MITAC
AMERICA INC.'S COUNTERCLAIMS (2:18-cv-
01543-JLR) - 42

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

remaining allegations in this paragraph, including the related footnote, which state opinion, rather than fact.

76.     Bombardier's public statements confirm that the company expects to increase its share of the Regional Jet Market in the near term. In media briefings in June 2018, Bombardier's Commercial Aircraft President Fred Cromer stated that Bombardier is actively seeking to increase its share of the market through sales of its CRJ 900 and that the company anticipates achieving a market share of over 50%. Mr. Cromer contended that the only competition for sale of the CRJ 900 came from Embraer, apparently suggesting to the media and public that the MRJ would not enter the market and compete with the CRJ 900. Indeed, Mr. Cromer stated that the barriers to entry into the marketplace would effectively shield Bombardier from competition from the MRJ. In response to a question about whether Bombardier viewed the MRJ as a competitive threat in the regional jet market, Mr. Cromer stated that "[i]t's complicated to bring new technology to the marketplace . . . not only in your home country, but then to establish the footprint outside of your home country with authorities around the world, and we've been doing that for years and years and years and we have relationships and we know how to do it, and we know how difficult it is. So I think it is going to be challenging over time for other OEMs that are starting that process to catch up with what other established OEMs have, and that allows us to continue to make our own advancements and continue to be at the forefront of where those opportunities are."

**Response to Paragraph 76:** The allegations in Paragraph 76 purport to characterize certain of Bombardier's public statements without specific citation, but Bombardier denies that the characterization is either definitive or accurate. Bombardier also specifically denies statements MITAC America attributes to Mr. Cromer suggest or indicate anticompetitive activity by Bombardier. Bombardier denies any remaining allegations in this paragraph.

77.     Bombardier's power in the Regional Jet Market is augmented by substantial barriers to entry, including the following:

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Development costs. The cost of developing a new jet is significant and often exceeds initial estimates. For example, the cost of developing the MRJ was initially estimated to be $1.9 billion but has increased to nearly $5 billion. Similarly, although Bombardier initially estimated that development of its narrowbody CSeries jets would cost $2.1 billion, the program ultimately cost $5.4 billion.

Complexity of development and certification process. Development of a new regional jet is complex, and entry to the market requires that a new jet pass through a long, complex, and difficult certification process. In addition, unanticipated challenges and problems in the development and certification process are commonplace. Moreover, as explained above, the finite supply of skilled engineers capable of assisting in the development and certification of regional jets serves as an additional barrier to entry.

Manufacturing requirements and costs. The manufacturing of regional jets requires substantial and costly manufacturing capabilities and facilities, as well as significant reliance on subcontractors and complex supply chains. Many firms are incapable of making the substantial investment required to establish adequate manufacturing capabilities and facilities.

Customer trust. Establishing customer trust in the operability and reliability of a regional jet can present challenges, particularly for manufacturers that are seeking to enter the jet market. Establishing a reliable global customer support network also requires significant investment and presents operational challenges. This is particularly true given the substantial price and long-term commitment associated with the purchase of a regional jet.

Brand loyalty and switching costs. Customers with existing fleets comprised of a given manufacturer's jets may be more inclined to purchase additional jets from the same manufacturer rather than a different manufacturer (particularly a new entrant) given the costs associated with switching to a different manufacturer's jets. These switching costs include the time and expense of retraining personnel (pilots, crew, and maintenance workers); the costs associated with maintenance program changes, proving flights, establishing a new spare parts inventory, equipment tooling, and supply chain integration; and other overhead costs associated with adding a new aircraft type to air operator's certificates issued by national aviation authorities. Loyalty to a given manufacturer's jets and personal relationships between a manufacturer's and customer's personnel may also present barriers to entry to a new competitor.

**Response to Paragraph 77:** Bombardier admits that Paragraph 77 identifies considerations relevant to deciding whether to develop, manufacture, sell and service an airplane. Paragraph 77 is specifically denied to the extent it implies or suggests that the recited considerations are due to anticompetitive activity of Bombardier. Bombardier also denies that

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

MITAC America has properly defined the "Regional Jet Market." Bombardier denies any other allegations in Paragraph 77.

78.     These barriers to entry and other technical, business, and political challenges to penetrating the Regional Jet Market are so significant that government support is often necessary to the successful entry of a new jet manufacturer.

**Response to Paragraph 78:** Bombardier is without sufficient knowledge to form a belief about the truth, if any, of the allegations of this paragraph and therefore denies them.

