The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| BOMBARDIER, INC., <br><br> Plaintiff, <br><br> v. <br><br> MITSUBISHI AIRCRAFT CORPORATION, MITSUBISHI AIRCRAFT CORPORATION AMERICA INC., AEROSPACE TESTING ENGINEERING & CERTIFICATION INC., MICHEL KORWIN-SZYMANOWSKI, LAURUS BASSON, MARC-ANTOINE DELARCHE, CINDY DORNÉVAL, KEITH AYRE, AND JOHN AND/OR JANE DOES 1-88, <br><br> Defendants. | NO.   2:18-cv-01543-JLR <br><br> **DECLARATION OF KEITH AYRE** |

I, Keith Ayre, declare as follows:

1.  I am an Engineering Manager with Mitsubishi Aircraft Corporation ("MITAC") in Nagoya, Japan.  I am over the age of eighteen and am competent to testify.  I make this declaration based on personal knowledge.

DECLARATION OF KEITH AYRE - 1
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

A.   **Background**

2. I am and always have been a Canadian citizen. I have never resided in the United States. I have never been employed in the United States.

3. I currently live and work in Nagoya, Japan. I have lived in Nagoya since about August 27, 2016. I have been employed by MITAC in Nagoya since September 1, 2016.

4. Before becoming a MITAC employee, I was employed by Bombardier. I worked for Bombardier for over 32 years, and my last day as a Bombardier employee was August 26, 2016. While I was employed by Bombardier I lived and worked in Quebec, Canada. I never had a non-compete agreement with Bombardier.

B.   **My Contacts and Connections with Washington**

5. Bombardier alleges that I have "personally visited and participated in MRJ certification efforts in Washington State, and… illicitly relied on and made use of Bombardier trade secret information as part of those visits and efforts." (ECF No. 143 ¶ 80; *see also id.* ¶ 20.) These allegations are false.

6. I have made only one visit to Washington since becoming a MITAC employee: in April 2019 I met briefly with my attorneys at Savitt Bruce & Willey LLP in Seattle in connection with this case.

7. Prior to August 2016, I had visited Washington only a handful of times, the last of which was in 2011. Since then, I've been to Washington only twice: my meeting with my lawyers last month, in which I was in Seattle for two nights; and one visit in March 2016 for an interview with MITAC, during which I spent two nights in Washington, which I describe in more detail below.

8. In short, I have never visited Washington on MITAC business, nor have I done any MITAC business or work in Washington, nor have I "participated in MRJ certification efforts in Washington State." Bombardier's allegation that I "illicitly relied on and made use of Bombardier trade secret information" in connection with any visit I have ever made to, or any time I have ever spent in, Washington is false.

DECLARATION OF KEITH AYRE - 2
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

C. **My Decision to Work for MITAC in Japan**

9.   In late 2015, I learned that a friend and Bombardier colleague was leaving his job in Montreal to work for MITAC in Japan. He and I discussed his reasons for joining MITAC, but he did not try to encourage or entice me to leave Bombardier for MITAC or anywhere else.

10.   In January 2016, I decided to submit a resume and apply to work for MITAC in Japan. I had several phone interviews from Quebec, in February of 2016, but I was not offered a job at that time. These phone interviews were not with MITAC personnel, but rather were with MITAC's placement agency.

11.   I then was invited to an in-person interview with MITAC. That interview took place at the hotel that my interviewers were staying at for the trip, which was in Renton, Washington. I was in Washington for two nights for that trip. The interview was specifically for a job with MITAC in Japan; I did not interview for any job with Mitsubishi Aircraft Corporation America Inc., or any other job in Washington or in the United States. This interview was the sole MITAC-related activity of my two nights in Washington.

12.   During the March 2016 in-person interview, I did not provide my interviewers with any documents, nor did they provide me with any documents. I did not discuss the content of any documents, nor did they discuss the content of any documents with me. Nor did I disclose or use or reference any proprietary Bombardier information during the interview. I did not even visit MITAC America's offices or location; as noted above, the interview was at a hotel.

