The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| BOMBARDIER, INC., <br><br> Plaintiff, <br><br> v. <br><br> MITSUBISHI AIRCRAFT CORPORATION, MITSUBISHI AIRCRAFT CORPORATION AMERICA INC., AEROSPACE TESTING ENGINEERING & CERTIFICATION INC., MICHEL KORWIN-SZYMANOWSKI, LAURUS BASSON, MARC-ANTOINE DELARCHE, CINDY DORNÉVAL, KEITH AYRE, AND JOHN AND/OR JANE DOES 1-88, <br><br> Defendants. | NO.   2:18-cv-01543-JLR <br><br> **DECLARATION OF MARC-ANTOINE DELARCHE** |

I, Marc-Antoine Delarche, declare as follows:

1. I am an aircraft performance engineer with Mitsubishi Aircraft Corporation ("MITAC") in Nagoya, Japan. I am over the age of eighteen and am competent to testify. I make this declaration based on personal knowledge.

**A.    Background**

2. I am a citizen of France and of Canada.

3. I have been employed by MITAC in Nagoya since September 3, 2018.

DECLARATION OF MARC-ANTOINE DELARCHE - 1
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

4. I currently live and work in Nagoya, Japan. I have lived in Nagoya since late August 2018.

5. Before becoming a MITAC employee, I was employed by Aerospace Testing Engineering & Certification ("AeroTEC"). I worked for AeroTEC in Seattle, Washington, from July 2016 through early August 2018.

6. Bombardier asserts in its Updated Motion for a Preliminary Injunction that I "freely transfer[ed]" from AeroTEC to MITAC. (ECF No. 146, at 16.) If this is meant to imply that MITAC and AeroTEC are affiliated companies within which employees can transfer, this is false. I chose to apply for a job at MITAC just like any other job applicant, and MITAC hired me as a new employee. No one at MITAC recruited me from AeroTEC.

7. Before joining AeroTEC, I was employed by Bombardier. I worked for Bombardier for about 11 years, and my last day as a Bombardier employee was May 18, 2016. While I was employed by Bombardier I lived and worked in Quebec, Canada. I never had a non-compete agreement with Bombardier.

8. I chose to apply for a job at AeroTEC. No one from AeroTEC or MITAC contacted me.

9. I gave Bombardier notice of my resignation on May 5, 2016. When I gave my notice, I told Bombardier employees that I was going to work for AeroTEC in Seattle. I worked diligently to transition my work during my notice period. No one at Bombardier raised any concerns about my joining AeroTEC. No one told me that there was certain information or certain documents that I should not access during my notice period. No restriction was placed on the subject matter of my work due to a concern that I was leaving to work for a competitor.

**B.   Connection to Washington**

10. Bombardier alleges that I misappropriated six Bombardier certification reports concerning air data probes on the CSeries, and they allege that I used those reports "in furtherance of MITAC's MRJ certification efforts in [the Western District of Washington] while employed at AeroTEC in [the Western District of Washington] and while working at the

DECLARATION OF MARC-ANTOINE DELARCHE - 2
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

[Seattle Engineering Center] first on behalf of AeroTEC and then later on behalf of MITAC." (ECF No. 143 ¶ 19.)  This is false.

11. I emailed these six documents to myself because, as discussed more fully below (¶¶ 19–45), a Bombardier colleague asked me to review three of them in place of another colleague who was overwhelmed with other work, and the other three were to help me with that task.  I emailed the documents to myself so that I could complete this task along with other things I had to accomplish; I only had time to do this work at home.  I reviewed these reports for Bombardier while working as a Bombardier employee.  I have never reviewed, used, or disclosed any of these documents since leaving Bombardier.

12. Bombardier also alleges that "Defendant Delarche has traveled to [the Western District of Washington] since transferring from [the Western District of Washington] to Japan, and specifically has returned to the [Seattle Engineering Center] in the Western District of Washington on MITAC's behalf, for the purposes of assisting in MRJ certification efforts and used and/or further disclosed without authorization, Bombardier confidential and trade secret information." (ECF No. 143 ¶ 19.)  Again, this is false.

13. Since moving to Nagoya in August 2018, I have not returned to Washington, whether on MITAC business or otherwise.

C.  **The Eleven Documents that Are the Subject of Bombardier's Motion**

14. I have reviewed Bombardier's "[Proposed] Order Granting Bombardier Inc.'s Motion for Preliminary Injunction Against," among others, myself.  (ECF No. 146-1.)

15. I understand that by its motion for a preliminary injunction, Bombardier seeks to enjoin me from "[u]sing, accessing, imitating, copying, disclosing, or making available to any person or entity" eleven documents "and/or any information or data contained therein," or "[u]sing, accessing, imitating, copying, disclosing, or making available to any person or entity any information derived from the information" contained in those eleven documents.  (ECF No. 146-1.)

