The Honorable James L. Robart

1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT
9      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

10   BOMBARDIER, INC.,                          NO.    2:18-cv-01543-JLR

11          Plaintiff,

12      v.

13

14   MITSUBISHI AIRCRAFT CORPORATION,           **DECLARATION OF**
     MITSUBISHI AIRCRAFT CORPORATION            **JACOB P. FREEMAN**
15   AMERICA INC., AEROSPACE TESTING
     ENGINEERING & CERTIFICATION INC.,
16   MICHEL KORWIN-SZYMANOWSKI,
     LAURUS BASSON, MARC-ANTOINE
17   DELARCHE, CINDY DORNÉVAL, KEITH
     AYRE, AND JOHN AND/OR JANE DOES
18   1-88,

19          Defendants.

20

21      I, Jacob P. Freeman, declare as follows:

22      1.      I am an associate with the firm Savitt Bruce & Willey LLP, and I am one of the

23   attorneys responsible for the representation of Defendants Keith Ayre and Marc-Antoine

24   Delarche in this matter.  I am competent to testify and make this declaration based on personal

25   knowledge and conversations with Messrs. Ayre and Delarche.

26

27

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

2.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from Bombardier, Inc.'s 2016 financial report, obtained from Bombardier's website: <https://ir.bombardier.com/en/financial-reports/all-reports#>.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from Bombardier, Inc.'s 2018 financial report, obtained from Bombardier's website: <https://ir.bombardier.com/en/financial-reports/all-reports#>.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of an English translation of Exhibit N to Plaintiff Bombardier Inc.'s First Amended Complaint.  The body of the email contained in the original Exhibit N is in French; my office directed a certified translator to translate that email from French to English.  The translator's Certificate of Accuracy is included in Exhibit 3 hereto.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of email correspondence between counsel for Mr. Ayre and Mr. Delarche, and counsel for Bombardier, dated April 2 through April 4, 2019.

6.      Bombardier did not serve the eleven documents that are the subject of its current Updated Motion for Preliminary Injunction on Mr. Ayre and Mr. Delarche when it served its original motion for preliminary injunction, and it indicated that it would do so only if they agreed to be bound by the stipulated protective order negotiated and agreed to by the previously served defendants.  (Ex. 4, at 3.)  Counsel for Mr. Ayre and Mr. Delarche offered to enter into a confidentiality agreement regarding those documents for the purposes of responding to Bombardier's motion, but we declined to agree to a protective order that raised serious concerns.  (*Id*. at 2.)  (The protective order in place raises, e.g., due process concerns for these two individual defendants who themselves would be denied access to evidence that is being used against them under that order.)  Bombardier declined to discuss a separate confidentiality agreement and refused to provide to Mr. Ayre and Mr. Delarche, or their counsel, the eleven documents at issue in its Motion.  (*Id*. at 1.)

DECLARATION OF JACOB P. FREEMAN - 2
No. 2:18-cv-01543-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

7.      In its Motion for Preliminary Injunction against MITAC America and the AeroTEC defendants (ECF No. 4) and its Updated Motion for Preliminary Injunction against those same defendants (ECF No. 145), Bombardier cites Exhibits A through J to the Burns Declaration and Exhibit A to the Tidd Declaration.  However, Bombardier does not cite those exhibits in its Updated Motion for Preliminary Injunction against Mr. Ayre and Mr. Delarche (and MITAC) (ECF No. 146).[1]  Instead, in its Motion against Mr. Ayre and Mr. Delarche, Bombardier cites to, and relies upon, the testimony in the Burns and Tidd declarations that purport to summarize what these documents say.  (*Compare* ECF No. 4, at 5:12–13, *and* ECF No. 145, at 5:1–2 [citing Burns Decl. "¶¶ 3-7 and supporting exhibits A and B thereto"], *with* ECF No. 146, at 4–6 [not citing either Burns Decl. ¶¶ 3–7 or its Exs. A & B]; *compare* ECF No. 4, at 6:1–2, *and* ECF No. 145, at 5:16–17 [citing "Burns Decl., ¶¶ 8-20 and Exs. C-H thereto"], *with* ECF No. 146, at 5:17 [citing "Burns Decl., Dkt. # 5, ¶¶ 8-20" only]; *compare* ECF No. 4, at 6:13–14, *and* ECF No. 145, at 5:26–6:1 [citing Burns Decl. "¶¶ 21-25 and Exs. I-J"], *with* ECF No. 146, at 4–6 [not citing either Burns Decl. ¶¶ 21–25 or its Exs. I & J]; *compare* ECF No. 4, at 6:24–25, *and* ECF No. 145, at 6:8–9 [citing Tidd Decl. "¶¶ 2-7, Ex. A."], *with* ECF No. 146, at 4–6 [not citing either Tidd Decl. ¶¶ 2–7 or its Ex. A]; *compare* ECF No. 4, at 14:26–15:1, *and* ECF No. 145, at 13:16 [citing "Burns Decl., Exs. A-J; Tidd Decl., Ex. A"], *with* ECF No. 146, at 11:20–21 [citing "Burns Decl., Dkt. # 5, ¶¶ 5, 11, 14, and 23; Tidd Decl., Dkt. # 7, ¶ 5"].)

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED this 13th day of May, 2019.

*s/Jacob P. Freeman*
Jacob P. Freeman

---

[1] Bombardier similarly did not cite any of the exhibits to the Burns and Tidd declarations in its original Motion for Preliminary Injunction against Mr. Ayre and Mr. Delarche (and MITAC).  (*See* ECF No. 123, at 4–6, 13).

DECLARATION OF JACOB P. FREEMAN - 3
No. 2:18-cv-01543-JLR

# EXHIBIT 1

# 2016
# FINANCIAL REPORT

FISCAL YEAR ENDED
**DECEMBER 31, 2016**

**BOMBARDIER**

We are the world's leading manufacturer of both planes and trains, operating under four reportable segments: Business Aircraft, Commercial Aircraft, Aerostructures and Engineering Services and Transportation. We are providing more efficient, sustainable and enjoyable transportation solutions. Our products, services, and most of all, our 66,000 dedicated and highly skilled employees are what makes us a global leader in mobility and innovation. As at the date of this report, we have 73 production and engineering sites in 29 countries and a worldwide network of service centres.



### BUSINESS AIRCRAFT

Designs and manufactures industry-leading business jets and offers, when combined, the most comprehensive product portfolio of all business aircraft manufacturers. Business Aircraft also provides world-class aftermarket services for its expertly engineered *Learjet*, *Challenger* and *Global* aircraft with more than 60 service and maintenance facilities around the world.

Revenues[1]
$5.7 billion

Order backlog[2]
$15.4 billion

Employees[3]
9,400



### COMMERCIAL AIRCRAFT

Designs and manufactures a broad portfolio of commercial aircraft in the 60- to 150-seat market segments, including the *Q400* turboprop, the *CRJ700*, *CRJ900* and *CRJ1000* regional jets as well as the only aircraft optimized for the 100- to 150-seat market segment, the *C Series* single-aisle aircraft. Commercial Aircraft provides aftermarket services for these aircraft as well as for the 20- to 59-seat range category.

Revenues[1]
$2.6 billion

Order backlog, in units[1]
436

Employees[3]
5,350



### AEROSTURUCTURES AND ENGINEERING SERVICES

Designs and manufactures complex metallic and advanced composite aircraft structural components for original equipment manufacturers, including fuselages, wings and engine nacelles. It also provides aftermarket component repair and overhaul, as well as other engineering services for both internal and external clients.

Revenues[1]
$1.5 billion

External order backlog[2]
$42 million

Employees[3]
10,000



### TRANSPORTATION

Provides the most comprehensive product range and services offering in the rail industry. Covers the full spectrum of rail solutions, ranging from complete trains to subsystems, services, system integration, signalling and e-mobility solutions.

Revenues[1]
$7.6 billion

Order backlog[2]
$30.1 billion

Employees[3]
37,150

*All amounts in this financial report are in US dollars unless otherwise indicated.*

[1] For fiscal year 2016.   [2] As at December 31, 2016.   [3] As at December 31, 2016, including contractual and inactive employees. Some 4,100 Product Development Engineering, Corporate office and other employees are not allocated to a reportable segment.

