THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BOMBARDIER INC.,

                    Plaintiff,

v.

MITSUBISHI AIRCRAFT
CORPORATION, MITSUBISHI
AIRCRAFT CORPORATION AMERICA
INC., et al.,

                    Defendants.

No. 2:18-cv-1543 JLR

DEFENDANT MITSUBISHI AIRCRAFT
CORPORATION'S OPPOSITION TO
PLAINTIFF'S UPDATED MOTION FOR
PRELIMINARY INJUNCTION

NOTE ON MOTION CALENDAR:
MAY 17, 2019

ORAL ARGUMENT REQUESTED

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................. 1

II.    FACTS .................................................................................................................... 1

    A.    THERE IS NO EVIDENCE OF MISAPPROPRIATION BY MITAC ............... 1

        1.    The Evidence Is Clear and Unrebutted:  MITAC Has Never Used or Disclosed the Bombardier Documents .................................................... 1

        2.    Bombardier's Core Inferences Are Directly Contrary to the Evidence........................................................................................................ 3

               a.    Bombardier's Aircraft Are Different from the MRJ and Were Certified Before a Different Certifying Body: The Alleged Trade Secret Information Is Not Useful for MRJ Certification ................................................................................... 3

                    (i)    The MRJ Is Differently Designed from Bombardier Aircraft............................................................ 3

                    (ii)    JCAB Is Very Different that Transport Canada.................. 4

               b.    MITAC Has Hired Experienced Aviation Engineers from Across the Industry; It Has Not Targeted Bombardier Employees...................................................................................... 5

               c.    Former Bombardier Employees Have Not Caused Any Sudden Breakthroughs ................................................................ 7

    B.    THIS CASE IS NOT ABOUT TRADE SECRETS ......................................... 8

        1.    The 11 Documents Consist Mainly of Widely Known, Public Information ............................................................................................ 8

        2.    Bombardier Refuses to Specifically Identify Its Claimed Trade Secrets Because the Information Is Public................................................ 8

    C.    THERE IS NO IMMINENT THREAT OF MISAPPROPRIATION ................. 9

        1.    Bombardier's Delay Undercuts any Claim of Irreparable Harm.............. 9

        2.    MITAC Told Bombardier that It Will Not Use or Disclose the 11 Documents ......................................................................................... 10

    D.    Bombardier Has Failed to Show that It Owns the Alleged C-Series Trade Secrets ....................................................................................................... 11

III.    ARGUMENT......................................................................................................... 11

    A.    BOMBARDIER IS UNLIKELY TO SUCCEED ON THE MERITS ................ 11

        1.    There Is No Actual or Threatened Misappropriation............................... 11

               a.    MITAC has not acquired, disclosed or used the alleged trade secrets.................................................................................... 12

               b.    MITAC did not have the requisite knowledge for misappropriation .............................................................................. 13

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) –i

144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**TABLE OF CONTENTS**
(continued)

Page

      c.     The individual employees have not and will not use or disclose any of Bombardier's purported trade secrets ................ 14

    2.     Bombardier Has Failed to Identify Protectable Trade Secrets................ 16

B.    THERE IS NO THREAT OF IRREPARABLE HARM ..................................... 19

C.    THE PUBLIC WOULD BE HARMED BY AN INJUNCTION BECAUSE IT WOULD STIFLE COMPETITION AND IMPEDE AIRLINE SAFETY ................................................................. 21

D.    BOMBARDIER'S PROPOSED INJUNCTION IS IMPROPERLY VAGUE............................................................................. 22

E.    THE BALANCE OF HARDSHIPS FAVORS MITAC ..................................... 23

F.    IF AN INJUNCTION ISSUES, THE BOND SHOULD BE SIGNIFICANT ................................................................. 24

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# TABLE OF AUTHORITIES

Page

**CASES**

*Active Network, Inc. v. Elec. Arts Inc.*,
  No. 10-cv-1158, 2010 WL 3463378 (S.D. Cal. Aug. 31, 2010)............................23

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ........................................................11

*Allied Supply Co., Inc. v. Brown*,
  585 So. 2d 33 (Ala. 1991)........................................................19

*Allora, LLC v. Brownstone, Inc.*,
  No. 1:07CV87, 2007 WL 1246448 (W.D.N.C. Apr. 27, 2007)............................23

*Am. Can Co. v. Mansukhani*,
  742 F.2d 314 (7th Cir. 1984) ........................................................23

*Amazon, Inc. v. Powers*, 2012 WL 6726538 *10
  (W.D Wa. 2012)........................................................22

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
  No. 4:00-CV-70CEJ, 2002 WL 32727076 (E.D. Mo. Feb. 25, 2002)....................19

*Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*,
  No. 16-2671, 2016 WL 4472943 (D. Minn. Aug. 24, 2016)............................19

*Blue Star Land Servs., LLC v. Coleman*,
  No. CIV-17-931-R, 2017 WL 6210901 (W.D. Okla. Dec. 8, 2017) ......................13

*Boeing Co. v. Sierracin Corp.*,
  108 Wash. 2d 38 (1987)........................................................16, 18

*Buffets, Inc. v. Klinke*,
  73 F.3d 965 (9th Cir. 1996) ........................................................19

*Cont'l Grp., Inc. v. Amoco Chem. Co.*,
  614 F.2d 351 (3d Cir. 1980)........................................................21

*Costco Wholesale Corp. v. Hoen*,
  No. C04-360P, 2006 WL 2645183 (W.D. Wash. Sept. 14, 2006)........................20

*Desert Sun Net LLC v. Kepler*,
  No. C06-1041P, 2006 WL 3091170 (W.D. Wash. Oct. 27, 2006)........................13

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – iii
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## TABLE OF AUTHORITIES
### (continued)

Page

*Droeger v. Welsh Sporting Goods Corp.*,
541 F.2d 790 (9th Cir. 1976) ........................................................................................15

*Edifecs Inc. v. Tibco Software Inc.*,
756 F. Supp. 2d 1313 (W.D. Wash. 2010)..............................................................12, 13

*First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*,
155 F. Supp. 2d 194 (M.D. Pa. 2001) ............................................................................20

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .........................................................................................20

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*,
415 U.S. 423 (1974).......................................................................................................22

*Hagen v. Burmeister & Assoc.*,
633 N.W.2d 497 (Minn. 2001)........................................................................................16

*Joshua David Mellberg LLC v. Will*,
96 F. Supp. 3d 953 (D. Ariz. 2015) ...............................................................................13

*Katch, LLC v. Sweetser*,
143 F. Supp. 3d 854 (D. Minn. 2016).............................................................................20

*MAI Sys. Corp. v. Peak Comput., Inc.*,
991 F. 2d 511 (9th Cir. 1993) ........................................................................................16

*Masters Software, Inc. v. Discovery Commc'ns, Inc.*,
725 F. Supp. 2d 1294 (W.D. Wash. 2010) .....................................................................24

*Mazurek v. Armstrong*,
520 U.S. 968 (1997).......................................................................................................14

*Mead Johnson & Co. v. Abbott Labs*,
201 F.3d 883 (7th Cir. 2000) .........................................................................................24

*Memphis Light, Gas & Water Div. v. Craft*,
436 U.S. 1 (1978)...........................................................................................................21

*Modumetal, Inc. v. Xtalic Corp.*,
4 Wash. App. 2d 810, 828 (2018) ..................................................................................12

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – iv
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

4

*Nat'l City Bank, N.A. v. Prime Lending, Inc.*,
    737 F. Supp. 2d 1257 (E.D. Wash. 2010) ........................................................12, 13

5

*Niemi v. Am. Axle Mfg. & Holding, Inc.*,
    No. 269155, 2007 WL 29383 (Mich. Ct. App. Jan. 4, 2007) ...............................19

6

7

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984).............................................................................................17

8

9

*Schmidt v. Lessard*,
    414 U.S. 473 (1974).............................................................................................22

