THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BOMBARDIER INC., | No. 2:18-cv-1543-JLR |
| Plaintiff, | DECLARATION OF ANDREW TELESCA IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION |
| v. | |
| MITSUBISHI AIRCRAFT CORPORATION, MITSUBISHI AIRCRAFT CORPORATION AMERICA, INC., et al., | |
| Defendants. | FILED UNDER SEAL |

I, ANDREW TELESCA declare:

1.      I am the Head of Certification Management Office for Mitsubishi Aircraft Corporation ("MITAC"). I am over the age of 18 and competent to testify and I make this declaration based on my personal knowledge.

2.      My job is to lead the team that is ultimately responsible for obtaining the necessary certifications for the Mitsubishi Regional Jet ("MRJ"). I joined MITAC in Nagoya, Japan in January 2017. Before that, I worked 10 years for The Boeing Company in Everett, Washington. In my last position at Boeing, I was the Lead Certification Engineer for the 777X Program. Here at MITAC, I am the person ultimately responsible for representing to the certifying agencies that the MRJ is safe and meets all applicable aviation regulations.

DECLARATION OF ANDREW TELESCA –
1

3.      I have a basic understanding of the allegations Bombardier is making in this lawsuit and can speak directly to some of its assertions.

4.      I am not aware of anyone using any Bombardier documents or trade secrets in their work on our certification efforts and I will not allow that to occur under my leadership under any circumstances.

5.      I can speak to some of the assumptions underlying Bombardier's core claims, particularly as they relate to the Certification Management Office. (Others at MITAC can speak to the broader organization.) Specifically, there is no truth whatsoever to the allegation that my group has been specially targeting Bombardier employees in order to obtain Bombardier's trade secrets relating to airplane certification. Nor is it true in any respect that as a result of hiring former Bombardier employees MITAC's certification "prospects look suddenly promising." This is wrong on so many levels.

6.      First, my certification team is not singling out Bombardier employees in our recruiting. To the contrary, we are hiring aerospace engineers with experience in airplane certification from all over the world. We have hired from Boeing, Airbus, Embraer, NASA, British Aerospace, and dozens of smaller aerospace companies. We have also hired certification specialists from the leading regulatory agencies, including the United States Federal Aviation Administration ("FAA"), the European Union Aviation Safety Agency ("EASA"), Brazil's National Civil Aviation Agency ("ANAC") and Transport Canada Civil Aviation ("TCCA"). There are, in sum, many dozens of companies and agencies around the world where aerospace engineers can gain meaningful skills and experience in airplane certification and we have hired from these many different sources rather than targeting any one company or agency. Nor is there anything unusually unique or valuable about the work experience of Bombardier employees compared with the other employees we have hired to help certify the MRJ. In my group, it is demonstrably untrue that former Bombardier employees have been disproportionately hired. Nor have former Bombardier employees disproportionately contributed to our certification efforts.

DECLARATION OF ANDREW TELESCA –
2

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

144165756.2

7.     To illustrate, I have eleven managers (team leaders and above) who report to me and help lead our certification efforts. Not one came from Bombardier. My group leaders came from Embraer, Airbus, Rolls Royce, ANAC, and other Mitsubishi Heavy Industries group companies. I came from Boeing. More broadly, there are fifty-nine employees in my organization. Only one previously worked at Bombardier, and that was for only three years of the employee's more than 30-year aerospace career.

8.     I understand that Bombardier's claims center around approximately 11 documents that Bombardier alleges contains specific information about Bombardier's work to certify Bombardier's C-Series and other planes. I have read the Burns and Tidd Declarations that refer to these 11 documents, but I have not reviewed those documents and their contents have not been shared with me. Based on my reading of the Burns and Tidd Declarations, I understand that some of the 11 documents concern the certification of systems relating to flap skew detection, the pitot static system, the air data system, and flight performance data. I will assume for the purposes of this declaration that the documents do contain specific information relating to how Bombardier certified certain aspects of these systems for its aircraft.

9.     It is important initially to understand how Bombardier's allegations fit within the scope of certifying an airplane. I estimate that the MRJ will require compliance demonstrations for approximately 16,700 different aspects of the airplane—that is, individual demonstrations that particular aspects of the plane are safe and comply with an applicable regulation. These 16,700 proofs will be contained in approximately 3,500 different compliance documents that are carefully prepared and presented to the JCAB. Thus, the 11 documents Bombardier identifies in its papers would relate to only the tiniest fraction of our overall efforts even if we did want to use them, which we do not. To put this in another perspective, the three systems the Bombardier documents relate to—the skew detection system, the pitot static system and the air data system—are accounted for in just a handful of the approximately 250 pages of the System Description Document for the Flight Control System ("FCS") used to describe the design for certification.

DECLARATION OF ANDREW TELESCA –
3

144165756.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  Certification of the FCS, in turn, is one of 58 different certification plans capturing the overall

2  compliance work necessary for the MRJ.  In other words, even if the 11 documents completely

3  addressed certification of the skew detection, pitot static and air data systems, which I'm sure they

4  do not, the three sub-systems represented by the Bombardier documents together comprise only a

5  fraction of 1% of the total certification universe.

