THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BOMBARDIER INC.,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>MITSUBISHI AIRCRAFT<br>CORPORATION, MITSUBISHI<br>AIRCRAFT CORPORATION AMERICA,<br>INC., et al.,<br><br>　　　　　　　Defendants. | No. 2:18-cv-1543 JLR<br><br>DECLARATION OF MARY Z. GASTON IN<br>SUPPORT OF DEFENDANT MITSUBISHI<br>AIRCRAFT CORPORATION AMERICA,<br>INC.'S MOTION TO DISMISS |

Mary Z. Gaston declares as follows:

1.　　I am a partner in the law firm of Perkins Coie LLP and counsel for Defendant Mitsubishi Aircraft Corporation America, Inc. ("MITAC America") in this action. Unless otherwise stated, I make this declaration based on personal knowledge of the events and matters described herein or information provided to me by MITAC America.

2.　　Bombardier filed its First Amended Verified Complaint ("Amended Complaint") on April 30, 2019.  (*See* Dkt. 143.)  I instructed Perkins Coie support staff to use word-processing software to compare the Amended Complaint with Bombardier's original Complaint.  I understand the software is designed to show the differences between the two documents in redline.  Such a comparison is a task routinely performed by support staff.

GASTON DECLARATION ISO MOTION TO DISMISS BY
MITSUBISHI AIRCRAFT CORPORATION AMERICA
(NO. 2:18-CV-1543 JLR) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    3.    After the comparison was created, I instructed support staff to highlight allegations

2 premised "upon information and belief" in the Amended Complaint that were not in the original

3 Complaint.

4    4.    I instructed Perkins Coie attorneys to check the accuracy of the comparison.  The

5 attorneys confirmed the comparison accurately reflected the differences between the original

6 Complaint and the Amended Complaint.  A true and correct copy of the comparison is attached as

7 Exhibit A.

8    I declare under penalty of perjury under the laws of the United States that the foregoing is

9 true and correct.

10    Executed this 14th day of May, 2019.

11

12    *s/ Mary Z. Gaston*
    Mary Z. Gaston

13

14

15

16

17

18

19

20

21

22

23

24

25

26

GASTON DECLARATION ISO MOTION TO DISMISS
BY MITSUBISHI AIRCRAFT CORPORATION AMERICA
(NO. 2:18-CV-1543 JLR)

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that on May 14, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses indicated on the Court's Electronic Mail Notice List.

DATED this 14th day of May 2019.

*s/ Mary Z. Gaston*
Mary Z. Gaston, WSBA No. 27258
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
E-mail: mgaston@perkinscoie.com

CERTIFICATE OF SERVICE
(NO. 2:18-CV-1543 JLR) – 1

# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| BOMBARDIER INC., | No. 2:18-cv-~~1543~~01543-JLR |
| Plaintiff, | FIRST AMENDED VERIFIED COMPLAINT |
| v. | JURY DEMAND |
| MITSUBISHI AIRCRAFT CORPORATION, MITSUBISHI AIRCRAFT CORPORATION AMERICA INC., AEROSPACE TESTING ENGINEERING & CERTIFICATION INC., MICHEL KORWIN-SZYMANOWSKI, LAURUS BASSON, MARC-ANTOINE DELARCHE, CINDY DORNÉVAL, KEITH AYRE, AND JOHN AND/OR JANE DOES 1–88, | |
| Defendants. | |

Plaintiff Bombardier Inc. ("Plaintiff" or "Bombardier") by and through its undersigned counsel, complains as follows:

**NATURE OF THE ACTION**

1.    This is an action for trade secret misappropriation under federal and state law pursuant to the Defend Trade Secrets Act of 2016 ("DTSA") codified at 18 U.S.C. § 1836 *et seq.* and the Washington Uniform Trade Secrets Act ("WUTSA") codified at RCW 19.108.010 *et seq.* Claims for Tortious Interference with Business Expectancies and/or Contracts under Washington state common law are also raised herein, as are Breach of Contract claims.

## PARTIES

2.     Plaintiff Bombardier Inc. ("Bombardier") is a corporation organized and existing under the laws of Québec, Canada, with its principal place of business at 800 Boulevard René-Lévesque West, Montréal, QC H3B 1Y8, Canada. Bombardier has developed and owns all of the trade secret and confidential information misappropriated by Defendants.

3.     Upon information and belief, Defendant Mitsubishi Aircraft Corporation ("MITAC") is a corporation organized and existing under the laws of Japan, with its registered office and principal place of business at Nagoya Airport, Toyoyama-cho, Nishikasugai-Gun, Aichi 480-0287, Japan.

4.     Upon information and belief, Defendant Mitsubishi Aircraft Corporation America Inc. ("MITAC America") is a subsidiary corporation of Defendant MITAC organized and existing under the laws of the State of Delaware, with its registered principal place of business at 4951 Airport Parkway Suite 500, Addison, TX 75001 and with its Engineering Center located at 6100 4th Avenue South, Suite 300, Seattle, WA 98108. Upon information and belief, predicated on the facts herein, MITAC America is the alter ego of Defendant MITAC.

5.     Upon information and belief, Defendant Aerospace Testing Engineering & Certification Inc. ("AeroTEC") is a corporation organized and existing under the laws of the State of Washington, with its registered office and principal place of business at 6100 4th Avenue South, Suite 300, Seattle, WA 98108.

6.     Upon information and belief, Defendant Michel Korwin-Szymanowski is an individual currently residing in this judicial district and working as Director, Test & Evaluation at AeroTEC after having worked at Bombardier for approximately fifteen (15) years, most recently as the Director, C-Series Flight Test Teams. (*See* Declaration of John D. Denkenberger, attached hereto as Exhibit A ("Denkenberger Decl."), at Exhibit 1.)

7.      Upon information and belief, Defendant Laurus Basson is an individual currently residing in this judicial district and working as a Mechanical Systems Engineer (FCS) at AeroTEC after having worked at Bombardier in Canada for over three (3) years, most recently as a Senior Engineering Specialist (Flight Controls) and as a Candidate Design Approval Designee. (*See* Denkenberger Decl., Ex. 2.)

8.      Upon information and belief, Defendant Marc-Antoine Delarche is an individual currently residing in this judicial district and workingor near Nagoya, Aichi, Japan, and is an employee of MITAC, having worked most recently as an Aircraft Performance Engineer at AeroTEC after havingin Seattle, Washington until at least August 2018. (*See* Denkenberger Decl., Ex. 3.) Prior to that, he worked at Bombardier in Canada for over ten (10) years, most recently as an Engineering Specialist for Aircraft Performance. (*See* Denkenberger Decl., Ex. 3.4.)

9.      Upon information and belief, Defendant Cindy Dornéval is an individual currently residing in this judicial district and working as an Aircraft Performance Engineer at AeroTEC after having worked at Bombardier in Canada for approximately ten (10) years, most recently as an Aircraft Performance Engineer. (*See* Denkenberger Decl., Ex. 4.5.)

10.      Upon information and belief, Defendant Keith Ayre is an individual who is currently residing in or near Nagoya, Aischi, Japan and working as a Project Manager for MITAC after having worked at Bombardier for over thirty-two (32) years, most recently as an Aerospace Engineer. (*See* Denkenberger Decl., Ex. 5.6.)

11.      Upon information and belief, Defendants John and/or Jane Does 1-88 are individuals residing either in this judicial district or in Nagoya, Aischi, Japan working in various roles for either MITAC, MITAC America, or AeroTEC, or working actively on the Mitsubishi Regional Jet project (as described below) in another capacity, after having worked at Bombardier for a number of years in similar capacities. Collectively, the parties identified in paragraphs 43-10 above are referred to hereafter collectively as "Defendants."

## JURISDICTION AND VENUE

12.     This action arises under the laws of the United States, namely the DTSA codified at 18 U.S.C. § 1836 *et seq.* This Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

13.     This action also arises under the laws of the State of Washington. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1367 because the actions giving rise to claims under applicable state law are the same and/or related to the actions giving rise to the asserted claims under federal law. As such, the claims are so related that they form part of the same case or controversy under Article III of the United States Constitution.

14.     The Court has personal jurisdiction over Defendants because each of them either currently resides in the State of Washington, has a regular and established place of business within the State of Washington, has had minimum contacts with the State of Washington sufficient to confer the Court with general personal jurisdiction, or has committed acts within the State of Washington giving rise to the claims asserted herein.

15.     MITAC is subject to personal jurisdiction in this Court because MITAC has purposefully directed its activities at residents of the State of Washington and/or has purposefully availed itself of the privilege of conducting activities within the State of Washington, and thus has invoked the benefits and protections of Washington Law. MITAC maintains a flight-test center at the Grant County International Airport in Moses Lake, Washington, where it conducts flight tests of its Mitsubishi Regional Jet ("MRJ") and, on information and belief, employs around 100 pilots, engineers, and technicians. (Denkenberger Decl., Ex. 6.7.) MITAC originally estimated that, of the 100 people at Moses Lake working on MRJ flight testing, 50-60 would be MITAC's engineers and technicians from Japan who would stay for at least a year. (*Id.*) Additionally, MITAC noted that several of its Japanese employees would remain in Moses Lake for several years as part of the MRJ flight testing. (*Id.*) Moreover, MITAC maintains at least four (4) MRJ flight-test aircraft in the State of Washington at its Moses Lake flight-test center. (Denkenberger Decl., Ex. 7.8.)

16.     Further, MITAC celebrated the opening of its Seattle Engineering Center ("SEC") on August 3, 2015, in Seattle, Washington. (Denkenberger Decl., Ex. 8.9.) During the ceremony, MITAC representatives, including then-MITAC President Hiromichi Morimoto ("Mr. Morimoto"); Masahiro Omura, Consul General of the Japan in Seattle; and Washington State Governor Jay Inslee participated in a traditional "kagami-biraki" (鏡開き) sake barrel opening ceremony to celebrate MITAC's relations with Seattle and the State of Washington. (*Id.*; *see also* Denkenberger Decl., Ex. 9.10.) Defendant MITAC directly employs about 50-60 Mitsubishi Aircraft engineers from Japan at the SEC and, on information and belief, other employees, who work with Defendants AeroTEC and MITAC America to provide flight-test and certification support for the MRJ. (*Id.*) Then-President "Morimoto said Mitsubishi chose to set up here 'to make the best use of the resources and skill sets of the aircraft engineers and professionals of Seattle, which is a global hub of the aviation industry.'" (*Id.*) Further, MITAC enlisted the assistance of Defendant AeroTEC, a Seattle-based company, to support its efforts for certification of the MRJ. MITAC's Seattle employees are supported by MITAC headquarters in Nagoya, Japan, such that "[a]ny data that needs crunching, engineering that needs to be worked out, [Seattle employees] can hand over to Japan and they can take a stab at it while we're asleep." (Denkenberger Decl., Ex. 10.11.)

17.     Additionally, high-ranking MITAC personnel, including Mr. Morimoto, regularly visit Seattle and the State of Washington. In addition to attending and speaking at the SEC opening ceremony, Mr. Morimoto in his capacity at MITAC attended a ceremony held at the Museum of Flight in Seattle, Washington on December 10, 2015. (Denkenberger Decl., Ex. 11.12.) At the ceremony, Mr. Morimoto celebrated MITAC's customer support partnership with Boeing, including the partnership's unveiling of a web portal enabling customers to access MRJ support on the internet. (*Id.*) Mr. Morimoto, on behalf of MITAC, also attended a summit held by the Aerospace Futures Alliance, an aerospace industry association in Washington, on October 6, 2016. (Denkenberger Decl., Ex. 12.13.) On January 12, 2017, Mr. Morimoto, on behalf of MITAC, again visited the State of Washington,

this time as part of a meeting between representatives of the aerospace industry and Governor Inslee. (Denkenberger Decl., Ex. ~~13.~~14.)

18.     Moreover, the causes of actions complained of herein arise out of or relate to MITAC's activities within the State of Washington and this judicial district. For example, and on information and belief, in its aforementioned efforts to obtain certification of its MRJ aircraft, MITAC has committed trade secret misappropriation in the State of Washington and this judicial district, individually, through its subsidiary MITAC America, and through its partnership with AeroTEC, such that personal jurisdiction over Defendant MITAC would comport with notions of fair play and substantial justice.

19.     Defendant Marc-Antoine Delarche is subject to personal jurisdiction in this Court because, as detailed herein upon information and belief, he has committed and/or is continuing to commit trade secret misappropriation in the State of Washington and this judicial district by way of illicitly using and/or disclosing—and having previously used and/or disclosed—Bombardier trade secret information to unauthorized third parties within this judicial district. Additionally, personal jurisdiction of this Court over Defendant Delarche is proper at least because he purposefully directed his activities at this forum, because Bombardier's claims against him arise out of this forum-related activity, and because the exercise of jurisdiction over Defendant Delarche is reasonable under the circumstances alleged herein. Specifically, and as alleged herein in greater detail, Defendant Delarche committed intentional acts constituting trade secret misappropriation at least when he (a) wrongfully obtained Bombardier trade secret information by sending such information without authorization to his personal email accounts from his Bombardier work email account within weeks and days of his planned and voluntary departure from Bombardier to work first for AeroTEC and later for MITAC on the MRJ project; (b) on information and belief, used Bombardier trade secret information without authorization in furtherance of MITAC's MRJ certification efforts in this judicial district while employed at AeroTEC in this judicial district and while working at the SEC first on behalf of AeroTEC and then later on behalf of MITAC;

and (c) impermissibly disclosed Bombardier trade secret information to unauthorized third parties. To the extent any of these acts did not occur exclusively in Washington and this judicial district, upon information and belief, these acts were expressly aimed at Washington and at this judicial district because Defendant Delarche knew at all relevant times that substantial MRJ certification efforts were occurring at least at the SEC in this judicial district and that Bombardier's trade secret information therefore would be used without authorization in this judicial district. Defendant Delarche also knew that Bombardier would likely incur harm in this judicial district as a result of his intentional acts, most notably in the form of devalued trade secret information and accelerated regional-jet-market competition. Further, upon information and belief, Defendant Delarche has traveled to this judicial district since transferring from this judicial district to Japan, and specifically has returned to the SEC in the Western District of Washington on MITAC's behalf, for the purposes of assisting in MRJ certification efforts and used and/or further disclosed without authorization, Bombardier confidential and trade secret information. At the very least, Defendant Delarche knew when he first wrongfully obtained Bombardier trade secret information, and later when he illicitly used and/or disclosed Bombardier trade secret information, that his acts would have foreseeable effects in this judicial district given the MRJ certification efforts occurring here. Because these acts and effects give rise to Bombardier's claims against Defendant Delarche, and because these acts took place in this judicial district and/or these effects in this judicial district were at all relevant times foreseeable (if not foreseen), the exercise of personal jurisdiction over Defendant Delarche by this Court is reasonable.

19.20.   Defendant Keith Ayre is subject to personal jurisdiction in this Court because, as detailed herein upon information and belief, he has committed and/or is continuing to commit trade secret misappropriation in the State of Washington and this judicial district by way of illicitly using and/or disclosing Bombardier trade secret information to unauthorized third parties within this judicial district. Additionally, personal subject matterjurisdiction of this Court over Defendant Ayre is proper at least because he purposefully directed his activities at this forum,

because Bombardier's claims against him arise out of this forum-related activity, and because the exercise of jurisdiction over Defendant Ayre is reasonable under the circumstances alleged herein. Specifically, and as alleged herein in greater detail, Defendant Ayre committed intentional acts constituting trade secret misappropriation at least when he (a) wrongfully obtained Bombardier trade secret information by sending such information without authorization to his personal email accounts from his Bombardier work email account within weeks and days of his planned and voluntary departure from Bombardier to work for MITAC on the MRJ project *(see* Ex. S); (b) on information and belief, traveled from Japan to this judicial district and specifically to the SEC and during this period disclosed and/or used Bombardier trade secret information without authorization in furtherance of MITAC's MRJ certification efforts in this judicial district at the SEC; and (c) impermissibly disclosed Bombardier trade secret information to unauthorized third parties. Each ofTo the extent any of these acts did not occur in Washington and this judicial district, upon information and belief, these acts were expressly aimed at Washington and at this judicial district because Defendant Ayre knew at all relevant times that substantial MRJ certification efforts were occurring at least at the Seattle Engineering CenterSEC in this judicial district and that Bombardier's trade secret information therefore would be used without authorization in this judicial district. Defendant Ayre also knew that Bombardier would likely incur harm in this judicial district as a result of his intentional acts, most notably in the form of devalued trade secret information and accelerated regional jet market competitionjetmarket competition. Further, upon information and belief and as noted above, Defendant Ayre has traveled to this judicial district, specifically to the SEC in the Western District of Washington, for the purposes of assisting in MRJ certification efforts and used and/or further disclosed without authorization Bombardier confidential and trade secret information. At the very least, Defendant Ayre knew when he first wrongfully obtained Bombardier trade secret information, and later when he illicitly used and/or disclosed Bombardier trade secret information, that his acts would have foreseeable effects in this judicial district given the MRJ certification efforts occurring here. Because these acts and effects give rise to Bombardier's

claims against Defendant Ayre, and because these acts took place in this judicial district and/or these effects in this judicial district were at all relevant times foreseeable (if not foreseen), the exercise of personal jurisdiction over Defendant Ayre by this Court is reasonable.

20.21.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and/or (2) because at least one Defendant resides in this judicial district where all Defendants are residents of the State of Washington, and/2) or (3) because a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this judicial district; or alternatively because at least one defendant is subject to this Court's personal jurisdiction for the acts alleged herein.

## FACTUAL ALLEGATIONS

### Bombardier and Development of the C-Series Aircraft

21.22.    Plaintiff Bombardier is one of the world's leading manufacturers of both planes and trains. It is headquartered in Montréal, Canada, and its shares are publicly traded on the Toronto Stock Exchange (BBD). It is comprised of over 69,000 employees and generated revenues exceeding $16 billion in FY2017 alone.

22.23.    A significant portion of Bombardier's business involves the design, manufacture, and support of innovative aviation products for the business, commercial, specialized, and amphibious aircraft markets. Bombardier employs more than 29,000 employees in its Aerospace division, and its high-performance aircraft and services set the standard of excellence in several aircraft, aircraft services, and aircraft training markets.

23.24.    Among the many aircraft Bombardier has designed, built, sold, and supported over the past thirty (30) is Bombardier's latest clean-sheet design: the C-Series. The C-Series, a "clean -sheet" aircraft designed by Bombardier from the ground up, is a family of narrow-body, geared turbofan twin-engine, medium-range jet airliners that marks a dramatic improvement over older competing aircrafts in terms of efficiency and dependability. Bombardier's clean-sheet C-Series design was adopted to cater to the aviation market seeking aircraft that could accommodate between 110 and 135 passengers over 3,200 nautical miles and do so at

measurably lower operating costs than existing aircraft of that class.

24.25.   The history and development of the C-Series is well documented in various publicly available sources. According to these sources, Bombardier first began investigating the feasibility of what would become the C-Series in 2004. Efforts to develop and launch the C-Series program continued into January 2006, at which time Bombardier announced that market conditions could not justify a full-scale pursuit of the launch. Cost estimates for the C-Series program at that time—a program that would require a complete redesign of many components of an aircraft, as well as successful navigation of lengthy and expensive regulatory processes to obtain a series of necessary governmental approvals to build and mass produce the aircraft (described more fully below)—was estimated to cost approximately US$2.1 billion.

25.26.   In January 2007, Bombardier announced that work on the C-Series would continue in earnest. Then-current economic forecasts projected that the market for 100- to 149-seat aircraft—the market segment targeted by the C-Series—would amount to approximately 6,300 units and roughly US$250 billion in revenues.

26.27.   After committing full-scale resources to the C-Series program over the next six-and-a-half years, Bombardier received government approval for the first C-Series aircraft test flight. Nearly three (3) years and further government approvals later, in cooperation with SWISS International Air Lines, the first C-Series entered into service.

**The Expense of "Clean-Sheet" Design and Regulatory Approvals**

27.28.   That Bombardier dedicated nearly a decade and committed several billion dollars to bring the C-Series from concept and design to commercialization and flight is not atypical for a clean -sheet aircraft. Indeed, it is extremely complex and costly to achieve successful clean-sheet design certification, even for an Original Equipment Manufacturer who has gone through said process before and can use existing processes, strategies, analysis, means and methods. Since 2000, only four (4) companies world-wide have been able to develop a commercial clean-sheet aircraft program in compliance with the regulatory requirements of the Federal Aviation Administration ("FAA"), Transport Canada (Canada's

FAA counterpart), and the European Aviation Safety Agency ("EASA," Europe's FAA counterpart). This is because, understandably, these various regulatory agencies require aircraft manufacturers to meet innumerable exacting standards to ensure aircraft airworthiness and public safety.

28.29.   For example, federal law requires that before a clean -sheet aircraft can be developed, sold, and entered into service on a commercial scale, FAA must issue a "type certificate," a "production certificate," and an "airworthiness certificate" applicable to each manufactured aircraft. (*See* 49 U.S.C. § 44704.) The aircraft manufacturer bears the burden to convincingly demonstrate to FAA that each certificate should be issued, and FAA must be confident that innumerable applicable federal regulations are satisfied before the certification process can conclude. (*See, e.g.*, 14 CFR Parts 21, 25, 34, and 36.) The process is incredibly costly, time-consuming, and complex—even for the most experienced of aircraft manufacturers who have gone through that process and developed trade secrets to face it more efficiently.

29.30.   For instance, FAA "type certification"—or the certification issued by FAA to deem an aircraft and its subcomponent designs suitable to assemble airworthy aircraft—has been described by FAA to consist of five (5) phases: Conceptual Design, Requirements Definition, Compliance Planning, Implementation, and Post Certification. (*See* FAA Order 8110.4C; *see also* FAA Product Certification Guide, Third Edition, *available at* https://www.faa.gov/aircraft/air_cert/design_approvals/media/CPI_guide.pdf.)   Within each phase, multiple steps must be performed. The Conceptual Design Phase requires "familiarization meetings" between the aircraft manufacturer ("applicant") and FAA; memorialized "correspondence to document decisions, agreements, schedules, milestones, and action item assignments" agreed upon between applicant and FAA; a "preliminary certification basis"; a "definition and plan for resolution of critical issues"; and identification of a "core team to ensure continuity." (*Id.*) The Requirements Definition Phase is comprised of submission of a formal application for type certification; acknowledgment of the

application by FAA; formal Certification Project Notification and Establishment of Project; development of the Project Specific Certification Plan ("PSCP") including identification of project milestones and related events; agreement of proposed certification basis and definition of project issues such as means of compliance including special conditions, Equivalent Level of Safety findings ("ELOS"), and any exemptions. (*Id*.) The Compliance Planning Phase consists of, among other events, FAA formally accepting the PSCP; further "project schedul[ing] with FAA and applicant milestones for completion of analyses, test plan submission, . . . flight testing, . . . critical issues resolution plan, and other items affecting the completion of the project"; identifying "stakeholders, including suppliers, subs-vendors, installers, inspection, etc."; establishing "Conformity Inspection Plans"; reaching agreement between applicant and FAA on what the type certification basis will be; formulating a "Compliance Checklist" and "Conformity Inspection Plans"; and establishing "Project evaluation measures." (*Id*.) The Implementation Phase similarly is comprised of numerous events, including but not limited to "[t]rack[ing] and meet[ing] milestones for preparations for and accomplishment of work, procurement of materials, parts conformities, data, completion of analyses, manuals, test plan submission, equipment qual [*sic*] and test, ground test, installation conformities, TIA [Type Inspection Authorization], flight test, AEG [Aircraft Evaluation Group] evaluations, critical issues resolution plan, and other items affecting completion of the project"; "[c]omplet[ing] test plans/reports, conformity requests, inspections, and compliance documentation"; making "[c]ompliance and conformance findings"; and ultimately "Certificate . . . approval issuance." (*Id*.)

