Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| BOMBARDIER INC., <br><br> Plaintiff, <br><br> v. <br><br> MITSUBISHI AIRCRAFT CORPORATION, MITSUBISHI AIRCRAFT CORPORATION AMERICA INC., AEROSPACE TESTING ENGINEERING & CERTIFICATION INC., MICHEL KORWIN-SZYMANOWSKI, LAURUS BASSON, MARC-ANTOINE DELARCHE, CINDY DORNÉVAL, KEITH AYRE, AND JOHN AND/OR JANE DOES 1-88, <br><br> Defendants. | No. 2:18-cv-01543-JLR <br><br> BOMBARDIER INC.'S REPLY TO DEFENDANT MITSUBISHI AIRCRAFT CORPORATION'S OPPOSITION TO BOMBARDIER INC.'S UPDATED MOTION FOR PRELIMINARY INJUNCTION AGAINST MITSUBISHI AIRCRAFT CORPORATION, MARC-ANTOINE DELARCHE, AND KEITH AYRE <br><br> **NOTE ON MOTION CALENDAR:** <br> **MAY 17, 2019** |

BOMBARDIER INC.'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (2:18-cv-01543-JLR) - i

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT .................................................................................................................. 1

    A. The Documents and Information at Issue Constitute Trade Secrets ....................... 1

        1. The Subject Documents Are Not Bombardier's Only Trade Secrets Or Even The Only Trade Secrets At Issue In This Litigation ............................... 1

        2. Bombardier's Certification Roadmap Is A Trade Secret .......................................... 2

        3. The Information in the Subject Documents Constitutes Trade Secrets..................... 2

        4. Bombardier Has Standing............................................................................3

    B. MITAC Acquired and Used the Subject Documents .................................................. 3

        1. MITAC's Reliance Upon A Stated Policy Of Respecting Other Parties' Trade Secrets Is Unavailing................................................................................3

        2. MITAC's Search For Bombardier Documents Was Inadequate At Best ............... 5

    C. Bombardier's Trade Secrets Have Enormous Value to MITAC ............................. 6

        1. That The MRJ Is Different From Bombardier's C-Series Is A Red Herring............................................................................................................. 6

            a. Bombardier's Flap Skew Detection Information Has Value to MITAC ............................................................................................................. 7

            b. Bombardier's Type Certification Reports Have Value to MITAC .................. 7

            c. Regulations Apply Equally to C-Series, Global 7000/8000, and MRJ ............................................................................................................ 8

        2. Bombardier Documents Have Value in JCAB Certification.................................... 8

            a. Bombardier's Trade Secrets Assist in FAA, TCCA, JCAB, and EASA Certification ............................................................................................. 8

            b. MITAC's Argument That Certification Experience With Certifying Authorities Other Than JCAB Is Detrimental Defies Common Sense ............................................................................................................... 9

            c. The Number of Employees And Documents Is Irrelevant ............................. 10

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - ii

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

    D.    The Harm To Bombardier Is Real, Imminent And Irreparable ............................ 10

        1.    The Irreparable Harm To Bombardier Is Imminent Absent Injunction ............... 10

        2.    Bombardier Did Not Unduly Delay By Respecting Due Process ........................ 11

    E.    A Private Agreement Does Nothing Except Beg For More Protracted Litigation. ........................................................................................................... 11

    F.    MITAC's Remaining Arguments Undermine Prior Arguments .......................... 11

III.    CONCLUSION ............................................................................................................. 12

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - iii

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

# TABLE OF AUTHORITIES

**Cases**

*BladeRoom Group Ltd. v. Facebook, Inc.*, 219 F. Supp. 3d 984, 990 (N.D. Cal. 2017)............3

*Cascade Fin. Corp. v. Issaquah Community Bank*, C07-1106Z, 2007 WL 2871981 (W.D. Wash. Sept. 27, 2007)....................................................................................................5

*Earthbound Corp. v. MiTek USA, Inc.*, No. C16-1150 RSM, 2016 WL 4418013 (W.D. Wash. Aug. 19, 2016) ................................................................................................................2

