THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BOMBARDIER INC.,<br><br>                          Plaintiff,<br><br>v.<br><br>MITSUBISHI AIRCRAFT<br>CORPORATION, MITSUBISHI<br>AIRCRAFT CORPORATION AMERICA,<br>INC., et al.,<br><br>                          Defendants. | 2:18-cv-1543 JLR<br><br>DECLARATION OF JERRY A.<br>RIEDINGER IN SUPPORT OF<br>DEFENDANT MITSUBISHI AIRCRAFT<br>CORPORATION'S OPPOSITION TO<br>BOMBARDIER, INC.'S MOTION FOR<br>PRELIMINARY INJUNCTION<br><br>REDACTED |

I, Jerry A. Riedinger, declare as follows:

1.      I am a Partner with Perkins Coie LLP ("Perkins Coie") and one of the attorneys who has appeared in this case on behalf of defendant Mitsubishi Aircraft Corporation (MITAC). I am lead counsel for MITAC in this matter, and am responsible for supervising all aspects of the litigation.

2.      Attached as Exhibit A to this declaration is a "redline" comparison of the original, April 4, 2019 Bombardier brief supporting its motion for a preliminary injunction against MITAC (Dkt. 123) and Bombardier's Updated, May 7, 2019 brief supporting that motion (Dkt. 146).  Exhibit A was prepared by the Perkins Coie word processing staff under my supervision. It shows added material in blue, deleted material in red, and moved material in green.

DECL. OF JERRY A. RIEDINGER IN SUPPORT
OF DEFENDANT MITAC'S RESPONSE TO
PLAINTIFF'S MOTION FOR PRELIM. - 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

3.  Attached as Exhibit B to this declaration is a true and accurate copy of an April 25,

2019 email sent to me by Jeffrey Danley, at attorney at the law firm representing Bombardier,

attaching an August 24, 2016 email from Keith Ayre to himself regarding "SSA Analysis."

Exhibit B was sent to me with no confidentiality designation for the email or its attachment.

4.  Attached as Exhibit C to this declaration is a true and accurate copy of the August 24

2016 "SSA Analysis" email that was sent to me as an attachment to Exhibit B.  Bombardier has

never designated Exhibit C as confidential.

**I declare under penalty of perjury under the laws of the United States
that the foregoing is true and correct**

Executed at Seattle, WA this 13th day of May 2019.


*/s/ Jerry A. Riedinger*
Jerry A. Riedinger

DECL. OF JERRY A. RIEDINGER IN SUPPORT
OF DEFENDANT MITAC'S RESPONSE TO
PLAINTIFF'S MOTION FOR PRELIM. - 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

**CERTIFICATE OF SERVICE**

2          I certify under penalty of perjury that on May 13, 2019, I electronically filed the

3   foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of

4   such filing to the email addresses indicated on the Court's Electronic Mail Notice List.

5          DATED this 13th day of May, 2019.

6                                                          *s/Jerry A. Riedinger*
                                                           Jerry A. Riedinger, WSBA No. 25828
7                                                          **Perkins Coie LLP**
                                                           1201 Third Avenue, Suite 4900
8                                                          Seattle, WA 98101-3099
                                                           Telephone: 206.359.8000
                                                           Facsimile: 206.359.9000
9                                                          E-mail: JRiedinger@perkinscoie.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE
(No. 2:18-cv-1543 RAJ) – 1

# EXHIBIT A

**Compare of Original and Update Confidential Brief Supporting Their Motion for a Preliminary Injunction Against MITAC, Ayre and Delarche (Dkts 123 and 146)**

~~Pursuant to Federal Rule of Civil Procedure 65,~~ Plaintiff Bombardier Inc. (~~"Plaintiff" or~~ "Bombardier") ~~hereby respectfully~~ moves for a preliminary injunction against ~~Defendants Mitsubishi Aircraft Corporation ("MITAC Japan"), Mr. Marc~~ Mr. Marc-Antoine Delarche, ~~and Mr.~~ Mr. Keith Ayre (collectively, "the ~~Foreign~~ Individual Defendants~~"), and Mitsubishi Aircraft Corporation ("MITAC"~~") to enjoin them all ("All Defendants") from the ~~continued~~ use ~~and~~, disclosure, and retention (in any form) of Bombardier trade secret information, ~~as well as~~ and any information derived therefrom.

## I. ~~ISSUE PRESENTED~~

~~Whether the Foreign Defendants should be preliminarily enjoined from disclosing and/or using Bombardier Confidential and trade secret information illicitly taken and retained by former Bombardier personnel now working for, at the direction of, or for the benefit of MITAC Japan.~~ **II.** **INTRODUCTION**

The relief ~~sought by way of~~ Bombardier~~'s Motion for Preliminary Injunction ("Motion")~~ seeks arises out of ~~Defendant~~ MITAC ~~Japan~~'s multi-billion dollar, ~~nearly decade long, still continuing,~~ as yet unsuccessful effort to certify ~~and commercially deliver (or "enter into service")~~ Japan's first commercial airliner in ~~nearly~~ fifty (50) years—the Mitsubishi Regional Jet ("MRJ"). Since ~~shortly after~~ the ~~official~~ launch of the MRJ ~~project on March 28,~~ in 2008, MITAC ~~Japan has continually faltered in navigating the incredibly complex regulatory approval process to obtain the certifications necessary to commercialize the MRJ~~ has failed to navigate the complex certification process required of all new aircraft. To assist with MRJ certification, MITAC ~~Japan has enlisted the assistance of~~ retained third party ~~aviation~~ aircraft certification experts~~: such as ex-Boeing personnel; it~~ formed a U.S. subsidiary, ~~Defendant~~ MITAC America, to spearhead its efforts in the United States; and it partnered with ~~Defendant~~ AeroTEC, a company claiming to specialize in flight testing and certification processes.[1] Despite these efforts, totaling billions of dollars ~~and countless person hours, MRJ~~, certification ~~remained elusive. Over a nine-year (9) period, MITAC Japan announced no fewer than five (5) distinct and~~

---

[1] ~~Hereafter, MITAC Japan, MITAC America, and AeroTEC are referred to collectively as "the Corporate Defendants."~~

~~extraordinarily costly delays to the expected commercial availability of the MRJ~~remains elusive after no less than five delays have placed the MRJ about eight years behind schedule.

~~Though the MRJ still awaits certification, its prospects look suddenly promising. That is because on~~On the eve of ~~the MRJ's~~a fifth ~~announced~~ delay, however, MITAC and the other Corporate Defendants (MITAC America and AeroTEC) began working the certification problem in a significantly different—and legally culpable—manner. Specifically, they began targeted recruiting of ~~then current~~ Bombardier personnel —including the Individual Defendants—having experience with, and access to, Bombardier trade secret information ~~pertaining~~related to the successful certification of Bombardier aircraft. ~~Led by~~ MITAC ~~Japan, the Corporate Defendants~~ hired these individuals to assist ~~in their~~with MRJ certification efforts. MITAC, ~~and~~ together ~~all defendants~~with the other Corporate Defendants, is knowingly ~~used~~using Bombardier's trade secrets ~~in an attempt~~ to fast-track ~~MRJ~~ certification.

Bombardier's First Amended Complaint ~~and supporting papers detail and document~~, Dkt. # 143 ("FAC") details the MRJ's certification problems and associated delays ~~to commercialization~~, the targeted recruitment of ***hundreds*** ~~of~~ Bombardier personnel to assist in ~~MRJ~~the certification, and ~~Defendants'~~MITAC's sudden confidence that the ~~MRJ, including its~~ newly redesigned ~~components,~~MRJ will be certified this year despite nearly eight years of failure. Further, the ~~Complaint~~FAC establishes ~~in detail~~ that at least ~~Defendants Basson, Delarche, Dornéval, and Ayre (collectively, "~~the Individual Defendants~~")~~ misappropriated Bombardier trade secrets and confidential documents ~~pertaining~~related to its proprietary ~~aircraft~~ ~~certification processes and therefore violated their contractual obligations to Bombardier. MITAC Japan has been knowingly and willfully complicit in this conduct, and it is unjustly benefitting therefrom. Accordingly, the Foreign Defendants should be enjoined from further utilizing~~certification processes. Discovery will establish what the current evidence suggests: MITAC knew or had reason to know that the contributions of the Individual Defendants to MRJ certification efforts were based on misappropriated Bombardier trade secrets.

To prevent continued irreparable harm, and to preserve the extraordinary investment in and value of its proprietary certification processes, Bombardier requests a narrowly tailored injunction prohibiting All Defendants from the retention, disclosure, and use of Bombardier's trade secret information ~~for any purpose~~and any information derived therefrom. A balancing of the equities and public interest favor enjoining All Defendants in the limited manner Bombardier requests.

### ~~III~~II.    FACTUAL BACKGROUND

**A. The Parties**

**1. Bombardier**

Bombardier~~,~~ is a Canadian corporation headquartered in Montréal, Canada~~,~~. It generates annual revenues in excess of $16 billion ~~and currently employs over 69,000 people globally as the world's leading manufacturer of both aircraft and trains. (Complaint, Dkt. No. 1,~~ (FAC, ¶¶ 2, ~~21,~~22.) Bombardier's Aerospace division generates over half of ~~its~~Bombardier's total annual revenue~~,~~ and employs more than 29,000 personnel dedicated to setting the standard of excellence in several ~~aircraft, aircraft services, and aircraft training~~aviation markets. (*Id.* ¶ ~~22.~~23.) Since ~~its purchase of Canadair in~~ 1986, Bombardier has successfully designed, ~~developed,~~ certified, and entered into service nearly thirty ~~(30) different~~ models of aircraft, "some of which were derivative models of [previous] aircraft, while others 'were entirely new clean-sheet designs.~~'" (*Id* ¶ 33.) These efforts "demonstrate[]~~ that have demonstrated Bombardier's robust certification process.~~" (*Id.* ¶ 33.~~'" (*Id.* ¶ 35.) Bombardier's most recent success was its clean-sheet C-Series Aircraft—"a family of narrow-body, geared turbofan twin-engine, medium range jet airliners." (*Id.* ¶ 24.)