79.     Both the cyclical nature of demand for regional jets and the length of a regional jet's lifecycle can present additional barriers to entry. These interrelated factors also make certain periods of time particularly important for manufacturers' sales of regional jets. The average lifespan of regional jets currently in service is approximately 18 years. As an in-service regional jet nears the end of its life, the owner must choose whether to replace the jet or invest in maintenance and related services to extend the life of the jet. In the United States (which is home to over 57% of all regional jets in service worldwide), the average age of regional jets currently in service is such that a large replacement wave is forecast to begin in 2022. The ability to make sales in advance of the upcoming U.S. replacement wave will be critical to regional jet manufacturers' success, both in terms of earning revenue from initial sales and aftermarket services during the life of the aircraft, and in creating a foundation for additional sales inside and outside the U.S. The next several years are thus of vital importance to established regional jet manufacturers and new entrants alike. As a result, even a small impairment to a regional jet manufacturer's ability to compete in the upcoming U.S. replacement cycle could have significant ramifications for the manufacturer's revenues and market share— and for the revenues and market shares of the manufacturer's competitors. Accordingly, if Bombardier successfully prevents, delays, or undermines the MRJ's availability to be sold during the upcoming U.S. replacement cycle, it could be foreclosed from capturing any meaningful share of the U.S. and global markets for many years to come, and could be foreclosed from entry entirely.

BOMBARDIER INC.'S ANSWER TO MITAC AMERICA INC.'S COUNTERCLAIMS (2:18-cv-01543-JLR) - 45

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Response to Paragraph 79:** Bombardier denies the allegations of Paragraph 79, to the extent they are opinion based in large part on speculation. Bombardier specifically denies acting, or having acted in an improper or illegal manner to prevent, delay, or undermine the MRJ's availability to be sold during what MITAC America considers to be an upcoming U.S. replacement cycle. Bombardier denies any remaining allegations in this paragraph because it lacks knowledge or information sufficient to form a belief about the truth, if any, of the allegations.

80.     The barriers to entry into the Regional Jet Market increase Bombardier's market power beyond the level suggested by the company's market share alone. This is particularly true with respect to customers whose fleets of regional jets are already comprised in whole or in part by Bombardier jets. Due to the aforementioned switching costs and brand loyalty in the current duopoly market, Bombardier has greater market power with respect to customers that already own or operate Bombardier jets. Entry of a new competitor could threaten Bombardier's market power with respect to these customers, particularly as they decide whether and when to replace aging CRJs already in their fleet.

**Response to Paragraph 80:** Bombardier denies the allegations of Paragraph 80, to the extent they are opinion based in large part on speculation. Bombardier specifically denies the allegations of Paragraph 80 to the extent they suggest improper or illegal activity by Bombardier. Bombardier denies any remaining allegations in this paragraph.

81.     The nature of regional jets and their lifecycles also make the provision of aftermarket services an important source of revenue for regional jet manufacturers, including Bombardier. Over the life of an in-service regional jet, manufacturers typically earn substantial revenue from the sale of parts, maintenance, repair, and other services. The need for these services—and thus the revenue manufacturers derive from their provision—tends to increase as a jet ages. More expensive maintenance services, such as overhaul of jet engines, also tend to be required later in the life of a regional jet. As a result, as a jet ages, owners are often confronted with the choice of whether to extend the life of the jet through increasingly expensive

BOMBARDIER INC.'S ANSWER TO MITAC
AMERICA INC.'S COUNTERCLAIMS (2:18-cv-
01543-JLR) - 46

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

aftermarket maintenance and services or to instead replace the aging jet. A jet owner's decision to forego the purchase of aftermarket services provided by the jet's manufacturer and instead to purchase a new regional jet from a different manufacturer would thus have a significant impact on both manufacturers' revenue streams.

**Response to Paragraph 81:** Bombardier denies the allegations of Paragraph 81, to the extent they are opinion based in large part on speculation. Bombardier specifically denies the allegations of Paragraph 81 to the extent they suggest improper or illegal activity by Bombardier. Bombardier denies any remaining allegations in this paragraph.

82.     As a result of these market dynamics, even a temporary delay or impairment of the certification, development, or sale of the MRJ would have a significant impact not only on the short- and long-term prospects for the MRJ, but also for Bombardier. Indeed, any such delay or impairment would enable Bombardier to capture additional sales, including in the upcoming replacement cycle in the U.S., and allow Bombardier to gain additional revenue from the sale of aftermarket services as airlines elect to extend the lives of in-service Bombardier jets rather than purchasing new MRJs.