13.   In late July 2016, I attended a MITAC job fair in the Montreal area. At that job fair, I signed an employment contract to work for MITAC in Japan. Shortly after that, I gave Bombardier two weeks' notice that I was resigning.

14.   When I gave my notice, I was up front about my plans. I told Bombardier that I was going to work for MITAC in Japan. No restriction was placed on the subject matter of my work due to the concern that I was leaving to work for a competitor. In addition, no one told

DECLARATION OF KEITH AYRE - 3
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

me that there was certain information or certain documents that I should not access or retain possession of during my notice period. During my notice period, I worked hard to finish as much pending work as possible and to transition the work I had been responsible for to others. In addition, I was asked by engineering colleagues to identify and explain my open and ongoing tasks and to highlight any areas of concern. Bombardier was aware that I was actively working right up through my last day.

### D.  The Eleven Documents that Are the Subject of Bombardier's Motion for a Preliminary Injunction

15. I have reviewed Bombardier's "[Proposed] Order Granting Bombardier Inc.'s Motion for Preliminary Injunction Against," among others, myself. (ECF No. 146-1.)

16. I understand that by its motion for a preliminary injunction, Bombardier seeks to enjoin me from "[u]sing, accessing, imitating, copying, disclosing, or making available to any person or entity" eleven documents "and/or any information or data contained therein," or "[u]sing, accessing, imitating, copying, disclosing, or making available to any person or entity any information derived from the information" contained in the eleven documents. (ECF No. 146-1.)

17. Neither I nor my counsel have been provided with copies of these eleven documents.

18. The only information I have about those eleven documents is their file names and Bombardier's descriptions of them in its public filings in this case. Based on the descriptions of the documents in Bombardier's public filings, I am confident that I do not possess and have never personally possessed any copies (physical or electronic) of any of these eleven documents. In addition, Bombardier's allegations in its Updated Motion for a Preliminary Injunction and its First Amended Complaint concerning these eleven documents do not attempt to connect them to me, and none of its allegations regarding me assert that I have any connection to these documents.

DECLARATION OF KEITH AYRE - 4
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

E.  **The Documents Bombardier Accuses Me of Misappropriating**

19.  The only trade secrets that Bombardier accuses me of misappropriating are two emails contained in Exhibit S to the First Amended Complaint and one email that Bombardier has not submitted as an exhibit but which it describes in paragraph 79 of the First Amended Complaint.

20.  While I do not agree that these emails contain trade secrets, it is false that I wrongfully took any of those emails, or wrongfully disclosed or used any information they contained.  I address the circumstances of each document separately below.

21.  None of the emails that Bombardier accuses me of misappropriating are among the eleven documents listed in the proposed preliminary injunction order.

    **1.  Forwarded 2013 email from David Johns of Transport Canada**

22.  Bombardier alleges in its Updated Motion for a Preliminary Injunction that "[t]wo days before [my] departure" from Bombardier (i.e., August 24, 2016), I "emailed to [my] personal account a highly confidential email discussing Bombardier trade secrets that [I] initially received from TCCA *nearly three years earlier* concerning smoke penetration testing for Bombardier aircraft."  (ECF No. 146, at 6, emphasis in original.)  Bombardier supports this allegation by relying on the email that starts on page 7 of Exhibit S to the First Amended Complaint.

23.  The August 24 email forwards a December 9, 2013 email from David Johns, an engineer with Transport Canada (or "TCCA"), which is the Canadian equivalent of the FAA.  The 2013 email included in Exhibit S is heavily redacted, and Bombardier has not provided me or my counsel with an unredacted version.  But I recognize it as an email from Mr. Johns responding to a request I had made to Transport Canada in 2013 that Bombardier be permitted to use, as part of required smoke-penetration testing, an alternate ▮▮▮▮▮▮▮▮▮▮ to those described under the then-applicable official advisory circular issued by the regulators.