DECLARATION OF MARC-ANTOINE DELARCHE - 3
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

16. Neither I nor my counsel have been provided with copies of these eleven documents.

17. From those eleven documents' file names, I recognize three documents as the draft CS300 air data certification reports discussed below (items c, d & e, addressed at ¶¶ 23, 24), and I recognize another three documents as the final CS100 air data certification reports discussed below (items f, g & h, addressed at ¶¶ 25, 26).  These six documents are the same six documents referenced in paragraphs 10 and 11 above and discussed in paragraphs 19 through 45 below.

18. Bombardier's proposed order references five other documents.  I do not recognize items a, b, i, and j listed in Bombardier's proposed order.  I do recognize item k, which is a Bombardier Manual that was used in my group at Bombardier.  The only information I have about the other documents is their file names and Bombardier's descriptions of them in its public filings in this case.  Based on the descriptions of the documents in Bombardier's public filings, I do not believe that I now possess or have ever personally possessed any copies (physical or electronic) of any of these five documents (items a, b, i, j & k).  There are no allegations in the Updated Motion for a Preliminary Injunction or in the First Amended Complaint that relate these five documents to me, or that suggest I have any involvement in Bombardier's allegations about these five documents in any way.

D. **The Six Bombardier Certification Reports**

19. Bombardier asserts in its Updated Motion for a Preliminary Injunction that on May 6, 2016, I emailed six Bombardier documents from my Bombardier work email account to my personal email account.  (ECF No 146, at 5.)  These are items c through h in Bombardier's proposed order.

20. The only alleged trade secret information in regard to which Bombardier makes any allegations against me are these six documents.

DECLARATION OF MARC-ANTOINE DELARCHE - 4
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

21. I did email the six PDF documents to myself on May 6, 2016, but this was so I could perform work for Bombardier. Since leaving Bombardier I have never accessed, used, or disclosed those documents or any of their substance.

22. Neither I nor my counsel have been provided copies of those PDF documents, so even as part of this litigation I have not reviewed these documents. I have, however, reviewed the descriptions and file names of those documents in paragraph 69 of the First Amended Complaint, and I have reviewed the emails attached as Exhibits N and O to the First Amended Complaint, and from that review I am confident that I know what these six documents are: certification reports for two different Bombardier aircraft.

23. I believe that the three certification reports that were attached to the email shown in Exhibit N concern the CS300 aircraft. These three CS300 reports were non-final drafts.

24. All three of the CS300 draft reports generally concern "air data": data concerning airspeed, altitude, and angle of attack, which is gathered by probes on the aircraft and processed by a computer or computers on the aircraft. More specifically, the three CS300 draft reports concern calibration of the probes, and each concerns a different subject, as indicated by the reports' file names.

25. I believe that the three certification reports that were attached to the email shown in Exhibit O concerned the CS100 aircraft. To the best of my recollection, the three CS100 reports were copies of the final versions that Bombardier submitted to Transport Canada.

26. The subject of each of the three CS100 reports corresponds to the subject of each of the three CS300 draft reports, as indicated by the reports' file names.

27. Exhibit N shows that on May 6, 2016, I attached the three CS300 draft reports to an email that I forwarded from my Bombardier email to my personal email account.

28. The forwarded email is dated May 3, 2016, and has the subject "Review of CS300 reports". As it indicates, that May 3 email was originally sent to my Bombardier work

DECLARATION OF MARC-ANTOINE DELARCHE - 5
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

1  email address by Charles Armand Tatossian.  Mr. Tatossian was an engineer with whom I
2  worked at Bombardier.  His area of focus was air data, and he had prepared the three CS300
3  draft reports.

4  29.  The body of the May 3 email is in French.  I understand that my counsel is
5  submitting to the Court an English translation of the May 3 email.  I have reviewed that
6  translation against the original French version, and I believe that the English translation is
7  accurate.

8  30.  As the English translation of the May 3 email shows, Mr. Tatossian wrote to me:
9  "In order to lessen Charles' workload, I am going to put you as **Checker** for my CS300 reports.
10 It seems to me that this was the plan from the beginning for your candidacy as future DAD."

11 31.  The "Charles" referred to by Charles Tatossian in the email is a different
12 Charles:  Charles Fichet, who is copied on the May 3 email.  Like Charles Tatossian, Mr.
13 Fichet had specialized knowledge concerning air data.  At this time, Mr. Fichet was a Transport
14 Canada Design Approval Designee ("DAD").

15 32.  A DAD is a person who works for an aircraft manufacturer and to whom
16 Transport Canada has delegated certain responsibilities in connection with the aircraft-
17 certification process.  One of a DAD's delegated responsibilities is to review and, if
18 appropriate, sign the certification report to indicate that it complies with the applicable
19 certification rule(s).

20 33.  In May 2016, I was a "candidate" DAD.  Although a full DAD would need to
21 sign the report as described above, I, or anyone else with sufficient technical knowledge, could
22 "check" the report for accuracy.

23 34.  At this time, Mr. Fichet was overwhelmed with other work.  Mr. Tatossian
24 wrote to me on May 3 to tell me that, in order to address Mr. Fichet's heavy workload, Mr.
25 Tatossian was going to name me on the CS300 draft reports as their "Checker"; that is, as being
26 responsible for checking the three CS300 air data reports.