# UNLEASHING VALUE
# THROUGH SOLID EXECUTION

**After having successfully de-risked Bombardier in 2016, our focus is shifting to building earnings power and generating stronger free cash flow. All elements are in place to execute our plan and early results clearly show that we are on the right path to achieve our 2020 goals and create sustainable value for our shareholders.**

Dear Shareholders,

Over the past year, we made great progress executing our turnaround plan and setting a strong foundation for the future. From a financial performance perspective, we delivered high quality results, exceeding our commitments. We also de-risked our business by strengthening our balance sheet and achieving our program milestones. And finally, we took the hard actions necessary to put our turnaround plan in full motion and position Bombardier to deliver strong growth in 2017 and beyond.

I am incredibly proud of what the Bombardier team accomplished in 2016 and very excited about the opportunities ahead of us to fully unleash the value of the Bombardier portfolio.

As we look to the future, we see tremendous value creation opportunities across Bombardier. We have four strong franchises that are well positioned in growth markets. Our rail business has one of the broadest and newest product offerings in the industry. We have one of the best business aircraft franchises in the world, and will be introducing new class defining aircraft with the *Global 7000* and *Global 8000* program. Our commercial aircraft business has tremendous growth opportunities with the new *C Series* aircraft family and we have world-class research, design and manufacturing capabilities in our Aerostructures business and Engineering organization.

With the continued disciplined execution of our turnaround plan, we are confident in our ability to unlock Bombardier's full potential and achieve our 2020 goals. We are equally confident in our ability to achieve our long-term vision for

Bombardier, which is to build the most advanced planes and trains in the world; to create value for our customers; to be the market leader in each of our business segments; and to deliver superior value to our shareholders in any market environment.

The milestones achieved by the Bombardier team in 2016 both demonstrate the early benefits of our turnaround plan and highlight the clear path we are on to realize our goals and vision. Among the most notable accomplishments were:

- **Achieving High Quality Financial Results:** We delivered full-year results above our EBIT and free cash flow[1] guidance ranges; we exceeded our margin targets in Transportation, Business Aircraft and Commercial Aircraft; and our year-over-year cash performance has improved by almost $800 million.

- **Successfully De-Risked the Business:** We successfully completed the first and critical de-risking phase of our turnaround plan. By closing the CDPQ and Government of Québec equity investments, extending our credit facilities and refinancing $1.4 billion of senior notes and extending their maturity dates to 2021, we have secured the liquidity necessary to fully execute the final two phases of our turnaround plan: building earnings and cash flow, and starting in 2019, to de-leverage our balance sheet.

[1] Non-GAAP financial measure. Refer to the Non-GAAP financial measures section for a definition of this metric.

- **Delivering Strong Program Execution:** From a program execution perspective, 2016 was a remarkable year. We completed the certification of both *C Series* aircraft models; we greatly improved the quality of our backlog with the Air Canada and Delta contracts; and we successfully placed both *C Series* models into service, with outstanding in-service performance and reliability. The *Global 7000* business jet also achieved its first flight with a high level of maturity demonstrating that the lessons learned from the *C Series* are being fully captured.

- **Placing our Transformation in Full Motion:** Bombardier ended 2016 with our operations transformation in full motion. The actions taken, including launching two major restructuring initiatives to reduce costs and improve efficiencies in our own manufacturing facilities and across our supply chain, have put us on track to deliver a 3% EBIT margin improvement by 2020.[1] We also demonstrated our disciplined approach to working capital management and capital allocation, which will support cash generation well into the future.

With the business stabilized and a clear strategy in place, we begin 2017 with powerful momentum and a clear focus on growing revenues and earnings. Over the next four years, we expect our revenues to grow significantly as we (i) reap the benefits of the large aerospace investments we've made over the past few years, (ii) execute on our $30 billion rail backlog and (iii) capture additional value related to servicing large installed fleets in both our rail and aerospace businesses, which include approximately 7,000 aircraft in service and more than 100,000 train cars in operation. Combining these growth opportunities with our new lower cost structure will allow us to deliver powerful earnings acceleration and strong free cash flow generation.

In closing, 2016 was a year of great progress. Of course, this progress reflects the dedication, hard work and willingness of 66,000 employees around the world to embrace change and support our turnaround plan. On behalf of all our shareholders, I thank our employees for their many contributions and for making our vision possible.

And while we are proud of our progress, we also know that we are still less than half-way through our turnaround plan. We know there is still much more work ahead of us. We fully understand that we need to continue to reduce costs, further leverage our scale, meet our program milestones, accelerate the creation of true centres of excellence and seize all growth opportunities. Simply put, we need to continue to execute our financial plan and meet our customer commitments.

We clearly recognize that our customers have made us leaders in each of our segments. They have choices and how we perform determines whether they will continue to choose us in the future. We are grateful for the confidence and trust they have placed in Bombardier in the past year, and are committed to finding better, faster and more efficient ways to deliver value and support their success in 2017 and in the years ahead.

With respect to our financial targets, we reaffirm, with increased confidence, the goals established when we launched our turnaround plan in the fall of 2015, including growing revenues to $25 billion, EBIT margins of 7-8%, and generating sustainable free cash flows between $750 million and $1 billion by 2020.[1] As we demonstrated with our performance this year, we have the right team, the right strategy and the ability to execute and deliver on these commitments.

Alain Bellemare
President and Chief Executive Officer

---

[1] Please refer to the Guidance and forward-looking statements section in Overview for the forward-looking disclaimer. Also refer to the Strategic priorities section in Overview for the assumptions related to the forward-looking statements.

# BOMBARDIER INC.
# MANAGEMENT'S DISCUSSION AND ANALYSIS
## For the fiscal year ended December 31, 2016

|                                          | PAGE |
|------------------------------------------|------|
| OVERVIEW                                 | 5    |
| BUSINESS AIRCRAFT                        | 40   |
| COMMERCIAL AIRCRAFT                      | 56   |
| AEROSTRUCTURES AND ENGINEERING SERVICES  | 75   |
| TRANSPORTATION                           | 83   |
| OTHER                                    | 100  |

All amounts in this report are expressed in U.S. dollars, and all amounts in the tables are in millions of U.S. dollars, unless otherwise indicated.

This MD&A is the responsibility of management and has been reviewed and approved by the Board of Directors of Bombardier Inc. (the "Corporation" or "Bombardier"). This MD&A has been prepared in accordance with the requirements of the Canadian Securities Administrators. The Board of Directors is responsible for ensuring that we fulfill our responsibilities for financial reporting and is ultimately responsible for reviewing and approving the MD&A. The Board of Directors carries out this responsibility principally through its Audit Committee. The Audit Committee is appointed by the Board of Directors and is comprised entirely of independent and financially literate directors. The Audit Committee reports its findings to the Board of Directors for its consideration when it approves the MD&A and financial statements for issuance to shareholders.

The data presented in this MD&A is structured by reportable segment: Business Aircraft, Commercial Aircraft, Aerostructures and Engineering Services and Transportation, which is reflective of our organizational structure effective as of January 1, 2015.

The results of operations and cash flows for the fourth quarter are not necessarily indicative of the results of operations and cash flows for the full fiscal year.

**IFRS and non-GAAP measures**
This MD&A contains both IFRS and non-GAAP measures. Non-GAAP measures are defined and reconciled to the most comparable IFRS measure (see the Non-GAAP financial measures and Liquidity and capital resources sections in Overview and each reportable segment's Analysis of results section).

**Materiality for disclosures**
We determine whether information is material based on whether we believe a reasonable investor's decision to buy, sell or hold securities of the Corporation would likely be influenced or changed if the information were omitted or misstated.

Certain totals, subtotals and percentages may not agree due to rounding.

The Financial Report for fiscal year 2016 comprises the message from our President and Chief Executive Officer to shareholders, this MD&A and our consolidated financial statements.