10

*Standard Brands, Inc. v. Zumpe*,
    264 F. Supp. 254 (E.D. La. 1967).........................................................................21

11

12

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ..............................................................................21

13

14

*Tape Head Co., Inc. v. R C A Corp.*,
    452 F.2d 816 (10th Cir. 1971) ..............................................................................21

15

*Thola v. Henschell*,
    164 P.3d 524 (2007).............................................................................................16

16

17

*Union Pac. R.R. Co. v. Mower*,
    219 F. 3d 1069 (9th Cir. 2000) .............................................................................22

18

19

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
    467 U.S. 797 (1984).............................................................................................19

20

*United Transp. Union v. State Bar of Mich.*,
    401 U.S. 576 (1971).............................................................................................21

21

22

*Valeo Intellectual Prop., Inc. v. Data Depth Corp.*,
    368 F. Supp. 2d 1121 (W.D. Wash. 2005).............................................................20

23

24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).....................................................................................11, 14, 21

**STATUTES**

25

26

18 U.S.C. § 1836 *et seq.*.................................................................................11, 12

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – v
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

18 U.S.C. § 1839(3)(A).................................................................................19

4

18 U.S.C. § 1839(3)(B).................................................................................16

5

18 U.S.C. § 1839(5)(A).................................................................................13

6

18 U.S.C. § 1839(5)(B).................................................................................13

7

18 U.S.C. § 1839(A)....................................................................................12

8

18 U.S.C. § 1839(B)....................................................................................12

9

Freedom of Information Act .....................................................................17, 18

10

RCW 19.108.010 *et seq.* ......................................................................... passim

11

**RULES**

12

Fed. R. Civ. P. 4(f)(3)...................................................................................21

13

Fed. R. Civ. P. 65(c)....................................................................................24

14

Fed. R. Civ. P. 65(d)...................................................................................22

15

16

17

18

19

20

21

22

23

24

25

26

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – vi

144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# I.      INTRODUCTION[1]

Bombardier's request for preliminary injunctive relief against Mitsubishi Aircraft Corporation ("MITAC") is meritless at every level and should be denied. No one at MITAC is using or disclosing the 11 documents Bombardier claims are so valuable and secret. Bombardier's theory underlying this motion, and indeed this whole lawsuit, twists innocent events into a vast and improbable conspiracy that is wholly undercut by the facts. MITAC is not using, and it has no desire or need to use, Bombardier's 11 "secret" documents. MITAC is competing fairly, both in developing and certifying the Mitsubishi Regional Jet ("MRJ"), and in hiring the experienced engineers and other employees necessary to accomplish these goals.

Bombardier's motion is a feint. The true point is not to stop MITAC from using the 11 documents. At this point, more than two years after the last of the accused "misappropriaters" left Bombardier, Bombardier knows that MITAC has no intention of using these 11 documents. That would be wildly reckless, even if they were somehow useful (which they are not). The true purpose of this motion is to obtain a public order that Bombardier believes will slow sales of the MRJ and chill its employees from seeking better job opportunities.

# II.      FACTS

## A.      THERE IS NO EVIDENCE OF MISAPPROPRIATION BY MITAC

### 1.      The Evidence Is Clear and Unrebutted:  MITAC Has Not Used or Disclosed the Bombardier Documents

The premise of Bombardier's motion is that MITAC must be stopped from using the 11 "secret" documents supposedly "stolen" by the former employees Bombardier has also sued in this lawsuit. But MITAC has told Bombardier that it does not have and will not use any of the 11

---

[1] Bombardier's "updated" brief is hardly the minor update envisioned by the Court's Order. (Dkt. 144). It is a wholesale rewrite. Declaration of Jerry Riedinger, Ex. A. Arguments are dropped and added in ways unrelated to the Court's Motion to Dismiss Order. So be it. Bombardier's claim for preliminary injunctive relief is just as meritless now as it was before. To the extent Bombardier raises new arguments not previously raised in its October or April briefs, that just confirms that there was never any urgency (and that Bombardier realizes its first motion was deficient and unwarranted). Otherwise, the arguments would have been raised before as the facts have not changed.

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 1
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

documents. But Bombardier still brought this motion, needlessly burdening the Court and significantly adding to the cost of litigation. The reason is plain. Bombardier doesn't truly care about the 11 documents. What it wants is a public injunction from a federal court, no matter how narrow or unnecessary, because it knows that will sow doubt in the marketplace about a significant new competitor.

Each of the individuals accused by Bombardier has now submitted a sworn declaration affirming that they have never used or disclosed any of the 11 "secret" documents since leaving Bombardier. In addition, to confirm that the 11 documents are not in MITAC's possession, MITAC engaged a forensic team to search for them on its servers. Extensive search efforts have not found any of the 11 documents present on the file servers used by MITAC. Declaration of Hajime Kanja ¶¶ 3-4; Declaration of Stephen Porter ¶ 10; Declaration of Duc Nguyen ¶ 2.

The Head of Certification Management Office at MITAC—the person leading the team that is ultimately responsible for obtaining necessary certifications for the MRJ—is unequivocal: "I am not aware of anyone using any Bombardier documents or trade secrets in their work on our certification efforts and I will not allow that to occur under my leadership under any circumstances." Declaration of Andrew Telesca ¶ 4. MITAC employees working on the small subset of systems relevant to the subject matter of the "secret" documents further confirm that they have never seen or used the Bombardier documents in their work, and they have not seen or heard that anyone on their teams has done so. Declaration of Melanie Cabot ¶¶ 6-7; Declaration of Yuichi Matsumoto ¶¶ 10-12; Declaration of Maria Regina Piacesi ¶¶ 9-10; Declaration of Noriuki Hattori ¶¶ 7-9; Declaration of Hiroyuki Morino ¶¶ 7-8.

### 2.    Bombardier's Core Inferences Are Directly Contrary to the Evidence

#### a.    Bombardier's Aircraft Are Different from the MRJ and Were Certified Before a Different Certifying Body: The Alleged Trade Secret Information Is Not Useful for MRJ Certification

A core assumption underlying Bombardier's motion is that specific certification activities or decisions recorded in the 11 documents would be useful for certifying the MRJ. This is wrong

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 2
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1   for two key reasons:  first, the MRJ has a very different design than any Bombardier plane, and

2   second, the certifying body for the MRJ—the Japan Civil Aviation Bureau ("JCAB")—is very

3   different from Transport Canada Civil Aviation ("Transport Canada"), the government agency

4   that certifies Bombardier's planes.

5          **(i)**        **The MRJ Is Differently Designed from Bombardier Aircraft**

6          The MRJ is a "clean sheet" design. A "clean sheet" design is a new design; it is not

7   derivative of a previously certified aircraft. (Dkt. 143 ¶¶ 24, 35). Bombardier misleadingly tries

8   to equate general systems at a high level, but the details of the newly-designed systems in the

9   MRJ are very different. And when it comes to certifying aircraft, details are everything.

10          The 11 "secret" documents relate to two Bombardier aircraft: the C-Series and the Global

11   7000/8000 (a business jet recently renamed the Global 7500).[2] Dr. John Hansman, a professor of

12   Aerospace engineering at MIT, concluded that the "systems in question of the MRJ are

13   sufficiently different from those of the C-Series and Global 7000, such that information relating

14   to the C-Series and Global 7000 systems would not be useful in designing or certifying the MRJ

15   systems." (Dkt. 78 at 4). For instance, the MRJ is designed using a conventional air data system

16   with pneumatic tubes. (*Id.* at 5-6). That design has not significantly changed since 2008. Hattori

17   Decl. ¶3. The C-Series uses a different air data system—one with SmartProbes made by UTC

18   Aerospace Systems. (Dkt. 78 at 6). That SmartProbe-based design is a "fundamentally different

19   air data system architecture." *Id.* Yet six of the 11 "secret" documents (Burns Exhibits C-H) that

20   have supposedly been so helpful in certifying the MRJ relate to the C-Series' SmartProbe

21   system. (*Id.* at 16-18; Dkt. 143 ¶ 69).