6        10.    I understand that Bombardier claims that the 11 documents were used to "fast-

7  track MRJ certification."  This is false.  To the best of my knowledge, none of the 11 Bombardier

8  documents have ever been in MITAC's possession and I am aware of nothing that would suggest

9  any of them were used to help with the certification efforts of the MRJ.  Not only is the allegation

10  factually unfounded, but the underlying premise is wrong.  Bombardier's argument assumes that

11  if something worked previously with the TCCA (or the FAA or any other certifying agency) then

12  that same approach will also work with the JCAB.  However, this premise has repeatedly proven

13  untrue in the case of the MRJ.

14        11.    I believe that one of the main reasons for this is that the MRJ is the first

15  commercial airplane the modern JCAB has attempted to certify.  As a result, each compliance

16  review is novel to the inspector, resulting in a lack of common assumptions and understanding

17  between the regulator and the applicant. In my experience working with other agencies, they

18  would often accept precedent and what we refer to as "engineering judgment" to support that

19  particular aspects of a plane's design meet compliance requirements.  That is not the case with the

20  JCAB.  This is especially true when dealing with what we refer to as non-prescriptive regulations.

21  By way of background, airplane safety regulations can be broken into two general categories:

22  prescriptive regulations and non-prescriptive regulations.  A prescriptive regulation might require

23  that the width of an aisle be greater than 15 inches, for example.  A non-prescriptive regulation,

24  by contrast, might require that a particular airplane part perform its "intended function" or have

25  behavior that is "predictable and unambiguous."  Non-prescriptive regulations have proved the

26  most challenging as this is the area where the JCAB is the least likely to accept the types of

DECLARATION OF ANDREW TELESCA –
4

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

144165756.2

1    precedent and "engineering judgment" that are generally accepted by other agencies. Thus,

2    knowing that a particular approach to certification worked previously with another agency isn't

3    particularly helpful to our efforts. Almost to an extreme, the JCAB operates under a "prove it"

4    approach. On some occasions they have even required that we demonstrate that an existing FAA

5    regulation is valid and appropriate.

6         12.    One example illustrates my overall point. A key member of my team is a former

7    regulator from Canada's TCCA. At MITAC, she was in charge of putting together the

8    certification plans for the MRJ's interior systems, which includes things like the cabin layout,

9    waste water system, cargo holds, and oxygen systems. As a former regulator with the TCCA, she

10   has detailed knowledge of what the TCCA has historically relied upon when certifying other

11   airplanes, including Bombardier's C Series planes. She used this experience to develop a

12   certification approach based on these Canadian standards. What she (and we) learned through

13   this process was that the JCAB would not accept various steps in a certification plan simply

14   because the TCCA or another agency had previously accepted the same test, engineering principle

15   or other approach to certification. Rather, she was repeatedly required to prove every step of the

16   process, literally from the ground up. Her detailed knowledge of what the TCCA had previously

17   accepted, which is more than what any former Bombardier employee would know, proved to be

18   not only of little value, but actually detrimental in some respects, as the JCAB often required her

19   to reinvent the wheel in order to clarify basic assumptions of the aerospace industry, rather than

20   accept specific approaches that she knew from her experience at the TCCA were valid.

21        13.    This same pattern has played out repeatedly during the certification process with

22   the JCAB. I experienced this first hand when I proposed a compliance approach for safety

23   analysis documentation in support of MRJ Type Inspection Authorization to the JCAB. I based

24   my proposal on public TCCA documentation that explicitly described what the TCCA required to

25   satisfy this safety requirement. Even though clear documentation was available showing that

26   TCCA would accept MITAC's position, this carried no weight with the JCAB. It disregarded

DECLARATION OF ANDREW TELESCA –
5

144165756.2

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  clear evidence of what the TCCA had previously accepted, and imposed a different and stricter

2  requirement that resulted in a delay to program testing.  These kinds of instances, usually

3  involving JCAB approval relating to non-prescriptive regulations, is one of the primary reasons,

4  in my view, that it has taken so long to certify the MRJ.  We have repeatedly been required to

5  return to core aeronautical principles to prove that each part of the MRJ is safe and airworthy. As

6  a result, it has become clear that specific experience or knowledge about compliance precedents

7  set by other regulatory agencies has simply not been very valuable to our program.  What has

8  been valuable is good engineering and hard work.

9         14.    MITAC does not presently intend to seek certification with the TCCA because it

10  has no Canadian customers at the present time.

11

12

13         I declare under penalty of perjury that the foregoing is true and correct.

14         Signed this 25ᵗʰ day of April, 2019, at Nagoya, Japan.

15

16                                             Andrew Telesca

17

18

19

20

21

22

23

24

25

26

DECLARATION OF ANDREW TELESCA –
6

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

144165756.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on May 13, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses indicated on the Court's Electronic Mail Notice List.

DATED this 13th day of May, 2019.

*s/Jerry A. Riedinger*
Jerry A. Riedinger, WSBA No. 25828
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
E-mail: JRiedinger@perkinscoie.com

CERTIFICATE OF SERVICE
(No. 2:18-cv-1543 RAJ) – 1