~~30.~~31.      Only after all these steps are completed to the satisfaction of FAA, meaning only if these steps result in establishing with FAA that the aircraft's design appears to satisfy all applicable federal regulations, can an aircraft manufacturer rely on the design to produce airworthy aircraft. Coupled with this rigorous process, however, are time constraints. Specifically, depending on the parameters of the aircraft to be type certified, the process must be completed (absent special dispensation) within five (5) years. This is because when a

company applies for a type certificate, the rules and regulations that are in force at the time of application are the rules with which the applicant must comply. And given that FAA rules and regulations evolve and change over time, an applicant that takes longer than five (5) years to certify its aircraft will be obtaining a type certification under antiquated standards. Therefore if an applicant fails to obtain type certification within the governing time limitation, it must certify to the later standards, thereby incurring significant and redundant costs in the process.

~~31.~~*32.*  Production certification is another regulatory approval process required before a manufacturer can begin producing a duplicate aircraft from a previously obtained type certification—in other words, before a manufacturer can enter into service an aircraft on a commercial scale. *See* 49 U.S.C. § 44704(c). Like the type certification process, this regulatory process is costly and time consuming, even more for an OEM who is going through it for the first time from scratch. Unlike other certification processes, however, this certification focuses on the manufacturer's ability to duplicate an aircraft, aircraft engines, and/or its appliances that conform to the manufacturer's previously obtained and applicable type certification (or supplemental type certification, if applicable). *Id.*

~~32.~~33.  Once the requisite certifications are obtained, all subsequently manufactured aircraft must be certified for "airworthiness" prior to delivery. *See* 49 U.S.C. § 44704(d)(1). This process is also complex and costly, as the OEM needs to developed testing parameters and configurations to prove that the aircraft meets the certified design criteria without having to arrive at those parameters and configurations independently or having to conduct needless, incredibly costly, additional flight testing.

34.  These FAA certification requirements are applicable for aircraft manufactured domestically as well as abroad. For example, the certification standards in Japan are expressly governed by the same standards used by the FAA. *See* Implementation Procedures for Airworthiness Covering Design Approval, Production Activities, Export Airworthiness Approval, Post Design Approval Activities, and Technical Assistance Between Authorities,

Under the Agreement between the Government of the United States of America and the Government of Japan for Promotion of Aviation Safety, April 27, 2009, Section 1.5.1 ("The JCAB [Civil Aviation Bureau of Japan] has incorporated the equivalent of FAR parts 23, 25, 27, 29, 33, and 35 into [its Airworthiness Inspection Manual].") Likewise, FAA standards are relevant to aircraft certification in Canada. *See* 5 CAR 525 (Preamble) ("The content of this chapter is based on the United States Code of Federal Regulations, Title 14, Chapter I, Part 25, entitled, Airworthiness Standards, Transport Category Airplanes. These United States airworthiness standards have been used and adopted as the model for the Canadian standards supplemented by additional airworthiness requirements based on Canadian experience and required for Canadian aviation purposes.").

33.35. As a market leader with vast experience in aircraft manufacturing, Bombardier has been independently identified as proficient in aircraft certification procedures. (*See* Denkenberger Decl., Ex. 14.15.) As noted by this same source, Bombardier successfully certified eighteen (18) aircraft from 1989 to 2006, some of which were derivative models of its previous aircraft, while others "were entirely new clean-sheet designs that have demonstrated Bombardier's robust certification process." (*Id.*) Since then, Bombardier has developed and certified ten (10) additional clean-sheet design and derivative programs, and in doing so, has continued to cultivate and safeguard significant trade secrets. "This whole process—design, certification, production—is the heart of each company's competitive advantage, its own special secret sauce, and they are not about to reveal the recipe." (*Id.*) "It's almost impossible to understand the full certification criteria for an aircraft, if one has not been through it once or twice." (Denkenberger Decl., Ex. 1516 (attributing the quoted statement to Defendant Korwin-Szymanowski and his MRJ project colleague, Alex Bellamy, former Bombardier C-Series Flight Test Manager and current Vice President of MITAC).)

### The MRJ Project and Its Many Delays

34.36. At approximately the same time Bombardier began investigating the feasibility of what would become the C-Series project, the Japanese government in conjunction with

Mitsubishi Heavy Industries, Ltd. ("MHI") initiated its own investigation into the feasibility of a similar aircraft project—the Mitsubishi Regional Jet ("MRJ"). Like the C-Series, the MRJ is a narrow-body, geared turbofan twin-engine, medium-range jet aircraft. Unlike the C-Series, however, the MRJ has yet to receive the proper certifications to enter into service.

35.37. According to MHI, the MRJ program was officially launched on March 28, 2008, with MHI initially targeting the MRJ's entry into service at some time in 2013. Also on that day, MHI announced that effective April 1, 2008, Defendant MITAC—a "company established by MHI to conduct MRJ business"—would be responsible for "accelerat[ing] the MRJ's development and further strengthen sales activities to potential customers worldwide." MITAC's responsibilities would also include "the jetliner's design, acquisition of type certification (T/C), procurement, sales and customer support." (Denkenberger Decl., Ex. 16.17.)

36.38. Within the first two (2) years of the project, however, MITAC began implementing design changes in the MRJ that resulted in multiple significant delays. For example, a report of September 9, 2009 revealed that MITAC "unveiled extensive design changes" which would (1) move MITAC's deadline for a final design freeze from Q3 2009 to "mid-2010," (2) delay the MRJ's first flight test from Q4 2011 to Q2 2012, and (3) delay commercial delivery of the first MRJ from Q4 2013 to Q1 2014. (Denkenberger Decl., Ex. 17.18.)

37.39. Approximately a year later, on September 15, 2010, MITAC announced that it was entering the production drawing phase of the MRJ project and was proceeding with the manufacturing process. At that time MITAC also announced that "the MRJ program continues to progress on schedule, with first flight scheduled for Q2 2012 and first delivery in Q1 2014." (Denkenberger Decl., Ex. 18.19.) MITAC would subsequently experience issues, however, that would further delay the MRJ's first test flight and first commercial delivery.

38.40. On April 25, 2012, "[f]ollowing an in-depth review of the MRJ program," MITAC announced a "schedule update." In relevant part, MITAC pushed the first scheduled flight of the MRJ from Q2 2012 to Q3 2013, and it delayed first commercial delivery of the

MRJ from Q1 2014 to "the summer or later half of JFY [Japanese Fiscal Year] 2015." (Denkenberger Decl., Ex. ~~19.~~20.) Thus just four (4) years into the MRJ program, MITAC announced at least two (2) delays that pushed the first scheduled test flight and first scheduled commercial delivery of the MRJ by nearly two (2) years. More delays would follow.

~~39.~~41.  On August 22, 2013, MITAC disclosed that the updated schedule provided on April 25, 2012 would need further amendment. Specifically, MITAC moved the MRJ's first scheduled flight to Q2 2015 and the aircraft's first commercial delivery to Q2 2017. (Denkenberger Decl., Ex. ~~20.~~21.) On information and belief, MITAC's latest "delay was due to the company's underestimation of the time it needed to sort out how to validate the safety of the manufacturing process of the jet and its components, and not from any issues with specific suppliers." (*Id.*) This "latest delay to the MRJ extend[ed] development to nine years from the originally planned five and three quarter years. Its cause, not previously detailed, stems from 2009 . . . [when MITAC] learned that it needed company-wide organization delegation authorization (ODA), under which it would act on behalf of the certifying authority in the more routine aspects of approving designs and ensuring airworthiness standards." (Denkenberger Decl., Ex. ~~21.~~22.) MITAC "underestimated the amount of effort in getting ODA from the Japan Civil Aviation Bureau, which locally instituted the FAA system to keep certification regulations internationally consistent." (*Id.*)

~~40.~~42.  As of August 22, 2013, however, "it remain[ed] unclear why [MITAC] took until Aug. 22, more than five years after program launch and less than five months before its previous first-flight target, to announce that the ODA tasks, by then complete, had caused another delay of about 18 months." (*Id.*) MITAC's first announced delay in 2009 was attributable to design changes, and its second delay was reportedly caused by MITAC's discovery that "it had not properly documented production processes. The ODA work was separate from that problem and ended in September 2012 when the authorization was received." (*Id.*) Nevertheless, by August 2013, MITAC had "no [remaining] hurdles except

the usual challenges of moving through manufacturing to flight testing and certification," for which it had "hired many foreign experts, especially ex-Boeing people, to help." (*Id.*)

~~41.~~43.  Notwithstanding the clear road ahead, and despite already working with many foreign experts on the MRJ project to date, MITAC began dedicating substantial additional resources to the MRJ project by 2014. For instance, MITAC formed its subsidiary, Defendant MITAC America, on June 4, 2014, to, upon information and belief, focus on drawing from North American resources to design, develop, and certify the MRJ. Additionally, by no later than July 14, 2014, MITAC enlisted the assistance of Defendant AeroTEC, "a small engineering company that provides flight-testing and aircraft certification services, [to] provide technical support" for MITAC's MRJ project. (Denkenberger Decl., Ex. ~~6.~~7.) According to MITAC's then-president, Teruaki Kawai, MITAC's explanation for these additional resources was because until this time, "[MITAC] 'didn't have any experience in how to get certification~~.~~' ~~[. ..]~~... In Washington state, 'there are a lot of experienced people.'" (*Id.*)

~~42.~~44.  Even with the assistance of Defendants MITAC America and AeroTEC, however, MITAC still could not avoid further unplanned delays on the MRJ project. For instance, MITAC failed to conduct its MRJ flight test in accordance with its third amended schedule. Instead of the MRJ's maiden voyage occurring in Q2 2015, it finally took place on November 11, 2015. (Denkenberger Decl., Ex. ~~22.~~23.) At that time, MITAC also confirmed the MRJ's "first delivery scheduled for the second quarter of 2017," and it announced that "flight tests in the US are scheduled to start in the second quarter of 2016, from the MRJ base at Grant County International Airport at Moses Lake in Washington State." (*Id.*) MRJ flight testing, development, and certification in the United States would be, and is, managed through the Seattle Engineering Center, formed on August 3, 2015 and jointly staffed by all Corporate Defendants.

~~43.~~45.  On December 24, 2015, approximately six (6) weeks after MITAC re-confirmed first commercial delivery of the MRJ for Q2 2017, MITAC again amended its

schedule to delay delivery until 2018—"[a] surprise yearlong delay." (Denkenberger Decl., Ex. 23.24.) MITAC reportedly attributed the delay to the fact that the MRJ's "frame had passed strength tests for normal use, but there were concerns it wouldn't pass certification tests." (*Id.*) Defendant AeroTEC reportedly confirmed at that time that the latest MRJ delay would have "no impact to the preparations in Seattle and Moses Lake." (*Id.*)

44.46. This "fourth delay in bringing the [MRJ] to market" "likely [made] the U.S. side of the [MRJ] certification program more important." (*Id.*) According to at least one (1) report, the delay caused one aviation analyst to observe, "When you have a situation like this it's all hands on deck." (*Id.*)

45.47. Additionally, the MRJ program's fourth delay raised speculation that MITAC might start to lose purchase orders. (*Id.*) As of December 24, 2015, MITAC reportedly had "received 407 orders, including options and purchase rights" for the MRJ, 100 of which originated from U.S. regional airline SkyWest. (*Id.*)

46.48. On January 22, 2017, initial reports circulated that MITAC was "expected to announce yet another delay to the MRJ regional jet program at a press conference in Tokyo" that afternoon. (Denkenberger Decl., Ex. 24.25.) Speculation of the announcement had "been rife since last October [2016], when [MITAC] admitted that it had warned launch customer All Nippon Airways of a 'risk of delay' to the first MRJ." (*Id.*)

47.49. The following day, on January 23, 2017, MITAC confirmed the MRJ's fifth delay in the history of the program. (Denkenberger Decl., Ex. 25.26.) MITAC reportedly attributed this latest delay "due to revisions of certain systems and electrical configurations on the aircraft to meet the latest requirements for certification." (*Id.*) In light of the significant design change, and despite the fact that the MRJ Project was now well into its eighth year, MITAC would be forced to return to the first stages of "preliminary design review for the design change area," would "get into the critical design phase in a few months" thereafter, and would "require an additional two years" for projected commercial delivery of the MRJ. (Denkenberger Decl., Ex. 26.27.) MITAC now "expected to obtain type certification in mid-

2019" for its new design, and it projected first commercial delivery of the MRJ to occur "in mid-2020." (Denkenberger Decl., Ex. 25.26, *see also* Denkenberger Decl., Ex. 36.)

48.50. Nearly four (4) months after announcing the MRJ project's fifth delay, MITAC was more forthcoming publicly about the need for it: reportedly the delay "was mainly to mitigating [*sic*] the risk of not meeting certification criteria, or having to make changes even further down the aircraft's development." (Denkenberger Decl., Ex. 27.28.) MITAC further reportedly explained that "in some small areas, it was very difficult to show the compliance of the avionics bay, so we decided to relocate components in the avionics bay and this also led to a change in the electrical wires routing." (*Id.*) When "[a]sked why the issue was only discovered more than eight years into the MRJ's development, [MITAC] stresse[d] that the manufacturer was already aware of the requirements, but explain[ed] that certification regulations do not 'precisely define' the risk analysis that must be done. (*Id.; see also* Denkenberger Decl., Ex. 35.)* There was also the risk that it would 'take a lot of time' to explain how the system meets compliance to Japan's Civil Aviation Bureau, which could further delay its schedule." (*Id.*) MITAC also reportedly disclosed that "[f]rom some efficiency view point, our original design of the avionics bay components was very efficient. But at the same time we needed a complex process to certify it. So from the viewpoint of how easy it is for certification, our original design was not so good." (*Id.*) MITAC's decision for the MRJ's design change was reportedly made in December of 2016, after "[t]he [certification] issue was first identified sometime between summer and autumn [of 2016]." (*Id.*) Importantly, the certification issue was identified only shortly after MITAC's direct recruiting efforts of Bombardier personnel began paying off. Indeed, a detailed explanation for the MRJ program's January 2017 delay (its fifth) was provided to Leeham News six (6) months later by two (2) former Bombardier personnel— Alex Bellamy, former C-Series Flight Test Program Manager for Bombardier, subsequently the Senior Director of the MRJ Program Management office for Defendant MITAC, and a current MITAC Vice President; and Defendant Michel Korwin-Szymanowski, former Director of Bombardier's C-Series Flight

Test Teams and the new Head of MRJ Flight Testing for Defendant AeroTEC. (Denkenberger Decl., Ex. ~~15~~16 (explaining latest delay attributable to "concerns the present aircraft configuration would be challenging to get through certification")).)

### Targeted Recruitment of Bombardier Personnel and Theft of Bombardier's Trade Secrets

~~49.~~51. Shortly before MITAC's announcement in December 2015 of the MRJ's fourth delay, and despite the fact that MITAC had been working with ex-Boeing employees and other industry personnel in developing the MRJ, Defendants MITAC, MITAC America, and AeroTEC began a direct recruiting effort of Bombardier personnel. As part of this effort, MITAC and MITAC America organized a "job fair" in Montréal to be held on July 15-16, 2016 at a venue located less than one (1) kilometer from Bombardier's global principal place of business. (*See* Denkenberger Decl., Ex. ~~28.~~29.) On information and belief, MITAC and MITAC America promoted their job fair both online and in the Montréal Gazette in the weeks leading up to the event and they advertised that it was "looking to hire over 200 Aircraft System Engineers **who can work on Certification activities of MRJ aircraft**." (*Id.* (emphasis added).) On information and belief, MITAC's July 2016 targeted recruiting of Bombardier's employees in Montréal started paying dividends shortly thereafter. For example, by no later than August 18, 2016, MITAC successfully secured the commitment Mr. Keith Ayre to join the MRJ project. Mr. Ayre at that time was serving in the critical role of TCCA's Design Approval Designee ("DAD") for Bombardier. Mr. Ayre therefore was critical to Bombardier's own certification efforts regarding the C-Series and Global 7000/8000 Aircraft, as MITAC well knew. And despite the fact that Mr. Ayre did not terminate his employment with Bombardier until August 26, 2016, MITAC was actively soliciting, and Mr. Ayre was actively providing, MRJ certification guidance during Bombardier business hours through Mr. Ayre's personal email account more than one (1) week before Mr. Ayre left Bombardier. For example and by no means limiting, Mr. Ayre sent an email on August 24, 2016—using Bombardier equipment and from Bombardier

facilities—addressed to an individual named "Frederic" (who upon information and belief was a MITAC employee or contractor during the relevant time period) disclosing Bombardier confidential and/or trade secret information pertaining to Fire Detection and Extinguishing ("FIDEX") and related System Safety Analysis ("SSA"). On information and belief, Mr. Ayre's disclosures and teachings to "Frederic" in August 2016 led to an improved redesign of the MRJ now subject to certification efforts. (*See* Denkenberger Decl., Exs. 26-28.)

50.52. In addition to MITAC's direct recruitment efforts in Montreal, AeroTEC launched its own targeted recruiting campaign of Bombardier personnel working in the United States. Specifically, Mr. Korwin-Szymanowski on behalf of both MITAC America and AeroTEC organized a job fair to be held on October 23-24 of 2015 in Wichita, Kansas— home of Bombardier's Flight Test Center in the United States—to interview candidates to work on MRJ flight testing in Seattleat MITAC America's SEC for purposes of certifying the MRJ . (*See* Denkenberger Decl., Ex. 29.30.) On further information and belief, AeroTEC and MITAC America targeted Bombardier personnel specifically for this job fair by arranging for billboards mounted on flatbed trucks advertising the job fair to be displayed immediately outside Bombardier's Flight Test Center. (*See id.*)

51.53. On information and belief, further efforts of MITAC, MITAC America, and AeroTEC to recruit Bombardier personnel to work on MRJ development and certification included retaining and using professional recruiting services such as Velocity Consulting Solutions (*see* Denkenberger Decl., Ex. 3031), contacting Bombardier personnel directly via email (Denkenberger Decl., Ex. 3132), and using successfully-recruited former Bombardier personnel to entice their former colleagues to likewise defect. For example, and by no means limiting, former Bombardier employee and Defendant Korwin-Szymanowski on behalf of both AeroTEC and MITAC America sent a targeted email on October 20, 2015 "to 247 Bombardier [email] accounts" entitled, "Flight Test Opportunities in Seattle" to inform then-current Bombardier personnel of "positions open immediately" to work on "the development and certification of the Mitsubishi Regional Jet (MRJ)." (*Id.*) Four (4) days later, on October

24, 2015, Defendant Korwin-Szymanowski spoke directly with Mr. Stephen Stowe, then a Senior Engineering Test Pilot for Bombardier, about potential recruitment to AeroTEC. (Denkenberger Decl., Ex. ~~32) Four (4) days after that, on October 28, 2015,~~33) In addition, Defendant Korwin-Szymanowski ~~attended~~made detailed plans to attend a "hiring event" four (4) days after that, on October 28, 2015 in Montréal, Canada~~and~~. *See* Denkenberger Decl., Ex. 34. He solicited Bombardier personnel to meet him that evening for "drinks & food" at a venue located within a fifteen-minute drive from Bombardier. (Denkenberger Decl., Ex. ~~33.~~34.) On information and belief, these activities represent only a small fraction of the various Defendants' targeted recruiting efforts of Bombardier personnel.

54.     Further, while he was working to recruit Bombardier personnel with trade secret knowledge, Defendant Korwin-Szymanowski was, upon information and belief, working as an agent for his principal MITAC America to staff MITAC America's facilities as part of his scope of employment and job responsibilities. According to Defendant KorwinSzymanowski:

> At AeroTEC, I am functionally responsible for Flight Test and I have supported multiple projects in my three years here, including the MRJ flight test program. My duties include organizing AeroTEC's facilities and support equipment, and assisting with staffing the **MITAC America's new MRJ flight test center in Moses Lake. As part of this effort, I helped develop a recruiting plan starting in the Fall of 2015. My strategy was to hire across the North American aerospace labor market . . . .**

*See* Dkt. No. 65, ¶ 9 (emphasis added).

55.     The Moses Lake facility, in addition to the SEC, is another physical locus for MITAC America. Kenji Okimoto, vice president for MITAC America, runs operations at the Moses Lake Flight Test Center. *See* Denkenberger Decl., Ex. 11, at 1.

56.     As an agent for MITAC America, during his time working at MITAC America's facilities, Defendant Korwin-Szymanowski knew or had reason to know that employees he had recruited to work on the MRJ program were using Bombardier trade secret

information related to flight testing and certification. Due to his lengthy tenure at Bombardier, during which he became intimately familiar with Bombardier's proprietary and trade secret certification information (and its employees' ongoing obligation to maintain the secrecy of that information), Defendant Korwin-Szymanowski possessed the expertise to recognize—and on information and belief did recognize—Bombardier trade secret information as it flowed from MITAC in Nagoya to MITAC America and AeroTEC in Washington State, and was shared among the employees of those companies in both Moses Lake and the Seattle Engineering Center.

57.   On information and belief, in his role in assisting with MRJ certification, Defendant Korwin-Szymanowski had recruited and was supervising multiple employees who used Bombardier trade secrets, including Defendants Dornéval, Delarche, and Basson. Upon information and belief, in that supervisory capacity, Defendant Korwin-Szymanowski reviewed and used their work and contributions to advance MRJ certification, which upon further information and belief incorporated the Bombardier trade secret information that each illicitly emailed to their personal email accounts prior to their planned and voluntary departure from Bombardier. Upon further information and belief, based on his lengthy tenure and experience with Bombardier, Defendant Korwin-Szymanowski knew and recognized, or at least should have known and recognized, that the work and contributions of at least Defendants Dornéval, Delarche, and Basson were incorporating Bombardier trade secret information of which each was under a duty to maintain its secrecy. Defendant KorwinSzymanowski therefore knew or should have known that Bombardier's trade secret information had been misappropriated by Defendants Dornéval, Delarche, and Basson and was being used for improper purposes to assist in MRJ certification. Because Defendant Korwin-Szymanowski's role at AeroTEC was to assist in MRJ certification, and because he was aware that Bombardier trade secret information was being used for MRJ certification purposes, Defendant Korwin-Szymanowski was also knowingly using and further disclosing Bombardier trade secret information without authorization.

52.