*Nat'l City Bank, N.A. v. Prime Lending, Inc.*, 737 F. Supp. 2d 1257 (E.D. Wash. 2010)..........4

*Pate v. Bodega Latina Corp.*, CV15-4228-GHK (AGRX), 2015 WL 12661924 (C.D. Cal. July 30, 2015) ...............................................................................................................5

*United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016) ..............................................................2

**Statutes**

18 U.S.C. § 1839(4)....................................................................................................................3

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - iv

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

## I. INTRODUCTION

Nothing in the Opposition of Mitsubishi Aircraft Corporation ("MITAC") diminishes the fact that Bombardier has made a clear showing of the following: (1) Bombardier owns trade secrets embodied in the 11 documents forming the basis of this preliminary injunction motion; (2) it has a likelihood of success on the merits of this litigation; (3) it is suffering and will continue to suffer irreparable harm; and (4) the public interests of fair competition and public safety favor granting the injunction. The requested injunction is warranted and proper.

## II. ARGUMENT

### A. The Documents and Information at Issue Constitute Trade Secrets

The documents and information Bombardier has placed at issue in this matter qualify for trade secret protection. MITAC's arguments to the contrary lack merit.

#### 1. The Subject Documents Are Not Bombardier's Only Trade Secrets Or Even The Only Trade Secrets At Issue In This Litigation

As an initial matter, it is imperative to note that Bombardier has moved for a preliminary injunction seeking to bar MITAC and its affiliates from using only 11 specific documents and the information derived therefrom ("the Subject Documents"). (*See generally* Updated Mot. for Preliminary Injunction, Dkt. # 146.) Those 11 documents may be the only Bombardier trade secrets that are subject to the instant preliminary injunction motion, but they are far from the entire universe of Bombardier trade secrets and far from the only trade secret documents at issue in this litigation. Bombardier's decision to seek preliminary relief based only on 11 documents now known to have been improperly acquired and believed to be in use does not mean this lawsuit is limited to those 11 documents. Indeed, Bombardier expects to uncover numerous additional documents and things that embody or contain Bombardier trade secrets, all of which will become pertinent to this litigation.

Discovery is not yet open. Bombardier's formal investigation is incipient. Much remains to be learned, and Bombardier expects to identify quite a few more trade secrets which have been misappropriated. However, the urgency of imminent, irreparable harm has

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 1

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

compelled Bombardier to move forward on what it currently knows, seeking preliminary relief as to the 11 documents that constitute the most obvious instances of misappropriation.

**2. Bombardier's Certification Roadmap Is A Trade Secret**

Contrary to MITAC's repeated argument, and as this Court has already acknowledged, compilations of otherwise publicly available information can be trade secrets. "[T]he compilation of publicly available data can be a trade secret, even if that data is publicly available in more than one place." (Dkt. # 111, at 16-17 (citing *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016)).) Such is the case here. The Subject Documents are the culmination of decades of certification know-how which is not generally known. That information includes compilations of business data such as aircraft configuration, flight test profiles, applicable regulatory sections and data assumptions required for certification that were compiled by Bombardier over decades of certification efforts, and forms part of Bombardier's playbook for obtaining certifications. (Burns Decl., Dkt. # 5, ¶¶ 3-26; Tidd Decl., Dkt. # 7, ¶¶ 2-7; First Amended Complaint ("FAC"), Dkt. # 143, ¶¶ 24, 68.) This is the type of information that the DTSA and WUTSA are intended to safeguard. *See Earthbound Corp. v. MiTek USA, Inc.*, No. C16-1150 RSM, 2016 WL 4418013, at *10-11 (W.D. Wash. Aug. 19, 2016) (finding plaintiff's compilations of business data protectable trade secrets under both the DTSA and WUTSA and granting injunction).