**2. MITAC ~~Japan~~ and the Other Corporate Defendants**

~~Defendant~~ MITAC ~~Japan~~ is a Japanese corporation ~~that was formed to lead the MRJ program with MITAC America. (*See*~~formed in 2008 to pursue the design, development, and commercialization of Japan's "first commercial airliner [] in about half a century, the [MRJ]." (*See* Declaration of John D. Denkenberger, Dkt. # 143-1 ("JDD Decl."), Exs. 17, 34; *see also*

MITAC America's Answer and Counterclaim ("Answer"), Dkt. No.# 105, at 2 and 75, ¶ 15.) MITAC Japan expects that the MRJ will be the "first all-new commercial jet developed in large part by a Japanese company since the 1960s" and¶ 17 (Counterclaim).) MITAC's subsidiary admitted, though, that "at the time the MRJ program was launched, few individuals in Japan possessed expertise related to the development and certification of aircraft." (Id. ¶ 17.) To help shore up this lack of expertise, MITAC JapanAnswer, Dkt. # 105, ¶ 17 (Counterclaim).) About six years into the MRJ project, after multiple delays to its design and certification schedule, and despite working with "many foreign experts, especially ex-Boeing people, to help," (See JDD Decl., Ex. 22; see also FAC, ¶ 42), MITAC began dedicating additional, U.S.-based resources to "work the MRJ problem." In June 2014, MITAC formed subsidiary MITAC America, having an office in Seattle, Washington, to assist on the MRJ project. In July 2014, MITAC also partnered with Seattle-based AeroTEC, which specializes in testing, engineering, and certification of aircraft, to attempt tomove the MRJ project forward. (Id. ¶ 18.Answer, Dkt. # 105, ¶ 18 (Counterclaim).) In August 2015, MITAC opened its Seattle Engineering Center ("SEC") where its personnel work with AeroTEC to advance MRJ commercialization. (FAC, ¶ 43.) However, AeroTEC alone could not provide the necessary knowledge and experience to proceed with certification. To acquire the necessary certification expertise, MITAC Japan, MITAC America, and AeroTEC all worked hand-in-hand to recruit individuals for the MRJ project. (See, e.g., Answer, Dkt. No.# 105, ¶¶ 17-22.) Indeed,22 (Counterclaim).) Defendant AeroTEC has admitted that it "openly solicited Bombardier employees, who most likely would have had authorization to access confidential information as part of their jobs." (AeroTEC Reply In Support of Motion to Dismiss, Dkt. No.# 95, at 6.)In response to these recruitment efforts, Bombardier put the Corporate Defendants on notice of the confidentiality obligations of current and former Bombardier employees several times throughout 2015 to 2017. (See, e.g., October 2015 letter to AeroTEC, Dkt. No. 1-11; April 2016 letter to AeroTEC, Dkt. No. 1-12, at 13; August 2016 Letter to Mitsubishi Heavy Industries ("MHI"), Dkt. No. 1-16; January 2017 letter to MHI, Dkt. No. 1-17; February 2017 letter to MITAC Japan, Dkt. No. 1-18.)

~~Nevertheless, the Corporate Defendants continued to recruit Bombardier employees for the improper purpose of learning Bombardier's trade secrets. (*See, e.g.,* e-mail addressed to "Fukuda-san" from K. Ayre, Dkt. 1-27, at 9.)~~ The Corporate Defendants now expect MRJ certification by mid-2019 and ~~MRJ commercialization~~delivery by mid-2020. (~~Complaint, Dkt. No. 1,~~FAC, ¶ ~~47.~~49.)

MITAC, MITAC America, and AeroTEC form a seamless entity to certify and commercialize the MRJ. The Corporate Defendants have boasted of this relationship: "Once a flight test [in Moses Lake] has been performed, there's a debrief in the afternoon where results are reviewed and data is prepared for transmission to Japan. As the day progresses, Nagoya wakes up and the cycle beings anew." (*Id.* ¶ 84.) Thus, "[r]ather than two teams working separately from opposite sides of the world, the MRJ operation has evolved and come together as one team." (*Id.*)

Targeting Washington to form this team was no accident. As one MITAC executive noted, "The reason we had delays for this program is that we didn't have any experience in how to get certification," but in Washington, "there are a lot of experienced people," including those at AeroTEC. (*See* JDD Decl., Ex. 7.) Information, computers, and even employees are shared between the MITAC entities and AeroTEC. For example, Delarche recently worked for AeroTEC before leaving to work for MITAC in Japan, and the President of MITAC America, Hirofumi Takahashi, also serves as a "Manager Corporate Planner" for MITAC. (FAC, ¶¶ 8, 86.) Korwin-Szymanowski, a former Bombardier employee, helped to staff MITAC America's facilities after he started working for AeroTEC. (FAC, ¶ 54.) AeroTEC employees Basson and Delarche (when employed by AeroTEC) also use MITAC America's laptops and save their work product on a server that AeroTEC shares with MITAC America. (*See* Read Decl., Dkt. # 67, ¶ 6; Nguyen Decl., Dkt. # 79, ¶ 7.) The SEC was "formed" and "jointly staffed" by the three entities to facilitate their joint efforts on the MRJ's "flight testing, development, and certification in the United States." (*See* FAC, ¶ 44.)

**3. The Individual Defendants**

The Individual Defendants are former Bombardier employees who, within months, weeks, and days of their departures from Bombardier, retained unauthorized copies of proprietary Bombardier certification information in violation of their contractual obligations. (*Id.* ¶¶ 69-70, 74-76.) The proprietary and trade secret information taken by the Individual Defendants relates to their responsibilities at their new employer(s) for the MRJ project.

These actions violate provisions within the Code of Ethics that each Individual Defendant agreed to honor while at Bombardier, and Delarche even did so as a condition of employment on his first day of work. (*See id.* ¶¶ 69, 74.) The Code of Ethics expressly forbids employees from divulging Bombardier's confidential information to any unauthorized person and requires employees to maintain the confidentiality of such information at all times, even after leaving Bombardier. (*Id.*)

   a.   ~~Defendant Laurus Basson~~

~~Upon information and belief, Defendant Laurus Basson still serves as a Mechanical Systems Engineer (Flight Control Systems) at AeroTEC in Seattle and who until March 4, 2016, was a Senior Engineering Specialist (Flight Control Systems) at Bombardier. (*See* Denkenberger Decl., Ex. 2, Dkt. No. 1-10.) AeroTEC, in furtherance of MITAC Japan's certification of the MRJ, actively recruited Defendant Basson to work on the MRJ project. (*See, e.g.*, Answer, Dkt. No. 105, ¶¶ 17-22.)~~

~~On March 4, 2016, his last day of work, Defendant Basson without authorization sent an email from his Bombardier work email account to his personal "Yahoo" email account attaching copies of two (2) proprietary Bombardier PowerPoint slide decks entitled, "TCCA Skew Detection Presentation- Updated with latest Systems and Structure Limits 16-02-01.pptx" and "2016-03-03 TCCA Skew Detection Presentation JAN 28 FINAL.pptx." (*See* Complaint, Dkt. No. 1, ¶ 60.) The information contained in these files is marked as proprietary Bombardier information and discloses details of Bombardier's proprietary aircraft certification processes. (Declaration of Daniel Burns ("Burns Decl."), Dkt. No. 5, ¶¶ 3-7.)~~

   b.   ~~Defendant Cindy Dornéval~~

~~Defendant Cindy Dornéval is a current Aircraft Performance Engineer at AeroTEC who until February 10, 2017, had the same title at Bombardier. (Denkenberger Decl., Ex. 4, Dkt. No. 1-10.) On November 18, 2016, Defendant Dornéval without authorization sent an email from her Bombardier work email account to her personal email account attaching copies of four (4) proprietary Bombardier documents, including two (2) entitled, "FTP PROD CSeries Rev 5.0 – 17 November 2016.docx" and "FTP PROD CSERIES Rev 5.0 – 17 November 2016.pdf." (*See* Complaint, Ex. O, Dkt. No. 1-24.) These documents were marked as proprietary Bombardier information. (Burns Decl., Dkt. No. 5, ¶¶ 21-25.) These documents disclose Bombardier's proprietary processes related to obtaining a Certificate of Airworthiness required for commercial aircraft delivery post-certification. (Burns Decl., Dkt. No. 5, ¶ 22.)~~

~~In addition, on February 10, 2017, her last day at Bombardier, Defendant Dornéval without authorization attempted to send Bombardier's proprietary Computerized Airplane Flight Manual ("CAFM") Calculation Methodology, entitled "BM7002.02.15.02 – Flight Performances.pdf," from her work email to her personal email. (*See* Complaint, Ex. Q, Dkt. No. 1-26.) This document is expressly marked as proprietary Bombardier information and discloses methodologies and other information underlying Bombardier's proprietary CAFM, a computerized version of an Airplane Flight Manual, which is necessary to obtain a Certificate of Airworthiness. (Declaration of David Tidd ("Tidd Decl."), Dkt. No. 7, ¶¶ 2-7.)~~**c.** **Defendant Marc-Antoine Delarche**

~~Defendant~~ Marc-Antoine Delarche is ~~a current~~<ins>an</ins> employee of MITAC ~~Japan who until recently had been working for AeroTEC, after~~<ins>,</ins> having worked <ins>most recently</ins> as an ~~Engineering Specialist for~~ Aircraft Performance <ins>Engineer at AeroTEC, and until May 2016, held a similar position</ins> at Bombardier ~~until May 18, 2016. (Denkenberger Decl., Ex. 3, Dkt. No. 1-10.) On May 6, 2016, Defendant Delarche without authorization~~ ~~and~~<ins>. (JDD Decl., Exs. 3-4.) Three days</ins> *after* tendering his ~~notice of~~ resignation ~~from Bombardier on May 3~~ <ins>notice,</ins> <ins>Delarche without authorization</ins> sent an email from his Bombardier ~~work~~ email account to his personal email account attaching copies of six ~~(6)~~ proprietary Bombardier documents entitled,

"RAA-BA503-412 Reduction of Temperature, Airspeed, Altitude  and    Mach  Number

Errors.pdf";    "RAA-BA503-414                         Lag_Effects_in_the_Production_

and_Experimental_Pitot-Static_Systems.pdf";          "RAA-

BA503-418 Data Reduction of Ground Position Errors.pdf," "RAA-BA500-412 Rev A -

Reduction  of  Temperature,  Airspeed,  Altitude  and  Mach  Number  Errors.pdf";

"RAA-BA500-414-RevA-Lag _Effects _in _the_ Production _and _Experimental_ Pitot-Static

_Systems.pdf"; and "RAA-BA500-418_signed.pdf." (*See* ~~Complaint~~FAC, Exs. ~~L~~N-~~M~~O, Dkt.