**Response to Paragraph 82:** Bombardier denies the allegations of Paragraph 82, to the extent they are opinion based in large part on speculation. Bombardier specifically denies the allegations of Paragraph 82 to the extent they suggest improper or illegal activity by Bombardier. Bombardier denies any remaining allegations in this paragraph.

**E.     Anticompetitive Effect and Injury**

83.     Bombardier's anticompetitive practices have excluded competition, reduced choice, suppressed innovation, and increased barriers to entry in the Regional Jet Market. On information and belief, Bombardier's conduct has also reduced output and increased prices for regional jets. As a result, Bombardier's actions have harmed competition, regional jet purchasers, engineers, and MITAC America.

**Response to Paragraph 83:** Bombardier denies the allegations in Paragraph 83.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

84.     Competition in the Regional Jet Market has been harmed. Bombardier has delayed the entry of new competitors, reduced the movement of skilled aerospace engineers, reduced choice, and suppressed innovation. By delaying the entry of new regional jets, Bombardier has reduced choice and limited innovation in the Regional Jet Market. By blocking and otherwise chilling the movement of skilled engineers within the market, Bombardier has further diminished competitors' ability to compete and innovate in the market. And by unfairly tarnishing the image of Mitsubishi and the MRJ in the eyes of customers, Bombardier has suppressed competition in the Regional Jet Market. On information and belief, this has reduced output and elevated prices of regional jets above what they would have been but for Bombardier's conduct.

**Response to Paragraph 84:** Bombardier denies the allegations in Paragraph 84.

85.     Purchasers of regional jets have also been harmed in that they have fewer and less innovative options for regional jets. In addition, Bombardier can maintain higher prices than would otherwise prevail in the face of new competition.

**Response to Paragraph 85:** Bombardier denies the allegations in Paragraph 85.

86.     Individual engineers looking for employment related to commercial jets have also been harmed. Individual engineers and competitors for their talent are harmed by Bombardier's campaign to impede the movement of skilled engineers. The industry is highly concentrated and news travels fast when any company or individual in the industry is sued. Bombardier's threats and actual litigation against individual employees chills the marketplace for such talent, which will endure for several years to come.

**Response to Paragraph 86:** Bombardier denies the allegations in Paragraph 86.

87.     MITAC America has incurred antitrust injury from the violations of law alleged and would not have incurred such injury in the absence of Bombardier's anticompetitive actions. As the direct result of Bombardier's ongoing predatory campaign described above, MITAC America has been undermined or delayed in its ability to recruit, hire, and retain engineers critical to the development and certification of the MRJ, which has not only risked delaying the

BOMBARDIER INC.'S ANSWER TO MITAC AMERICA INC.'S COUNTERCLAIMS (2:18-cv-01543-JLR) - 48

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

MRJ's certification, but also impedes MITAC America's innovation and design efforts and raises MITAC America's costs and the barriers to enter the Regional Jet Market.

**Response to Paragraph 87:** Bombardier denies the allegations in Paragraph 87.

88.    For example, as a result of Bombardier's anticompetitive conduct:

Recruitment and hiring efforts by MITAC America, MITAC, and AeroTEC in support of the MRJ program have been undermined.

AeroTEC was forced to decline to extend an offer of employment to one or more Bombardier employees that would have supported the MRJ program.

At least one prospective employee that MITAC America intended to hire withdrew his application for employment, citing the situation between Bombardier and Mitsubishi as the reason for doing so.

The start dates of at least two individuals employed in connection with the MRJ program were delayed.

On information and belief, other prospective employees declined to either seek or accept employment on the MRJ program, slowing the pace of hiring related to the MRJ program.

The ability of MITAC America, MITAC, and AeroTEC to hire and retain employees for the MRJ program, including but not limited to highly-skilled individuals currently or formerly employed by Bombardier, has been reduced, with significant near-term and long-lasting effects on the companies.

**Response to Paragraph 88:** Bombardier specifically denies that any of the examples set forth in Paragraph 88 constitute anticompetitive conduct. Bombardier further denies any remaining allegations in Paragraph 88 because it lacks knowledge or information sufficient to form a belief about the truth, if any, of the allegations.