DECLARATION OF KEITH AYRE - 5
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

24. The applicable FAA advisory circular was issued in 1994 and is publicly available on the FAA's website.[1] Among other things, that advisory circular lists acceptable ▓▓▓▓▓▓▓▓ for smoke detection tests.

25. I forwarded the December 2013 email to my personal email before I departed Bombardier in 2016, to remind myself of two things. First, I wanted to remember to reach out to the sender of that email, Mr. Johns of Transport Canada, to let him know that I'd left Bombardier. Second, I intended the December 2013 email to be a reminder to ensure, once I began working for MITAC, that a MITAC employee join the International Aircraft System Fire Protection Forum. This forum is open to anyone in the international community in industry, government, and academia with an interest in aircraft fire protection systems. Presentations, minutes, and attendee lists for the forum are publicly available on the FAA's website.[2] I sent the December 2013 email to myself in hopes of reminding myself to suggest that a MITAC employee join this forum, because it concerned a subject that was under consideration and discussion by the forum.

26. After forwarding the December 2013 email to my personal account in August 2016, I never again viewed that email—other than the redacted version in Exhibit S—and I never forwarded it to anyone or disclosed its contents to anyone, including MITAC. In fact, I forgot that I had forwarded the December 2013 email to myself, and did not even access it. (Without referencing the email, I did remember to ensure that a MITAC employee joined the forum described above, and to call Mr. Johns.)

27. Bombardier's assertion that the December 2013 email I forwarded on August 24 "discuss[es] Bombardier trade secrets" is false. (*See* ECF No. 146, at 6.) As I stated, and to the best of my recollection, that email does not discuss Bombardier trade secrets. Instead, it discusses ▓▓▓▓▓▓▓▓ that are manufactured by third parties and that are available for sale

---

[1] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
[2] <https://www.fire.tc.faa.gov/systems.asp>.

DECLARATION OF KEITH AYRE - 6
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

to the general public. Such ████████ are used, for example, at concerts and other events, as well as smoke testing on airplanes.

28. Putting aside whether anything in the December 2013 email would have been proprietary to Bombardier *in 2013*—it is an email sent by a regulator, not by anyone employed by or working for Bombardier—everything of substance in that email would have been generally known or available to industry participants, such as the other members of the industry forum described above, in *August 2016*. By that time, three years later, the conversation between the industry and regulators had moved to a point where the regulators had agreed that the alternate ████████ discussed in the December 2013 email was generally accepted. The FAA's publicly available fire safety website has a wealth of information on the topic of ████████.[3]

29. In short, when I sent the August 24 email from my Bombardier work email account to my personal email account, I was not taking any proprietary or secret information from Bombardier. I sent this three-year-old email from a regulator to myself to remind myself to follow up on unrelated matters; I didn't view it after sending it; and there is nothing in it that is Bombardier's private information much less anything that could be a trade secret.

30. In my experience, it was not uncommon for Bombardier employees to send emails to personal email accounts. There were times when other Bombardier employees sent emails regarding Bombardier work to my personal email account.

**2.    Email dated August 18, 2016**

31. In its Updated Motion for a Preliminary Injunction, Bombardier alleges: "While still employed by Bombardier, Ayre began assisting MITAC with MRJ certification." (ECF No. 146, at 5.) Specifically, Bombardier alleges that "[o]n August 18, 2016, Ayre forwarded to himself a copy of an email with a MITAC executive, Mr. Koki Fukuda, the Engineering Lead of Ice Protection Systems for the MRJ, in which Ayre provided Bombardier trade secret

---

[3] <https://www.fire.tc.faa.gov/>.

DECLARATION OF KEITH AYRE - 7
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

information, the details of which he was 'happy to discuss' 'when [he is] in the MRJ office.'" (*Id.*)  For support Bombardier relies on the email starting on page 9 of Exhibit S.