27

DECLARATION OF MARC-ANTOINE DELARCHE - 6
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

35. Unlike Mr. Tatossian and Mr. Fichet, my specialty was not air data. Although air data is a sub-category of aircraft performance, the group in which I worked, it was not my particular specialty. Normally, a certification report would be reviewed by a DAD with particular expertise in the subject matter of the certification report. But because Mr. Fichet was so busy with other work at this time, I was asked to review the draft reports.

36. This was a task that I needed to take seriously, and probably took more of my time than it would have taken of Mr. Fichet's. Although I was a "candidate" DAD, I did not have the same expertise in air data, and had to ask Mr. Tatossian questions about various parts of the reports and how certain tests were performed in order to gain comfort that the reports were accurate and adequate.

37. In order to complete the task of reviewing the CS300 reports as I had been asked to do, along with all of the other tasks I had to finish, I emailed the reports to my personal email account, in order to review them at home.

38. Bombardier alleges that my sending these documents to myself by email was "unauthorized." While it is true that I did not ask anyone for explicit permission to send these documents to myself by email, I did not believe I was required to. I was doing what was necessary to get my work done. There was no policy I was aware of that forbade emailing Bombardier information to a personal email account in order to work from home. I understood that Bombardier engineers did so from time to time.

39. The discussion above relates to the three draft reports attached to Exhibit N. As I stated above and as shown in Exhibit O, on May 6 I also emailed to my personal email account three final CS100 certification reports on the same subjects as the CS300 draft reports. I did this because having the final CS100 reports, which had been signed-off on by a DAD, on the same subjects, was a helpful reference when I was reviewing and checking the CS300 reports. This is normal practice in checking certification reports on a derivative aircraft model.

40. In short: the reason I emailed to myself the six certification reports attached to Exhibits N and O had nothing to do with my departure from Bombardier or my subsequent

DECLARATION OF MARC-ANTOINE DELARCHE - 7
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

employment at AeroTEC (or MITAC, which wasn't even on my mind at the time).  Instead, I did so to enable me to do work for Bombardier that I had been asked to do.

41. At no time did anyone at Bombardier tell me that I should not review the CS300 draft reports because of my impending departure from Bombardier to work at AeroTEC.

42. I did in fact review the draft CS300 reports as Mr. Tatossian had asked me to do. I am not certain whether or not I ultimately signed the report as its official checker; it is possible there was not enough time before my last day for Mr. Tatossian and I to discuss my proposed adjustments, for Mr. Tatossian to make them, and for me to then re-check the reports and sign them.

43. After I reviewed the draft CS300 reports while still a Bombardier employee, to the best of my recollection I never opened the PDF files containing them again, nor did I ever again open the PDF files containing the CS100 certification reports.

44. I have not opened any of these six certification reports since my departure from Bombardier, nor have I disclosed these reports to anyone outside of Bombardier.  Aside from this declaration (and my discussions with counsel in this case), I have never disclosed anything about these reports' contents to anyone outside of Bombardier, including anyone at AeroTEC, MITAC, or MITAC America.

45. I have never used any of these six certification reports, or their contents or substance, for any purpose since my work as checker for Mr. Tatossian, including in connection with my work on the MRJ whether at AeroTEC or MITAC.

**E.   An Injunction Is Not Called for and Would Harm My Career**

46. I have not read, reviewed or otherwise used the six certification reports (items c through h in Bombardier's proposed order) since May 2016, three years ago when I worked at Bombardier.

47. I have no memory of ever seeing four of the other five documents listed in the proposed order (items a, b, i, & j), and I do not have knowledge of their contents.  As to the fifth, the Bombardier Manual listed as item k, I referenced it as a Bombardier employee, but I

DECLARATION OF MARC-ANTOINE DELARCHE - 8
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

have not reviewed or otherwise used it since leaving Bombardier. I do not possess any copies (physical or electronic) of these five documents (items a, b, i, j & k).

48. Bombardier's proposed injunction order appears to be worded broadly enough that, if the Court enters that proposed order, I could inadvertently violate it by, for example, disclosing to someone at MITAC a regulatory provision, a principle of physics, or general engineering knowledge that may be contained in one of the eleven documents, or disclosing to someone at MITAC information that was derived from any such regulatory provision, principle of physics, or general engineering knowledge.

49. Therefore, if the Court enters Bombardier's proposed order, I worry that I may not be able to continue doing my job at MITAC, or to work elsewhere as an aircraft performance engineer, without running the risk of inadvertently violating that order.

50. In addition, aerospace engineers and employers are closely watching this case, which is getting significant press coverage in our industry. The entry of a preliminary injunction order against me would send the signal that I likely misappropriated trade secrets from a former employer. This would not only stain my reputation in the industry, it could kill my career.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED this 13th day of May, 2019, at Nagoya, Japan.

Marc-Antoine Delarche

DECLARATION OF MARC-ANTOINE DELARCHE - 9
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 13, 2019 I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 13th day of May, 2019 at Seattle, Washington.

*Gabriella Sanders*
Gabriella Sanders

CERTIFICATE OF SERVICE
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500