The following table shows the abbreviations used in the MD&A and the consolidated financial statements.

| Term | Description | Term | Description |
|------|-------------|------|-------------|
| AFS | Available for sale | GAAP | Generally accepted accounting principles |
| BPS | Basis points | GDP | Gross domestic product |
| CAGR | Compound annual growth rate | HFT | Held for trading |
| CCTD | Cumulative currency translation difference | IAS | International Accounting Standard(s) |
| CDPQ | Caisse de dépôt et placement du Québec | IASB | International Accounting Standards Board |
| CGU | Cash generating unit | IFRIC | International Financial Reporting Interpretation Committee |
| CIS | Commonwealth of Independent States | | |
| CSALP | C Series Aircraft Limited Partnership | IFRS | International Financial Reporting Standard(s) |
| DB | Defined benefit | L&R | Loans and receivables |
| DC | Defined contribution | MD&A | Management's discussion and analysis |
| DDHR | Derivative designated in a hedge relationship | NCI | Non-controlling interests |
| DSU | Deferred share unit | NMF | Information not meaningful |
| EBIT | Earnings (loss) before financing expense, financing income and income taxes | OCI | Other comprehensive income (loss) |
| | | PP&E | Property, plant and equipment |
| EBITDA | Earnings (loss) before financing expense, financing income, income taxes, amortization and impairment charges on PP&E and intangible assets | PSG | Performance security guarantee |
| | | PSU | Performance share unit |
| | | R&D | Research and development |
| EBT | Earnings (loss) before income taxes | RSU | Restricted share unit |
| EIS | Entry-into-service | RVG | Residual value guarantee |
| EPS | Earnings (loss) per share attributable to equity holders of Bombardier Inc. | SG&A | Selling, general and administrative |
| | | U.K. | United Kingdom |
| FTV | Flight test vehicle | U.S. | United States of America |
| FVTP&L | Fair value through profit and loss | | |

# OVERVIEW

| | PAGE |
|---|---|
| **HIGHLIGHTS OF THE YEAR** | **6** |
| Highlights of our results for the fiscal year | |
| Key events | |
| **KEY PERFORMANCE MEASURES AND METRICS** | **8** |
| Key performance measures and associated metrics that we use to monitor our progress on a consolidated basis | |
| Key financial data for the last five years | |
| **STRATEGIC PRIORITIES** | **9** |
| Our roadmap to 2020 | |
| **GUIDANCE AND FORWARD-LOOKING STATEMENTS** | **12** |
| Guidance and disclaimers in connection with our forward-looking statements | |
| **CONSOLIDATED RESULTS OF OPERATIONS** | **14** |
| Our consolidated results for the fourth quarter and fiscal year ended December 31, 2016 | |
| **CONSOLIDATED FINANCIAL POSITION** | **19** |
| Explanations of significant variances in our assets, liabilities and equity | |
| **LIQUIDITY AND CAPITAL RESOURCES** | **20** |
| Our cash flows, available short-term capital resources, expected future liquidity requirements and credit ratings | |
| **CAPITAL STRUCTURE** | **26** |
| Global metrics we use to monitor our capital structure | |
| **RETIREMENT BENEFITS** | **27** |
| Overview of our retirement benefit plans, associated risks and related mitigation strategies as well as key financial data | |
| **RISK MANAGEMENT** | **32** |
| Our key financing and market risks and related mitigation strategies | |
| **NON-GAAP FINANCIAL MEASURES** | **36** |
| Definitions of our non-GAAP financial measures and reconciliations to the most comparable IFRS measures | |

# Workforce

**Total number of employees**

| | As at December 31 | |
|---|---|---|
| | **2016** | 2015 |
| Permanent[(1)] | **4,800** | 4,500 |
| Contractual[(2)] | **550** | 550 |
| | **5,350** | 5,050 |
| Percentage of permanent employees covered by collective agreements | **42%** | 38% |

[(1)] Including inactive employees.
[(2)] Including non-employees and agency outsourced personnel.

The workforce as at December 31, 2016 increased by 300 employees, or 6%, when compared to previous year.

The increase is mainly related to a higher workforce to support the production ramp-up of the *C Series* aircraft program.

However, the increase was partially offset by initial impacts of our October 2016 announcement to take further restructuring actions, including streamlining administrative and non-production functions across the organization, workforce optimization and site specialization, partially offset by strategic hiring to support ramp-up for the *C Series* aircraft program as well as our growth strategy in aftermarket business.

Our incentive-based compensation plan for non-unionized employees across Commercial Aircraft sites rewards the collective efforts of our employees in achieving our objectives using performance indicator targets. A total of 2,800 employees worldwide, or 58% of permanent employees, participate in the program. In 2016, as part of this program, incentive-based compensation was linked to the achievement of targeted results, based on EBIT before special items and free cash flow.

# STRATEGIC PARTNERSHIP

## Government of Québec's investment in the *C Series* aircraft program

On June 30, 2016, we closed the $1.0-billion investment by the Government of Québec (through Investissement Québec) in return for a 49.5% equity stake in a newly-created limited partnership, the C Series Aircraft Limited Partnership (CSALP), to which we have transferred the assets, liabilities and obligations of the *C Series* aircraft program. CSALP is owned 50.5% by Bombardier Inc. and, as a subsidiary of Bombardier, will carry on the operations related to our *C Series* aircraft program. CSALP continues to be consolidated in our financial results.

On June 30 and September 1, 2016, we received the investment in two installments of $500 million each. The proceeds of the investment are being used entirely for cash flow purposes of the *C Series* aircraft program. Under the terms of the limited partnership agreement, we have committed to invest additional capital contributions to CSALP up to a maximum amount of $1.0 billion in case of any liquidity shortfall in CSALP. Additional capital contributions by Bombardier would increase our ownership interest in CSALP.

Also on June 30 and September 1, 2016 we issued, in the name of Investissement Québec, warrants exercisable for a total number of 100,000,000 Class B Subordinate Voting Shares in the capital of Bombardier Inc., exercisable for a period of five years at an exercise price per share equal to $1.72 U.S. dollars, being the equivalent of $2.21 Canadian dollars using the exchange rate at the date of execution of the subscription agreement.

The investment contemplates a continuity undertaking providing that we maintain in the Province of Québec, for a period of 20 years, CSALP's operational, financial and strategic headquarters, manufacturing and engineering activities, policies, practices and investment plans for research and development, in each case in respect of the

design, manufacture and marketing of the *CS100* and *CS300* aircraft and after-sales services for these aircraft and that we will operate the facilities located in Mirabel, Canada for these purposes.

Subject to certain conditions, we have the right to repurchase Investissement Québec's interest in CSALP at fair market value.

# GUIDANCE AND FORWARD-LOOKING STATEMENTS

|  | Latest guidance for 2016 | What we did in 2016 | What's next for 2017[1] |
|---|---|---|---|
| **Growth and deliveries** | Revenues of approximately $2.7 billion.<br><br>Between 85 to 90 deliveries. | Revenues of $2.6 billion.<br><br>86 deliveries. | Revenues of approximately $2.9 billion.<br><br>Between approximately 80 to 85 deliveries. |
| **Profitability[2]** | Negative EBIT before special items[2] of approximately $450 million, mainly due to the dilutive impact of the initial years of production of the *C Series* aircraft program.[3] | Negative EBIT before special items[2] of $417 million. | Negative EBIT before special items[2] of approximately $400 million, mainly due to the dilutive impact of the initial years of production of the *C Series* aircraft program.[3] |

[1] See Forward-looking statements in boxed text below for details regarding the assumptions on which the guidance is based. Also see forward-looking statements disclaimer in Overview.

[2] Profitability guidance is based on EBIT before special items. Refer to the Non-GAAP financial measures section in Overview for a definition of this metric and to the Analysis of results section for a reconciliation to the most comparable IFRS measure for 2016.

[3] Early production units in a new aircraft program require higher costs than units produced later in the program and the selling prices of early units are generally lower.

## *Update on 2016 guidance*

In September 2016, we revised the delivery forecast for the *C Series* aircraft program for 2016, from 15 to 7 aircraft, as a result of engine delivery delays by our supplier Pratt & Whitney. Mainly as a result of this delivery adjustment, we updated Commercial Aircraft delivery guidance for 2016 from approximately 95 deliveries to between 85 to 90 aircraft. Also our free cash flow usage target for the *C Series* aircraft program in 2016 was revised to approximately $1.15 billion and total 2016 Commercial Aircraft revenues were revised from approximately $3.0 billion to approximately $2.7 billion. We delivered 2016 revenues of $2.6 billion on 86 deliveries, in line with our revised 2016 guidance.

In November 2016, following the successful EIS of the *C Series* aircraft program, we increased 2016 Commercial Aircraft profitability guidance from negative EBIT before special items[1] of approximately $550 million to approximately $450 million, based on strong execution while ramping-up production and cost control during the initial months following EIS, supported by the reliability of the *CS100* aircraft in service. For the full year, negative 2016 EBIT before special items[1] of $417 million exceeded our revised guidance as a result of continuing strong execution and cost control as the *CS300* aircraft entered into service.

[1] Profitability guidance is based on EBIT before special items. Refer to the Non-GAAP financial measures section in Overview for a definition of this metric and to the Analysis of results section for a reconciliation to the most comparable IFRS measure for 2016.