22          Similarly, two additional "secret" documents relate to the flap skew detection system

23   ("SDS") of the Global 7500 business jet. (Dkt. 78 at 15-16; Dkt. 143, ¶ 68). But the Global 7500

24   ───────────────

25       [2] Bombardier claims that one of the documents also includes confidential information about Bombardier's

26   CRJ aircraft, (Dkt. 83 at 5), but this is incorrect. Burns Exhibit A does discuss the CRJ's skew detection system
("SDS") as it compares to the SDS of the Global 7500. But Exhibit A does not include CRJ certification data and the
technical and performance information about the CRJ in Exhibit A is already public. (Dkt. 77 at 34-35).

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 3
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

flap SDS is "substantially different in design and operation than the flap SDS in the MRJ." (Dkt. 78 at 9). The design of the MRJ's SDS has not changed since 2010. Matsumoto Decl. ¶ 6. Information relating to how Bombardier certified the very different SDS system on one of its business jets is simply not useful for certifying the SDS in the MRJ.

These are just two examples. But if Bombardier wants the Court to adopt its theory, at the threshold, it must at least offer proof that the relevant subsystems of the MRJ are sufficiently similar in design to the subsystems discussed in the 11 "secret" documents so as to make a certification decision as to one at least somewhat relevant to the other. Bombardier apparently hopes the Court will simply assume that all airplanes are the same. They are not.

### (ii)    JCAB Is Very Different that Transport Canada

The other significant difference that undercuts Bombardier's weak chain of inferences is that the JCAB—the certifying agency for the MRJ—is not the same as Transport Canada—the certifying agency for Bombardier's planes. MITAC is not currently seeking certification from Transport Canada. Telesca Decl. ¶ 14. Bombardier assumes that if something worked before Transport Canada it will work equally well before the JCAB. But this is wrong. Telesca Decl. ¶¶10-13. Because it has not certified a commercial jet in the modern era, the JCAB does not have the same institutional knowledge as other agencies (like Transport Canada or the FAA). *Id.* ¶11. As a result, the JCAB has adopted a "prove it" approach to certification that affords very little weight to decisions made by other certifying agencies. *Id.* ¶ 12. This approach is amplified because the JCAB is being shadowed by the FAA and must prove to the FAA that it independently employs a level of care sufficient to be trusted by the FAA and other certifying agencies. Declaration of Stephen Boyd ("Boyd Decl.") ¶¶ 39-42. Thus, knowledge about precedents from other agencies has not been helpful to MITAC's certification efforts. Telesca Decl. ¶12. As an example, one member of the MRJ team is a former Transport Canada regulator (with significant knowledge about what works at Transport Canada). *Id.* She was placed in charge of developing the certification plan for the MRJ's interior systems, which includes things

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 4
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    like cabin layout, waste water, cargo holds, and oxygen systems. *Id.* Relying on her experience

2    as a former Transport Canada regulator, she put a certification plan together based on what she

3    knew would work if she was trying to certify a plane with Transport Canada. *Id.* But rather than

4    accept this approach, the JCAB repeatedly required her to prove every step of the plan. What

5    MITAC learned from this is that the JCAB does not accept various steps in a certification plan

6    simply because Transport Canada (or another agency) had previously accepted the same test,

7    engineering principle or other approach to certification. *Id.*

8         Thus, even if MITAC **wanted** to rely on the specific experience supposedly contained in

9    the 11 documents—which it does not—any such reliance would be unhelpful because the JCAB

10   would not accept it. There are no shortcuts in certifying the MRJ with the JCAB.

11        **b.      MITAC Has Hired Experienced Aviation Engineers from Across the
                     Industry; It Has Not Targeted Bombardier Employees**

12

13        These are not the only core premises that Bombardier gets wrong. Bombardier suggests

14   that MITAC "targeted" Bombardier's employees to gain access to Bombardier's secrets, and by

15   hiring so many Bombardier employees, MRJ certification is now imminent. This is fanciful to

16   the point of self-delusion. It is true that MITAC hired experienced engineers from other aviation

17   companies, including Bombardier. But Bombardier employees have not been singled out or

18   targeted. Bombardier tries to create that impression with a misleading trick—it tells only **its** part

19   of the story. For example, in discussing Michel Korwin-Szymanowski's recruiting efforts,

20   Bombardier talks about only Montreal and Wichita, where it has locations, while omitting other

21   locations, like the Puget Sound, Fort Worth, Savannah, Mojave, Jupiter and Pax River, where

22   Korwin-Szymanowski also sought experienced aerospace professionals. (Dkt. 65 at 3-4).

23        Similarly, Bombardier repeatedly insinuates that its employees now working on the MRJ

24   were targeted and recruited. But that is untrue about Korwin-Szymanowski, it is untrue about

25   Delarche, it is untrue about Ayre, it is untrue about Laurus Basson, and it is untrue of Cindy

26

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 5
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Dorneval.[3] *Id.* at 3; Delarche Decl., ¶ 6; Ayre Decl., ¶¶ 9-10; (Dkt. 117 at 3); (Dkt. 64 at 3). ***It is, in sum, untrue about every individual Bombardier names in this lawsuit.*** None of the accused "misappropriaters" were targeted or recruited. They left Bombardier for their own reasons and, for each, one reason was that Bombardier was an insecure and often difficult place to work. *Id.*; (Dkt. 72 at 8-9).

It is also untrue that former Bombardier employees are playing a disproportionate role in MITAC's efforts to certify the MRJ. MITAC's certification efforts are led by its Certification Management Office ("CMO"), which is headed by Andrew Telesca, who came to MITAC from Boeing, where he was the Lead Certification Engineer for the 777X Program. Telesca Decl. ¶2. Telesca's certification team is led by 11 managers who joined MITAC from Boeing, Embraer, Airbus, Rolls Royce, Brazil's National Civil Aviation Agency ("ANAC"), and from other companies in the Mitsubishi group. *Id.* ¶7. ***None*** of the eleven managers in the CMO came from Bombardier. *Id.* In fact, of the 59 employees that make up the CMO, ***only one*** previously worked at Bombardier, and that was for only three years of the employee's more than 30-year aerospace career. *Id.* More broadly, MITAC currently has 1,152 engineers who are involved in the design, development, testing or certification of the MRJ. Declaration of Gaku Ozaki ¶6. Only 85 previously worked at Bombardier. *Id.* ¶ 8.[4] Nor is there anything unusually unique or valuable about the work experience of Bombardier employees compared with others MITAC has hired to help certify the MRJ. Telesca Decl. ¶ 6.

c.     **Former Bombardier Employees Have Not Caused Any Sudden Breakthroughs**

The absurdity of the story Bombardier tells about a struggling MITAC that could not find a way to certify the MRJ until it peeked at the "secret" 11 documents (more accurately

---

[3] Cindy Dorneval was good friends with Marc Delarche, who had already joined AeroTEC. She sent him her resume and he gave it to AeroTEC.

[4] More former Embraer engineers work on the MRJ than former Bombardier engineers. Ozaki Decl. ¶ 8.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

characterized as six documents given that five are essentially duplicates)[5] becomes apparent once one steps back and appreciates how much work is required to certify a new commercial airplane. The MRJ will require compliance demonstrations for an estimated 16,700 different aspects of the airplane—that is, individual demonstrations that particular aspects of the plane are safe and comply with the regulations. Telesca Decl. ¶ 9. These 16,700 proofs will be contained in approximately 3,500 different compliance documents that are carefully prepared and presented to the JCAB. *Id.* The breadth, depth, and details involved in certifying an aircraft is staggering. Boyd Decl. ¶¶ 4-14. By comparison, the several subsystems that are the subject of the 11 "secret" documents are each part of one of the 3,500 different compliance documents. *Id.* Bombardier surely knows this. Yet it invites the Court to find that a handful of documents that **might** somehow relate to three or four of 16,700 proofs led to a major breakthrough in the certification process and are poised to save MITAC "hundreds of millions of dollars" and "avoid years of delay." (Dkt. 145 at 19-20). This is just absurd. The 11 documents aren't the "meat and potatoes of new airplane development." (Dkt. 145 at 19). Collectively, they are barely a fleck of salt.