58.     Defendant Korwin-Szymanowski acted as an agent of MITAC America for the purposes of certifying the MRJ and for hiring personnel to support that objective. As such, MITAC America, through Korwin-Szymanowski, knew or had reason to know that Bombardier trade secret information had been illicitly obtained and was being improperly used for purposes of certifying the MRJ. Bombardier learned of the Corporate Defendants' sustained targeted recruiting efforts shortly after they began with Defendant ~~Korwin-Szymanowski~~KorwinSzymanowski's October 20, 2015 email, and it engaged in significant steps short of litigation to stop it. For instance, on October 22, 2015, Bombardier wrote directly to Defendant Korwin-Szymanowski and AeroTEC to address the impropriety of their targeted recruitment of 247 Bombardier employees via email just two (2) days earlier, as well as the impropriety of AeroTEC's targeted recruiting of Bombardier personnel in Wichita, Kansas. (*See* ~~Exhibit~~Ex. B.) Specifically, Bombardier informed AeroTEC and Defendant Korwin-Szymanowski of his ongoing duties of confidentiality owed to Bombardier; it informed them that their targeted recruiting was occurring at a critical time in the development of the C-Series, Global 7000, and Global 8000 Aircraft; and it specifically stated that their continued "activities in order to entice some key flight test employees to leave the employ of Bombardier and join AeroTEC LLC may lead to serious consequences on Bombardier's affairs." (*Id.*) Bombardier also requested that their targeted recruiting activities immediately cease. (*Id.*)

~~53.~~59. On April 26, 2016, Bombardier followed up with AeroTEC concerning the impropriety of its targeted recruiting efforts. In addition to repeating its positions previously stated in its October 22, 2015 letter, Bombardier cited additional instances of improper recruiting efforts, including but not limited to using outgoing-but-still-current Bombardier personnel to actively recruit other Bombardier employees before their departure from Bombardier. (*See* Ex. C.) Bombardier also emphasized its former employees' ongoing obligation to maintain the confidentiality of Bombardier's proprietary information. (*Id.*) Bombardier requested that in addition to discontinuing the practice of targeting Bombardier employees for recruitment, AeroTEC and all its former Bombardier employees execute an

attached "Agreement and Acknowledgement of Obligations and Actions to Ensure Compliance with the Same" ("Agreement"). (*Id.*) Terms of the Agreement included "refrain[ing] from, amongst other things, . . . Using or disclosing any confidential or proprietary information of Bombardier" as well as "Directly or indirectly soliciting or communicating with any current or recently departed employee of Bombardier regarding any employment or similar opportunities for work . . . for a period of one year." (*Id.*) Bombardier also provided a copy of relevant portions of Bombardier's Code of Ethics. (*Id.*) Notably, Bombardier's Code of Ethics expressly provides, "~~Employees~~[e]mployees agree to maintain [the] confidentiality [of Bombardier's confidential information] at all times, even after leaving the employ of Bombardier." (*Id.*; *see also* Ex. D, at 15.)

~~54.~~60.    Having achieved no progress with its correspondence with AeroTEC directly, Bombardier on June 3, 2016 contacted Mr. Luke Walker of MHI, MITAC's corporate parent, to address concerns relating to AeroTEC's improper recruiting efforts. Bombardier informed MHI of its concern that AeroTEC had "recently been soliciting and recruiting a number of key employees . . . , despite being asked by us on numerous occasions to cease and desist from that practice." (Ex. E.) Bombardier continued:

> ~~. . . we~~[W]e have reasons to believe that AeroTEC has been soliciting Mr. Ed Grabman, one of our test pilots who will be critical to the Global 7000 and 8000 flight test program. His departure would seriously disrupt our flight test program.
>
> We also have reasons to believe that some of these former Bombardier employees have been transferred to MHI or are working on the MRJ flight test program.
>
> This raises serious concerns. First, this is draining our capabilities and depriving us of key resources that are critical to the success of our aircraft programs in development. Second, the science and expertise of flight testing can only be acquired through experience and is extremely valuable to any OEM. We are concerned that some of the Bombardier proprietary methods and know-how ("Proprietary IP") developed or acquired by the former Bombardier employees hired by AeroTEC while working for

Bombardier will inevitably be transferred and used by AeroTEC or MHI for the purpose of their flight testing activities.

I am seeking your assistance in ensuring that this practice of soliciting and hiring Bombardier key flight testing employees ceases immediately and that those Bombardier employees who have been hired by AeroTEC or MHI and are working on MHI aircraft program development do not use any Bombardier Proprietary IP.

(*Id.*) Mr. Walker in response stated, "The MITAC legal department and I are looking into this matter, and we will get back to you after we find out more information." (*Id.*) Thus, the concerns that Bombardier conveyed to MHI were subsequently shared by MHI with MITAC, and on information and belief, with MITAC America.

~~55.~~61. On July 14, 2016, after being "recently informed" of MITAC's upcoming Montréal job fair, Bombardier again reached out to MHI. On this occasion, Bombardier informed MHI of the potential harm to Bombardier resulting from that job fair. (*See* Ex. F.)

~~56.~~62. On August 5, 2016, Bombardier again reached out to MHI in an effort to protect its interests and intellectual property, this time from the desk of Bombardier's President and Chief Executive Office, Mr. Alain Bellemare, to MHI's Chairman of the Board Mr. Hideaki Omiya. Mr. Bellemare, citing the fact that "Bombardier and MHI have been partners on various aircraft programs for several decades," and in an effort to preserve their "mutually beneficial relationship," asked for MHI's cooperation concerning execution of the Agreements Bombardier sent to AeroTEC in April 2016. (Ex. G.) Mr. Bellemare was forced to follow up with Mr. Omiya on January 27, 2017. (*See* Ex. H.) Mr. Bellemare again requested that the targeted solicitation of Bombardier employees immediately cease, and he stated unequivocally as follows:

Last August, I wrote to inform you that MHI has been engaging in massive solicitation of Bombardier engineers and asked that MHI cease[] such solicitation which is contrary to the relationship of trust that must prevail between close business partners such as ourselves. Unfortunately, despite my letter to you and the various attempts that my team has made to address the situation with your team, MHI continues to actively solicit and hire key employees of Bombardier. The employees targeted by MHI are highly skilled and specialized engineers and test pilots that have developed valuable know-how and trade-secrets through their experience and wor~~thk~~k with Bombardier. . . .

> As you can understand, the hiring of these employees by MHI is detrimental to Bombardier's business. Not only does it deprive Bombardier of key resources at a time when these resources are crucial to the development of its new aircraft programs, but we have reasons to believe that the employees recruited by MHI will use the intellectual property owned by Bombardier to assist MHI in developing the MRJ aircraft which will compete against Bombardier aircraft.

(*Id.*)

~~57.~~63. On February 17, 2017, because its repeated attempts to resolve its concerns with the Corporate Defendants were unavailing, Bombardier commissioned outside counsel to contact Mr. Hiromichi Morimoto, President of MITAC, via couriered letter. (*See* Ex. I.) In so doing, Bombardier's counsel conveyed a formal "Letter of Demand – Solicitation of Key Bombardier Employees." (*Id.*) The letter reiterated in detail the concerns Bombardier previously conveyed to the various Corporate Defendants, and it contained a number of formal requests. Among those requests were to "[r]equire all former employees of Bombardier to sign agreements undertaking not to solicit employees of Bombardier"; to "[r]equire all former employees of Bombardier to sign agreements undertaking not to divulge or use any confidential, proprietary or trade secret information of Bombardier for the purposes of the MJR [*sic*] program"; and to "[t]ake any and all necessary measures to ensure that the agreements are respected by former employees of Bombardier." (*Id.*)

~~58.~~64. This February 17, 2017 Demand Letter prompted communications to begin between outside counsel for Bombardier and outside counsel for MITAC. For the next several months, counsel exchanged correspondence to relay to each other their respective positions. Communications between the parties resumed in 2018 after a brief hiatus to thoroughly evaluate opposing positions. The most recent discussion between Bombardier and MITAC was held on September 13, 2018. No resolution was reached.

65.     Through its series of letters and communications, Bombardier put MHI—and as such MITAC and MITAC America—on notice of specific individuals Bombardier believed could abscond with Bombardier's trade secret information, and of the specific information Bombardier believed would be compromised by MITAC's aggressive, targeted recruitment campaign. In particular, in his letter from January 27, 2017, Mr. Bellemare informed the chairman of MHI's board that MITAC's recruitment efforts were depriving Bombardier of key resources at a critical time for Bombardier, and that Mr. Bellemare feared that former Bombardier employees could potentially use intellectual property acquired at Bombardier to "assist MHI in developing the MRJ." (*See* Ex. H.) In Bombardier's next letter, sent through counsel, Bombardier identified key employees—including Keith Ayre— who had left Bombardier for MITAC, and expressed concern of the potential that these individuals "possess[ed] confidential information essential to the development of the MRJ program and to meeting certification requirements." (*See* Ex. I.)

66.     MHI's attorneys acted on behalf of both MITAC and MITAC America, and on information and belief, disseminated the notice to those subsidiary companies that MITAC and MITAC America may be knowingly and improperly acquiring and using Bombardier's trade secret information related to aircraft certification. As of at least January 27, 2017, through their shared counsel, both MITAC and MITAC America were on specific notice of the potential acquisition and use of Bombardier trade secrets by their new employees, and therefore knew or had reason to know of those trade secrets' improper acquisition as of at least that date. The targeted recruitment campaign by MITAC and MITAC America therefore not only resulted in the transfer of trade secret information from Bombardier to MITAC and MITAC America, but also in Bombardier's expressly informing MITAC and MITAC America of their employees' misappropriation of trade secrets.

59.67.  Despite Bombardier's best efforts to prevent the continued targeted recruitment of its employees, Defendants MITAC, MITAC America, and AeroTEC now employ, on information and belief, at least 92 former Bombardier personnel whose current job

responsibilities relate directly to the development, certification, and/or commercialization of the MRJ. Among these are the individually named Defendants, who absconded with highly sensitive Bombardier trade secret information before departing Bombardier.

60.68.   For example, Defendant Laurus Basson, on information and belief, is currently working on the MRJ project as a "Mechanical Systems Engineer (FCS)" at AeroTEC in Seattle, Washington. (Denkenberger Decl., Ex. 2.) As a condition of his employment, Defendant Basson, on information and belief, signed an acknowledgement on the first day of his employment, March 4, 2013, of having received and agreeing to abide by the then-current version of Bombardier's Code of Ethics. (*See* Ex. K, agreeing to abide by the version of Bombardier's Code of Ethics attached hereto as Ex. D, which is an unmodified version of the Code of Ethics that Mr. Basson agreed to abide by when he first began employment at Bombardier.) Under this Code of Ethics, which has a copyright date of 2012 (hereinafter, "the 2012 Code of Ethics"), Defendant Basson agreed to "not divulge confidential information to anyone other than the person or persons for whom it is intended." (*See* Ex. D, at 14-15.) Moreover, Defendant Basson "agree[d] to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (*Id.*) Defendant Basson was based in and worked out of Bombardier's offices in Canada, until leaving to work for AeroTEC. On March 4, 2016, his last day as a Bombardier employee, Defendant Basson, without permission, sent an email from his Bombardier email account to his private "Yahoo" email account two (2) proprietary PowerPoint slide decks entitled, "TCCA Skew Detection Presentation- Updated with latest Systems and Structure Limits 16-02-01.pptx" and "2016-03- 03 TCCA Skew Detection Presentation-JAN 28 FINAL.pptx." (*See* Ex. J.) These documents contain highly sensitive, proprietary Bombardier trade secret information concerning Bombardier's Global 7000/8000 Skew Detection System ("SDS") and related confidential communications Bombardier made with Transport Canada for certification purposes, such as (a) the proposed agenda and topics Bombardier intended to cover with TCCA in presenting its SDS for consideration and acceptance during negotiations well known to be highly

confidential; (b) explicit identification of Bombardier's Preliminary Design Review ("PDR") Requirements; (c) a design schematic of Bombardier's Slat/Flap Control System ("SFCS") complete with identification and placement of the various skew sensors; (d) explicit identification of Bombardier's Critical Design Review ("CDR") Requirements; (e) disclosure and explanations of Bombardier's previously approved CRJ SDS, complete with high-level schematics, upon which Bombardier's Global 7000/8000 aircraft SDS was predicated; (f) particularized and extensive details comparing and contrasting the SDS of the Global 7000/8000 and the CRJ SDS, complete with specific identification of design and component differences for both production and Safety of Flight ("SOF") configurations for the two models, and including defined and measured operating parameters and system characteristics of each SDS; (g) particular details concerning installation of various components; (h) summaries and detailed analysis of compliance with various regulatory requirements related to criticality impact, Functional Development Assurance Level ("FDAL"), and Candidate Certification Maintenance Requirements ("CCMR"); (i) identification of particularized certification regulations "deemed applicable for demonstration of SDS compliance"; (j) summaries and data sufficient to show results from specifically identified testing configurations and compliance with applicable regulations; (k) identification of the third party suppliers of various components of the SDS; (l) identification of and explanation of the Skew Detection Unit ("SDU") inputs/outputs and built-in tests; (m) explanation of conditions triggering SDS Crew-Alerting System ("CAS") messaging; (n) explanation and analysis of SDS Proof of Concept testing; and (o) explanation and analysis of SDS SOF requirements. These files also contain over 60 slides of particularized information concerning Bombardier's design, development, testing, and certification approach of the Global 7000/8000 Aircraft SDS, and it identifies with precision and specificity the entirety of regulations for which Bombardier specifically comported its testing to demonstrate regulatory compliance of its SDS. All of this information is highly proprietary to Bombardier, and none of it is publicly disseminated or available—including the testing data and information found therein. Even the

applicable regulations for which Bombardier tested compliance are not readily ascertainable, because those particular regulations applicable to a specific system are a subset of countless regulations relating to commercial aircraft certification, and they are identified only after an aircraft manufacturer meets in confidence with certifying authority representatives (often through the course of several meetings) to reach agreement on which specific subset of regulations must be satisfied. The information contained in these documents would be invaluable to anyone involved in an effort to certify an aircraft, specifically, and without limitation, to those attempting to certify the MRJ's skew detection system, for entry into service, and Defendant Basson knew or should have known as much. The information contained in these documents is not readily ascertainable by proper means, as it was the result of countless hours of design effort, testing, verification, and other development efforts dedicated towards certification of Bombardier's aircraft throughout the past thirty (30) years and Defendant Basson knew this. The documents also were the subject of efforts reasonable under the circumstances to keep secret, as access to the documents was restricted by Bombardier and the documents themselves were marked private and confidential, with Bombardier expressly reserving all rights in the documents. Further, Defendant Basson knew or should have known he was violating Bombardier's 2012 Code of Ethics—a code taught to each Bombardier employee with the express expectation that each remains compliant therewith— when he emailed such highly sensitive information to his personal email account. Defendant Basson expressly "agree[d] to conform to" Bombardier's Code of Ethics after expressly acknowledging "having received Bombardier's Code of Ethics" and "having read and understood all the dispositions of that Code." (*See* Ex. K.) And because he emailed these documents to himself on his last day as a Bombardier employee knowing he would soon begin work on the MRJ project for AeroTEC, Defendant Basson, on information and belief, had every intention of misusing this information in his new role.

61.69.    Similarly, upon information and belief Defendant Marc-Antoine Delarche is a former Bombardier employee currently working on the MRJ project as an Aircraft

Performance Engineer at MITAC after having worked in the same capacity at AeroTEC. (Denkenberger Decl., ~~Ex. 3.)~~Exs. 3 and 4.) As a condition of his employment, Defendant Delarche signed an acknowledgement on the first day of his employment, January 17, 2005, of having received and agreeing to abide by the then-current version of Bombardier's Code of Ethics. (*See* Ex. L, agreeing to abide by the version of Bombardier's Code of Ethics attached hereto as Ex. M, which is an unmodified version of the Code of Ethics that Mr. Delarche agreed to abide by when he first began employment at Bombardier.) Under this Code of Ethics, which has a copyright date of 2004 (hereinafter, "the 2004 Code of Ethics"), Defendant Delarche agreed to "not divulge confidential information to anyone other than the person or persons for whom it is intended." (*See* Ex. M, at 13–14.) Moreover, Defendant Delarche "agree[d] to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (*Id.*) Defendant Delarche was based in and worked out of Bombardier's offices in Canada until leaving to work for AeroTEC. Defendant Delarche's last day with Bombardier was May 18, 2016, but in the two (2) weeks leading up to his departure, after giving his notice of resignation, he sent several documents containing highly sensitive Bombardier trade secret information to his personal email account. Specifically, on May 6, 2016, Defendant Delarche emailed six (6) such documents from his work email to his "Hotmail" email account entitled "RAA-BA503-412 Reduction of Temperature, Airspeed, Altitude and Mach          Number Errors.pdf";    "RAA-BA503-414  Lag_Effects_in_the_Production_and_Experimental_~~Pitot-Static~~PitotStatic_ Systems.pdf";       "RAA--BA503-418 Data Reduction of Ground Position Errors.pdf," "RAA-BA500-412 Rev A - Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf";                                            "RAA-BA500- 414-RevA--_Lag_Effects_in_the_Production_and_Experimental_Pitot-Static_Systems.pdf";  and  "~~RAA-BA~~RAABA500-418_signed.pdf." (*See* Exs. ~~L~~N-~~M~~O.) Generally speaking, these documents are certification reports for Bombardier's CSeries Aircraft, specifically the CS100 Model BD-500-1A10 Commercial Aircraft and the CS300 Model BD-500-1A11, specifically recording the demonstration of compliance and constituting statements of compliance with pertinent

certification type approval requirements as established by government regulations. More specifically, the documents disclose highly confidential and proprietary Bombardier trade secret information concerning the CS100 and CS300 airspeed indicating systems under various conditions, static pressure systems, air temperature indicators, and lag effects during flight. They disclose very specific and/or highly technical data and information pertaining to (a) Bombardier's production and experimental air data systems; (b) the flight tests conducted by Bombardier to determine the air data system errors, including but not limited to the flight test aircraft configurations used by Bombardier to demonstrate regulatory compliance (of which there are literally hundreds of possibilities, as a result of the various positions in which, for example, inboard and outboard slats, flaps, and ailerons could be configured and whether such tests were conducted with the landing gear deployed); (c) Bombardier's proprietary methodology used to determine Static Source Error Correction ("SSEC"); (d) how Bombardier's air data systems comport with applicable and governing regulations for certification, including but not limited to measuring and testing performance thresholds when approaching flight stall speeds as well as at above maximum operating speeds; (e) Bombardier's total temperature probe; (f) identification of the regulations applicable to the air data system for which Bombardier is demonstrating compliance; (g) the proprietary methodology Bombardier used to determine the various lag values of its air data system; (h) the specific instrumentation installed by Bombardier for lag testing; (i) the parameters used to identify and quantify its air data system lag; (j) the proposed lag constants Bombardier used to calculate various lag through application of standardized formulae; (k) specific details concerning Bombardier's air data system for production; (l) detailed schematics of Bombardier's production and experimental air data systems; (m) specific data collected concerning the various lags of its air data systems; and (n) information in the form of extensive testing data under very specific and explicit testing conditions and configurations sufficient to establish conclusively and convincingly with the certifying authority that during accelerated takeoff for the CS100 and CS300 aircraft, ground speed errors between indicated

and calibrated airspeeds were sufficiently negligible so as to require no correction to decision speed (V1), rotation speed (VR), or takeoff safety speed (V2) as they are required to be presented in each aircraft's Aircraft Flight Manual ("AFM"). The information contained in these documents would be invaluable to anyone involved in an effort to certify aircraft for entry into service—they provide tremendous insight as to the quality, quantity, and type of information an aircraft manufacturer needs to provide to any particular regulatory agency to obtain certification—and Defendant Delarche knew or should have known as much. The information contained in these documents is not readily ascertainable by proper means, as it was the result of innumerable hours of exhaustive development efforts throughout the past thirty (30) years, and Defendant Delarche knew it. The documents also were the subject of efforts reasonable under the circumstances to keep secret, as access to the documents was restricted by Bombardier and the documents themselves were marked private and confidential, with Bombardier expressly reserving all rights in the documents. Further, Defendant Delarche knew or should have known he was violating Bombardier's 2004 Code of Ethics when he emailed such highly sensitive information to his personal email account. Defendant Delarche expressly agreed to conform to Bombardier's 2004 Code of Ethics after expressly acknowledging having received Bombardier's Code of Ethics and having read and understood all dispositions of that Code. (*See* Ex. NL.) And because he emailed these documents to himself in the two (2) weeks before his departure from Bombardier, after resigning, knowing he would soon begin work on the MRJ project for AeroTEC, Defendant Delarche on information and belief had every intention of misusing this information in his new role.

70.    On information and belief, Defendant Delarche took the Bombardier trade secrets from his new employer AeroTEC to his latest employer, MITAC. All of the knowledge Defendant Delarche imparted to AeroTEC, he then transferred to MITAC, which was and is collaborating closely with AeroTEC on the certification of the MRJ.

62.71.    Like Defendants Basson and Delarche before her, Defendant Cindy Dornéval is a former Bombardier employee who, upon information and belief, is currently working on the

MRJ project for AeroTEC. (Denkenberger Decl., Ex. ~~4.)~~5.) As a condition of her employment, Defendant Dornéval signed an acknowledgement on the first day of her employment, July 3, 2007, of having received and agreeing to abide by the then-current version of Bombardier's Code of Ethics. (*See* Ex. Q, agreeing to abide by the version of Bombardier's Code of Ethics attached hereto as Ex. M, which is an unmodified version of the Code of Ethics that Ms. Dornéval agreed to abide by when she first began employment at Bombardier.) Under the 2004 Code of Ethics, Defendant Dornéval agreed to "not divulge confidential information to anyone other than the person or persons for whom it is intended." (*See* Ex. M, at 13–14.) Moreover, Defendant Dornéval "agree[d] to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (*Id.*) Defendant Dornéval was based in and worked out of Bombardier's offices in Canada, until leaving to work for AeroTEC. Defendant Dornéval's last day with Bombardier was February 10, 2017, and in the weeks, days, and even hours before her departure, she sent several documents containing highly sensitive Bombardier trade secret information to her personal email account. For example, on November 18, 2016, Defendant Dornéval emailed two (2) documents from her work email to her "Hotmail" email account entitled "FTP PROD CSeries Rev 5.0 – 17 November 2016.docx"; and "FTP PROD CSERIES Rev 5.0 – 17 November 2016.pdf." (*See* Ex. ~~O~~P.) Generally speaking, these documents constitute Production Test Flight Profiles for Bombardier's CSeries Aircraft. More specifically, these documents disclose highly confidential and proprietary Bombardier trade secret information disclosing (a) preflight checklists detailing every system and component the flight crew must check prior to every test flight; (b) the ground checks that the flight crew must perform prior to every test flight; and (c) the critical in-flight checklist that details hundreds of flight conditions the aircraft must perform to efficiently gather the data necessary to show the aircraft and its systems perform properly during flight and therefore that the aircraft warrants a Certificate of

Airworthiness. In other words, these documents constitute hundreds of pages of highly sensitive, proprietary Bombardier trade secret information in the form of specific details concerning the flight test profiles developed throughout previous certification which Bombardier employed in gathering necessary data to obtain certificates of airworthiness for the C-Series aircraft prior to being able to commercially deliver them. This information would be invaluable to anyone involved in an effort to obtain certificates of airworthiness for commercial delivery of an aircraft—not least because it would give the reader flight streamlined testing parameters and configurations to prove that the aircraft meets the certified design criteria without having to arrive at those parameters and configurations independently or having to conduct needless, incredibly costly additional flight testing. The information contained in these documents is not readily ascertainable by proper means, as it was the result of innumerable hours of exhaustive development efforts throughout the past thirty (30) years, and Defendant Dornéval knew it. The documents also were the subject of efforts reasonable under the circumstances to keep secret, as access to the documents was restricted by Bombardier and the documents themselves were either marked private and confidential with Bombardier expressly reserving all rights in the documents or the documents on their face contained known confidential information. Further, Defendant Dornéval knew or should have known she was violating Bombardier's 2004 Code of Ethics when she emailed such highly sensitive information to her personal email account. Defendant Dornéval expressly agreed to conform to Bombardier's Code of Ethics after expressly acknowledging having received Bombardier's 2004 Code of Ethics and having read and understood all dispositions of that Code. (*See* Ex. PQ.)