**3. The Information in the Subject Documents Constitutes Trade Secrets**

Each of the Subject Documents meets the criteria for proprietary compilations of business data (trade secret subject matter) even though some of that business data may be the identification of certain publicly available regulations or other public documents. For example, Mr. Dan Burns, Bombardier's Senior Director for Product Integrity, painstakingly reviewed each of the Subject Documents and specifically identified how the particular data compiled and synthesized in each would not be readily ascertained without access to those documents. (*See* Burns Decl., Dkt. # 5, ¶¶ 3-26.) MITAC's argument that it has not been notified of exactly what trade secrets are at issue simply defies reason. The Subject

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 2

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Documents show how to navigate clean-sheet certification for each of several components and systems of a new airplane. (Burns Decl., Dkt # 5, *passim*.) As MITAC knows only too well after a decade of futility, the pathway to certification is far from obvious using publicly available information alone. Bombardier's Subject Documents provide an extraordinary advantage in the certification process and qualify as protectable trade secret subject matter.

### 4. Bombardier Has Standing

MITAC's argument that Bombardier does not own its trade secrets is meritless. (Opp'n, Dkt. # 165, at 11.) Bombardier did not transfer its trade secrets with the C-Series program as alleged by MITAC. Just because Bombardier used its trade secrets in certifying the C-Series aircraft does not make them an asset of the C-Series. The trade secrets apply across multiple types of aircraft.

Even if Bombardier did transfer some of its trade secret rights as MITAC contends (and they did not), even MITAC admits that such a transfer was only partial because Bombardier continues to own an interest in those trade secrets. Tellingly, MITAC cites no authority for the proposition that 100% ownership of a trade secret is necessary for standing. Contrary to MITAC's argument, a license alone is sufficient for standing. *See, e.g.*, 18 U.S.C. § 1839(4) (defining "owner" as including a person with license to the trade secret); *see also BladeRoom Group Ltd. v. Facebook, Inc*., 219 F. Supp. 3d 984, 990 (N.D. Cal. 2017)). For those reasons, Bombardier has standing to bring this suit.

## B. MITAC Acquired and Used the Subject Documents

MITAC's argument that it has neither acquired nor used Bombardier's trade secrets also lacks merit.

### 1. MITAC's Reliance Upon A Stated Policy Of Respecting Other Parties' Trade Secrets Is Unavailing

MITAC's position that it never wanted anything to do with the Subject Documents is belied by the evidence. MITAC's certification efforts were failing badly. (FAC, Dkt. # 143, ¶¶ 36-50.) It had suffered delay after delay with no end in sight. (*Id*.) MITAC was desperately

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 3

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

recruiting engineers with certification experience to try and salvage a project years behind schedule and billions of dollars over budget. (*Id.* ¶¶ 51-58.) There is undisputed, and in most cases confirmed, evidence that several former Bombardier employees improperly retained the Subject Documents which all coincide exactly with the new duties of those employees now working on MRJ certification. (*See* Order, Dkt. # 136, at 17 ("[t]hese trade secrets also relate to the exact reason that [the Corporate Defendants] recruited these employees").) And MITAC's argument in defense now, against the overwhelming tide of evidence to the contrary, is that its senior management has adopted a policy to not use the trade secrets of other companies. (Opp'n, Dkt. # 165 at 12 (citing *Nat'l City Bank, N.A. v. Prime Lending, Inc.*, 737 F. Supp. 2d 1257, 1267 (E.D. Wash. 2010)).)

MITAC's implausible argument is unavailing. If simply adopting a policy against using the misappropriated trade secrets of others were sufficient to defeat a showing of a likelihood of success on the merits of a trade secret misappropriation claim, preliminary injunctions could be avoided with a wink and a nod, so long as corporate employers instructed their personnel to refrain from misappropriating trade secrets.

Here, MITAC misstates facts and disregards other uncontroverted evidence of misappropriation, including that the individual defendants retained unauthorized copies of marked Bombardier proprietary information years after their departure from Bombardier; that they went to work on the MRJ project in the same roles they occupied while at Bombardier; that they had no reason in the final weeks, days, and hours of their employment with Bombardier to retain copies of those documents for any legitimate reason; that at least some individual defendants still have possession, custody, and control of their unauthorized copies of the Subject Documents; and that those individual defendants continue to work on MRJ certification. These facts are uncontroverted and drastically undermine MITAC's positions.