Nos. ~~1-21, 1-22.~~143-14, 143-15.) The  information  contained  in  these  files  is  marked  as

proprietary Bombardier information and discloses details of ~~Bombardier's~~its proprietary

aircraft certification processes. (Burns Decl., Dkt. ~~No.~~# 5, ¶¶ 8-20.)

### ~~d.~~ **b.** Defendant Keith Ayre

Defendant Keith Ayre is a current Project Manager at MITAC ~~Japan~~, who until August

2016 ~~had~~ worked as an aerospace engineer at Bombardier. (~~Denkenberger~~JDD Decl., Ex. ~~5,~~6,

Dkt. ~~No. 1 10.~~# 143-1.) ~~On~~In July ~~11,~~ 2016, ~~Defendant~~ Ayre sent from his Bombardier ~~work~~

email account to his personal email account ~~an email with~~ revisions to a MITAC ~~Japan~~ job

description he ~~would~~ ultimately accept~~ed~~. (~~Complaint~~FAC, Ex. ~~R~~S, Dkt. ~~No. 1 27,~~# 143-19, at

5.) While still employed by Bombardier, ~~Defendant~~ Ayre began assisting MITAC ~~Japan~~ with

MRJ certification. ~~Specifically, on~~On August 18, 2016, ~~Defendant Ayre forwarded a series of~~

~~"brief answers to [MITAC Japan's] questions..." regarding FAR25.1419 (e) (h) concerning~~

~~aircraft certification. (Complaint, Ex. R., Dkt. No. 1 27, at 9.) Further, on August 24, 2016,~~

~~Defendant Ayre forwarded to his personal email account Bombardier~~Ayre forwarded to himself

a copy of an email to a MITAC executive, Mr. Koki Fukuda, the Engineering Lead of Ice

Protection Systems for the MRJ, in which Ayre provided Bombardier trade secret information,

the details of which he was "happy to discuss" "when [he is] in the MRJ office." (FAC, Ex. S,

Dkt. # 143-1); *see also* Dkt. # 128, Ex. A (email from Ayre to Fukuda). In this correspondence,

Mr. Fukuda demonstrated a lack of understanding or awareness of the progression of the

relevant certification requirements for these systems. (*Id.*) Mr. Fukuda solicited from Ayre

while Ayre was working for Bombardier direction related to the certification process and requirements for these systems on the MRJ. Mr. Fukuda knew or should have known that the information he was soliciting, and the information he received from Ayre in response, included Bombardier confidential, proprietary, and/or trade secret information (FAC, Ex. S., Dkt. # 143-19, at 9.)

Ayre also forwarded trade secrets to himself in the days before his departure from Bombardier. Two days before his departure, Ayre emailed to his personal account a highly confidential email discussing Bombardier trade secrets that he initially received from TCCA *nearly three years earlier* concerning smoke penetration testing for Bombardier aircraft, one of Ayre's areas of responsibility at MITAC. (*Id.* at 7.) On this same day, Ayre forwarded more trade secret information ~~pertaining to proprietary equipment used to test various systems of Bombardier's aircraft for certification. (*Id.* at. 7; Complaint, Dkt. No. 1, ¶¶ 19, 49, 65.) Mr. Ayre's final day at Bombardier was two days later, August 26, 2016. (Complaint, Dkt. No. 1, ¶ 49.)~~ to his personal account. (*See* FAC, ¶ 79.)

### B. Aircraft Certification and Bombardier~~'s~~ Trade Secrets

Before ~~an aircraft manufacturer can legally produce and enter~~ commercial delivery of any aircraft ~~into service~~, ~~the~~ its manufacturer must ~~first~~ obtain ~~mandatory governmental~~ regulatory certifications deeming the aircraft ~~and its design~~ airworthy and safe for operation. (~~Complaint, Dkt. No. 1,~~ FAC, ¶¶ ~~28-32.~~ 29-34.) Navigating ~~this regulatory approval~~ the certification process ~~has been described as~~ is "one of the most frustrating, time-consuming, bureaucratically convoluted, mind-bogglingly expensive yet ultimate rewarding business ventures of all." (~~Denkenberger~~ JDD Decl., Ex. ~~14, Dkt. No. 1-10.) Even the~~ 15.) The Corporate Defendants ~~have admitted publicly~~ admit that "it's almost impossible to understand the full certification criteria for an aircraft, if one has not been through it once or twice." (*Id.* at Ex. ~~15.) Thus, it is no surprise~~ 16.) The process is so demanding that since 2000, only four ~~(4)~~ companies ~~worldwide~~ world-wide have ~~been able to develop~~ certified a clean-sheet commercial aircraft ~~program~~ in compliance with the ~~regulatory~~ requirements of the Federal Aviation Administration

("FAA"), Transport Canada (FAA's Canadian counterpart), and the European Aviation Safety Agency ("EASA," FAA's European counterpart.), (Complaint, Dkt. No.1, FAC, ¶ 27.28.) Bombardier is one of those companies; MITAC Japan is the Corporate Defendants are not. (*See id.*) As a result, Bombardier has developed a deep and up to date understanding of all three (3) these regulatory agencies and each agency's interpretation of the requirements.

In addition to successfully certifying multiple clean sheet aircraft, Bombardier is a market leader having vast experience in, and proficiency with, aircraft certification procedures. (*Id.* ¶ 33.) Since 1989, Bombardier has obtained the requisite governmental certifications for certified nearly thirty (30) different aircraft, models. While some of which models were derivative models and of previous aircraft, others of "were entirely new clean-sheet designs," thereby "demonstrat[ing." (*See* JDD Decl., Ex. 15.) This success "demonstrate[s] Bombardier's robust certification process." (*See* Denkenberger Decl., Ex. 14, Dkt. No. 1 10.*Id.*) Bombardier has dedicated countless person hours and spent billions of dollars over three (3) decades to develop, refine, and implement its proprietary regulatory certification procedures, procedures that market participants readily understand to be "the heart of each company's competitive advantage, its own special secret sauce." (*Id.*) Bombardier has gone to significant great lengths to protect these secrets, including but not limited to restricting physical and virtual. It restricts access to such information to only properly credentialed personnel — including, applying various tiers of virtual access for which the individual defendants, due to their senior increasingly restrictive access. The Individual Defendants, because of their positions, had the highest authorization — and requiring but they, like all employees, were required as a condition of employment to be bound by a Code of Ethics restricting dissemination of this information. (Declaration of Moshe Toledano, Dkt. # 10 ("Toledano Decl."), Dkt. No. 10, ¶¶ 2-7; Declaration of Nicole L'Écuyer, Dkt. # 9 ("L'Écuyer Decl."), Dkt. No. 9, ¶¶ 2-4; Complaint, Dkt. No. 1, *see also* FAC, ¶¶ 19, 60-65 20, 68-76; Complaint FAC, Ex Exs. D & M, Dkt. No Nos. 1 143-4 & 143-13.)

**C.** ~~The Corporate Defendants' Failure to Certify the~~ **MRJ Delays and Subsequent Targeted Recruiting of Bombardier Personnel**

The MRJ program has been delayed numerous times. When ~~the program was~~ officially launched ~~on~~in March ~~28,~~2008, the MRJ was projected to enter into service ~~some time~~ in 2013. (~~Denkenberger~~JDD Decl., Ex. ~~16, Dkt. No. 1-10.) Approximately~~17.) About two ~~(2)~~ years later, that ~~date was moved~~projection slipped from 2013 to 2014. (*Id.* at Ex. ~~17.~~18.) In April 2012, ~~that date was~~it slipped again ~~moved, this time from 2014 to 2015. (*Id.* at Ex. 19.) In~~to 2015, and in August 2013, ~~that date was moved~~it slipped a third time~~,~~ to 2017. (*Id.* at ~~Ex~~Exs. ~~20.~~20, 21.) In December 2015, ~~the MRJ's planned entry into service was moved~~it slipped for a fourth time~~,~~ to 2018. (*Id.* at Ex. ~~23.~~24.) In January 2017, MITAC ~~Japan~~ announced a fifth delay, ~~this time~~ pushing the expected first commercial delivery of the MRJ to "mid-~~2020."~~2020," nearly eight years behind schedule. (*Id.* at Ex. ~~25.~~26.)

MITAC ~~Japan has~~ attributed the ~~many~~delays to its lack of experience in ~~navigating the regulatory~~ certification ~~process~~. (*Id.* at Ex. ~~20~~21 (delay attributable to MITAC ~~Japan~~'s "underestimation of the time it needed to sort out how to validate the safety of the manufacturing process"), Ex. ~~21~~22 (delay attributable to MITAC ~~Japan~~ learning "that it needed company-wide organization authorization (ODA), under which it would act on behalf of the certifying authority" and because MITAC ~~Japan~~ "had not properly documented production processes" for certification purposes); Ex. ~~6~~7 (delays stemming from the fact that MITAC ~~Japan~~ "didn't have any experience in how to get certification"), Ex. ~~23~~24 (delay due to "concerns [the MRJ] wouldn't pass certification tests"); Ex. ~~25~~26 (delay because of "revisions of certain systems and electrical configurations on the aircraft to meet the latest requirements for certification").) MITAC announced all of these delays despite: (i) working with "many foreign experts, especially ex-Boeing people, to help" with certification since at least August 2013 (JDD Decl., Ex. 22), (ii) forming MITAC America and partnering with AeroTEC by no later than July 2014 to assist with certification processes (JDD Decl., Ex. 10), and (iii) investing several billion dollars in the MRJ project to date. (JDD Decl., Ex. 36.)