89.    MITAC America has also incurred antitrust injury in the form of harm to its reputation and goodwill caused by Bombardier's anticompetitive conduct, including its baseless claims that MITAC America has misappropriated Bombardier's trade secrets. On information and belief, the reputation and goodwill of MITAC America and MITAC among current and potential MRJ customers and suppliers has been diminished as a result of Bombardier's conduct,

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

with long lasting detrimental effects. Similarly, Bombardier's insinuation that the MRJ program is built on misappropriated trade secrets may create uncertainty among current and potential MRJ customers and suppliers about whether MITAC America and MITAC can be trusted business partners and whether the MRJ will be able to meet development and production deadlines and enter the market notwithstanding the litigation. Both harm not only MITAC America's reputation and goodwill, but also its sales.

**Response to Paragraph 89:** Bombardier denies the allegations in Paragraph 89.

90.     Bombardier's relentless threats and demands that MITAC America, MITAC, and AeroTEC enter into unlawful no-poach agreements have also forced the companies to divert attention and resources that could have otherwise been committed to the MRJ program, including through the retention of outside counsel and mounting legal fees and costs associated with responding to Bombardier's baseless demands and legal actions.

**Response to Paragraph 90:** Bombardier denies that it undertook any action either prior to, or during this litigation, that is baseless, anticompetitive, improper, or illegal. Bombardier denies any remaining allegations in this paragraph because it lacks knowledge or information sufficient to form a belief about the truth, if any, of the allegations.

91.     The effects of Bombardier's predatory scheme harm competition, regional jet purchasers, aerospace engineers, and MITAC America. These harms are the types that antitrust laws were designed to prevent and those harms flow directly from that which makes Bombardier's conduct unlawful. Bombardier's practices are not reasonably necessary to accomplish any significant procompetitive benefit.

**Response to Paragraph 91:** Bombardier denies that is has engaged in a "predatory scheme" or harmful and unlawful conduct of the kind envisioned by antitrust laws. Bombardier denies the remaining allegations in this paragraph because it lacks knowledge or information sufficient to form a belief about the truth, if any, of the allegations.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**COUNTERCLAIM I: ATTEMPTED MONOPOLIZATION IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2 92.**

92.     MITAC America realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

**Response to Paragraph 92:** Bombardier fully restates and incorporates by reference its responses to Paragraphs 1 through 91 above.

93.     Bombardier has market power in the Regional Jet Market and has a dangerous probability of obtaining monopoly power.

**Response to Paragraph 93:** Bombardier denies the allegations in Paragraph 93.

94.     Bombardier has engaged in a scheme to expand its market power in the Regional Jet Market, to the detriment of competition, purchasers of regional jets, aerospace engineers, and MITAC America.

**Response to Paragraph 94:** Bombardier denies the allegations in Paragraph 94.

95.     Bombardier's anticompetitive and exclusionary conduct includes its ongoing actions to impede or delay the development, certification, and sale of the MRJ by (1) levying baseless threats at MITAC America, MITAC, MHI, AeroTEC, and those companies' current and prospective employees in order to restrict the free flow of skilled labor necessary to the development and certification of the MRJ; (2) making threats against its own employees to deter them from accepting employment on the MRJ program; (3) attempting to coerce MITAC America, MITAC, MHI, and AeroTEC to enter per se unlawful no-poaching agreements in order to restrict recruitment and hiring activities in support of the MRJ program; (4) threatening the long-standing supply relationship between MHI and Bombardier in an attempt to achieve its illicit ends; and (5) initiating this litigation in an effort to delay the MRJ program and undermine sales of the MRJ. In furtherance of this scheme, Bombardier has engaged in a pattern of threats of litigation without regards to the merits and for the purpose of injuring MITAC, MITAC America, AeroTEC, and competition in the Regional Jet Market. Bombardier has also threatened and filed litigation against MITAC, MITAC America, AeroTEC, and former Bombardier

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1   employees that is objectively baseless and subjectively intended to interfere with MITAC,

2   MITAC America, and AeroTEC's ability to compete.

3      **Response to Paragraph 95:** Bombardier admits that it has filed litigation against

4   MITAC, MITAC America, AeroTEC, and former Bombardier employees, but Bombardier

5   denies it has undertaken any anticompetitive or exclusionary conduct, including but not limited

6   to any of the acts enumerated in Paragraph 95. Bombardier denies the remaining allegations in

7   Paragraph 95.

8      96.    Bombardier undertook the anticompetitive and exclusionary conduct alleged

9   herein with the specific intent to acquire monopoly power in the Regional Jet Market.

10     **Response to Paragraph 96:**  Bombardier denies the allegations in Paragraph 96.