32. Bombardier is incorrect that the August 18 email is a copy of correspondence I had previously exchanged with Fukuda-san.  Instead, the August 18 email is a draft of an email I intended to send to Fukuda-san at MITAC.  More importantly, the August 18 email does not contain any "Bombardier trade secret information."

33. Fukuda-san had sent me an email in which he stated that he "would like to know the history about IPS activation/deactivation regulatory requirement."  This statement is quoted in the draft email, on page 9 of Exhibit S.  "IPS" is an abbreviation for "ice protection system."  The "regulatory requirement" referenced governmental regulations, not Bombardier secrets.  I drafted a response to Fukuda-san during my lunch break, and then sent the draft to my personal email account at the end of the business day so that I could continue to work on it at home.

34. In my August 18 draft response, I provide general responses to Fukuda-san's questions about the history of the governmental ice protection regulations, and I mention that he can find more information on the FAA's own website.  I also provide a quotation of the FAA's publicly available summary of the applicable rule, which Bombardier has redacted from Exhibit S even though it is public information.

35. None of this information is proprietary to Bombardier.  Instead, the information is publicly available, including, at the time, on the FAA's website, and concerns certification activities that any manufacturer of transport aircraft would have to undertake.

36. I understand that MITAC has located on its servers, and filed under seal with the Court, the final email that I sent to Fukuda-san from my personal email account.  (ECF No. 127 Ex. A.)  I have reviewed the redacted version of that email which MITAC has filed publicly, and it is a true and correct copy—except for the redaction—of the email I sent to Fukuda-san.  I also understand that MITAC has located, and filed under seal with the Court, a publicly available document containing the FAA's summary of the rule that I quoted in my August 18 draft.  (ECF No. 127 Ex. B.)  Because that otherwise publicly available document is filed under

DECLARATION OF KEITH AYRE - 8
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

seal, I have not been able to review it as filed in this lawsuit. But the rule it discusses is FAR 25.1419(e)–(h) (codified at 14 C.F.R. § 25.1419(e)–(h)).

37.     Bombardier also asserts in its Motion for a Preliminary Injunction that I "began assisting MITAC with MRJ certification" by responding to Fukuda-san's questions about the history of the IPS regulations. (*See* ECF No. 146, at 5.) I did not then, nor do I now, regard that response as providing material assistance with MRJ certification. I provided general answers to broad questions that anyone with my experience at any aircraft manufacturer, or regulatory body, would have been able to provide. This kind of high-level information is routinely exchanged in our industry, and I didn't see anything wrong with having this kind of broad, general discussion even before I'd officially departed Bombardier. If I made an incorrect call on that, I would regret it, but this email did not in any event convey any confidential information.

38.     At the time I emailed the draft response email to myself, I had already announced my intention to leave Bombardier. I emailed the draft to my personal email account so that I could respond to Fukuda-san from that personal account, rather than my Bombardier work account.

### 3.     The four other documents contained in Exhibit S

39.     The first document in Exhibit S, on page 2, is an "acknowledgement of receipt" of the version of Bombardier's "Code of Ethics" that was effective February 1, 1991. That almost 30-year-old version of the "Code of Ethics" is not included in Exhibit S. The "acknowledgement of receipt" document in Exhibit S does not contain any information that is proprietary to Bombardier.

40.     The second document in Exhibit S, on page 3, is an email dated July 13, 2016, which I sent from my Bombardier work email account to my personal email account. It attaches a signature page for MITAC's "Employee Proprietary Information, Inventions, Non-Competition and Non-Solicitation Agreement," the third document in Exhibit S, on page 4. I scanned that signature page and sent it to my personal email account so that I could send the

DECLARATION OF KEITH AYRE - 9
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

signature page on to MITAC.  The signature page attached to the July 13 email in Exhibit S does not contain any information that is proprietary to Bombardier.