# EXHIBIT 2

**BOMBARDIER**

# 2018
# FINANCIAL
## REPORT

**FISCAL YEAR ENDED
DECEMBER 31, 2018**

We are the world's leading manufacturer of both planes and trains, operating under four reportable segments: Business Aircraft, Commercial Aircraft, Aerostructures and Engineering Services and Transportation. We are providing efficient, sustainable and enjoyable transportation solutions. Our products, services, and most of all, our 68,000 dedicated and highly skilled employees are what makes us a global leader in mobility and innovation. As at the date of this report, we have 75 production and engineering sites in 28 countries and a worldwide network of service centers.



### BUSINESS AIRCRAFT

Designs, develops, manufactures, markets and provides aftermarket support for three class-leading families of business jets - *Learjet, Challenger* and *Global.*

Revenues[1]
## $5.0 billion

Order backlog[2]
## $14.3 billion

Employees[3]
## 11,400



### COMMERCIAL AIRCRAFT

Designs, develops and manufactures a broad portfolio of commercial aircraft in the 50- to 100-seat segment, including the *CRJ550, CRJ700, CRJ900* and *CRJ1000* regional jets and the *Q400* turboprop, and participates in a partnership with Airbus on the A220 family aircraft. Commercial Aircraft provides aftermarket services and support for its large installed base.

Revenues[1]
## $1.8 billion

Order backlog, in units[2]
## 97

Employees[3]
## 2,770



### AEROSTRUCTURES AND ENGINEERING SERVICES

Designs, develops and manufactures complex metallic and advanced composite aircraft structural components for original equipment manufacturers, including fuselages, wings and engine nacelles. It also provides aftermarket component repair and overhaul, as well as other engineering services for both internal and external customers.

Revenues[1]
## $2.0 billion

Employees[3]
## 9,190



### TRANSPORTATION

Offers a wide-ranging portfolio of innovative and efficient solutions in the rail industry. Covers the full spectrum of rail solutions, ranging from global mobility solutions to a variety of trains and sub-systems, services, system integration and signalling to meet the market's needs and expectations.

Revenues[1]
## $8.9 billion

Order backlog[2]
## $34.5 billion

Employees[3]
## 40,650

*All amounts in this financial report are in US dollars unless otherwise indicated.*
[1] For fiscal year 2018. [2] As at December 31, 2018. [3] As at December 31, 2018, including contractual and inactive employees. Some 3,900 Product Development Engineering, Corporate office and other employees are not allocated to a reportable segment.

**DRIVING EFFICIENCY THROUGH THE GROWTH CYCLE**

*Three years after the launch of our turnaround plan, Bombardier is a much stronger company. We have a clear path to achieve our 2020 objectives and we see tremendous opportunities beyond that. Together, we are building a company capable of delivering superior financial performance for shareholders, unmatched value for customers and rewarding opportunities for employees.*

Dear Shareholders,

2018 was another year of great progress for Bombardier as we continue to execute our turnaround plan. When we began the year, we had three key priorities: certifying and placing the *Global 7500* aircraft into service; accelerating key rail project deliveries; and finalizing our partnership with Airbus. An aggressive agenda, which we have largely delivered.

With the successful certification and entry-into-service of our *Global 7500* aircraft, we achieved a critical milestone – the completion of our heavy investment cycle and the transition into a strong growth and cash generation phase. This is a major inflection point for Bombardier. With this progress, we are well positioned to achieve our 2020 objectives and to re-claim our place as a leading industrial company.[1]

I am very proud of what our team has accomplished. We have managed to stay the course in the face of numerous unforeseen challenges and are closely tracking with the plan we launched three years ago. This success reflects the commitment of the entire Bombardier team. Around the world, our 68,000 employees have demonstrated exceptional talent in making our vision possible and, on behalf of all our shareholders, I wish to thank them for their dedication.

Because of this great work, we have created a very strong foundation for growth. A foundation that includes a refreshed portfolio of best-in-class products, industry leading backlogs, and a more streamlined cost structure.

From a financial performance perspective, we continue to deliver improving results. Year-over-year earnings before special items[2] grew by 42% in 2018 to over $1.0 billion[3], a five-year high. Margins before special items[2] grew 180 bps year-over-year to 6.3%[3]. Since 2015, EBIT margins before special items[1] have expanded by 330 bps and we have a clear path to reaching our 2020 objective of greater than 8% EBIT margin before special items[2] as we

continue to drive our transformation and efficiencies through the growth cycle.[1]

These efficiencies will come from our newly launched enterprise-wide productivity program; the right-sizing of our engineering organization to reflect the completion of our heavy investment cycle; and new initiatives targeting product cost, indirect goods and services and inventory reduction. Collectively, these efforts will allow us to further lean-out and simplify our operations.

A key objective of our turnaround plan is to position the business to generate strong and sustainable free cash flow[2] and we continue to make solid progress in this area, and we are confident to reach our objective of $750 million to $1.0 billion of free cash flow[2] in 2020. We also begin the year in a strong cash position with $3.2 billion of liquidity, which positions us well to begin the deleveraging phase of our plan.[1]

Across the company, there were many notable accomplishments in 2018. Among them was the completion of our value-creating partnership with Airbus ahead of schedule. The partnership is now fully operational. And, with an order book of more than 500 aircraft, the A220 has firmly established itself as the leading aircraft in its class. The global scale, strong customer relationships and operational experience Airbus brings to the partnership will allow us to realize the full potential of this remarkable aircraft.[1]

In addition to our Airbus partnership, we see tremendous value creation opportunities across our portfolio. We have strong franchises that are well positioned in growth markets. Bombardier's consolidated backlog reached $53.1 billion at the end of 2018. Book-to-bill ratios at our largest segments, Business Aircraft and Transportation, both equaled 1.1, demonstrating strong market demand for our products and services.

Growth in our global rail business continues to be driven by very strong megatrends: urbanization and the increasing demand for more efficient and environmentally friendly public transportation systems. We are well positioned to capture this demand with a refreshed portfolio of rolling stock, signaling and services solutions. In 2018, Bombardier

Transportation increased its output by 20%, grew its backlog to $34.5 billion and improved its mix of service and signaling contracts. Despite some timing issues affecting deliveries on a limited number of projects, Bombardier Transportation has strong growth fundamentals in place and remains on track to become a $10 billion business by 2020.[1]

The on-schedule entry-into-service of the *Global 7500* aircraft was a major accomplishment in 2018. With its unmatched range, speed, comfort and cabin size, the *Global 7500* is setting a new standard in the large business aircraft segment. The aircraft's extended 7,700 nautical mile range – 300 more than our original commitment – is a testament to the tremendous skill of our employees, and its multi-year backlog demonstrates the strong market demand.

Beyond the *Global 7500*, we also strengthened our Business Aircraft franchise with the launch of the *Global 5500* and *Global 6500* aircraft. These aircraft, along with our *Challenger* and *Learjet* families, give Bombardier the best portfolio in the industry. We also continued to expand our aftermarket network in 2018 with the announcement of a new state-of-the art customer service center in southern Florida and the expansion of our worldwide mobile response services. With refreshed product portfolio and renewed aftermarket focus, our Business Aircraft segment is well positioned to achieve its $8.5 billion revenue objective for 2020.[1]

Also poised for growth is our Aerostructures and Engineering Services business segment, with its position as a key supplier for the A220, the A320 and the *Global 7500* programs. The recent acquisition of the *Global 7500* wing program from Triumph further solidifies Bombardier's position as a leading aerostructure manufacturer, while also securing the production ramp-up for the program. In addition to these growth programs, our world-class research, design and manufacturing capabilities position us to capture additional third-party growth opportunities in a strong commercial aerospace market.

In closing, 2018 was a year of solid performance, delivered with a complete commitment to the highest ethical, environmental and safety standards.  As we begin the fourth year of our five-year turnaround plan, we can reaffirm with increased confidence our commitment to deliver on our 2020 objectives. These objectives include growing revenues by approximately $4 billion, to over $20 billion; reaching EBIT margins before special items[1] above 8%; and generating sustainable free cash flows[2] between $750 million and $1.0 billion a year.[1]

We recognize that there is still much more work ahead of us to achieve our goals. This includes addressing our working capital and execution issues at Transportation, as well as navigating an aggressive production ramp-up at Business Aircraft. In addition, we need to continue to reduce costs, fully engage our employees, remain disciplined in our allocation of capital and further leverage our scale.