Bombardier relies on a vague and fanciful story because the facts disprove its claim at every turn. For example, in one of the few instances where it does get specific, Bombardier suggests that one of the 11 "secret" documents might have played some role in MITAC's decision to redesign the electrical wiring in the MRJ's avionics bay. (Dkt. 123 at 17). But, none of the 11 "secret" documents have anything to do with electrical wiring in the avionics bay. Declaration of Robert John Hansman Jr. ("Hansman Decl.") ¶¶ 4-6.

---

[5] (Dkt. 5 ¶ 3 ("the exact information provided in Exhibit B can be found" in Exhibit A); *id.* ¶ 9 (exhibits C, D and E "address[] the same topics and systems" as exhibits F, G, and H, respectively, with one set for CS100 and the other for CS300); *id.* ¶ 21 ("Exhibits I and J contain the exact same information")).

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 7
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

**B.     THIS CASE IS NOT ABOUT TRADE SECRETS**

2

**1.     The 11 Documents Consist Mainly of Widely Known, Public Information**

3

Bombardier's conspiracy theory shrinks even further when its so-called "secret

4

documents" are subjected to scrutiny. Most of the information discussed in the 11 "secret"

5

documents is not secret at all. Much of what is known about certifying airplanes is public

6

knowledge and it is so for a reason. As Boyd, who supervised certifications at the FAA, puts it,

7

"a large number of organizations, both in government and in industry, [] actively support the

8

spread of design and certification knowledge" because aircraft manufacturers "all share the same

9

goal of 'zero accidents.'" (Dkt. 77 at 4). Much of the information in the "secret" documents

10

includes "basic physics" found in a variety of textbooks. (Dkt. 78 at 14).

11

Similarly, six of the 11 documents relate to the SmartProbe-based air data system of the

12

C-Series. The SmartProbes used in the C-Series are made by a third-party, UTAS (now known as

13

Collins Aerospace). (Dkt. 78 at 6-8). Those SmartProbes are not unique to the C-Series but have

14

been used in a "diverse range of military and commercial aircraft," such as aircraft manufactured

15

by Boeing, Embraer, and Honda. *Id*. SmartProbe system design, internal operation, and

16

certification knowledge is "widespread and longstanding." *Id.*

17

**2.     Bombardier Refuses to Specifically Identify Its Claimed Trade Secrets
         Because the Information Is Public**

18

Bombardier has decided to obfuscate the lack of trade secrets in the 11 documents by

19

20

broad-brushing its arguments and refusing to specifically identify what it believes constitutes a

21

protectable trade secret. During a motion to seal dispute with MITAC America, Bombardier

22

retreated to the position that the 11 documents include a "compilation of publicly available

23

information." (Dkt. 98 at 4). In granting Bombardier's request to place references to textbooks

24

and government regulations under seal, this Court explained that evaluating the merits of

25

Bombardier's trade secret assertions in the context of a motion to seal would put the cart before

26

the horse. (Dkt. 111 at 14).

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 8
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

But now is the time for proof. On a motion for a preliminary injunction—where Bombardier is seeking a public order enjoining MITAC from doing something it has not done and has no intention of doing—Bombardier must do better. It must show, not merely assert, that it is likely to succeed in proving that the 11 documents contain protectable trade secrets. Doing so would require Bombardier to demonstrate that the textbooks and government regulations it insisted be sealed are not "readily ascertainable" to aerospace engineers (of course, they are). Hansman Decl. ¶¶ 11, 15-24; Boyd Decl. ¶¶ 43-53. It refuses to identify where its alleged trade secrets are hiding amongst all the public information because it knows that the closer one looks, the flimsier its allegations become.

## C.   THERE IS NO IMMINENT THREAT OF MISAPPROPRIATION

### 1.   Bombardier's Delay Undercuts any Claim of Irreparable Harm

The alleged "theft," had it occurred at all, would have happened years ago. Delarche's last day at Bombardier was in May 2016. (Dkt. 143 ¶ 69). Ayre's last day at Bombardier was in August 2016. (*Id.* ¶ 76). There is nothing urgent about Bombardier's claims that justifies a preliminary injunction. If misappropriation has occurred (it has not), then Bombardier can try to prove it during the normal course of litigation.

While Bombardier won't say when it first learned of the alleged misappropriation, the record evidence shows that Bombardier has sat on this for at least two years. Bombardier represented to this Court that it was "concerned" as early as June 2016 "that trade secrets obtained by former Bombardier employees would be transferred to MITAC." (Dkt. 91 at 10). By February 2017, Bombardier had hired outside counsel to raise concerns about former employees using or disclosing unidentified trade secrets during their work on the MRJ. (*Id.*) Bombardier obviously has access to employee emails, since that is basically its evidence. Tying these strings together, knew about the facts underlying its claim no later than early 2017. If Bombardier's true concern was the imminent use of its supposed secrets, it would not have waited 20 months before seeking injunctive relief.

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 9
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Bombardier's new excuse for delay is a March 2018 "Special Condition" in the Federal Register that supposedly alerted it to MITAC's "imminent and continued use" of trade secrets. (Dkt. 145 at 28). Bombardier does not even attempt to explain why this was the sudden trigger, rather than the 2016 and 2017 emails that it primarily relies on. It simply cites to the Special Condition, suggests it has something to do with flap skew and then hopes the Court will look no further. But the "Special Condition" has nothing to do with flap skew or anything else relating to Bombardier's allegations. A "Special Condition" is a requirement that becomes part of the certification basis for an aircraft **when existing regulations** do not "fit" the aircraft's new technology. Boyd Decl. ¶¶ 33-37. Special Conditions are effectively "stop gap" measures that are used until the regulations are updated. *Id.* ¶ 36(b). This particular Special Condition relates to the structural performance requirements for the MRJ. Hansman Decl. ¶ 8. Bombardier claims that the Special Condition implicates the MRJ's flap skew detection system because it references nonlinearity which Bombardier insists includes flap skew. (Dkt. 145 at 28). But that is not true. Hansman Decl. ¶¶ 8-9. The nonlinearities being discussed in the Special Condition have nothing to do with flap skew. *Id.* So, assuming Bombardier is capable of comprehending the meaning of the Special Condition, which it surely is, there is no way this Special Condition could have alerted Bombardier to any supposed misappropriation. This is a manufactured excuse for delay.

### 2.    MITAC Told Bombardier that It Will Not Use or Disclose the 11 Documents

MITAC has never wanted anything to do with the 11 documents and Bombardier knows this. At the start of the litigation, MITAC America told Bombardier this and offered to confirm it with a written agreement. (Dkt. 76, Ex. A). Bombardier was also told that MITAC would do the same. (*See id.*) But Bombardier is not interested in any private confirmation or agreement. It wants a "narrow" but **public** injunction. Bombardier's refusal to be reasonable is inexplicable unless there is an underlying, alternative motive: to obtain the extraordinary relief of a public court order that has the real potential to chill other employees from considering job offers with MITAC and slow or otherwise interfere with the launch of the MRJ because customers might

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 10
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    believe any injunction order will hinder MITAC's ability to deliver MRJs as planned.