63.72.    In addition to her illicit email of November 18, 2016, Cindy Dornéval improperly attempted to transmit to her personal email account highly sensitive, proprietary Bombardier trade secret and other Bombardier Confidential information on her last day at Bombardier on February 10, 2017. Shortly after 8:00 P.M. upon completing her last day of work, Defendant Dornéval sent an email to her personal email account attaching a .zip file

named "Carriere et training.zip" containing copies of three (3) Bombardier's Air Safety Investigation Office (ASIO) Manuals, entitled "010101," "020301," and "BM7002.06.01.01 - TSG." (*See* Ex. ~~Q~~R.) These confidential manuals set forth "standards and requirements regarding aircraft accident and incident investigations" meeting regulatory certification requirements. Defendant Dornéval also attached Bombardier's Computerized Airplane Flight Manual ("CAFM") calculation methodology, entitled "BM7002.02.15.02 – Flight Performances" to that email. This document sets the standard for all current and future Bombardier aircraft CAFM and would be highly valuable to another aircraft manufacturer's attempts to obtain a certificate of airworthiness to enable it to deliver its commercial aircraft: the document discloses with specificity the performance calculation methodology that Bombardier uses in its CAFM to calculate performance outputs for various scenarios that can occur during flight, including but not limited to identifying numerous coefficients determined by equations and constants that were negotiated with applicable regulatory authorities; identifying calculation methodologies for scenarios involving drag on the aircraft from various precipitation conditions, for various airspeed and altitude calibrations, for maximum altitude, weight, mach, load factor, and bank angle scenarios; and a large volume of other significant, specific, and highly proprietary Bombardier trade secret information that was the result of extraordinary investments in time and resources in design, development, and testing of critical Bombardier aircraft components. Defendant Dornéval's email attempt failed, however, because the file sizes of the email attachments were too large. Undaunted by her first failure, Defendant Dornéval attempted to send the same attachments, with one exception, to her personal email account again at 8:~~14PM~~13 P.M. (PST); at 8:18~~PM~~ P.M. (PST); and at 8:20~~PM~~ P.M. (PST). (*Id.*) The lone exception, Bombardier's CAFM calculation methodology, contained 186 pages of Bombardier highly proprietary and trade secret certification information. Upon information and belief, Defendant Dornéval absconded with this information in either hard copy form or through portable storage device means after realizing the file was too large to send by way of email.

64.73. While each of Defendant Dornéval's attempts to send highly sensitive, proprietary Bombardier trade secret information and other confidential information to her personal email account late in the evening on her last day of work failed, on information and belief Defendant Dornéval nonetheless privately retained, in addition to the CAFM calculation methodology, copies of the documents entitled "010101," "020301," and "BM7002.06.01.01 – TSG" in violation of the Bombardier 2004 Code of Ethics. These documents were expressly marked as Bombardier Confidential and Proprietary Information, and the information contained therein was "not to be used, reproduced or disclosed to others without the written consent of Bombardier Inc." Because Defendant Dornéval emailed or otherwise retained personal copies of this information knowing she would soon begin work on the MRJ project for AeroTEC, on information and belief, she had every intention of misusing this information in her new role.

65.74. Defendant Ayre is another former Bombardier employee who, upon information and belief, is currently working on the MRJ project for MITAC. (Denkenberger Decl, Ex. 5.), Ex. 6.) Defendant Ayre signed an acknowledgement on March 31, 1991, of having received and agreeing to abide by the then-current version of Bombardier's Code of Ethics. (*See* Ex. S.) Under this Code of Ethics, which was implemented in 1991 (hereinafter, "the 1991 Code of Ethics"), Defendant Ayre, upon information and belief, agreed to "keep secret and undertake not to use for his profit or the profit of third parties, nor to divulge or transmit to third parties: information, knowledge or documents designated as secret, confidential or privileged." Moreover, Defendant Ayre, upon information and belief, agreed to abide by these provisions "during and at all times after the duration of his employment with the Company." Defendant Ayre was based in and worked out of Bombardier's offices in Canada, until leaving to work for MITAC.

75.   Bombardier relied, to its detriment, on the representations that Defendant Ayre made by signing his 1991 acknowledgement letter. Specifically, Bombardier relied on these representations to provide him with confidential and proprietary and trade secret information. Bombardier's reliance on these representations is further evidenced by the investment it made

in Defendant Ayre's professional growth, ultimately resulting in Defendant Ayre becoming a Bombardier Design Approval Designee—a position requiring heightened trust and fidelity.

76.        Defendant Ayre's last day with Bombardier was August 26, 2016, and in the weeks and days before his departure, he sent several emails containing highly sensitive Bombardier trade secret information to his personal email accounts. For example, on August 24, 2016, Defendant Ayre sent multiple emails from his Bombardier work email account to either his personal "Apple" or "Gmail" account containing detailed Bombardier trade secret information concerning Bombardier aircraft certification efforts and issues, schematics, and discussions with Transport Canada (TCCA). (*See*, *e.g.*, Ex. R̶S.) This information would be invaluable to anyone involved in an effort to obtain certificates of airworthiness for commercial delivery of an aircraft. Additionally, the information contained in these emails is not readily ascertainable by proper means, as it was the result of innumerable hours of exhaustive development efforts throughout the past thirty (30) years, and Defendant Ayre knew it. The information contained in these emails were the subject of efforts reasonable under the circumstances to keep secret, as the information on its face is precisely the type of highly proprietary and confidential information routinely marked as such by Bombardier, is the type of information identified in Bombardier's 1991 Code of Ethics as highly confidential and trade secret information, and is information that an individual with Defendant Ayre's extensive experience would know to be trade secret information of Bombardier. Defendant Ayre served as Bombardier's Principal Engineering Specialist (PES) and TCCA's Design Approval Designee (DAD), and in that role Defendant Ayre would have every reason to know that the information he was sending to his personal email accounts was restricted, was not for any use other than for Bombardier's benefit, and was not to be circulated through unsecure or private channels. Such distribution was expressly prohibited by Bombardier's 1991 Code of Ethics, a Code Defendant Ayre agreed to abide, a representation upon which Bombardier detrimentally relied. (*See* Ex. R̶S.)

66.77.  Upon information and belief, Defendant Ayre had every intention of misusing

Bombardier trade secret information for MRJ certification efforts once he began work for MITAC. For instance, on July 11, 2016, Defendant Ayre emailed to himself what appears to be a summary of his job responsibilities that he would assume upon joining MITAC, and the next day, on July 12, 2016—more than one month before his final day at Bombardier— Defendant Ayre signed and dated a MITAC "Employee Proprietary Information, Inventions, Non-Competition and Non-Solicitation Agreement." (Ex. ~~R~~S.) Among Defendant Ayre's responsibilities at MITAC would be to "[d]efine and support flight test for all smoke test detection, smoke penetration and smoke evacuation activities and systems effects." (*Id.*) Two days before his departure from Bombardier, on August 24, 2016, Defendant Ayre emailed to his personal account a highly confidential email discussing Bombardier trade secrets that he initially received from TCCA nearly three years earlier concerning smoke penetration testing for Bombardier aircraft. (*Id.*)

78.    Additionally, on August 18, 2016, Defendant Ayre emailed to himself a copy of correspondence previously exchanged with MITAC personnel, Mr. Koki Fukuda, the Engineering Lead of Ice Protection Systems for the MRJ, concerning Bombardier trade secret certification activities, the details of which he was "happy to discuss" "when [he is] in the MRJ office." (*Id.*); *see also* Dkt. No. 128, Ex. A (full email from Ayre to Fukuda, dated August 19, 2016.) On information and belief, Mr. Fukuda's responsibilities at the time involved certification efforts related to ice detection and prevention systems for the MRJ, the very subject of his correspondence with Mr. Ayre. In his correspondence with Defendant Ayre, Mr. Fukuda demonstrated a complete lack of understanding or awareness of the history and progression of the relevant certification requirements for these systems. As a result, Mr. Fukuda contacted Mr. Ayre while Mr. Ayre was working for Defendant Bombardier to solicit direction related to the certification process and requirements for these systems on the MRJ. Mr. Fukuda knew or should have known that the information he was soliciting, and the information he eventually received from Mr. Ayre in response, included Bombardier

confidential, proprietary, and/or trade secret information. Moreover, not only did Mr. Ayre respond to Mr. Fukuda's solicitation by disclosing Bombardier's trade secret information, but he did so during normal business hours, and on information and belief, while at Bombardier's facilities and using Bombardier's equipment. Mr. Fukuda, within the scope of his employment at MITAC, thereby induced Mr. Ayre to breach his obligations to Bombardier to not divulge such confidential, proprietary, and/or trade secret information to others, and in violation of his ongoing duties of good faith and fidelity to his employer.

79.    On information and belief, Defendant Ayre also sent other emails from his Bombardier email address to his personal email address and then forwarded those emails to MITAC. For example, on August 24, 2016, two days prior to his last day at Bombardier, Defendant Ayre—using Bombardier equipment and from Bombardier facilities—sent an email addressed to an individual named "Frederic" (who upon information and belief was a MITAC employee or contractor during the relevant time period) disclosing Bombardier confidential and/or trade secret information pertaining to Fire Detection and Extinguishing ("FIDEX") and related System Safety Analysis ("SSA"). On information and belief, Mr. Ayre's disclosures and teachings to "Frederic" in August 2016 led to an improved redesign of the MRJ now subject to certification efforts. (*See* Denkenberger Decl., Exs. 26-28.)

67.80. Upon information and belief, Defendant Ayre also has personally visited and participated in MRJ certification efforts in Washington State, and he illicitly relied on and made use of Bombardier trade secret information as part of those visits and efforts. Additionally, Defendant Ayre knew at all relevant times that MRJ certification efforts were taking place within this judicial district, and that the trade secret certification information he deliberately misappropriated from Bombardier would be used within this judicial district to the detriment of Bombardier.

68.81.  In addition to the named Individual Defendants, and on information and belief, other former Bombardier personnel now currently residing in Japan also absconded with Bombardier trade secret information. For example, and on information and belief, Andrius

Knystautas is another former Bombardier employee who is now working on the MRJ project after having been involved with the C-Series project. Specifically, Mr. Knystautas, after resigning, worked his last day at Bombardier on March 2, 2017, but less than one (1) month before his departure he sent an email to his "Videotron.ca" email account with a password-protected .zip file attached thereto. Despite repeated efforts, Bombardier to date has been unable to determine the contents of that .zip file because of the strength of password protection Mr. Knystautas, on information and belief, imparted on that file. On further information and belief, the .zip file Mr. Knystautas transmitted to his personal email account contains highly sensitive, proprietary Bombardier trade secret information.

82.    The hiring of Bombardier personnel involved in the certification process by MITAC, MITAC America, and AeroTEC had a detrimental impact on Bombardier's certification efforts, as Bombardier warned it would. For example, the hiring of Bombardier personnel by MITAC, MITAC America, and AeroTEC occurred during Bombardier's efforts to certify its C-series Aircraft, as well as its Global 7000/8000 Aircraft. As a result of the actions of Defendants MITAC, MITAC America, and AeroTEC, as well as those acting on their behalf (both separately and collectively), Bombardier's certification efforts for these aircraft were delayed by several months. The Defendants were alerted to the fact that Bombardier would sustain harm in the form of delays to its certification schedule as a result of Defendants' targeted recruiting. (*See* Exs. C, E, F, and I.) Defendants MITAC, MITAC America, and AeroTEC nevertheless continued to recruit and hire Bombardier personnel involved in the certification process even knowing about the detrimental impact that these actions would have on Bombardier.

### MITAC America's Continuous Operation as Alter Ego of MITAC

83.    MITAC formed its subsidiary, Defendant MITAC America, on June 4, 2014, to, upon information and belief, focus on drawing from North American resources to design, develop, and certify the MRJ. (*See, e.g.*, Denkenberger Decl., Exs. 10 and 11.)

84.     Upon information and belief, MITAC America has never operated independently from MITAC, and in fact, it operates as an extension, or alter ego, of MITAC. Based on publicly available information and on sources from MITAC itself, the two companies are, in fact, one:

a.      MITAC America does not maintain its own website. Attempts to visit a web address for MITAC America are redirected to www.flythemrj.com (accessed April 19, 2019).

b.      That page—entitled the Mitsubishi Aircraft Corporation's "Company Profile" lists the five locations of the company together, with Nagoya being the "head office" and Seattle and Dallas comprising the "Mitsubishi Aircraft Corporation America" offices in the United States. *See* Denkenberger Decl., Ex. 37.

c.      Evidence from numerous sources shows that there is no distinction between the Nagoya and Seattle offices for the purposes of designing and certifying the MRJ. For example, according to a "Progress Update" posted by the MRJ team in December 2017, the teams merely trade work according to whether it is daytime in Seattle (and nighttime in Japan), or daytime in Japan (and nighttime in Seattle). According to an employee in the MRJ's operations support group, "Any data that needs crunching, engineering that needs to be worked out, we can hand over to Japan and they can take a stab at it while we're asleep." *See* Denkenberger Decl., Ex. 11, at 2.

d.      Further, the article describes:

Once a flight test has been performed, there's a debrief in the afternoon where results are reviewed and data is prepared for transmission to Japan. As the day progresses, Nagoya wakes up and the cycle begins anew. Workers on site say it feels similar to working at a commercial airport, where there's a constant flurry of activity.

Rather than two teams working separately from opposite sides of the world, the MRJ operation has evolved and come together as one team.

*Id*. at 3.

85.     In MITAC's own words, the entities working in Japan share specific, technical knowledge pertaining to the certification efforts with the domestic entities (MITAC America and AeroTEC)—and vice-versa—at least twice per day.

86.     MITAC and MITAC America share key personnel, and in many cases, employees hold positions within both companies simultaneously and without conflict. As one example, Hirofumi Takahashi, the president of MITAC America, states publicly that in addition to his MITAC America role, he is also currently a "Manager Corporate Planning" at "Mitsubishi Aircraft Corporation." *See, e.g.*, Denkenberger Decl., Ex. 38.

87.     Further, the employees of the two entities share an email address domain name, mitsubishiaircraft.com.

88.     The companies also share a legal team. (*See* Dkt. No. 107, ¶ 3.)

89.     On information and belief, MITAC America is a wholly owned subsidiary of MITAC, and MITAC America generates no revenue of its own.

90.     On information and belief, MITAC America also generates no profit of its own.

91.     On information and belief, MITAC America is entirely controlled by its parent company MITAC. MITAC America has neither autonomy nor decision making authority over its functions, its revenue, or its budget.

92.     MITAC has stated publicly that by extending its operations to the United States through MITAC America, MRJ certification processes have advanced considerably. According to its Progress Update, MITAC's expansion "is already producing results: In recent months, the MRJ's development has accelerated and the company has set important benchmarks on tests critical to achieving type certification." (Denkenberger Decl., Ex. 11, at 3.)

93.     On information and belief, MITAC and MITAC America are currently using their corporate structure to shield MITAC America from liability for knowledge of Bombardier's trade secrets under the guise of separate business identity. However, as

demonstrated by MITAC's own statements, the companies are constantly sharing information. That information sharing has led, in MITAC's own words, to "results" for the MRJ in the certification process. On information and belief, that information shared includes but is not limited to Bombardier's trade secret information as well as the knowledge that the information was acquired by former Bombardier personnel known to have had duties to maintain that information as confidential.

94.    Continued adherence to the fiction of separation between MITAC and MITAC America will harm Bombardier and promote injustice. First and foremost, it will harm Bombardier because former Bombardier employees or others may believe that they can transmit Bombardier trade secrets to MITAC with impunity, as long as they ostensibly avoid MITAC America. Second, it will also ensure that if MITAC is held liable for the claims alleged in this case, only MITAC will suffer the consequences—potentially allowing MITAC America to continue with its certification efforts unabated. That will produce the same harm for Bombardier as if this case had never been filed.

95.    Adherence to this fiction will also promote injustice because any other companies offering regional jets to compete with the MRJ would suffer the same fate as Bombardier. This will have the result of stifling innovation in an industry that is absolutely critical for the regional and worldwide economies.

69.96.  Defendants John and/or Jane Does 1-88 are individuals, including Mr. Knystautas, formerly employed by Bombardier and are currently working for either MITAC, MITAC America, or AeroTEC, andor have some relationship to or connection with the MRJ project. Individuals will be named with specificity to the extent discovery reveals that any individual appears to have misappropriated Bombardier trade secret information.

## CLAIMS FOR RELIEF

## Count I: Violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.* (MITAC)

70.97.  Bombardier incorporates by reference paragraphs 1-69,96, above, as though fully

set forth herein.

71.98. Prior to the commencement of the C-Series aircraft program, Bombardier had certified twenty-seven (27) clean-sheet design and derivative programs over a period of thirty (30) years. To successfully achieve said design certifications, Bombardier developed and owns confidential, proprietary, and trade secret information. Said information was then used throughout the design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad, as described above, of Bombardier's latest clean-sheet design: the C-Series aircraft. Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier. This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

72.99. This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

73.100.    Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

74.101.This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the

disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC in its efforts to develop, certify, and commercialize its MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, ~~medium-range~~ jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

~~75.~~ 102. In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836, MITAC misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged above and herein. In addition to the foregoing, and upon further information and belief as detailed in part below, MITAC has misappropriated Plaintiff's trade secrets under federal law because it acquired Bombardier trade secret information knowing or having reason to know that it was acquired by improper means. Additionally, MITAC misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, MITAC knew or had reason to know its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use. Alternatively, MITAC misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission, knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before MITAC materially changed its position.

~~76.~~ For example, and by no means limiting, MITAC (as described above) had been working on the MRJ project for "more than five years" by August 22, 2013, and by that time it had already "hired many foreign experts, especially ex-Boeing people, to help." (Denkenberger Decl., Ex. ~~21.~~ 22.) Notwithstanding years of its best efforts in conjunction with outside expert consulting help, MITAC was heading for ~~its fourth announced delay by the end of 2015. Upon realizing that it was no closer to successful certification of the MRJ program after seven (7) full years of effort than it was years before~~ further delays. On information and

belief, MITAC and/or MITAC officers and/or directors formed MITAC America on June 4, 2014, at least in part to expand efforts into the United States to work the MRJ project. On further information and belief, MITAC America (MITAC's alter ego) then opened the Seattle Engineering Center jointly with AeroTEC on August 3, 2015, at least in part to further expand U.S. efforts to work the MRJ project. This resulted in "a constant flow of communication" among MITAC, MITAC America, and AeroTEC, which upon information and belief included the sharing of Bombardier trade secret information and the fact that such information had been illicitly obtained. (Denkenberger Decl., Ex. 11.) Shortly thereafter, on information and belief, MITAC began willful, targeted recruiting of Bombardier personnel—personnel who had experience in designing and/or certifying the clean-sheet, narrow-body, geared turbofan twin-engine, medium range C-Seriesaircraft to assist in the design and/or certification of MITAC'scertifying the clean-sheet, narrow-body, geared turbofan twin-engine, medium range C-Series aircraft—to assist in the design and/or certification of MITAC's clean-sheet, narrow-body, geared turbofan twin-engine MRJ aircraft. Upon further information and belief, MITAC specifically targeted Bombardier personnel for recruitment with the intention of using these new recruits to provide proprietary and trade secret Bombardier design and/or certification information for use in the MRJ project. This is evidenced as described above, but it is also evidenced by the fact that experienced aviation experts such as ex-Boeing personnel lacked sufficient information to prevent MITAC from experiencing four (4) significant delays in the MRJ timetable; by the fact that, upon information and belief, at least one (1) representative from MITAC —Mr. Koki Fukuda—was knowingly extracting confidential, proprietary, and trade secret information from then-current Bombardier personnel that had already accepted positions with MITAC and were simply working their notice periods for Bombardier in the scope of his employment with and for the benefit of MITAC from then-Bombardier Design Approval Designee Mr. Ayre; by the fact that MITAC hosted a job fair less than one (1) kilometer from Bombardier's global principal place of business weeks before the fourth announced delay of the MRJ project, advertising that it was "looking to hire over 200 Aircraft System Engineers who can work on Certification activities of MRJ aircraft" (Denkenberger Decl., Ex. 29); and by the fact that, upon information and belief, MITAC had knowledge of and condoned MITAC America's and AeroTEC's targeted recruiting of Bombardier personnel in Wichita, Kansas.;

and by the fact that it had been expressly informed by Bombardier that such continued, widespread, targeted recruiting efforts directed at Bombardier could well lead to misappropriation of Bombardier's intellectual property and trade secret information. (*See* Exs. C, E, F, G, and H.)

103.    Further, MITAC's misappropriation of Bombardier trade secret information is also evidenced by the fact that shortly after a critical mass of former Bombardier personnel began working for MITAC, MITAC America, and AeroTEC in their respective capacities on the MRJ project—a period that began over eight (8) years after the MRJ project was initially launched— MITAC abandoned its design of certain MRJ systems and electrical configurations in favor of a new design that ~~would be easier to certify, even though that would require  MITAC to begin its certification process anew~~was prompted by Mr. Ayre's feedback while he was still employed by Bombardier. On information and belief, MITAC has been using Bombardier confidential and trade secret information to assist in the new design's certification, and MITAC has been benefiting from MITAC America's and AeroTEC's known illicit use of Bombardier's trade secrets to further the MRJ project. On further information and belief, MITAC kn~~e~~ows or should ~~know~~have known that certification of its new design ~~will rely on~~incorporates Bombardier trade secret information, because of the aforementioned circumstances leading up to and surrounding MITAC's January 2017 announcement~~—~~—said circumstances including the explicit notification by Bombardier to MHI counsel who acted on behalf of both MITAC and MITAC America and were on specific notice of the potential acquisition and use of Bombardier trade secrets by its now-former employees (including Mr. Ayre).