Even more damaging to MITAC is the fact that the evidence of record contradicts its position now. Without the cloud of litigation over its head, MITAC's Team Leader of Ice Protection Systems for the MRJ, Mr. Koki Fukuda, reached out to Keith Ayre while still a

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 4

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Bombardier employee with direct, technical, certification-related questions which Mr. Fukuda was happy to receive. (*See* FAC, Dkt. # 143, ¶ 78.)

Against this backdrop, MITAC's declarations claiming that none of the Subject Documents are in MITAC's possession or being used is simply unavailing. For example, MITAC submits the declaration of Hiroyuki Morino, a department Manager at MITAC, for the proposition that he has never seen anyone using Bombardier documents on his team. (Morino Decl., Dkt # 176 at ¶ 8.) However, Mr. Morino also states that he has "never seen a Bombardier production flight test profile" (*id.* ¶ 8), so he would be unable to testify as to whether his team had ever relied upon information *derived from* Bombardier test profiles or other documents. Under these circumstances, Mr. Morino's testimony should be given little to no weight. *See, e.g., Cascade Fin. Corp. v. Issaquah Community Bank*, C07-1106Z, 2007 WL 2871981, at *15 (W.D. Wash. Sept. 27, 2007) (giving little weight to "self-serving" declarations submitted in opposition to motion for preliminary injunction). *Pate v. Bodega Latina Corp.*, CV15-4228-GHK (AGRX), 2015 WL 12661924, at *5 (C.D. Cal. July 30, 2015) (finding that motion for preliminary injunction opponent's "self-serving and ambiguous statements … hold little weight").

**2. MITAC's Search For Bombardier Documents Was Inadequate At Best**

MITAC's argument—that it is not in possession of any of the Subject Documents or the information contained therein—is also founded upon an alleged "search" specifically for the Subject Documents residing on select MITAC computer servers and/or laptops. (Opp'n, Dkt. # 165, at 12.) That argument is fatally flawed for numerous reasons.

First, the supposed "search" performed by MITAC appears to have been carefully orchestrated *not* to find any Bombardier documents. For example, MITAC never involved Bombardier in that search or elicited any input from Bombardier regarding how that search should be performed. MITAC never even asked Bombardier to suggest search terms that could be used to locate the Subject Documents on MITAC's computing systems. Even now, MITAC fails to explain its search methodology or even when such searches were performed.

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 5

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

It appears from the declaration of Hajime Kanja that the *contents* of files residing on MITAC servers were not even searched, only the file *names*. (*See* Kanja Decl., Dkt # 171, ¶ 3.)

Even more troubling, the search terms allegedly used by MITAC's search team are woefully inadequate. (*See id.* at Exhibit A (listing 23 search terms used).) Tellingly, MITAC's purported search for Bombardier confidential documents on its servers did not even use obvious search terms like "BOMBARDIER" or "CONFIDENTIAL" or "PROPRIETARY." Any legitimate electronic search would not have omitted these obvious search terms. It appears that the terms MITAC searched were carefully selected to avoid finding anything damaging. And even employing these best efforts, they still uncovered that Defendant Cindy Dornéval affirmatively uploaded to her personal MITAC laptops Bombardier's BM7002.02.15.02 – Flight Performances.pdf (Exhibit A to the Declaration of David Tidd, Dkt. # 8). (Declaration of Duc Nguyen, Dkt. # 178, ¶ 7.)