~~Throughout 2015~~By late 2015, well into their multi-year certification quagmire, the Corporate Defendants turned to a known source of certification expertise—Bombardier. In

October 2015, Korwin-Szymanowski on behalf of AeroTEC and ~~2016 MITAC Japan, MITAC America (collectively, "MITAC"), and AeroTEC coordinated a campaign to recruit and hire over 200 aircraft certification system engineers to work on certification activities for the MRJ. (Answer, Dkt. No. 105, ¶¶ 19-20.) In 2016 both MITAC and AeroTEC held~~ MITAC America sent an email to 247 Bombardier email accounts advertising immediate employment opportunities to work on "the development and certification of the [MRJ]." (JDD Decl., Ex. 32.) Within the next year, MITAC and AeroTEC would both hold job fairs to recruit Bombardier personnel. ~~MITAC organized its job fair to be held on July 15-16, 2016, at a venue located~~, with AeroTEC even admitting that it "openly solicited Bombardier employees, who most likely would have had authorization to access confidential information as part of their jobs." (AeroTEC Reply In Support of Motion to Dismiss, Dkt. # 95, at 6.) MITAC held its job fair less than 1 kilometer from Bombardier's headquarters ~~(See Complaint, Dkt. No. 1, ¶ 49.) The job fair was promoted both online and in the Montréal Gazette in the weeks leading up to the event, and~~, a job fair MITAC advertised ~~that it was "looking~~ as part of its efforts "to hire over 200 Aircraft Systems Engineers who can work on Certification activities of MRJ aircraft." ~~(Denkenberger Decl., Ex. 28, Dkt. No. 110.) AeroTEC's job fair was held on October 23-24, 2015, in Wichita, Kansas—home of Bombardier's Flight Test Center in the United States—with the aim of interviewing candidates to work on the MRJ project in Seattle, Washington. (See Complaint, Dkt. No. 1, ¶¶ 49-50.) AeroTEC specifically targeted Bombardier employees in part by arranging for billboards mounted on flatbed trucks advertising the job fair to be displayed immediately outside Bombardier's Flight Test Center. (See Denkenberger Decl., Ex. 29, Dkt. No. 1-10.) MITAC Japan, MITAC America, and AeroTEC all worked hand in hand to recruit individuals for the MRJ project. (See, e.g., Answer, Dkt. No. 105, ¶¶ 18-22.) All told, as far as Bombardier is presently aware~~ See FAC, ¶ 51; see also JDD Decl., Ex. 29.) As a result of these and other efforts, the Corporate Defendants hired ~~approximately 100~~ at least 92 former Bombardier employees, including the Individual Defendants. (See ~~Complaint, Dkt. No. 1,~~ FAC, ¶ ~~59.~~ 67.)

### D. Bombardier's **Subsequent** Efforts to Avoid Litigation

Bombardier ~~had actively and~~ frequently corresponded with the various Defendants ~~in an effort~~ to avoid ~~the need for litigation since becoming aware of the Corporate Defendants' targeted recruitment of Bombardier personnel in late 2015. (Complaint, Dkt. No. 1, ¶¶ 52-58.) Specifically,~~litigation. (FAC, ¶¶ 58-64.) Bombardier notified ~~Defendant~~Korwin-Szymanowski ~~in his individual capacity, Defendant~~, AeroTEC, ~~Defendant~~and the MITAC ~~Japan, and even~~entities, including MITAC's ~~corporate parent, MHI, at various times~~parent corporation, through their officers and counsel of the impropriety of their targeted recruiting of Bombardier personnel and of the obligation to respect and preserve the confidentiality of Bombardier proprietary information which was now at risk of being misappropriated and used by the Corporate Defendants. (*Id.*) ~~Further exhibiting MITAC Japan's direction in these matters, MITAC Japan's outside counsel corresponded with Bombardier in March 2017 regarding Bombardier's request that the Corporate Defendants cease their apparent attempt to learn Bombardier's trade secrets through Bombardier's current and former employees. (*See, e.g.*, Answer, Dkt. No. 105, ¶¶ 41-43.)~~Notwithstanding Bombardier's repeated attempts to resolve its concerns with the Corporate Defendants amicably, Bombardier was forced to file suit ~~particularly to preserve the secrecy and value of its trade secret information. The following claims are now pending against MITAC Japan: Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836 *et seq.* (Count I); Violation of the Washington Uniform Trade Secrets Act ("WUTSA") RCW 19.108.010 *et seq.* (Count II); and Tortious Interference with Contractual Relationship and/or Business Expectancy (Count VII). Additionally, the following claims are pending against Messrs. Delarche and/or Ayre: Violation of the DTSA (Counts XIII and XXII); Violation of the WUTSA ("WUTSA") RCW 19.108.010 (Counts XIV and XXIII); and Breach of Contract (Count XV)~~.

~~IV~~III. ARGUMENT

### A. Applicable Legal Standards

#### 1. Preliminary Injunction Standards

"A ~~plaintiff~~party seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. ~~Natural~~Nat. Res. ~~Def.~~Defense Council, Inc.*, 555 U.S. 7, 20 (2008~~) (citing Munaf v. Geren, 553 U.S. 674, 689~~90 (2008)~~). In the context of ~~a claim for~~ trade secret misappropriation, "~~[a]ctual~~actual or threatened misappropriation may be enjoined," (RCW 19.108.020; *see also* 18 U.S.C. § 1836(b)(3)(A)(i)), and therefore ~~mere~~ "threats of disclosure . . . of ~~. . .~~[] trade secrets (future misconduct) [can] constitute[] irreparable injury justifying injunctive relief by the court." *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1204 (E.D. Wash. 2003)~~(explaining justification for injunctive relief in trade secret misappropriation context)~~.

   **2.** ~~Parent Subsidiary Liability~~**Trade Secret Misappropriation Standards~~**

   ~~It is well settled that the alter ego test can be used to impute liability of a subsidiary to a parent or vice versa. *See, e.g.*, *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070 71 (9th Cir. 2015); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 600 (Del. Ch.), *aff'd sub nom, ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010); *Miles Inc. v. Cookson Am., Inc.*, No. CIV.A. 12,310, 1994 WL 676761, at \*19 (Del. Ch. Nov. 15, 1994); *Landstar Inway Inc. v. Samrow*, 181 Wash. App. 109, 126 (2014); *E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 675 (D. Del. 2018); *see also Minton v. Ralston Purina Co.*, 146 Wn.2d 385, 396 98 (2002). Similarly, an employer may be vicariously liable for trade secret misappropriation by its employees. *See, e.g.*, *Thola v. Henschell*, 140 Wash. App. 70, 78 (2007) ("But we agree with the majority of jurisdictions addressing the issue and conclude that one may violate the UTSA vicariously and be held responsible for such violation.").~~

   ~~3.~~ **Trade Secret Misappropriation Standards**

   The DTSA and WUTSA both provide a cause of action for trade secret misappropriation, and the DTSA further requires that the trade secrets relate to products used or intended for use in interstate or foreign commerce. 18 U.S.C. § 1836(b)(1). Each defines trade

secrets similarly: "financial, business, scientific, technical, economic, or engineering information" that the owner has taken reasonable measure to keep secret, and that "derives independent economic value . . . from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *See* 18 U.S.C. § 1839(3)(A)(B); RCW 19.108.010(4). Both also define "misappropriation" similarly to include:

> (A)    acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B)    disclosure or use of a trade secret of another without express or implied consent by a person who—
> (i) used improper means to acquire knowledge of the trade secret;
> (ii)    at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
> (I) derived from or through a person who had used improper means to acquire the trade secret;
> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> (III)    derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that [.]
> (I) the trade secret was a trade secret; and
> (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5)(A)(B); RCW 19.108.010(2). "Improper means" under the DTSA and WUTSA "includes theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6); RCW 19.108.010(1).

**B. Bombardier Is Likely to Succeed on the Merits of its Trade Secret Misappropriation Claims Bombardier is more than likely to succeed on the merits of its trade secret misappropriation claims.** Bombardier has developed and owns trade secrets—particularly with respect to aviation its certification processes—that were acquired through improper means by the Individual Defendants through improper means. Further, Bombardier will more than is likely

to prove, as ~~circumstantial~~current evidence already strongly suggests, that the Individual Defendants~~, including Messrs. Delarche and Ayre,~~ have disclosed these trade secrets to ~~the Corporate Defendants~~MITAC for ~~their~~its use, and that ~~the Corporate Defendants, including~~ MITAC ~~Japan, have~~has acquired and ~~already~~ used this information knowing (or at least having reason to know) that ~~the information~~it was Bombardier's and was acquired through improper means.

### 1. Bombardier Has Developed and Owns Trade Secret Information

The certification information Bombardier~~'s Aerospace division~~ has ~~compiled,~~ developed~~,~~ and protected over ~~the last three (3)~~ decades ~~pertaining to the regulatory approval process the~~ information misappropriated by the ~~d~~Defendants—qualifies for trade secret protection under federal and state law. Bombardier~~'s Complaint~~ identifies specific files that the ~~individual defendants wrongfully acquired in their final weeks, days, and even hours at Bombardier~~Individual Defendants stole before departing Bombardier to work on the MRJ ~~project. (Complaint, Dkt. No. 1, ¶¶ 58-62.) Additionally, as detailed above~~FAC, ¶¶ 64-71.) Also, Bombardier "has taken reasonable measures to keep such information secret," and the information "derives ~~independent~~ economic value ~~....~~[] from not being ~~generally~~ known to, and not being readily ascertainable through proper means~~,~~" by~~,~~ the Corporate Defendants. 18 U.S.C. § 1839(3)~~(A)(B).~~; *(see also* FAC, ¶¶ 100, 101, 112, 113.)