11     97. As evidenced by Bombardier's market share and the dynamics of the Regional Jet

12   Market, including the significant barriers to entry to the Regional Jet Market, there is a

13   dangerously high probability that Bombardier's scheme to impede competition from the MRJ

14   and monopolize the Regional Jet Market will succeed.

15     **Response to Paragraph 97:**  Bombardier denies the allegations of Paragraph 97.

16     98.    Bombardier's conduct has no efficiency or procompetitive benefit or justification,

17   the anticompetitive effects of its conduct outweigh any purported procompetitive justifications,

18   and Bombardier could reasonably achieve any purported procompetitive goals through less

19   restrictive alternatives.

20     **Response to Paragraph 98:**  Bombardier denies the allegations of Paragraph 98.

21     99.    Bombardier's conduct constitutes attempted monopolization in violation of

22   Section 2 of the Sherman Act, 15 U.S.C. § 2.

23     **Response to Paragraph 99:**  Bombardier denies the allegations of Paragraph 99.

24     100.    As a direct and proximate result of the unlawful conduct of Bombardier in

25   furtherance of the violations alleged, MITAC America has been injured in its business and

26   property in an amount to be proved at trial and to be automatically trebled, as provided by 15

27   U.S.C. § 15.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    **Response to Paragraph 100:** Bombardier denies the allegations of Paragraph 100.

2    101.    MITAC America is also entitled to recover from Bombardier the cost of suit,

3    including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

4    **Response to Paragraph 101:** Bombardier denies the allegations of Paragraph 101.

5    **COUNTERCLAIM II: ATTEMPTED MONOPOLIZATION IN VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT, RCW 19.86.040**

6    102.    MITAC America realleges and incorporates by reference the allegations set forth

7    in the preceding paragraphs as though fully set forth herein.

8    **Response to Paragraph 102:** Bombardier fully restates and incorporates by reference its

9    responses to Paragraphs 1 through 101.

10    103.    Bombardier has market power in the Regional Jet Market and has a dangerous

11    probability of obtaining monopoly power.

12    **Response to Paragraph 103:** Bombardier denies the allegations in Paragraph 103.

13    104.    Bombardier has engaged in a scheme to expand its market power in the Regional

14    Jet Market, to the detriment of competition, purchasers of regional jets, aerospace engineers, and

15    MITAC America.

16    **Response to Paragraph 104:** Bombardier denies the allegations in Paragraph 104.

17    105.    Bombardier's anticompetitive and exclusionary conduct includes its ongoing

18    actions to impede or delay the development, certification, and sale of the MRJ by (1) levying

19    baseless threats at MITAC America, MITAC, MHI, AeroTEC, and those companies' current and

20    prospective employees in order to restrict the free flow of skilled labor necessary to the

21    development and certification of the MRJ; (2) making threats against its own employees to deter

22    them from accepting employment on the MRJ program; (3) attempting to coerce MITAC

23    America, MITAC, MHI, and AeroTEC to enter per se unlawful no-poaching agreements in order

24    to restrict recruitment and hiring activities in support of the MRJ program; (4) threatening the

25    long-standing supply relationship between MHI and Bombardier in an attempt to achieve its

26    illicit ends; and (5) initiating this litigation in an effort to delay the MRJ program and undermine

27

BOMBARDIER INC.'S ANSWER TO MITAC AMERICA INC.'S COUNTERCLAIMS (2:18-cv-01543-JLR) - 53

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

sales of the MRJ. In furtherance of this scheme, Bombardier has engaged in a pattern of threats of litigation without regards to the merits and for the purpose of injuring MITAC, MITAC America, AeroTEC, and competition in the Regional Jet Market. Bombardier has also threatened and filed litigation against MITAC, MITAC America, AeroTEC, and former Bombardier employees that is objectively baseless and subjectively intended to interfere with MITAC, MITAC America, and AeroTEC's ability to compete.

**Response to Paragraph 105:**  Bombardier admits that it has filed litigation against MITAC, MITAC America, AeroTEC, and former Bombardier employees, but Bombardier denies it has undertaken any anticompetitive and exclusionary conduct, including but not limited to any of the acts enumerated in Paragraph 105. Bombardier denies the remaining allegations in Paragraph 105.

106.    Bombardier undertook the anticompetitive and exclusionary conduct alleged herein with the specific intent to acquire monopoly power in the Regional Jet Market.