41. The fourth document in Exhibit S, which starts on page 5, is an email dated July 11, 2016, which I sent from my Bombardier work email account to my personal email account. The body of the email contains MITAC's proposed scope of work for the position for which MITAC wanted to hire me, with my proposed edits to the description of my new job.  In other words, this is a job description that MITAC prepared in the first instance, and which I then edited as I contemplated and negotiated potential employment with MITAC.  It has nothing to do with Bombardier information or activities.  I emailed my edits to the proposed scope of work to my personal email account so that I could send them on to MITAC from that personal account, rather than my Bombardier work account.  The July 11 email in Exhibit S does not contain any information that is proprietary to Bombardier.

**4.    Email dated August 24, 2016, addressed to "Frederic"**

42. Bombardier's Updated Motion for a Preliminary Injunction alleges that on the "same day" that I forwarded the 2013 Transport Canada email to myself (i.e., August 24, 2016), I "forwarded more trade secret information to [my] personal account." (ECF No. 146, at 6.)  For support, Bombardier cites paragraph 79 of its First Amended Complaint.

43. In paragraph 79 of its First Amended Complaint Bombardier alleges:

> [O]n August 24, 2016, two days prior to his last day at Bombardier, Defendant Ayre—using Bombardier equipment and from Bombardier facilities—sent an email addressed to an individual named "Frederic" (who upon information and belief was a MITAC employee or contractor during the relevant time period) disclosing Bombardier confidential and/or trade secret information pertaining to Fire Detection and Extinguishing ("FIDEX") and related System Safety Analysis ("SSA").  On information and belief, Mr. Ayre's disclosures and teachings to "Frederic" in August 2016 led to an improved redesign of the MRJ now subject to certification efforts.

DECLARATION OF KEITH AYRE - 10
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

It is true that in late August 2016 I sent to my personal email account an email that I had previously drafted to a person named Frederic, concerning fire detection and extinguishing and related system safety analysis.  The rest of these accusations are false.

44. Bombardier did not include a copy of this August 24 email as an exhibit to its First Amended Complaint.  My counsel has obtained a copy of the email in question, and I understand that it is being submitted to the Court as an exhibit.

45. The individual named "Frederic" was not "a MITAC employee or contractor," as Bombardier asserts.  He is instead a man named Frederic Deschamps, who worked at Bombardier as a safety engineer until sometime during the summer of 2016.  I believe that Mr. Deschamps technically was not a Bombardier employee, but rather was hired as a contractor.  But he had a Bombardier email address, wore a Bombardier badge, and sat with and worked with Bombardier employees.

46. Frederic Deschamps was responsible for preparing the ATA 26 system safety assessment ("SSA") for the CSeries.  "ATA 26" refers to fire protection, under the standard numbering system for aircraft documentation developed by the Air Transport Association.  The SSA is an assessment on the architecture, design, and installation of an aircraft's systems to ensure that relevant safety requirements are met.  During the SSA process, critical failure conditions and their effects on the aircraft are assessed.  Prior to sending this email to myself, and well before I accepted a job with MITAC, I had raised concerns within Bombardier about the design of the CSeries' fire detection and extinguishing system ("FIDEX") system.

47. The concerns I'd raised, which remained relevant in August 2016 as I was preparing to depart Bombardier, related to the number of connections between different components in the FIDEX system.  That is, I was concerned that there were too many places where a single failure, or a "dormancy," might cause the system to not function as it should.  And this posed a possible safety risk because the FIDEX system controls fire detection and extinguishing.

DECLARATION OF KEITH AYRE - 11
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

48. I had raised this issue with Frederic Deschamps during late 2015 and again in 2016. This email is addressed to Frederic Deschamps because he was the engineer directly responsible for assessing fire safety on the CSeries at the time I initially drafted the email. I cannot remember for certain whether I ultimately sent this particular email to Mr. Deschamps, or whether I sent a similar email. But I do know that I discussed the issue with him, and others at Bombardier.