Our strong performance over the past three years gives us confidence that we have the right team and the right strategy to successfully complete our turnaround plan. We are equally confident in our ability to realize our long-term vision for Bombardier; to build the most advanced planes and trains in the world; to create unmatched value for our customers; to be the market leader in each of our business segments; and to deliver superior value to our shareholders in any market environment.

The entire Bombardier team remains very excited about the opportunities ahead of us and fully committed to unleashing the full value of the Bombardier portfolio.

Alain Bellemare
President and Chief Executive Officer

[1] Forward-looking statement. See the forward-looking statements assumptions on which the guidance is based and forward-looking statements disclaimer in Overview.
[2] Non-GAAP financial measures. Refer to the Non-GAAP financial measures section in Overview for definitions of these metrics and to the  Analysis of results section and Liquidity and capital resources section for reconciliations to the most comparable IFRS measures.
[3] For the fiscal year 2018, EBIT and EBIT margin were $1.0 billion and 6.2%, respectively.

*Table of Contents*

## MANAGEMENT'S DISCUSSION AND ANALYSIS

For the fiscal year ended
December 31, 2018

## 4

## CONSOLIDATED FINANCIAL STATEMENTS

For the fiscal years ended
December 31, 2018 and 2017

## 154

# BOMBARDIER INC.
# MANAGEMENT'S DISCUSSION AND ANALYSIS

For the fiscal year ended
December 31, 2018

## Table of Contents

| OVERVIEW | BUSINESS AIRCRAFT | COMMERCIAL AIRCRAFT | AEROSTRUCTURES AND ENGINEERING SERVICES | TRANSPORTATION | OTHER |
|---|---|---|---|---|---|
| 6 | 52 | 68 | 85 | 94 | 115 |

All amounts in this report are expressed in U.S. dollars, and all amounts in the tables are in millions of U.S. dollars, unless otherwise indicated.

This MD&A is the responsibility of management and has been reviewed and approved by the Board of Directors of Bombardier Inc. (the "Corporation" or "Bombardier"). This MD&A has been prepared in accordance with the requirements of the Canadian Securities Administrators. The Board of Directors is responsible for ensuring that we fulfill our responsibilities for financial reporting and is ultimately responsible for reviewing and approving the MD&A. The Board of Directors carries out this responsibility principally through its Audit Committee. The Audit Committee is appointed by the Board of Directors and is comprised entirely of independent and financially literate directors. The Audit Committee reports its findings to the Board of Directors for its consideration when it approves the MD&A and financial statements for issuance to shareholders.

The data presented in this MD&A is structured by reportable segment: Business Aircraft, Commercial Aircraft, Aerostructures and Engineering Services and Transportation.

**IFRS and non-GAAP measures**
This MD&A contains both IFRS and non-GAAP measures. Non-GAAP measures are defined and reconciled to the most comparable IFRS measure (see the Non-GAAP financial measures and Liquidity and capital resources sections in Overview and each reportable segment's Analysis of results section).

**Materiality for disclosures**
We determine whether information is material based on whether we believe a reasonable investor's decision to buy, sell or hold securities of the Corporation would likely be influenced or changed if the information were omitted or misstated.

Certain totals, subtotals and percentages may not agree due to rounding.

The Financial Report for fiscal year 2018 comprises the message from our President and Chief Executive Officer to shareholders, this MD&A and our consolidated financial statements.

The following table shows the abbreviations used in the MD&A and the consolidated financial statements.

| Term | Description | Term | Description |
|------|-------------|------|-------------|
| AFS | Available for sale | GDP | Gross domestic product |
| bps | Basis points | HFT | Held for trading |
| BT Holdco | Bombardier Transportation (Investment) UK Limited | IAS | International Accounting Standard(s) |
| | | IASB | International Accounting Standards Board |
| CAGR | Compound annual growth rate | IFRIC | International Financial Reporting Interpretation Committee |
| CCTD | Cumulative currency translation difference | | |
| CDPQ | Caisse de dépôt et placement du Québec | IFRS | International Financial Reporting Standard(s) |
| CGU | Cash generating unit | Libor | London Interbank Offered Rate |
| CIS | Commonwealth of Independent States | MD&A | Management's discussion and analysis |
| CSALP | C Series Aircraft Limited Partnership | N/A | Not applicable |
| DB | Defined benefit | NCI | Non-controlling interests |
| DC | Defined contribution | NMF | Information not meaningful |
| DDHR | Derivative designated in a hedge relationship | OCI | Other comprehensive income (loss) |
| DSU | Deferred share unit | PP&E | Property, plant and equipment |
| EBIT | Earnings (loss) before financing expense, financing income and income taxes | PSG | Performance security guarantee |
| | | PSU | Performance share unit |
| EBT | Earnings (loss) before income taxes | R&D | Research and development |
| EIS | Entry-into-service | RSU | Restricted share unit |
| EPS | Earnings (loss) per share attributable to equity holders of Bombardier Inc. | RVG | Residual value guarantee |
| | | SG&A | Selling, general and administrative |
| Euribor | Euro Interbank Offered Rate | U.K. | United Kingdom |
| FVTP&L | Fair value through profit and loss | U.S. | United States of America |
| GAAP | Generally accepted accounting principles | | |

# OVERVIEW

*Table of Contents*

| HIGHLIGHTS OF THE YEAR | KEY PERFORMANCE MEASURES AND METRICS | STRATEGIC PRIORITIES | GUIDANCE AND FORWARD-LOOKING STATEMENTS | CONSOLIDATED RESULTS OF OPERATIONS | CONSOLIDATED FINANCIAL POSITION |
|---|---|---|---|---|---|
| 7 | 9 | 11 | 17 | 21 | 27 |

| LIQUIDITY AND CAPITAL RESOURCES | CAPITAL STRUCTURE | RETIREMENT BENEFITS | RISK MANAGEMENT | NON-GAAP FINANCIAL MEASURES |
|---|---|---|---|---|
| 28 | 35 | 37 | 42 | 48 |

# STRATEGIC PARTNERSHIP

## Airbus acquired a majority stake in the C Series Aircraft Limited Partnership effective July 1, 2018

On July 1, 2018, Airbus SAS (Airbus), a wholly-owned subsidiary of Airbus SE acquired the control of CSALP, the entity that manufactures and sells the C Series aircraft. Under the terms of the transaction Airbus provides procurement, sales and marketing, and customer support expertise to CSALP. Effective July 1, 2018, Airbus owns a 50.01% interest in CSALP. The Corporation and Investissement Québec (IQ) own 33.55% and 16.44% respectively. Subsequent to July 1, 2018, Airbus rebranded the C Series aircraft as A220.

Since the Corporation no longer controls CSALP, the transaction has been accounted as a disposal of CSALP on July 1, 2018 in exchange for an equity interest in CSALP that is accounted for using the equity method of accounting and recorded in the Commercial Aircraft segment. The transaction resulted in a pre-tax accounting charge of $616 million ($552 million after tax) in Special items, see Note 9 - Special items.

**Ownership Structure and Agreement Highlights**

Effective July 1, 2018, Airbus is also responsible to provide (i) sales and marketing support services for the C Series aircraft program, (ii) management of procurement, which includes leading negotiations to improve CSALP level supplier agreements, and (iii) customer support for the C Series aircraft program. CSALP's headquarters and primary assembly line and related functions remain in Mirabel, Québec, with the support of Airbus' global reach and scale. Airbus' global industrial footprint expands with the final assembly line in Canada and additional C Series aircraft production at Airbus' manufacturing site in Alabama, U.S. No cash contribution was made at closing by any of the partners, nor did CSALP assume any financial debt. Due to the early closing of the transaction, the terms of the Corporation's funding plan were updated according to the following schedule: Bombardier will fund the cash shortfalls of CSALP, if required, during the second half of 2018, up to a maximum of $225 million; during 2019, up to a maximum of $350 million; and up to a maximum aggregate amount of $350 million over the following two years, the whole in consideration for non-voting units of CSALP with cumulative annual dividends of 2%. Any excess shortfall during such periods will be shared proportionately amongst the Corporation, Airbus and IQ, but in the latter case, at its discretion. Airbus rebranded the C Series aircraft as A220. As of December 31, 2018, the Corporation invested $225 million in CSALP in exchange for non-voting units of CSALP.