2    **D.    BOMBARDIER HAS FAILED TO SHOW THAT IT OWNS THE ALLEGED
3          C-SERIES TRADE SECRETS**

4          Most of the eleven documents in Bombardier's motion relate to the C-Series aircraft. Yet

5    Bombardier no longer owns the C-Series, and thus might no longer have standing to assert

6    misappropriation of C-Series trade secrets. Bombardier sold its C-Series rights to a different

7    organization, the "C Series Aircraft Limited Partnership" ("CSALP") in July of 2018. (Dkt. 76 at

8    9-14). Bombardier now owns only 34% of CSALP. (*Id.*) The majority owner is Airbus, Ltd. (*Id.*)

9    Bombardier did not mention the CSALP sale in either its complaint or motion, and has not

10   demonstrated that it continues to own the alleged C-Series trade secrets.

11                              **III.    ARGUMENT**

12         The Court should deny Bombardier's motion for the "extraordinary remedy" of a

13   preliminary injunction because: (1) Bombardier is unlikely to succeed on the merits;

14   (2) Bombardier faces no irreparable harm; (3) an injunction would expose MITAC to significant

15   hardship; and (4) the public interest would be disserved by an injunction. *See Winter v. Nat. Res.*

16   *Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

17   1127, 1134–35 (9th Cir. 2011). Bombardier's proposed injunction is also impermissibly vague.

18   **A.    BOMBARDIER IS UNLIKELY TO SUCCEED ON THE MERITS**

19         **1.    There Is No Actual or Threatened Misappropriation**

20         Bombardier bases its motion on claims under the federal Defend Trade Secrets Act

21   ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and the Washington Uniform Trade Secrets Act

22   ("WUTSA"), RCW 19.108.010 *et seq.* (Dkt. 143, Counts I and II). Under these statutes, MITAC

23   can be liable only if Bombardier shows that MITAC acquired, used or disclosed Bombardier

24   trade secrets while knowing or having reason to know the trade secrets were acquired by

25   improper means. *See* 18 U.S.C. §§ 1839(A),(B); RCW 19.108.010(2)(a), (b). Bombardier cannot

26   make this showing.

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 11
144129828.3

1

          **a.**      **MITAC has not acquired, disclosed or used the alleged trade secrets**

2        All direct evidence confirms that MITAC has never acquired, disclosed or used the 11

3  documents. All the accused individuals confirm under oath that they have not used or disclosed

4  the 11 "secret" documents since leaving Bombardier. Despite extensive searching, forensic

5  experts have been unable to find the 11 documents on MITAC's servers, and <u>a document review</u>

6  <u>of almost 30,000 documents from the MITAC email folders of ex-Bombardier employees that</u>

7  <u>now work at MITAC (including the individual Defendant's email folders) failed to find a single</u>

8  <u>copy of these 11 documents.</u>  *See* Kanja Decl; Porter Decl. *see also* Nguyen Decl.

9        . MITAC's team leader on the certification effort has never seen anyone using any

10  Bombardier documents or trade secrets in their work and confirms that he will not, under any

11  circumstances, allow this to occur under his leadership. Telesca Decl. ¶ 4. Other MITAC

12  employees working on the MRJ's flap skew detection system, air data system, as well as the

13  MRJ's airplane flight manual and production flight profile, confirm that they have never seen or

14  used the 11 documents in their work, and they have not seen or heard that anyone on their teams

15  has done so. Cabot Decl. ¶¶ 6-7; Matsumoto Decl. ¶¶ 10-12; Piacesi Decl. ¶¶ 9-10; Hattori Decl.

16  ¶¶ 7-9; Morino Decl. ¶¶ 7-8. MITAC specifically instructs new employees not to use any trade

17  secrets they may have acquired from their former employers. (Dkt. 55-1 at Article 7). Against

18  this evidence, Bombardier is highly unlikely to succeed on its misappropriation claims. *See Nat'l*

19  *City Bank, N.A. v. Prime Lending, Inc.*, 737 F. Supp. 2d 1257, 1267 (E.D. Wash. 2010).

20        Lacking evidence, Bombardier shifts to speculation and innuendo. Bombardier appears to

21  rely on the doctrine of "inevitable disclosure," albeit without identifying it as such. (Dkt. 146 at

22  14). Inevitable disclosure substitutes evidence of misappropriation with a presumption "that the

23  defendant's new employment will inevitably lead to reliance on plaintiff's trade secrets." *Edifecs*

24  *Inc. v. Tibco Software Inc.*, 756 F. Supp. 2d 1313, 1318 n.2 (W.D. Wash. 2010). But Washington

25  courts have never endorsed inevitable disclosure, *e.g., Modumetal, Inc. v. Xtalic Corp.*, 4 Wn.

26  App. 2d 810, 828 (2018), and the DTSA rejects it by proscribing any injunctive relief that would

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 12
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   "prevent a person from entering into an employment relationship." 18 U.S.C.

2   § 1836(b)(3)(A)(i)(I). In any case, there is no reason at all to assume that Ayre and Delarche will

3   "inevitably" use the 11 documents in performing their jobs at MITAC.

4        Bombardier's claim also fails to the extent it relies on "threatened" misappropriation.

5   Little Washington law exists on this theory. *See Edifecs*, 756 F. Supp. 2d at 1318. Under

6   comparable California law, "threatened misappropriation means a threat by a defendant to

7   misuse trade secrets, manifested by words or conduct, where the evidence indicates imminent

8   misuse." *Id.* at 1319. Here, the words and conduct show no risk. Just the opposite. The

9   individuals deny any threat, MITAC policies forbid the use of trade secret information and

10  MITAC offered to confirm in writing that there would be no misappropriation. *See Nat'l City*

11  *Bank*, 737 F. Supp. 2d at 1267; (Dkt. 76, Ex. A).

12       In sum, Bombardier has failed to show misappropriation—actual, inevitable or

13  threatened. *See Desert Sun Net LLC v. Kepler*, No. C06-1041P, 2006 WL 3091170, at *8 (W.D.

14  Wash. Oct. 27, 2006) (finding "vague and conclusory" allegations of misappropriation

15  insufficient to show likely success on merits); *see also Nat'l City Bank*, 737 F. Supp. 2d at 1267.

16       **b.**     **MITAC did not have the requisite knowledge for misappropriation**

17       Bombardier is also unlikely to succeed on the merits because there is no evidence that

18  MITAC acquired or used trade secrets *knowing or having reason to know* the trade secrets were

19  improperly acquired. *See* 18 U.S.C. § 1839(5)(A),(B); RCW 19.108.010(2)(a),(b). Bombardier's

20  argument appears to be that coordination between MITAC, MITAC America and AeroTEC is

21  sufficient to impute knowledge to each corporate party that Dornéval or Ayre or Delarche sent

22  Bombardier work to their personal emails during their last weeks, days and months of

23  employment ***and*** that this was somehow wrong—even though each has explained the legitimate

24  reasons for their actions. Not only is this the weakest of inferences, but it is also wrong on how

25  imputed knowledge works. "Liability by association is not enough." *Blue Star Land Servs., LLC*

26  *v. Coleman*, No. CIV-17-931-R, 2017 WL 6210901, at *8 (W.D. Okla. Dec. 8, 2017); *Joshua*

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 13
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

*David Mellberg LLC v. Will*, 96 F. Supp. 3d 953, 982 (D. Ariz. 2015). For at least that reason, Bombardier fails to show it would succeed on the merits simply because the companies are working on the MRJ project together. (*See* Dkt. 146 at 16-17).

Bombardier next resorts to the "no-poach" letters it wrote prior to this lawsuit to evidence MITAC's supposed knowledge. (Dkt. 146 at 17-18). But this Court explained that "none of Bombardier's alleged requests to stop recruitment identified a specific trade secret," making those letters insufficient to impute the requisite knowledge to its readers. (*See* Dkt. 136 at 31).[6] No other evidence suggests that MITAC had the requisite knowledge for Bombardier to succeed.