104.    In addition to MITAC misappropriating Bombardier's trade secret information in a corporate capacity, MITAC is liable for trade secret misappropriation due to the conduct of its employees within the scope of their employment with and for the benefit of MITAC. Specifically, upon information and belief, MITAC employees, including Mr. Ayre, Mr. Knystautas, and Mr. Delarche, knowingly obtained, used, and/or disseminated at least portions of the Bombardier trade secret information identified above, and each did so within the scope of their employment with, and for the benefit of, MITAC to advance certification

efforts for the MRJ. Those employees also knew or had reason to know that the Bombardier trade secret information was improperly obtained, particularly because each was aware during their employment with Bombardier that this information was shared with Bombardier employees only because of an ongoing duty to maintain the confidentiality of this information even following an employee's departure from Bombardier. Their use of the information to further MRJ certification efforts contravened these ongoing obligations of confidentiality and constitute acquisition/distribution/use of Bombardier's trade secret information by improper means. Under these circumstances, in accordance with the doctrine of respondeat superior, MITAC is liable for the improper actions—and in this case the trade secret misappropriation— of those individuals.

77.105. MITAC's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

78.106. As a direct and proximate result of MITAC's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequate remedy at law.

79.107. Plaintiff has also suffered substantial damages as a direct and proximate cause of MITAC's conduct in an amount to be proven at trial.

80.108. MITAC has also been unjustly enriched by its misappropriation of Bombardier's trade secrets in an amount to be proven at trial.

**Count II: Violation of the Washington Uniform Trade Secrets Act (WUTSA), RCW 19.108.010 *et seq.* (MITAC)**

81.109. Plaintiff incorporates by reference paragraphs 1-80,108, above, as though fully set forth herein.

82.110. As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation,

certification, and commercialization for use in the United States and abroad. Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier. This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

83. 111.    This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

84. 112.    Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

85. 113.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC in its efforts to develop, certify, and commercialize its MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

86. 114.   In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*, MITAC misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged above and herein. In addition to the foregoing, and upon further information and belief as detailed in part below, MITAC has misappropriated Plaintiff's trade secrets under Washington law because it acquired Bombardier trade secret information knowing or having reason to know that it was acquired by improper means. Additionally, MITAC misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, MITAC knew or had reason to know its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use. Alternatively, MITAC misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission, knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before MITAC materially changed its position.

87.   For example, and by no means limiting, MITAC (as described above) had been working on the MRJ project for "more than five years" by August 22, 2013, and by that time it had already "hired many foreign experts, especially ex-Boeing people, to help." (Denkenberger Decl., Ex. 21. 22.) Notwithstanding years of its best efforts in conjunction with outside expert consulting help, MITAC was heading for its fourth announced delay by the end of 2015. Upon realizing that it was no closer to successful certification of the MRJ program after seven (7) full years of effort than it was years before further delays. On information and belief, MITAC and/or MITAC officers and/or directors formed MITAC America on June 4, 2014, at least in part to expand efforts into the United States to work the MRJ project. On further information and belief, MITAC America (MITAC's alter ego) then opened the Seattle Engineering Center jointly with AeroTEC on August 3, 2015, at least in part to further expand U.S. efforts to work the MRJ project. This resulted in "a constant flow of communication" among MITAC, MITAC America, and AeroTEC, which upon information and belief included

the sharing of Bombardier trade secret information and the fact that such information had been illicitly obtained. (Denkenberger Decl., Ex. 11.) Shortly thereafter, on information and belief, MITAC began willful, targeted recruiting of Bombardier personnel—personnel who had experience in designing and/or certifying the clean-sheet, narrow-body, geared turbofan twin-engine, medium range C-Series aircraft—to assist in the design and/or certification of MITAC's clean-sheet, narrow-body, geared turbofan twin-engine medium range MRJ aircraft. Upon further information and belief, MITAC specifically targeted Bombardier personnel for recruitment with the intention of using these new recruits to provide proprietary and trade secret Bombardier design and/or certification information for use in the MRJ project. This is evidenced as described above, but it is also evidenced by the fact that experienced aviation experts such as ex-Boeing personnel lacked sufficient information to prevent MITAC from experiencing four (4) significant delays in the MRJ timetable; by the fact that, upon information and belief, at least one (1) representative from MITAC —Mr. Koki Fukuda—was knowingly extracting confidential, proprietary and trade secret information from then-current Bombardier personnel that had already accepted positions with MITAC and were simply working their notice periods in the scope of his employment with and for the benefit of MITAC from then-Bombardier Design Approval Designee Mr. Ayre; by the fact that MITAC hosted a job fair less than one (1) kilometer from Bombardier's global principal place of business weeks before the fourth announced delay of the MRJ project, advertising that it was "looking to hire over 200 Aircraft System Engineers who can work on Certification activities of MRJ aircraft" (Denkenberger Decl., Ex. 29); and by the fact that, upon information and belief, MITAC had knowledge of and condoned MITAC America's and AeroTEC's targeted recruiting of Bombardier personnel in Wichita, Kansas.; and by the fact that it had been expressly informed by Bombardier that such continued, widespread, targeted recruiting efforts directed at Bombardier could well lead to misappropriation of Bombardier's intellectual property and trade secret information. (*See* Exs. C, E, F, G, and H.)

115. Further, MITAC's misappropriation of Bombardier trade secret information is also evidenced by the fact that shortly after a critical mass of former Bombardier personnel

began working for MITAC, MITAC America, and AeroTEC in their respective capacities on the MRJ project—a period that began over eight (8) years after the MRJ project was initially launched—MITAC abandoned its design of certain MRJ systems and electrical configurations in favor of a new design that ~~would be easier to certify, even though that would require MITAC to begin its  certification process anew~~was prompted by Mr. Ayre's feedback while he was still employed by Bombardier. On information and belief, MITAC has been using Bombardier trade secret information to assist in the new design's certification, and MITAC has been benefiting from MITAC America's and AeroTEC's known illicit use of Bombardier's trade secrets to further the MRJ project. On further information and belief, MITAC kn~~o~~ews or should ~~know~~have known that certification of its new design ~~will rely on~~incorporates Bombardier trade secret information, because of the aforementioned circumstances leading up to and surrounding MITAC's January 2017 announcement~~.~~—said circumstances including the explicit notification by Bombardier to MHI counsel who acted on behalf of both MITAC and MITAC America and were on specific notice of the potential acquisition and use of Bombardier trade secrets by its now-former employees (including Mr. Ayre).

116. In addition to MITAC misappropriating Bombardier's trade secret information in a corporate capacity, MITAC is liable for trade secret misappropriation due to the conduct of its employees within the scope of their employment with and for the benefit of MITAC. Specifically, upon information and belief, MITAC employees, including Mr. Ayre, Mr. Knystautas, and Mr. Delarche, knowingly obtained, used, and/or disseminated at least portions of the Bombardier trade secret information identified above, and each did so within the scope of their employment with, and for the benefit of, MITAC to advance certification efforts for the MRJ. Those employees knew or had reason to know that the Bombardier trade secret information was improperly obtained, particularly because each was aware during their employment with Bombardier that this information was shared with Bombardier employees only because of an ongoing duty to maintain the confidentiality of this information even following an employee's departure from Bombardier. Their use of the information to further MRJ certification efforts contravened these ongoing obligations of confidentiality and

constitute acquisition/distribution/use of Bombardier's trade secret information by improper means. Under these circumstances, in accordance with the doctrine of respondeat superior, MITAC is liable for the improper actions—and in this case the trade secret misappropriation—of those individuals.

88.117. MITAC's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

89.118. As a direct and proximate result of MITAC's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

90.119. Plaintiff has also suffered substantial damages as a direct and proximate cause of MITAC's conduct in an amount to be proven at trial.

91.120. MITAC has also been unjustly enriched by its misappropriation of Bombardier's trade secrets in an amount to be proven at trial.

## Count III: Violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.* (MITAC America)

92.121. Plaintiff incorporates by reference paragraphs 1-91,120, above, as though fully set forth herein.

93.122. As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.

94.123. Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier. This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

95.

124.     This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

96.125.     Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

97.126.     This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC America in its efforts assisting MITAC to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of collective effort.

98.127.     In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836, MITAC America misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged above and herein. In addition to the foregoing, and upon further information and belief as detailed in part below, MITAC America has misappropriated Plaintiff's trade secrets under federal law because it acquired Bombardier trade secret information knowing or having reason to know

that it was acquired by improper means. Additionally, MITAC America misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, MITAC America knew or had reason to know its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use. Alternatively, MITAC America misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission, knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before MITAC America materially changed its position.

99. 128. For instance, MITAC (MITAC America's corporate parent as described above) had been working on the MRJ project for "more than five years" by August 22, 2013, and by that time it had already "hired many foreign experts, especially ex-Boeing people, to help." (Denkenberger Decl., Ex. 21.22.) Notwithstanding years of its best efforts in conjunction with outside expert consulting help, MITAC was heading for further delays. On information and belief, MITAC and/or MITAC officers and/or directors formed MITAC America on June 4, 2014, at least in part to expand efforts into the United States to work the MRJ project. On further information and belief, MITAC America then opened the Seattle Engineering Center jointly with AeroTEC on August 3, 2015, at least in part to further expand U.S. efforts to work the MRJ Project. This resulted in "a constant flow of communication" among MITAC, MITAC America, and AeroTEC, which upon information and belief included the sharing of Bombardier trade secret information and the fact that such information had been illicitly obtained. (Denkenberger Decl., Ex. 11.) Shortly thereafter, on information and belief, MITAC America participated with MITAC in the willful, targeted recruiting of Bombardier personnel— personnel who had experience in designing and/or certifying the clean-sheet, narrow-body, geared turbofan twin-engine, medium range C-Series aircraft—to assist in the

design and/or certification of MITAC's clean-sheet, narrow-body, geared turbofan twin-engine

~~medium range~~ MRJ aircraft. Upon further information and belief, MITAC America specifically targeted Bombardier personnel for recruitment with the intention of using these new recruits to provide proprietary and trade secret Bombardier design and/or certification information for use in the MRJ project. This is evidenced as described above, but it is also evidenced by the fact that experienced aviation experts such as ex-Boeing personnel lacked sufficient information to prevent MITAC from experiencing four (4) significant delays in the MRJ timetable; by the fact that MITAC America, on information and belief, operates as a corporate subsidiary and alter ego to MITAC and was formed at least in part to expand efforts in North America to design, develop, and certify the MRJ; by the fact that shortly after forming MITAC America, MITAC hosted a job fair less than one (1) kilometer from Bombardier's global principal place of business weeks before the fourth announced delay of the MRJ project advertising that it was "looking to hire over 200 Aircraft System Engineers who can work on Certification activities of MRJ aircraft" (Denkenberger Decl., Ex. 29); and by the fact that, upon information and belief, MITAC America had knowledge of ~~and~~, condoned, and participated in AeroTEC's targeted recruiting of Bombardier personnel in Wichita, Kansas~~.~~ by virtue of Mr. Korwin-Szymanowski's admitted agency of MITAC America for purposes of recruiting certification personnel.    Further, MITAC America's misappropriation of Bombardier trade secret information is also evidenced by the fact that shortly after a critical mass of former Bombardier personnel began working for MITAC, MITAC America, and AeroTEC in their respective capacities on the MRJ project—a period that began over eight (8) years after the  MRJ project was launched—MITAC abandoned its design of certain MRJ systems and electrical configurations in favor of a new design that ~~would be easier to certify, even though  that would require MITAC to begin its certification process anew~~was prompted by Mr. Ayre's feedback while he was still employed by Bombardier. On information and belief, MITAC America has been using Bombardier confidential and trade secret information to assist in the new design's certification, and MITAC America has been benefiting from the Corporate Defendants' collective known illicit use of Bombardier's trade secrets to further the

MRJ project. On further information and belief, MITAC America kno~ews~ or should ~know~have known that certification of its new design ~will rely on~incorporates Bombardier trade secret information, because of the aforementioned circumstances leading up to and surrounding MITAC's January 2017 announcement—said circumstances including the explicit notification by Bombardier to MHI counsel who acted on behalf of both MITAC and MITAC America and were on specific notice of the potential acquisition and use of Bombardier trade secrets by its now-former employees (including Mr. Ayre).

129.    Additionally, because of the unique, highly detailed, and highly technical nature of Bombardier's trade secret information pertaining to aircraft certification, MITAC America employees recruited from Bombardier would know or have reason to know and recognize any Bombardier trade secret information being incorporated into MRJ certification processes. Further, these same employees would know that this information would have been acquired under an ongoing duty to Bombardier to maintain its confidentiality, and as such would know that its incorporation into MRJ certification processes is in contravention of this ongoing duty and thus acquired/disclosed/used through improper means.

130.    Further, at all relevant times, MITAC America operated as an alter ego of MITAC. As alleged in the foregoing paragraphs, MITAC America does not operate independently from MITAC, and in fact, it was created and sustained—and is sustained to this day—for the very purpose of certifying the MRJ. MITAC and MITAC America freely and intentionally share all information related to technical data, flight tests, and certification, using their multiple global locations to ensure that they can work around the clock and "hand off" unfinished projects to their counterparts across the Pacific when it is time to turn in for the day. Upon information and belief, and according to MITAC's own public statements, the institutional knowledge of MITAC and MITAC America—at least with respect to the development, design, and certification of the MRJ—are coextensive in scope.

131.    As a result of MITAC America's establishment, existence, and operation as an alter ego of MITAC, all knowledge possessed by MITAC, both of the improper acquisition of

Bombardier's trade secrets *and* of the use and dissemination of those trade secrets, can and must be attributed to MITAC America. As such, MITAC America knew or had reason to know—just as MITAC knew or had reason to know—that it improperly acquired and/or used Bombardier's trade secrets knowing that these secrets were obtained through improper means.

100.132.     MITAC America's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

101.133.     As a direct and proximate result of MITAC America's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

102.134.     Plaintiff has also suffered substantial damages as a direct and proximate cause of MITAC America's conduct in an amount to be proven at trial.

103.135.     MITAC America has also been unjustly enriched by its misappropriation of Bombardier's trade secrets in an amount to be proven at trial.

**Count IV: Violation of the Washington Uniform Trade Secrets Act (WUTSA), RCW 19.108.010 *et seq.* (MITAC AMERICA)**

104.136.     Plaintiff incorporates by reference paragraphs 1-103,135, above, as though fully set forth herein.

105.137.     As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.

138.     Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier. This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

106.

139.    This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

107.140.    Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

108.141.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC America in its efforts assisting MITAC to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of collective effort.

109.142.    In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*, MITAC America misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged above and herein. In addition to the foregoing, and upon further information and belief as detailed in part below, MITAC America has misappropriated Plaintiff's trade secrets under federal law because it acquired Bombardier trade secret information knowing or having reason to know that it was acquired

by improper means. Additionally, MITAC America misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, MITAC America knew or had reason to know its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use. Alternatively, MITAC America misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission, knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before MITAC America materially changed its position.

110. 143. For instance, MITAC (MITAC America's corporate parent as described above) had been working on the MRJ project for "more than five years" by August 22, 2013, and by that time it had already "hired many foreign experts, especially ex-Boeing people, to help." (Denkenberger Decl., Ex. 21. 22.) Notwithstanding years of its best efforts in conjunction with outside expert consulting help, MITAC was heading for further delays. On information and belief, MITAC and/or MITAC officers and/or directors formed MITAC America on June 4, 2014, at least in part to expand efforts into the United States to work the MRJ project. On further information and belief, MITAC America then opened the Seattle Engineering Center jointly with AeroTEC on August 3, 2015, at least in part to further expand U.S. efforts to work the MRJ Project. This resulted in "a constant flow of communication" among MITAC, MITAC America, and AeroTEC, which upon information and belief included the sharing of Bombardier trade secret information and the fact that such information had been illicitly obtained. (Denkenberger Decl., Ex. 11.) Shortly thereafter, on information and belief, MITAC America participated with MITAC in the willful, targeted recruiting of Bombardier personnel—personnel who had experience in designing and/or certifying the clean-sheet, narrow-body, geared turbofan twin-engine, medium range C-Series aircraft—to assist in the design and/or certification of MITAC's clean-sheet, narrow-body, geared turbofan twin-.

engine ~~medium range~~ MRJ aircraft. Upon further information and belief, MITAC America specifically targeted Bombardier personnel for recruitment with the intention of using these new recruits to provide proprietary and trade secret Bombardier design and/or certification information for use in the MRJ project. This is evidenced as described above, but it is also evidenced by the fact that experienced aviation experts such as ex-Boeing personnel lacked sufficient information to prevent MITAC from experiencing four (4) significant delays in the MRJ timetable; by the fact that MITAC America, on information and belief, operates as a corporate subsidiary <u>and alter ego</u> to MITAC and was formed at least in part to expand efforts in North America to design, develop, and certify the MRJ; by the fact that shortly after forming MITAC America, MITAC hosted a job fair less than one (1) kilometer from Bombardier's global principal place of business weeks before the fourth announced delay of the MRJ project advertising that it was "looking to hire over 200 Aircraft System Engineers who can work on Certification activities of MRJ aircraft" <u>(Denkenberger Decl., Ex. 29)</u>; and by the fact that, upon information and belief, MITAC America had knowledge of ~~and~~, condoned<u>, and participated in</u> AeroTEC's targeted recruiting of Bombardier personnel in Wichita, Kansas.<u> by virtue of Mr. Korwin-Szymanowski's admitted agency of MITAC America for purposes of recruiting certification personnel.</u>  Further, MITAC America's misappropriation of Bombardier trade secret information is also evidenced by the fact that shortly after a critical mass of former Bombardier personnel began working for MITAC, MITAC America, and AeroTEC in their respective capacities on the MRJ project—a period that began <u>over eight (8)  years after the MRJ project was launched—MITAC</u> abandoned its design of certain MRJ systems and electrical configurations in favor of a new design that ~~would be easier to certify, even though  that would require MITAC to begin its certification process anew~~<u>was prompted by Mr. Ayre's feedback while he was still employed by Bombardier</u>. On information and belief, MITAC America has been using Bombardier <u>confidential and </u>trade secret information to assist in the new design's certification, and MITAC America has been benefiting from the Corporate Defendants' collective known illicit use of Bombardier's trade secrets to further the MRJ project. On further information and belief, MITAC America ~~knows or should know that certification of its new design will rely on Bombardier trade secret information, because of the aforementioned circumstances leading up to and surrounding MITAC's January 2017 announcement.~~<u>knew or should have known</u>

that certification of its new design incorporates Bombardier trade secret information, because of the aforementioned circumstances leading up to and surrounding MITAC's January 2017 announcement—said circumstances including the explicit notification by Bombardier to MHI counsel who acted on behalf of both MITAC and MITAC America and were on specific notice of the potential acquisition and use of Bombardier trade secrets by their now-former employees (including Mr. Ayre).

144.    Additionally, because of the unique, highly detailed, and highly technical nature of Bombardier's trade secret information pertaining to aircraft certification, MITAC America employees recruited from Bombardier would know or have reason to know and recognize any Bombardier trade secret information being incorporated into MRJ certification processes. Further, these same employees would know that this information would have been acquired under an ongoing duty to Bombardier to maintain its confidentiality, and as such would know that its incorporation into MRJ certification processes is in contravention of this ongoing duty and thus acquired through improper means.

145.    Further, at all relevant times, MITAC America operated as an alter ego of MITAC. As alleged in the foregoing paragraphs, MITAC America does not operate independently from MITAC, and in fact, it was created and sustained—and is sustained to this day—for the very purpose of certifying the MRJ. MITAC and MITAC America freely and intentionally share all information related to technical data, flight tests, and certification, using their multiple global locations to ensure that they can work around the clock and "hand off" unfinished projects to their counterparts across the Pacific when it is time to turn in for the day. Upon information and belief, and according to MITAC's own public statements, the institutional knowledge of MITAC and MITAC America—at least with respect to the development, design, and certification of the MRJ—are coextensive in scope.

146.    As a result of MITAC America's establishment, existence, and operation as an alter ego of MITAC, all knowledge possessed by MITAC, both of the improper acquisition of Bombardier's trade secrets and of the use and dissemination of those trade secrets, can and

must be attributed to MITAC America. As such, MITAC America knew or had reason to know—just as MITAC knew or had reason to know—that it improperly acquired and/or used Bombardier's trade secrets knowing that these secrets were obtained through improper means.

111.147.    MITAC America's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

112.148.    As a direct and proximate result of MITAC America's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

113.149.    Plaintiff has also suffered substantial damages as a direct and proximate cause of MITAC America's conduct in an amount to be proven at trial.

114.150.    MITAC America has also been unjustly enriched by its misappropriation of Bombardier's trade secrets in an amount to be proven at trial.

**Count V: Violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.***

**(AeroTEC)**

115.151.    Plaintiff incorporates by reference paragraphs 1-114,150, above, as though fully set forth herein.

116.152.    As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad. Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier. This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

117.153.    This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or

ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

118.154.    Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

119.155.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to AeroTEC in its efforts to assist MITAC and MITAC America develop, certify, and commercialize its MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

120.156.   In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836, AeroTEC misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein. In addition to the foregoing, and upon further information and belief, AeroTEC has misappropriated Plaintiff's trade secrets under federal law because it acquired Bombardier trade secret information knowing or having reason to know that it was acquired by improper means. Additionally, AeroTEC misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, AeroTEC knew or had

reason to know its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use. Alternatively, AeroTEC misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission, knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before AeroTEC materially changed its position.

121.157. For example, and by no means limiting, AeroTEC on information and belief began its involvement with the MRJ project by no later than August 3, 2015, at which time in conjunction with MITAC America it opened the Seattle Engineering Center. On information and belief, MITAC America partnered with AeroTEC for at least the purpose of enlisting AeroTEC's assistance in the design, development, and/or certification of the MRJ—a project that by August 3, 2015 had experienced three significant delays and would soon experience a fourth. Upon information and belief, shortly after partnering with MITAC America in forming the Seattle Engineering Center, and after realizing it did not then have the necessary personnel or resources to effectively assist MITAC and MITAC America with the MRJ project, AeroTEC began willful, targeted recruiting of Bombardier personnel—personnel who had experience in designing and/or certifying the clean-sheet, narrow-body, geared turbofan twin-engine, medium range C-Series aircraft—to assist in the design and/or certification of MITAC's clean-sheet, narrow-body, geared turbofan twin-engine medium range MRJ aircraft. Upon further information and belief, AeroTEC specifically targeted Bombardier personnel for recruitment with the intention of using these new recruits to provide proprietary and trade secret Bombardier design and certification information for use in the MRJ project. This is evidenced as described above, but it is also evidenced by the fact that, upon information and belief, AeroTEC initially lacked the requisite expertise—just as experienced aviation experts such as ex-Boeing personnel did—to prevent MITAC from experiencing any additional delays in the MRJ timetable; by the fact that at least one (1) officer or director of

AeroTEC, former Bombardier employee Defendant Michel Korwin-Szymanowski, sent targeted electronic communications to then-current Bombardier personnel relaying his and AeroTEC's intention to hire Bombardier personnel for work on the MRJ project; by the fact AeroTEC retained the services of professional recruiting services such as Velocity Consulting Solutions who attempted to recruit Bombardier personnel; and by the fact that AeroTEC organized a job fair in Wichita, Kansas in proximity to Bombardier's U.S. Flight Test Center and upon information and belief further targeted Bombardier personnel specifically for this job fair by arranging for billboards mounted on flatbed trucks advertising the job fair to be displayed immediately outside Bombardier's Flight Test Center. Further, AeroTEC's misappropriation of Bombardier trade secret information is also evidenced by the fact that shortly after a critical mass of former Bombardier personnel began working for AeroTEC in their respective capacities on the MRJ project—over eight (8) years after the MRJ project was launched—MITAC abandoned its design of certain MRJ systems and electrical configurations in favor of a new design that would be easier to certify, even though that would require MITAC to begin its certification process anew. On information and belief, AeroTEC has been using Bombardier trade secret information to assist in the new design's certification, and AeroTEC has been benefiting from the Corporate Defendants' collective known illicit use of Bombardier's trade secrets to further the MRJ project. On further information and belief, AeroTEC knows or should know that certification of the MRJ's new design will rely on Bombardier's trade secret information, because of the aforementioned circumstances leading up to and surrounding MITAC's January 2017 announcement.