### C. Bombardier's Trade Secrets Have Enormous Value to MITAC

#### 1. That The MRJ Is Different From Bombardier's C-Series Is A Red Herring

MITAC misguidedly contends that any information contained in the documents at issue would not be useful on the MRJ project. (Opp'n, Dkt. # 165, at 3.) The contention strains credulity for a host of reasons. First, it assumes that the documents at issue pertain only to Bombardier's C-Series aircraft, an assumption dispelled at least in part by the documents themselves. (*See*, *e.g*., Burns Decl., Dkt. # 5, ¶ 5 (identifying Bombardier information pertaining to its "Global 7000/8000 and [] CRJ" aircraft, the latter directly competitive with the MRJ).) Second, it mistakenly ignores the potential application of the information to aircraft in general. (*See id.* ¶¶ 7, 12, 15, 18, 20 (explaining the value of the information to anyone seeking to certify an aircraft, not just a regional jet); *see also* Borfitz Decl., Dkt. # 88, ¶¶ 11-17, 19-20, 22, 24, 28, 33; Waterhouse Decl., Dkt. # 89, ¶ 25.) Third, it ignores the realities of aircraft certification, as well as party admissions concerning the same. (FAC, Dkt. # 143, ¶ 35 (noting that Defendant Korwin-Szymanowski and an officer of MITAC are quoted as stating "It's almost impossible to understand the full certification

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 6

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

criteria for an aircraft, if one has not been through it once or twice."); *see also* Waterhouse Decl., Dkt. # 89, ¶¶ 14-16.) MITAC would have the Court believe that unless certification information contained in the documents at issue can be applied without modification to a different aircraft, it would have no value. Even MITAC's own experts deny such a conclusion. (*See* Boyd Decl., Dkt. # 77, ¶ 64(g).)

### a. Bombardier's Flap Skew Detection Information Has Value to MITAC

MITAC's argument that the trade secrets surrounding Bombardier's flap skew detection systems ("SDS") would have no value to MITAC is incorrect and misguided. The dissimilarity between the systems is irrelevant because "the regulations do not envision types of flap actuation systems in a manufacturer's design. Rather, the regulatory standards provide the minimum standards that must be met for a given design." (*See* Borfitz Decl., Dkt. # 88, ¶ 19.) Indeed, "the MRJ and Global 7000 flap and flap skew systems are considered equal by the regulations and the methods of compliance will certainly be similar if not identical," and it would be "relatively simple to translate the SDS compliance plan from the Global 7000 to the MITAC MRJ." (*Id.*)

### b. Bombardier's Type Certification Reports Have Value to MITAC

MITAC's argument that the MRJ's use of a "pitot-static" system different from Bombardier's is also flawed. As Bombardier's technical expert Nigel Waterhouse explained, "whether MITAC could use this data to obviate its own need for testing is not the point. [The RAA-BS503-414 and RAA-BA500-414-RevA type certification documents] provide at least an approved point of reference for the certification of aircraft pitot static systems. They provide a certification basis, a method, approved results, a report structure and format that is known and accepted by the regulatory authorities. Use of these reports save MITAC the effort of compiling this information themselves." (Waterhouse Decl., Dkt. # 89, ¶ 46.)  This alone provides tremendous value to MITAC in certification efforts.

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 7

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

### c. Regulations Apply Equally to C-Series, Global 7000/8000, and MRJ

Bombardier's expert Mr. Michael Borfitz testified that for purposes of CFR Part 25, Bombardier's C-Series and Global 7000/8000 and MITAC's MRJ are to be treated similarly. (*See* Borfitz Decl., Dkt. # 88, ¶¶ 10-13.) Additionally, "[t]here are several official FAA guidance documents that clearly state similarity is an acceptable means of compliance (MOC). Any data obtained by one manufacturer from another may be used to obtain certification credit regardless of how that data was obtained. Based on this alone, it can be shown that the Bombardier Documents are extremely useful and valuable to MITAC." (Waterhouse Decl., Dkt. # 89, ¶ 23.)

### 2. Bombardier Documents Have Value in JCAB Certification

#### a. Bombardier's Trade Secrets Assist in FAA, TCCA, JCAB, and EASA Certification

MITAC again makes the argument that the Subject Documents are of no use with any certifying agency other than the TCCA. (Opp'n, Dkt. # 165, 2-5.) That argument is flatly false. It is widely known in the aviation industry that "[t]here is a current Part 25 bilateral agreement with [TCCA], and the FAA recognizes and accepts [TCCA's] certifications." (Borfitz Decl., Dkt. # 88, ¶¶ 14-15.) It is similarly known that JCAB accepts FAA certifications and heavily relies upon FAA regulations. (*Id.* ¶ 15 ("a Japanese applicant can literally copy a proposed certification plan from a Canadian applicant and present that plan to the JCAB with little or no modification, and reasonably expect that plan to be accepted, because both regulators refer directly to the FAA requirements as a common source"); *see* Japan Bilateral Aviation Safety Executive Agreement, available at https://www.faa.gov/aircraft/air_cert/international/bilateral_agreements/baa_basa_listing/media/Japan_Executive_Agreement.pdf. *See also* FAC, Dkt. # 143, ¶ 34 (identifying uniform standards applicable across FAA, TCCA, and JCAB).)