### a. The Substance of the Information at Issue Qualifies as Trade Secrets

The information contained in the files identified in the ~~Complaint~~FAC as misappropriated (*see* ~~Complaint, Dkt. No. 1, ¶¶ 60-67, 165-169, 174-178, 188-192, 197-201, 211-215, 220~~224, ~~261-265, 270-274~~FAC, ¶¶ 68-80, 200-204, 209-213, 223-227, 232-236, 246-250, 255-259, 298-302, 307-312) qualifies for trade secret protection under both federal and Washington law. The ~~highly technical~~ information at issue ~~was~~includes compilations of business data, such as aircraft configuration, flight test profiles, applicable regulatory sections and data assumptions required for certification that were compiled by Bombardier over decades ~~as a result of its successful~~of certification ~~of nearly thirty (30) clean sheet and/or derivative~~

~~programs over thirty (30) years~~efforts, and forms part of Bombardier's playbook for obtaining ~~mandatory regulatory aircraft~~ certifications. (Burns Decl., Dkt. ~~No.~~# 5, ¶¶ 3-26; Tidd Decl., Dkt. ~~No.~~# 7, ¶¶ 2-7; ~~Complaint~~FAC, Dkt. ~~No. 1,~~# ¶¶ ~~23, 60.~~24, 68.) This is ~~precisely~~ the type of information that the DTSA and WUTSA is intended to safeguard from misappropriation. *See Earthbound Corp. v. MiTek USA, Inc.*, No. C16-1150 RSM, 2016 WL 4418013, at *10-11 (W.D. Wash. Aug. 19, 2016) (finding plaintiff's compilations of business data protectable trade secrets under both the DTSA and WUTSA and granting TRO, using preliminary injunction standard, enjoining defendants from use of plaintiff's data).

**b.  Bombardier Has Taken ~~Sufficient~~Reasonable Measures to Protect Its Trade ~~Secret Information~~Secrets**

Bombardier's proprietary information has been the subject of reasonable efforts to maintain its secrecy. ~~As an initial matter, all of the~~The material contained in the documents and files identified ~~with specificity~~ in the ~~Complaint is clearly and legibly~~FAC are marked as Bombardier proprietary information that was not to be shared with unauthorized personnel. (Burns Decl., Dkt. ~~No.~~# 5, ¶¶ 5, 11, 14, and 23; Tidd Decl., Dkt. ~~No. 7, ¶ 5.) To the extent that any information was not expressly marked as Bombardier proprietary information, the individual defendants knew that the information they disclosed would be considered proprietary Bombardier information that was not to be shared with unauthorized personnel. (Complaint, Dkt. No. 1, ¶¶ 49, 60-67.~~# 7, ¶ 5.) The Individual Defendants should have known that other material, including confidential correspondence with certifying authorities, included Bombardier trade secret and/or confidential information. (*See* FAC Dkt. # 143, ¶ 76, FAC Ex. S, Dkt. # 143-19.) Additionally, ~~as noted above,~~ Bombardier requires ~~all~~ employees to abide by its ~~published~~ Code of Ethics, which ~~expressly~~(1) defines "Confidential Information" to include the type of information at issue here; (2) forbids employees from distributing ~~"Confidential Information"~~such information to unauthorized personnel~~, expressly~~; (3) cautions against "transmitting confidential documents by electronic devices [except] when it is reasonable to believe this can be done under secure conditions~~,~~"; and ~~expressly~~(4) states that "~~[e]mployees~~Employees agree to maintain such confidentiality at all times, even after leaving

the employ of Bombardier." (L'~~ÉcuyerDecl~~Écuyer Decl., Dkt. ~~No.~~# 9, ¶¶ 3-4; *see also* ~~Complaint~~FAC, Ex. D, Dkt. ~~No. 1-13,~~# 143-4, at 14-~~15~~15.~~)~~. Each of the Individual Defendants declared that they had read the Code of Ethics and agreed to ~~be bound by~~ its terms. (*See* ~~Complaint~~FAC, Exs. K, ~~N~~L, ~~P~~Q, ~~R~~S, Dkt. Nos. ~~1-20, 1-23, 125, and 1-27.~~143-11, 143-12, 143-17, and 143-19.) Further, Bombardier ~~restricts physical~~allows access to confidential information ~~to~~only to properly credentialed individuals. (Toledano Decl., Dkt. ~~No.~~# 10, ¶¶ 2-3.) Bombardier likewise restricts virtual access to sensitive information, including the information ~~specifically~~ identified in the Complaint, and has multiple tiers of access, with the ~~most~~highest level of access being reserved ~~solely~~ for the most senior technical employees—like the ~~i~~Individual ~~d~~Defendants. (*Id.* ¶¶ 2-7; *see also* ~~Complaint, Dkt. No. 1,~~FAC, ¶¶ ~~65-66.~~76-78.) Thus, Bombardier has ~~made "efforts that are~~ taken "reasonable measures under the circumstances to maintain [the] secrecy" of its trade secret information.~~"~~ RCW 19.108.010(4)(b); *see~~ also~~* 18 U.S.C. § 1839(3)(A); *see also Earthbound ~~Corp. v. MiTek USA, Inc.,~~* No. CV 16-7223 DMG (JPRx), 2017 WL 2919101, at *11 (C.D. Cal. Feb. 10, 2017),~~ 2016 WL 4418013, at *5, 21 n.3* (granting preliminary injunction under the DTSA and WUTSA based on reasonable measures to maintain secrecy including restricting access to information despite employer failing to require employees to sign confidentiality agreements).

### c. The Information at Issue Has Significant Value and Is Not Readily Ascertainable through Proper Means

~~As noted above, the~~The information at issue has significant value because it relates to the data, processes, strategies, analysis, and methods Bombardier employs to obtain ~~regulatory~~ certification for its aircraft or which Bombardier uses after certification ~~to streamline~~for commercial delivery ~~of its aircraft~~. These types of information are "the meat and potatoes of new airplane development," they comprise "the heart of each company's competitive advantage," and companies possessing this type of information "are not about to reveal the recipe." (~~Denkenberger~~JDD Decl., Ex. ~~14,~~15, Dkt. ~~No. 1-10.~~# 143-1.) And because Bombardier has invested billions of dollars ~~spanning~~ over ~~three (3)~~ decades to develop~~,~~ ~~improve,~~ and refine its certification processes, its information unquestionably holds value.

(Burns Decl., Dkt. ~~No.~~# 5, ¶ 26; *see also* ~~Complaint, Dkt. No. 1, ¶¶ 23-26, 33, 65.~~FAC, ¶¶ 24-27, 35, 76.)

~~Further, the Bombardier~~The information at issue is also not readily ascertainable through proper means by another who can obtain economic value from its disclosure or use. As noted by the Corporate Defendants ~~themselves~~, "it's almost impossible to understand the certification criteria for an aircraft, if one has not been through it once or twice." (~~Denkenberger~~JDD Decl., Ex. 16, Dkt. ~~No. 1-10, Ex. 15.) This much is also evidenced by the fact that since 2000 only four (4) companies world-wide have successfully certified a clean-sheet aircraft with FAA, EASA, and Transport Canada (Complaint, Dkt. No. 1, ¶ 27); by the fact that MITAC for nearly a decade has attempted and~~# 143-1.) For nearly a decade, MITAC has failed to obtain ~~requisite~~ certifications for the MRJ. (*~~id.~~*FAC, ¶¶ ~~35~~37~~-48); and by the fact that~~50.) MITAC's explanation for ~~those~~its failures is ~~because~~ it "didn't have any experience in how to get certification." (~~Denkenberger~~JDD Decl., Ex. 7, Dkt. ~~No. 110, Ex. 6~~# 143-1). With the assistance of the information misappropriated by the ~~i~~Individual ~~d~~Defendants, the Corporate Defendants will ~~likely save at least~~obtain economic value because they will save hundreds of millions of dollars in flight-testing alone and avoid ~~several~~ years~~'~~ of delay in the certification process because ~~the information is, again, part of~~ Bombardier's ~~certification playbook and~~information identifies, ~~among other things, the~~*inter alia,* specific types of flight tests, applicable regulations, and data that regulators have previously approved for certification. (Burns Decl., Dkt. ~~No.~~# 5, ¶ 26; ~~Complaint, Dkt. No. 1, ¶¶ 23-26, 33, 65.~~FAC, ¶¶ 24-27, 35, 76.) As such, the Bombardier information wrongfully obtained by the ~~i~~Individual ~~d~~Defendants constitutes trade secret information.