**Response to Paragraph 106:**  Bombardier denies the allegations in Paragraph 106.

107.    As evidenced by Bombardier's market share and the dynamics of the Regional Jet Market, including the significant barriers to entry to the Regional Jet Market, there is a dangerously high probability that Bombardier's scheme to impede competition from the MRJ and monopolize the Regional Jet Market will succeed.

**Response to Paragraph 107:**  Bombardier denies the allegations of Paragraph 107.

108.    Bombardier's conduct has no efficiency or procompetitive benefit or justification, the anticompetitive effects of its conduct outweigh any purported procompetitive justifications, and Bombardier could reasonably achieve any purported procompetitive goals through less restrictive alternatives.

**Response to Paragraph 108:**  Bombardier denies the allegations of Paragraph 108.

109.    Bombardier's conduct constitutes attempted monopolization in violation of RCW 19.86.040.

**Response to Paragraph 109:**  Bombardier denies the allegations of Paragraph 109.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

110.     As a direct and proximate result of the unlawful conduct of Bombardier in furtherance of the violations alleged, MITAC America has been injured in its business and property in an amount to be proved at trial and, in the Court's discretion, to be increased up to an amount not to exceed three times the actual damages sustained, as provided by RCW 19.86.090.

**Response to Paragraph 110:** Bombardier denies the allegations of Paragraph 110.

111.  MITAC America is also entitled to recover from Bombardier the cost of suit, including a reasonable attorney's fee, as provided by RCW 19.86.090.

**Response to Paragraph 111:** Bombardier denies the allegations of Paragraph 111.

### COUNTERCLAIM III: PROPOSAL FOR AN ARRANGEMENT TO VIOLATE THE WASHINGTON CONSUMER PROTECTION ACT, RCW 19.86.030

112.     MITAC America realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

**Response to Paragraph 112:** Bombardier fully restates and incorporates by reference its responses to Paragraphs 1 through 111.

113.     Bombardier proposed (and demanded) that MITAC America agree to cease all recruitment and hiring of Bombardier employees.

**Response to Paragraph 113:** Bombardier denies the allegations of Paragraph 113.

114.     If consummated, Bombardier's proposed no-poaching agreement would have constituted a per se violation of RCW 19.86.030, which prohibits every contract, combination, or conspiracy in restraint of trade or commerce. In any event, the proposed agreement had no legitimate business justification, but instead was proposed and demanded by Bombardier in order to reduce competition in the Regional Jet Market by restricting hiring related to the MRJ. There is no efficiency-enhancing, procompetitive justification for the proposal. Any purported procompetitive justifications or effects are outweighed by the anticompetitive impact, and there are less restrictive alternatives available to achieve any purported procompetitive impact.

**Response to Paragraph 114:** Bombardier denies the allegations of Paragraph 114.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

115.     As a direct and proximate result of its refusal to accede to Bombardier's proposal, MITAC America has been injured in its business and property in an amount to be proved at trial and trebled pursuant to RCW 19.86.090. In particular, MITAC America has been forced to incur the burden and expense of responding to and defending against Bombardier's repeated threats and demands, including the attorneys' fees and costs incurred in relation to the instant litigation, and to otherwise divert away attention and resources that could have otherwise been committed to the MRJ program.

**Response to Paragraph 115:** Bombardier denies the allegations of Paragraph 115.

116.     MITAC America is also entitled to recover from Bombardier the cost of suit, including a reasonable attorney's fee, as provided by RCW 19.86.090.

**Response to Paragraph 116:** Bombardier denies the allegations of Paragraph 116.

**COUNTERCLAIM IV: UNFAIR COMPETITION IN VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT, RCW 19.86.020 117**

117.     MITAC America realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

**Response to Paragraph 117:** Bombardier fully restates and incorporates by reference its responses to Paragraphs 1 through 116.

118.     Bombardier's conduct constitutes unfair methods of competition and unfair acts or practices within the meaning of RCW 19.86.020 because the conduct: (1) offends public policy as it has been established by statutes, the common law, or otherwise, including state and federal laws that prohibit anticompetitive conduct; (2) is oppressive in that it seeks to prevent or limit lawful competition; and/or (3) causes substantial injury to competitors (e.g. MITAC America, MITAC, and AeroTEC), other businesspersons (e.g., airlines and other purchasers of regional jets who may pay more for regional jets due to the reduction in competition in the market for regional jets), and/or consumers (e.g., individuals who may pay more for airplane tickets if airplane manufacturers can charge airlines more for jets due to the reduction of competition in the market for regional jets).

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1    **Response to Paragraph 118:**  Bombardier denies the allegations of Paragraph 118.