49. As I noted above, I was asked to identify areas of concern as one topic for my exit meeting with my peers at Bombardier. To prepare for that exit meeting I reviewed my emails to identify issues and tasks that remained pertinent. In doing so I came across the "FIDEX" email, which I had prepared earlier. (I believe that it was during this review that I also came across the 2013 Transport Canada email discussed above.) I copied the "FIDEX" email and sent it to myself to ensure I added this issue to the list of issues I planned to raise at that meeting. Mr. Deschamps had departed, and I was about to depart, and I wanted to ensure this issue was not lost by my departure. I did in fact raise this issue, among others, during that exit meeting, which took place on the afternoon of my last day at Bombardier, August 26, 2018.

50. I have no idea why Bombardier now says it believes that Frederic Deschamps was a MITAC employee or contractor. He was an engineer at Bombardier, and to my knowledge Mr. Deschamps never became and never has been a MITAC employee or contractor, and has not had any association with MITAC.

51. In short, the only reason I wrote the "FIDEX" email and later sent it to myself was to perform my job duties at Bombardier, and everything I did in regard to that email or its subject matter was to perform my job at Bombardier.

52. I have never disclosed this email, or the information it contains, to anyone outside of Bombardier, including to MITAC (although I understand that Bombardier's attorneys have shared the email with MITAC's attorneys).

DECLARATION OF KEITH AYRE - 12
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

53. Not only did I not disclose the August 24 email (or its contents) to anyone at MITAC, I would have had no reason to do so. When I arrived at MITAC, it already had in place a FIDEX system for the MRJ. Furthermore, the MRJ's FIDEX system is different from the CSeries' and does not have the same issues or flaws I identified in the email addressed to Frederic Deschamps.

54. It is untrue that anything in the email to Frederic Deschamps "led to an improved design of the MRJ now subject to certification efforts." I know this because I did not share the email with anyone at MITAC and I made no use of it at MITAC. Furthermore, the FIDEX system discussed in that email has nothing to do with the redesign related to the MRJ's avionics bay, described in Exhibits 26–28 of the Declaration of John D. Denkenberger (ECF No. 143-1; *see also* ECF No. 143 ¶ 79).

**F.     An Injunction Is Not Appropriate and Would Harm My Career**

55. I do not possess any copies (physical or electronic) of any of the eleven documents that are listed in Bombardier's proposed order and I would not use or disclose them in the unlikely event they were to ever come into my possession, except as might be legitimately required as part of this case to defend myself against Bombardier's accusations.

56. Bombardier's proposed injunction order is worded so broadly that it seems to me that even normal day-to-day activities could be mischaracterized as a violation. For example, would it be a violation if I were to discuss a public regulatory provision, a principle of physics, or general engineering knowledge with someone else if that information also was contained in one of the eleven documents? Or what if I discussed with someone information that was derived from any of these regulatory provisions, principles of physics, or general engineering knowledge? Would that violate the order? And how would I even know if I was violating the order given that I have never been provided, and never have read, any of the eleven documents?

DECLARATION OF KEITH AYRE - 13
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

57. If the Court were to enter Bombardier's proposed order, I would worry that I may not be able to continue doing my job at MITAC without running the risk of inadvertently violating that order.

58. Additionally, this case is being followed closely by the industry press, and my colleagues and peers are aware that I have been implicated in it. The entry of an injunction against me would be publicized, and it would cause other engineers and potential employers to believe that I either actually or probably misappropriated trade secrets from a former employer. This would be a stain on my reputation, which I have built over more than 30 years in the industry, and it could damage or destroy any prospect of finding future employment in my field.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this __13__ day of May, 2019, at Nagoya, Japan.

_____
Keith Ayre

DECLARATION OF KEITH AYRE - 14
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 13, 2019 I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 13th day of May, 2019 at Seattle, Washington.

*Gabriella Sanders*
Gabriella Sanders

CERTIFICATE OF SERVICE
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500