Airbus benefits from a call right in respect of all of Bombardier's interest in CSALP at fair market value, including its non-voting units (which shall for such purposes each have the same fair market value as each participating unit held by Bombardier), exercisable no earlier than 7.5 years following the closing of the transaction, except in certain circumstances such as an adverse change in the control of Bombardier, where the right is then accelerated. Bombardier benefits from a corresponding put right whereby it could require that Airbus acquires its interest at fair market value after the expiry of such 7.5-year period. Airbus also benefits from a call right exercisable any time before the expiry of such 7.5-year period in respect of the non-voting units of CSALP held by Bombardier, for an amount equal to the invested amount plus the cumulative annual preferred return of 2%. IQ's interest is redeemable at fair market value at CSALP's option, under certain conditions, starting on June 30, 2023. IQ also benefits from tag along rights in connection with a sale by Bombardier of its interest in the partnership.

The Board of Directors of CSALP consists of seven directors, four of whom were nominated by Airbus, two of whom were nominated by Bombardier, and one of whom was nominated by IQ. Airbus is entitled to designate the Chairman of CSALP.

Furthermore, upon closing, Bombardier issued warrants to Airbus, exercisable on a one for one basis for a total number of 100,000,000 Class B shares (subordinate voting) at an exercise price per share equal to $1.74, being the U.S. dollar equivalent of CDN $2.29 for a period of five years. The warrants contain market standard adjustment provisions, including in the event of corporate changes, stock splits, non-cash dividends, distributions of rights, options or warrants to all or substantially all shareholders or consolidations.

# EXHIBIT 3



Hello@HelloVerbio.com
www.VerbioGroup.com
USA: +1 855.678.7267 | +1 503.914.1119
12655 SW Center St, Suite 520
Beaverton, OR 97005 USA

## ATTESTATION DE TRADUCTRICE ASSERMENTÉE

Dans ma capacité de traductrice assermentée, je soussignée Virginia Joplin certifie par les présents :
• que je suis prestataire professionnel des services de traduction ;
• que je suis compétente et dument qualifiée pour traduire les documents ci-joints de la langue française vers la langue anglaise ;
o Courriel de Charles Armand Tatossian à Marc-Antoine Delarche le 3 mai 2016 à 16:00

• que ceci est une traduction complète, authentique et exacte au mieux de mes capacités, connaissances et compréhension.

Je n'accepte pas de responsabilité pour le contenu du document original ni pour l'utilisation faite de la traduction de ceci. La présente attestation se rapporte à la traduction originale ci-jointe consistante en **3** page(s) imprimée(s) au moment quand cette traduction a fini d'être sous mon contrôle personnel et n'applique pas aux potentielles modifications introduites à la traduction par d'autres personnes ni par des logiciels.

## TRANSLATOR'S CERTIFICATE OF ACCURACY

In my capacity as a certified translator, I, the undersigned Virginia Joplin, do hereby certify :
• that I am a professional translation services provider;
• that I am competent and qualified to translate the attached documents from the French language into the English language:
o Email from Charles Armand Tatossian to Marc-Antoine Delarche on May 03, 2016 4:00 PM

• That this translation is a complete, true and accurate rendering to the best of my ability, knowledge, and understanding.

I accept no liability for the contents of the original document nor for the use of its translation. This certification applies to the original translation consisting of **3** printed page(s), attached hereto, at the time it left my personal custody and control and does not cover any modifications made thereafter by other persons or software programs.

**Virginia C. Joplin**
**Verbio**
American Translators Association, Active Member 221761
Traductrice assermentée par le Consulat de France à San Francisco
Authorized Translator for the French Consulate in San Francisco



Signature : *Virginia C Joplin*
Date : 01 May 2019
N° de référence / Reference No. : O- 4848

**For the notary:**

State of Oregon
County of Washington
Signed and affirmed before me on 01 May 2019

Notary's Signature: *Amy L. Campbell*
Notary Public - State of Oregon
My commission expires: 11 April 2021

OFFICIAL SEAL
AMY LYNN CAMPBELL
NOTARY PUBLIC - OREGON
COMMISSION NO. 961340
MY COMMISSION EXPIRES APRIL 11, 2021

 **Words in motion**

**Page 1 of 7**

  

# EXHIBIT N



  

| From: | Marc-Antoine Delarche |
|---|---|
| To: | marc_delarche@hotmail.com |
| Subject: | FW: Review of CS300 Reports |
| Date: | Friday, May 06, 2016 11:22:00 AM |
| Attachments: | image001.jpg |
| | RAA-BA503-412 Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf |
| | RAA-BA503-414 Lag Effects in the Production and Experimental Pitot-Static Systems.pdf |
| | RAA-BA503-418 Data Reduction of Ground Position Errors.pdf |
| | image002.png |

**From:** Charles Armand Tatossian
**Sent:** Tuesday, May 03, 2016 4:00 PM
**To:** Marc-Antoine Delarche
**Cc:** Charles Fichet; Jean-Francois Chretien; Mathieu Berthereau; Cedric Kho; Dave Corriveau
**Subject:** Review of CS300 Reports

Hi Marc-Antoine,

In order to lessen Charles' workload, I am going to put you as **Checker** for my CS300 reports. It seems to me that this was the plan from the very beginning for your candidacy as future DAD. With the recent flights from Roswell, I just finished the Ground PE report. Over the next month, I am going to work on the low speed drag report, even if we haven't finished the ice on the CS300.



**Charles A. Tatossian**
Engineering Specialist
Advanced Aerodynamics / CSeries WP7.5 FTCE Technical
charles.armand.tatossian@aero.bombardier.com
Extension: 20155; Cell: (514) 497-3033





?



# EXHIBIT N



| | |
|---|---|
| **From:** | Marc-Antoine Delarche |
| **To:** | marc_delarche@hotmail.com |
| **Subject:** | FW: Review of CS300 Reports |
| **Date:** | Friday, May 06, 2016 11:22:00 AM |
| **Attachments:** | image001.jpg |
| | RAA-BA503-412 Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf |
| | RAA-BA503-414 Lag Effects in the Production and Experimental Pitot-Static Systems.pdf |
| | RAA-BA503-418 Data Reduction of Ground Position Errors.pdf |
| | image002.png |

**From:** Charles Armand Tatossian
**Sent:** Tuesday, May 03, 2016 4:00 PM
**To:** Marc-Antoine Delarche
**Cc:** Charles Fichet; Jean-Francois Chretien; Mathieu Berthereau; Cedric Kho; Dave Corriveau
**Subject:** Review of CS300 Reports

Salut Marc-Antoine,

Pour offloader le workload de Charles, je vais te mettre comme **Checker** pour mes rapports du
CS300. Il me semble que c'était le plan du tout début pour ta candidature de futur DAD. Avec les vols
récents de Roswell, je viens de terminer le rapport des Ground PEs. Durant le mois prochain, je vais
travailler sur le rapport de low speed drag, même si on n'a pas fini le ice sur le CS300.



**Charles A. Tatossian**
Spécialiste en ingénierie
Aérodynamique avancée / CSeries WP7.5 FTCE Technical
charles.armand.tatossian@aero.bombardier.com
Extension: 20155; Cell: (514) 497-3033





# EXHIBIT 4

| | |
|---|---|
| **From:** | Brian McMahon <brian.mcmahon@cojk.com> |
| **Sent:** | Thursday, April 4, 2019 8:47 AM |
| **To:** | Jacob Freeman; James Savitt |
| **Cc:** | John Denkenberger; BMBD-6-3764 |
| **Subject:** | RE: Bombardier v. Mitsubishi et al |

Jacob,

In view of your notice of appearance filed yesterday, you may have 30 additional days as measured from April 9 to respond to the complaint.

Thanks very much,
Brian

Brian F. McMahon
Member
Christensen O'Connor Johnson Kindness PLLC
1201 Third Avenue, Suite 3600
Seattle, Washington 98101
Direct Dial: 206.695.1655

www.cojk.com

PRIVILEGED and CONFIDENTIAL. If you received this e-mail in error, please advise the sender and permanently delete the message, including all attachments, without copying or disclosing the contents. Thank you.

**From:** Brian McMahon
**Sent:** Wednesday, April 03, 2019 1:53 PM
**To:** 'Jacob Freeman'
**Cc:** John Denkenberger; BMBD-6-3764
**Subject:** RE: Bombardier v. Mitsubishi et al

Jacob,

Unfortunately we cannot agree to negotiate a "new side confidentiality agreement that would cover the PI motion papers and its exhibits." We pursued this path with your co-defendants and that course took well over a month. As I mentioned previously, Bombardier does not have the luxury of time in this instance. Further, none of your co-defendants agreed to all terms in the governing Protective Order—we required judicial intervention to address conflicting proposals between the parties, and the Court imposed terms it deemed fair and reasonable. We see no circumstance—and you have identified none—that would render these terms unreasonable for your clients while still fair for all remaining co-defendants. It seems unlikely that you can present a scenario that the Court would not have already foreseen, and we will not delay proceedings further to account for this very remote possibility.