### c. The individual employees have not and will not use or disclose any of Bombardier's purported trade secrets

Bombardier claims its evidence of the supposedly suspicious MRJ certification timeline shows that the individual defendants disclosed the 11 documents to MITAC. (Dkt. 146 at 14-15). In its April 15, 2019 Order, however, this Court acknowledged that "there are innocent alternative explanations for the facts alleged, namely that design changes and delays are routine when certifying an aircraft and that 'the general skills and experience of the entire MRJ team (not just the former Bombardier employees on that team) advanced the project toward completion.'" (Dkt. 136 at 18). While the Court concluded that Bombardier's allegations are plausible, plausibility is not enough for Bombardier to obtain a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Bombardier must make a clear showing that it is likely to succeed on the merits. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (preliminary injunctive relief requires a clear showing on the burden of persuasion).[7]

Plus, at this point, MITAC has submitted substantial evidence supporting the "innocent

---

[6] This argument is premised on the notion that, *after* Bombardier told MITAC that Delarche and Ayre had emailed themselves Bombardier documents, MITAC knowingly allowed them to use the documents in their work at MITAC. This is not only implausible, but, as each individual has stated under oath, it never happened.

[7] Moreover, Bombardier's argument that none of the first four announced delays "were coupled with an announcement of a redesign to the MRJ" (Dkt. 146 at 15) to suggest a surprising reversal of precedent is contradicted by its own allegations. (*See* Dkt. 143 ¶ 38 ("MITAC began implementing design changes in the MRJ that resulted in multiple significant delays")).

MITAC OPPOSITION TO PLAINTIFF'S UPDATED MOTION FOR PRELIMINARY INJUNCTION (No. 2:18-cv-1543 JLR) – 14

144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

alternative explanation." Most important, each of the accused individuals attest under oath that they have not used the 11 documents in their work for MITAC, and each has explained the legitimate reasons they had for emailing work documents to their personal email. For example, Dornéval emailed documents to her home email ***three months*** before resigning so she could prepare for a flight test the next morning. (Dkt. 64 at 4). Delarche emailed work documents to his home his last week so he could work at night to help an overworked co-worker. Delarche Decl. ¶ 11. Ayre sent himself an old email regarding a Bombardier safety issue to refresh his memory before his exit interview because he wanted to make sure someone was addressing it after he was gone. Ayre Decl. ¶¶42-52. Each is an instance of an employee going above and beyond ***for the benefit of*** Bombardier. And this lawsuit is their reward.

MITAC, for its part, expressly instructs its employees to take care not to use trade secrets from former employers. In the big picture, the sheer breadth and depth of the aircraft certification effort—involving compliance demonstrations for approximately 16,700 different aspects of the MRJ and an estimated 3,500 compliance documents—disproves Bombardier's insinuation that the only explanation for MITAC's ability to certify the MRJ must be the 11 (really six) "secret" documents. Bombardier's employees were not disproportionately recruited, and its former employees are not playing a disproportionate role on the MRJ team (*e.g.*, none of them are on the CMO leadership team). On this record, Bombardier has not come close to showing that the individual defendants have or will use or disclose the 11 documents.[8]

For similar reasons, Bombardier's vicarious liability argument (premised on MITAC employees using the 11 documents) also fails. Bombardier cannot succeed merely by showing

---

[8] Bombardier argues that MITAC employee Fukuda knowingly viewed and used Bombardier trade secret information, relying on an August 18, 2016 email cited in the Amended Complaint. (*See* Dkt. 146 at 17-18 (citing Dkt. 143 ¶ 78)). That email is not one of the 11 documents at issue in this Motion, so it is irrelevant. (*See also* Dkt. 136 at 12, n.3 ("the identified documents are the only trade secrets that Bombardier alleges with sufficient particularity to support a trade secret misappropriation claim.")). In any case, the email does not contain trade secret information; rather, it contains information Bombardier published on the docket, except for a straight copy-and-paste from the Federal Register that it redacted. (*Compare* Dkt. 143-19 at 9 *with* Dkt. 128).

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 15
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

that MITAC employs persons alleged to have committed wrongdoing. *See Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 792-93 (9th Cir. 1976) ("it is generally not appropriate to . . . impute an agent's knowledge of a secret to the principal."). And as discussed, there is no evidence Ayre or Delarche (the only MITAC employees mentioned in the motion) used the alleged trade secrets at MITAC—the evidence shows the opposite. Nor would it make sense for them to do so. Not only does MITAC specifically instruct them not to use trade secrets from other companies, but the "secret" documents relate to certification before Transport Canada, which would not help MITAC's certification efforts before the JCAB. Telesca Decl. ¶¶ 11-13. Again, even if Ayre and Delarche had used the 11 documents (which they did not), Bombardier has provided no evidence that MITAC knew or had reason to know about the alleged misappropriation. *See Thola v. Henschell*, 164 P.3d 524, 532-33 (2007) (denying vicarious liability in part because employer had no knowledge of employee's wrongful misappropriation of former employer's trade secrets); *see also Hagen v. Burmeister & Assoc.*, 633 N.W.2d 497, 505 (Minn. 2001) (denying vicarious liability when employer did not know or have reason to know about employee's misappropriation of former employer's trade secrets and thus employee's misappropriation was not foreseeable).

## 2.    Bombardier Has Failed to Identify Protectable Trade Secrets

Bombardier is further unlikely to succeed because the 11 documents are not "trade secrets." A "trade secret" must be information that:

> derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3)(B); RCW 19.108.010(4)(a) (similar). Bombardier has the burden of proving that the documents contain protectable trade secrets. *See MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F. 2d 511, 522 (9th Cir. 1993); *Boeing Co. v. Sierracin Corp.*, 108 Wash. 2d 38, 49 (1987).

Bombardier's motion should be limited (as it originally was) to purported "trade secrets"

MITAC OPPOSITION TO PLAINTIFF'S UPDATED MOTION FOR PRELIMINARY INJUNCTION (No. 2:18-cv-1543 JLR) – 16

144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

information in the 11 documents related to the "regulatory approval process." (*See* Dkt. 123 at

12).[9] Bombardier has conceded that the entirety of the 11 documents are not a trade secret. (Dkt.

99-4 ¶ 30) (Bombardier agreeing to unseal a schematic from Burns Exhibit A). Although

Bombardier must be contending that only some subset of information in the 11 documents are a

protectable trade secret, Bombardier has so far refused to identify that subset of information. All

we know is that subset of information includes admittedly public information. (Dkt. 98 at 4

(Bombardier referring to its "complication of publicly available information")). To be sure,

Bombardier has not shown that the 11 documents contain *any* non-public information about the

regulatory approval process. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)

("Information that is public knowledge or that is generally known in an industry cannot be a

trade secret."). This is especially so because the regulations are public, the industry standards are

public, information about how to comply with the regulations is public, designs are routinely

disclosed via published patent applications, systems are designed and developed by others, and

documents submitted to the FAA are subject to FOIA requests. Dr. Hansman and Mr. Boyd

reviewed the 11 documents and found no information about the "regulatory approval process"

that is not publicly accessible. (Dkt. 77, ¶ 63; Dkt. 78, ¶¶ 39, 54).