122.158.    AeroTEC's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

123.159.    As a direct and proximate result of AeroTEC's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

124.160.     Plaintiff has also suffered substantial damages as a direct and proximate cause of AeroTEC's conduct in an amount to be proven at trial.

125.161.     AeroTEC has also been unjustly enriched by its misappropriation of Bombardier's trade secrets in an amount to be proven at trial.

### Count VI: Violation of the Washington Uniform Trade Secrets Act (WUTSA), RCW 19.108.010 *et seq.* (AeroTEC)

126.162.     Bombardier incorporates by reference paragraphs 1-125,161, above, as though fully set forth herein.

127.163.     As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad. Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier. This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

128.164.     This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

129.165.     Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting

access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

130.166.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to AeroTEC in its efforts to assist MITAC and MITAC America develop, certify, and commercialize its MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

131.167.    In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*, AeroTEC misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein. In addition to the foregoing, and upon further information and belief, AeroTEC has misappropriated Plaintiff's trade secrets under federal law because it acquired Bombardier trade secret information knowing or having reason to know that it was acquired by improper means. Additionally, AeroTEC misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, AeroTEC knew or had reason to know its knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use. Alternatively, AeroTEC misappropriated Bombardier's trade secrets because it used Bombardier's trade secrets without permission, knowing or having reason to know that the information constituted trade secrets acquired by accident or mistake before AeroTEC materially changed its position.
132.

168. For example, and by no means limiting, AeroTEC on information and belief began its involvement with the MRJ project by no later than August 3, 2015, at which time in conjunction with MITAC America it opened the Seattle Engineering Center. On information and belief, MITAC America partnered with AeroTEC for at least the purpose of enlisting AeroTEC's assistance in the design, development, and/or certification of the MRJ—a project that by August 3, 2015 had experienced three significant delays and would soon experience a fourth. Upon information and belief, shortly after partnering with MITAC America in forming the Seattle Engineering Center, and after realizing it did not then have the necessary personnel or resources to effectively assist MITAC and MITAC America with the MRJ project, AeroTEC began willful, targeted recruiting of Bombardier personnel—personnel who had experience in designing and/or certifying the clean-sheet, narrow-body, geared turbofan twin-engine, medium range C-Series aircraft—to assist in the design and/or certification of MITAC's clean-sheet, narrow-body, geared turbofan twin-engine medium range MRJ aircraft. Upon further information and belief, AeroTEC specifically targeted Bombardier personnel for recruitment with the intention of using these new recruits to provide proprietary and trade secret Bombardier design and certification information for use in the MRJ project. This is evidenced as described above, but it is also evidenced by the fact that, upon information and belief, AeroTEC initially lacked the requisite expertise—just as experienced aviation experts such as ex-Boeing personnel did—to prevent MITAC from experiencing any additional delays in the MRJ timetable; by the fact that at least one (1) officer or director of AeroTEC, former Bombardier employee Defendant Michel Korwin-Szymanowski, sent targeted electronic communications to then-current Bombardier personnel relaying his and AeroTEC's intention to hire Bombardier personnel for work on the MRJ project; by the fact AeroTEC retained the services of professional recruiting services such as Velocity Consulting Solutions who attempted to recruit Bombardier personnel; and by the fact that AeroTEC organized a job fair in Wichita, Kansas in proximity to Bombardier's U.S. Flight Test Center and upon information and belief further targeted Bombardier personnel specifically for this

job fair by arranging for billboards mounted on flatbed trucks advertising the job fair to be displayed immediately outside Bombardier's Flight Test Center. Further, AeroTEC's misappropriation of Bombardier trade secret information is also evidenced by the fact that shortly after a critical mass of former Bombardier personnel began working for AeroTEC in their respective capacities on the MRJ project—over eight (8) years after the MRJ project was launched—MITAC abandoned its design of certain MRJ systems and electrical configurations in favor of a new design that would be easier to certify, even though that would require MITAC to begin its certification process anew. On information and belief, AeroTEC has been using Bombardier trade secret information to assist in the new design's certification, and AeroTEC has been benefiting from the Corporate Defendants' collective known illicit use of Bombardier's trade secrets to further the MRJ project. On further information and belief, AeroTEC knows or should know that certification of the MRJ's new design will rely on Bombardier's trade secret information, because of the aforementioned circumstances leading up to and surrounding MITAC's January 2017 announcement.

133.169.    AeroTEC's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

134.170.    As a direct and proximate result of AeroTEC's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

135.171.    Plaintiff has also suffered substantial damages as a direct and proximate cause of AeroTEC's conduct in an amount to be proven at trial.

136.172.    AeroTEC has also been unjustly enriched by its misappropriation of Bombardier's trade secrets in an amount to be proven at trial.

**Count VII: Tortious Interference with Contractual Relationship and/or Business Expectancy (MITAC)**

137.173.      Plaintiff incorporates by reference paragraphs 1-136.172, above, as though fully set forth herein.

138.174.      Bombardier had a reasonable and valid contractual relationship and/or business expectancy with each of its former employees arising from each former employee's agreement to be bound by Bombardier's Code of Ethics provision to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so. This includes confidential information provided by suppliers and customers. Employees agree to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (Ex. D.), at 15.) Both the 2004 Code of Ethics and the 2012 Code of Ethics contain this provision. (*See* Exs. D and M.) Upon information and belief, all previous versions of Bombardier's Code of Ethics contained these exact or substantively identical provisions.

175.      On information and belief, each of Defendants Delarche and Dornéval signed an acknowledgement on their respective first day of working for Bombardier that as a condition to their respective employment each would abide by the 2004 Code of Ethics. On information and belief, Defendant Basson signed an acknowledgement on his first day of working for Bombardier that as a condition of his employment he would abide by the 2012 Code of Ethics. The relevant versions of Bombardier's Code of Ethics that each of Defendants Basson, Delarche, and Dornéval signed and agreed to abide by on their respective first day of working for Bombardier included the confidentiality provision noted in the preceding paragraph. Thus, each of these employees had a continuing obligation under the respective Code of Ethics to maintain the confidentiality of all Bombardier trade secret, proprietary, and/or confidential information following termination of employment. On information and belief, at least Defendant Delarche, as well as certain of Does 1-88, owed this

continuing duty to Bombardier when they were employed by MITAC as part of Defendants' efforts to gain certification for the MRJ.

139.176.        Bombardier also had a reasonable and valid business expectancy that it would continue to employ its personnel, specifically personnel working out of its offices in Canada would honor their duties of good faith and fidelity to Bombardier as their employer under Canadian law. (*See* Dkt. No. 87-1.) Bombardier had a reasonable expectation that, as part of these duties, these employees would not take or use any of Bombardier's trade secret, confidential, and/or proprietary information when these employees left Bombardier. This reasonable expectation exists at least with respect to Defendants Basson, Delarche, Dornéval, and Does 1-88, to continue their design, development, engineering, and/or certification efforts in Bombardier's aerospace division. These employer-employee relationships were more than simple "at-will" employment arrangements at least because each employee Ayre, as well as any of Does 1-88 who previously worked in or out of Bombardier's Canadian offices. Thus, each of these employees had a continuing obligation following termination of employment to maintain the confidentiality of all Bombardier trade secret, proprietary, and/or confidential information.140.        Bombardier also had a reasonable and valid business expectancy that it would not lose a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft within a span of months to work for a competing venture in need of Bombardier's proprietary and confidential information. On information and belief, at least Defendants Delarche and Ayre, as well as certain of Does 1-88 who previously worked in or out of Bombardier's Canadian offices and now work at MITAC, owe this continuing duty to Bombardier while employed by MITAC.

141.177.        Bombardier had yet another reasonable and valid business expectancy that it would generally adhere to its certification schedules set forth for the C-Series and Global 7000/8000 Aircraft, particularly because Bombardier had successfully obtained certification for approximately thirty (30) different aircraft in the preceding three (3) decades, it had significant experience and understanding of certification processes as a result of these previous

certifications, and it could reasonably expect based on this experience and understanding that its projected schedule to obtain certification for the C-Series and Global 7000/8000 Aircraft would be accurate. The hiring by Defendant MITAC of Bombardier personnel working on the certification process occurred during, and had a detrimental impact on, the certification schedules for the C-Series and the Global 7000/8000 Aircraft, delaying these certification schedules by at least several months. On information and belief, MITAC continued its recruitment and hiring of Bombardier personnel who were working on Bombardier's certification efforts despite learning—at least through written correspondence sent to MHI (and therefore MITAC and MITAC America)—about the detrimental impact that the continued recruitment and hiring of Bombardier personnel would have on Bombardier's certification schedules. Accordingly, MITAC knew or should have known of the detrimental impact that its actions were having on Bombardier and its certification schedules but nevertheless persisted in continuing to recruit and hire these Bombardier personnel. Based on the foregoing, and upon further information and belief, MITAC's persisted course of conduct, which resulted in the loss of key Bombardier certification personnel (including but not limited to Bombardier's chief and deputy chief flight test pilots for certification purposes) at critical times to Bombardier's certification efforts, was done for the improper purpose of delaying Bombardier's certification schedule, it in fact delayed Bombardier's certification schedule, and it inflicted resulting harm on Bombardier in the form of costly delays to the certification schedules of its C Series and/or Global 7000/8000 Aircraft.

142.178.    MITAC knew of each of these contractual relationships and business expectancies, at least because Bombardier informed MITAC's parent of these relationships and expectancies through various letters described above and, on information and belief, because MITAC's parent shared information regarding these relationships and expectancies with MITAC, because MITAC had previously hired former Bombardier personnel who were aware of these relationships and expectancies, and/or because MITAC as a similarly situated corporate entity maintains the same relationships and/or expectations of its own.

143.179.    By engaging in the aforementioned conduct, specifically but without

limitation targeting Bombardier personnel for recruitment for its MRJ project, MITAC intentionally interfered with Bombardier's contractual relationships and business expectancies, which proximately induced or caused breach of the aforementioned contractual relationships with, and/or business expectancies from, at least individual Defendants ~~Basson,~~ Delarche~~,~~ ~~Dornéval~~ Ayre, and those Does 1 ~~88 as individuals, with these defendants collectively as comprising a significant number of its key personnel involved in the testing and certification of the C Series and Global 7000/8000 Aircraft, and with these defendants collectively as instrumental to adhering to Bombardier's certification schedule for the C Series and Global 7000/8000 Aircraft.~~ 88 employed by MITAC. ' ~~144.~~

180.   MITAC's intentional interference with Bombardier's contractual relationships and business expectancies was conducted for improper purposes~~:~~, namely—to knowingly, willfully, and illicitly obtain Bombardier confidential, proprietary, and/or trade secret information ~~knowingly and willfully~~ to assist in the development and/or certification of its MRJ; and to harm Bombardier in the form of costly delays to its certification efforts for the C-Series and Global 7000/8000 Aircraft, which in fact materialized as described above.

181.   MITAC's intentional interference with Bombardier's contractual relationships and business expectancies was also conducted using improper means, namely—by knowingly, willfully, and illicitly solicit Bombardier confidential, proprietary, and/or trade secret information from then-current Bombardier employees to assist Defendants in their efforts in developing and/or certifying the MRJ. For example, in at least one instance, MITAC's Engineering Lead of Ice Protection Systems for the MRJ, Mr. Fukuda, solicited and received Bombardier confidential and/or trade secret information from Defendant Ayre while Defendant Ayre still worked for Bombardier. (*See* Ex. S (email to Fukuda-san).) At the time of this correspondence, Mr. Ayre held a high level position with Bombardier and had specific responsibility on Bombardier's certification efforts as a Design Approval Designee. On information and belief, Mr. Fukuda's responsibilities at the time were related to MITAC's certification efforts for the ice detection and prevention systems for the MRJ, the very subject

of his correspondence with Mr. Ayre; yet, in this correspondence, Mr. Fukuda appeared to be unaware of the history and progression of the relevant certification requirements for these systems. As a result, on information and belief, Mr. Fukuda contacted Mr. Ayre while Mr. Ayre was working for Defendant Bombardier to solicit input and obtain guidance related to the certification process and requirements for these systems on the MRJ. By virtue of his leadership position at MITAC, Mr. Fukuda knew or should have known of Mr. Ayre's obligation to refrain from assisting Bombardier competitors while still employed by Bombardier. Further, Mr. Fukuda knew or should have known that the information he was soliciting, and the information he eventually received from Mr. Ayre in response, included

Bombardier confidential and/or trade secret information. Moreover, not only did Mr. Ayre respond to Mr. Fukuda's solicitation by disclosing Bombardier's confidential and/or trade secret information, but he did so during normal business hours, and on information and belief, while at Bombardier's facilities and using Bombardier's equipment.

145.182.    MITAC's intentional interference with Bombardier's contractual relationships and business expectancies for an improper purpose by improper means has caused resulting damage to Plaintiff and is continuing to cause resulting damage to Plaintiff at least by causing Bombardier's confidential, proprietary, and/or trade secret information to be divulged, and/or by causing delays to Bombardier's own certification schedule, as described above, in an amount to be determined at trial.

## Count VIII: Tortious Interference with Contractual Relationship and/or Business Expectancy (MITAC AMERICA)

146.183.    Plaintiff incorporates by reference paragraphs 1-145,182, above, as though fully set forth herein.

147.    Bombardier had a reasonable and valid contractual relationship and/or business expectancy with each of its former employees arising from each former employee's agreement to be bound by Bombardier's Code of Ethics provision to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended,

unless authorized or legally required to do so. This includes confidential information provided by suppliers and customers. Employees agree to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (Ex. D, at 15.)

148.   Bombardier also had a reasonable and valid business expectancy that it would continue to employ its personnel, specifically Defendants Basson, Delarche, Dornéval, and Does 1-88, to continue their design, development, engineering, and/or certification efforts in Bombardier's aerospace division. These employer-employee relationships were more than simple "at-will" employment arrangements at least because each employee had a continuing obligation following termination of employment to maintain the confidentiality of all Bombardier proprietary and confidential information.

149.   Bombardier also had a reasonable and valid business expectancy that it would not lose a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft within a span of months to work for a competing venture in need of Bombardier's proprietary and confidential information.

150.184.   Bombardier had yet anothera reasonable and valid business expectancy that it would generally adhere to its certification schedules set forth for the C-Series and Global 7000/8000 Aircraft, particularly because Bombardier had successfully obtained certification for approximately thirty (30) different aircraft in the preceding three (3) decades, it had significant experience and understanding of certification processes as a result of these previous certifications, and it could reasonably expect based on this experience and understanding that its projected schedule to obtain certification for the C-Series and Global 7000/8000 Aircraft would be accurate. The hiring by Defendant MITAC America of at least some of Does 1-88 occurred during and had a detrimental impact on the certification schedules for the C-Series and the Global 7000/8000 Aircraft, delaying these certification schedules by at least several months. In addition, Defendant Korwin-Szymanowski acted as an agent for MITAC America by recruiting and hiring employees for MITAC America's facilities. (*See* Dkt. No. 65, ¶ 9.)

Bombardier informed Mr. Korwin-Szymanowski (as well

as counsel for MHI, and therefore MITAC and MITAC America, as detailed above) of the

detrimental impact that these recruiting efforts were having, and would continue to have, on

Bombardier and its certification schedules.

185. On information and belief, MITAC America and Defendant

KorwinSzymanowski continued their recruitment and hiring of Bombardier personnel who were

working on Bombardier's certification process despite learning about the detrimental impact

that these efforts would have on Bombardier's certification schedules. Accordingly, MITAC

America knew or should have known of the detrimental impact that its actions were having on

Bombardier and its certification schedules but nevertheless persisted in continuing to recruit and

hire these Bombardier personnel. Based on the foregoing, and upon further information and

belief, MITAC America's persisted course of conduct, which resulted in the loss of key

Bombardier certification personnel (including but not limited to Bombardier's chief and deputy

chief flight test pilots for certification purposes) at critical times to Bombardier's certification

efforts, was done for the improper purpose of delaying Bombardier's certification schedule, it

in fact delayed Bombardier's certification schedule, and it inflicted resulting harm on

Bombardier in the form of costly delays to the certification schedules of its C Series and/or

Global 7000/8000 Aircraft.

151.186. MITAC America knew of each of these contractual relationships and

business expectancies to maintain projected certification schedules, at least because Bombardier

informed MITAC America's agent (Defendant Korwin-Szymanowski) along with MHI of these

relationships and expectancies through various letters described above, and on information and

belief, MITAC America's agent and/or MHI counsel acting on behalf of MITAC America

shared information regarding these relationships and expectancies with MITAC America, and

because MITAC America had previously hired former Bombardier personnel who were aware

of these relationships and expectancies, and/or because MITAC America as a similarly situated

corporate entity maintains the same relationships and/or expectations of its ownexpectancies regarding certification schedules.

152.187.    By engaging in the aforementioned conduct, specifically but without limitation targeting Bombardier personnel for recruitment for its MRJ project, MITAC America intentionally interfered with Bombardier's contractual relationships and business expectancies , which proximately induced or caused breach of the aforementioned contractual relationships with, and business expectancies from, at least Defendants Basson, Delarche, Dornéval, and Does 1-88 as individuals, with these defendants collectively as comprising a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft, and with these defendants collectively as instrumental to adhering to Bombardier's certificationcaused delay to Bombardier's schedule for the C-Series and Global 7000/8000 Aircraftand inflicted resultant harm on Bombardier.

153.188.    MITAC America's intentional interference with Bombardier's contractual relationships and business expectancies was conducted for an improper purposes; namely  to illicitly obtain Bombardier confidential, proprietary, and/or trade secret information knowingly and willfully to assist in the development and/or certification of its MRJ; andpurpose, namely to harm Bombardier in the form of costly delays to its certification efforts for the C-Series and Global 7000 and 8000 Aircraft, which in fact materialized as described above.

154.189.    MITAC America's intentional interference with Bombardier's contractual relationships and business expectancies for an improper purpose has caused resulting damage to Plaintiff and is continuing to cause resulting damage to Plaintiffat least by causing delays to Bombardier's own certification schedule, as described above, in an amount to be determined at trial.

### Count IX: Tortious Interference with Contractual Relationship and/or Business Expectancy (AeroTEC)

155.190.    Plaintiff incorporates by reference paragraphs 1-154,189, above, as though fully set forth herein.

156.191.      Bombardier had a reasonable and valid contractual relationship and/or business expectancy with each of its former employees arising from each former employee's agreement to be bound by Bombardier's Code of Ethics provision to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so. This includes confidential information provided by suppliers and customers. Employees agree to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (Ex. D, at 15.) Both the 2004 Code of Ethics and the 2012 Code of Ethics contain this provision. (*See* Exs. D and M.)

157.     Bombardier also had a reasonable and valid business expectancy that it would continue to employ its personnel, specifically Defendants Basson,

192.      On information and belief, each of Defendants Delarche, Dornéval, and Does 1-88, to continue their design, development, engineering, and/or certification efforts in Bombardier's aerospace division. These employer-employee relationships were more than simple "at-will" employment arrangements at least because each employee and Dornéval signed an acknowledgement on their respective first day of working for Bombardier that as a condition to their respective employment each would abide by the 2004 Code of Ethics. On information and belief, Defendant Basson signed an acknowledgement on his first day of working for Bombardier that as a condition of his employment he would abide by the 2012 Code of Ethics. The relevant versions of Bombardier's Code of Ethics that each of Defendants Basson, Delarche, and Dornéval signed and agreed to abide by on their respective first day of working for Bombardier included the confidentiality provision noted in the preceding paragraph. Thus, each of these employees had a continuing obligation following termination of employment under the respective Code of Ethics to maintain the confidentiality of all Bombardier trade secret, proprietary and confidential information, and/or confidential information following termination of employment. On information and belief, at least

Defendants Basson, Delarche, and Dornéval, as well as certain of Does 1-88, owed this continuing duty to Bombardier when they were employed by AeroTEC as part of Defendants' efforts to gain certification for the MRJ.

158.   Bombardier also had a reasonable and valid business expectancy that it would not lose a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft within a span of months to work for a competing venture in need of Bombardier's proprietary and confidential information. 193.   Bombardier also had a reasonable and valid business expectancy that personnel working out of its offices in Canada would honor their duties of good faith and fidelity to Bombardier as their employer under Canadian law. (*See* Dkt. No. 87-1.) Bombardier had a reasonable expectation that, as part of these duties, these employees would not take or use any of Bombardier's trade secret, confidential, and/or proprietary information when these employees left Bombardier. This reasonable expectation exists at least with respect to Defendants Basson, Delarche, Dornéval, and Ayre, as well as any of Does 1-88 who previously worked in or out of Bombardier's Canadian offices. Thus, each of these employees had a continuing obligation following termination of employment to maintain the confidentiality of all Bombardier trade secret, proprietary, and/or confidential information. On information and belief, at least Defendants Basson, Dornéval, and Delarche, as well as certain of Does 1-88 who previously worked in or out of Bombardier's Canadian offices and now work at AeroTEC, owe this continuing duty to Bombardier while employed by AeroTEC.

159. 194.   Bombardier had yet another reasonable and valid business expectancy that it would generally adhere to its certification schedules set forth for the C-Series and Global 7000/8000 Aircraft, particularly because Bombardier had successfully obtained certification for approximately thirty (30) different aircraft in the preceding three (3) decades, it had significant experience and understanding of certification processes as a result of these previous certifications, and it could reasonably expect based on this experience and understanding that

its projected schedule to obtain certification for the C-Series and Global 7000/8000 Aircraft would be accurate. The hiring by Defendant AeroTEC of Bombardier personnel working on the certification process occurred during, and had a detrimental impact on, the certification schedules for the C-Series and the Global 7000/8000 Aircraft, delaying these certification schedules by at least several months. Defendant AeroTEC continued its recruitment and hiring of Bombardier personnel who were working on Bombardier's certification efforts despite learning about the detrimental impact that the continued recruitment and hiring of Bombardier personnel would have on Bombardier's certification schedules. Accordingly, Defendant AeroTEC knew or should have known of the detrimental impact that its actions were having on Bombardier and its certification schedules but nevertheless persisted in continuing to recruit and hire these Bombardier personnel. Based upon the foregoing, and upon further information and belief, Defendant AeroTEC's persisted course of conduct, which resulted in the loss of key Bombardier certification personnel (including but not limited to Bombardier's chief and deputy chief flight test pilots for certification purposes) at critical times to Bombardier's certification efforts, was done for the improper purpose of delaying Bombardier's certification schedule, it in fact delayed Bombardier's certification schedule, and it inflicted resulting harm on Bombardier in the form of costly delays to the certification schedules of its C Series and/or Global 7000/8000 Aircraft.