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 8

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

### b. MITAC's Argument That Certification Experience With Certifying Authorities Other Than JCAB Is Detrimental Defies Common Sense

Through its Head of Certification Management Office ("CMO"), Andrew Telesca, MITAC argues that experience certifying airplanes before the other certifying agencies around the world is not only unhelpful, it is in fact a detriment to certification before the JCAB. (Opp'n, Dkt. # 165, at 4; Telesca Decl., Dkt. # 175, ¶ 12.) That statement not only defies the evidence, it defies common sense. MITAC, together with MITAC America and AeroTEC, advertised extensively in search of engineers who had experience in aircraft certification. (FAC, Dkt. # 143, ¶¶ 51-58.) The JCAB has not certified a clean-sheet aircraft in half a century. (Declaration of John D. Denkenberger, Dkt. #143-1, Ex. 36). Accordingly, the only engineers alive with aircraft certification experience who MITAC could recruit are necessarily those with experience certifying aircraft before agencies other than the JCAB. Common sense dictates that if non-JCAB certification experience is a detriment, MITAC would not continue to recruit engineers with such experience.

In addition, Mr. Telesca, (again, the Head of MITAC's Certification Management Office), tells a very different story to the media than he does to this Court. When speaking publicly—without the motivation of litigation behind his statements—Mr. Telesca says "working closely with the JCAB and the FAA will help make certification with aviation authorities in other countries a much smoother process." (Decl. of John D. Denkenberger ¶ 2, Ex. A.) "Having the FAA on board at the same time [as the JCAB] makes things more efficient." (*Id*.)

Finally, MITAC's argument that the JCAB is being more stringent and requiring MITAC to "return to core aeronautical principles" to achieve certification (Opp'n, Dkt. # 165, at 4-5; Telesca Decl. Dkt. # 175, ¶ 13) actually suggests a *greater* need for use of documents detailing precisely how certification can be achieved; documents like those taken from Bombardier which detail exactly the principles which need be proven to achieve certification.

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 9

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Notwithstanding MITAC's unsubstantiated arguments to the contrary, certification experience before the TCCA and the FAA is by far the most relevant and valuable experience to MITAC's certification efforts at the JCAB. That is why MITAC has been recruiting those engineers. It is MITAC's ***actions*** in recruiting Bombardier personnel and obtaining Bombardier information, not MITAC's arguments, that reveal the true value of Bombardier's trade secret information to MRJ certification.

### c. The Number of Employees And Documents Is Irrelevant

MITAC attempts to diminish the value of Bombardier's information by suggesting that the number of trade secrets misappropriated by MITAC and its affiliates is *de minimis*. MITAC misses the point. The number of documents at issue has no bearing on the overall value of those documents. For example, and by no means limiting, one document misappropriated by Cindy Dornéval and stored on a MITAC America computer—by MITAC's own admission (Nguyen Decl., Dkt. # 178, ¶ 7)—represents the standard used for the CRJ-900 Computerized Airplane Flight Manual ("CAFM") and contains the complete methodology used to derive and develop the performance parameters for not only the CRJ-900, but also *for all new and future Bombardier aircraft designs*. (*See* Tidd Declaration, Ex. A, Dkt. # 8, at 1.) "To be clear, there is a large volume of significant information contained within the [document] that is proprietary to Bombardier beyond [] cited examples. Just a quick glance at the CAFM Methodology, or any document containing the information within the CAFM Methodology, would readily demonstrate that it is obviously the result of extraordinary investments in time and resources in design, development, and testing." (Tidd Decl., Dkt. # 7, ¶ 5.) This hardly constitutes *de minimis* misappropriation.