## 2.   The Individual Defendants Misappropriated Bombardier Trade Secrets

Each of the ~~individual defendants, including Messrs. Delarche and Ayre,~~Individual Defendants knowingly and without authorization retained ~~personal~~ copies of highly sensitive ~~Bombardier~~ trade secret information pertaining to Bombardier's certification of ~~various Bombardier~~its aircraft~~, including its C Series. (Complaint, Dkt. No. 1, ¶¶ 19, 49, 60-67,~~

~~165-169, 174-178, 188-192, 197-201, 211-215, 220-224, 261-265,270-274, Exs. J, L, M, O, Q,~~ (FAC, ¶¶ 20, 51, 68-80, 200-204, 209-213, 223-227, 232-236, 246-250, 255-259, 304-309, 314-319, Exs. J, N, O, P, R, S, Dkt. Nos. ~~1-19, 1-21, 1-22, 1-24, 1-26, 1-27.~~143-10, 143-14, 143-15, 143-16, 143-18, 143-19.) Each did so in ~~express~~ contravention of the confidentiality obligations incurred under both Canadian law and Bombardier's Code of Ethics, and each did so within weeks, and days~~, and even hours~~ of their ~~planned and voluntary~~ departure from Bombardier to begin work on the MRJ ~~project~~. (*Id.*; *see also* ~~Complaint,~~FAC, ¶ 176 and Exs. K, N L, P Q, ~~R Dkt. Nos. 1-20, 1-23, 1-25, 1-27.) Moreover, because Bombardier's Code of Ethics expressly instructed the individual defendants to maintain Bombardier's information in confidence subsequent to their departure, the individual defendants acquired such information under circumstances giving rise to a duty to maintain its secrecy. (Complaint, Ex. D, Dkt. No. 1-13, at 15.) Thus, the individual defendants~~S Dkt. Nos. 143-11, 143-12, 143-17, 143-19.) Moreover, the trade secret information taken by the Individual Defendants coincides with the very reason that MITAC recruited these employees, namely to further MRJ certification after a decade-long failure. (FAC, ¶¶ 69-70, 74-79.) The Individual Defendants knew or should have known—based on their years of experience and positions at Bombardier, their signed acknowledgement to the Code of Ethics, and/or the Confidentiality markings on the documents themselves—that these documents contained trade secrets. (*Id.*)

This evidence shows that the Individual Defendants not only had the motive and opportunity to improperly acquire and use Bombardier's trade secrets, but also took affirmative steps to improperly acquire these trade secrets before joining MITAC and the other Corporate Defendants in the same or similar positions as they previously held at Bombardier. The Individual Defendants also used improper means to acquire the trade secrets by sending the information to their personal email accounts just before going to work on the MRJ. (*See* FAC, ¶¶ 69-70, 76.) The Individual Defendants took these illicit actions and used improper means because they would no longer have access to the information as Bombardier employees. Accordingly, the Individual Defendants' acquisition, and any subsequent disclosure or use, of

the documents they retained this information is quintessential trade secret misappropriation. *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (granting TRO injunction and finding plaintiff likely to succeed prevail on the merits of its DTSA and California trade secret claims because "Defendant[s] e-mailed and downloaded, to [their] personal devices, confidential information from [Plaintiff] before leaving . . . [] to work at a competitor" despite having signed signing confidentiality agreements); *Henry Schein, Inc. v. Cook*, No. 16 CV 03166 JST, 2016 WL 3418537, at *5 (N.D. Cal. June 22, 2016) (preliminarily enjoining defendant's use of misappropriated trade secrets based on same actions. Under these circumstances, Bombardier is likely to show that the Individual Defendants misappropriated its trade secret information. *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 973 (9th Cir. 1991) (affirming grant of preliminary injunction under the Oregon UTSA because, "[a]s a practical matter, it would be difficult for a person developing the same technology for two clients not to use knowledge gained from the first project in producing the second").

**3.** ~~Currently Available Evidence Strongly Suggests that the Individual Defendants Have Wrongfully Disclosed, and that the Corporate Defendants Have__ MITAC Knowingly and__ Wrongfully Acquired and Used, Bombardier's the Trade Secrets**

Currently available The evidence shows that the individual defendants disclosed and/or MITAC has acquired and used Bombardier trade secret information following their departure from Bombardier for purposes of advancing the MRJ project in further contravention of their ongoing duty to maintain the secrecy of that information. Such evidence also shows that the Corporate Defendants have at least wrongfully acquired, if not illicitly used, Bombardier knowing that this information was wrongfully obtained by Bombardier's former employees, including the Individual Defendants. The wrongful acquisition and use of Bombardier's trade secret information. As noted above, the Corporate Defendants have is evidenced by the timeline of the development and certification of the MRJ. MITAC delayed the certification and delivery schedule of the MRJ aircraft no less than five (5) times since such that the project began a decade ago. (Complaint, Dkt. No. 1, is nearly eight years behind schedule.

(FAC, ¶¶ ~~35-48.~~37-50.) The first four ~~(4)~~ delays were incurred prior to the arrival of any ~~individual defendant at AeroTEC~~Individual Defendant at the Corporate Defendants, and none of ~~the first four (4)~~those delays were coupled with ~~any~~an announcement of a redesign to the MRJ. (*See id.* ¶¶ ~~35-45.) Defendant~~37-47.) Basson ~~then~~ left Bombardier for AeroTEC in March 2016, taking ~~with him~~ unauthorized ~~personal~~ copies of Bombardier Confidential and trade secret information ~~pertaining to~~about aircraft certification. (*Id.* ¶ ~~60.) Defendant~~68.) Delarche did likewise two ~~(2)~~ months later. (*Id.* ¶ ~~61.) Similarly, Defendant~~69.) Ayre left Bombardier at the end of August 2016, but not before he collected Bombardier's trade ~~secret information~~secrets to take with him to MITAC ~~Japan~~. (*Id.* ¶¶ ~~49, 65-67.~~51, 76, 78-79.) Indeed, in the final days of his employment with Bombardier, ~~Defendant~~ Ayre gathered Bombardier trade secret information contained in confidential correspondence from years earlier, stemming from his fiduciary service to Bombardier as a Design Approval Designee. (*Id.*)

~~Just five (5)~~Seven months thereafter, ~~in January 2017,~~ MITAC announced its fifth ~~and most recent~~ delay, but this time it ~~coupled its announcement with the unexpected news that it was changing direction in the MRJ design. (Complaint, Dkt. No. 1, ¶ 47.) The MRJ redesign, MITAC explained, was for purposes of facilitating MRJ certification. (Id. ¶ 48.) Despite~~was to redesign the MRJ to facilitate certification. (*Id.* ¶¶ 49, 50.) MITAC further stated that the redesigned MRJ would be certified by mid-2019 despite failing to certify the MRJ's original design after nearly eight ~~(8) years of failures, MITAC in January 2017 suddenly and unequivocally informed the public of a confidence that the MRJ, with its newly redesigned components, will be certified within two and a half years. One month later, Defendant Dornéval left Bombardier to take a comparable role in the Corporate Defendants' MRJ certification effort. Before leaving, however, Defendant Dornéval maintained contact with the Corporate Defendants during her final months at Bombardier and misappropriated Bombardier Confidential and~~ ~~trade secret~~ ~~information in her final weeks -- *and evidence strongly suggests even in her last few hours* -- of Bombardier employment. (Id. at ¶¶ 62-64.)Shortly after these recruitment efforts began paying off particularly with Defendants Basson, Delarche,~~

~~Ayre,~~years of continuous effort. With the arrival of the Individual Defendants along with Basson and later Dornéval, ~~arriving~~ with Bombardier trade secret information in hand~~—~~, the Corporate Defendants publicly and confidently forecasted MRJ certification by mid-2019, even though that would require certifying the brand-new MRJ redesigns within a fraction of the time it would otherwise take. Under these circumstances, Bombardier will ~~more than likely prevail in establishing that the individual defendants disclosed and used Bombardier Confidential and trade secret information. *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 973 (9th Cir. 1991) (affirming grant of preliminary injunction under the Oregon UTSA because, "[a]s a practical matter, it would be difficult for a person developing the same technology for two clients not to use knowledge gained from the first project in producing the second").~~ ~~Bombardier will also~~ more than likely prove that the Corporate Defendants not just wrongfully acquired, but also illicitly used, Bombardier trade secret information, knowing that this information had been misappropriated. *See* ~~*id.*~~*Lamb-Weston,* 941 F.2d at 973 (finding circumstantial evidence sufficient to support that defendant knew that its newly hired consultant would utilize misappropriated trade secrets from that consultant's former employer, the plaintiff, when defendant hired consultant to design a similar device).

The wrongful acquisition and use of Bombardier's trade secret information is also evidenced by the circumstances giving rise to, and the close connection between, MITAC and the other Corporate Defendants. MITAC was established to work on the MRJ, and it formed MITAC America to further develop and certify the MRJ. (*See* FAC, ¶¶ 37, 43.) The MITAC entities engaged AeroTEC to further the certification efforts for the MRJ, and these three corporations then jointly staffed the SEC to assist with "flight testing, development, and certification" of the MRJ. (*Id.* ¶ 44) MITAC and the other Corporate Defendants jointly worked on the MRJ with an "all hands on deck" effort, freely sharing resources, information, and employees, and enlisting the assistance of third-party aviation experts, and still could not successfully certify the initial design of the MRJ. (JDD Decl., Ex. 24.) These three entities also jointly recruited Bombardier personnel with experience in clean-sheet aircraft certification of similar types of aircraft to join the MRJ certification effort. (FAC, ¶¶ 51-53.) Thus, based on this inferential chain, Bombardier is likely to prove that any trade secret information obtained by any one of MITAC or the Corporate Defendants was likely transmitted to the others.

Bombardier is also likely to show that MITAC and the other Corporate Defendants had the requisite knowledge based on the constant communication, overlapping resources and personnel, and close coordination between these entities. As MITAC executives have repeatedly

emphasized, the MRJ operations of MITAC and MITAC America have "evolved and come together as one team" such that data and work performed in the United States is sent to Japan at the end of the work day for further processing. (FAC, ¶ 84.) At least some employees, such as Mr. Takahashi, are employed by both MITAC and MITAC America *at the same time*, and other employees, such as Delarche, freely transfer between MITAC, MITAC America, and AeroTEC. (*See* FAC, ¶¶ 8, 86.) In addition, the three entities jointly staff the SEC, allowing the employees of all three to work side-by-side, exchanging data and other information, as everyone works towards certifying the MRJ. (FAC, ¶ 44.) In this instance, Bombardier has both identified employees at MITAC (*e.g.*, Mr. Ayre and Mr. Delarche) and AeroTEC (*e.g.*, Ms. Dornéval and Mr. Basson) who misappropriated Bombardier's trade secrets and identified at least some of the trade secret information that they took. Based on the present situation in which the employees of the three entities freely and routinely share information, Bombardier is likely to show that the Corporate Defendants shared not only trade secret information but also the knowledge that the information was improperly obtained, thereby satisfying the knowledge element for MITAC.