2    119.    Bombardier's conduct took place in the course of trade or commerce because

3    Bombardier's threats and demands were issued by Bombardier in the course of its business

4    operations, were directed towards other companies and individuals involved in the manufacture

5    of regional jets, and were related to efforts to compete with Bombardier in the market for

6    regional jets.

7    **Response to Paragraph 119:**  Bombardier denies the allegations of Paragraph 119.

8    120.    Bombardier's conduct is injurious to the public interest, within the meaning of

9    RCW 19.86.093(1), because it violates statutes that incorporate the Consumer Protection Act,

10   including but not limited to RCW 19.86.020, 19.86.030, and 19.86.040.

11   **Response to Paragraph 120:**  Bombardier denies the allegations of Paragraph 120.

12   121.    Bombardier's conduct is injurious to the public interest within the meaning of

13   RCW 19.86.093(3)(a) because it has injured persons other than MITAC America, including

14   MITAC, MHI, AeroTEC, the current and former Bombardier employees who were the recipients

15   of Bombardier's threats and allegations, and other individuals, including but not limited to

16   current and former Bombardier employees, among others, who were deterred or dissuaded from

17   seeking employment related to the MRJ.

18   **Response to Paragraph 121:**  Bombardier denies the allegations of Paragraph 121.

19   122.    Bombardier's conduct is injurious to the public interest within the meaning of

20   RCW 19.86.093(3)(b) and RCW 19.86.093(3)(c) because it had the capacity, and still has the

21   capacity, to injure other persons, including current and former Bombardier employees who were

22   deterred or dissuaded from seeking employment related to the MRJ, as well as other companies

23   or individuals who may be the recipients of similarly improper threats, accusations, and

24   invitations to collude in the future.

25   **Response to Paragraph 122**:  Bombardier denies the allegations of Paragraph 122.

26   123.    As a direct and proximate result of Bombardier's conduct, MITAC America has

27   been injured in its business and property in an amount to be proved at trial and, in the Court's

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

discretion, to be increased up to an amount not to exceed the greater of three times the actual damages sustained or $25,000, as provided by RCW 19.86.090.

**Response to Paragraph 123:** Bombardier denies the allegations of Paragraph 123.

124. MITAC America is also entitled to recover from Bombardier the cost of suit, including a reasonable attorney's fee, as provided by RCW 19.86.090.

**Response to Paragraph 124:** Bombardier denies the allegations of Paragraph 124.

## BOMBARDIER'S AFFIRMATIVE DEFENSES

Without prejudice to the denials set forth in its Answer, without admitting any averments of the Counterclaims not otherwise admitted, and without undertaking any of the burdens imposed by law on MITAC America, Bombardier asserts the following separate defenses to the Counterclaims:

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim upon Which Relief Can Be Granted)

The Counterclaims fail to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

### SECOND AFFIRMATIVE DEFENSE
### (Equitable Defenses)

The Counterclaims are barred by the doctrines of acquiescence, estoppel, laches, waiver, unclean hands, unjust enrichment, and/or other equitable defenses that will find support in evidence uncovered during discovery in this action.

### THIRD AFFIRMATIVE DEFENSE
### (Adequacy of Remedy at Law)

MITAC America is not entitled to any injunctive relief sought, either preliminarily or permanently, because any injury to MITAC America is neither immediate nor irreparable, MITAC America has an adequate remedy at law, the balance of hardships favors no injunctive relief, and the public interest favors no injunctive relief.

BOMBARDIER INC.'S ANSWER TO MITAC AMERICA INC.'S COUNTERCLAIMS (2:18-cv-01543-JLR) - 58

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

## FOURTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

The Counterclaims are barred, in whole or in part, by the applicable statute(s) of limitations.

## FIFTH AFFIRMATIVE DEFENSE
### (Independent Duty/Economic Loss)

The Counterclaims are barred by the doctrines of Independent Duty and/or Economic Loss.

## SIXTH AFFIRMATIVE DEFENSE
### (Lack of standing)

The Counterclaims are barred because MITAC America lacks standing to assert injury based on Bombardier's alleged anticompetitive conduct.

## SEVENTH AFFIRMATIVE DEFENSE
### (Lawful Competition)

The Counterclaims are barred by the doctrine of lawful competition.

## EIGHTH AFFIRMATIVE DEFENSE
### (Unreasonable Restraint Of Trade)

The Counterclaims are barred, in whole or in part, because the relief sought by MITAC America would constitute an unreasonable restraint of trade.