Additionally, your suggestion to work towards a separate Protective Order to apply to your clients is eminently unworkable. Your suggestion would result in the application of two separate protective orders issued by the same Court in the same case for different parties, and Bombardier would have to potentially honor two different protective orders simultaneously. In the alternative, you are inviting a renegotiation by all parties of the governing protective order, which has already been scrutinized and entered by the Court. We cannot indulge such a lengthy, costly, and wasteful proposal.

1

Finally, you are mistaken that we are requiring you and your clients "to make a substantive concession," as we provided you with an express reservation of pertinent rights.  Your conclusory mischaracterizations of our proposals and positions do not justify any further delay of these proceedings.

Regrettably, it appears that we will not be able to reach a compromise on this issue.  And your positions may well force Bombardier to burden an already overburdened Court with two separate motions for preliminary injunction instead of a single consolidated one.

Brian

Brian F. McMahon
Member
Christensen O'Connor Johnson Kindness PLLC
1201 Third Avenue, Suite 3600
Seattle, Washington 98101
Direct Dial: 206.695.1655

www.cojk.com

PRIVILEGED and CONFIDENTIAL. If you received this e-mail in error, please advise the sender and permanently delete the message, including all attachments, without copying or disclosing the contents. Thank you.

**From:** Jacob Freeman [mailto:jfreeman@sbwllp.com]
**Sent:** Wednesday, April 03, 2019 11:29 AM
**To:** Brian McMahon
**Cc:** John Denkenberger; BMBD-6-3764
**Subject:** RE: Bombardier v. Mitsubishi et al

Brian,

As I told you yesterday, we cannot agree to compromise our clients' substantive rights in order to get an extension of time.  This is a complicated case with dozens of filings, and we are not now in a position to fully analyze the potential effects of agreeing to be bound by a stipulated protective order that we did not negotiate, let alone stipulate to.  As I don't need to explain to you, our clients, as individuals, are differently situated from the other defendants, who are either corporate entities or are being represented by counsel who also represents a corporate defendant.  As such, our clients have concerns that may not have addressed by the other defendants.

Moreover, and aside from this legal issue, it is distasteful to be asked to make a substantive concession in order to be accorded a courtesy that parties give each other routinely, as a matter of course.  This is especially true here because, as you know, our clients are halfway around the world and so difficult to communicate with on short notice.

That said, if your concern is that our not immediately agreeing to be bound by the stipulated protective order will delay your filing a motion for a preliminary injunction, we would be willing to moot this concern by negotiating and entering into a side confidentiality agreement that would cover the PI motion papers and its exhibits, and which would be superseded by whatever protective order our clients do stipulate to after we have had a chance to suggest and negotiate appropriate changes.

Please let me know as soon as possible whether you agree to this solution.

JACOB P. FREEMAN | SAVITT BRUCE & WILLEY LLP | 206/749-0500

*Privileged and Confidential*:  Please be advised that this message may contain information that is private and legally privileged.  If you are not the person for whom this message is intended, please delete it and notify me immediately of the error.  Please do not copy or send this message to anyone else.  Thank you for your cooperation.

**From:** Brian McMahon <brian.mcmahon@cojk.com>
**Sent:** Wednesday, April 3, 2019 8:32 AM
**To:** Jacob Freeman <jfreeman@sbwllp.com>
**Cc:** John Denkenberger <john.denkenberger@cojk.com>; BMBD-6-3764 <BMBD-6-3764@cojk.com>
**Subject:** Re: Bombardier v. Mitsubishi et al

Jacob,
In a final effort to reach a compromise without having to burden the court, our client would be willing to give you an additional 30 days to answer or otherwise respond to the complaint if you (1) file your notice of appearance on behalf of both your clients today, and (2) agree on your own behalf as well as that of both your clients to be bound by the protective order currently in place with the caveat that you reserve the right to petition the court to modify any terms you subsequently find problematic.  Please let us know if you find this acceptable.  If so, we believe your first responsive pleading would be due May 7.

Best,
Brian

Sent from my iPhone

On Apr 2, 2019, at 5:24 PM, Brian McMahon <brian.mcmahon@cojk.com> wrote:

Jacob,

I'm sorry you see my email as you do.  Nothing contained therein accuses you of bad faith or compromises your clients' rights.  You have requested a courtesy that will come at potentially significant expense to Bombardier; we are trying to reach a compromise.  Your (mis)characterization of my email and related accusations do nothing to advance the chance of reaching compromise.

You have our position on the matter.  Unless you are willing to acknowledge that your request will prejudice Bombardier to some extent, there is no point to further discussions.

Have a good evening,
Brian

Brian F. McMahon
Member
Christensen O'Connor Johnson Kindness PLLC
1201 Third Avenue, Suite 3600
Seattle, Washington 98101
Direct Dial: 206.695.1655

www.cojk.com
PRIVILEGED and CONFIDENTIAL. If you received this e-mail in error, please advise the sender and permanently delete the message, including all attachments, without copying or disclosing the contents. Thank you.

**From:** Jacob Freeman [mailto:jfreeman@sbwllp.com]
**Sent:** Tuesday, April 02, 2019 4:53 PM
**To:** Brian McMahon

**Cc:** John Denkenberger; BMBD-6-3764
**Subject:** RE: Bombardier v. Mitsubishi et al

Brian,

This is the first you've raised the issue of multiple motions for a preliminary injunction, but that does not change the fact that we need time to evaluate the protective order and the edits we may propose, which you solicited earlier today.  It's disappointing that you've made the extension of a professional courtesy contingent on compromising our clients' rights, implied that my client fled the jurisdiction, and accused me personally of bad faith.

We would agree to appear tomorrow, Wednesday, April 3, but we cannot agree to be bound by the protective order at this time.  Please let me know as soon as possible whether you will grant an extension of time of 30 additional days to respond to the complaint.

Jacob P. Freeman | Savitt Bruce & Willey llp | 206/749-0500

*Privileged and Confidential*:  Please be advised that this message may contain information that is private and legally privileged.  If you are not the person for whom this message is intended, please delete it and notify me immediately of the error.  Please do not copy or send this message to anyone else.  Thank you for your cooperation.

---

**From:** Brian McMahon <brian.mcmahon@cojk.com>
**Sent:** Tuesday, April 2, 2019 4:31 PM
**To:** Jacob Freeman <jfreeman@sbwllp.com>
**Cc:** John Denkenberger <john.denkenberger@cojk.com>; BMBD-6-3764 <BMBD-6-3764@cojk.com>
**Subject:** RE: Bombardier v. Mitsubishi et al

Jacob,

We understand the need for you to familiarize yourself with this case, and we also want to avoid any unnecessary motions practice.  But the lengthy extension that you are seeking, coupled with your reservation of rights to review the protective order and/or assess propriety of service and/or make a notice of appearance will require us to engage in unnecessary motions practice in the form of filing *two additional motions for preliminary injunction* instead of filing one consolidated PI motion against MITAC Japan, Mr. Delarche, and Mr. Ayre (collectively, "the Japanese Defendants").

Bombardier publicly stated in its first preliminary injunction motion of October 19, 2018 that a second preliminary injunction motion would be filed against MITAC Japan and your clients.  It is a matter of record.  The questions we asked you at the outset of this email communication were (1) to determine whether and how much additional delay Bombardier might expect from your request; and (2) to assess whether an injunction against the Japanese Defendants would require a single motion or two separate motions.  Your consistent refusal to provide us with any definitive position on any of the questions we posed forces Bombardier into unnecessary and duplicative motions practice while alleviating the same burden for your clients.  If this is your intent, it is hardly indicative of good faith warranting the professional courtesy you are now seeking.

Further, you may not be aware that your request is not the matter of "ordinary" professional courtesy you reference.  Your request comes at a time when Bombardier has been trying to enjoin your clients and your clients' employers from using highly proprietary trade secret information *for months*.  Your clients have known about this case since the day it was filed, and quite possibly since before its filing— Mr. Delarche was conveniently transferred from AeroTEC in Seattle to MITAC Japan before Bombardier

could serve him with process here in the United States.  We appreciate that this case may be completely new to you, but it most certainly is not new to your clients.