To the extent Bombardier is now contending that the "trade secrets" at issue are really

compilations of public information, MITAC can only guess at what subset of information in the

11 documents Bombardier thinks is a trade secret. One clue is to consider the redactions

Bombardier has requested in connection with prior filings. For example, Bombardier requested

---

[9] The Court has further confirmed that the only trade secrets alleged in the Complaint with sufficient particularity to support a trade secret claim are the 11 documents. (Dkt. 136 at 12, n.3). Consequently, the Court should disregard any Bombardier attempt to suggest that Ayre's August 24, 2016 email contained Bombardier trade secrets. (Dkt. 123 at 6). Further, the August 24, 2016 email is not the subject of the relief requested (*i.e.*, reference to it appears nowhere in Bombardier's proposed order, Dkt. 123-1), making it irrelevant to Bombardier's motion. And, most importantly, Bombardier's claim that the August 24, 2016 email contains trade secrets is unsupported— Bombardier referred to the highly-redacted email (to which neither MITAC nor the Court have an unredacted copy) as "highly confidential" in its Complaint (*see* Dkt. 1 ¶ 66), but the email is a communication with Transport Canada that includes no statements or markings suggesting the content is confidential, and Bombardier does not allege that Transport Canada is under any obligation to maintain the secrecy of the email.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

that references to two "standard undergraduate engineering textbooks" be sealed because, according to Bombardier, those textbooks include information that make up the subset of information that it considers a trade secret. (Dkt. 99-4 ¶ 40; Hansman Decl. ¶¶ 16-17.) Dr. Hansman confirms that he has used these textbooks in teaching undergraduates at MIT (and each is available in the MIT library). *Id.* To be sure, the information in those textbooks is "readily ascertainable" to aerospace engineers. Bombardier further requested that references to certain NASA publications be redacted from the public docket. (Dkt. 98 at 7 (requesting that Exhibits J, K, O, S, and T of the Boyd Declaration be sealed in their entirety)). An aerospace engineer can easily find those documents with a simple Google search. Hansman Decl. ¶¶ 21-22. As such, Bombardier cannot show that any purported compilation is a protectable trade secret, which requires Bombardier to prove that the information is not "readily ascertainable by proper means from some other source, including the product itself." *Boeing Co. v. Sierracin Corp.*, 108 Wash. 2d 38, 49-50 (1987) (quoting RCW 19.108.010(4)(a)).

Even assuming the unknown subset of information in the 11 documents is "secret," Bombardier further failed to show that the supposed "regulatory approval" information derives its value from being secret. The 11 documents discuss particular designs for a small subset of systems that, as discussed above, are differently designed on the MRJ. Bombardier does not explain how its methods of certifying those specific systems would be relevant, let alone helpful. For example, Bombardier's witnesses contend that a reader will know "with greater certainty the quantity and quality of data needed for regulatory approval." (*See, e.g.*, Dkt. 5 ¶¶ 7, 12, 25). But the quantity and quality of data needed to show compliance by a SmartProbe-based pitot-static system does not help certify a conventional system. Moreover, Bombardier does not address how information about the "regulatory approval process" used at Transport Canada is relevant or helpful to efforts to certify the MRJ in front of the JCAB. As discussed in detail above, the JCAB has taken a "prove it" approach that does not place value on precedents from other agencies like Transport Canada.

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 18

144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Finally, Bombardier is unlikely to show that it took reasonable measures to protect the 11 documents. *See* 18 U.S.C. § 1839(3)(A); RCW 19.108.010(4)(b) (a trade secret owner must take reasonable measures to keep information secret). Bombardier, a multi-billion-dollar company with 69,000 employees, neglected to undertake the most basic step to protect its purported trade secrets: entering into confidentiality agreements with its employees who were given access to the allegedly top-secret information. *See Niemi v. Am. Axle Mfg. & Holding, Inc.*, No. 269155, 2007 WL 29383, at *2 (Mich. Ct. App. Jan. 4, 2007) (absence of written confidentiality agreements belied plaintiff's claim that it undertook "reasonable efforts"); *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, No. 4:00-CV-70CEJ, 2002 WL 32727076, at *4 (E.D. Mo. Feb. 25, 2002) (absence of written confidentiality agreement is an "important factor to consider in determining whether reasonable steps were taken"). Bombardier employees regularly sent confidential materials to their personal email accounts to work at home and could do so under the Bombardier "Code." (Dkt. 1-13 at 18); *see, e.g.*, *Buffets, Inc. v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996) (evidence that employees were allowed to take purported trade secret materials home undercut reasonableness of security measures); *Allied Supply Co., Inc. v. Brown*, 585 So. 2d 33, 36 (Ala. 1991) (same).

## B.     THERE IS NO THREAT OF IRREPARABLE HARM

Despite the lack of evidence showing MITAC acquired or used the purported trade secrets, Bombardier's only alleged harm is the potential "revival of the Japanese aircraft manufacturing industry." (Dkt. 146 at 20). This argument is speculation and sensationalism. *See Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*, No. 16-2671, 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) ("remote and speculative" claims of competitive harm insufficient to demonstrate irreparable harm).  Certifying the MRJ will require compliance demonstrations for an estimated 16,700 different aspects of the airplane and approximately 3,500 different compliance documents. Telesca Decl. ¶ 9.[10] Bombardier's suggestion that 11 documents (again,

---

[10] *See also United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 805 n.7 (1984) (it would not be uncommon to submit "300,000 engineering drawings and changes, 2,000

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 19

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

really six) are somehow the key to the revival of a nation's aircraft industry can't be made with a straight face. Plus, this is not a race to the finish line; Bombardier has already achieved type certification for both the C-Series and Global 7000 aircraft. (Dkt. 76, Exs. E, F).

Bombardier's real complaint is that it will have to compete with the MRJ. That is not irreparable harm; it is a normal part of a market economy. *See Costco Wholesale Corp. v. Hoen*, No. C04-360P, 2006 WL 2645183, at *5 (W.D. Wash. Sept. 14, 2006) ("[T]he mere existence of competition is not irreparable harm, in the absence of substantiation of severe economic impact.") (citation omitted). And if Bombardier is arguing it might lose sales, in the farfetched scenario where a jury would find that the 11 documents really were the key to kingdom, that injury could be remedied with money damages, precluding a preliminary injunction. *See Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 874 (D. Minn. 2016) ("Normally, lost profits and lost business can be readily calculated and redressed through monetary relief.") (quotation omitted).

More glaring is that the alleged misappropriation occurred two to three years ago. (Dkt. 146 at 15). Bombardier's only explanation is that it waited to bring suit until it discovered evidence "indicating imminent and continued use of Bombardier trade secrets." (Dkt. 146 at 21). Bombardier supplies no supporting facts. And its "Special Condition" excuse is unavailing. *See, supra*. Bombardier could have asserted its theory of "threatened disclosure" years ago. Even if the 11 documents were in MITAC's possession (they are not), any alleged harm that might occur would have happened long ago. *See First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 235-36 (M.D. Pa. 2001) ("A preliminary injunction is not a vehicle through which a plaintiff can seek correction of past wrongs."). Bombardier's delay fatally undercuts its argument that it will be irreparably harmed absent a preliminary injunction. *See Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (district court did not abuse discretion by finding that plaintiff's delay in seeking injunctive relief undercut claim of irreparable harm); *Valeo*

---

engineering reports, and 200 other reports" during the certification process); (Dkt. 143 ¶ 29 (Bombardier referring to the "innumerable applicable federal regulations" that must be satisfied for certification)).

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 20
144129828.3

1    *Intellectual Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005)

2    (finding delay in seeking injunctive relief belies claim of irreparable harm).

3           In addition, Bombardier's own actions caused much of the delay in filing the present

4    motion for a preliminary injunction. Bombardier could have filed a lawsuit in Japan. It could also

5    have tried to file a lawsuit in Canada. It chose to do neither and instead filed a lawsuit in Seattle

6    against a Japanese company, knowing of the potential delay that strategy might create in getting

7    jurisdiction. Bombardier also could have asked the Court for an order under Federal Rule of

8    Civil Procedure 4(f)(3) allowing service on MITAC America or MITAC's attorneys. It did not

9    do so. It instead pursued the much slower Hague process.

10   **C.    THE PUBLIC WOULD BE HARMED BY AN INJUNCTION BECAUSE IT
           WOULD STIFLE COMPETITION AND IMPEDE AIRLINE SAFETY**

11

12          Bombardier must show that an injunction is in the public interest. *See Winter*, 555 U.S. at

13   9. Where an injunction would adversely affect a public interest, even temporarily, the Court may

14   withhold preliminary relief, even if the postponement may burden the plaintiff. *See Stormans,*

     *Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).
15

16          The evidence shows that the 11 documents do not contain trade secrets and have not been

17   misused. The public interest is not served by an unnecessary injunction. Injunctions should not

18   issue where they serve only "to restrain one from doing what he is not attempting and does not

19   intend to do" or to allay the fears of a plaintiff. *Cont'l Grp., Inc. v. Amoco Chem. Co.*, 614 F.2d

20   351, 358-59 (3d Cir. 1980) (quoting *Standard Brands, Inc. v. Zumpe*, 264 F. Supp. 254, 267-68

21   (E.D. La. 1967)); *see also Tape Head Co., Inc. v. R C A Corp.*, 452 F.2d 816 (10th Cir. 1971).