160. 195. AeroTEC knew of each of these contractual relationships and business expectancies, at least because Bombardier informed AeroTEC of this expectation through various letters described above, because upon information and belief they were relayed from Bombardier through MHI/MITAC/MITAC America to AeroTEC, because AeroTEC had previously hired former Bombardier personnel who were aware of these relationships and expectancies and upon information and belief now work as AeroTEC officers, and/or because AeroTEC as a similarly situated corporate entity maintains the same relationships and/or expectations of its own.

161.196.     By engaging in the aforementioned conduct, specifically but without limitation targeting Bombardier personnel for recruitment for its MRJ project, AeroTEC intentionally interfered with Bombardier's contractual relationships and business expectancies, which proximately induced or caused breach of the aforementioned contractual relationships with, and business expectancies from, at least individual Defendants Basson, Delarche, Dornéval, and those Does 1-88 as individuals, with these defendants collectively as comprising a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft, and with these defendants collectively as instrumental to adhering to Bombardier's certification schedule for the C-Series and Global 7000/8000 Aircraft 88 employed by AeroTEC.

162.197.     AeroTEC's intentional interference with Bombardier's contractual relationships and business expectancies was conducted for improper purposes;, namely—to knowingly, willfully, and illicitly obtain Bombardier confidential, proprietary, and/or trade secret information knowingly and willfully to assist in the development and/or certification of the MRJ; and to harm Bombardier in the form of costly delays to its certification efforts for the C-Series and Global 7000/8000 Aircraft, which in fact materialized as described above.

163.198.     AeroTEC's intentional interference with Bombardier's contractual relationships and business expectancies for an improper purpose has caused resulting damage to Plaintiff and is continuing to cause resulting damage to Plaintiff. at least by causing Bombardier's confidential, proprietary, and/or trade secret information to be divulged, and/or by causing delays to Bombardier's own certification schedule, as described above, and in an amount to be determined at trial.

### Count X: Violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.*

### (Laurus Basson)

164.199.     Bombardier incorporates by reference paragraphs 1-163,198, above, as though fully set forth herein.

165.200.     As explained above, Plaintiff has developed, owns, and possesses certain

confidential, proprietary, and trade secret information, including but not limited to

information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad. Such information includes, but is not limited to, information contained in two proprietary PowerPoint slide decks entitled, "TCCA Skew Detection Presentation- Updated with latest Systems and Structure Limits 16-02-01.pptx" and "2016-03-03 TCCA Skew Detection Presentation-JAN 28 FINAL.pptx" (collectively, "Bombardier Skew Detection TCCA Files"). These documents contain highly sensitive, proprietary Bombardier trade secret information concerning Bombardier's Skew Detection System and related confidential communications Bombardier made with Transport Canada for certification purposes.

166.201.      This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Skew Detection TCCA Files—relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of certain Bombardier aircraft.

167.202.      Plaintiff has taken reasonable measures to keep such information—including the information contained in the Bombardier Skew Detection TCCA Files—secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

168.203.      This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Skew Detection TCCA Files—derives independent economic value from not being generally known to, and not being readily ascertainable through

proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue

would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

169.204.     In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836, Defendant Basson misappropriated the confidential, proprietary, and trade secret information described above, including but not limited to the Bombardier Skew Detection TCCA Files, in an improper and unlawful manner as alleged herein. Specifically, and without limitation, Defendant Basson misappropriated at least the Bombardier Skew Detection TCCA Files because at the time he emailed the files to his private email account, he lacked authorization to do so, and he knew or should have known that this was an impermissible transfer of Bombardier files containing highly sensitive Bombardier trade secret information for his personal possession. Additionally, and upon information and belief, on or after May 11, 2016, Defendant Basson disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

170.205.     Defendant Basson's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

171.206.     As a direct and proximate result of Defendant Basson's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which

there is no adequate~~ly~~ remedy at law.

~~172.~~207.          Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Basson's conduct in an amount to be proven at trial.

### Count XI: Violation of the Washington Uniform Trade Secrets Act (WUTSA), RCW 19.108.010 *et seq.* (Laurus Basson)

~~173.~~208.          Bombardier incorporates by reference paragraphs 1-~~172,~~207, above, as though fully set forth herein.

~~174.~~209.          As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including, but is not limited to, information contained in two proprietary PowerPoint slide decks entitled, "TCCA Skew Detection Presentation- Updated with latest Systems and Structure Limits 16-02-01.pptx" and "2016-03-03 TCCA Skew Detection Presentation-JAN 28 FINAL.pptx" (collectively, "Bombardier Skew Detection TCCA Files"). These documents contain highly sensitive, proprietary Bombardier trade secret information concerning Bombardier's Skew Detection System and related confidential communications Bombardier made with Transport Canada for certification purposes.

~~175.~~210.          This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Skew Detection TCCA Files—relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of certain Bombardier aircraft.

~~176.~~211.          Plaintiff has taken reasonable measures to keep such information— including the information contained in the Bombardier Skew Detection TCCA Files—secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to

properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

~~177.~~

212.    This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Skew Detection TCCA Files—derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

~~178.~~213.    In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*, Defendant Basson misappropriated the confidential, proprietary, and trade secret information described above, including but not limited to the Bombardier Skew Detection TCCA Files, in an improper and unlawful manner as alleged herein. Specifically, and without limitation, Defendant Basson misappropriated at least the Bombardier Skew Detection TCCA Files because at the time he emailed the files to his private email account, he lacked authorization to do so, and he knew or should have known that this was an impermissible transfer of Bombardier files containing highly sensitive Bombardier trade secret information for his personal possession. Additionally, and upon information and belief, Defendant Basson disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

~~179.~~214.    Defendant Basson's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

~~180.~~

215.    As a direct and proximate result of Defendant Basson's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

181.216.    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Basson's conduct in an amount to be proven at trial. **Count XII:**
**Breach of Contract (Laurus Basson)**

182.217.    Bombardier incorporates by reference paragraphs 1-181,216, above, as though fully set forth herein.

183.218.    At all relevant times, Bombardier had a valid and enforceable contract with Defendant Basson at least arising out of Defendant Basson's express agreement to abide by Bombardier's Code of Ethics.2012 Code of Ethics. On information and belief, Defendant Basson signed on March 4, 2013, his first day of employment with Bombardier, as a condition for his employment, the acknowledgement that he would abide by the 2012 Code of Ethics.

184.219.    Pursuant to at least Bombardier's 2012 Code of Ethics, Defendant Basson owed Bombardier a duty to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so." (Exs. D, K.) Defendant Basson's duty was "to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (*Id.*) Defendant Basson also owed Bombardier duties to Bombardier to "keep[] electronic and paper documents and files containing confidential information in a safe place"; to "transmit[] confidential documents by electronic devices, such as by fax or e-mail, only when it is reasonable to believe this can be done under secure conditions"; and to "avoid[] unnecessary copying of confidential documents." (*Id.*)

185.220.    Defendant Basson breached these duties owed to Bombardier at least by making and sending electronic copies of confidential and/or trade secret information from his work email account to his unsecure personal email account without authorization as described

above. Upon information and belief, Defendant Basson also breached these duties by disclosing Bombardier's confidential and/or trade secret information to unauthorized third parties—including but not limited to his employer AeroTEC—and/or by using Bombardier's confidential and/or trade secret information in his role at AeroTEC.

186.221.    Defendant Basson's breach of his duties has proximately caused Bombardier harm, both in the form of irreparable harm and monetary damages to be determined at trial, at least because his breach has compromised the security of Bombardier confidential and/or trade secret information, has lessened the value of Bombardier's investment to develop and maintain the misappropriated confidential and/or trade secret information at issue, and has reduced Bombardier's benefits and competitive advantages it previously enjoyed by virtue of maintaining such information as confidential.

## Count XIII: Violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.*
### (Marc-Antoine Delarche)

187.222.    Bombardier incorporates by reference paragraphs 1-186,221, above, as though fully set forth herein.

188.223.    As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad.    Such information includes, but is not limited to, information contained in six proprietary .pdf files entitled, "RAA-BA503-412 Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf";                                "RAA-BA503-414 Lag_Effects_in_the_Production_and_Experimental_ Pitot-StaticPitotStatic_ Systems.pdf"; "RAA-BA503-418 Data Reduction of Ground Position Errors.pdf," "RAA-BA500-412 Rev A - Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf";                                "RAA-BA500-414-RevA-Lag_Effects_in_the_Production_and_Experimental_Pitot-Static_Systems.pdf"; and "RAA-BA500-418_signed.pdf." (collectively, "Bombardier Certification Reports").    These

documents contain highly sensitive, proprietary Bombardier trade secret information developed throughout previous certification and used for the certification of the C-Series aircraft and critical subcomponents, and they include hundreds of pages of highly detailed certification reports.

189.224.      This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Certification Reports—relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of the C-Series, a medium range aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

190.225.      Plaintiff has taken reasonable measures to keep such information—including the information contained in the Bombardier Certification Reports—secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

191.226.      This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Certification Reports—derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a

narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

192.227.    In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836,1836 *et seq.,* Defendant Delarche misappropriated the confidential, proprietary, and trade secret information described above, including but not limited to the Bombardier Certification Reports, in an improper and unlawful manner as alleged herein. Specifically, and without limitation, Defendant Delarche misappropriated at least the Bombardier Certification Reports because at the time he emailed the files to his private email account, he lacked authorization to do so, and he knew or should have known that this was an impermissible transfer of Bombardier files containing highly sensitive Bombardier trade secret information for his personal possession. Additionally, and upon information and belief, Defendant Delarche disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

193.228.    Defendant Delarche's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

194.229.    As a direct and proximate result of Defendant Delarche's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

195.230.    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Delarche's conduct in an amount to be proven at trial.

**Count XIV: Violation of the Washington Uniform Trade Secrets Act (WUTSA),**
**RCW 19.108.010 *et seq.* (Marc-Antoine Delarche)**

196.231.        Bombardier incorporates by reference paragraphs 1-195,230, above, as though fully set forth herein.

197.232.        As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used, among others, for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad. Such information includes, but is not limited to, information contained in six proprietary .pdf files entitled, "RAA-BA503-412 Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf"; "RAA-BA503-414 Lag_Effects_in_the_Production_and_Experimental_PitotStatic_Systems.pdf"; "RAA-BA503-418 Data Reduction of Ground Position Errors.pdf," "RAA-BA500-412 Rev A - Reduction of Temperature, Airspeed, Altitude and Mach Number Errors.pdf";                          "RAA-BA500-414-RevA-Lag_Effects_in_the_Production_and_Experimental_Pitot-Static_Systems.pdf"; and "RAA-BA500-418_signed.pdf." (collectively, "Bombardier Certification Reports").        These documents contain highly sensitive, proprietary Bombardier trade secret information developed throughout previous certification and used for the C-Series aircraft and critical subcomponents, and they include hundreds of pages of highly detailed certification reports.

198.233.        This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Certification Reports—relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of the C-Series, a medium range aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

199.

234.    Plaintiff has taken reasonable measures to keep such information—including the information contained in the Bombardier Certification Reports—secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

200.235.    This confidential, proprietary, and trade secret information—including the information contained in the Bombardier Certification Reports—derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

201.236.    In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*, Defendant Delarche misappropriated the confidential, proprietary, and trade secret information described above, including but not limited to the Bombardier Certification Reports, in an improper and unlawful manner as alleged herein. Specifically, and without limitation, Defendant Delarche misappropriated at least the Bombardier Certification Reports because at the time he emailed the files to his private email account, he lacked authorization to do so, and he knew or should have known that this was an impermissible transfer of Bombardier files containing highly sensitive Bombardier trade secret information for his personal possession. Additionally, and upon information and belief, Defendant Delarche

disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

202.237.    Defendant Delarche's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

203.238.    As a direct and proximate result of Defendant Delarche's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

204.**239.**    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Delarche's conduct in an amount to be proven at trial.

**Count XV: Breach of Contract (Marc-Antoine Delarche)**

205.240.    Bombardier incorporates by reference paragraphs 1-204,239, above, as though fully set forth herein.

206.241.    At all relevant times, Bombardier had a valid and enforceable contract with Defendant Delarche at least arising out of Defendant Delarche's express agreement to abide by Bombardier's Code of Ethics.2004 Code of Ethics. Defendant Delarche signed on January 17, 2005, his first day of employment at Bombardier, as a condition for his employment, the acknowledgement that he would abide by the 2004 Code of Ethics.

207.242.    Pursuant to at least Bombardier's 2004 Code of Ethics, Defendant Delarche owed Bombardier a duty to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so." (ExsEx. DM, N.at 14.) Defendant Delarche's duty was "to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (*Id.*) Defendant Delarche also owed Bombardier duties to Bombardier to "keep[] electronic and paper documents and files

containing confidential information in a safe place"; to "transmit[] confidential documents by electronic devices, such as by fax or e-mail, only when it is reasonable to believe this can be done under secure conditions"; and to "avoid[] unnecessary copying of confidential documents." (*M*)

208.243.    Defendant Delarche breached these duties owed to Bombardier at least by making and sending electronic copies of confidential and/or trade secret information from his work email account to his unsecure personal email account without authorization as described above. Upon information and belief, Defendant Delarche also breached these duties by disclosing Bombardier's confidential and/or trade secret information to unauthorized third parties—including but not limited to his employers AeroTEC and then MITAC—and/or by using Bombardier's confidential and/or trade secret information in his roles at AeroTEC and then MITAC.

209.244.    Defendant Delarche's breach of his duties has proximately caused Bombardier harm, both in the form of irreparable harm and monetary damages to be determined at trial, at least because his breach has compromised the security of Bombardier confidential and/or trade secret information, has lessened the value of Bombardier's investment to develop and maintain the misappropriated confidential and/or trade secret information at issue, and has reduced Bombardier's benefits and competitive advantages it previously enjoyed by virtue of maintaining such information as confidential.

## Count XVI: Violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.*
### (Cindy Dornéval)

210.245.    Bombardier incorporates by reference paragraphs 1-209,244, above, as though fully set forth herein.

211.246.    As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad. Such

information includes, but is not limited to, information contained in various Bombardier electronic documents with the following file names: "FTP PROD CSeries Rev 5.0 – 17 November 2016.docx"; "FTP PROD CSERIES Rev 5.0 – 17 November 2016.pdf"; "CS100_Flight_FTP_Perf_N1_target.pdf"; and "CS300_Flight_FTP_Perf_N1_target.pdf," and "BM7002.02.15.02 – Flight Performances" (collectively, "Flight Test Files and CAFM Methodology"). These documents contain highly sensitive, proprietary Bombardier trade secret information developed throughout previous certification and used for the C-Series aircraft, including but not limited to hundreds of pages of specific details concerning the flight test profiles Bombardier employed in gathering necessary data to obtain certificates of airworthiness for the C-Series aircraft for entry into service and parameters used in Bombardier's proprietary Airplane Flight Manual.

212.247.     This confidential, proprietary, and trade secret information—including the information contained in the Flight Test Files and CAFM Methodology —relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of the C-Series, a medium range aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

213.248.     Plaintiff has taken reasonable measures to keep such information—including the information contained in the Flight Test Files and CAFM Methodology—secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

214.249.    This confidential, proprietary, and trade secret information—including the information contained in the Flight Test Files and CAFM Methodology—derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in how to streamline flight testing to ultimately obtain a certificate of airworthiness for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft.

215.250.    In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836,1836 *et seq.,* Defendant Dornéval misappropriated the confidential, proprietary, and trade secret information described above, including but not limited to the Flight Test Files and CAFM Methodology, in an improper and unlawful manner as alleged herein. Specifically, and without limitation, Defendant Dornéval misappropriated at least the Flight Test Files and CAFM Methodology because at the time she emailed the files to her private email account, she lacked authorization to do so, and she knew or should have known that this was an impermissible transfer of Bombardier files containing highly sensitive Bombardier trade secret information for her personal possession. Additionally, and upon information and belief, Defendant Dornéval disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

216.251.    Defendant Dornéval's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

217.252.    As a direct and proximate result of Defendant Dornéval's conduct,

Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

218.**253.**    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Dornéval's conduct in an amount to be proven at trial. **Count XVII: Violation of the Washington Uniform Trade Secrets Act (WUTSA), RCW 19.108.010 *et seq.* (Cindy Dornéval)**

219.254.    Bombardier incorporates by reference paragraphs 1–218,253, above, as though fully set forth herein.

220.255.    As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad. Such information includes, but is not limited to, information contained in various Bombardier electronic documents with the following file names: "FTP PROD CSeries Rev 5.0 – 17 November 2016.docx"; "FTP PROD CSERIES Rev 5.0 – 17 November 2016.pdf"; "CS100_Flight_FTP_Perf_N1_target.pdf"; and "CS300_Flight_FTP_Perf_N1_target.pdf," and "BM7002.02.15.02 – Flight Performances" (collectively, "Flight Test Files and CAFM Methodology")." These documents contain highly sensitive, proprietary Bombardier trade secret information developed throughout previous certification and used for the C-Series aircraft, including but not limited to hundreds of pages of specific details concerning the flight test profiles Bombardier employed in gathering necessary data to obtain certificates of airworthiness for the C-Series aircraft for entry into service and parameters used in Bombardier's proprietary Airplane Flight Manual.

221.256.    This confidential, proprietary, and trade secret information—including the information contained in the Flight Test Files and CAFM Methodology—relates to products

and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of the C-Series, a medium range aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

222.257.    Plaintiff has taken reasonable measures to keep such information— including the information contained in the Flight Test Files and CAFM Methodology—secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

223.258.    This confidential, proprietary, and trade secret information—including the information contained in the Flight Test Files and CAFM Methodology—derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in how to streamline flight testing to ultimately obtain a certificate of airworthiness for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft.

224.259.    In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*, Defendant Dornéval misappropriated the confidential, proprietary, and trade secret information described above, including but not limited to the Flight Test Files and CAFM Methodology, in an improper and unlawful manner as alleged herein. Specifically, and

without limitation, Defendant Dornéval misappropriated at least the Flight Test Files and CAFM Methodology because at the time she emailed the files to her private email account, she lacked authorization to do so, and she knew or should have known that this was an impermissible transfer of Bombardier files containing highly sensitive Bombardier trade secret information for her personal possession. Additionally, and upon information and belief, Defendant Dornéval disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

225.260.    Defendant Dornéval's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

226.261.    As a direct and proximate result of Defendant Dornéval's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

227.**262.**    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Dornéval's conduct in an amount to be proven at trial. **Count XVIII: Breach of Contract (Cindy Dornéval)**

228.263.    Bombardier incorporates by reference paragraphs 1-227,262, above, as though fully set forth herein.

229.264.    At all relevant times, Bombardier had a valid and enforceable contract with Defendant Dornéval at least arising out of Defendant Dornéval's express agreement to abide by Bombardier's Code of Ethics. Defendant Dornéval signed on July 3, 2007, her first day of employment with Bombardier, as a condition for her employment, the acknowledgement that she would abide by the 2004 Code of Ethics.
230.

265.    Pursuant to at least Bombardier's 2004 Code of Ethics, Defendant Dornéval owed Bombardier a duty to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it is intended, unless authorized or legally required to do so." (Exs.Ex. DM. P.at 14.) Defendant Dornéval's duty was "to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (*Id.*) Defendant Dornéval also owed Bombardier duties to Bombardier to "keep[] electronic and paper documents and files containing confidential information in a safe place"; to "transmit[] confidential documents by electronic devices, such as by fax or e-mail, only when it is reasonable to believe this can be done under secure conditions"; and to "avoid[] unnecessary copying of confidential documents." (*Id.*)

231.266.    Defendant Dornéval breached these duties owed to Bombardier at least by making and sending electronic copies of confidential and/or trade secret information from her work email account to her unsecure personal email account without authorization as described above. Upon information and belief, Defendant Dornéval also breached these duties by disclosing Bombardier's confidential and/or trade secret information to unauthorized third parties—including but not limited to his employer AeroTEC—and/or by using Bombardier's confidential and/or trade secret information in her role at AeroTEC.

232.267.    Defendant Dornéval's breach of his duties has proximately caused Bombardier harm, both in the form of irreparable harm and monetary damages to be determined at trial, at least because her breach has compromised the security of Bombardier confidential and/or trade secret information, has lessened the value of Bombardier's investment to develop and maintain the misappropriated confidential and/or trade secret information at issue, and has reduced Bombardier's benefits and competitive advantages it previously enjoyed by virtue of maintaining such information as confidential.

**Count XIX: Violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.***
**(Michel Korwin-Szymanowski)**

233.268.         Bombardier incorporates by reference paragraphs 1-232,267, above, as though fully set forth herein.

234.269.         As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad. Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier. This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

235.270.         This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

236.271.         Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

237.272.         This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the

disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

238.273.    In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836,1836 *et seq.,* Defendant Szymanowski misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein. Additionally, Szymanowski misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, Szymanowski knew or had reason to know that his knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use. Specifically, and without limitation, Defendant Szymanowski misappropriated Bombardier trade secrets by inducing or knowingly permitting Defendants Basson, Delarche, and Dornéval to misappropriate, divulge, and/or use the Bombardier trade secrets described above through his targeted recruitment efforts on behalf of AeroTEC, including through his emails to Defendants Basson, Delarche, and Dornéval. Alternatively, upon information and belief, on or after May 11, 2016, Szymanowski misappropriated Bombardier's trade secrets because he disclosed and/or used Bombardier trade secrets without permission, knowing or having reason to know that the information constituted trade secrets.

274.    Specifically, and upon information and belief, in his role in assisting with MRJ certification, Defendant Korwin-Szymanowski was supervising multiple employees who used Bombardier trade secrets, including Defendants Dornéval, Delarche, and Basson. Upon information and belief, in that supervisory capacity, Defendant Korwin-Szymanowski

reviewed and used their work and contributions to advance MRJ certification, which ==upon further information and belief== incorporated the Bombardier trade secret information that each illicitly emailed to their personal email accounts prior to their planned and voluntary departure from Bombardier. ==Upon further information and belief,== based on his lengthy tenure and experience with Bombardier, Defendant Korwin-Szymanowski knew and recognized, or at least should have known and recognized, that the work and contributions of at least Defendants Dornéval, Delarche, and Basson were incorporating Bombardier trade secret information of which each was under a duty to maintain its secrecy. Defendant Korwin-Szymanowski therefore knew or should have known that Bombardier's trade secret information had been misappropriated by Defendants Dornéval, Delarche, and Basson and was being used for improper purposes to assist in MRJ certification. Because Defendant Korwin-Szymanowski's role at AeroTEC was to assist in MRJ certification, and because he was aware that Bombardier trade secret information was being used for MRJ certification purposes, Defendant Korwin-Szymanowski was also knowingly using and further disclosing Bombardier trade secret information without authorization.