### D. The Harm To Bombardier Is Real, Imminent And Irreparable

MITAC's argument that Bombardier will not suffer irreparable harm is without merit.

#### 1. The Irreparable Harm To Bombardier Is Imminent Absent Injunction

Public pronouncements uniformly put MITAC's anticipated date for certification of the MRJ at mid-2019. (FAC, Dkt. # 143, ¶ 49.) MITAC's anticipated certification window is

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 10

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

therefore now open. If the MRJ reaches its goal of certification before an injunction issues, then the injury to Bombardier is complete. Money damages will be insufficient to remediate the damage in value to Bombardier's once proprietary trade secrets.

### 2. Bombardier Did Not Unduly Delay By Respecting Due Process

MITAC's opposition papers reveal much about its culture of eschewing the proper for the expedient. MITAC actually criticizes Bombardier for (1) filing this lawsuit here in the proper jurisdiction rather than "trying" to file somewhere else, and (2) pursuing service under the Hague Convention as the Federal Rules require rather than trying to bypass proper service. (Opp'n, Dkt. # 165, at 21.) MITAC actually argues that Bombardier's "strategy" of properly following the rules resulted in "unnecessary delay." (*Id*.) Bombardier can hardly be criticized for honoring the due process rights of the Defendants, particularly when it was MITAC that unnecessarily delayed proceedings by repeatedly refusing to waive service under the Hague Convention—even when its lawyers were already participating in this case. (*See* Declaration of John D. Denkenberger, Dkt. # 107, ¶¶ 2-4.)

### E. A Private Agreement Does Nothing Except Beg For More Protracted Litigation.

MITAC makes much ado about the fact that it has already offered to abide by the terms of the proposed injunction by private agreement, but again MITAC misses the point. Bombardier needs the power of an injunction, and the threat of contempt sanctions, to properly dissuade MITAC from using Bombardier's trade secrets. A private agreement, rather than a clear and narrowly tailored court order, would only invite more litigation as the parties battle privately over intentional "misunderstandings" about the breadth and scope of the agreement. The power and clarity of a court order, not publicity, is needed to ensure timely and complete compliance by MITAC.

### F. MITAC's Remaining Arguments Undermine Prior Arguments

MITAC's argument concerning the impermissible vagueness and overbreadth of the proposed terms of the preliminary injunction contradicts all its other arguments. On the one hand, MITAC admits that it was ready to privately abide by the very terms of Bombardier's

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 11

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

proposed order (Opp'n, Dkt. # 165, at 10), yet on the other it argues that those terms are unenforceably vague for a Court Order (*id*. at 22-23). MITAC fails to explain why it would know how to comport its behavior for private purposes yet lack "fair and precisely drawn notice of what the injunction" would prohibit. (*Id*.) Moreover, MITAC claims that the documents "are filled with public information," and it should not be subject to contempt for using public information contained in those documents. (*Id*.) MITAC can avoid any contempt simply by acquiring the purportedly public information contained in Bombardier's documents from public—rather than Bombardier—sources.

Additionally, MITAC cannot rationally explain how the balance of hardships favors MITAC in this instance, particularly after it has admitted that it was willing to comply with the very terms of Bombardier's proposed order in exchange for a withdrawal of Bombardier's Motion. Its "sky is falling" argument referencing potential lost MRJ sales resulting from the public announcement of an injunction is baseless. (*Id.* at 9, 22-23.)

Finally, MITAC's Bond Argument undermines its previous representations that it does not have the Bombardier information at issue, that it never used such information, that it lacks any knowledge of the information, and that the information would not be useful in any MRJ applications. If these arguments are true, then public confidence in the MRJ should remain unaffected by any injunction, and the resulting bond amount should be negligible.

## III.  CONCLUSION

For the foregoing reasons, and for the reasons identified in its Motion, Bombardier respectfully requests that the Court maintain the status quo and grant the narrowly tailored injunction requested against MITAC.

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 12

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

Dated this 17th day of May, 2019.