Even more compelling, Bombardier brought its concerns regarding trade secret misappropriation directly to the attention of MITAC. In June 2016, Bombardier contacted Luke Walker, legal counsel for MHI, regarding the solicitation of Bombardier certification employees to work on the MRJ. (*See* FAC, ¶ 60.) Mr. Walker responded that he would look into these issues with "the MITAC legal department," which represents the interests of both MITAC and MITAC America. (*Id.;* Dkt. # 107, ¶ 3 (MHI counsel represents MITAC America).) Bombardier sent additional correspondence to MHI, and by extension MITAC and MITAC America, regarding its concern over MITAC and "its subsidiar[y]" MITAC America "acquiring proprietary information belonging to Bombardier to accelerate the development and entry into service of the MRJ aircraft." (*See* FAC, ¶¶ 61-64; FAC Ex. I, Dkt. # 143-9 at 2.) Bombardier informed MITAC and MITAC America of the specific areas of trade secrets that might be at issue (*e.g.*, "certification requirements") and the specific people, including MITAC employee Keith Ayre, who were potentially in possession of these trade secrets. (FAC, ¶ 65.)

Bombardier's President and CEO sent correspondence to MHI's Chairman of the Board expressing a concern that the former Bombardier employees "will use the intellectual property owned by Bombardier." (*Id.* ¶ 65; FAC Ex. H, Dkt. # 143-8 at 2.) Thus MITAC—through Bombardier's correspondence with their legal departments and senior executives and their corresponding duty to investigate—should have known well before Bombardier itself that Bombardier trade secrets were being misappropriated by the several key employees who possessed them.

MITAC also used improper means to elicit trade secret information from Bombardier's employees, providing another basis on which Bombardier is likely to show misappropriation by MITAC. For example, Mr. Koki Fukuda was knowingly viewing and using confidential, proprietary and trade secret information that he solicited in the scope of his employment with and for the benefit of MITAC from Ayre, who was employed by Bombardier at the time as a Design Approval Designee, a position of tremendous trust. (FAC, ¶ 78.) This trade secret information related to the certification efforts of the MRJ. (*Id.*) Mr. Fukuda, based on his position at MITAC and the fact that he was corresponding with a Bombardier employee, knew or should have known that the information he received included Bombardier's trade secrets that Ayre should not have been disclosing. (*Id.*)

Bombardier will likely prove that MITAC wrongfully acquired and used Bombardier's trade secret information knowing that information had been improperly obtained. *See Lamb-Weston, Inc.*, 941 F.2d at 973 (finding circumstantial evidence sufficient to show that defendant knew its new consultant would use misappropriated trade secrets from consultant's former employer when defendant hired consultant to design a similar device). The evidence suggests that but for the wrongful individual disclosure and corporate acquisition of Bombardier's trade secrets, MRJ certification would remain elusive for far longer than MITAC now projects. Discovery in these proceedings will establish as much.

**4.** ~~The Evidence Already Conclusively Establishes Threatened Trade Secret Misappropriation by The Foreign Defendants~~***Respondeat Superior* Makes MITAC Liable for Its Employees' Acts**

MITAC is liable for its employees' misappropriation through the doctrine of *respondeat superior*, under which "an employer is vicariously liable for the torts of its employees committed within the scope of employment." *See SolarCity Corp. v. Pure Solar Co.*, No. 16-01814-BRO, 2016 WL 11019989, *5 (C.D. Cal. Dec. 27 2016). "[C]onduct will be considered within the scope of employment when it is performed, at least in part, to benefit the employer, though the employer may forbid it." *Id.* The Individual Defendants, who both work for MITAC, acted within the scope of their employment for the benefit of MITAC when they used Bombardier's trade secret and Confidential information to assist in the MRJ certification. Indeed, certifying the MRJ was the very reason that MITAC hired the Individual Defendants, and the certification of the MRJ was the very reason that MITAC was founded. (FAC, ¶¶ 37, 51, 102, 114.) Moreover, MITAC's certification efforts were nearly eight years behind schedule by the time that MITAC announced its latest delay. (FAC, ¶ 49.) MITAC, therefore, was under tremendous pressure from its parent MHI to finally deliver on this over-budget and behind schedule project. To address this pressure, MITAC targeted its hiring of former Bombardier certification personnel, and at least some of these personnel, and in particular the Individual Defendants, used Bombardier's certification trade secrets within the scope of their employment to the benefit of MITAC as part of MITAC's principal functions of certifying and commercializing the MRJ, as discussed above. (FAC, ¶¶ 37, 51, 102, 114.) Thus, MITAC, under the *respondeat superior* doctrine, is liable for the use of misappropriated trade secrets in its employees' possession.

**5. The Evidence Establishes Threatened Misappropriation by MITAC**

Even if the evidence outlined above is insufficient to establish a likelihood that the individual defendants have already disclosed, and MITAC Japan has already acquired and/or used, Bombardier trade secret information, theThe narrow preliminary injunction Bombardier now seeks is nevertheless still appropriate, warranted, and needed. It is appropriate because under both federal and Washington state law, "the Court may grant an injunction to prevent actual or threatened misappropriation of trade secrets." *Earthbound Corp. v. MiTek USA, Inc.*, 2016 WL 4418013, at *10 11 (W.D. Wash. Aug. 19, 2016) (citing 18 U.S.C. § 1836(b)(3); RCW

19.108.020) ~~(emphasis added)~~. It is warranted because the evidence ~~noted above~~ establishes at least a threat of imminent disclosure~~, acquisition, and/~~ or use by MITAC ~~Japan~~. Specifically, the ~~i~~Individual ~~d~~Defendants wrongfully possess Bombardier trade secret information~~, they now occupy positions with the Corporate Defendants that are~~ that they took in the days and weeks before leaving Bombardier, and thus evidenced an intent to use that information. These same individuals now occupy the same or similar ~~to their previous~~ positions with MITAC as previously held at Bombardier, and ~~the~~no-doubt wishing to succeed in their new roles and help certify the MRJ, would be motivated to use the Confidential and/or trade secret information they took. Moreover, the misappropriated information would ~~on its face be invaluable to both the individual and Corporate Defendants in their sustained and as of yet unsuccessful efforts to obtain regulatory certification of the MRJ. If the individual defendants~~be invaluable in the MRJ certification efforts of the Corporate Defendants, who would be motivated to use the trade secret information to avoid additional costly delays. If the Defendants have not already disseminated Bombardier's trade secret information ~~to their employers~~ (and ~~currently available~~the evidence ~~already~~ strongly suggests that they have), the narrow preliminary injunction Bombardier ~~now~~ seeks is appropriate, warranted, and needed to prevent that ~~from happening.~~, and the resulting irreparable harm. **C. A Preliminary Injunction Is Necessary to Prevent Further Irreparable Harm** Bombardier will sustain irreparable ~~injury if the Foreign Defendants are permitted to continue benefiting~~harm if MRJ certification continues to benefit from Bombardier's trade secret information and related data, as well as information derived therefrom. ~~Specifically, unless~~Unless the ~~Foreign~~ Defendants are enjoined, Bombardier's misappropriated trade secret information ~~stands to~~may serve as the ~~very~~ foundation for a premature revival of the Japanese aircraft manufacturing industry~~as a whole~~. Recently published business news reports confirm as much. ~~(See~~ Denkenberger Decl., Ex. 35, Dkt. No. 1-10.~~:~~

> The Mitsubishi Regional Jet (MRJ) has been delayed five times and faces rising costs, yet its future as the vanguard of Japanese-built passenger jets seems assured by the corporate muscle behind it and a government set on reviving an aerospace industry dismantled after World War Two.

> . . . [T]he Japanese government's primary goal isn't to make money for [MITAC], the MRJ's manufacturer, rather it's to have the plane cement an industry revival that failed to take off half a century ago.
>
> . . . Presentation documents prepared by the ministry of Economy, Trade and Industry, seen by Reuters, see the MRJ as the first in a three-generation program stretching beyond 2060.

(JDD Decl., Ex. 36.) In other words, MITAC ~~Japan intends to leverage~~is leveraging Bombardier's ~~proprietary~~ trade secret information to certify the MRJ, which will then serve as "the foundation of a strong aerospace industry" spanning ~~for~~decades. (*Id.*) MITAC ~~Japan~~ views the MRJ "as the creation of a new industry, establishing supply chains *and a regulatory certification process*" for years to come. (*Id.* (emphasis added).)

If ~~the Foreign~~all Defendants are not enjoined from continued use of Bombardier's trade secret ~~certification~~information, ~~the irreparable harm awaiting~~ Bombardier ~~is immeasurable. Not only will Bombardier be deprived of its substantial investment made in developing and refining its proprietary certification processes, but it will also be forced to~~will be irreparably harmed. Not only will it grant Corporate Defendants an unfair head start in developing the MRJ, but it will also force Bombardier to prematurely compete with ~~literally~~ a new nation of aircraft manufacturers ~~that would otherwise not exist for at least several years to come. Permitting the Foreign Defendants to utilize.~~ The Corporate Defendants have spent nearly a decade failing to obtain the requisite certifications. Permitting the continued use of Bombardier information to accelerate the launch of not just one competing aircraft, but ~~the innumerable Japanese~~of more aircraft ~~that will~~to follow, is the ~~very~~type of irreparable harm a preliminary injunction is designed to prevent. *See Lamb-Weston~~, Inc.~~,* 941 F.3d at 974 ("An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained."). ~~*E.g., Pac. Aerospace*, 295 F. Supp. 2d at 1198 ("an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm").~~