## NINTH AFFIRMATIVE DEFENSE
### (No Damages)

MITAC America is entitled to no relief because MITAC America has sustained no damage as a result of Bombardier's activities.

## TENTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate Damages)

MITAC America is entitled to no relief because MITAC America has failed to mitigate its damages allegedly resulting from Bombardier's purported misconduct.

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

### ELEVENTH AFFIRMATIVE DEFENSE
#### (Contributory Negligence)

MITAC America is entitled to no relief because any damages allegedly sustained as a result of the conduct alleged are in fact proximately caused, in whole or in part, by MITAC America's own negligent conduct in attempting to develop and certify the MRJ.

### ADDITIONAL AFFIRMATIVE DEFENSES

Bombardier reserves all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure and any other defenses, at law or in equity, that may now exist or in the future be available based on discovery and further factual investigation in this case.

Dated this 13th day of May, 2019.

CHRISTENSEN O'CONNOR
JOHNSON KINDNESS[PLLC]

s/ John D. Denkenberger
John D. Denkenberger, WSBA No.: 25,907
Brian F. McMahon, WSBA No.: 45,739
E. Lindsay Calkins, WSBA No.: 44,127
Christensen O'Connor Johnson Kindness[PLLC]
1201 Third Avenue, Suite 3600
Seattle, WA 98101-3029
Telephone: 206.682.8100
Fax: 206.224.0779
E-mail: john.denkenberger@cojk.com,
brian.mcmahon@cojk.com,
lindsay.calkins@cojk.com, litdoc@cojk.com

*Attorneys for Plaintiff Bombardier Inc.*

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jerry A. Riedinger
PERKINS COIE LLP
Email:
JRiedinger@perkinscoie.com
docketsea@perkinscoie.com
lshaw@perkinscoie.com
sporter@perkinscoie.com

Mack H. Shultz
PERKINS COIE LLP
Email:
MShultz@perkinscoie.com
docketseapl@perkinscoie.com
sbilger@perkinscoie.com

Mary Z. Gaston
PERKINS COIE LLP
Email:
MGaston@perkinscoie.com
docketsea@perkinscoie.com
jstarr@perkinscoie.com

James Sanders
PERKINS COIE LLP
Email:
JSanders@perkinscoie.com
RBecken@perkinscoie.com
docketsea@perkinscoie.com
jdavenport@perkinscoie.com

Shylah R. Alfonso
PERKINS COIE LLP
Email:
SAlfonso@perkinscoie.com
docketsea@perkinscoie.com

Attorneys for Mitsubishi Aircraft Corporation and Mitsubishi Aircraft Corporation America Inc.

Richard J. Omata
KARR TUTTLE CAMPBELL
Email: romata@karrtuttle.com
jnesbitt@karrtuttle.com
swatkins@karrtuttle.com

Mark A. Bailey
KARR TUTTLE CAMPBELL
Email: mbailey@karrtuttle.com
jsmith@karrtuttle.com
mmunhall@karrtuttle.com
sanderson@karrtuttle.com

Daniel T. Hagen
KARR TUTTLE CAMPBELL
Email: dhagen@karrtuttle.com
ksagawinia@karrtuttle.com

Attorneys for Aerospace Testing Engineering & Certification Inc., Michel Korwin-Szymanowski, Laurus Basson, and Cindy Dornéval

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

James P. Savitt
SAVITT BRUCE &
WILLEY LLP
Email: jsavitt@sbwLLP.com
eservice@sbwllp.com

Jacob P. Freeman
SAVITT BRUCE &
WILLEY LLP
Email:
jfreeman@sbwLLP.com

Attorneys for Marc-Antoine Delarche and Keith Ayre

s/ John D. Denkenberger
John D. Denkenberger, WSBA No.: 25,907
Brian F. McMahon, WSBA No.: 45,739
E. Lindsay Calkins, WSBA No.: 44,127
Christensen O'Connor Johnson Kindness<sup>PLLC</sup>
1201 Third Avenue, Suite 3600
Seattle, WA 98101-3029
Telephone: 206.682.8100
Fax: 206.224.0779
E-mail: john.denkenberger@cojk.com,
brian.mcmahon@cojk.com,
lindsay.calkins@cojk.com, litdoc@cojk.com

*Attorneys for Plaintiff Bombardier Inc.*

BOMBARDIER INC.'S ANSWER TO MITAC
AMERICA INC.'S COUNTERCLAIMS (2:18-cv-
01543-JLR) - 62

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100