Against this background, we have again conferred with our client concerning your request.  If you are willing to make your notice of appearance by close of business tomorrow, Wednesday, April 3, 2019, and at the same time if your clients agree to be bound by the terms of the Protective Order in this matter, we will agree to an extension of an additional 30 days by which you must answer or otherwise respond to the complaint.  Please let us know if you find these terms acceptable.

Thanks very much,
Brian


Brian F. McMahon
Member
Christensen O'Connor Johnson Kindness PLLC
1201 Third Avenue, Suite 3600
Seattle, Washington 98101
Direct Dial: 206.695.1655

www.cojk.com
PRIVILEGED and CONFIDENTIAL. If you received this e-mail in error, please advise the sender and permanently delete the message, including all attachments, without copying or disclosing the contents. Thank you.

**From:** Jacob Freeman [mailto:jfreeman@sbwllp.com]
**Sent:** Tuesday, April 02, 2019 12:50 PM
**To:** Brian McMahon
**Cc:** John Denkenberger; BMBD-6-3764
**Subject:** RE: Bombardier v. Mitsubishi et al

Brian,

I can't tell from your email below whether I should expect a response to my request for additional time by the end of the day.  Please clarify.

As I believe I made clear during my call with John yesterday, the good cause supporting the request is the complicated nature of the case, both factually and legally, and our need to familiarize ourselves with proceedings that have been ongoing for months and a service package containing numerous and extensive documents, much larger than the usual service package, and to work out issues raised by that package such as your redactions.  I also informed John that I am simultaneously briefing a motion for summary judgment—this arrives in the midst of a challenging period.

We are prepared to file our notice of appearance, plan to do so shortly in any event, and will do so if that is required for us to agree on an extension and avoid unnecessary motion practice.  Otherwise, I have addressed your questions and continue to seek an extension as a matter of ordinary professional courtesy at the outset of a case.  As I've advised, I ask for a response to my request by day's end today, because we must prepare a motion for an extension if you will not agree to one.  If you will not allow us the time I asked for, please advise if there is any extension you will agree to.

JACOB P. FREEMAN | SAVITT BRUCE & WILLEY LLP | 206/749-0500

*Privileged and Confidential*:  Please be advised that this message may contain information that is private and legally privileged.  If you are not the person for whom this message is intended, please delete it and

notify me immediately of the error.  Please do not copy or send this message to anyone else.  Thank you for your cooperation.

---

**From:** Brian McMahon <brian.mcmahon@cojk.com>
**Sent:** Tuesday, April 2, 2019 12:22 PM
**To:** Jacob Freeman <jfreeman@sbwllp.com>
**Cc:** John Denkenberger <john.denkenberger@cojk.com>; BMBD-6-3764 <BMBD-6-3764@cojk.com>
**Subject:** Re: Bombardier v. Mitsubishi et al

Jacob,
John and I are in the same meetings.

To clarify for our conversation with our client, can you explain why you're waiting to file your notice of appearance?  You stated yesterday that absent an agreed-upon extension, you would have to file a motion for an extension of time by this Thursday.  Why give us the "within 21 days" answer when we're considering your request for what is essentially a professional courtesy?  (You've provided us with no good cause for your request, so this truly would be a courtesy.)

Please understand that if your clients had been involved in this matter from its inception in October 2018, the extension of 60 days you're now seeking of course would have been accommodated as it was with the other defendants at that time.  But your reasoning that a 60 day extension now is fair because it was extended back in October ignores the realities surrounding this case.  With FAA recently authorizing its personnel to board MRJ test flights for purposes of expediting certification, any further delay of these proceedings is that much more prejudicial to Bombardier.

I regret that we're currently unavailable for a call, but please appreciate that we are trying to accommodate your request and need additional information to do so.  I have to now return my attention to my current meeting; I apologize in advance for any delay in correspondence this afternoon.

Thanks,
Brian

Sent from my iPhone

On Apr 2, 2019, at 11:34 AM, Jacob Freeman <jfreeman@sbwllp.com> wrote:

Brian,

I'm disappointed you or John can't make time to speak with me.  These issues are usually better discussed in real time rather than through email.  We will file an appearance within 21 days of receipt of the summons.  As I told John yesterday, we are still evaluating the issues in this case, including service and the protective order.  As you know, the packages of documents our clients received were very large, and much has already transpired in this case, so we're still getting up to speed.  That is in large part why we have requested the professional courtesy of additional time to respond to the complaint.

Based on my review of the docket, it appears that both MITAC America and AeroTEC received almost 60 days beyond that allowed by the Rules to respond to the complaint.  If you legitimately believe that granting Mr. Ayre and Mr. Delarche the same additional time will unduly prejudice Bombardier, please let me know how much time you will agree to, as soon as possible.

I'm still available to discuss by phone.

Thanks,
Jacob

JACOB P. FREEMAN | SAVITT BRUCE & WILLEY LLP | 206/749-0500

*Privileged and Confidential*:  Please be advised that this message may contain information that is private and legally privileged.  If you are not the person for whom this message is intended, please delete it and notify me immediately of the error.  Please do not copy or send this message to anyone else.  Thank you for your cooperation.

**From:** Brian McMahon <brian.mcmahon@cojk.com>
**Sent:** Tuesday, April 2, 2019 11:18 AM
**To:** Jacob Freeman <jfreeman@sbwllp.com>
**Cc:** John Denkenberger <john.denkenberger@cojk.com>; BMBD-6-3764 <BMBD-6-3764@cojk.com>
**Subject:** Re: Bombardier v. Mitsubishi et al

Jacob,
Sorry I missed your call.  I'm tied up with other meetings currently and am not sure when I will be available.  Also, a written response will allow for more accurate communication with our client about your positions, and will also keep John in the loop as well.  Thanks for your understanding.

Brian

Sent from my iPhone

On Apr 2, 2019, at 11:09 AM, Jacob Freeman <jfreeman@sbwllp.com> wrote:

> Brian,
>
> I tried calling you in response to your email.  Please give me a call at the number below so we can discuss.  Thanks.
>
>
> JACOB P. FREEMAN | SAVITT BRUCE & WILLEY LLP | 206/749-0500
>
> *Privileged and Confidential*:  Please be advised that this message may contain information that is private and legally privileged.  If you are not the person for whom this message is intended, please delete it and notify me immediately of the error.  Please do not copy or send this message to anyone else.  Thank you for your cooperation.
>
> **From:** Brian McMahon <brian.mcmahon@cojk.com>
> **Sent:** Tuesday, April 2, 2019 10:37 AM
> **To:** Jacob Freeman <jfreeman@sbwllp.com>
> **Cc:** John Denkenberger <john.denkenberger@cojk.com>; BMBD-6-3764 <BMBD-6-3764@cojk.com>
> **Subject:** Bombardier v. Mitsubishi et al

Jacob,

Following up on our call yesterday, John has spoken with our client about your request for an additional 60 days to answer or otherwise respond to the complaint.  Given the unusual posture of the case and that time is of the essence from our perspective, Bombardier would appreciate additional information before making a final decision on your request.  Specifically, they would like to know the following:

1. When are you planning to file your notice of appearance?  Our client is confused that you're asking for accommodations before you're even formally part of the case.
2. Are you still considering contesting the applicability of the protective order to you and your clients?  If so, we should immediately begin discussions to account for any particular concerns you might have.  If not, will you affirmatively represent to the Court that you and your clients will abide by the terms of the order?  I've attached a copy of it for your convenience and review.
3. Will you agree that service was proper, or are you still investigating the issue?  We know of no authority that supports the contention that service through the Central Authority is insufficient.  If you have authority to the contrary, please provide that at your earliest convenience.

Once we have your positions on these issues, we will contact our client immediately and get back to you as soon as possible.

Thanks,
Brian

Brian F. McMahon
Member
Christensen O'Connor Johnson Kindness PLLC
1201 Third Avenue, Suite 3600
Seattle, Washington 98101
Direct Dial: 206.695.1655

www.cojk.com
PRIVILEGED and CONFIDENTIAL. If you received this e-mail in error, please advise the sender and permanently delete the message, including all attachments, without copying or disclosing the contents. Thank you.

1

## **CERTIFICATE OF SERVICE**

2          The undersigned hereby certifies that on May 13, 2019 I electronically filed the

3    foregoing document with the Clerk of Court using the CM/ECF system which will send

4    notification of such filing to all counsel of record.

5          I declare under penalty of perjury under the laws of the United States of America that

6    the foregoing is true and correct.

7          Dated this 13th day of May, 2019 at Seattle, Washington.

8

9    Gabriella Sanders

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500