     Bombardier has failed to show that MITAC will engage in the conduct sought to be proscribed.
22
     *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 8 (1978); *United Transp. Union v.*
23
     *State Bar of Mich.*, 401 U.S. 576, 584 (1971). A preliminary injunction would serve no purpose.
24

25          Instead, the public interest favors promoting competition to produce safe and modern

26   passenger aircraft. Bombardier seeks to impede the mobility of engineers with certification

---

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

experience and lock up their collective wisdom and skill for its sole benefit. An injunction would send a chilling message to aerospace engineers, making it harder to attract and train certification talent, thereby making it harder for anyone (other than Bombardier) to achieve certification. Granting an injunction in this case would effectively endorse Bombardier's unlawful strategy of seeking to prevent its employees having highly coveted experience from ever leaving its employ. *See Amazon, Inc v. Powers*, 2012 WL 6726538, at *10 (W.D. Wa. 2012) (ruling that a company may not "eliminate skilled employees from future competition by the simple expedient of hiring them").

## D.   BOMBARDIER'S PROPOSED INJUNCTION IS IMPROPERLY VAGUE

Injunction language must avoid ambiguity as to what conduct is restrained. Federal Rule of Civil Procedure 65(d) requires that "[e]very order granting an injunction" must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). Those provisions are "no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Rather, Rule 65(d) "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders. . . . " *Id.* The "one basic principle" built into Rule 65(d) is that "those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits." *Union Pac. R.R. Co. v. Mower*, 219 F. 3d 1069, 1077 (9th Cir. 2000) (citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 444 (1974)).

The proposed order would enjoin anyone at MITAC from using any information ***in*** any of the 11 documents and from using any information "***derived from***" any information ***in*** any of the 11 documents. (Dkt. 146-1 ¶¶ 1-2). This would be unworkable because, as even Bombardier concedes, the 11 documents are replete with public information, public regulations, and basic physics. (Dkt. 5 ¶ 15 ("[A]dmittedly some information contained in these documents [] would be known or readily ascertainable by those with experience in the field . . . ."); *see also* Dkt. 78 ¶¶ 13-19; Dkt. 77 ¶¶ 30-48)). In its proposed order, Bombardier has not identified the subset of

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 22
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   allegedly "secret" information in the 11 documents—it covers all information in all 11

2   documents. The proposed injunction thus tries to cover "using" public information simply

3   because it is contained within one, or derived from information contained within, any of the 11

4   documents. *See Am. Can Co. v. Mansukhani*, 742 F.2d 314, 333 (7th Cir. 1984) (contempt

5   proceedings inappropriate means of clarifying vague injunction).

6         MITAC's concern is real. Bombardier previously asked this Court to seal citations to

7   entire undergraduate textbooks. MITAC thus has real concerns that Bombardier will seek to

8   misuse any injunction to tie up MITAC with litigation seeking spurious findings of contempt for

9   normal engineering and certification activity. It highlights how surreal Bombardier's request is

10  that this even needs to be said, but MITAC engineers must be able to rely on basic physics and

11  standard engineering textbooks without running the risk of fighting a contempt order.

12  **E.    THE BALANCE OF HARDSHIPS FAVORS MITAC**

13        The balance of hardships strongly weighs against an injunction. Both the C-Series and the

14  Global 7000 aircraft have already achieved type certification. (Dkt. 76, Exs. E, F). Plus,

15  Bombardier has transferred the C-Series aircraft to a new company, (*id.*, Ex. B), lessening or

16  eliminating any harm to Bombardier. Granting an injunction would likely chill other Bombardier

17  employees from seeking new employment and thus help with Bombardier's employee retention

18  problems, but that is an improper end and should not be considered in the balance of hardships.

19        By contrast, even a narrow and essentially meaningless injunction could prove

20  devastating to MITAC. MITAC suspects that is exactly what Bombardier is angling for and why

21  it insists on forcing this Court to adjudicate an issue that could easily have been handled out of

22  court. The adverse publicity from even a narrow injunction could slow MRJ sales if customers

23  thought, even mistakenly, that the injunction could impede MITAC's ability to timely deliver

24  aircraft. *See Active Network, Inc. v. Elec. Arts Inc.*, No. 10-cv-1158, 2010 WL 3463378, at *6

25  (S.D. Cal. Aug. 31, 2010) (finding balance of equities weighed against injunction where

26  defendant faced loss of unrecoverable sales potential); *Allora, LLC v. Brownstone, Inc.*, No.

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 23
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1:07CV87, 2007 WL 1246448, at *7 (W.D.N.C. Apr. 27, 2007) (finding balance of hardships favored defendants, who faced "massive damage" to their "reputations and financial stability" that was "much more obvious and immediate than harm" alleged by plaintiff).

**F.      IF AN INJUNCTION ISSUES, THE BOND SHOULD BE SIGNIFICANT**

If the Court enters a preliminary injunction, it should require Bombardier to post a significant bond to account for the resulting risk of lost MRJ sales. *See* Fed. R. Civ. P. 65(c); *Masters Software, Inc. v. Discovery Commc'ns, Inc.*, 725 F. Supp. 2d 1294, 1308-09 (W.D. Wash. 2010) (bond amount must take into account "the potential financial ramifications of entering a preliminary injunction") (internal quotation marks omitted); *Mead Johnson & Co. v. Abbott Labs*, 201 F.3d 883, 888 (7th Cir. 2000) (in setting bond amount, courts "should err on the high side").

Bombardier estimates the market for regional jets of the MRJ's size (60 to 100 passengers) to be $240 billion between 2017 and 2036. (Dkt. 76, Ex. D at 6). That amounts to $12 billion per year. Loss of just 10% of those sales for two years would eliminate $240 million in revenue. The Court should require Bombardier to post a bond of at least $240 million.

*      *      *

For the reasons stated herein, MITAC respectfully requests that the Court deny Bombardier's updated motion for a preliminary injunction in full.

RESPECTFULLY SUBMITTED this 13th day of May, 2019.

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 24
144129828.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*s/Jerry A. Riedinger*
Jerry A. Riedinger, WSBA No. 25828
Mack H. Shultz, WSBA No. 27190
Mary Z. Gaston, WSBA No. 27258
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
E-mail: JRiedinger@perkinscoie.com
E-mail: MShultz@perkinscoie.com
E-mail: MGaston@perkinscoie.com

Attorneys for Defendant Mitsubishi Aircraft
Corporation America Inc.

MITAC OPPOSITION TO PLAINTIFF'S UPDATED
MOTION FOR PRELIMINARY INJUNCTION
(No. 2:18-cv-1543 JLR) – 25
144129828.3

1

**CERTIFICATE OF SERVICE**

2          I certify under penalty of perjury that on May 13, 2019, I electronically filed the

3  foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of

4  such filing to the email addresses indicated on the Court's Electronic Mail Notice List.

5          DATED this 13th day of May, 2019.

6                                                    *s/Mary Z. Gaston*
                                                     Mary Z. Gaston, WSBA No. 27258
7                                                    **Perkins Coie LLP**
                                                     1201 Third Avenue, Suite 4900
8                                                    Seattle, WA 98101-3099
                                                     Telephone: 206.359.8000
                                                     Facsimile: 206.359.9000
9                                                    E-mail: mgaston@perkinscoie.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE
(No. 2:18-cv-1543 JLR) – 1

144129828.3