239.275.    Defendant Szymanowski's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

240.276.    As a direct and proximate result of Defendant Szymanowski's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

241.277.    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Szymanowski's conduct in an amount to be proven at trial.

**Count XX: Violation of the Washington Uniform Trade Secrets Act (WUTSA),**

**RCW 19.108.010 *et seq.* (Michel Korwin-Szymanowski)**

242.278.    Bombardier incorporates by reference paragraphs 1-241,277, above, as though fully set forth herein.

243.279.      As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad. Such information includes, but is not limited to, the specific documents described and/or identified above as being illicitly transmitted to personal email accounts by former Bombardier personnel before their departure from Bombardier. This information constitutes financial, business, scientific, technical, economic, and/or engineering information.

244.280.      This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the medium range C-Series aircraft with a range of over 3,000 nautical miles approved by FAA and other regulatory agencies abroad for service between states and foreign countries.

245.281.      Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

246.282.      This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a

narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

247.283.    In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836,WUTSA, RCW 19.108.010 *et seq.,* Defendant Szymanowski misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein. Additionally, Szymanowski misappropriated Bombardier's trade secrets because at the time it obtained and/or used Bombardier trade secret information without Bombardier permission, Szymanowski knew or had reason to know that his knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Bombardier to maintain its secrecy or limit its use. Specifically, and without limitation, Defendant Szymanowski misappropriated Bombardier trade secrets by inducing or knowingly permitting Defendants Basson, Delarche, and Dornéval to misappropriate, divulge, and/or use the Bombardier trade secrets described above through his targeted recruitment efforts on behalf of AeroTEC, including through his emails to Defendants Basson, Delarche, and Dornéval. Alternatively, upon information and belief, Szymanowski misappropriated Bombardier's trade secrets because he disclosed and/or used Bombardier trade secrets without permission, knowing or having reason to know that the information constituted trade secrets.

284.    Specifically, and upon information and belief, in his role in assisting with MRJ certification, Defendant Korwin-Szymanowski was supervising multiple employees who used Bombardier trade secrets, including Defendants Dornéval, Delarche, and Basson. Upon information and belief, in that supervisory capacity, Defendant Korwin-Szymanowski reviewed and used their work and contributions to advance MRJ certification, which upon further information and belief, incorporated the Bombardier trade secret information that each illicitly emailed to their personal email accounts prior to their planned and voluntary departure from Bombardier. Upon further information and belief, based on his lengthy tenure and

experience with Bombardier, Defendant Korwin-Szymanowski knew and recognized, or at least should have known and recognized, that the work and contributions of at least Defendants Dornéval, Delarche, and Basson were incorporating Bombardier trade secret information of which each was under a duty to maintain its secrecy. Defendant KorwinSzymanowski therefore knew or should have known that Bombardier's trade secret information had been misappropriated by Defendants Dornéval, Delarche, and Basson and was being used for improper purposes to assist in MRJ certification. Because Defendant Korwin-Szymanowski's role at AeroTEC was to assist in MRJ certification, and because he was aware that Bombardier trade secret information was being used for MRJ certification purposes, Defendant Korwin-Szymanowski was also knowingly using and further disclosing Bombardier trade secret information without authorization.

~~248.~~285.   Defendant Szymanowski's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

~~249.~~286.   As a direct and proximate result of Defendant Szymanowski's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

~~250.~~**287.**   Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Szymanowski's conduct in an amount to be proven at trial.

## Count XXI: Tortious Interference with Contractual Relationship and/or Business Expectancy (Michel Korwin-Szymanowski)

~~251.~~288.   Plaintiff incorporates by reference paragraphs 1-~~250,~~287, above, as though fully set forth herein.

~~252.~~289.   Bombardier had a reasonable and valid contractual relationship and/or business expectancy with each of its former employees arising from each former employee's agreement to be bound by Bombardier's Code of Ethics provision to "not divulge [Bombardier] confidential information to anyone other than the person or persons for whom it

is intended, unless authorized or legally required to do so. This includes confidential information provided by suppliers and customers. Employees agree to maintain such confidentiality at all times, even after leaving the employ of Bombardier." (Ex. D, at 15.) Both the 2004 Code of Ethics and the 2012 Code of Ethics contain this provision. (*See* Exs. D and M.)

253.    Bombardier also had a reasonable and valid business expectancy that it would continue to employ its personnel, specifically Defendants Basson, Delarche, Dornéval, and Does 1-88, to continue their design, development, engineering, and/or certification efforts in Bombardier's aerospace division. These employer-employee relationships were more than simple "at will" employment arrangements at least because each employee had a continuing obligation

290.    On information and belief, each of Defendants Delarche and Dornéval signed an acknowledgement on their respective first day of working for Bombardier that as a condition to their respective employment each would abide by the 2004 Code of Ethics. On information and belief, Defendant Basson signed an acknowledgement on his first day of working for Bombardier that as a condition of his employment he would abide by the 2012 Code of Ethics. The relevant versions of Bombardier's Code of Ethics that each of Defendants Basson, Delarche, and Dornéval signed and agreed to abide by on their respective first day of working for Bombardier included the confidentiality provision noted in the preceding paragraph. Thus, each of these employees had a continuing obligation under the respective Code of Ethics to maintain the confidentiality of all Bombardier trade secret, proprietary, and/or confidential information following termination of employment to maintain the confidentiality of all Bombardier proprietary and confidential information.

254.    Bombardier also had a reasonable and valid business expectancy that it would

~~not lose a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 aircraft within a span of months to work for a competing venture in need of Bombardier's proprietary and confidential information.~~. On information and belief, at least Defendants Basson, Delarche, and Dornéval, as well as certain of Does 1-88, owed this continuing duty to Bombardier when they were contacted by Defendants Korwin-Szymanowski about working on Defendants' efforts to gain certification for the MRJ.

291.    Bombardier also had a reasonable and valid business expectancy that personnel working out of its offices in Canada would honor their duties of good faith and fidelity to Bombardier as their employer under Canadian law. (*See* Dkt. No. 87-1.) Bombardier had a reasonable expectation that, as part of these duties, these employees would not take or use any of Bombardier's trade secret, confidential, and/or proprietary information when these employees left Bombardier. This reasonable expectation exists at least with respect to Defendants Basson, Delarche, Dornéval, and Ayre, as well as any of Does 1-88 who previously worked in or out of Bombardier's Canadian offices. Thus, each of these employees had a continuing obligation following termination of employment to maintain the confidentiality of all Bombardier trade secret, proprietary, and/or confidential information. On information and belief, at least Defendants Basson, Dornéval, and Delarche, as well as certain of Does 1-88 who previously worked in or out of Bombardier's Canadian offices and were recruited and/or hired by Defendant Korwin-Szymanowski, owe this continuing duty to Bombardier'.

~~255.~~ 292. 'Bombardier had yet another reasonable and valid business expectancy that it would generally adhere to its certification schedules set forth for the C-Series and Global 7000/8000 Aircraft, particularly because Bombardier had successfully obtained certification for approximately thirty (30) different aircraft in the preceding three (3) decades, it had significant experience and understanding of certification processes as a result of these previous

certifications, and it could reasonably expect, based on this experience and understanding, that its projected schedule to obtain certification for the C-Series and Global 7000/8000 Aircraft would be accurate. The recruitment of Bombardier's certification personnel by Defendant Korwin-Szymanowski on behalf of, and the subsequent hiring of Bombardier's certification personnel by, Defendants occurred during and had a detrimental impact on the certification schedules for the C-Series and the Global 7000/8000 Aircraft, delaying these certification schedules by at least several months. Defendant Korwin-Szymanowski continued his recruitment of Bombardier personnel who were working on Bombardier's certification efforts despite learning about the detrimental impact that the continued recruitment and hiring of Bombardier personnel would have on Bombardier's certification schedules. Accordingly, Defendant Korwin-Szymanowski knew or should have known of the detrimental impact that his actions were having on Bombardier and its certification schedules but nevertheless persisted in continuing to recruit these Bombardier personnel for hiring by Defendants. Based upon the foregoing, and upon further information and belief, Defendant Korwin-Szymanowski's persisted course of conduct, which resulted in the loss of key Bombardier certification personnel (including but not limited to Bombardier's chief and deputy chief flight test pilots for certification purposes) at critical times to Bombardier's certification efforts, was done for the improper purpose of delaying Bombardier's certification schedule, it in fact delayed Bombardier's certification schedule, and it inflicted resulting harm on Bombardier in the form of costly delays to the certification schedules of its C Series and/or Global 7000/8000 Aircraft.'

256.293.     As a former employee of Bombardier, Defendant Korwin-Szymanowski knew of each of these contractual relationships and business expectancies. Further, Defendant Korwin-Szymanowski was made aware of these relationships and expectancies through various letters he received from Bombardier as detailed above., particularly the letter addressed to

Defendant Korwin-Szymanowski personally and dated October 22, 2015.

257.294.    By engaging in the aforementioned conduct, specifically but without limitation using and/or authorizing various means to target Bombardier personnel for recruitment for AeroTEC's involvement in the MRJ project, Defendant Korwin-Szymanowski intentionally interfered with Bombardier's contractual relationships and business expectancies, which proximately induced or caused breach of the aforementioned contractual relationships with, and business expectancies from, at least Defendants Basson, Delarche, Dornéval, and Does 1-88 as individuals, with these defendants collectively as comprising a significant number of its key personnel involved in the testing and certification of the C-Series and Global 7000/8000 Aircraft, and with these defendants collectively as instrumental to adhering to Bombardier's certification schedule for the C-Series and Global 7000/8000 Aircraftthose individual Does 1-88 who were identified for recruitment and/or recruited by Defendant Korwin-Szymanowski'.

258.295.    Defendant Korwin-Szymanowski's intentional interference with Bombardier's contractual relationships and business expectancies was conducted for improper purposes;, namely—to knowingly, willfully, and illicitly obtain Bombardier confidential, proprietary, and/or trade secret information knowingly and willfully to assist in the development and/or certification of the MRJ; and to harm Bombardier in the form of costly delays to its certification efforts for the C-Series and Global 7000/8000 Aircraft, which in fact materialized as described above.

259.296.    Defendant Korwin-Szymanowski's intentional interference with Bombardier's contractual relationships and business expectancies for an improper purpose has caused resulting damage to Plaintiff and is continuing to cause resulting damage to Plaintiff at least

by causing Bombardier's confidential, proprietary, and/or trade secret information to be divulged, and/or by causing delays to Bombardier's own certification schedule, as described above, in an amount to be determined at trial.

**Count XXII: Violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.***

**(Keith Ayre)**

260.297.     Bombardier incorporates by reference paragraphs 1-259,296, above, as though fully set forth herein.

261.298.     As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad. Such information includes, but is not limited to, information contained in several emails Defendant Ayre sent from his Bombardier work email account to his personal Apple and Gmail email accounts in the weeks and days before his departure from Bombardier. These emails contain highly sensitive, proprietary Bombardier trade secret information concerning Bombardier's aircraft certification efforts and related confidential communications Bombardier made with Transport Canada for certification purposes.

262.299.     This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of certain Bombardier aircraft.

263.300.     Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier

proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting

access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

264.301.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

265.302.    In violation of Plaintiff's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836, Defendant Ayre misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein. Specifically, and without limitation, Defendant Ayre misappropriated the identified Bombardier aircraft certification information because at the time he emailed the information to his private email accounts, he lacked authorization to do so, and he knew or should have known that this was an impermissible transfer of Bombardier information containing highly sensitive Bombardier trade secret information for his personal possession. Additionally, and upon information and belief, on or after August 18, 2016, Defendant Ayre used and/or disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using improper means to acquire the information, knowing or

having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

303.    For example, as detailed above, Defendant Ayre emailed to his personal account two days before his departure from Bombardier a highly confidential email discussing Bombardier trade secrets that he initially received from TCCA nearly three years earlier concerning smoke penetration testing for Bombardier aircraft. Additionally, on August 18, 2016, Defendant Ayre emailed to himself a copy of correspondence previously exchanged with MITAC personnel, Mr. Koki Fukuda, the Engineering Lead of Ice Protection Systems for the MRJ, concerning Bombardier trade secret certification activities, the details of which he was "happy to discuss" "when [he is] in the MRJ office." On information and belief, Defendant Ayre actually discussed and disclosed Bombardier trade secret information with unauthorized third parties, including but not limited to MITAC, when he arrived "in the MRJ office." Further still, Mr. Ayre sent an email on August 24, 2016—using Bombardier equipment and from Bombardier facilities—addressed to an individual named "Frederic" (who upon information and belief was a MITAC employee or contractor during the relevant time period) disclosing Bombardier trade secret information pertaining to Fire Detection and Extinguishing ("FIDEX") and related System Safety Analysis ("SSA"). On information and belief, Mr. Ayre's disclosures and teachings to "Frederic" in August 2016 led to an improved redesign of the MRJ now subject to certification efforts. (*See* Denkenberger Decl., Exs. 26 28.)

266.304.    Defendant Ayre's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

267.305.    As a direct and proximate result of Defendant Ayre's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an

irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

268.306.     Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Ayre's conduct in an amount to be proven at trial.

**Count XXIII: Violation of the Washington Uniform Trade Secrets Act (WUTSA), RCW 19.108.010 *et seq.* (Keith Ayre)**

269.307.     Bombardier incorporates by reference paragraphs 1-268,306, above, as though fully set forth herein.

270.308.     As explained above, Plaintiff has developed, owns, and possesses certain confidential, proprietary, and trade secret information, including but not limited to information used for the C-Series aircraft's design, development, testing, evaluation, certification, and commercialization for use in the United States and abroad. Such information includes, but is not limited to, information contained in several emails Defendant Ayre sent from his Bombardier work email account to his personal Apple and Gmail email accounts in the weeks and days before his departure from Bombardier. These emails contain highly sensitive, proprietary Bombardier trade secret information concerning Bombardier's aircraft certification efforts and related confidential communications Bombardier made with Transport Canada for certification purposes.

271.309.     This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce, as it was used, among others, for the design, development, and/or certification of certain Bombardier aircraft.

272.310.     Plaintiff has taken reasonable measures to keep such information secret as described above and including, without limitation, subjecting all employees to a Code of

Ethics that instructs personnel in the specifics of identifying and safeguarding Bombardier proprietary information; clearly marking trade secret information as proprietary and confidential subject to restrictions on further use and dissemination; physically restricting access in its facilities to properly credentialed individuals; and virtually restricting electronic access to proprietary trade secret information to properly credentialed personnel.

273.311.   This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. In addition to the foregoing, the information at issue would be of tremendous value to MITAC, MITAC America, and AeroTEC in their efforts to develop, certify, and commercialize the MRJ aircraft, as it would at a minimum provide invaluable guidance in ultimately obtaining regulatory certification for entry into service of a narrow-body, geared turbofan twin-engine, medium-range jet aircraft, something MITAC has been unable to obtain for its MRJ despite nearly a decade of effort.

274.312.   In violation of Plaintiff's rights under the WUTSA, RCW 19.108.010 *et seq.*, Defendant Ayre misappropriated the confidential, proprietary, and trade secret information described above in an improper and unlawful manner as alleged herein. Specifically, and without limitation, Defendant Ayre misappropriated the identified Bombardier aircraft certification information because at the time he emailed the information to his private email accounts, he lacked authorization to do so, and he knew or should have known that this was an impermissible transfer of Bombardier information containing highly sensitive Bombardier trade secret information for his personal possession. Additionally, and upon information and belief, on or after August 18, 2016, Defendant Ayre used and/or disclosed this and potentially other Bombardier trade secret information to others without Bombardier permission after using

improper means to acquire the information, knowing or having reason to know at the time of disclosure that his knowledge of the trade secret information was derived under circumstances giving rise to a duty to maintain its secrecy and limit its use.

313.    For example, as detailed above, Defendant Ayre emailed to his personal account two days before his departure from Bombardier a highly confidential email discussing Bombardier trade secrets that he initially received from TCCA nearly three years earlier concerning smoke penetration testing for Bombardier aircraft. Additionally, on August 18, 2016, Defendant Ayre emailed to himself a copy of correspondence previously exchanged with MITAC personnel, Mr. Koki Fukuda, the Engineering Lead of Ice Protection Systems for the MRJ, concerning Bombardier trade secret certification activities, the details of which 275.    he was "happy to discuss" "when [he is] in the MRJ office." On information and belief, Defendant Ayre actually discussed and disclosed Bombardier trade secret information with unauthorized third parties, including but not limited to MITAC, when he arrived "in the MRJ office." Further still, Mr. Ayre sent an email on August 24, 2016—using Bombardier equipment and from Bombardier facilities—addressed to an individual named "Frederic" (who upon information and belief was a MITAC employee or contractor during the relevant time period) disclosing Bombardier trade secret information pertaining to Fire Detection and Extinguishing ("FIDEX") and related System Safety Analysis ("SSA"). On information and belief, Mr. Ayre's disclosures and teachings to "Frederic" in August 2016 led to an improved redesign of the MRJ now subject to certification efforts. (*See* Denkenberger Decl., Exs. 26 28.) Defendant Ayre's conduct as described herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

276.314.    As a direct and proximate result of Defendant Ayre's conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an

irreparable loss of the confidentiality of their proprietary and trade secret information, for which there is no adequately remedy at law.

277.315.    Plaintiff has also suffered substantial damages as a direct and proximate cause of Defendant Ayre's conduct in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

A.    A preliminary and permanent injunction prohibiting MITAC, MITAC America, AeroTEC, and all those employed by, or acting in concert with, any of them from using, disclosing, further disclosing, or in any way relying on any proprietary Bombardier information misappropriated by any former Bombardier personnel;

B.    A preliminary and permanent injunction prohibiting MITAC, MITAC America, AeroTEC, and all those employed by, or acting in concert with, any of them from continuing to recruit personnel from Bombardier for the improper purpose of obtaining Bombardier confidential, proprietary, and/or trade secret information;

C.    An award of Plaintiff's damages;

D.    Disgorgement of, or constructive trust on, the wrongful profits attributable to and resulting from Defendants' conduct;

E.    An award to Plaintiff of punitive damages; and

F.    Any other relief deemed appropriate by this Court.

**<u>JURY DEMAND</u>**

Bombardier demands a jury trial on all issues triable by jury.

Dated this ~~19~~30th day of ~~October, 2018.~~April, 2019.

CHRISTENSEN O'CONNOR JOHNSON KINDNESSPLLC

<u>s/ John D. Denkenberger</u>
John D. Denkenberger, WSBA No.: 25,907 Brian F. McMahon, WSBA No.: 45,739 E. Lindsay Calkins, WSBA No.: 44,127 Christensen O'Connor Johnson KindnessPLLC 1201 Third Avenue, Suite 3600
Seattle, WA 98101-3029
Telephone: 206.682.8100
Fax: 206.224.0779
E-mail: john.denkenberger@cojk.com, brian.mcmahon@cojk.com, lindsay.calkins@cojk.com, litdoc@cojk.com

*Attorneys for Plaintiff Bombardier Inc.*

~~VERIFICATION~~
## CERTIFICATE OF SERVICE

~~I, Fassi Kafyeke, am a Senior Director for Strategic Technology and Innovation, Aerospace, for Bombardier, Inc.~~ I hereby certify that on April 30, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

~~1.      I have personal knowledge of the facts concerning and relating to Bombardier, Inc. as set forth in the foregoing Verified Complaint and as supported by the relevant accompanying exhibits and if called to testify as to these matters would do so competently.~~

~~2.      I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.~~

~~Executed on _____, 2018.~~

Jerry A. Riedinger             Mack H. Shultz              Mary Z. Gaston
PERKINS COIE LLP          PERKINS COIE LLP          PERKINS COIE LLP
Email:                        Email:                       Email:
JRiedinger@perkinscoie.com MShultz@perkinscoie.com      MGaston@perkinscoie.com
docketsea@perkinscoie.com docketseapl@perkinscoie.com docketsea@perkinscoie.com
lshaw@perkinscoie.com         sbilger@perkinscoie.com      jstarr@perkinscoie.com
sporter@perkinscoie.com


James Sanders                 Shylah R. Alfonso
PERKINS COIE LLP          PERKINS COIE LLP
Email:                        Email:
JSanders@perkinscoie.com SAlfonso@perkinscoie.com
RBecken@perkinscoie.com docketsea@perkinscoie.com
mailto:docketsea@perkinscoie.com
jdavenport@perkinscoie.com


Attorneys for Mitsubishi Aircraft Corporation and Mitsubishi Aircraft Corporation America Inc.


Richard J. Omata                              Mark A. Bailey

KARR TUTTLE CAMPBELL
Email: romata@karrtuttle.com
jnesbitt@karrtuttle.com
swatkins@karrtuttle.com

Daniel T. Hagen
KARR TUTTLE CAMPBELL
Email: dhagen@karrtuttle.com

KARR TUTTLE CAMPBELL
Email: mbailey@karrtuttle.com
jsmith@karrtuttle.com
mmunhall@karrtuttle.com
 sanderson@karrtuttle.com

Fassi Kafyeke
Senior Director, Strategic Technology
andksagawinia@karrtuttle.com

Attorneys for Aerospace Testing Engineering & Certification Inc., Michel KorwinSzymanowski, Laurus Basson, and Cindy Dornéval

James P. Savitt   Jacob P. Freeman
SAVITT BRUCE &   SAVITT BRUCE &
WILLEY LLP    WILLEY LLP
Email: jsavitt@sbwLLP.com Email:
eservice@sbwllp.com  jfreeman@sbwLLP.com

Attorneys for Marc-Antoine Delarche and Keith Ayre

        s/ John D. Denkenberger  John D.
        Denkenberger, WSBA No.: 25,907 Brian F.
        McMahon, WSBA No.: 45,739 E. Lindsay
        Calkins, WSBA No.: 44,127 Christensen
        O'Connor Johnson KindnessPLLC 1201
        Third Avenue, Suite 3600
        Seattle, WA 98101-3029
        Telephone: 206.682.8100
        Fax: 206.224.0779
        E-mail: john.denkenberger@cojk.com,
        brian.mcmahon@cojk.com,
        lindsay.calkins@cojk.com, litdoc@cojk.com

        ~~Innovation, Aerospace,~~*Attorneys for Plaintiff*
        *Bombardier~~,~~ Inc.*

Document comparison by Workshare 9 on Tuesday, May 14, 2019 11:05:26 AM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\aguee\Desktop\Redlines\MITAC Verified Complaint.docx |
| Description | MITAC Verified Complaint |
| Document 2 ID | file://C:\Users\aguee\Desktop\Redlines\Bombardier First Amended Complaint.docx |
| Description | Bombardier First Amended Complaint |
| Rendering set | Perkins |

| Legend: | |
|---|---|
| Insertion | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 766 |
| Deletions | 475 |
| Moved from | 7 |
| Moved to | 7 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 1255 |