        CHRISTENSEN O'CONNOR
        JOHNSON KINDNESS[PLLC]

        s/ John D. Denkenberger
        John D. Denkenberger, WSBA No.: 25,907
        Brian F. McMahon, WSBA No.: 45,739
        E. Lindsay Calkins, WSBA No.: 44,127
        Christensen O'Connor Johnson Kindness[PLLC]
        1201 Third Avenue, Suite 3600
        Seattle, WA  98101-3029
        Telephone:  206.682.8100
        Fax:  206.224.0779
        E-mail:  john.denkenberger@cojk.com,
        brian.mcmahon@cojk.com,
        lindsay.calkins@cojk.com, litdoc@cojk.com

        *Attorneys for Plaintiff Bombardier Inc.*

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 13

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

**Certificate of service**

I hereby certify that on May 17, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | | |
|---|---|---|
| Jerry A. Riedinger<br>PERKINS COIE LLP<br>Email:<br>JRiedinger@perkinscoie.com<br>docketsea@perkinscoie.com<br>lshaw@perkinscoie.com<br>sporter@perkinscoie.com | Mack H. Shultz<br>PERKINS COIE LLP<br>Email:<br>MShultz@perkinscoie.com<br>docketseapl@perkinscoie.com<br>sbilger@perkinscoie.com | Mary Z. Gaston<br>PERKINS COIE LLP<br>Email:<br>MGaston@perkinscoie.com<br>docketsea@perkinscoie.com<br>jstarr@perkinscoie.com |
| James Sanders<br>PERKINS COIE LLP<br>Email:<br>JSanders@perkinscoie.com<br>RBecken@perkinscoie.com<br>docketsea@perkinscoie.com<br>jdavenport@perkinscoie.com | Shylah R. Alfonso<br>PERKINS COIE LLP<br>Email:<br>SAlfonso@perkinscoie.com<br>docketsea@perkinscoie.com | |

Attorneys for Mitsubishi Aircraft Corporation and Mitsubishi Aircraft Corporation America Inc.

| | |
|---|---|
| Richard J. Omata<br>KARR TUTTLE CAMPBELL<br>Email: romata@karrtuttle.com<br>jnesbitt@karrtuttle.com<br>swatkins@karrtuttle.com | Mark A. Bailey<br>KARR TUTTLE CAMPBELL<br>Email: mbailey@karrtuttle.com<br>jsmith@karrtuttle.com<br>mmunhall@karrtuttle.com<br>sanderson@karrtuttle.com |
| Daniel T. Hagen<br>KARR TUTTLE CAMPBELL<br>Email: dhagen@karrtuttle.com<br>ksagawinia@karrtuttle.com | |

Attorneys for Aerospace Testing Engineering & Certification Inc., Michel Korwin-Szymanowski, Laurus Basson, and Cindy Dornéval

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 14

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS
1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100

| | |
|---|---|
| James P. Savitt<br>SAVITT BRUCE &<br>WILLEY LLP<br>Email: jsavitt@sbwLLP.com<br>eservice@sbwllp.com | Jacob P. Freeman<br>SAVITT BRUCE &<br>WILLEY LLP<br>Email:<br>jfreeman@sbwLLP.com |

Attorneys for Marc-Antoine Delarche and Keith Ayre

                                               s/ John D. Denkenberger
John D. Denkenberger, WSBA No.: 25,907
Brian F. McMahon, WSBA No.: 45,739
E. Lindsay Calkins, WSBA No.: 44,127
Christensen O'Connor Johnson Kindness$^{PLLC}$
1201 Third Avenue, Suite 3600
Seattle, WA  98101-3029
Telephone:  206.682.8100
Fax:  206.224.0779
E-mail: john.denkenberger@cojk.com,
brian.mcmahon@cojk.com,
lindsay.calkins@cojk.com, litdoc@cojk.com

*Attorneys for Plaintiff Bombardier Inc.*

BOMBARDIER INC.'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
(2:18-cv-01543-JLR) - 15

CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

1201 Third Avenue
Suite 3600
Seattle, WA 98101-3029
1.206.682.8100