Now that MITAC ~~Japan~~ expects to certify the MRJ in mid-2019, and has been conducting certification test flights guided by Bombardier trade secret information, time is of

the essence. (*See* ~~Complaint, Dkt. No. 1,~~FAC, ¶ ~~47-48~~49-50; *see also* Federal Aviation Administration; Special Conditions: Mitsubishi Aircraft Corporation Model MRJ–200 Airplane, Interaction of Systems and Structures, 83 Fed. Reg. 10,559 (Mar. 12, 2018) (Special Condition for the MRJ requiring certification to include analyses of "any significant nonlinearity" (including flap skew, the very subject matter Defendant Basson misappropriated from Bombardier)).) Bombardier "reasonably refrained from bringing suit until it discovered evidence indicating use"—in this case, public statements from the Corporate Defendants, as well as in the Federal Register, indicating imminent and continued use of Bombardier trade secrets. *See Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 2123560, at *~~11~~20 (N.D. Cal. May 15, 2017) (holding that it was appropriate for Waymo to file its preliminary injunction motion until it received what it believed was proof of Uber's use of its trade secrets, and that any delay did not "suggest[] a lack of urgency belying likelihood of irreparable harm"). ~~Bombardier timely sought injunctive relief against all then-served defendants on October 19, 2019. (*See* Motion for Preliminary Injunction, Dkt. No. 4.) With the Foreign Defendants now having recently appeared in this matter (Dkt. Nos. 120 and 121), injunctive relief against all defendants is proper.~~

### D.   The Balance of Equities Favors a Preliminary Injunction

~~The balance of equities likewise overwhelmingly favors the issuance of a preliminary injunction against the Foreign Defendants because Bombardier is seeking a very narrow form of relief. In particular,~~ Bombardier seeks to enjoin ~~the Foreign~~All Defendants merely from disclosing and/or using any proprietary Bombardier information that any former Bombardier employee wrongfully retained ~~after his or her departure from Bombardier~~, and from using any information subsequently derived from that information. ~~The Corporate Defendants have publicly disclosed that hundreds of personnel are currently working on the MRJ project, so temporarily curtailing the use of trade secret information four (4) individuals initially misappropriated for use on the MRJ project is hardly prohibitive. That is particularly the case here, where substantial irreparable harm to Bombardier hangs in the balance.~~Additionally,

~~enjoining the Foreign~~Enjoining All Defendants from further disclosure and/or use of Bombardier Confidential and/or trade secret information or information derived therefrom merely maintains the status quo of affairs prior to the ~~i~~Individual ~~d~~Defendants' misappropriation ~~of that information. And if none of the defendants in fact disclosed~~ If MITAC is not enjoined from continuing its work on the MRJ project, and if MITAC in fact did not disclose or use~~d~~ any Bombardier information, the injunction will have no impact at all. Bombardier's requested relief is sufficiently narrow in scope to be eminently fair to all involved. *See Henry Schein, Inc.*, 191 F.    Supp. 3d at 1077 (The "balance of hardships tips in favor of plaintiff seeking injunction when it would do no more than require Defendant to comply with federal and state ~~. . .~~ laws.") ~~(alteration in original) (~~citations and quotations omitted).

In addition, MITAC and Mr. Ayre come to this process sullied. MITAC, through its executive, Mr. Fukuda, elicited Bombardier's confidential and trade secret information from at least one Bombardier employee, Ayre, while he was still working at Bombardier. (*See* FAC, ¶ 78.) Mr. Fukuda elicited this information for MITAC to assist on the development of the MRJ. For his part, Ayre began to selectively forward Bombardier's confidential and trade secret information to Mr. Fukuda from his Bombardier email account, possibly using Bombardier's facilities and equipment, during his work day at Bombardier in the week before his departure. (*Id.*) Having already elicited trade secrets from Bombardier, and having already provided trade secret information while still a Bombardier employee, the balance of equities further weigh in Bombardier's favor. (FAC, ¶ 76, 78-79.)

### E. A Preliminary Injunction Advances the Public Interest

The issuance of a preliminary injunction against ~~the Foreign~~All Defendants in this instance also favors the public interest. "Theft of trade secrets, and allowing the thieves to retain and use the confidential information they purloined, undermines business development and stability; preventing such conduct is in the public's interest." *Earthbound Corp.*, 2016 WL ~~4418013,~~4418013 at *10. ~~*See also Henry Schein, Inc.*, 191 F. Supp. 3d at 1078 (~~"[T]he public interest is served when defendant is asked to do no more than abide by trade laws and the

obligations of contractual agreements signed with her employer. Public interest is also served by enabling the protection of trade secrets."~~)~~. *Henry Schein, Inc.*, 191 F. Supp. 3d at 1078. Moreover, any competition- related concerns are minimal as Bombardier's requested relief allows ~~all defendants~~MITAC to continue ~~development~~to develop and ~~certification of~~certify the MRJ, albeit in a proper manner. *See Waymo*, ~~2017 WL 2123560,~~ at *12~~21~~ ("[S]afeguards imposed on [the Corporate Defendants] in response to brazen misappropriation of trade secrets by its executive[s] and engineer[s] would hardly discourage *legitimate* competition in a field where intellectual property rights are important to innovation.").

### F. Any Bond Should Be Minimal

Any bond required ~~by Bombardier~~ to ~~obtain~~secure a preliminary injunction ~~in this matter~~ should be minimal. ~~As a preliminary matter,~~ Bombardier has eminently clean hands, and it should not be forced to pay a prohibitive ransom to maintain the secrecy of its invaluable proprietary information. ~~Second,~~ Bombardier is seeking injunctive relief that ~~effectively passes strict scrutiny: it~~ is narrowly tailored to protect Bombardier misappropriated proprietary information~~ that was misappropriated in very specific instances~~, and it is ~~ostensibly~~ the least restrictive means to maintain the secrecy and value of that information. Bombardier is requesting only that the ~~Foreign~~ Defendants stop any ~~continued~~ use and/or disclosure of ~~Bombardier information that was~~its misappropriated ~~by former employees~~information. Finally, and perhaps definitively, the injunction will not restrict ~~the Foreign Defendants~~MITAC in the slightest if ~~they are not continuing any disclosure or use of~~it is in fact not misappropriating Bombardier trade secret information. "[T]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *U.S. Mission Corp. v. City of Mercer Island*, No. C14-1844RSM, 2015 WL 540182, at *9 (W.D. Wash. Feb. 10, 2015) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)).

### ~~V~~IV. CONCLUSION

~~In light of the foregoing,~~ Bombardier ~~respectfully~~ requests that the Court grant Bombardier's Motion and issue the narrowly tailored preliminary injunction requested herein.

Dated this ~~4~~7th day of ~~April~~May, 2019.

### CERTIFICATE OF SERVICE

I hereby certify that on ~~April 4,~~May 7, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Document comparison by Workshare 9 on Tuesday, May 7, 2019 11:06:31 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\V-RENAC\Desktop\Current workspace\SR2360178 - Gray, John conversion and redline\2019-04-04 (123) Motion for Preliminary InjunctionAgainst Mitsubishi Aircraft Corp., Marc-Antoine Delarche, and Keith Ay.docx |
| Description | 2019-04-04 (123) Motion for Preliminary InjunctionAgainst Mitsubishi Aircraft Corp., Marc-Antoine Delarche, and Keith Ay |
| Document 2 ID | file://C:\Users\V-RENAC\Desktop\Current workspace\SR2360178 - Gray, John conversion and redline\BA Updated Second PI Motion 5-7-19.docx |
| Description | BA Updated Second PI Motion 5-7-19 |
| Rendering set | Perkins |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 396 |
| Deletions | 545 |
| Moved from | 14 |
| Moved to | 14 |

| | |
|---|---|
| Style change | 0 |
| Format changed | 0 |
| Total changes | 969 |

# EXHIBIT B

**Riedinger, Jerry A. (SEA)**

| | |
|---|---|
| **From:** | Jeffrey Danley <Jeffrey.Danley@cojk.com> |
| **Sent:** | Thursday, April 25, 2019 3:39 PM |
| **To:** | Riedinger, Jerry A. (SEA) |
| **Cc:** | John Denkenberger; Brian McMahon; BMBD-6-3764; Lindsay Calkins; Shultz, Mack H. (SEA); Gaston, Mary Z. (SEA); Sanders, James (SEA); John Whitaker |
| **Subject:** | Bombardier v. MITAC - Exhibit |
| **Attachments:** | 2016-08-24 SSA Analysis.pdf |

Jerry,

I'm working with John, Brian, and the rest of the COJK team on the Bombardier-MITAC litigation.  We plan to file the attached email as an exhibit to our First Amended Complaint.  Please let us know by no later than COB Friday whether MITAC would consider that this exhibit should be filed under seal.

Regards,

- Jeff

Christensen O'Connor Johnson Kindness PLLC

1201 Third Avenue, Suite 3600
Seattle, Washington 98101
Direct: 206.695.1717
Jeffrey.Danley@cojk.com

www.cojk.com
PRIVILEGED and CONFIDENTIAL. If you received this e-mail in error, please advise the sender and permanently delete the message, including all attachments, without copying or disclosing the contents. Thank you.

# EXHIBIT C

| | |
|---|---|
| **From:** | Keith Ayre </O=BOMBARDIERAEROSPACE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KEITH AYREC13> |
| **To:** | Keith Ayre (keithayre@me.com) |
| **Sent:** | 8/24/2016 12:57:54 PM |
| **Subject:** | SSA analysis |

Frederic,



Keith Ayre
PES and Core DAD
Environmental Systems & Occupant Safety
Bombardier Core Engineering
514-855-7775  Office
514-443-0215  Cell
Aerospace / Aéronautique

*2351 Boul. Alfred Nobel - BAN1N (M14-81-N2)*
*Montreal, QC, Canada, H4S 2A9*

**www.bombardier.com**

**BOMBARDIER**
the evolution of mobility

**CONFIDENTIALITY NOTICE** - This communication may contain privileged or confidential information. If you are not the intended recipient or received this communication by error, please notify the sender and delete the message without copying, forwarding and/or disclosing it.

**AVIS DE CONFIDENTIALITÉ** – Cette communication pourrait renfermer des informations privilégiées ou confidentielles. Si vous n'êtes pas la personne à laquelle s'adresse ce message ou si vous avez reçu cette communication par erreur, veuillez en informer l'expéditeur et supprimer le message sans le copier, le faire suivre et/ou en divulguer le contenu.